# Exhibit 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### CRYSTALLEX INTERNATIONAL CORPORATION

#### v.

### BOLIVARIAN REPUBLIC OF VENEZUELA

### (ICSID CASE NO. ARB(AF)/11/2)

I hereby certify that the attached document is a true copy of the Arbitral Tribunal's Award rendered in English and Spanish on April 4, 2016.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., April 4, 2016

**Arbitration under the Rules of the Additional Facility of the International Centre for Settlement of Investment Disputes**

**Crystallex International Corporation**

CLAIMANT

**v.**

**Bolivarian Republic of Venezuela**

RESPONDENT

**ICSID Case No. ARB(AF)/11/2**

_____

# Award

_____

*Members of the Tribunal*
Dr. Laurent Lévy, President
Dean John Y Gotanda, Arbitrator
Prof. Laurence Boisson de Chazournes, Arbitrator

*Secretary of the Tribunal*
Ms. Alicia Martín Blanco

*Assistant of the Tribunal*
Dr. Michele Potestà

*Date of dispatch to the Parties:* 4 April 2016

REPRESENTATION OF THE PARTIES

Representing Crystallex International
Corporation:

Mr. Nigel Blackaby
Mr. Alexander Wilbraham
Ms. Caroline Richard
Mr. Jeffery Commission
Mr. Carlos Ramos-Mrosovsky
Mr. James Freda
Mr. Patrick Childress
Mr. Ricardo Chirinos
Ms. Giulia Previti
Ms. Guadalupe López
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

Mr. Alexander Yanos
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482
United States of America

Mr. Eduardo Travieso Uribe
Travieso Evans Arria Rengel & Paz
Edificio Atlantic, Piso 6
Avenida Andrés Bello
Los Palos Grandes
Caracas 1060
Venezuela

Mr. Luis Guerrero
Wallis & Guerrero
Avenida Venezuela, Edificio El Samán, Piso 6
El Rosal, Chacao
Caracas
Venezuela

Representing the Bolivarian Republic of
Venezuela:

Dr. Reinaldo Enrique Muñoz Pedroza
*Viceprocurador General de la República*
Dr. Felipe Daruiz
*Coordinador Integral Legal del Despacho del
Procurador*
Av. Los Ilustres , cruce con calle Francisco
Lazo Marti - Edificio Sede Procuraduria General
de la Republica Venezuela, piso 8
Urb. Santa Monica – Caracas
Venezuela

Dr. Ronald E. M. Goodman
Ms. Mélida N. Hodgson
Mr. Kenneth Juan Figueroa
Foley Hoag LLP
1717 K Street, NW
Suite 1200
Washington, DC 20006-1238
United States of America

# TABLE OF CONTENTS

I.   Overview of the dispute ................................................................................ 1

   A.   Introduction ..................................................................................... 1

   B.   Early Developments in Las Cristinas ............................................... 2

   C.   The Conclusion of the Administrative Agreement and Mine Operation Contract in 2002 ................................................................................................ 3

   D.   The Permitting Process between 2003 and 2008 .............................. 5

      1.   The Land Occupation Permit .......................................................... 6

      2.   The Feasibility Study ..................................................................... 6

      3.   The Environmental Impact Study ................................................... 8

   E.   The Denial of the Permit in April 2008 .......................................... 11

   F.   Main Events from the Permit Denial to the MOC rescission ........... 11

   G.   The CVG's Rescission of the MOC and Crystallex's Initiation of Arbitration in February 2011 ............................................................................. 14

II.  Procedural History ......................................................................................... 16

   A.   Constitution of the Tribunal and First Session .............................. 16

   B.   Respondent's Request for Bifurcation ........................................... 17

   C.   Merits phase ................................................................................. 18

   D.   Hearing on Jurisdiction and the Merits ......................................... 20

   E.   Reconstitution of the Tribunal and Continuation of the Hearing on Jurisdiction and the Merits ................................................................................. 25

   F.   Further Quantum Information Requested by the Tribunal and Hearing on Quantum ....................................................................................... 31

III. Preliminary Matter: Venezuela's procedural objections ................................. 37

   A.   Objections regarding Claimant's PHB ........................................... 38

   B.   Objection regarding Claimant's PHB ............................................ 39

   C.   Objection regarding Claimant's PHB ............................................ 39

   D.   Objection regarding the cost approach valuation ........................... 41

   E.   Objection regarding Claimant's PHB ............................................ 41

IV.  The Parties' prayers for relief ...................................................................... 42

V.   the positions of the parties ........................................................................... 44

**A.  Crystallex's Previous Mining Experience And Its Investment In Las Cristinas... 44**

1.  The Claimant's Position ................................................................ 44

2.  The Respondent's Position ........................................................... 48

**B.  The Denial of the Permit ........................................................................ 53**

1.  The Claimant's Position ................................................................ 53

2.  The Respondent's Position ........................................................... 80

**C.  The Rescission of the MOC ................................................................... 96**

1.  The Claimant's Position ................................................................ 96

2.  The Respondent's Position ......................................................... 101

**D.  The Partnership with Other Parties ................................................... 103**

1.  The Claimant's Position .............................................................. 103

2.  The Respondent's Position ......................................................... 104

**VI.  Jurisdiction .................................................................................................. 106**

**A.  Overview .............................................................................................. 106**

**B.  First objection to jurisdiction: no notice of dispute and amicable settlement in relation to the moc claims ................................................................... 107**

1.  The Respondent's Position ......................................................... 107

2.  The Claimant's Position .............................................................. 109

3.  Analysis ...................................................................................... 112

**C.  Second objection to jurisdiction: no jurisdiction with respect to contract claims 115**

1.  The Respondent's Position ......................................................... 115

2.  The Claimant's Position .............................................................. 117

3.  Analysis ...................................................................................... 119

**VII.  Liability ....................................................................................................... 124**

**A.  Overview .............................................................................................. 124**

**B.  Fair and Equitable Treatment ............................................................ 125**

1.  The Parties' Positions ................................................................. 125

2.  Analysis ...................................................................................... 137

**C.  Full Protection and Security ............................................................... 167**

1.  The Parties' Positions ................................................................. 167

2.  Analysis ...................................................................................... 169

**D.   Expropriation** ................................................................................ **171**

   1.   The Claimant's Position .................................................... 171

   2.   The Respondent's Position ................................................ 175

   3.   Analysis ............................................................................ 181

**VIII. REPARATION** ................................................................................ **198**

  **A.   Overview of the Parties' positions** ......................................... **198**

  **B.   Restitution** .............................................................................. **198**

   1.   The Claimant's Position .................................................... 198

   2.   The Respondent's Position ................................................ 199

   3.   Analysis ............................................................................ 200

  **C.   Monetary Compensation** ....................................................... **200**

   1.   The Positions of the Parties .............................................. 201

   2.   Analysis ............................................................................ 232

  **D.   Interest** ................................................................................... **253**

   1.   The Claimant's Position .................................................... 253

   2.   The Respondent's Position ................................................ 254

   3.   Analysis ............................................................................ 255

  **E.   Tax** ......................................................................................... **258**

   1.   The Claimant's Position .................................................... 258

   2.   The Respondent's Position ................................................ 259

   3.   Analysis ............................................................................ 259

**IX.   Costs** ................................................................................................ **260**

**X.   Decision** ............................................................................................ **263**

FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| Additional Facility Rules | ICSID Additional Facility Rules as amended in April 2006 |
| Arbitration Rules | Arbitration (Additional Facility) Rules |
| BIT or Treaty | July 1996 Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, which entered into force on 28 January 1998 |
| C-PHB | Claimant's Post-Hearing Brief dated 12 May 2014 |
| Claimant or Crystallex | Crystallex International Corporation |
| C-Supplemental Submission on Quantum | Claimant's Supplemental Submission on Quantum in Response to the Tribunal's 25 July 2014 Questions dated 12 September 2014 |
| Counter-Memorial | Respondent's Counter-Memorial on jurisdiction and the merits dated 21 November 2012 |
| ER Iribarren | Legal Opinion of Dr. Henrique Iribarren Monteverde dated 13 September 2013 |
| ER Meier | Expert Report on Venezuelan Law of Professor Henrique Meier Echeverrí dated 9 May 2013 |
| ER Muci | Expert Report on Venezuelan Law of Professor José Antonio Muci Borjas dated 9 May 2013 |
| ER Pearson | Expert Report of Mr. Thomas Pearson dated 17 September 2013 |
| Exh. [C] [R] | Exhibit [Claimant] [Respondent] |
| Exh. [CLA] [RLA] | Legal Authority [Claimant] [Respondent] |
| First Expert Mining and Environmental Report | Mining and Environmental Expert Report of Dr. Richard Jolk, Dr. Ronald Cohen and Dr. David Snow dated 9 May 2013 |
| First ER ENVIRON | Environmental Expert Report by Mr. Reed Huppmann, Dr. Robert Langstroth and Ms. Sharon Maharg dated 10 May 2013 |

| | |
|---|---|
| First ER Dagdelen | Expert Mining Report of Professor Kadri Dagdelen dated 21 November 2012 |
| First ER Ellis | Expert Report of Mr. Trevor Ellis dated 9 February 2012 |
| First ER Hart | Damages Report of Mr. Timothy Hart dated 21 November 2012 |
| First ER Lexecon | Expert Report on Damages of Compass Lexecon dated 10 February 2012 |
| First ER OptiTech | Environmental and Social Expert Report of OptiTech Engineering Solutions, Inc. dated 21 November 2012 |
| First ER de los Ríos | Expert Report of Professor Isabel de los Ríos dated 21 November 2012 |
| First WS of J.C. Palazzi | First Witness Statement of Juan Claudio Palazzi dated 10 February 2012 |
| First WS of L.F. Cottin | First Witness Statement of Luis Felipe Cottin dated 10 February 2012 |
| First WS of L. Paredes | First Witness Statement of Laura Paredes dated 7 November 2012 |
| First WS of M. González | First Witness Statement of Manuel González Díaz dated 16 November 2012 |
| First WS of P. Romero | First Witness Statement of Pedro Romero dated 9 November 2012 |
| First WS of R.A. Fung | First Witness Statement of Robert A. Fung dated 10 February 2012 |
| First WS of R. Olivares | First Witness Statement of Ramón Olivares dated 15 November 2012 |
| First WS of S. El-Alfy | First Witness Statement of Sadek El-Alfy dated 10 February 2012 |
| First WS of S. Rodríguez | First Witness Statement of Sergio Rodríguez dated 18 November 2012 |
| First WS of S. Alcalá | First Witness Statement of Sergio Alcalá dated 10 February 2012 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| Memorial | Claimant's Memorial on the Merits, dated 10 February 2012 |
| R-PHB | Respondent's Post-Hearing Brief dated 12 May 2014 |
| Rejoinder | Respondent's Rejoinder on Jurisdiction and the Merits dated 18 September 2013 |
| Reply | Claimant's Reply Memorial on Jurisdiction and the Merits dated 9 May 2013 |
| Respondent or Venezuela | Bolivarian Republic of Venezuela |
| R-Supplemental Submission on Quantum | Respondent's Supplemental Submission on Quantum in Response to the Tribunal's 25 July 2014 Questions dated 31 October 2014 |
| Second ER Dagdelen | Second Expert Mining Report of Professor Kadri Dagdelen, dated 17 September 2013 |
| Second ER Ellis | Second Expert Report of Mr. Trevor Ellis dated 9 May 2013 |
| Second ER Hart | Second Damages Report of Mr. Timothy Hart dated 17 September 2013 |
| Second ER Lexecon | Second Expert Report on Damages of Compass Lexecon dated 9 May 2013 |
| Second ER OptiTech | Second Environmental and Social Expert Report of OptiTech Engineering Solutions, Inc. dated 17 September 2013 |
| Second ER de los Ríos | Second Expert Report of Professor Isabel de los Ríos dated 18 September 2013 |
| Second WS of J.C. Palazzi | Second Witness Statement of Juan Claudio Palazzi dated 9 May 2013 |
| Second WS of L.F. Cottin | Second Witness Statement of Luis Felipe Cottin dated 9 May 2013 |
| Second WS of L. Paredes | Second Witness Statement of Laura Paredes dated 29 August 2013 |
| Second WS of M. González | Second Witness Statement of Manuel González Díaz dated 16 September 2013 |
| Second WS of P. Romero | Second Witness Statement of Pedro Romero dated 14 August 2013 |

| | |
|---|---|
| Second WS of R.A. Fung | Second Witness Statement of Robert A. Fung dated 9 May 2013 |
| Second WS of R. Olivares | Second Witness Statement of Ramón Olivares dated 8 September 2013 |
| Second WS of S. El-Alfy | Second Witness Statement of Sadek El-Alfy dated 9 May 2013 |
| Second WS of S. Rodríguez | Second Witness Statement of Sergio Rodríguez dated 18 September 2013 |
| Second WS of S. Alcalá | Second Witness Statement of Sergio Alcalá dated 9 May 2013 |
| Third ER Hart | Third Damages Report of Mr. Timothy Hart dated 31 October 2014 |
| Third ER Lexecon | Third Expert Report on Damages of Compass Lexecon as revised 15 September 2014 |
| Tr. [Jurisdiction and Merits] / Tr. [Supplemental *Quantum*] [page:line] | Transcript of the hearing on jurisdiction and on the merits / Transcript of the supplemental hearing on *quantum* |
| WS of J.S. Khan | Witness Statement of José Salamat Khan Fernández dated 16 September 2013 |
| WS of R. Roa | Witness Statement of Rodolfo Roa Delgado dated 15 August 2013 |
| WS of C. Rodríguez | Witness Statement of Charly Rodríguez dated 10 September 2013 |

## I.    OVERVIEW OF THE DISPUTE

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the July 1996 Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments (the "BIT"), which entered into force on 28 January 1998, and the ICSID Additional Facility Rules as amended in April 2006.

2.    The Claimant is Crystallex International Corporation and is hereinafter referred to as "Crystallex" or the "Claimant."  Crystallex is represented in this arbitration by Messrs. Nigel Blackaby, Lluís Paradell and Mrs. Caroline Richard, from the law firm Freshfields Bruckhaus Deringer US LLP in Washington, D.C., Mr. Luis Guerrero, from the law firm Wallis & Guerrero in Caracas, and Mr. Eduardo Travieso Uribe from the law firm Travieso Evans Arria Rengel & Paz in Caracas.

3.    The Claimant is a company incorporated under the laws of Canada.

4.    The Respondent is the Bolivarian Republic of Venezuela and is hereinafter referred to as "Venezuela" or the "Respondent".  Venezuela is represented by Dr. Reinaldo Enrique Muñoz Pedroza, Viceprocurador General de la República and, since 25 September 2011, by Dr. Ronald E.M. Goodman, Messrs. Paul S. Reichler and Alberto Wray from the law firm Foley Hoag LLP, Washington, D.C.  Before 25 September 2011, Venezuela was represented by (a) Mr. Paolo di Rosa and Ms. Gaela Gehring Flores from the law firm Arnold & Porter LLP in Washington, D.C. and (b) Messrs. Luis Torres Darias and Antonio Guerrero Araujo, from the law firm Torres Darias & Asociados in Caracas.

5.    The Claimant and the Respondent are hereinafter collectively referred to as the "Parties".

## A.    INTRODUCTION

6.    The present dispute arises out of certain measures taken by Venezuela which, according to the Claimant, have wrongfully affected the Claimant's investment in the areas called "Las Cristinas". Las Cristinas is reported to contain one of the largest undeveloped gold deposits in the world and is divided into four mining concessions, Cristina 4, 5, 6, and 7, which are located within the municipality of Sifontes in the State of Bolívar in the Guayana region in southeast Venezuela. The Las Cristinas site borders the Cuyuni River, is approximately 6 km west of the village of Las Claritas and 20 km from the border of Guyana, and sits in the Imataca National Forest Reserve.

7.    The Claimant contends that through its actions and omissions vis-à-vis Crystallex, Venezuela has breached several of its obligations under the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the

1

Promotion and Protection of Investments (the "BIT" or the "Treaty").[1] It particularly points to Venezuela's April 2008 denial of a permit to Crystallex to exploit the gold deposits at Las Cristinas, and of the rescission by the *Corporación Venezolana de Guayana* (the "CVG"), a state-run corporation tasked with stimulating economic activity in the Guayana region, of the Mine Operation Contract ("MOC") in February 2011.

8.    This Section (Section I) provides a general recollection of the main facts underlying the dispute. It only purports to put the dispute in its context, rather than to provide an exhaustive description of all the events relevant for the dispute. Further factual circumstances will be described in more detail when dealing with the Parties' positions (Section IV).

## B.    EARLY DEVELOPMENTS IN LAS CRISTINAS

9.    The following paragraphs summarize the main developments in Las Cristinas which occurred before Crystallex was involved in the site.

10.    In 1964, the concession titles for Las Cristinas were issued to Ms. Dot Culver de Lemon for a period of 25 years.[2] However, Ms. de Lemon did not carry out any industrial mining operations at the site. According to the Claimant, from the early '80s a significant number of illegal miners began working the gold deposits using techniques that caused deforestation and pollution at Las Cristinas.[3] In 1986, the Cristinas 4 and 6 concessions were transferred to Inversora Mael C.A. ("Inversora Mael"). This transfer gave rise to litigation with the Ministry of Mines, which resulted in a 1991 Supreme Court decision in favor of Inversora Mael.[4]

11.    However, according to the Claimant competing rights over Las Cristinas ensued when the Ministry of Mines, under Presidential Decree 1409 of 1990, empowered the CVG to execute contracts with third parties for the exercise of mining rights in the Guayana region of Venezuela.[5] On this basis, in June 1991, the CVG entered into a joint venture with the Canadian mining company Placer Dome Inc. ("Placer Dome") initially to explore and, if economically feasible, produce gold at Las Cristinas. The newly established company, Minera Las Cristinas, S.A. ("MINCA") was owned 30% by the

---

[1] Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, **Exh. C-3** (the "BIT" or the "Treaty").

[2] *Gaceta Oficial* No. 27363, 6 February 1964, **Exh. C-73**; *Gaceta Oficial* No. 27527, 27 August 1964, **Exh. C-74**.

[3] Memorial, paras 52-54.

[4] Ruling of the Supreme Court, 9 May 1991, **Exh. C-82**.

[5] Memorial, para. 56.

CVG and 70% by Placer Dome.[6] The CVG and MINCA subsequently concluded a contract to explore and exploit Las Cristinas for an initial period of 20 years.[7] Despite MINCA having later obtained all the necessary permits from the Ministry of Mines and the Ministry of Environment, exploitation of the mines never commenced.[8]

12.    On 2 March 1997, according to the Claimant, Crystallex purchased Inversora Mael for a total purchase price of US$30 million, and asserted Inversora Mael's competing rights over Las Cristinas in Venezuelan courts.[9]

13.    In July 2001, Placer Dome sold its shares in MINCA to the Canadian Company Vannessa Ventures Ltd.[10] The CVG and the Ministry of Mines refused to recognize the transfer. In November 2001, the CVG terminated the MINCA contract, as a consequence of which all rights over Las Cristinas reverted to the State.[11]

14.    On 29 April 2002, then President Hugo Chávez issued Decree 1757, whereby he reserved to the Venezuelan State the exercise of mining activities at Las Cristinas, declaring them as a matter of "priority for the Republic" and authorizing the Ministry of Mines to contract with the CVG to that effect.[12]

## C.    THE CONCLUSION OF THE ADMINISTRATIVE AGREEMENT AND MINE OPERATION CONTRACT IN 2002

15.    On 16 May 2002, the Ministry of Energy and Mines (the "Ministry of Mines")[13] and the CVG entered into an agreement (the "Administrative Agreement between the Ministry of Energy and Mines and the CVG with respect to Las Cristinas Deposits",

---

[6] Shareholders Agreement between Placer Dome and the CVG, 25 July 1991, **Exh. C-83**.

[7] Mining Contract between the CVG and Placer Dome, 25 July 1991, **Exh. C-84**.

[8] For a summary of the facts concerning the involvement of Placer Dome (and later Vannessa Ventures) in Las Cristinas, see *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)04/6, Decision on Jurisdiction, 22 August 2008, **Exh. RLA-99** ("Vannessa Ventures"), pp. 3-6.

[9] Memorial, para. 62.

[10] Report by the Permanent Commission of Energy and Mines of the National Assembly, 20 November 2002, **Exh. C-99**, p. 4. See also Vannessa Ventures, pp. 5-6.

[11] Resolutions No. 035 and No. 036 of the Ministry of Mines, 6 March 2002, published in the *Gaceta Oficial* No. 37400 on 8 March 2002, **Exh. C-96**.

[12] Decree 1757, 29 April 2002, published in the *Gaceta Oficial* No. 37437 on 7 May 2002, **Exh. C-6**.

[13] At the time that the Claimant entered into the MOC in September 2002, the Ministry of Mines was known as the *Minisiterio de Energía y Minas* (Ministry of Energy and Mines). In 2005 it was reorganized as the *Ministerio del Poder Popular para las Industrias Básicas y Minería* (or "MIBAM" by its Spanish acronym). In 2011, the responsibility for mining policy was returned to the *Ministerio del Poder Popular para la Energía y Petróleo* and is now part of the *Ministerio del Poder Popular de Petróleo y Minería*. See Counter-Memorial, p. 3, fn. 4.

hereinafter the "Administrative Agreement").[14] The Administrative Agreement was executed on the basis of Decree No. 1757 of 29 April 2002.[15]

16.    Pursuant to the Administrative Agreement, the Ministry of Mines "authorize[d] [the CVG] to explore, exploit and sell the gold mineral found in the deposits located in the areas of the concessions identified as Cristina 4, Cristina 5, Cristina 6 and Cristina 7, in the municipality of Sifontes in the Bolívar State [...]".[16] It also authorized the CVG to enter into contracts with third parties subject to prior notification to the Ministry of Mines.[17]

17.    In May 2002, following the conclusion of the Administrative Agreement, the CVG met with several companies, including Crystallex, to discuss the prospects of developing Las Cristinas.[18]

18.    On 2 September 2002, the Board of Directors of the CVG approved the execution of the future MOC with Crystallex.[19] On 17 September 2002, Crystallex and the CVG concluded the MOC, which laid out the framework of rights and responsibilities of the parties for the development of Las Cristinas.[20] Under the MOC, Crystallex was required to bear all responsibility for the development of the Las Cristinas project and all of its associated costs,[21] proceed with the construction of the agreed social works[22] and make an initial payment of US$15 million, while being entitled to the proceeds deriving from the sale of its gold production, subject to payment of a sliding royalty to the CVG and all applicable taxes required under Venezuelan law.[23]

---

[14] Administrative Agreement between the Ministry of Mines and the CVG, 16 May 2002, **Exh. C-7** (the "Administrative Agreement").

[15] See *supra* para. 14.

[16] Administrative Agreement, **Exh. C-7**, Clause 1.

[17] Administrative Agreement, **Exh. C-7**, Clause 2.

[18] See Report by the Permanent Commission of Energy and Mines of the National Assembly, 20 November 2002, **Exh. C-99**.

[19] Notification from the CVG to the Ministry of Mines, containing CVG Resolution No. 8700 of 2 September 2002, 6 September 2002, **Exh. C-8**.

[20] Mine Operation Contract between the CVG and Crystallex ("MOC"), 17 September 2002, **Exh. C-9**.

[21] MOC, **Exh. C-9**, Clause 2.1.

[22] These social works included bearing the costs of maintenance, supplies and other expenses related to the Las Claritas healthcare facility (MOC, Clause 7); construction of homes in the village of Santo Domingo (*ibid.*), providing training programs and technical assistance to works from the local communities, developing and completing various infrastructure works for the benefit of the local communities (*ibid.*). In addition, Crystallex was to provide technical assistance, under the supervision of the CVG, to groups of small-scale miners present in the Las Cristinas area in order to ensure good operating practice and a lower environmental impact. See MOC, Clause 12.

[23] MOC, **Exh. C-9**, Clause 6.

19.    For its part, the CVG assumed the obligations of, *inter alia*, securing the permits required for the development of the project[24] and of issuing and processing all notices to the Ministry of Mines required in connection to the MOC.[25] According to Clause 17.4 of the MOC, "[t]he [CVG] shall be in charge of the formalities before the Ministry of Environment and Natural Resources".

20.    The MOC provided for an initial duration of 20 years, which was extendable for two 10-year periods, for a maximum lifetime of 40 years.[26]

## D.    THE PERMITTING PROCESS BETWEEN 2003 AND 2008

21.    To start operating Las Cristinas, Crystallex[27] had to obtain a number of authorizations and permits from Venezuelan entities. In particular, it had to obtain an Authorization to Affect Natural Resources (*Autorización Para Afectar Recursos Naturales*) from the Ministry of Environment (the "AARN", by its Spanish initials, or the "Permit").[28] The following steps were necessary for the Permit to be granted:

   a.    Crystallex had to obtain a Land Occupation Permit issued by the Ministry of Environment;[29]

   b.    Crystallex had to prepare and submit a Feasibility Study for approval to the CVG and the Ministry of Mines, setting out in detail a project that was geologically, technically and financially sound;[30]

   c.    Crystallex had to prepare and submit an Environmental Impact Study ("EIS") to the CVG for approval to the Ministry of Environment, which would address the project's effects on the environment.[31]

---

[24] MOC, **Exh. C-9**, Clause 9.4.

[25] MOC, **Exh. C-9**, Clause 9.5.

[26] MOC, **Exh. C-9**, Clause 18.1.

[27] For the sake of brevity, Crystallex will be referred to as the entity charged with obtaining various permits or perform various tasks without recalling that the CVG is the concession-holder.

[28] See MOC, **Exh. C-9**, Preamble, Section 5, and Clause 9.4.

[29] Organic Law on Territorial Organization, 26 July 1983, published in the *Gaceta Oficial* No. 3238 of 11 August 1983, **Exh. C-78**, Article 49; Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35946 on 25 April 1996, **Exh. C-2**, Article 15.

[30] MOC, **Exh. C-9**, Clause 2.2.1. According to Clause 2.2.1 of the MOC, the Feasibility Study had to be completed within one year from signing the MOC of 17 September 2002, i.e. 17 October 2003.

[31] Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35946 on 25 April 1996, **Exh. C-2**, Articles 20 and 40.

    d. Crystallex had to post a construction compliance guarantee bond (the "Bond")[32] and pay certain environmental taxes.

### 1. The Land Occupation Permit

22.    The Land Occupation Permit was originally obtained by the CVG from the Ministry of Environment on 26 April 1993. Subsequently, the Ministry ratified its validity on 26 June 1997, 18 March 2002 and in August 2004.[33]

### 2. The Feasibility Study

23.    In February 2003, Crystallex retained the mine engineering and geology consulting firms SNC-Lavalin and Mine Development Associates ("MDA") to prepare a technical, economic and financial study (the "Feasibility Study") for the Las Cristinas project, in accordance with its obligation under clause 2.2 of the MOC.[34]

24.    On 10 September 2003, Crystallex submitted the Feasibility Study to the CVG.[35] The report assumed an ore production rate of 20,000 tpd.[36] On 7 October 2003, the CVG requested additional information from Crystallex, including information on the water deviation channel to control surface water and its possible influence on the neighboring Las Brisas concessions, as well as the submission of a new EIS of the project in order to comply with the current Venezuelan regulatory framework and Clause 9 of the MOC.[37]

25.    During a meeting held on 29 October 2003, the CVG requested additional clarifications of particular technical information. Crystallex informed the CVG that it believed it could "substantially increase production in years 4 or 5 to 40,000 tonnes per day reducing the mine life to 17 years".[38] In addition, Crystallex confirmed, *inter alia*, that the updated EIS would discuss the socio-economic impact of the project and outline the associated costs.[39]

---

[32] Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35946 on 25 April 1996, **Exh. C-2**, Article 45.

[33] See Oficio 0272 from the Ministry of Environment to the CVG, 26 April 1993, **Exh. C-86**; Providencia 033 of the Ministry of the Environment, 28 July 1997, **Exh. C-89**; Oficio 078 from the Ministry of the Environment to the Ministry of Mines, 15 March 2002, **Exh. C-97**; and Crystallex 2005 Annual Report, **Exh. C- 189**, p. 6.

[34] Feasibility Study (Executive Summary), September 2003, **Exh. C-10**, p. 3.

[35] Letter from Crystallex to the CVG, 10 September 2003, **Exh. C-109**.

[36] SNC-Lavalin, Feasibility Study, September 2003, **Exh. C-106**, p. 5-19

[37] Letter from the CVG to Crystallex, 7 October 2003, **Exh. C-110**, p. 2.

[38] SNC-Lavalin's minutes of the meeting between Crystallex and the CVG held on 29 October 2003, 3 November 2003, **Exh. C-111**, p. 4.

[39] SNC-Lavalin's minutes of the meeting between Crystallex and the CVG held on 29 October 2003, 3 November 2003, **Exh. C-111**, p. 7.

26.     On 4 December 2003, the CVG noted that the parties had agreed upon an initial production rate of 20,000 tpd for the first three years, after which the project would expand to accommodate 40,000 tpd.[40]

27.     On 19 December 2003, Crystallex submitted to the CVG a set of "Additional Clarifications" (*Aclaraciones Adicionales*), illustrating its plans to increase production from 20,000 to 40,000 tpd by year 8 of the project.[41] On 9 January 2004, the CVG asked Crystallex to state that it would expand to 40,000 tpd by year 4, instead of year 8.[42] On 16 January 2004, Crystallex submitted Addendum 1 to the Feasibility Study, in which it explained that for financing reasons, the Feasibility Study had to state that expansion would occur in year 9, although it was likely that the expansion could happen earlier.[43] The same financing concerns underlying an expansion plan only as of year 9 were reiterated by Crystallex in a letter to the CVG dated 5 February 2004.[44]

28.     On 8 March 2004, the CVG approved the Feasibility Study,[45] and on 15 April 2004 it sent the document to the Ministry of Mines for its review and approval.[46]

29.     The Ministry of Mines made comments and requested changes to the Feasibility Study by way of a letter to the CVG of 23 December 2004,[47] which the CVG forwarded to Crystallex on 5 January 2004.[48] Crystallex reportedly replied to those requests in February 2005.[49]

30.     Further exchanges of correspondence between Crystallex and the Ministry of Mines followed between February and December 2005.[50]

---

[40] Letter from the CVG to Crystallex, 4 December 2003, **Exh. C-115**, p. 2.

[41] SNC-Lavalin, Feasibility Study *Aclaraciones Adicionales*, December 2003, **Exh. C-114**, Section 2.2.

[42] Letter from the CVG to Crystallex, 9 January 2004, **Exh. C-117**, p. 2.

[43] SNC-Lavalin, Feasibility Study, Addendum 1, 16 January 2004, **Exh. C-119**, Section 4.2. Following an additional request by the CVG (Letter from the CVG to Crystallex, 30 January 2004, **Exh. C-121**), on 25 February 2004, Crystallex submitted a revised Addendum 1 to the Feasibility Study. See Letter from Crystallex to the CVG attaching excerpts of the Feasibility Study, Addendum 1, Revision 1, 25 February 2004, **Exh. C-128**.

[44] Letter from Crystallex to the CVG, 5 February 2004, **Exh. C-125**.

[45] CVG Resolution No. 8867, 8 March 2004, **Exh. C-129**.

[46] Oficio PRE-216-04 from the CVG to the Ministry of Mines, 15 April 2004, **Exh. C-134**.

[47] Oficio DMV-289 from the Ministry of Mines to the CVG, 23 December 2004, **Exh. C-158**.

[48] Letter from the CVG to Crystallex, 5 January 2005, **Exh. C-160**.

[49] The February 2005 letter from Crystallex to the Ministry of Mines is reported in the Letter from Luis Felipe Cottin to Víctor Álvarez, 6 October 2005, **Exh. C-174**, Annex A.

[50] See Letter from Luis Felipe Cottin to Víctor Álvarez, 6 October 2005, **Exh. C-174**; Letter from Crystallex to the Ministry of Energy and Mines, 5 December 2005, **Exh. C-176**; Letter from the Ministry of Mines to Crystallex, 10 January 2006, **Exh. C-178**; Letter from Crystallex to the Ministry of Mines, 13 January 2006, **Exh. C-179**; Letter from Crystallex to the Ministry of Mines, 18 January 2006, **Exh. C-180**.

31.     In the meantime, further documents were prepared by Crystallex. In August 2005, SNC-Lavalin submitted to the Ministry of Mines the 2005 Development Plan for Las Cristinas.[51] In October 2005, SNC-Lavalin prepared a 20,000 to 40,000 tpd expansion plan, which called for an initial throughput of 20,000 tpd starting in February 2007, with an expansion to 40,000 tpd after two years.[52]

32.     On 6 March 2006, the Ministry of Mines approved Crystallex's Feasibility Study, which had been submitted by the CVG to the Ministry on 15 April 2004.[53]

### 3.     The Environmental Impact Study

33.     The EIS was prepared by SNC-Lavalin for Crystallex and was submitted in December 2003 to the CVG.[54] On 15 April 2004, the same day it submitted to the Ministry of Mines the Feasibility Study, the CVG delivered the EIS[55] to the Ministry of Environment, together with its request for the Permit.[56]

34.     A period of discussions between Crystallex and the CVG, on one side, and the Ministry of Environment, on the other, followed the submission of the EIS. After an environmental inspection of the Las Cristinas area on 11 and 12 May 2004,[57] Crystallex and the CVG made a presentation of the EIS to the Ministry of Environment.[58] Some of these discussions addressed the plan to alter the flow of three streams that ran through Las Cristinas by means of a river diversion channel.[59]

---

[51] SNC-Lavalin, Development Plan, August 2005, **Exh. C-167**.

[52] SNC-Lavalin, 20,000 to 40,000 t/d Expansion Plan, October 2005, **Exh. C- 171**.

[53] Oficio 1193-2006 from the Vice-Minister of Mines to the CVG, 6 March 2006, **Exh. C-13**.

[54] See Letter from Crystallex to CVG, 4 December 2003, **Exh. C-310**. A revised version of the EIS was submitted to the CVG on 27 February 2004, incorporating comments made by the CVG in January 2004. See Letter from Crystallex to the CVG, 27 February 2004, **Exh. C-318**.

[55] SNC-Lavalin, Environmental Impact Study, April 2004, **C-131(bis)**.

[56] Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**.

[57] See Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 2.

[58] See Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 2.

[59] See Communication VPCACT/440 from the CVG to the Ministry of Environment and Natural Resources, **Exh. C-136**, 15 June 2004; Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 3.

35.     On 1 July 2004, the Ministry of Environment sent a letter to the CVG with a series of questions,[60] to which the CVG replied on 12 July 2004.[61] On 20 July 2004, the CVG contacted the Ministry of Environment to reiterate its request for approval of Crystallex's EIS.[62] In the second half of 2004, Crystallex provided a number of Addenda to the EIS, addressing the Ministry of Environment's concerns,[63] as well as an Environmental Supervision Plan (to be implemented during the construction phase of the project).[64]

36.     On 29 December 2004, the Ministry of Environment requested that the CVG and Crystallex reformulate the project, noting that the study had been presented without prior terms of reference.[65] However, in early 2005, according to the Claimant, the newly appointed Minister of Environment, Ms. Jacqueline Faria, expressed the position that the project's existing terms of reference would remain in place,[66] and scheduled a series of workshops with Crystallex and the CVG in order to discuss the outstanding technical issues.[67]

37.     In March 2006, at the request of the Ministry of Environment, Crystallex resubmitted all of the documentation related to the approval of the EIS.[68] In February and April

---

[60] Oficio 01-00-19-04-237/2004 from the Ministry of Environment and Natural Resources to the CVG, 1 July 2004, **Exh. C-139**.

[61] The exchange of correspondence is reported in Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 3.

[62] Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 3.

[63] See SNC-Lavalin, Environmental Impact Study: Addendum No. 1, August 2004, **Exh. C-142**; Letter from CVG to the Ministry of Environment, 25 August 2004, **Exh. C-143**; SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 1, October 2004, **Exh. C-147**; SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 2, November 2004, **Exh. C-152**; Letter from CVG to the Ministry of Environment, 28 October 2004, **Exh. C-151**; Letter from CVG to the Ministry of Environment, 18 November 2004, **Exh. C-154**.

[64] Communication VPCACT/729 from the CVG to the Ministry of Environment and Natural Resources, 15 September 2004, **Exh. C-145**; Environmental Supervision Plan, September 2004, **Exh. R-37**.

[65] Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**.

[66] Memorial, para. 186; Reply, para. 228; Letter from Crystallex to the Ministry of Energy and Mines, 6 October 2005, **Exh. C-174**, Annex A, p. 1. This point appears undisputed by Venezuela. See Counter-Memorial, para. 208 ("In early 2005 there was a change in Ministry personnel including a new Director General of the Permissions Office, and the new officials responsible for the environmental review of the Las [Cristinas] permit application decided not to require Crystallex to start completely from scratch with new terms of reference"); Rejoinder, para. 86 ("These workshops followed the Ministry's agreement in early 2005—despite its previously expressed concerns and in response to pressure from Crystallex and the CVG—to allow Crystallex the opportunity to supplement its EIASC without starting over with new terms of reference.").

[67] Memorial, para. 186; Letter from Crystallex to the Ministry of Energy and Mines, 6 October 2005, **Exh. C-174**, Annex A, p. 1.

[68] Communication No. VPDI/GM/0197/06 from the CVG to the Ministry of Environment and Natural Resources, 14 March 2006, **Exh. C-185**.

2007, Crystallex provided answers to additional concerns that had been raised by the Ministry.[69]

38.    On 16 May 2007, the Ministry of Environment, through its then Vice-Minister of Environmental Administration and Governance, Merly Garcia, sent a letter to Crystallex, requesting the payment of a bond which was to "guarantee the implementation of the measures proposed in the document presented for the Environmental Impact Evaluation of the project, which have been analyzed and approved by this Office […]".[70]

39.    The meaning and import of the Ministry of Environment's letter of 16 May 2007 are disputed between the Parties.[71]

40.    On the same day, Ms. Merly Garcia submitted a letter to the CVG, asking the CVG to pay a fee for the issuance of the Permit.[72]

41.    On 18 May 2007, Crystallex posted the Bond at the Office of Environmental Permits in Caracas, and paid the environmental taxes.[73]

42.    On 14 June 2007, Crystallex announced to the market that it had fulfilled the requirements for receiving the Permit.[74]

43.    On 31 October 2007, the CVG wrote to the Ministry of Environment to inquire about the status of the Permit, and referred to the Ministry of Environment's letter of 16 May 2007 stating that the Permit would be handed over once the procedural requirements would be complied with by Crystallex.[75]

---

[69] See Answers to the technical observations made by the Ministry of Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)**; Communication VPDI/GM/0376-07 from the CVG to the Ministry of Environment and Natural Resources, 25 April 2007, **Exh. C-203**; Proposal for the treatment of copper and cyanide, April 2007, **Exh. C-201**.

[70] Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15**.

[71] See *infra* Sections V.B.1.a.vi -V.B.1.a.vii) – V.B.1.e and V.B.2.b-V.B.2.c.

[72] Oficio from the Vice-Minister of Environmental Administration and Governance to the CVG, 16 May 2007, **Exh. C-205**. On 17 May 2007, the CVG forwarded both letters from the Ministry of Environment to Crystallex. See Letter from the CVG to Crystallex, 17 May 2007, **Exh. C-206**.

[73] Letter from Crystallex to the CVG, 18 May 2007, **Exh. C-16**; Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 May 2007, **Exh. C-17**. On 18 September 2007, in response to a request from the Ministry of Mines, Crystallex filed an amended Bond with the Office of Environmental Permits. See Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20**.

[74] "Crystallex reúne requisitos para iniciar explotación de Las Cristinas", *El Universal*, 14 June 2007, **Exh. C-208**.

[75] Letter from the CVG to the Ministry of Environment, 31 October 2007, **Exh. C-213**.

E.    THE DENIAL OF THE PERMIT IN APRIL 2008

44.    On 14 April 2008, the Director General of the Administrative Office of Permissions of the Ministry of Environment informed the CVG that the request for the Permit was denied.[76] The reasons put forward by the Ministry of Environment included concerns for the environment and the indigenous peoples of the Imataca Forest Reserve.

45.    According to the Claimant, the CVG received the Permit denial on 28 April 2008, and informally made Crystallex aware of that decision on the same day.[77] Crystallex formally acknowledged its awareness of that decision on 5 May 2008.[78]

46.    On 12 May 2008, Crystallex formally asked that the Permit request be reconsidered by filing a motion for reconsideration (*Recurso do Reconsideración*) before the Director General of the Office of Permits of the Ministry of Environment.[79] On 28 May 2008, the Ministry of Environment declared Crystallex's motion for reconsideration inadmissible, on the basis that Crystallex lacked standing to file the appeal.[80] The Director General also reaffirmed his rejection of the CVG's application for the Permit. Crystallex appealed the Director General's ruling on 17 June 2008, by means of a hierarchical appeal (*Recurso Jerárquico*) to the Minister of Environment.[81] It is undisputed between the Parties that the Minister of Environment did not rule on the appeal, although the Parties disagree on the legal implications of such omission.

F.    MAIN EVENTS FROM THE PERMIT DENIAL TO THE MOC RESCISSION

47.    On 4 June 2008, Crystallex appeared at a public hearing of the National Assembly's Permanent Committee for Economic Development.[82]

48.    On 4 August 2008, Crystallex submitted to the Ministry of Environment a report entitled "Proposals for Sustainable Development, Development Alternatives and Minimizing the Environment Impact of the 'Las Cristinas' Project".[83]

---

[76] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**.

[77] Memorial, para. 203.

[78] Notification of Awareness of Oficio 1427, 5 May 2008, **Exh. C-226**. The CVG communicated a copy of the Permit denial to Crystallex on 13 May 2008. See Communication PVE/059-08 from the CVG to Crystallex, 13 May 2008, **Exh. C-227**.

[79] Crystallex's Recurso de Reconsideración, 12 May 2008, **Exh. C-28**.

[80] Oficio 2765 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to Crystallex, 29 May 2008, **Exh. C-30**.

[81] Crystallex's Recurso Jerárquico, 17 June 2008, **Exh. C-33**.

[82] Minutes No. 014-2008 of the Ordinary Meeting held on 4 June 2008, 4 June 2008, **Exh. C-32**.

[83] Letter from Crystallex to the Vice-Minister of Environmental Administration and Governance, 4 August 2008, **Exh. C-35**.

49.     In response to Crystallex's report of 4 August 2008, the Ministry of Environment informed Crystallex on 20 August 2008 that:

> "[…] having fully studied the body of ideas proposed in the aforementioned document, which tend to adhere to Government guidelines in both environmental and social matters, this Office considers the evaluation by our technicians to be useful in making a decision regarding whether to take on the "Las Cristinas" Gold Project".[84]

50.     However, on 19 September 2008, President Chávez stated in a public address that:

> "In Guayana for example, we are taking back big mines, and one of them is one of the biggest in the world. And do you know what it is? It's gold, it's gold!"[85]

51.     On 5 November 2008, the Minister of Mines, Mr. Rodolfo Sanz, expressed the intention to nationalize Las Cristinas:

> "[…] by 2009, the State will take back, operate and manage the Las Cristinas mine, previously owned by Cristalex [sic], an international company".[86]

52.     Further, according to a 6 November 2008 report by Reuters, Minister Sanz announced that Venezuela would sign an agreement with Rusoro Mining Ltd. ("Rusoro"), a Russian-managed mining company, to build and operate a mine at Las Cristinas through a joint venture with the Venezuelan Government.[87] Minister Sanz added that: "[w]e have to rescind our relationship with a company that has been working in the zone. We have a legal problem there".[88]

53.     On 24 November 2008, after having written a number of letters to the Ministry of Mines,[89] Crystallex notified the Ministry of Mines of a dispute under the Treaty between Crystallex and Venezuela (the "Notice of Dispute").[90]

---

[84] Oficio 1719 from the Vice-Minister of Environmental Administration and Government to Crystallex, 20 August 2008, **Exh. C-36**. Crystallex filed a supplementary motion requesting that the Ministry consider Vice-Minister Garcia's letter of 20 August 2008 when ruling on Crystallex's appeal of the Permit denial. See Crystallex's submission to the Minister of the Environment: "Escrito mediante el cual se consigna Oficio 1719 de fecha 20 de agosto de 2008, emanado de ese Ministerio", 24 October 2008, **Exh. C-39**.

[85] "Chávez asegura que está 'recuperando' las grandes minas de oro", *El Universal*, 19 September 2008, **Exh. C-37**.

[86] Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, p. 2.

[87] "Venezuela offers Russians big gold projects", Reuters, 6 November 2008, **Exh. C-45**.

[88] "Venezuela offers Russians big gold projects", Reuters, 6 November 2008, **Exh. C-45**.

[89] See Letter from Crystallex to the Minister of Mines, 6 November 2008, **Exh. C-46**; Letter from Crystallex to the Minister of Mines, 10 November 2008, **Exh. C-48**; Letter from Crystallex to the Minister of Mines, 13 November 2008, **Exh. C-49**.

[90] Notice of Dispute, 24 November 2008, **Exh. C-51**.

54.    On 13 January 2009, in his annual message to the National Assembly, President Chávez announced that:

> "[T]his year the Venezuelan State has taken over the exploitation and control of the gold deposits of Las Cristinas at kilometer 88 in the State of Bolívar; one of the largest gold deposits on the American continent. Cristinas is estimated to have approximately 35.2 million ounces of gold, that is 1,094 metric tons of estimated reserves. Of this reserve, 24.5 million ounces, or 762 tons, are classified as proven.
>
> In this way, the Venezuelan State controls 30,000 million dollars, which is the current estimated worth of the deposit. Currently, 30 thousand. The Las Cristinas concessions are organized into five parts: Cristina IV, Cristina V, Cristina VI, Cristina VII and Brisas del Cuyuni. They are under the control of socialism, for the development of economic growth for the national development.
>
> [...]
>
> In mining we have created this year (2008) the mixed company Venrús, with Russia, a Russian company and a Venezuelan company, a mixed company for the deposits of Las Cristinas [...]".[91]

55.    On 26 February 2009, Crystallex sought information from the CVG regarding the status of the MOC,[92] in response to which the CVG sent the following letter on 2 March 2009:

> "Taking into account that the normative act that gave origin to the operations contract [MOC] has not been revoked or replaced, and that the contract is valid for 20 years and that Crystallex has been fulfilling the obligations assumed with the contract, we hereby inform you that the contract is fully valid and in the process of obtaining the required permits from the competent authorities for the development of the Project".[93]

56.    On 25 April 2010, according to the transcript of the President's weekly television address, "Aló Presidente", President Chávez stated, *inter alia*, that:

> "If we are going to exploit gold, we will have to nationalize all of it, recuperate and put an end to concessions, which led to degeneration [...]".[94]

---

[91] Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53**.

[92] Letter from Crystallex to CVG, 26 February 2009, **Exh. C-400**.

[93] Letter from the CVG to Crystallex, 2 March 2009, **Exh. C-55**.

[94] Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information (extracts), 25 April 2010, **Exh. C-62**.

57.    In response to a request from Crystallex dated 20 July 2010, the CVG informed
       Crystallex on 15 August 2010 that:

> "[…] Given that the contract [MOC] has a duration of twenty (20) years and
> that the administrative act underlying the contract has not been replaced or
> repealed, it is clear that the same contract remains in full force and effect."[95]

58.    On 17 October 2010, the *Agencia Venezolana de Noticias* (State news agency) reported
       that President Chávez made the following statement during his visit in Belarus:

> "Las Cristinas, this mine belongs to Venezuela and it has been handed over
> to transnational companies, I announce to the world that the revolutionary
> Government recuperated it, together with the Las Brisas mine. These mineral
> resources are for the Venezuelan people, not for transnationals".[96]

## G.    THE CVG'S RESCISSION OF THE MOC AND CRYSTALLEX'S INITIATION OF ARBITRATION IN FEBRUARY 2011

59.    On 3 February 2011, the CVG informed Crystallex that it was rescinding the MOC.
       The CVG's resolution stated that the CVG had decided to "unilaterally rescind for
       reasons of opportunity and convenience, the [MOC] […] due to the cessation of
       activities for more than one (1) year, in accordance with Clause Twenty-four [of the
       MOC]".[97]

60.    On 11 February 2011, Crystallex informed the CVG that it considered the CVG's
       resolution of 3 February 2011 to be null and that it was waiving its right to exercise a
       Petition for Reconsideration of the resolution, without prejudice to the rights it could
       assert in an arbitration proceeding under the Treaty.[98]

61.    On 16 February 2011, Crystallex filed a Request for Arbitration against Venezuela with
       the ICSID Secretariat.[99]

62.    On 25 February 2011, Crystallex wrote to the CVG's President Minister Khan in
       relation to the transfer of Las Cristinas to the Venezuelan authorities.[100] On 15 March
       2011, Crystallex sent a letter to Minister Khan informing him that Crystallex would
       maintain custody of the Las Cristinas camp only until 31 March 2011.[101] On 31 March

---

[95] Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**.

[96] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", Agencia Venezolana de Noticias (State news agency), 17 October 2010, **Exh. C-65**.

[97] CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**.

[98] Letter from Luis Felipe Cottin to José Khan, 16 February 2011, **Exh. C-249**.

[99] Request for Arbitration, 16 February 2011.

[100] Letter from Crystallex to the CVG, 25 February 2011, **Exh. C-252**.

[101] Letter from Crystallex to the CVG, 15 March 2011, **Exh. C-255**.

2011, Crystallex wrote a further letter to the CVG in relation to the transfer of Las Cristinas to the Venezuelan authorities.[102]

63.    On 31 March 2011, the formal transfer took place before a Venezuelan Judge, who ordered that the material transfer take place within three business days.[103] The material transfer of Las Cristinas took place on 4 and 5 April 2011.[104]

---

[102] Letter from Crystallex to the CVG, 31 March 2011, **Exh. C-257**.

[103] Minutes of the Transfer, 31 March 2011, **Exh. C-258**.

[104] Minutes of Delivery, 4 April 2011, **Exh. C-261**.

## II.    PROCEDURAL HISTORY

### A.    CONSTITUTION OF THE TRIBUNAL AND FIRST SESSION

64.    On 17 February 2011, ICSID received a request for arbitration from Crystallex against Venezuela (the "Request" or "RFA").

65.    On 9 March 2011, the Secretary-General of ICSID registered the Request in accordance with Articles 4 and 5 of the Arbitration Rules and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible, in accordance with Rule 5(e) of the Arbitration Rules.

66.    By letters dated 10 and 13 June 2011, the Parties agreed that the Arbitral Tribunal would consist of three arbitrators, one to be appointed by each Party and the third arbitrator and President of the Tribunal to be appointed by agreement of the Parties.    The appointment of the President of the Tribunal would be through a ballot method if the Parties did not reach an agreement within 14 days or agreed extension.    If the ballot method did not render a result, the President of the Tribunal would be appointed pursuant to Article 10 of the Arbitration Rules.

67.    On 14 June 2011, following his appointment by the Claimant, Professor John Y. Gotanda, a national of the United States of America, accepted his appointment as arbitrator.    On 15 June 2011, following his appointment by the Respondent, Justice Florentino Feliciano, a national of the Philippines, accepted his appointment as arbitrator.    On 4 October 2011, following his appointment by the Parties, Dr. Laurent Lévy, a national of Brazil and Switzerland, accepted his appointment as presiding arbitrator.

68.    In accordance with Article 13 of the Arbitration Rules, on 5 October 2011, the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Ann Catherine Kettlewell, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

69.    Pursuant to Article 21(1) of the Arbitration Rules, on 25 October 2011 the Parties agreed to hold the First Session outside of the 60-day period.    The Parties submitted a joint letter with their comments on the agenda of the First Session on 18 November 2011.

70.    The Tribunal held a First Session with the Parties on 1 December 2011 in Washington, D.C.    In addition to the Members of the Tribunal and the Secretary of the Tribunal, present at the First Session were:

For the Claimant:

Mr. Nigel Blackaby                         Freshfields Bruckhaus Deringer

Mr. Alex Wilbraham                         Freshfields Bruckhaus Deringer

Mr. Patrick Childress                      Freshfields Bruckhaus Deringer

Mr. Robert Fung                            Crystallex International Corporation

Mr. Marc Oppenheimer                       Crystallex International Corporation


For the Respondent:

Mr. Ronald E.M. Goodman                    Foley Hoag LLP

Mr. Kenneth Figueroa                       Foley Hoag LLP

Ms. Martha Madero                          Foley Hoag LLP


71.    The Parties confirmed that the Members of the Tribunal had been validly appointed.  It
       was agreed *inter alia* that the applicable Arbitration Rules would be those in effect from
       10 April 2006, that the procedural languages would be English and Spanish, and that
       the place of arbitration would be Washington, D.C., U.S.A.

72.    The agreements of the Parties and decisions of the Tribunal were embodied in the
       Minutes of the First Session signed by the President and circulated to the Parties on 5
       January 2012.

73.    As agreed at the first session, on 10 February 2012, the Claimant filed a Memorial on
       the Merits ("Memorial").


## B.    RESPONDENT'S REQUEST FOR BIFURCATION

74.    On 2 April 2012, the Respondent filed a request to address the objections to jurisdiction
       as a preliminary question.

75.    On 6 April 2012, the Tribunal established a date for the filing of the Claimant's reply
       and declared the proceeding on the merits suspended as of the date of the submission
       of the request for bifurcation and until a decision had been made by the Tribunal on the
       request.

76.    On 23 April 2012, the Claimant filed its reply, and on 26 April 2012 and 2 May 2012,
       the Parties exchanged further observations on the Respondent's request.

77.    On 23 May 2012, the Tribunal issued its Decision on Bifurcation, rejecting the
       Respondent's request to address the objections to jurisdiction as a preliminary question.
       As a result, the Tribunal dismissed all other prayers for relief and reserved the decision
       on costs for this Award.  The Tribunal further lifted the suspension of the proceedings,

proposed a new procedural calendar and confirmed the dates of the hearing on jurisdiction and the merits.

## C.    MERITS PHASE

78.    On 8 June 2012, the Parties proposed a revised procedural calendar, which was confirmed by the Tribunal on 14 June 2012.

79.    On 4 September 2012, the Claimant submitted a request for the Tribunal to decide on Venezuela's document production request, pursuant to section 14 of the Minutes of the First Session.  On 7 September 2012, the Respondent submitted further comments on its reply to the Claimant's objections to Respondent's document production request. On 10 September 2012, the Claimant objected to Respondent's further comments as they were not agreed in the Minutes of the First Session.  This exchange was further commented by the Respondent and the Claimant on the same date.

80.    On 17 September 2012, the Tribunal indicated that its decision would be based on the Parties' exchanges of 6, 16, 23 August and 4 September 2012, which reflected the process envisaged by the Minutes of the First Session.  On 24 September 2012, the Tribunal issued Procedural Order No. 1 ruling on the Respondent's request for document production.

81.    On 9 October 2012, the Claimant informed the Tribunal that the Parties had reached an agreement to amend the procedural calendar.  On 11 October 2012, the Tribunal confirmed the amendment to the procedural calendar agreed by the Parties.

82.    On 5 November 2012, the Respondent submitted a request for the Tribunal to decide on a request for document production from the Claimant, pursuant to section 14.1(d) of the Minutes of the First Session.  On 12 November 2012, the Tribunal issued Procedural Order No. 2, deciding on the Claimant's request for document production.

83.    In accordance with the amended schedule agreed by the Parties and confirmed by the Tribunal, on 21 November 2012, the Respondent filed its Counter-Memorial on Jurisdiction and the Merits ("Counter-Memorial").

84.    On 26 November 2012, the Respondent informed the Tribunal of difficulties in producing certain documents in accordance with Procedural Order No. 2.  Following comments from the Claimant, on 29 November 2012, the Tribunal ordered the Respondent to produce the documents on a rolling basis and to propose a reasonable time limit for that purpose.  The Respondent explained that some documents contained confidentiality provisions that did not allow for their disclosure, and indicated that it would request authorization to disclose from the third party that had executed them. Following instructions from the Tribunal, on 3 December 2012, the Claimant requested a procedural order (i) guaranteeing the confidentiality of the documents and (ii) ordering Venezuela to complete the disclosure by 7 December 2012.

85.   After numerous exchanges, on 21 December 2012, the Parties submitted the final agreed text of the confidentiality terms.  On 28 December 2012, the Tribunal issued Procedural Order No. 3 concerning confidentiality terms for the production of documents ordered in Procedural Order No. 2.

86.   On 23 January 2013, the Claimant requested the Tribunal to order the Respondent to disclose unredacted versions and other documents ordered under Procedural Order No. 2.  On 29 January 2013, the Respondent indicated that it had continued efforts to obtain the consent for disclosure of the documents.  On the basis of this information, on 1 February 2013 the Tribunal set a deadline for the Respondent to produce the documents ordered in Procedural Order No. 2.  On 4 February 2013, the Respondent informed the Tribunal that all requested documents in Venezuela's possession, custody, or control had been produced and delivered to the Claimant, as stated in its communication of 31 January 2013.

87.   On 6 February 2013, the Claimant requested the Tribunal to order Venezuela to: (a) confirm whether the Development Consulting Agreement, the Engineering Procurement and Construction Contract, the Project Financing and any other documents responsive to the Tribunal's disclosure order relating to the Claimant's document production request were in the possession, custody or control of certain government-related third parties; and to (b) disclose any documents responsive to the Tribunal's disclosure order relating to the Claimant's document request.  On 12 February 2013, the Respondent confirmed that it had complied with the Tribunal's instructions contained in Procedural Order No. 2.

88.   On 11 February 2013, the Respondent forwarded to the Tribunal the Parties' exchanges with respect to the Claimant's second document production request, and requested that the Tribunal rule upon the outstanding objections in accordance with Section 14.1 of the Minutes of the First Session.  On 18 February 2013, the Tribunal issued Procedural Order No. 4 on the Claimant's second document production request.

89.   On 22 April 2013, the Parties agreed to an amendment to the procedural calendar, which was confirmed by the Tribunal on 24 April 2013.

90.   On 20 May 2013, the Parties informed the Tribunal of certain procedural agreements concerning the hearing.  On 23 May 2013, the Tribunal confirmed the Parties' agreements and established the procedural calendar for the remainder of the proceeding.

91.   On 9 May 2013, the Claimant filed its Reply on jurisdiction and the merits ("Reply").

92.   On 10 September 2013, the Tribunal confirmed the pre-hearing conference call.

93.   On 13 September 2013, the Claimant informed the Tribunal that the Respondent had not produced certain documents ordered in Procedural Order No. 2 and requested the Tribunal to order the Respondent to produce a list of documents included in its letter together with any other documents responsive to Procedural Order No. 2.  On 20 September 2013, the Respondent indicated that it had produced in good faith the documents initially requested by the Claimant.  It also indicated that the specific

documents referred to by the Claimant in its letter had also been produced and provided further reasons as to why other documents had not been produced.

94. On 18 September 2013, the Respondent filed its Rejoinder on Jurisdiction and the Merits ("Rejoinder").

95. On 27 September 2013, the Claimant submitted comments to Venezuela's response of 20 September 2013 and requested that the Tribunal order Venezuela to disclose immediately and, at any rate, no later than 4 October 2013 a number of documents in the possession, custody or control of Venezuela. On 30 September 2013, the Respondent requested the Tribunal to reject the Claimant's submission of 27 September 2013. The Respondent further argued that it had already complied with Procedural Order No. 2 and that the Claimant's list of documents constituted a new request to which the Respondent requested leave to reply to. On 1 October 2013, the Claimant confirmed that it had no further comments to its 27 September 2013 letter.

96. On 30 September 2013, the Parties filed their requests for witnesses and experts to be made available for cross-examination at the hearing on jurisdiction and merits.

97. On 1 October 2013, the President of the Tribunal inquired whether the Parties would agree to Dr. Michele Potestà's appointment as an Assistant to the Tribunal in this case. On 4 October 2013, both Parties agreed to Dr. Potestà's appointment. On 8 October 2013, the Tribunal confirmed the Parties' agreement and on 14 October 2013, the Centre circulated to the Parties Dr. Potestà's signed declaration.

98. On 4 October 2013, the Tribunal issued Procedural Order No. 5 regarding the latest document production request formulated by the Claimant.

## D.    HEARING ON JURISDICTION AND THE MERITS

99. On 7 October 2013, the Parties submitted a joint procedural proposal for the hearing and indicated that they would provide their respective views on the points of conflict separately on 14 October 2013.

100. On 8 October 2013, the Tribunal confirmed the Parties' agreement and asked the Parties to indicate whether any additional items should be added to the agenda for the pre-hearing conference call.

101. On 11 October 2013, the Parties submitted further explanations regarding the issues where they had been unable to reach an agreement.

102. On 17 October 2013, the President of the Tribunal, the Assistant to the Tribunal, the Secretary of the Tribunal and the Parties held a pre-hearing conference call in English and Spanish. The Parties were represented by:

On behalf of the Claimant

Mr. Nigel Blackaby          Freshfields Bruckhaus Deringer US LLP

Mr. Alexander Yanos         Freshfields Bruckhaus Deringer US LLP

Mr. Alex Wilbraham          Freshfields Bruckhaus Deringer US LLP

Ms. Caroline Richard        Freshfields Bruckhaus Deringer US LLP

Mr. James Freda             Freshfields Bruckhaus Deringer US LLP


On behalf of the Respondent

Mr. Ronald E.M. Goodman     Foley Hoag LLP

Ms. Mélida Hodgson          Foley Hoag LLP

Mr. Kenneth Figueroa        Foley Hoag LLP

Ms. Alexandra Meise Bay     Foley Hoag LLP

Ms. Analía González         Foley Hoag LLP


103. On 18 October 2013, the Claimant submitted new exhibits pursuant to section 3.3 of Procedural Order No. 5, which were admitted by the Tribunal into the record on 4 November 2013.

104. On 23 October 2013, the Tribunal issued Procedural Order No. 6 concerning procedural matters relating to the hearing on jurisdiction and the merits.

105. On 28 October 2013, the Parties submitted their respective lists of the witnesses they intended to examine regarding new issues not covered by their statements but directly related to the dispute and in which those witnesses had personal involvement pursuant to Section 6.3 of Procedural Order No. 6. The Respondent's communication also included a list of new exhibits (R-161 to R-182) pursuant to Section 7.3 of Procedural Order No. 6.

106. On the same date, the Claimant submitted a list of additional exhibits and legal authorities responsive to the Respondent's Rejoinder pursuant to Section 7.3 of Procedural Order No. 6. The Claimant also presented a list of exhibits, originally submitted by the Respondent in excerpted form, for which the Claimant submitted additional excerpts or the full document.

107. On 5 November 2013, the Respondent filed objections to the new exhibits submitted by the Claimant. On 29 October 2013, the Claimant objected to the Respondent's submission of new exhibits. On 30 October 2013, the Respondent indicated that

Procedural Order No. 6 did not limit the presentation of new exhibits to one party and it would seek leave from the Tribunal to enter these exhibits into the record independently of Procedural Order No. 6. On 31 October 2013, the Respondent filed an amended list of exhibits. On 31 October 2013, the Claimant replied to the Respondent's arguments. On 4 November 2013, the Respondent filed its response. On 5 November 2013, the Tribunal issued its decision regarding the new exhibits.

108.    By letter of 5 November 2013, the Claimant requested the introduction of certain translations of documents as new exhibits. On 6 November 2013, the Respondent objected to the introduction of the translations. On the same date the Tribunal issued a decision on this issue.

109.    On 4 November 2013, the Respondent informed the Tribunal that Mr. José Salamat Khan Fernández was not going to be able to travel to Washington, D.C. for the hearing due to health concerns and as a result of his high level position at the Venezuelan government, which would not allow him to travel for long periods of time. The Respondent indicated that Mr. Khan Fernández would be made available for examination through videoconference. On 5 November 2013, the Tribunal granted leave to examine Mr. Khan Fernández by videoconference.

110.    A hearing on jurisdiction and the merits took place in Washington, D.C. in November 2013. Although the hearing had originally been scheduled to take place from 11 November 2013 to 22 November 2013, the proceeding was suspended on November 19, 2013 as a consence of the events described *infra*. In addition to the Members of the Tribunal, the Assistant to the Tribunal and the Secretary of the Tribunal, present at the hearing were:

On behalf of the Claimant:

| | |
|---|---|
| Mr. Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Mr. Alex Yanos | Freshfields Bruckhaus Deringer US LLP |
| Mr. Alex Wilbraham | Freshfields Bruckhaus Deringer US LLP |
| Mr. Giorgio Mandelli | Freshfields Bruckhaus Deringer US LLP |
| Ms. Caroline Richard | Freshfields Bruckhaus Deringer US LLP |
| Mr. Jeffery Commission | Freshfields Bruckhaus Deringer US LLP |
| Mr. Viren Mascarenhas | Freshfields Bruckhaus Deringer US LLP |
| Mr. Giacomo Freda | Freshfields Bruckhaus Deringer US LLP |
| Mr. Carlos Ramos-Mrosovsky | Freshfields Bruckhaus Deringer US LLP |
| Mr. Patrick Childress | Freshfields Bruckhaus Deringer US LLP |
| Mr. Ricardo Chirinos | Freshfields Bruckhaus Deringer US LLP |

| | |
|---|---|
| Ms. Rebecca Everhardt | Freshfields Bruckhaus Deringer US LLP |
| Ms. Guadalupe Lopez | Freshfields Bruckhaus Deringer US LLP |
| Ms. Giulia Previtti | Freshfields Bruckhaus Deringer US LLP |
| Ms. Karima Sauma | Freshfields Bruckhaus Deringer US LLP |
| Mr. David Turner | Freshfields Bruckhaus Deringer US LLP |
| Mr. Francisco Franco-Rodriguez | Freshfields Bruckhaus Deringer US LLP |
| Mr. Henry Lancaster | Freshfields Bruckhaus Deringer US LLP |
| Ms. Allison Gilchrist | Freshfields Bruckhaus Deringer US LLP |
| Ms. Sarah Gans | Freshfields Bruckhaus Deringer US LLP |
| Mr. Israel Guerrero | Freshfields Bruckhaus Deringer US LLP |
| Mr. Iain McGrath | Freshfields Bruckhaus Deringer US LLP |
| Mr. Luis Guerrero | Wallis & Guerrero |
| Mr. Eduardo Travieso | Travieso, Evans, Arria, Rengel & Paz |
| Mr. Ricardo Cottin | Gómez, Cottin & Tejera-Paris |
| Mr. Gonzalo Tejera | Gómez, Cottin & Tejera-Paris |
| Mr. Marc Oppenheimer | Crystallex International Corporation |
| Mr. Robert Crombie | Crystallex International Corporation |
| Mr. David Kay | Crystallex International Corporation |
| Mr. Robin Shah | Crystallex International Corporation |

On behalf of the Respondent:

| | |
|---|---|
| Dr. Ronald E.M. Goodman | Foley Hoag LLP |
| Ms. Mélida Hodgson | Foley Hoag LLP |
| Mr. Kenneth Figueroa | Foley Hoag LLP |
| Dr. Alberto Wray | Foley Hoag LLP |
| Mr. Thomas Ayres | Foley Hoag LLP |
| Ms. Analía González | Foley Hoag LLP |
| Ms. Alexandra Meise Bay | Foley Hoag LLP |
| Ms. Erin Argueta | Foley Hoag LLP |
| Mr. Diego Cadena | Foley Hoag LLP |
| Ms. Madeleine Rodriguez | Foley Hoag LLP |

23

| | |
|---|---|
| Mr. Pedro Ramirez | Foley Hoag LLP |
| Ms. Elizabeth Glusman | Foley Hoag LLP |
| Mr. Rodrigo Tranamil | Foley Hoag LLP |
| Ms. Angélica Villagran | Foley Hoag LLP |
| Ms. Carmen Roman | Foley Hoag LLP |
| Ms. Jennipher Izurieta | Foley Hoag LLP |
| Ms. Gabriela Guillen | Foley Hoag LLP |

111. Due to the suspension of the hearing, which will be discussed in the following paragraphs, only the following persons were examined:

For the Claimant, the following expert and witnesses:

**Witnesses**

| | |
|---|---|
| Mr. Robert Fung | Crystallex International Corporation |
| Mr. Luis Felipe Cottin | Fact witness |
| Mr. Sadek El-Alfy | Fact witness |
| Mr. Sergio Alcalá | Fact witness |
| Mr. Juan Claudio Palazzi | Fact witness |

**Expert**

| | |
|---|---|
| Prof. Henrique Meier | Universidad Metropolitana |

For the Respondent, the following witnesses:

**Witnesses**

| | |
|---|---|
| Mr. José S. Khan | Bolivarian Republic of Venezuela |
| Mr. Sergio Rodríguez | Bolivarian Republic of Venezuela |
| Mr. Pedro Romero | Bolivarian Republic of Venezuela |
| Mr. Manuel González Díaz | Bolivarian Republic of Venezuela |
| Mr. Rodolfo Roa | Bolivarian Republic of Venezuela |
| Ms. Charly Rodríguez | Bolivarian Republic of Venezuela |
| Mr. Ramón Olivares | Bolivarian Republic of Venezuela |
| Ms. Laura Paredes | Bolivarian Republic of Venezuela |

112.    Transcripts of the hearing were distributed to the Parties.  Audio recordings of the hearing in English and Spanish were also sent to the Parties.


**E.    RECONSTITUTION OF THE TRIBUNAL AND CONTINUATION OF THE HEARING ON JURISDICTION AND THE MERITS**

113.    On 18 November 2013, the Respondent filed before the Secretary-General a proposal for the disqualification of Justice Florentino Feliciano, pursuant to Articles 14 and 15 of the Arbitration Rules.  Since the proposal was filed during the hearing, the Respondent requested that the hearing be immediately suspended pursuant to Article 15(7).

114.    By letter dated 19 November 2013, the Secretary-General declared the proceeding suspended until a decision had been taken with respect to the proposal for the disqualification of Justice Feliciano.  On the same date, the two unchallenged arbitrators established the calendar of submissions regarding the challenge.

115.    On 5 December 2013, Justice Feliciano submitted his resignation to the Secretary-General.  His resignation was transmitted to the Parties and the other two Members of the Tribunal on 9 December 2013.  Pursuant to Article 14(3) of the Arbitration Rules, the reasons for Justice Feliciano's resignation were considered by the Tribunal, which consented thereto on 11 December 2013.  The proceeding remained suspended pursuant to Article 16(2) of the Arbitration Rules.

116.    On 15 December 2013, the Respondent appointed Professor Laurence Boisson de Chazournes, a national of France, as arbitrator pursuant to Articles 14(3) and 17(1) of the Arbitration Rules.

117.    On 19 December 2013, Professor Boisson de Chazournes accepted her appointment. The Tribunal was reconstitutued and the proceeding resumed in accordance with Article 18 of the Arbitration Rules.

118.    On 23 December 2013, the Tribunal informed the Parties that, given the short time between the appointment of Prof. Boisson de Chazournes and the date for the envisaged continuation of the hearing, Prof. Boisson de Chazournes envisaged the possibility to retain an assistant for the purpose of the preparation of the hearing. The Claimant and the Respondent consented to the appointment of such assistant on 24 December and 27 December 2013 respectively. It subsequently turned out that such support was eventually not needed.

119.    On 8 January 2014, the Tribunal confirmed that the procedural directions issued in relation to the November 2013 hearing would remain applicable to the continuation of the hearing, subject to some amendments.  On 17 January 2014, the Parties submitted their comments to the amendments.  On 22 January 2014, having considered the Parties'

comments, the Tribunal issued the final amended procedural directions, which were included as an amendment to Annex A to Procedural Order No. 6.

120. The continuation of the hearing on jurisdiction and the merits took place in Washington, D.C. from 16 February to 19 February 2014. In addition to the Members of the Tribunal, the Assistant to the Tribunal and the Secretary of the Tribunal, present at the hearing were:

On behalf of the Claimant:

| | |
|---|---|
| Mr. Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Mr. Alex Yanos | Freshfields Bruckhaus Deringer US LLP |
| Mr. Alex Wilbraham | Freshfields Bruckhaus Deringer US LLP |
| Ms. Caroline Richard | Freshfields Bruckhaus Deringer US LLP |
| Mr. Jeffrey Commission | Freshfields Bruckhaus Deringer US LLP |
| Mr. Viren Mascarenhas | Freshfields Bruckhaus Deringer US LLP |
| Mr. Giacomo Freda | Freshfields Bruckhaus Deringer US LLP |
| Mr. Carlos Ramos-Mrosovsky | Freshfields Bruckhaus Deringer US LLP |
| Mr. Ricardo Chirinos | Freshfields Bruckhaus Deringer US LLP |
| Ms. Guadalupe Lopez | Freshfields Bruckhaus Deringer US LLP |
| Mr. David Turner | Freshfields Bruckhaus Deringer US LLP |
| Ms. Karima Sauma | Freshfields Bruckhaus Deringer US LLP |
| Ms. Giulia Previti | Freshfields Bruckhaus Deringer US LLP |
| Mr. Francisco Franco | Freshfields Bruckhaus Deringer US LLP |
| Mr. Henry Lancaster | Freshfields Bruckhaus Deringer US LLP |
| Mr. Jaime Aranda | Freshfields Bruckhaus Deringer US LLP |
| Ms. Allison Gilchrist | Freshfields Bruckhaus Deringer US LLP |
| Ms. Sarah Gans | Freshfields Bruckhaus Deringer US LLP |
| Mr. Israel Guerrero | Freshfields Bruckhaus Deringer US LLP |
| Mr. Iain McGrath | Freshfields Bruckhaus Deringer US LLP |
| Mr. Ricardo Cottin | Gómez, Cottin & Tejera-Paris |
| Mr. Robert Fung | Crystallex International Corporation (previous fact witness) |
| Mr. Marc Oppenheimer | Crystallex International Corporation |
| Mr. Robert Crombie | Crystallex International Corporation |

| | |
|---|---|
| Mr. Robin Shah | Crystallex International Corporation |
| Mr. David Kay | Crystallex International Corporation |
| Mr. Sadek El-Alfy | Crystallex International Corporation (previous fact witness) |

On behalf of the Respondent:

| | |
|---|---|
| Dr. Ronald E.M. Goodman | Foley Hoag LLP |
| Ms. Mélida Hodgson | Foley Hoag LLP |
| Mr. Kenneth Figueroa | Foley Hoag LLP |
| Dr. Alberto Wray | Foley Hoag LLP |
| Mr. Thomas Ayres | Foley Hoag LLP |
| Ms. Alexandra Meise Bay | Foley Hoag LLP |
| Ms. Analía González | Foley Hoag LLP |
| Ms. Erin Argueta | Foley Hoag LLP |
| Mr. Diego Cadena | Foley Hoag LLP |
| Ms. Madeleine Rodriguez | Foley Hoag LLP |
| Mr. Pedro Ramirez | Foley Hoag LLP |
| Ms. Elizabeth Glusman | Foley Hoag LLP |
| Ms. Angélica Villagran | Foley Hoag LLP |
| Ms. Carmen Roman | Foley Hoag LLP |
| Ms. Jennipher Izurieta | Foley Hoag LLP |
| Mr. Peter Hakim | Foley Hoag LLP |

121.   The following experts were examined:

For the Claimant:

| | |
|---|---|
| Prof. José Antonio Muci | Muci-Abraham & Asociados |
| Ms. Sharon Maharg | Environ International Corp |
| Dr. Robert Langstroth | Environ International Corp |
| Mr. Reed Huppman | Environ International Corp |
| Dr. Richard Jolk | Mineral Property Development, Inc |

| | |
|---|---|
| Dr. David Snow | David T. Snow, Ph.D. & Associates |
| Dr. Ronald Cohen | Ronald R.H. Cohen, PhD, Environmental Consulting |
| Mr. Trevor Ellis | Ellis International |
| Mr. Manuel Abdala | Compass Lexecon |
| Mr. Pablo Spiller | Compass Lexecon |

For the Respondent:

| | |
|---|---|
| Dr. Henrique Iribarren Monteverde | Socorro & Iribarren |
| Dr. Isabel De los Rios | Expert witness |
| Prof. Kadri Dagdelen | OptiTech Engineering Solutions, Inc. |
| Mr. Luke Danielson | OptiTech Engineering Solutions, Inc. |
| Dr. Gültekin Savci | OptiTech Engineering Solutions, Inc. |
| Prof. Carron Meaney | OptiTech Engineering Solutions, Inc. |
| Mr. Thomas H. Pearson | Continental Partners LLC |
| Mr. Timothy H. Hart | Credibility International |

122.    Transcripts of the hearing were distributed to the Parties.  Audio recordings of the hearing in English and Spanish were also sent to the Parties.

123.    On 19 February 2014, the Respondent sought leave to amend footnote 239 on page 79 of the Environmental and Social Expert Report of OptiTech Engineering Solutions Inc. of November 21, 2012 (First ER OptiTech) which was an issue that had been raised during the examination of Mr. Luke Danielson.  On 21 February 2014, pursuant to the instructions provided by the Tribunal at the hearing, the Claimant submitted its observations to the amendment of the First ER OptiTech.  On 27 February 2014, the Respondent replied to the Claimant's observations.  On 28 February 2014, the Tribunal confirmed that the First ER OptiTech had been amended to reflect the correct citations as set forth in the Respondent's letter of 19 February 2014, and provided another deadline to the Parties to comment.  The Parties did not further comment on this issue.

124.    On 4 March 2014, the Secretary of the Tribunal transmitted a set of questions from the Tribunal for the Parties to address in their post-hearing submissions pursuant to the instructions provided at the hearing.  The questions were not meant to be exhaustive but rather to point to some areas that required additional clarification from the Parties. The questions were as follows:

1) Assuming that the Tribunal would not have jurisdiction over the claims arising directly from the rescission of the MOC (under either or both jurisdictional objections put forward by the Respondent), what would be the consequences, if any, on the prayers for relief, on the awards, on the valuation date, and especially on the amounts to be awarded?

2) The Tribunal understands that the Claimant has withdrawn its claim for restitution (Hearing Transcript, 11 November 2013, 205:14-18; 255:15-18). If this understanding is erroneous, the Tribunal invites the Claimant to clarify its position.

3) If the Tribunal were to conclude that Minister Khan did not have the authority to rescind the MOC, would the consequences be that the rescission is not valid? Would that mean that it produces no effects? If yes (to either of the two preceding questions in this paragraph), what would be the consequences of that invalid rescission under Venezuelan law, if relevant, and under international law?

4) Which were the rights of the Claimant (exploration, exploitation, occupation, development etc.) under the MOC at the time of the permit denial in 2008, and until the rescission of the MOC in 2011?

5) At what time(s) did the Claimant's alleged legitimate expectations arise?

6) Assuming that the Tribunal were to find liability under one of the Treaty's standards of treatment (expropriation, fair and equitable treatment, etc.), would it then have to analyze whether the other Treaty standards have also been breached? If yes, why?

7) How should the relationship between the fair and equitable treatment and the full protection and security standards be understood in the context of Article 2.2 of the Treaty?

8) What is the standard of compensation applicable in this case for Treaty breaches other than expropriation? What would result (in figures) from the application of that standard?

9)      Assuming the Tribunal were to find liability under one or more of the Treaty's standards of treatment, what would the Claimant's damages be under the various approaches set forth by Claimant, other than the stock market approach, if:

(i)      The date of valuation is (a) April 13, 2008 or (b) February 3, 2011;

(ii)     The price of gold is (a) $629, or $650, or $925, in the case of a valuation date of April 13, 2008, or (b) $1,039, or $1,100, or $1,328, in the case of a valuation date of February 3, 2011;

(iii)    The duration is 20 years (assume no renewals);

(iv)     The extraction rate is 20,000 tpd moving to 40,000 tpd in year 3; and

(iv)     The implied nominal discount rate is (a) 10.41%, or (b) 12.71%, or (c) 15%, or (d) 17%, or 22%?

10)     Assuming that the Tribunal were to find liability under one or more of the Treaty's standards of treatment and were to use a stock market approach, would it have all the needed figures (metrics, relevant stock prices)? If so, what would the Claimant's damage be applying a stock market approach, assuming: (a) a stock price from June 14, 2007, (b) a control premium of 20% or, in the alternative, no control premium, (c) applying the permitting bump (as set forth by Claimant) or, in the alternative, excluding a permitting bump, (d) applying the rate of growth in benchmark industry indices as set forth by Claimant, and (e) a valuation date of April 13, 2008, or in the alternative, February 3, 2011.

11)     Assuming that the Tribunal were to find liability under one or more of the Treaty's standards of treatment and were to use a cost approach, could the Parties provide the actual amounts spent and evaluate their contribution to value?

12)     Assuming the Tribunal were to find liability under one or more of the Treaty's standards of treatment and award damages, please explain why or why not the $37.4 million received from mitigation efforts should be deducted from any damages owed to Claimant?

125.    On 18 March 2014, the Claimant raised certain difficulties regarding Tribunal's question 9. On 4 April 2014, the Respondent filed its comments and noted that it

needed to address with new evidence or analysis some of the issues contained in the Claimant's letter of 18 March 2014. Therefore, the Respondent reserved its rights to provide supplemental comments to the Claimant's responses to the extent that such answers implied a new damages analysis or new evidence. On 7 April 2014, the Tribunal instructed the Parties to first seek leave from the Tribunal before making submissions on the referred issue, whether before or after the post-hearing briefs ("PHB"). In compliance with the Tribunal's direction, on 8 April 2014, the Claimant indicated that it also reserved its rights to comment on (a) the valuation date; and (b) the evidence on the record with respect to the value of the Claimant's interest in Las Cristinas depending on the valuation date used.

126.  On 28 March 2014, the Parties submitted the final agreed corrected transcripts of the hearing, in accordance with section 17 of Annex A to Procedural Order No. 6 (as amended).

127.  On 2 May 2014, the Parties informed the Tribunal that they had agreed to an extension to file the post-hearing briefs. On 5 May 2014, the Tribunal confirmed the extension agreed by the Parties.

128.  The Parties filed simultaneous post-hearing briefs on 12 May 2014.

129.  On 10 June 2014, the Respondent requested the Tribunal to strike from the record alleged new evidence, arguments and valuations presented in the Claimant's Post-Hearing Brief, to which the Claimant replied on 11 June 2014. On 13 June 2014, the Tribunal invited the Respondent to indicate the precise paragraphs or sentences from the Claimant's Post-Hearing Brief that it wished to have stricken from the record and the Claimant to subsequently indicate which of the identified section it objected to. The Parties submitted the requested information in their respective letters of 20 and 27 June 2014. On 30 June 2014, the Respondent submitted further comments on this matter.

## F.    FURTHER QUANTUM INFORMATION REQUESTED BY THE TRIBUNAL AND HEARING ON QUANTUM

130.  On 25 July 2014, the Tribunal invited the Parties to file one further round of submissions with related evidence and expert reports, if needed, subject to certain limitations. In doing so, the Tribunal specified that it did not wish to receive additional evidence that was not strictly related to the questions raised in the Tribunal's letter of 25 July 2014. In particular, the Tribunal invited the Claimant to provide a submission addressing the following questions with related evidence and expert reports, to be followed by the Respondent's submission with related evidence and expert reports, if needed:

> 1. To supply the necessary data and the calculations in relation to the P/NAV method, assuming:

(i) The date of valuation is 13 April 2008;

(ii) The price of gold is (a) $629, or (b) $650, or (c) $925;

(iii) The duration is (a) 20 years or (b) 40 years;

(iv) The extraction rate is 20,000 tpd moving to 40,000 tpd in year 3; and

(v) The implied nominal discount rate is (a) 10.41%, or (b) 12.71%, or (c) 15%, or (d) 17%, or (e) 22%.

2. To supply the necessary data and the calculations in relation to the market multiples method, assuming:

(i) The date of valuation is (a) 13 April 2008 or (b) 3 February 2011;

(ii) A control premium of 20% or, in the alternative, no control premium;

(iii) The duration is (a) 20 years or (b) 40 years;

(iv) The extraction rate is 20,000 tpd moving to 40,000 tpd in year 3 (assume no "unconstrained" scenario).

3. To supply the necessary data and the calculations in relation to the stock market approach:

(i) Assuming the date of valuation is (a) 13 April 2008 or (b) 3 February 2011;

(ii) Assuming a stock price from 14 June 2007;

(iii) Assuming a control premium of 20% or, in the alternative, no control premium;

(iv) Applying the permitting bump (as set forth by the Claimant) or, in the alternative, excluding a permitting bump;

(v) Using the Market Vectors Junior Gold Mining Index (Exh. CLEX-96) to project the growth of Crystallex's share price to (a) 13 April 2008 or (b) 3 February 2011.

4. To update and provide any further supporting document in relation to the cost approach, in particular any supporting evidence of net costs (i.e., costs from which the damage claim would flow) incurred until 2014.

5. To correct its request for relief set forth in paragraph 749 of its post-hearing brief. In order to avoid any misunderstanding, the Tribunal believes that there is a need to correct some typographical or clerical errors and is directing the Claimant only to correct such typographical or clerical errors, if indeed there are any.

131.    On 14 August 2014, the Respondent raised concerns regarding the Tribunal's 25 July 2014 request for further quantum information and requested that the Tribunal withdraw its request and allow it to comment on the Claimant's submitted new calculation on the cost approach. On 15 August 2014, the Tribunal invited the Claimant to comment on Respondent's 14 August 2014 communication, which the Claimant did on the same date and also requested an extension to file its response to the Tribunal's 25 July 2014 request for further quantum information. On 17 August 2014, the Respondent reiterated its request to the Tribunal. On 18 August 2014, the Tribunal decided to reaffirm its request from 25 July 2014 and extended the deadlines for the Parties to submit their responses.

132.    On 1 September 2014, the Respondent requested that the Tribunal hold a hearing after the submissions of the Parties in response to the Tribunal's 25 July 2014 request for further quantum information. On 4 September 2014, the Claimant requested an extension to submit its comments. On 5 September 2014, the Tribunal granted Claimant's request and indicated the dates in which the Tribunal would be available for a possible hearing, without prejudice to its decision regarding the Respondent's request. On 7 September 2014, the Claimant submitted its comments. On 8 September 2014, the Tribunal decided (a) to hold a short hearing limited to the examination of experts on quantum; and (b) that no further submissions were required beyond the ones contemplated.

133.    On 12 September 2014, the Claimant submitted its Supplemental Submission on Quantum and Compass Lexecon's Responses to the Tribunal's Questions dated 25 July 2014. On 15 September 2014, the Claimant submitted a revised version of Compass Lexecon's Responses to the Tribunal's Questions dated 25 July 2014.

134.    On 18 September 2014, Professor Boisson de Chazournes informed the Parties that she had acquired Swiss nationality.

135.    On 31 October 2014, the Respondent filed its Supplemental Submission on Quantum and the Third Expert Report of Timothy H. Hart of Credibility International.

136.    On 9 October 2014, the Claimant submitted the award in the case *Gold Reserve Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/09/1) as a new legal authority. Further to this submission, the Claimant also requested leave from the Tribunal for both Parties to submit a brief analysis of key elements in the aforementioned award. On 10 October 2014, the Tribunal invited the Respondent to submit its comments to the Claimant's request by 14 October 2014. The Respondent requested an extension to the deadline, which was granted by the Tribunal.

137.    On 15 October 2014, the Respondent submitted its comments to the specific elements raised by the Claimant in its 9 October 2014 letter and also submitted the award in the case *Mobil Corporation, Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd., and Mobil*

*Venezolana de Petróleos, Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/07/27) as a new legal authority in this case.

138.    On 16 October 2014, the Claimant replied to the Respondent's comments and reiterated its request for an exchange of brief submissions.  On the same date, the Respondent addressed the Claimant's request for brief submissions and suggested that such submissions be filed after the hearing scheduled for November 2014.

139.    On 17 October 2014, the Tribunal invited the Parties to submit brief comments on the two new legal authorities and reminded the Parties that the scheduled hearing was to be solely for the limited purpose of examining the Parties' experts on quantum.  On the same date, the Respondent requested an extension of the deadline to submit its brief comments.

140.    On 20 November 2014, the Tribunal indicated that it did not see the need to extend the deadline but that it could reconsider the Respondent's request once it had received the brief comments from the Claimant.

141.    On 31 October 2014, the Claimant submitted its comments on the new legal authorities.

142.    On 6 November 2014, the Respondent reiterated its request for an extension and noted that the Claimant was making new arguments with respect to the new legal authorities.  On 7 November 2014, the Claimant objected to the Respondent's characterization of its comments but did not object to the extension.

143.    On 10 November 2014, the Respondent filed its brief comments on the new legal authorities pursuant to the Tribunal's granted extension.

144.    On 23 September 2014, the Parties submitted agreed procedural rules for the hearing on quantum.

145.    On 25 September 2014, the Tribunal issued the final procedural rules for the hearing.

146.    On 7 November 2014, the Tribunal issued revised final procedural rules for the hearing.

147.    On 20 November 2014, the Claimant requested the Tribunal to rule on its request for leave to submit additional factual exhibits into the record in accordance with paragraph 16 of the updated procedural rules.   On the same date, the Respondent objected to the Claimant's new documents.  The Claimant's request was rejected by the Tribunal on the same day.

148.    On 22 November 2014, the hearing on further information on quantum took place in Paris.  In addition to the Members of the Tribunal, the Assistant to the Tribunal and the Secretary of the Tribunal, present at the hearing were:

On behalf of the Claimant:

Mr. Nigel Blackaby                              Freshfields Bruckhaus Deringer US LLP

Mr. Alexander Yanos                      Hughes Hubbard & Reed LLP

Mr. Alex Wilbraham                       Freshfields Bruckhaus Deringer US LLP

Mr. Carlos Ramos-Mrosovsky               Freshfields Bruckhaus Deringer US LLP

Ms. Giulia Previti                       Freshfields Bruckhaus Deringer US LLP

Mr. Israel Guerrero                      Freshfields Bruckhaus Deringer US LLP

Mr. Jaime Aranda                         Freshfields Bruckhaus Deringer US LLP

Ms. Mélanie Merouze                      Freshfields Bruckhaus Deringer US LLP

Mr. Ricardo Cottin                       Gómez, Cottin & Tejera-Paris

Mr. Robert Fung                          Crystallex International Corporation

Mr. Marc Oppenheimer                     Crystallex International Corporation

Mr. Robert Crombie                       Crystallex International Corporation

Mr. David Kay                            Crystallex International Corporation


On behalf of the Respondent:

Ms. Mélida N. Hodgson                    Foley Hoag LLP

Mr. Kenneth J. Figueroa                  Foley Hoag LLP

Mr. Thomas R. Ayres                      Foley Hoag LLP

Ms. Angélica Villagrán                   Foley Hoag LLP

Mr. Pedro Ramirez                        Foley Hoag LLP


149.    The following experts were examined:

For the Claimant:

Mr. Manuel Abdala                        Compass Lexecon

Mr. Pablo Spiller                        Compass Lexecon

35

For the Respondent:

Mr. Timothy Hart                         Credibility International

150.    On 26 November 2014, the Secretariat dispatched an electronic copy of the audio and transcripts of the hearing in English and Spanish.

151.    On 15 December 2014, the Parties sent the final agreed corrected transcript of the hearing on quantum.

152.    On 21 January 2015, the Respondent informed the Secretariat of changes to the contact list in the arbitration. On 22 January 2015, the Secretariat inquired as to the contact person to whom all communications should be addressed within the Attorney General's office. On that same date, the Respondent informed the Secretariat that all communications should be addressed to Dr. Reinaldo Enrique Muñoz Pedroza, *Viceprocurador General de la República*.

153.    On 23 January 2015, the Secretariat informed the Parties that, following the decision of Ms. Ann Catherine Kettlewell to leave her position at ICSID, the Secretary-General had appointed Ms. Alicia Martín Blanco, ICSID Legal Counsel, as Secretary of the Tribunal in this case.

154.    The Parties filed their submissions on costs on 23 January 2015.

155.    On 26 June 2015, the President of the Tribunal disclosed to the Parties his recent appointment as President in two separate arbitrations in which Freshfields acted as counsel for one of the parties, one of which arbitrations involved three state-owned Venezuelan entities as respondents. The President indicated that he did not consider that these facts affected his independence and impartiality and noted that the disclosure was made for the sake of transparency only.

156.    On 29 June 2015, the Respondent asked the President of the Tribunal to identify certain specifics about one of the arbitrations to which he had referred in his communication of 26 June 2015. On 1 July 2015, the President of the Tribunal provided to the Parties the information requested by the Respondent in its communication of 29 June 2015.

157.    The proceeding was closed on December 24, 2015.

### III.    PRELIMINARY MATTER: VENEZUELA'S PROCEDURAL OBJECTIONS

158.    As a preliminary matter, the Tribunal addresses certain procedural and due process objections made by the Respondent during the proceedings. The Tribunal finds it important to put those objections within the context in which they were made and to underscore the subsequent developments that followed those objections.

159.    On 2 June 2014, the Respondent sought leave from the Tribunal to provide comments to the Claimant's PHB and its Annex I, which according to the Respondent contained "new and misleading arguments largely based on documents not found in the evidentiary record". Further letters on this issue were received on 9 and 11 June 2014 from the Claimant and on 10 June 2014 from the Respondent respectively.

160.    On 13 June 2014, the Tribunal took note that in its 10 June 2014 letter, Venezuela had requested the Tribunal to strike from the record the allegedly new evidence, arguments and valuations presented in the Claimant's PHB. The Tribunal invited the Respondent to indicate by 20 June 2014 the precise paragraphs or sentences from the Claimant's PHB that should be struck from the record, and the Claimant to indicate by 27 June 2014 which of the paragraphs or sentences indicated by the Respondent it objected being struck from the record. The Tribunal added that it would "take a decision subsequently, possibly as late as in its Final Award".

161.    Pursuant to the Tribunal's directions, on 20 June 2014, the Respondent specified its request to strike certain paragraphs from the Claimant's PHB from the record, to which the Claimant replied in its letter of 27 June 2014.

162.    A further letter from the Respondent was received on 30 June 2014.

163.    As is recalled in the procedural history above,[105] the Tribunal asked further questions to the Parties on 25 July 2014, which in turn triggered a further round of written supplementary quantum submissions (and expert reports) as well as one full day of Hearing, the latter at the request of the Respondent.

164.    At the end of the Quantum Hearing, the President of the Tribunal asked the following question:

> "PRESIDENT LÉVY: We had some objections from [the Respondent's] side with respect to due process. Do those objections still stand, or not now, after this Hearing? Please, feel free to say that you don't want to answer now. But if you don't answer now, I would like for you to confirm in writing rather expeditiously. I don't need the answer now, but I need it, let's say, expeditiously. So, if you prefer.
>
> MS. HODGSON: Thank you, Mr. President. We will confer, and we will get back to you as soon as possible.

---

[105] See *supra* Section II(F).

PRESIDENT LÉVY: Very well."[106]

165.    The Tribunal received no further comment in this respect from the Respondent after the Quantum Hearing.

166.    As a general matter, the Tribunal notes that many of the Respondent's objections concern answers provided by the Claimant in response to certain specific Tribunal questions sent to the Parties on 4 March 2014. The Respondent did not object to the Tribunal's proposal at the hearing to list questions for the Parties to answer in a single round of post-hearing submissions to be filed simultaneously.[107] Furthermore, the Respondent did not object when the Tribunal forwarded its questions to the Parties on 4 March 2014. It is obvious that the possibility existed that somewhat new arguments or analysis could be made by either Party in response to such questions: after all, if the questions could prompt only identical arguments or analysis as those already contained in previous pleadings, there would have been no need for the Tribunal to ask those questions in the first place.

167.    More importantly, the Tribunal notes that, after Venezuela first raised its objections on 2 June 2014 (and then specified them in its letters of 10, 20 and 30 June 2014), the Parties had further opportunities to present their views, both in writing through their supplemental quantum submissions of 12 September and 31 October 2014 respectively, and orally at the Quantum Hearing of 22 November 2014. Finally, when asked by the Tribunal at the end of the Quantum Hearing whether the Respondent would maintain all or some of the objections recalled above, the Respondent advised that it would get back to the Tribunal "as soon as possible". As already noted, the Respondent did not provide any further comments or complaints, which the Tribunal understands to mean that the Respondent effectively did not wish to pursue those objections further. The Tribunal thus trusts that all objections have been satisfactorily resolved or addressed in the subsequent phase of the arbitration, or have been abandoned for other reasons even if they might have been warranted at the time they were first made.

168.    Out of abundance of caution and for the sole purpose of the avoidance of doubt, the Tribunal nonetheless addresses each of Venezuela's objections in the following paragraphs.

## A.    OBJECTIONS REGARDING CLAIMANT'S PHB

169.    The first two objections raised by Venezuela concern certain points made by the Claimant in response to Question 1 of the Tribunal's 4 March 2014 Questions.

170.    Venezuela argues that the Claimant consistently framed its claim positing that notice was given regarding the *rescission* in the November 2008 Notice of Dispute, while in

---

[106] Tr. [Supplemental *Quantum*] 373:19-22 – 374:1-8.

[107] See Tr. [Jurisdiction and Merits], Day 10, 3010: 5-11 and 3016: 4-6.

its answer to the Tribunal's questions, the Claimant for the first time sought to present the *transfer* of Las Cristinas, pursuant to the rescission, as an event independent of the rescission and constituting a *takeover*.[108] Venezuela further argues that the Claimant has not previously framed its jurisdiction rescission claim as one based on the "rescission" *"and/or"* "takeover".[109]

171. Question 1 of the Tribunal's 4 March 2014 Questions concerned a hypothetical about the possible consequences that would follow in the event that the Tribunal were to find that it had no jurisdiction over claims arising directly from the rescission of the MOC.[110] Because of the decision ultimately taken by the Tribunal that indeed it has jurisdiction over the entire dispute, the comments made by the Parties in response to Question 1 are of no relevance for any matter decided by the Tribunal in this Award, and Venezuela cannot have been prejudiced by any of such allegedly new arguments. The Tribunal can thus dispense with expressly resolving this objection.

### B.    OBJECTION REGARDING CLAIMANT'S PHB

172. The Respondent's next objection concerns an argument made by the Claimant that the relative market multiple method is unaffected by a 20-year contract life.[111]

173. The Tribunal notes that the Parties had ample opportunity to address the methodological bases of the market multiples analysis not only in their PHBs, but also subsequently in their supplemental quantum submissions and at the Quantum Hearing. The Respondent's objection that Venezuela has not had an opportunity to respond to those arguments, whether valid or not when it was made, is thus rejected.

### C.    OBJECTION REGARDING CLAIMANT'S PHB

174. The Respondent further objects to the Claimant's introduction of the so-called Goldcorp implied valuation for 13 April 2008. According to the Respondent, such implied valuation is new and was not requested by the Tribunal. Venezuela thus had no

---

[108] Letter from the Respondent to the Tribunal, 20 June 2014, pp. 1-2. See also Letter from the Respondent to the Tribunal, 2 June 2014, p. 3.

[109] Letter from the Respondent to the Tribunal, 20 June 2014, pp. 2-4.

[110] Question 1 of the Tribunal's 4 March 2014 reads as follows: "Assuming that the Tribunal would not have jurisdiction over the claims arising directly from the rescission of the MOC (under either or both jurisdictional objections put forward by the Respondent), what would be the consequences, if any, on the prayers for relief, on the awards, on the valuation date, and especially on the amounts to be awarded?".

[111] Letter from the Respondent to the Tribunal, 20 June 2014, pp. 4-6.

opportunity to respond to it.[112] Accordingly, the Respondent requests that those portions relating to the Goldcorp implied valuation be struck from the record.

175.   The Claimant argues that the so-called "Goldcorp transaction" confirms the results it has arrived at through its valuation methods.[113]

176.   The Claimant contends that, in February 2006, Goldcorp acquired 5% of Crystallex's shares, as well as the right to purchase an additional 4.9% at US$4.25 per share, for an overall 9.9% interest.[114] According to the Claimant, because between February 2006 and February 2011 (Claimant's proposed date of valuation), gold prices more than doubled, and the value of gold stock indices increased by 62%, the US$982 million valuation (control premium excluded) at which Goldcorp was willing to purchase shares in 2006 would have become a valuation of at least US$1.97 billion as of 3 February 2011 (control premium excluded).[115] Applying a "market standard" control premium of 20%, a but-for value of 100% of Crystallex projected from the Goldcorp investment as of the valuation date would yield a figure of US$2.37 billion.[116] According to the Claimant, these extrapolations from a major real-world investment in Crystallex's stock prior to Venezuela's unlawful measures yield values that should provide the tribunal with further confirmation that Crystallex's assessment of the Fair Market Value of its right at Las Cristinas is reasonable and consistent with market expectations.[117]

177.   With regard to Venezuela's objection that the Goldcorp "implied valuation" is new, the Claimant submits that such valuation is simply an arithmetical relationship between data that have long been in the record. Furthermore, it is not a valuation per se, but represents an actual arm's-length transaction that should serve as a reference point confirming the reasonableness of the results obtained by its experts.[118]

178.   The Tribunal agrees with the Respondent that the Goldcorp implied valuation is new and that it was not requested by the Tribunal in any of its questions. The Tribunal has not resorted to such "valuation" in reaching its conclusions on the damages to be awarded to the Claimant. The Respondent's objection in this respect is thus granted.

---

[112] Letter from the Respondent to the Tribunal, 20 June 2014, p. 6. See also Letter from the Respondent to the Tribunal, 2 June 2014, p. 2; Letter from the Respondent to the Tribunal, 10 June 2014, p. 2.

[113] On the Claimant's proposed valuation methods see *infra* Section VIII.C.1.c.

[114] See Documents Related to Crystallex and Goldcorp 2006 Agreement, Various Dates, **Exh. C-555**.

[115] C-PHB, paras 658-662.

[116] C-PHB, paras 663-664.

[117] C-PHB, para. 665.

[118] Letter from the Claimant to the Tribunal, 27 June 2014, Annex A, pp. 13-14. See also the letter from the Claimant to the Tribunal, 9 June 2014, pp. 2-3.

### D.    OBJECTION REGARDING THE COST APPROACH VALUATION

179.    The Respondent points to the Claimant's PHB, para. 105, to the Claimant's PHB Annex I, paras 11-1 to 11-5 (including tables and footnotes), and 11.6 (1st sentence), and argues that the cost approach valuation is based on evidence not in the record and includes classes of costs never before presented or explained by the Claimant. Venezuela contends that it was never given an opportunity to respond to such new valuation in order to demonstrate the various methodological and conceptual flaws it contains.[119]

180.    The Tribunal notes that the Parties subsequently had ample opportunity to address the cost approach figures put forward by the Claimant in response to the Tribunal's questions both in their supplemental quantum submissions and at the Quantum Hearing. The Respondent's objection that Venezuela has not had an opportunity to respond to those arguments is thus rejected. The Tribunal has in any circumstances come to the conclusion that the cost approach cannot be used as a valuation method in this arbitration for the reasons set out further below. It has referred to it only for illustrative purposes, i.e. *ex abundanti cautela,* to confirm the reasonableness of its conclusions reached by reference to other valuation methods.

### E.    OBJECTION REGARDING CLAIMANT'S PHB

181.    Finally, the Respondent argues that the Claimant's argument made in its PHB at para. 476 that the expropriation began in June 2007 is new, as the Claimant had previously argued that the alleged "creeping expropriation" began in April 2008.[120]

182.    The Claimant rebuts that Venezuela misrepresents its arguments, as it has never advanced any argument that there was a Treaty breach or creeping expropriation prior to the Permit Denial Letter of April 2008.[121]

183.    To the extent there could be a possible uncertainty as to the Claimant's argument with respect to the time when the alleged "creeping expropriation" began, the Tribunal has taken note of the Claimant's clarification in this respect. Given this clarification, the Tribunal believes that the record has been put straight, and that there cannot be a new argument made by the Claimant to which the Respondent might have needed to respond.

---

[119] Letter from the Respondent to the Tribunal, 20 June 2014, p. 6. See also Letter from the Respondent to the Tribunal, 2 June 2014, p. 2. See also Letter from the Respondent to the Tribunal, 10 June 2014, pp. 2-4.

[120] See Letter from the Respondent to the Tribunal, 20 June 2014, pp. 15-16; Letter from the Respondent to the Tribunal, 2 June 2014, p. 3.

[121] Letter from the Claimant to the Tribunal, 9 June 2015, p. 5.

## IV.    THE PARTIES' PRAYERS FOR RELIEF

184.    In this arbitration, the Claimant has made the following prayer for relief (as is stated in its latest submission, i.e. its Supplemental Quantum Submission):

> "[…] Crystallex respectfully requests that the Tribunal:
>
> DECLARE that:
>
> (i) Venezuela has breached Article VII(l) of the Treaty by expropriating the Claimant's investments in Venezuela; and
>
> (ii) Venezuela has breached Article II(2) of the Treaty by failing to accord the Claimant's investments in Venezuela fair and equitable treatment, and full protection and security;
>
> ORDER that:
>
> (iii) Venezuela pay the Claimant the sum of USD3,160,000,000 for its breaches of the Treaty or such other amount as the Tribunal determines is a consequence of (i) and (ii);
>
> (iv) Venezuela pay pre-award interest in the sum of USD1,034,174,685, calculated from the Valuation Date to 12 September 2014 or such other amount as the Tribunal considers will ensure full reparation and thereafter at a commercially reasonable rate of 8% per annum until the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (v) Venezuela pay post-award interest on (iii) and (iv) above at a commercially reasonable rate of 8% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparations [sic];
>
> DECLARE FURTHER that:
>
> (vi) The award of damages and interest in (iii), (iv) and (v) is made net of applicable Venezuelan taxes; and
>
> (vii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest in (iii), (iv) or (v);
>
> ORDER FURTHER that:
>
> (viii) Venezuela indemnify the Claimant in respect of any double taxation liability that would arise in Canada or elsewhere that would not have arisen but for Venezuela's adverse measures;
>
> GRANT:

(ix) Such other relief as the Tribunal considers appropriate; and

ORDER that:

(x) Venezuela pay all of the costs and expenses of this Arbitration, including the Claimant's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's Additional Facility costs".[122]

185. The Respondent has made the made the following prayer for relief (as is stated in its latest submission, i.e. its Supplemental Quantum Submission):

"1. the Tribunal lacks jurisdiction to hear Crystallex's claims with respect to the Mine Operating Contract in accordance with Article XII of the Treaty;

2. should the Tribunal find that it has jurisdiction over any or all of Crystallex's claims, then for all the reasons set forth above and in Venezuela's prior submissions, Claimant's claims--including its damages claims--should be dismissed in their entirety; and,

3. Venezuela should be awarded compensation for all the expenses and costs associated with defending against these claims".[123]

---

[122] C-Supplemental Quantum Submission, para. 56.

[123] R-Supplemental Quantum Submission, para. 90.

## V.    THE POSITIONS OF THE PARTIES

186.    Section IV summarizes the Parties' positions as to the disputed facts underlying the dispute. It presents the positions of the Parties by issues, to the extent possible. Section V.A deals with Crystallex's previous mining experience and its investment in Las Cristinas. Section V.B addresses Crystallex's permitting process up to the denial of the Permit in April 2008. Section V.C deals with the issues relating to rescission of the MOC. Finally, Section V.D presents the Parties' positions with respect to the alleged partnerships that Venezuela has concluded with other Parties concerning Las Cristinas, following the rescission of the MOC.

### A.    CRYSTALLEX'S PREVIOUS MINING EXPERIENCE AND ITS INVESTMENT IN LAS CRISTINAS

#### 1.    The Claimant's Position

##### a.    Crystallex was a successful mining company

187.    Crystallex contends that it has been a producer of gold with a successful track record of exploring, developing and operating mining properties and mines in Latin America, in particular in Brazil, Uruguay, and Venezuela.[124] In Venezuela, Crystallex operated an open pit mine at Albino 1, in the country's Kilometer 88 region, adjacent to the Las Cristinas site.[125] It also conducted mining operations in the El Callao region, by exploiting the Revenin Mill, the Tomi and the Lo Increíble deposits.[126] Through these operations, the Claimant contends to have gained the know-how required to operate open pit mines in Venezuela, as well as a network of support personnel and suppliers that could be readily adopted for use in the Las Cristinas project.[127]

188.    Furthermore, Crystallex's management team was highly experienced.[128] It consisted of mining experts with extensive experience working with major gold producers such as Barrick Gold Corporation and major Canadian gold miner, IAMGOLD.[129] Moreover, Crystallex claims to have hired first class contractors and consultants for the Las Cristinas project.[130] It instructed one of the world's leading mining engineering and construction groups, SNC Lavalin, to prepare the Feasibility Study and the EIS. It also

---

[124] Memorial, para. 37; Reply, paras 67-69.

[125] Memorial, paras 38-39.

[126] Memorial, paras 40-44.

[127] Memorial, para. 44.

[128] Reply, paras 70-72.

[129] Reply, para. 70.

[130] Reply, paras 73-76.

instructed other leading technical consultants, including MDA. Finally, Crystallex had a senior management team with significant financial experience, with familiarity with the financial markets in the US and Canada, which made it possible for Crystallex to raise significant sums of money.[131]

189.    In any event, even if it was true that Crystallex was a junior mining company and that its management lacked the competence to maximize the value of Las Cristinas or the ability to raise the required financing, as Venezuela contends, this would not, in the Claimant's view, have impacted the underlying value or development of Las Cristinas.[132]

190.    Crystallex claims that it had the profile of any mining company in an investment phase seeking to achieve asset growth,[133] and that it is quite common for junior single asset, or majority single asset gold mining companies, to be loss making when they are in a development phase.[134] However, the value of a company hinges on the nature of the assets a company has acquired, on the plans it has to develop those assets and on the value of the cash flows those assets will ultimately produce.[135]

191.    Furthermore, Crystallex was well known to the CVG because it had been working with the CVG on a number of other projects in the Guyana region, and was thus chosen by the CVG as its contractual partner for good reason.[136]

    b.    **The Claimant's investment in Las Cristinas**

192.    The Claimant describes Las Cristinas as one of the largest undeveloped gold deposits in the world, with resources of 20.76 million ounces of gold (plus an additional 6.28 million ounces of inferred resources) containing proven and probable gold reserves of 16.86 million ounces at a gold price of US$550 per ounce.[137] Las Cristinas is, in the Claimant's view, characterized by particularly favorable conditions. An international paved highway, Troncal 10, runs next to Las Cristinas. Furthermore, since 2001, a 400 Kv power line has run parallel to Troncal 10. Thus, any mining project at Las Cristinas would not require the construction of a major long-distance road to access population

---

[131] Reply, paras 77-79.

[132] C-PHB, paras 59-62.

[133] C-PHB, para. 69.

[134] C-PHB, para. 72.

[135] C-PHB, para. 74.

[136] C-PHB, paras 75-77.

[137] Memorial, para. 49.

hubs, nor an independent source of power to supply the mine.[138] Moreover, the area also enjoys favorable weather conditions (a temperate climate).[139]

193.    According to the Claimant, under the MOC, Venezuela assumed no risk in the development of the Las Cristinas project. It was Crystallex who was solely and exclusively responsible for such development and for compliance with the obligations arising under the MOC, including the achievement of annual production goals, regardless of the profitability or economic viability of the project, and notwithstanding gold price fluctuations. In contrast, Venezuela enjoyed a guaranteed income stream at all times.[140]

194.    The Claimant submits that, in accordance with its obligations under the MOC to implement social programs for the benefit of the communities surrounding Las Cristinas,[141] Crystallex generated a significant number of jobs in the local community;[142] provided technical support for small-scale mining associations, especially training in environmentally responsible (i.e., mercury-free) mining techniques,[143] bore the cost of maintenance, supplies and general operations of the Las Claritas Medical Center, and upgraded the medical center by investing in radiology and dentistry equipment and providing all necessary medical supplies at the site.[144] It also built a wholly new medical center at Las Claritas, which however the CVG refused to receive, according to the Claimant.[145] In addition, Crystallex built 30 houses;[146] provided free training to personnel from the local communities in the handling of machinery and equipment needed for mining operations;[147] installed and integrated water treatment systems and built an underground sewage system for use by the local communities;[148] paved streets and roads in Las Claritas and Santo Domingo (beyond its contractual obligations under the MOC);[149] and carried out education initiatives, including maintaining a program of scholarships and internships for students.[150]

---

[138] Memorial, paras 45-47.

[139] Memorial, para. 48.

[140] Memorial, para. 93.

[141] See MOC, **Exh. C-9**, Clauses 7 and 12.

[142] Memorial, paras 107-111.

[143] Memorial, paras 112-114.

[144] Memorial, paras 115-119.

[145] Memorial, paras 120-121.

[146] Memorial, paras 123-124.

[147] Memorial, paras 125-127.

[148] Memorial, paras 128-134.

[149] Memorial, paras 135-137.

[150] Memorial, paras 138-140.

195.    According to the Claimant, Crystallex invested heavily in bringing the mine to a "shovel-ready" stage. Between 2002 and 2010, it invested over US$500 million in the project, *inter alia* by acquiring mining and milling equipment that it could assign to the project at a later date;[151] by rebuilding and upgrading the campsite;[152] by upgrading the access road from Troncal 10 (the road between Kilometer 85 and Las Cristinas);[153] by paving and extending the airstrip;[154] and by building a solid waste landfill.[155]

196.    Crystallex hired MDA to complete a reserve and resource model as well as a mine plan. Between 2003 and 2007, Crystallex undertook a number of drilling programs to further delineate the deposit and increase the reserve estimate. A total of 28,427 meters were drilled in 90 holes.[156] As a result of these studies and drilling programs conducted while Crystallex was in possession of the site, the proven and probable reserves at Las Cristinas were increased, according to the Claimant, by 77% from the original estimated amount of 9.5 million ounces (according to the 2002 data received by the CVG) to 16.86 million ounces of proven and probable reserves as verified in 2007.[157]

c.    **Crystallex's Feasibility Study**

197.    As recounted above,[158] Crystallex submitted its first version of the Feasibility Study, prepared by SNC-Lavalin, in September 2003. After nearly two and a half years of discussions and negotiations, the Ministry of Mines approved Crystallex's Feasibility study on 6 March 2006.[159]

198.    According to the Claimant, its Feasibility Study reflected a modular plan that involved constructing a 20,000 tpd processing plant, followed by a second 20,000 tpd processing plant that would take mining up to 40,000 tpd as soon as practicable.[160] Crystallex claims that there were financial, technical and common sense reasons in favor of Crystallex's modular approach.[161]

---

[151] Memorial, para. 149.

[152] Memorial, para. 150.

[153] Memorial, para. 155.

[154] Memorial, para. 156.

[155] Memorial, para. 158.

[156] Memorial, paras 159-160.

[157] Memorial, para. 162.

[158] See *supra* paras 23-32.

[159] Oficio 1193-2006 from the Vice-Minister of Mines to the CVG, 6 March 2006, **Exh. C-13**.

[160] Memorial, paras 163–176; Reply, paras 89–96; C-PHB, para. 78.

[161] C-PHB, para. 81.

199.    Crystallex submits that the Feasibility Study was fully compliant with the MOC (as the CVG's approval shows)[162] and it was fully compliant with Venezuelan law because the Ministry of Mines approved it in March 2006.[163]

d.    **Crystallex raised equity and debt to finance the project**

200.    With the aim of raising funding for the project, Crystallex worked with Deutsche Bank and BNP Paribas who designed a financing strategy that would work in stages, mirroring Crystallex's plan to start operations quickly by initially processing 20,000 tpd, but then increase to 40,000 tpd.[164]

201.    According to the Claimant, the record shows that, at every stage, Crystallex always succeeded in raising funds to go to the next stage in development.[165] Even when gold prices were relatively low, Crystallex successfully raised over US$500 million.[166]

202.    The Claimant explains that its decision to favor equity financing over project finance (at that stage of the project) was based on reasons of convenience and prudent planning.[167] In this respect, Crystallex never had any issues raising the financing required to fund the development of Las Cristinas, even during the period after the Permit denial and before the MOC was rescinded.[168]

203.    Furthermore, some of the major institutional investors worldwide invested in Crystallex.[169] During the years in which the permitting process was underway, Crystallex concluded non-disclosure agreements with a significant number of potential investors so as to better enable them to conduct due diligence.[170]

2.    **The Respondent's Position**

a.    **General remarks on Las Cristinas**

204.    Venezuela first stresses that the geography and topography of the Las Cristinas area presents certain particular challenges to its development, including (i) its location in a remote tropical rainforest, affected by heavy rainfall and seasonal flooding; (ii) the

---

[162] CVG Resolution No. 8867, 8 March 2004, **Exh. C-129**.

[163] Reply, paras 87-88.

[164] Memorial, paras 141-146.

[165] Reply, paras 143-145; C-PHB, para. 85.

[166] Reply, para. 144; C-PHB, para. 85.

[167] C-PHB, paras 85-89.

[168] C-PHB, para. 89.

[169] C-PHB, para. 90, referring to Claimant's Opening Presentation, slide 7.

[170] See Documents Related to Crystallex and Goldcorp 2006 Agreement, Various Dates, **Exh. C-555**.

poverty of the soils in the area and the fragility of the ecosystems that rely upon them; (iii) the fact that the site borders the Las Brisas mining concessions and the Cuyuni River (which requires the operator to have a water plan to prevent water build-up in the mines); (iv) the low grade nature of the gold deposit; and (v) the presence of a large number of small-scale illegal miners.[171] Furthermore, Las Cristinas lies in the Imataca Reserve, which is a fragile rainforest with an extremely varied biodiversity and a significant indigenous population.[172]

205.    As a preliminary matter, Venezuela highlights that Crystallex did not hold a "concession" of exploration and exploitation.[173] Consequently, it never held a mining title, which carries with it certain rights over the property.[174] Rather, consistent with the Venezuelan Constitution[175] and Article 23 of the Mining Law,[176] the right to explore and exploit the mineral reserve at Las Cristinas was reserved to, and at all times remained with, the State.[177] The MOC was thus effectively a service contract, executed on the understanding that the right to explore and exploit the mineral reserve at Las Cristinas ultimately remained with the State, acting through the Ministry of Mines, which, in turn, assigned operations to the CVG.[178] However, while Crystallex stood as a mere operator vis-à-vis the CVG, the MOC incorporated certain obligations typical of a concessionaire, e.g. to submit a Feasibility Study within a period of one year from the date of signature of the MOC and to provide so-called "special advantages" (i.e., obligations to promote societal and economic benefits in the area).[179]

---

[171] Counter-Memorial, para. 13.

[172] Counter-Memorial, para. 14.

[173] See Mining Law 1999, **Exh. C-4**, Art. 24.

[174] Counter-Memorial, para. 29.

[175] See 1999 Constitution of the Bolívarian Republic of Venezuela, 30 December 1999, **Exh. R-11**, Art. 12 ("mineral […] deposits of any nature that exist within the territory of the nation, […] are the property of the Republic, are of public domain, and therefore inalienable and not transferable").

[176] 1999 Mining Law, **Exh. C-4**, Art. 23 ("The National Executive, when it best suits the public interest, may reserve for itself by means of Decree, certain mineral substances and the areas that contain them to explore them; or directly operate them only through the Ministry of Energy and Mines, or entities exclusively owned by the Republic.").

[177] Counter-Memorial, para. 29.

[178] Counter-Memorial, para. 30.

[179] Counter-Memorial, para. 30.

b.    **Crystallex was a junior mining company with limited experience and uncertain financing**

206.    Venezuela contends that Crystallex was a junior mining company that became involved in a project for which it lacked technical, financial and environmental planning capacity.[180]

207.    For the Respondent, a review of Crystallex's own annual reports reveals that Crystallex self-identified as a junior mining company and operated only a few significantly smaller mines, and moreover, did so at a loss.[181] Furthermore, Crystallex played no role in the initial permitting or the closing of the few small mines it operated, and it possessed no experience operating large-scale mines (such as Las Cristinas).[182]

c.    **Crystallex's "Feasibility Plan" and other studies were deficient**

208.    The Respondent contends that the Feasibility Study presented by Crystallex in September 2003 was initially not approved by the Ministry of Mines, and that it took Crystallex several years to sufficiently address the concerns of the Ministry of Mines with respect to the development and production goals.[183] When Crystallex's Feasibility Study was finally approved by the Ministry of Mines in March 2006, it was clear, the Respondent contends, that several technical, environmental and economic parameters still required significant additional work. In particular, according to Venezuela, the Feasibility Study was based on limited drilling, metallurgical testing and environmental work, with much of the analysis based on Placer Dome studies, which resulted in potential inaccuracies.[184]

209.    For the Respondent, Crystallex never had a concrete plan for developing Las Cristinas that approached a feasibility study level. Rather, it consistently modified central aspects of its project – from the processing plan and mine life (which varied from 20,000 to 40,000 tpd at various different operational life spans), to its reserve estimates, to the cost of capital and operating costs.[185]

210.    The Respondent notes that the initial "Feasibility Study" produced in September 2003 by Crystallex envisioned that it would take 34 years to extract and process the Las Cristinas deposit at a 20,000 tpd processing rate.[186] The reaction of the CVG was that

---

[180] Rejoinder, para. 13.

[181] Rejoinder, para. 24.

[182] Rejoinder, para. 25.

[183] Counter-Memorial, para. 70.

[184] Counter-Memorial, para. 82.

[185] Rejoinder, para. 48.

[186] Rejoinder, para. 30, discussing SNC-Lavalin, Feasibility Study, September 2003, **Exh. C-106**.

the 34-year mine life exceeded the 20-year initial term of the MOC.[187] Further, in a 4 December 2003 letter, the CVG reiterated its preference for a 20-year mine life and a 40,000 tpd production capacity.[188]

211.  The "Additional Clarifications" produced by Crystallex on 19 December 2003 envisioned a production capacity of 20,000 tpd for the first seven years, followed by a production capacity of 40,000 tpd for the subsequent 13 years.[189] However, the Respondent points out that only one month later, SNC-Lavalin produced a drastically different "Feasibility Study" that proposed processing 40,000 tpd from year 1 through year 20.[190] For the Respondent this study was not presented as an alternative to the CVG (as the Claimant contends), but it was the project feasibility study.[191]

212.  In February 2004, Addendum 1 was produced to the CVG,[192] in which Crystallex explained that for financing reasons it could not state a production capacity of 40,000 before year 9.[193] The CVG approved and sent the 2003 SNC-Lavalin "Feasibility Study" together with the Addendum to the Ministry of Mines for approval.[194]

213.  The Respondent contends that all of these studies suffered from a fundamental flaw based on their reliance on largely unverified drilling data from the Placer Dome data set.[195]

214.  Furthermore, the Respondent points out that in August 2005, Crystallex produced yet another plan for its project, the so-called SNC-Lavalin Development Plan,[196] which would have a processing capacity of only 20,000 tpd and a mine life of 41 years, without any reference to eventually expanding to a 40,000 tpd processing capacity at a later

---

[187] See SNC-Lavalin minutes of the meeting between Crystallex and the CVG held on 29 October 2003, 3 November 2003, **Exh. C-111**, point 3.2 ("The CVG reminded Crystallex that the mining contract is for an initial 20 years which may be extended. The Ministry of Mines sees any extension beyond 20 years as a change of contract and could use it as a point of argument. The CVG wants to avoid any problems with the Ministry and would prefer to see the mining complete within the 20 year initial term of the contract.").

[188] Letter from the CVG to Crystallex, 4 December 2003, **Exh. C-115**, p. 2 ("It is […] indispensable to design the project with a level of production of 40,000 tons a day").

[189] See SNC-Lavalin, Feasibility Study *Aclaraciones Adicionales*, December 2003, **Exh. C-114**.

[190] Rejoinder, para. 35, discussing SNC-Lavalin Feasibility Study Production Rate 40,000 tpd, 23 January 2004, **Exh. C-116**.

[191] Rejoinder, para. 35.

[192] See *supra* para. 27.

[193] SNC-Lavalin, Feasibility Study, Addendum 1, 16 January 2004, **Exh. C-119**, Section 4.2 (pp. 330-331 of the .pdf file).

[194] See Oficio PRE-216-04 from the CVG to the Ministry of Mines, 15 April 2004, **Exh. C-134**.

[195] Rejoinder, paras 39-41.

[196] SNC-Lavalin, Development Plan, August 2005, **Exh. C-167**.

stage.[197] And two months later, in the so-called SNC-Lavalin "Expansion Plan",[198] Crystallex proposed that it would mine 20,000 tpd in the first two years and then expand to 40,000 tpd in year 3 until year 23.

215.    Finally, in November 2007, MDA produced a technical report[199] that once more, according to the Respondent, changed the overall project plan, by proposing that the deposit would be mined at 20,000 tpd, resulting in a mine life of 64 years.[200]

216.    Thus, the Respondent contends that Crystallex's constant vacillation regarding two of the most important aspects of the overall project (i.e., processing capacity and mine life) yields the inescapable conclusion that it was unable to develop a concrete viable plan that would be palatable to both investors and the Venezuelan regulatory agencies.[201] Crystallex never presented a true feasibility study with a single comprehensive plan for the development and operation at Las Cristinas. The studies presented, to the contrary, offered varying and distinct plans that went to the very core of the operations.[202]

217.    Thus, the Respondent concludes that "[w]hile the Ministry of Mines, in a good faith effort to move the project along, agreed to accept Crystallex's September 2003 "Feasibility Study" as supplemented by the February 2004 "Addendum", this did not mean that Crystallex met its commitment to submit a fully realized plan for the Las Cristinas project (as demonstrated by the various subsequent efforts)".[203]

d.    **Crystallex's ability to raise financing is overstated**

218.    Venezuela contends that it is difficult to square Crystallex's current position that project financing, and the institutional lenders who might have provided it, were irrelevant and, therefore, are of no consequence to determining whether it had a viable project, with its repeated statements to the contrary in the years when it was pursuing the permitting process.[204]

219.    In this respect, the Respondent points to statements made by Crystallex before, during and after the permit review process to the effect that it would seek project financing.[205]

---

[197] Rejoinder, para. 42.

[198] SNC-Lavalin, 20,000 to 40,000 t/d Expansion Plan, October 2005, **Exh. C-171**.

[199] MDA, 2007 Technical Report, 7 November 2007, **Exh. C-214**.

[200] Rejoinder, para. 46.

[201] Rejoinder, para. 47.

[202] Rejoinder, para. 50.

[203] Rejoinder, para. 51.

[204] Rejoinder, para. 61.

[205] Rejoinder, paras 53-60.

220.    For Venezuela, project financing and bank lending would have been necessary components of any financing for a major project like Las Cristinas. However, the Respondent suggests that Crystallex never obtained traditional project financing from institutional lenders – including from its advisors BNP Paribas and Deutsche Bank – most likely because Crystallex's history of operational losses and constantly evolving plans for Las Cristinas did no meet the strict due diligence criteria that those lenders employ.[206]

221.    Pointing to Crystallex's own annual reports and financial information, the Respondent contends that Crystallex struggled at every step to obtain sufficient financing to develop, construct and operate Las Cristinas.[207] Thus, even if Crystallex had received the Permit in April 2008, the tightness of the credit markets following the worldwide financial crisis in late 2008 virtually eliminated whatever chances Crystallex had to raise funding for the project.[208]

## B.    THE DENIAL OF THE PERMIT

### 1.    The Claimant's Position

222.    The Claimant contends that the Permit it was seeking from the Ministry of Environment in order to exploit Las Cristinas was denied in an arbitrary manner, unrelated to the EIS approval process. It claims that the technical review of the EIS was successfully concluded on 16 May 2007, when the Ministry of Environment notified Crystallex that it had "analyzed and approved" the EIS; that the 16 May 2007 letter did not relate only to preliminary works, but to the entire Las Cristinas project; that the Permit that was promised in such letter was for exploitation, and not for exploration. With regard to the denial of the Permit in April 2008, the Claimant submits that one key document on which the denial is based is fraudulent, and that the Permit denial itself is defective in its own terms. It also contends that, after the Permit denial, Venezuela subjected Crystallex to a "rollercoaster" of mistreatment because on the one hand it made the company believe that it could still obtain the Permit, and on the other hand it threatened to nationalize or "take back" Las Cristinas.

### a.    The technical review of the EIS was completed in 2007

223.    The following paragraphs summarize the Claimant's position as to the main steps in the exchanges between Crystallex/the CVG and the Venezuelan authorities, in

---

[206] Rejoinder, para. 62.

[207] Rejoinder, para. 63.

[208] Rejoinder, para. 63.

particular the Ministry of Environment, concerning the environmental aspects of the project.

### i. 2003/2004: The EIS is submitted to the CVG and the Ministry of Environment

224. The 950-page EIS was prepared by Crystallex with SNC Lavalin and submitted to the CVG for review in December 2003.[209] A revised draft of the EIS, following comments by the CVG to Crystallex, was submitted on 27 February 2004.[210] On 15 April 2004, on the same day the CVG submitted the Feasibility Study to the Ministry of Mines, the CVG submitted the EIS to the Ministry of Environment's offices in Bolívar State and Caracas for approval.[211] The Claimant stresses that the EIS submitted on 15 April 2004 was for the whole project, i.e. it addressed the impact of the entire Las Cristinas project, from construction through operation to mine closure.[212]

### ii. 2004: Crystallex submits Addenda to the EIS and further studies

225. In May 2004, Crystallex submitted a "Technical Forestry Report" and a "Forestry Repopulation Plan".[213]

226. On 31 May 2004, the Ministry of Environment (Bolívar) sent the CVG written technical observation on the EIS.[214] These addressed, *inter alia*, the following items: water management issues; whether additional baseline data would be collected; the size of the tailings management facility; the risk of acid rock drainage in the tailings pond; why the chapter of the EIS setting out the environmental supervision plan was in outline form; the extent of the forestry inventory; resettlement plans for illegal miners; why it was not planned to process copper; the socio-economic impacts of the project; and the nature of the diversion channel.[215]

---

[209] Letter from Crystallex to CVG, 4 December 2003, **Exh. C-310**.

[210] Letter from Crystallex to the CVG, 27 February 2004, **Exh. C-318**.

[211] Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**; Letter from CVG to Ministry of Environment Bolívar, 15 April 2004, **Exh. C-322**.

[212] Reply, para. 167.

[213] See Technical Forestry Report I, May 2004, **Exh. C-313 (A)**; Reforestation Plan I, May 2004, **Exh. C-314 (A)**. Further forestry reports were submitted in October/November 2004. See Technical Forestry Report II, October 2004, **Exh. C-313 (B)**; Reforestation Plan II, October 2004, **Exh. C-314 (B)**; Technical Forestry Report III, November 2004, **Exh. C-313 (C)**; Reforestation Plan III, November 2004, **Exh. C-314**.

[214] Letter of 31 May 2004 detailing observations on ESIA, **Exh. R-32**.

[215] Letter of 31 May 2004 detailing observations on ESIA, **Exh. R-32**.

227.  Crystallex contends to have answered those questions from the Ministry "to its entire satisfaction",[216] by submitting on 15 June 2004 a response along with a report prepared by SNC Lavalin for that purpose.[217]

228.  On 1 July 2004, the Ministry replied stating that "all technical and legal factors requested by this Office were duly clarified".[218] However, it added that a number of outstanding issues still remained to be resolved before the Permit could be issued. Those included the fact that the Feasibility Study had first to be approved by the Ministry of Mines; whether the diversion channel would flow through the Potaso pit or around it; and whether the water diversion channel would be designed to withstand a 200-year flood of all four streams whose water it was designed to carry.[219] The Ministry concluded by stating that "once the missing supporting documentation is received, this Office will immediately issue the requested permit".[220]

229.  On 12 July 2004, Crystallex addressed these concerns in a letter to the Ministry of Environment.[221]

230.  On 21 July 2004, the Ministry of Environment (Bolívar) wrote to the CVG stating that all future decisions about Las Cristinas would be taken by the Ministry of Environment in Caracas.[222]

231.  On 25 August 2004, the CVG submitted Addendum No. 1 to the EIS to the Ministry of Environment (Caracas).[223] On 16 and 23 September 2004, representatives of the CVG and Crystallex gave a presentation about the plans described in the EIS to officials at

---

[216] Reply, para. 176.

[217] Communication VPCACT/440 from the CVG to the Ministry of Environment and Natural Resources, 15 June 2004, **Exh. C-136**, attaching SNC Lavalin report titled "Response to observations raised by the Bolívar State office of [Ministry of Environment] to Las Cristinas Project Environmental Impact Study", Response to observations raised by the Bolívar State office of MARN (MARN Bolívar) to Las Cristinas Project EIS, June 2004, **Exh. C-330**.

[218] Oficio 01-00-19-04-237/2004 from the Ministry of Environment and Natural Resources to the CVG, 1 July 2004, **Exh. C-139**.

[219] Oficio 01-00-19-04-237/2004 from the Ministry of Environment and Natural Resources to the CVG, 1 July 2004, **Exh. C-139**.

[220] Oficio 01-00-19-04-237/2004 from the Ministry of Environment and Natural Resources to the CVG, 1 July 2004, **Exh. C-139**, p. 2.

[221] Letter from CVG to the Ministry of Environment Bolívar, 12 July 2004, **Exh. C-332**. See also Communication VPCACT/544 from the CVG to the Minister of Environment and Natural Resources, 20 July 2004, **Exh. C-140**, p. 3.

[222] Letter from the Ministry of Environment to Crystallex, 21 July 2004, **Exh. C-141**.

[223] Letter from CVG to the Ministry of Environment, 25 August 2004, **Exh. C-143; SNC-Lavalin, Environmental Impact Study: Addendum No. 1, August 2004, **Exh. C-142**.

the Ministry of Environment.[224] Questions raised by the Ministry in those occasions were answered in Addendum 2.[225]

232.    On 15 September 2004, the CVG and Crystallex submitted a 394-page environmental supervision plan for the construction phase of the project, which was to serve as a practical guide for the implementation of the environmental mitigation measures undertaken during construction.[226] Crystallex contends that the environmental supervision plan covered the entire construction phase, not merely "preliminary construction-type works".[227]

233.    In September 2004, Crystallex also submitted an Addendum No. 3 to the EIS, which incorporated the results of two Baseline Studies performed by consultant Proconsult.[228] Addendum 3 described the socioeconomic impacts of the project in greater detail than the original EIS and was prepared by conducting interviews with members of the surrounding communities, including indigenous community leaders.[229] Addendum 3 also provided a 7-phase plan for relocating illegal miners.[230]

iii.    **The 29 December 2004 letter from the Ministry of Environment: Exhibit C-159**

234.    On 29 December 2004, the Office of Permissions at the Ministry of Environment replied to the CVG's letter of 15 April 2004, under cover of which the EIS had first been submitted.[231] This 3-page letter sent on 29 December 2004 is, according to the Claimant, the only letter containing written observations about the EIS that the CVG or Crystallex were to receive from the Ministry during the two year period between 20

---

[224] These workshops are referred to in the Letter from CVG to the Ministry of Environment, 18 November 2004, **Exh. C-154**; and in the Communication VPA/863 from the CVG to the Ministry of Environment and Natural Resources, 28 October 2004, **Exh. C-150**.

[225] Addendum 2 was sent to the Ministry of Environment in two parts, in October 2004 and November 2004 respectively. See SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 1, October 2004, **Exh. C-147**; SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 2, November 2004, **Exh. C-152**.

[226] Communication VPCACT/729 from the CVG to the Ministry of Environment and Natural Resources, 15 September 2004, **Exh. C-145**; Environmental Supervision Plan, September 2004, **Exh. R-37**.

[227] Reply, para. 201. As a supplement to this document, the Manual for Applying Natural and Physical Measures was subsequently completed in October 2005. See Environmental Supervision Plan, Manual for the Implementation of Physical-Natural Measures, October 2005, **Exh. C-172(bis)**.

[228] Proconsult S.A., Environmental Impact Study, Addendum 3, September 2004, **Exh. C-144(bis)**.

[229] Reply, paras 208-212.

[230] See Reply, paras 204-219, discussing Proconsult S.A., Environmental Impact Study, Addendum 3, September 2004, **Exh. C-144(bis)**.

[231] Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**.

July 2004 and 31 July 2006.[232] In this letter, the Ministry made observations, *inter alia*, on the fact that the EIS had been presented without prior terms of reference, and on the fact that the social, cultural and environmental impact of the project had been underestimated. Furthermore, it noted that the social impact associated with the illegal miners whom Crystallex would not employ had not been clearly defined. The Ministry concluded by demanding that the project be reformulated, starting with the preparation of new Terms of Reference.[233]

235.    According to the Claimant, the imprecise and vague observations contained in the three-page letter of 29 December 2004 made it difficult for Crystallex to understand how exactly it should have reformulated its plan.[234]

### iv.    2005-2006: Further exchanges and the Porlamar meeting

236.    According to the Claimant, following the appointment of Jacqueline Faria as new Minister of Environment in early 2005 (with related change in Ministry personnel), the Ministry changed course over its prior request that Crystallex start the project from scratch.[235]

237.    During 2005, a number of workshops were held with the new Ministry personnel.[236] For the Claimant, there is no merit to Venezuela's assertion that the Ministry spent the whole of 2005 making "continued requests" for information.[237] In contradistinction, Crystallex argues that, in the first six months of 2005, the Ministry of Environment made only a single request for further information, when it requested an updated baseline study in relation to vegetation, fauna and the quality of the environment.[238] The only other feedback Crystallex received was on the environmental social plan.[239]

---

[232] Reply, para. 222.

[233] Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**, p. 3.

[234] Reply, paras 225-226.

[235] Memorial, para. 186; Reply, para. 228; Letter from Crystallex to the Ministry of Energy and Mines, 6 October 2005, **Exh. C-174**, Annex A, p. 1. This point appears undisputed by Venezuela. See Counter-Memorial, para. 208 ("In early 2005 there was a change in Ministry personnel including a new Director General of the Permissions Office, and the new officials responsible for the environmental review of the Las [Cristinas] permit application decided not to require Crystallex to start completely from scratch with new terms of reference"); Rejoinder, para. 86 ("These workshops followed the Ministry's agreement in early 2005—despite its previously expressed concerns and in response to pressure from Crystallex and the CVG—to allow Crystallex the opportunity to supplement its EIASC without starting over with new terms of reference.").

[236] Reply, paras 229-232.

[237] Reply, para. 233.

[238] Las Cristinas Gold Extraction Project – Summary Sheet, 1 November 2006, Annex 1, **Exh. C-366**, p. 3. Reply, para. 233.

[239] Reply, para. 234.

238.   In June 2005, the Minister of Mines publicly stated that the status of the Permit was "well on track" and that the issuance of the Permit was "following its normal, routine course. It's a bureaucratic formality".[240]

239.   In July 2005, Crystallex completed the "Social Investment Plan", which was the result of consultations with indigenous and *criollo* communities located in the project's zone of influence.[241] This plan designed a number of social programs, ranging from promoting environmental conservation to supporting alternative to mining and enhancing community relations.[242] The Social Investment Plan was presented at a workshop with the Ministry on 19 July 2005.[243]

240.   Crystallex claims that in March 2006, it had to resubmit to the Ministry thirteen boxes of documents containing the EIS and related documents, because the Ministry had allegedly lost the files.[244]

241.   On 31 July 2006, the Ministry of Environment wrote to the CVG concerning the Las Cristinas Permit application.[245] According to the Claimant, the letter did not contain any analysis of Crystallex's EIS or the many other documents it had submitted for review during this period. Instead, the Ministry declared that, given the size and importance of the project, it intended to undertake a "Strategic Environmental Evaluation".[246] Such Strategic Environmental Evaluation for the Claimant is not a recognized or required procedure under Venezuelan law, but simply a "bureaucratic contrivance" that had been employed by the Ministry only once before in a project involving PDVSA.[247]

242.   On 17-18 October 2006, meetings organized by the Canadian embassy in Venezuela were held at Porlamar, which were attended by the Ministry of Environment (represented by Mr. Rodriguez, a witness in this arbitration), by Crystallex and by Gold Reserve, the operator of the adjacent Las Brisas concession (the "Porlamar meeting").[248] According to the meeting minutes,

---

[240] "Venezuela: Crystallex gold mine permit 'on track'," *Reuters*, 3 June 2005, **Exh. C-12.**

[241] Social Investment Plan, July 2005, **Exh. C-166(bis).**

[242] Reply, para. 239.

[243] Letter from Luis Felipe Cottin to Víctor Álvarez, 6 October 2005, **Exh. C-174**, Annex A, p. 2; Report on Social Investment Plan for the Las Cristinas Project, **Exh. R-40**, p. 5.

[244] Reply, paras 257-259.

[245] Official Letter No. 2352 from MinAmb Office of Permissions to CVG, 31 July 2006, **Exh. R-50**.

[246] Reply, para. 300, discussing Official Letter No. 2352 from MinAmb Office of Permissions to CVG, 31 July 2006, **Exh. R-50**.

[247] Reply, para. 301.

[248] Meeting Minutes, 18 October 2006, **Exh. R-53**.

> "There is an order from the Minister of the Environment, Eng. Jacqueline Faria, for expediting the issuance of environmental permits for both projects. In that regard, Rodriguez informed that Minister Faria had instructed that the procedure to grant permits be completed as soon as possible, and so did Vice Minister Nora Delgado, who also ordered that the procedure to grant permits be hastened until they were granted".[249]

243.    Further, according to the meeting minutes, the Ministry inquired about the cumulative impact caused by both projects (Las Cristinas and Las Brisas) and wished to see Gold Reserve and Crystallex agree on surface water drainage management, in particular, the movement of the diversion channel.[250]

244.    At the meeting, Crystallex and Gold Reserve were able to agree, amongst other things, that the diversion channel would be moved (at Crystallex's expenses) to the north, in order to accommodate the desire of Gold Reserve to maintain access to ore extending beyond the boundaries of its concession.[251]

245.    On 21 November 2006, Ms. Laura Paredes, also a witness in this arbitration and then Director General for Mining Concessions at the Ministry of Mines, wrote an internal memorandum to Minister of Mines José Khan summarizing the key information about the Las Cristinas project, and recommending that Minister Khan forward this memorandum to the Minister of Environment with a view to accelerating the Permit process.[252] The memorandum reads in relevant parts:

> "Currently, Crystallex in full co-ordination with the CVG, has already complied with all its pre-construction obligations, including all the works of social interest that were required. Likewise, it has already carried out all the important and difficult activities to ensure the financing of the main project. Complying with its undertaking to build in record time, it has already purchased machinery and parts for more than 75 million dollars and has concluded contracts with the necessary third parties for the additional sum of 90 million dollars. Nonetheless, the construction of the Las Cristinas Project has not been able to begin, given that it is still waiting for the Minister of the Environment to issue the permit for affecting natural resources. This permit was requested by the CVG in conjunction with Crystallex. While waiting for the permit, Crystallex is bearing the enormous cost of maintaining the equipment in storage at international ports and continuing the payments for the contracts and financing services, which cannot continue indefinitely given the enormous financial burden this imposes.

---

[249] Meeting Minutes, 18 October 2006, **Exh. R-53**, p. 2.

[250] Meeting Minutes, 18 October 2006, **Exh. R-53**, p. 2.

[251] See Meeting Minutes, 18 October 2006, **Exh. R-53**, p. 3.

[252] Punto de Información from Laura Paredes, Director General of Mining Concessions to José Khan, Minister of Basic Industry and Mines, 21 November 2006, **Exh. C-368**.

> FOR ALL THE ABOVE CONSIDERATIONS, HAVING VERIFIED THE
> LEGALITY OF THE CONTRACT, IT IS SUBMITTED THAT THE
> CITIZEN PRESIDENT SEND THE PRESENT MEMORANDUM OF
> INFORMATION TO THE HEAD OF THE MINISTRY OF THE
> ENVIRONMENT, CITIZEN JAQUELINE FARIA IN ORDER TO
> OBTAIN THE ISSUE OF THE ENVIRONMENTAL PERMIT".[253]

v.    **The 22 December 2006 meeting and subsequent exchanges**

246.    It is further the Claimant's argument that on 22 December 2006, a meeting was held between the CVG, Gold Reserve and the Ministry of Environment, to discuss the permitting process and certain documents that the Ministry had requested by way of letter on 19 December 2006.[254] According to the Claimant, the minutes of the 22 December 2006 meeting show that the CVG was told that the Environmental Permit to build the mine at Las Cristinas would be issued within three months if certain documents were delivered.[255] The Claimant disputes Venezuela's reading of this meeting, whereby the Ministry informed the CVG that, if certain documents were produced they would receive a preliminary permit only for certain limited infrastructure works that Crystallex had requested two and a half years before when it first applied for the permit.[256] The Claimant points at the minutes that list a number of items in relation to which the Ministry committed to issue a permit (if certain documents were provided). These items included the "construction of the processing plant" and "opening of pits". Thus, the minutes show that the Permit to be issued would cover issues that are at the very heart of the construction of the mine and formed no longer part of the long abandoned preliminary request made in 2004.[257]

247.    For the Claimant, the Ministry could not grant a preliminary permit to engage in the cost of construction of a processing plant and a deviation channel without the certainty that such plant would be permitted to operate.[258]

248.    The Claimant disputes the relevance of the distinction between a "short term" and a "medium term" permitting process, which is emphasized by Venezuela by reference to these minutes. According to Venezuela, the Permit to be issued on a "short term" basis (within 3 months, according to the minutes) could only relate to preliminary works.[259] The Claimant rebuts that the projects listed in the minutes as being "medium terms"

---

[253] Punto de Información from Laura Paredes, Director General of Mining Concessions to José Khan, Minister of Basic Industry and Mines, 21 November 2006, **Exh. C-368** (capital letters in the original).

[254] Letter 6155 from the Ministry of the Environment to the CVG, 19 December 2006, **Exh. C-193**.

[255] MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**, p. 1.

[256] Reply, para. 321.

[257] Reply, para. 324.

[258] Reply, para. 326.

[259] See *infra* paras 348, 361.

priorities for which a Permit could be expecting in "approximately three years" related to the two projects that Gold Reserve and Crystallex had agreed to build jointly at the Porlamar meeting (i.e., the community landing strip and sanitary landfill for San Isidro Parish).[260] Only those two projects were to be subject to "medium term" approval, and importantly neither of those joint projects was required to construct or to operate any of the mines.

249.    Crystallex further claims that it answered each of the Ministry's queries to the 19 December 2006 letter in an 8-volume submission dated 16 February 2007.[261]

250.    On 27 March 2007, Laura Paredes, the Director General of Mining Concessions at the Ministry of Mines, who had also been sent a copy of the latest Crystallex submission[262] and who had been liaising with the Ministry of Environment, wrote to Crystallex, stating that:

> "Knowing that the company Crystallex has complied duly and opportunely with all of the requirements imposed by the Ministry of Environment during the meeting of 22 December 2006, this Directorate has learned directly from the Directorate General of Permissions at the Ministry of the Environment that they are waiting [to receive] from the CVG the following requirement.
>
> Plan for the use of copper so as to minimize environmental damage".[263]

251.    This additional information was sent by the CVG to the Ministry of Environment on 17 April 2007.[264]

### vi.   The 16 May 2007 letter from the Ministry of Environment

252.    On 16 May 2007, the Ministry of Environment, through its then Vice-Minister of Environmental Administration and Governance, Merly Garcia, sent a letter to Crystallex, inviting it to post a Bond and to pay certain environmental taxes, after which the Permit would be handed over.[265] According to the Claimant, through this letter the Ministry of Environment approved the EIS, including the proposed measures and programs contained in such study for the preservation of the environment, which the Ministry expressly indicated had been "analyzed and approved".[266] Thus, Crystallex

---

[260] Reply, para. 328.

[261] Letter from Crystallex to the CVG, 16 February 2007, **Exh. C-199**; Answers to the technical observations made by the Ministry of Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)**. See Reply, para. 330.

[262] Letter from Crystallex to the Ministry of Mines, 16 February 2007, **Exh. C-379**.

[263] Letter from Laura Paredes of the Ministry of Mines to Crystallex, 27 March 2007, **Exh. C-385**.

[264] Letter from CVG to the Ministry of the Environment, 17 April 2007, **Exh. C-386**.

[265] Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15**.

[266] Memorial, para. 193.

contends, at this point in time it had complied with all of the substantive requirements to obtain the environmental Permit.[267]

253.    The 16 May 2007 letter, which for Crystallex expressed the Ministry's approval of the EIS and the promise to issue an environmental Permit subject only to the fulfillment of a procedural formality is, for the Claimant, of fundamental importance, because it shows that the Ministry was fully satisfied with the last round of documents it had received from Crystallex in early 2007.[268] The 16 May 2007 letter was the culmination of the technical process that had begun when Crystallex submitted its EIS to the Ministry of Environment in April 2004.[269]

### vii.    The posting of the Bond, the payment of the taxes and the draft Permit

254.    On 18 May 2007, Crystallex complied with the remaining formalities mentioned in the 16 May 2007 letter, i.e. the posting of the Bond and the payment of the environmental taxes.[270]

255.    Around this time, Crystallex claims to have received a draft of the Permit from the Ministry of Environment.[271] According to the Claimant, the Ministry asked Crystallex to help it finalize the Permit by verifying the accuracy of some technical details, such as the exact coordinates of the mine site.[272]

### b.    The letter of 16 May 2007 did not relate only to preliminary works

256.    According to the Claimant, the Permit promised in the Ministry letter of 16 May 2007 did not relate only to preliminary works, as the Respondent contends. Crystallex submits that Article 14 of Decree 1757, the key source of regulations governing EISs in Venezuela, provides for a single environmental permit covering all of the stages of a project, which rules out the possibility of obtaining a partial permit that would not allow Crystallex to build the mine and extract gold from Las Cristinas.[273] The Administration cannot authorize the construction of an entire mining complex,

---

[267] Memorial, para. 195.

[268] C-PHB, para. 108.

[269] C-PHB, para. 108.

[270] Letter from Crystallex to the CVG, 18 May 2007, **Exh. C-16**; Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 May 2007, **Exh. C-17**. On 18 September 2007, in response to a request from the Ministry of Mines, Crystallex filed an amended Bond with the Office of Environmental Permits. See Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20**.

[271] Draft Environmental Permit, undated, **Exh. C-273**.

[272] C-PHB, para. 157.

[273] C-PHB, para. 121.

including a processing plant and 8-km-long diversion channel, if it does not also approve all of the measures described in the EIS for the construction, operation and closure of the project.[274] In other words, Venezuelan law requires an EIS – with all its impacts and related mitigation measures – to be approved *as a whole*.[275] An approval of only part of an EIS and the issue of a partial environmental Permit would mean that construction of a project could begin before the fundamental question of whether the environmental impact of the project was tolerable had been resolved, which in Crystallex's view is impermissible under Venezuelan law.[276]

257.    Crystallex explains that, initially, Crystallex and the CVG believed that quicker progress could be made if an early authorization could be obtained for certain preliminary work that would prepare the site for major construction works.[277] Thus, the CVG explained to the Ministry of Environment, when submitting the EIS on 15 April 2004, that it was also seeking preliminary authorization for a number of items, such as the extension of access roads into the site, the construction of a diversion channel, the construction of a sanitary landfill.[278] However, according to the Claimant, this request for preliminary permit was abandoned by the CVG/Crystallex in late 2004 as the Ministry of Environment took the view that the EIS for the Las Cristinas project had to be approved before it would permit works to be undertaken that would impact the environment.[279] For the Claimant, between April 2004 and May 2007, the Ministry of Environment raised questions regarding several aspects of the project, from the construction of the mine, to its operation, closure and reclamation, to which Crystallex responded.[280] Furthermore, as discussed above,[281] the minutes of the 22 December 2006 meeting clearly show, according to the Claimant, that the Ministry was prepared to issue an Environmental Permit for the infrastructure works necessary to build the entire mine.[282]

258.    Furthermore, according to the Claimant, the measures listed at the end of the 16 May 2007 letter, whose implementation the Bond was supposed to secure (and which according to the Claimant contained elements of construction, operation and closure of

---

[274] C-PHB, para. 122.

[275] C-PHB, para. 122.

[276] Reply, paras 159-161.

[277] Reply, para. 171.

[278] Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**; Letter from CVG to Ministry of Environment Bolívar, 15 April 2004, **Exh. C-322**.

[279] Reply, para. 172.

[280] Reply, para. 172.

[281] See *supra* paras 246-248.

[282] Reply, para. 337.

the mine), greatly exceeded the scope of those preliminary works and clearly related to the entire project described in the EIS.[283]

259. It would make no sense for the Ministry to request a bond if the scope of the measures that it is supposed to guarantee – which form the basis for the calculation of its amount – had not been already approved.[284]

c. **The promised Permit was for exploitation, not for exploration**

260. Crystallex contends that the Permit that was promised in the 16 May 2007 letter was for exploitation, and not for exploration. The fact that the letter refers, in two passages, to "exploration" (and not to "exploitation") is, in the Claimant's view, merely the result of a typographical error, as can be deduced from the context of the approval and the numerous other documents following on from the 16 May 2007 letter which replace the erroneous word "exploration" with the intended term "exploitation".[285]

261. First, the EIS referred to in the 16 May 2007 letter, which was said to have been "analyzed and approved", made no reference whatsoever to any exploration activity, and dealt with the construction, exploitation and closure of the mine.[286]

262. Second, other documents on the record show that what was at issue in the 16 May 2007 letter was exploitation.[287] The Claimant points in particular to the letter from the Ministry of Environment to the CVG dated 23 August 2007, which states that the Permit promised in the 16 May 2007 letter was for (a) the construction of infrastructure and services; and (b) the exploitation phase of the Las Cristinas project.[288]

263. Furthermore, as a matter of Venezuelan law, a permit that relates to the construction of a mine is, by definition, a permit for exploitation since the concept of exploitation includes the construction phase.[289] Moreover, Crystallex's EIS was prepared in

---

[283] Reply, paras 172, 346; C-PHB, para. 126.

[284] C-PHB, para. 133.

[285] Reply, para. 349; C-PHB, para. 111.

[286] Reply, para. 351; C-PHB, para. 112.

[287] See Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**; Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20**; Letter from the CVG to the Ministry of Environment, 31 October 2007, **Exh. C-213**; Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**; Communication PVE/059-08 from the CVG to Crystallex, 13 May 2008, **Exh. C-227**.

[288] C-PHB, para. 111, discussing Letter from the Ministry of the Environment to the CVG, 23 August 2007, **Exh. C-390**.

[289] Reply, para. 352; C-PHB, para. 114. According to Decree 1257, "exploitation" and "exploration" are defined as follows: "Mining exploitation: Process to extract and process minerals as well as the activity intended to prepare and develop the areas that include the mineral mass or deposit"; "Mining exploration: Activity intended to determine the presence, quality, and geological characteristics of the mineral deposit and to quantify and assess the

conjunction with the Feasibility Study, and in fact they were delivered to the Ministry of Environment and the Ministry of Mines, respectively, on the same day (on 15 April 2004).[290] Because Decree 1757 establishes that an EIS for the exploitation phase should accompany a Feasibility Study, it follows, for the Claimant, that the measures described in the EIS and any permit issued on the basis of such measures were going to relate to the *exploitation* phase of the project.[291]

264.    Finally, the exploration phase of the project had already been concluded by Crystallex (and, before, by Placer Dome).[292]

265.    Also, the bond requested clearly related to exploitation. This is evident if one compares its amount (B$5.2 *billion*) to the amount of B$20.7 *million* which had been requested in 2006 in connection for an application of an exploration permit (to conduct exploratory drilling of 40 holes).[293]

d.    **The permitting process was technical, not discretionary**

266.    For the Claimant, there was nothing discretionary about the duty of the Ministry of Environment to issue the Permit promised in the 16 May 2007 letter, once Crystallex had duly paid the stamp tax and the Bond requested by the Ministry. Crystallex contends that Article 27 of the Stamp Tax Law provides that the tax whose payment was required by the Vice-Minister of Environment is payable simultaneously with the issuance of the Permit.[294] Furthermore, Article 45 of Decree 1257 provides that the purpose of bonds like the one requested by the Vice-Minister of the Environment is to guarantee the measures contemplated in the EIS.[295] It would only be reasonable, in the Claimant's view, to expect that a bond would be required at the *end* of the permitting process, once the measures and the EIS itself had already been approved by the Ministry of Environment.[296]

267.    For the Claimant, the power to issue an environmental permit requires determining whether a certain harm to the environment is a "tolerable harm", which can be made only after a rigorous technical, environmental and socio-economic analysis has been

---

reserves that can be used". See Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35,946 on 25 April 1996, **Exh. C-2**, Art. 3.6 and Art. 3.7, respectively.

[290] C-PHB, para. 116.

[291] C-PHB, para. 116.

[292] C-PHB, paras 115, 118.

[293] C-PHB, para. 119 discussing Providencia Administrativa N° 01-00-19-05-169-2006, 19 October 2006, **Exh. C-365**.

[294] C-PHB, para. 135.

[295] C-PHB, para. 135.

[296] C-PHB, para. 138.

conducted.[297] When so-called "indeterminate legal concepts" of a technical nature, such as "tolerable harm" (which is not specifically defined under Venezuelan law), are involved, the relevant decision by the Administration depends strictly on the result of the technical analysis conducted in the case in question.[298] In those cases, the decision-maker is not given any form of discretion or the power to factor in considerations of opportunity or convenience.[299]

268.   For the Claimant, once the EIS approval was granted based on technical elements, there was no further discretion in relation to the issuance of the Permit. For that reason and in any circumstances, the 16 May 2007 letter uses imperative language: "Once the Bond has been posted, checked and found to be compliant by this Office, the [Permit] *will be handed over*" (*les será entregado*, in the Spanish original).[300]

e.   **After the 16 May 2007 letter, Crystallex expected prompt issuance of the Permit**

269.   According to the Claimant, its expectation that it would promptly receive the Permit after 16 May was based not only on the terms of the 16 May 2007 letter, but also on past experience. In 2006, Crystallex had sought and received an environmental Permit to conduct further drilling at Las Cristinas. In that instance, the Permit was handed over to Crystallex on the very same day that the bond was posted.[301] Crystallex was also aware that in March 2007 it had taken Gold Reserve only one week from the posting of the bond and the payment of the taxes to be issued the relevant environmental permit for the adjacent Las Brisas site.[302]

270.   Furthermore, the expectations that the Las Cristinas Permit would be quickly delivered were strengthened, according to the Claimant, on 22 May 2007, when just four days after Crystallex had posted its Bond and paid its taxes, it received a draft copy of its environmental Permit. Crystallex argues that this draft Permit clearly shows that the work of preparing the Permit had already been completed.[303]

---

[297] C-PHB, para. 143.

[298] C-PHB, para. 144.

[299] C-PHB, para. 145.

[300] C-PHB, para. 147, referring to Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15** (emphasis added by the Claimant).

[301] C-PHB, para. 154, discussing Providencia Administrativa Nº 01-00-19-05-169-2006, 19 October 2006, **Exh. C-365**.

[302] C-PHB, para. 155, discussing Oficio No 010303-1080 from García La Rosa (Ministerio del Ambiente) to A. Rivero Acosta (Gold Reserve), 27 March 2007, **Exh. R-118**.

[303] C-PHB, para. 157.

271.    On 4 October 2007, the National Assembly Committee on Economic Development called a hearing to discuss the permitting process at Las Cristinas.[304] In addition to Crystallex's representatives, Mr. Sergio Rodriguez, representing the Ministry of Environment, and Ms. Laura Paredes, representing the Ministry of Mines, testified at that hearing.[305] According to the minutes,

> "Laura Paredes, MIBAM's representative, placed no obstacles to the granting of the permits, since the Ministry represented by her already issued the corresponding license for the beginning of the development of the project. She emphasized the importance of the participation of the Community Councils, particularly in relation to special advantages".[306]

272.    Furthermore, according to the minutes,

> "Eng. Sergio Rodriguez, Planning Director of the MARN, referred, in general, to environmental aspects. He also agreed with the matters related to the participation of Community Councils in the projects to be developed".[307]

273.    The Claimant underscores that, at the hearing, the Chairman of the Committee, Deputy Gutierrez, confirmed that based on "conversations held with the highest authorities of the Ministry of the Environment, […] there is no legal impediment for the [Ministry of the Environment] to grant the permits".[308] The official report set out the following conclusions:

> "In accordance with the statements of the participants in this meeting, the following conclusions are drawn:
>
> 1. – The concessionaire, Corporación Venezolana de Guayana (C.V.G), and the operator, Crystallex International, have complied with both the feasibility study and the other legal and technical requirements established for the corresponding permits to be granted to them by the Ministry of the Environment for the commencement of the construction and development of Las Cristinas Project.
>
> 2. – The delay in the granting of the permits affects the operator, due to the significant burden of personnel and maintenance expenses and socioeconomic expenditure that it has. It also delays a great part of the benefits for the community established in the agreement in relation to employment, housing, and education matters.

---

[304] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**.

[305] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

[306] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

[307] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

[308] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 3.

> 3. – The Chairman of the Committee reiterates demands to the Ministry of
> Environment to grant the corresponding license, thus allowing the mining
> development to begin".[309]

274.    The Claimant submits that, because the minutes confirm that the National Assembly's
conclusions were drawn "in accordance with the statements of the participants in this
meeting",[310] Crystallex understood that both the Ministry of Mines and the Ministry of
Environment, through their representatives, were in agreement that Crystallex had
complied with every legal and technical requirement to receive the environmental
Permit.[311]

   f.    **The Permit was denied in an arbitrary manner unrelated to the EIS**

275.    For the Claimant, there was no technical or legal basis for the permit denial. For the
Claimant, the Permit denial letter is defective in its own terms, and furthermore is based
on only one internal "technical report", which in the Claimant's view is likely to have
been fabricated *ex post facto* to justify the Permit denial.

276.    The Claimant contends that the Permit denial came "as a shock" to Crystallex given
that approval of the EIS had already taken place and the Ministry of Environment had
confirmed that the Permit would be handed over after the posting of the Bond and the
payment of the required environmental taxes.[312]

277.    According to the Claimant, the justifications adduced by the Ministry of Environment
(i.e., concerns for the environmental and indigenous people of the Imataca Forest
Reserve) had never been raised during the four-year approval process and were not
supported by a single study or document to demonstrate that the project would
adversely impact the Imataca region, where mining activities had already been
expressly authorized.[313]

278.    For Crystallex, the Permit denial letter of 14 April 2008 fails to refer to a single page
or paragraph of the 948-page EIS submitted in April 2004, to any of the thousands of
pages of addenda and supplementary reports to that study, or to any of the 460 pages
submitted in February 2007 in response to the Ministry's final request for information
of 22 December 2006.[314] The Permit denial vaguely alludes to unidentified "technical

---

[309] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

[310] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

[311] Reply, paras 370-371.

[312] Memorial, para. 203.

[313] Memorial, para. 204.

[314] Reply, paras 373-378; C-PHB, para. 176.

inspection reports" about illegal mining and "research carried out by the specialists competent in the matter", without any more specific support.[315]

279.    The Claimant has further developed the following arguments as to why the Permit denial lacked support and was arbitrary.

i.    **The Permit denial is based on one fraudulent document: Exhibit R-52**

280.    For the Claimant, the technical inspection report, allegedly prepared in September 2006, filed by Venezuela as Exhibit R-52, is the only technical report on the record that categorically recommends the denial of the environmental Permit.[316] The Permit denial letter of 14 April 2008 closely resembles Exhibit R-52.[317] One will see below that the Respondent avers that Exhibit R-52, also referred to as the "Technical Inspection Report" or the "Romero Report", foreshadows the letter which denied the Permit in April 2008. For Crystallex, the consistency and authenticity of Exhibit R-52 is of great importance because Venezuela, through the process of document disclosure in this arbitration, has confirmed that there were no other technical inspection reports, environmental studies, research data or reports of any kind referred to in the Permit denial letter or relied on in the preparation of that letter.[318] Thus, the Permit denial was based on just one document: Exhibit R-52.[319]

281.    For the Claimant, during the Hearing it became apparent that the report is not a genuine contemporary record of any actual site inspection, but a fraudulent document apparently created well after September 2006 for the purpose of justifying the Permit denial.[320]

282.    First, according to the Claimant, the alleged date on which the report was prepared (September 2006) raises a number of inconsistencies with other contemporaneous documents, which appear to suggest different courses of actions (e.g., requests for additional documents from Crystallex).[321] For example, in October 2006, Mr. Sergio Rodriguez, one of Venezuela's witnesses, told the representatives of Crystallex and Gold Reserve at the Porlamar meeting that the process of issuing the permits was to be

---

[315] Reply, para. 377; C-PHB, para. 176.

[316] C-PHB, para. 178.

[317] Reply, para. 267; C-PHB, paras 180-181.

[318] C-PHB, paras 182-185.

[319] C-PHB, para. 186.

[320] C-PHB, para. 188.

[321] C-PHB, para. 190.

accelerated.[322] Further, on 22 December 2006, Crystallex was given a list of additional documents it was required to provide for the Permit to be issued.[323]

283.    More importantly, for the Claimant the document is "nothing but a crude forgery".[324] Crystallex explains that the report is printed on a letterhead bearing the name of the "*Ministerio del Poder Popular para el Ambiente*". However, the Claimant explains, in September 2006 the Ministry of Environment was called the "*Ministerio del Ambiente*". It did not change its name to "*Ministerio del Poder Popular para el Ambiente*" until 8 January 2007, when the Venezuelan Official Gazette published Presidential Decree 5103 issued by President Chávez on 28 December 2006, through which the prefix "*del Poder Popular*" was added to the names of all Venezuelan Ministries.[325]

284.    At the hearing, Ms. Charly Rodriguez, a technician in the Bureau of Environmental Quality, explained this apparent inconsistency by suggesting that the report could have been prepared on a computer immediately after a site inspection in September 2006, but that it had probably been printed out at a later date using the Ministry's updated letterhead.[326] However, the Claimant underscores that even the text of Exhibit R-52 (and not just the letterhead) refers to the "*Ministerio del Poder Popular*" in one passage. Ms. Rodriguez suggested that the Ministry might have started using the new name after an announcement by President Chávez on his television program "Aló Presidente".[327] However, this, for Crystallex, is impossible, as the first announcement about the new ministerial name was made at the end of December 2006, i.e. three months after Exhibit R-52 was supposedly written.[328]

285.    Clear proof of this, according to the Claimant, derives from the fact that none of the Ministry's letters and internal documents on record in this arbitration dating form the period September 2006 to end-December 2006 contain body text or a letterhead that refers to the "*Ministerio del Poder Popular*".[329]

286.    For the Claimant, the conclusion is thus unavoidable: Exhibit R-52 was written long after September 2006, and it was tailor-made after the fact to justify the conclusion in

---

[322] C-PHB, para. 190.

[323] MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**.

[324] C-PHB, para. 195.

[325] C-PHB, para. 196, discussing Decree 5103, published in the *Gaceta Oficial Extraordinario* No. 5836, 8 January 2007, **Exh. C-373**; "Nuevos Ministros, el Mismo Rumbo en Venezuela", *Agencia Periodística de América del Sur*, 8 January 2007, **Exh. C-374**.

[326] C-PHB, para. 198, discussing Ms. Charly Rodriguez's testimony.

[327] Cross-Examination of C. Rodríguez, Tr. [Jurisdiction and Merits], Day 5, 1479: 12–20.

[328] C-PHB, para. 199.

[329] C-PHB, para. 199.

the Permit denial letter of 14 April 2008. Exhibit R-52 is thus "a crude fraud incapable of being a valid source of justification for the conclusion in the Permit Denial Letter".[330]

287.    Even if Exhibit R-52 were a genuine document, in the Claimant's view it could not justify the denial of the Permit under Venezuelan law or the Treaty because its alleged justifications are unreasonable, illogical, inconsistent and technically unsound.[331] Crystallex submits that the report does not contain a single specific reference to any page of the EIS or its addenda. No data is annexed to the inspection report itself. No comparisons are made with data in the EIS or its addenda.[332] Furthermore, according to the Claimant, it was prepared without the participation of key technical departments that were required to participate as a matter of Venezuelan law, specifically the Forestry Department and the Ministry of Environment in Bolívar State.[333]

288.    In conclusion, even if it were a genuine document (which the Claimant denies), the Technical Inspection Report cannot form the basis for a permitting decision.

ii.    **The Permit denial letter was defective on its own terms.**

289.    The Claimant additionally contends that the Permit denial letter of 14 April 2008 was defective in its own terms. The Claimant addresses the reasons mentioned in the letter for which the Permit was denied by the Ministry of Environment, and makes the following observations.

a.    **Mining in the Imataca Forest Reserve.** The Claimant recalls that the Imataca Forest Reserve had been expressly designated for mining and forestry use in the Presidential Decrees of 1997, 2002 and 2004.[334] Therefore, there was no reasonable or rational basis to assert that the Las Cristinas mine should be halted for the purpose of "preserving the environment in the Imataca Forestry Reserve".[335] It is noteworthy, the Claimant argues, that the Permit denial letter makes reference to "the Decree" when justifying the alleged problems in the project, without clearly identifying which Decree precisely it is referring to.[336] Furthermore, the fact that

---

[330] C-PHB, para. 200.

[331] Reply, paras 266-299; C-PHB, para. 202.

[332] C-PHB, para. 204.

[333] C-PHB, paras 206-208.

[334] Reply, paras 383-385; C-PHB, para. 212, discussing Decree 1850, 14 May 1997, published in the *Gaceta Oficial* No. 36215 on 28 May 1997, **Exh. C-88**; Decree 3110, 7 September 2004, published in the *Gaceta Oficial* No. 38028 on 22 September 2004, **Exh. C-146**; and Decree 1757, 29 April 2002, published in the *Gaceta Oficial* No. 37437 on 7 May 2002, **Exh. C-6**.

[335] C-PHB, para. 212.

[336] C-PHB, para. 213.

the Las Cristinas mine was given to CITIC/Minera to develop in 2012 shows that this excuse is "frivolous and arbitrary".[337]

b. **Global warming.** Crystallex argues that nowhere on the administrative file (except in Exhibit R-52) is there any analysis of the issue of global warming or carbon emissions in relation to the Las Cristinas project.[338] And even in that document, no attempt was made to include any kind of scientific data or analysis (e.g., carbon emissions analysis, etc.).[339]

c. **Effects of illegal mining on the environment.** For the Claimant, the Permit denial letter makes no attempt to explain how Crystallex and the project described in its EIS could possibly be to blame for the actions of the illegal miners, nor why the proposed properly constructed industrial mine would not improve the environmental situation.[340]

d. **Alteration to hydrology.** The Claimant contends that no criticism was raised about Crystallex's hydrology plans by the Ministry of Environment in its letter to the CVG of 16 May 2007. Furthermore, Crystallex points out that on 27 March 2007, Ms. Laura Paredes of the Ministry of Mines informed Crystallex that she had learned from the Ministry of Environment that it was satisfied with the documents it had received.[341] Not a single document exists, in the Claimant's view, on the record to show that, at some time between 16 May 2007 and 14 April 2008, the Ministry of Environment commissioned a technical report re-analyzing the approach to hydrology described in Crystallex's EIS or the other documents it had produced up to including February 2007. Also in this respect, the Claimant concludes, the Permit denial is arbitrary, illogical, unsupported and procedurally irregular.[342]

e. **Threat to biodiversity.** The Claimant argues that not a single specific reference is made to a page of Crystallex's EIS or its addenda – including the 470-page biodiversity report. The letter refers to "research carried out by specialists competent in the matter", without, however, referring to any facts, data or figures in the administrative file.[343] The Claimant points out that the measures approved in the 16 May 2007 letter include a "surface water quality protection program", a

---

[337] C-PHB, para. 218.

[338] C-PHB, para. 221.

[339] C-PHB, para. 222.

[340] Reply, paras 380-382; C-PHB, paras 225-227.

[341] C-PHB, para. 230.

[342] C-PHB, paras 233-234.

[343] C-PHB, para. 236.

"ground water quality protection program", a "soil quality protection program", an "erosion control and drainage management plan", a "forest resource protection and use program" and a "wildlife protection program".[344] Even if the Ministry had revisited Crystallex's biodiversity studies at some time prior to April 2008 and concluded that further work was required, a proportionate response would have been to ask that such work be carried out. Outright rejection of the Permit was utterly disproportionate.[345]

f.   **Need for public consultation.** Crystallex submits that it engaged in extensive consultations with the local communities and indigenous population over the course of several years. In 2005, Crystallex submitted the Social Investment Plan, which covered the results of those consultations.[346] In February 2007, Crystallex had provided the Ministry of Environment with a comprehensive report assessing its performance of the Social Investment Plan.[347] The Claimant submits that no reasons were given in the Permit denial letter as to why the extensive public consultations already carried out by Crystallex were defective, and no facts, data or figures were provided in this respect.[348]

g.   **Plan for small miners' relocation.** According to the Claimant, the Permit denial letter avoids addressing any specific element of Crystallex' EIS in this respect. Crystallex claims that it had submitted plans for dealing with the small miners and the indigenous communities.[349]

g.   **Crystallex provided all the information it was asked to provide**

290.   Crystallex argues that Venezuela's contention that the Claimant failed to provide information that had been "consistently requested" by the Venezuelan authorities is not even mentioned in the Permit denial letter.[350] In any event, the record shows that Crystallex consistently satisfied the requests for information it had received and that, at the time of the approval of the EIS in May 2007, it had fully responded to all of the

---

[344] C-PHB, para. 237, discussing Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15**, p. 3.

[345] C-PHB, para. 237.

[346] Social Investment Plan, July 2005, **Exh. C-166(bis)**.

[347] C-PHB, paras 239-243.

[348] C-PHB, para. 241.

[349] Reply, paras 387-388; C-PHB, paras 245-247, discussing SNC-Lavalin, Environmental Impact Study, April 2004, **C-131(bis)**; Proconsult S.A., Environmental Impact Study, Addendum 3, September 2004, **Exh. C-144(bis)**; Environmental Supervision Plan, September 2004, **Exh. R-37**; Social Investment Plan, July 2005, **Exh. C-166(bis)**.

[350] C-PHB, para. 248.

Ministry of Environment's outstanding requests.[351] This, in the Claimant's view, explains why the EIS was approved and a promise made to "hand over" the environmental Permit in May 2007 upon presentation of the bond.[352]

291.    In particular, Crystallex contends that it had resolved most of the issues to the satisfaction of the Ministry of Environment in Bolívar State in 2004, before the reviewing process passed to the office in Caracas.[353] Furthermore, the Claimant argues that the Ministry in Caracas took two years even to distribute key documents internally between the different departments which were supposed to review the EIS according to their area of expertise.[354] With specific regard to the 22 December 2006 meeting, on which Venezuela relies, Crystallex responded in February 2007 by submitting the requested information.[355]

292.    The Claimant points to the letter of 27 March 2007, in which Ms. Paredes confirmed that the Ministry of Environment had received the information provided by Crystallex in response to each of the Ministry's requests made on 22 December 2006, with the sole exception of one document relating to copper,[356] which was subsequently duly provided by Crystallex on 25 April 2007.[357]

293.    Finally, Crystallex contends that the so-called Equator Principles are not relevant to the resolution of this dispute. These principles are, according to the Claimant, an "adaptive environmental and social risk-based guidance framework, used by financial institutions to make lending decisions on project financing".[358] The Claimant notes that between 2004 and 2008, when Crystallex's EIS was under review by the Ministry of Environment, Crystallex was not actively engaged in submitting a proposal for project finance to an international lender.[359]

294.    Furthermore, the Equator Principles are not part of Venezuelan law, and, thus, it is not surprising that the guidelines are not referred to in any of Venezuela's internal documents relating to the EIS or in any of Venezuelan's communications with Crystallex. Consequently, when it comes to judging whether the actions of the Ministry

---

[351] See *supra* Section V.B.1.a.

[352] C-PHB, para. 248.

[353] C-PHB, para. 249.

[354] C-PHB, paras 250-265.

[355] C-PHB, para. 267.

[356] See Letter from Laura Paredes of the Ministry of Mines to Crystallex, 27 March 2007, **Exh. C-385**, quoted *supra* at para. 250.

[357] C-PHB, para. 270, discussing Communication VPDI/GM/0376-07 from the CVG to the Ministry of Environment and Natural Resources, 25 April 2007, **Exh. C-203**; Proposal for the treatment of copper and cyanide, April 2007, **Exh. C-201**.

[358] C-PHB, para. 292 (internal footnote omitted).

[359] C-PHB, para. 293.

of Environment in denying the Permit were justified at the time the decision was made, the Equator Principles have no relevance.[360]

295.    In any event, the project was, in the Claimant's view, fully compliant with the Equator Principles, and would therefore have qualified for project financing had Crystallex sought to apply for such financing.[361]

h.    **After the Permit Denial, Crystallex's due process rights were ignored**

296.    According to the Claimant, the fact that the Permit denial letter lacked all of the data, figures, supporting documents and other attributes it was legally required to have pursuant to Venezuelan law, deprived the Claimant of its due process right, because it prevented it from making its case once it chose to challenge the decision.[362]

297.    In addition, Crystallex's rights of due process were denied when it sought to challenge the Permit denial.[363] First, when it launched the recourse for reconsideration, it was denied the right to respond because it was told by the Director-General of the Administrative Office of Permissions at the Ministry of Environment that it had no standing because it was purportedly not domiciled in Venezuela, something which the Claimant contends is transparently false.[364]

298.    Second, when Crystallex mounted a hierarchical appeal against the Ministry's refusal to recognize its standing, Venezuela violated Crystallex's due process rights again through its failure to respond to the hierarchical appeal.[365]

i.    **The inconsistent statements and reassurances by Venezuelan authorities following the Permit denial**

299.    Following the Permit denial, Crystallex claims that Venezuela subjected it to a "rollercoaster of political mistreatment" that eventually culminated in the rescission of the MOC in February 2011.[366] While Crystallex was given assurances in private about the permitting process, other Government officials, including President Chávez

---

[360] C-PHB, para. 294.

[361] C-PHB, para. 295.

[362] C-PHB, paras 300-301; Reply, para. 379.

[363] Reply, paras 394-397.

[364] C-PHB, para. 302, discussing Oficio 2765 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to Crystallex, 29 May 2008, **Exh. C-30**, p. 8.

[365] C-PHB, para. 303.

[366] C-PHB, para. 298; Reply, para. 398.

himself, made inconsistent announcements that Las Cristinas would be "taken back" and developed by the State or with a partner of a different nationality.[367]

300.    On the one hand, Crystallex contends that the Ministry of Environment reopened the permitting decision shortly after the Permit denial.[368] For example, on 20 August 2008, Vice-Minister Merly Garcia wrote to Crystallex, giving the appearance that the Ministry was still deciding whether to issue the Permit, and stated that:

> "[H]aving fully studied [Crystallex's proposal], which tends to adhere to Government guidelines in both environmental and social matters, this Office considers that it is viable for our technicians to evaluate same with a view to the decision the Ministry must take on the Las Cristinas Gold Project".[369]

301.    Crystallex claims that Venezuela also continued to confirm that the conditions for the Permit were fulfilled. For example, senior representatives of the Ministry of Mines appeared at a hearing before the Permanent Committee for Economic Development of the National Assembly in June 2008, confirming that Crystallex was in compliance with the procedural and administrative requirements necessary to receive the Permit.[370] The Permanent Committee's post-hearing report noted that prior to the Permit's denial, Crystallex had received longstanding support from the Venezuelan Government.[371]

302.    On the other hand, Venezuelan Government officials publicly announced their intention to take back the value of the right to mine Las Cristinas.[372] The position of the Claimants as to the key developments in these respect is summarized in the following paragraphs.

### i.    July 2008-October 2010: Key events and announcements

303.    In 2008, President Chávez and President Putin decided to create a joint venture, called VenRus, to develop gold mines in the Imataca Reserve. The joint venture agreement, signed by Minister of Mines Rodolfo Sanz and a Russian-managed company, Rusoro, was signed in July 2008.[373] VenRus was then incorporated on 29 September 2008.[374]

---

[367] C-PHB, para. 304.

[368] C-PHB, paras 304-308.

[369] Oficio 1719 from the Vice-Minister of Environmental Administration and Government to Crystallex, 20 August 2008, **Exh. C-36**.

[370] Memorial, para. 209, discussing Minutes No. 014-2008 of the Ordinary Meeting held on 4 June 2008, 4 June 2008, **Exh. C-32**.

[371] Memorial, para. 209.

[372] C-PHB, paras 309-357.

[373] Acuerdo Compromiso Entre el Ministerio de Industrias Basicas y Mineria (MINBAM) y la Empresa Rusoro Mining LTD, 4 July 2008, **Exh. R-123**.

[374] Act and Articles of Incorporation of Corporación Minera Venrus, 29 September 2008, **Exh. C-38**.

304.    In September 2008, President Chávez publicly announced that:

> "In Guayana for example, we are taking back big mines, and one of them is one of the biggest in the world. And do you know what it is? It's gold, it's gold!"[375]

305.    For the Claimant, given the unique nature of the mine, it is self-evident that President Chávez could only have been referring to Las Cristinas.[376]

306.    On 5 November 2008, Minister Sanz announced, in an official press release, that the Government would take back Las Cristinas from Crystallex:

> "[T]he Las Cristinas mine, which used to be managed by transnational company Crystallex, is expected to begin being exploited in 2009. […] [T]he mine will be reclaimed and operated by the State. […] As a result of the financial crisis spreading worldwide, we must try to recover our gold in order to increase our international reserves".[377]

307.    Crystallex points out that the press release did not refer to any of the concerns which had been mentioned in the Permit denial letter.[378]

308.    On 6 November 2008, at a presentation to a Russian Government delegation which press agency Reuters attended, Minister Sanz explained that the Government would enter into an agreement with Rusoro to operate both the Las Cristinas and Las Brisas project in an effort to develop closer ties with Russia and increase mining input in light of tumbling crude prices. According to the Reuters press release, Minister Sanz stated that:

> "We have to rescind our relationship with a company that has been working in the zone. […] We have a legal problem there. […] the memorandum would not mention Las Cristinas and Brisas by name for legal reasons. […] 'You can be sure that those will be the deposits', he told the delegation".[379]

309.    Thereafter, Crystallex claims to have held a positive meeting with Adan Chávez, the brother of President Hugo Chávez, about a possible joint venture between Crystallex and the Venezuelan Government.[380]

---

[375] "Chávez asegura que está 'recuperando' las grandes minas de oro", *El Universal*, 19 September 2008, **Exh. C-37**.

[376] Reply, para. 422; C-PHB, para. 311.

[377] Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**.

[378] C-PHB, para. 316.

[379] "Venezuela offers Russians big gold projects", Reuters, 6 November 2008, **Exh. C-45**.

[380] C-PHB, paras 322-323.

310.   However, in his annual address to the Venezuelan people before the National Assembly in January 2009, President Chávez stated that:

> "[T]his year the Venezuelan State has taken over the exploitation and control of the gold deposits of Las Cristinas. […] [W]e have created this year (2008) the mixed company Venrús, with Russia, […] a mixed company for the deposits of Las Cristinas".[381]

311.   Again, Crystallex contends, no mention was made of environmental concerns relating to mining in the Imataca Forest Reserve, global warming or any of the other issues raised in the Permit denial letter.[382]

312.   However, on 22 January 2009, Reuters reported the following statement by Minister Sanz:

> "When asked whether Crystallex would leave the project, after having waited years for environmental permits to develop it, the Minster stated that 'I did not say that'. 'When we have made a decision we will communicate it to whomever it must be communicated' he added".[383]

313.   On 2 March 2009, Crystallex received yet further assurances from the CVG that the MOC remained in full force and effect, that it had fully complied with its obligations and that the project was in the process of obtaining the required permits:

> "Taking into account that […] Crystallex has been fulfilling the obligations assumed under the contract, we hereby inform you that the contract is fully valid and in the process of obtaining the required permits from the competent authorities for the initiation of the development of the Project".[384]

314.   In April 2010, during his weekly talk show "Aló Presidente", President Chávez stated:

> "If we are going to exploit gold we will have to nationalize all of it, recuperate and put an end to concessions which led to degeneration".[385]

315.   In May 2010, Crystallex claims that it sought to partner with an entity of a nationality that would be acceptable to the Government in order to move forward with the Las Cristinas project. It thus engaged in talks with China Rail, a Chinese State company.[386]

---

[381] Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53**, p. 2.

[382] C-PHB, para. 325.

[383] "Venezuela, sin decisión sobre explotación mina oro Las Cristinas", *Reuters*, 22 January 2009, **Exh. C-54**.

[384] Letter from the CVG to Crystallex, 2 March 2009, **Exh. C-55**.

[385] Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information (extracts), 25 April 2010, **Exh. C-62**, p. 2.

[386] C-PHB, paras 334-338.

316.    In August 2010, the CVG confirmed again that Crystallex's MOC was in full force and effect and requested further information from Crystallex regarding the proposed association with China Rail.[387]

317.    However, in October 2010, President Chávez travelled to Belarus accompanied by Minister of Mines José Khan. The President of Venezuela announced that:

> "Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies. I announce to the world that the revolutionary Government recuperated it, together with the Las Brisas mine. These mineral resources are for the Venezuelan people, not for transnationals […] ".[388]

### ii.    The controversial "VenRus Presentation" of late 2010: Exhibit C-439

318.    According to the Claimant, in late 2010, around the time of the President's trip to Belarus, a presentation surfaced titled "Project Proposal 'Brisas de Las Cristinas'".[389] The presentation's cover page bears the official logos of the Ministry of Mines, the State Mining company "Minera Nacional" and VenRus (the Venezuelan joint-venture with Rusoro), as well as the logo of Venezuela's "bicentenary of independence". In response to the suggestion by Venezuela and some of its witnesses that the powerpoint presentation may have been prepared by Rusoro, the Claimant points out that Rusoro's logo does not appear anywhere in the presentation.[390]

319.    The Claimant contends that the presentation set forth a legal strategy for "getting rid" of Crystallex without paying any compensation, so that Las Cristinas and the neighbouring Las Brisas mines could be jointly developed by VenRus and Minera.[391] Amongst other things, the presentation took aim at Crystallex being a "foreign enterprise" domiciled in British Columbia.[392] It set forth two alternative legal strategies for rescinding its commitment to Crystallex without compensation, one of which involved rescinding the MOC pursuant to Clause 24 of the MOC.[393] According to the Claimant, the presentation "provided a recipe for dressing up a sovereign act of expropriation as a mere contractual act".[394]

---

[387] Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**.

[388] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", Agencia Venezolana de Noticias (State news agency), 17 October 2010, **Exh. C-65**.

[389] "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**.

[390] C-PHB, para. 346.

[391] C-PHB, para. 347.

[392] "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**, p. 4.

[393] "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**, p. 12.

[394] C-PHB, para. 351.

320. The Claimant highlights that, at the hearing, both Ms. Paredes (the President of VenRus at the time) and Minister Khan (the Minister of Mines at the time) admit to having reviewed the presentation in 2010, although they both strongly denied any involvement by either the Ministry or VenRus in the preparation of the presentation.[395] Paredes suggested that the presentation was prepared by Rusoro.[396]

321. For the Claimant, this evidence is not credible, because it is implausible that Ms. Paredes and Minister Khan would have tolerated a private company's use of official Government logos; that Rusoro, a Canadian company domiciled in British Columbia, would cast aspersion on another mining company because of its domicile in British Columbia; and because Rusoro was not in a position to make a presentation concerning the interests of the Government of Venezuela, or to opine on Venezuela's policy and sovereignty as to national resources, as the presentation does at length.[397]

322. For the Claimant, the presentation is a document prepared by the Venezuelan Government, with the approval of the Ministry of Mines, reflecting the policies of the Venezuelan Government.[398] It provides a plan to expropriate Crystallex's rights in order to transfer them to the VenRus joint venture, disguised as a contractual matter to seek to avoid compensation and thus "reduce the risk of claims on [the] part of Crystallex brought either before the national courts or international tribunals".[399]

323. The Claimant notes that in February 2011 Venezuela precisely implemented the Ministry of Mines'/VenRus' legal strategy suggested in the VenRus Presentation, when it rescinded the MOC invoking Clause 24 of the MOC.[400]

## 2.  The Respondent's Position

324. The Respondent contends that the Ministry of Environment properly and justifiably denied Crystallex's request for an environmental Permit in 2008 after a thorough, technical review of all the information submitted. According to Venezuela, the denial was based on several well-founded concerns about the proposed project's likely unmitigated environmental and socio-cultural impacts, which had been raised and discussed with Crystallex since 2004. During the four-year environmental review process, Crystallex failed to adequately assess or address these concerns and failed to convince the Ministry that the project's impacts would be sufficiently mitigated, corrected and/or prevented.

---

[395] C-PHB, para. 353.

[396] C-PHB, para. 353, discussing Laura Paredes' testimony.

[397] C-PHB, para. 354.

[398] C-PHB, para. 356.

[399] C-PHB, para. 357, citing to "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**, p. 12.

[400] C-PHB, para. 358.

325.    According to Venezuela, during the four years in which the environmental analysis and Permit application remained pending, the Ministry of Environment was responsive to Crystallex. The Ministry did not delay in its answers, rather, it considered each submission by Crystallex, analyzing whether the Claimant was responsive to the concerns raised by its technical experts; and generally worked with the CVG and Crystallex to achieve an impact assessment and mitigation program that would be acceptable, yet to no avail.[401]

326.    Venezuela submits that the Ministry's review of Crystallex's application was a purely technical and apolitical process in which the Permitting Office at the Ministry solicited input, comments, and recommendations from technicians in numerous departments including experts in water resources, forestry, biodiversity, community impacts, and environmental mitigation and monitoring.[402]

     a.    **The Deficiencies in the Claimant's EIS were repeatedly raised with the Claimant since 2004**

327.    Venezuela contends that, when Crystallex submitted its EIS on 15 April 2004, it requested an initial permit for "preliminary work construction activities for the proposed project" to be followed by another permit for its exploitation activities (i.). At the end of 2004, the Ministry informed Crystallex of substantial deficiencies in its materials that would need to be corrected before any permits would be issued (i.-ii.). Throughout the next 18 months, the Ministry held roundtable discussions with the company, considered the company's responses, and had its own technicians evaluate different aspects of the proposal (ii.-iii.). By mid-2006, the Ministry notified Crystallex of its conclusion that Las Cristinas had to be evaluated jointly with the adjacent Las Brisas project in order to decrease the cumulative negative impacts on the environment of the two neighboring projects (iv.). Crystallex did not deliver the requested additional information and integrated analysis, and, as a result, the Ministry concluded that it had to deny the requested permits (v.).

328.    According to the Respondent, many contemporaneous documents show that the relevant subdivisions of the Ministry of Environment reviewing Crystallex's EIS identified numerous, significant deficiencies, which were inadequately addressed by the company.[403] Thus, by no means could the Permit denial come as "a surprise" to Crystallex.[404]

---

[401] Counter-memorial, para. 87.

[402] Rejoinder, para. 21.

[403] R-PHB, para. 23.

[404] R-PHB, para. 23.

329. The next sections analyze in greater detail the Respondent's position on the main exchanges between Crystallex, the CVG and the Venezuelan authorities, in particular the Ministry of Environment, on the environmental aspects of the project.

### i. 2004: From Crystallex's submission of the EIS, up to the Ministry's rejection on 29 December 2004

330. As a preliminary matter, the Respondent highlights that when Crystallex submitted its EIS on 15 April 2004, it requested an initial permit for "construction activities for the preliminary works of the project",[405] to be followed by another permit for its exploitation activities. For the Respondent, there is no evidence to support Crystallex's claim in the arbitration that "this request for a preliminary permit was abandoned by CVG/Crystallex in late 2004".[406]

331. Moreover, acceptance of the Placer Dome EIS was irrelevant to the environmental review of Crystallex's plan.[407] For Venezuela, minimal changes to an existing project continued by the same operator will require less analysis than a new project by a new operator based on new information many years after the original approval was sought. The latter is the case here, as the Placer Dome/MINCA EIS had been prepared in 1997.[408] Thus, in 2004, Crystallex could not rely on an old approval of an outdated study for its new proposal to build a complex, large open-pit mine.[409]

332. Furthermore, according to Venezuela, substantial concerns led the Ministry of Environment to reject Crystallex's permit request in late 2004.

333. As early as 31 May 2004, the Ministry of Environment set out its first set of technical observations to Crystallex's proposed EIS.[410] The Ministry raised concerns regarding water issues, the diversion channel, the lack of proper forestry inventory, the problem of illegal miners, and social issues more generally. Venezuela submits that every single one of these critiques also appears in the April 2008 Permit denial.[411]

334. Similar concerns were raised by the Ministry of Environment in a meeting with Crystallex that took place on 23 September 2004.[412] The Ministry's questions and

---

[405] Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**, p. 2.

[406] Rejoinder, para. 71, discussing Reply, para. 172.

[407] Rejoinder, paras 80-84.

[408] Rejoinder, paras 80-81.

[409] Rejoinder, para. 84.

[410] Letter of 31 May 2004 detailing observations on ESIA, **Exh. R-32**.

[411] Counter-Memorial, paras 191-197.

[412] Counter-Memorial, paras 198-202.

concerns prompted, according to Venezuela, the preparation of Addendum 2 of the EIS.[413]

335. On 29 December 2004, the Ministry of Environment communicated its rejection of the EIS documentation that Crystallex had submitted up to that point.[414] The Ministry asked for a reformulation of the project (and not just of its terms of reference, as argued by the Claimant) in order to minimize environmental impacts, highlighting various concerns regarding the proposed project and the inadequacy of Crystallex's EIS.[415]

336. The Ministry pointed at Crystallex's insufficient or entirely lacking data. It noted that Crystallex had failed to adequately identify the flora and fauna present in the area; that the proposal lacked the necessary mitigating preventive, or corrective measures related to the tailings pond, water diversion channel, landfill, and incinerator; that Crystallex had only assessed the impact of the proposed tailings pond "with respect to the area's deforestation process, yet never examining the interaction of this pond with the surrounding environment"; and that Crystallex had not adequately addressed the social impacts of its plans on illegal and small-scale miners nor planned to include them in the area of its operations.[416]

### ii.  2005: Key developments

337. The Respondent submits that during 2005, the Ministry provided substantial feedback to Crystallex by holding workshops with company representatives to discuss different concerns about the EIS through the year.[417]

338. In the framework of these workshops, the Ministry of Environment reiterated its concerns regarding certain aspects of the Las Cristinas project and its possible environmental and social impacts.[418] These meetings, according to Venezuela, were necessary because the Ministry was not satisfied with the responses and addenda it had received in 2004 from Crystallex.[419] In these interactions with the Claimant, the Ministry requested several additional items from the company, including the Social

---

[413] Crystallex submitted Annex 2 to the Ministry in two parts, on 28 October and 28 November of 2004, respectively. See SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 1, October 2004, **Exh. C-147**; SNC-Lavalin, Environmental Impact Study: Addendum No. 2, Part 2, November 2004, **Exh. C-152**.

[414] Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**.

[415] Counter-Memorial, paras 203-206, discussing Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**.

[416] Counter-memorial, paras 203-206; R-PHB, para. 26, discussing Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**.

[417] Rejoinder, paras 85-100; R-PHB, para. 28.

[418] Counter-Memorial, paras 207-210.

[419] Counter-Memorial, para. 210.

Investment Plan; the Manual for the Application of Natural Physical Measures; updated baseline studies for air, flora/fauna, and soils; and a forest report and reforestation plan.[420] For the Respondent, the issues raised in 2005 precisely foreshadow the reasons for the Permit denial in the 2008 letter.[421]

339.    For example, at a roundtable discussion on 18 April 2005, the parties agreed to set up three technical commissions to follow-up on specific aspects:[422] (i) environmental quality;[423] (ii) socio-cultural aspects;[424] and (iii) water, biodiversity, and forestry.[425]

### iii.    2006: The Technical Inspection Report (Exhibit R-52)

340.    During 2006, according to the Respondent, personnel from the Ministry visited the site, reiterated the same concerns discussed above, and went so far as to internally recommend the denial of the Permit.

341.    In particular, in July 2006, the Permissions Office of the Ministry of Environment prepared a summary on the review process, highlighting that there was no clear solution to the social problems concerning the small-scale illegal miners, nor a clear definition regarding the inclusion of indigenous communities in the project.[426]

342.    In September 2006, Pedro Romero and other experts from the Ministry of Environment visited the Las Cristinas site and prepared a report summarizing their findings (the "Technical Inspection Report", Exhibit R-52). This report raised the concerns that were later echoed in the April 2008 Permit denial. The report recommended that the Ministry's Permissions Office should deny the Permit requested for Crystallex's proposed project.[427]

343.    According to the Respondent, the Technical Inspection Report was prepared with the collaboration of a multidisciplinary technical team.[428] The Respondent highlights that the report provided several reasons for its conclusions that the proposed project should not be permitted. These included the issues related to small miners, deforestation,

---

[420] R-PHB, para. 28.

[421] See esp. the chart comparing the "concern[s] raised in 2005" with the "concern[s] mentioned in the denial of the Permit, 2008" at R-PHB, pp. 14-15.

[422] First Round Table Discussion on Aspects of Ecosystem Management and Hydrological Considerations for the "Las Cristinas" Open Air Mining Project Meeting Minutes, 18 April 2005, **Exh. R-108**.

[423] See Rejoinder, paras 91-92.

[424] See Rejoinder, paras 93-97.

[425] See Rejoinder, paras 98-99.

[426] Proyecto de Extraccion Aurifera Las Cristinas - Hoja Resumen, November 2006, **Exh. R-88**.

[427] Counter-Memorial, para. 213, discussing Technical Inspection Report noting environmental damage, September 2006, **Exh. R-52**.

[428] Rejoinder, para. 105.

changes to surface and subterranean water, the delicate nature of the Imataca Forest Reserve, and social issues related to the introduction of thousands of new workers to the area.[429] It also discussed concerns about water,[430] issues relating to the exploitation of copper,[431] and plans to mitigate acid rock drainage.[432]

    iv.  **2006 (cont'd): The Ministry's concerns with regard to the cumulative impacts of Las Cristinas and Las Brisas (Gold Reserve)**

344.    According to the Respondent, the second half of 2006 was dedicated to discussions between not only Crystallex and the Ministry, but also Gold Reserve, regarding the cumulative impacts of the Las Cristinas and Las Brisas projects and the need for cooperation between the companies to minimize and mitigate unacceptable environmental and social impacts.[433]

345.    On 31 July 2006, the Ministry of Environment notified Crystallex and Gold Reserve of the need to conduct a Strategic Environmental Evaluation (or "EAE" by its Spanish initials).[434] An EAE is a planning tool prepared by the Venezuelan State, which however requires certain joint analysis and evaluation by the affected project developers.[435] Venezuela explains that the Ministry of Environment considered it necessary to carefully analyze the cumulative impacts of both the Las Cristinas and Las Brisas projects and to conduct a Strategic Environmental Evaluation before either project could be fully permitted.[436]

346.    On 17-18 October 2006, the Ministry of Environment coordinated two days of meetings with Crystallex, the CVG, Gold Reserve, their consultants, and the Embassy of Canada as part of a "Venezuelan-Canadian Business Forum" held in Porlamar, Venezuela (the "Porlamar meeting").[437] In this context, the Ministry emphasized that while it would consider the requests for permits independently, the environmental authorizations for both projects were counting upon a coordinated effort to minimize environmental and social impacts.[438]

---

[429] Rejoinder, para. 108.

[430] Rejoinder, paras 110-116.

[431] Rejoinder, paras 117-119.

[432] Rejoinder, paras 120-122.

[433] Counter-Memorial, para. 211.

[434] Official Letter No. 2352 from MinAmb Office of Permissions to CVG, 31 July 2006, **Exh. R-50**; Official Letter No. 2353 from MinAmb Office of Permissions to Gold Reserve, 31 July 2006, **Exh. R-51**.

[435] Counter-Memorial, para. 216.

[436] Rejoinder, para. 129.

[437] Meeting Minutes, 18 October 2006, **Exh. R-53**.

[438] Rejoinder, para. 134.

347.    On 19 December 2006, the Ministry of Environment sent essentially the same letter to both Crystallex and Gold Reserve, indicating its concerns regarding the significant likely impacts of the two projects, outlining certain requirements of the EAE, and calling for a meeting to take place on 22 December 2006.[439]

348.    In the 22 December 2006 meeting with the two mining companies, according to Venezuela, the Ministry of Environment committed to a phased permit approach: (1) a "priority permitting process" in which it would issue *preliminary* Permits for both the Las Cristinas and Las Brisas projects within three months, if its requirements were satisfied by the project proponents; and (2) a "medium-term" schedule in which authorization for at least some of the other elements of both projects (i.e., everything not listed in the "short-term" category) might be expected in "approximately 3 years".[440] In other words, Venezuela contends that the Ministry promised a partial permit in three months, but required significant information for further analysis of Crystallex's plans and the likely impacts before it would grant an exploitation permit to Crystallex.[441] According to the minutes, the Ministry demanded, *inter alia*, a joint hydrological evaluation for Las Cristinas and Las Brisas, as well as a joint analysis of the socio-cultural impacts of the two projects, a "joint social investment plan" (one part of which was to focus on indigenous peoples), a comprehensive Environmental Supervision Plan, and supplemental information on Crystallex's plans regarding the use of copper.[442]

v.    **2007: Crystallex's inadequate feedback to the 22 December 2006 meeting requests**

349.    Venezuela submits that the materials that Crystallex submitted in early 2007 in response to the concerns raised in the 22 December 2006 meeting either completely ignored or inadequately addressed the Ministry's requests.[443] The Respondent makes the following observations:

---

[439] See Letter 6155 from the Ministry of the Environment to the CVG, 19 December 2006, **Exh. C-193**; MinAmb Official Letter No. 6154, 19 December 2006, **Exh. R-58**.

[440] MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**; Counter-Memorial, para. 228; Rejoinder, paras 137-144.

[441] Rejoinder, para. 139.

[442] Counter-Memorial, paras 231-232, discussing MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**.

[443] Rejoinder, paras 167-194.

350. With regard to the *joint* hydrology report, which the Ministry had requested Crystallex and Gold Reserve to submit, Crystallex's report submitted on 16 February 2007 contained no joint evaluation or analysis.[444]

351. With regard to social issues, Venezuela stresses that the minutes of the 22 December 2006 meeting confirm that the Ministry requested an "integrated analysis of the assessment of the socio-cultural impact of the two projects together" and an evaluation of the "Joint Social Investment Plan".[445] Nevertheless, the report on socio-cultural impacts which Crystallex submitted in February 2007 was not an integrated analysis of the cumulative impacts of the two proposed projects.[446] Furthermore, specific issues or concerns identified by the Ministry (such as gender inequalities, local indigenous culture and traditions, and incorporation of small miners) were inadequately addressed.[447]

352. Furthermore, Crystallex simply ignored the Ministry's request for a full "Environmental Supervision Plan", which was to consider every level of environmental impact for the project, the corresponding preventative, mitigating or corrective measures, as well as funding aspects.[448] Instead, it re-submitted the construction environmental supervision plan and the related Manual.[449]

353. Finally, also Crystallex's submissions relating to copper were inadequate.[450]

354. Thus, Venezuela concludes, the Ministry over four years gave Crystallex ample opportunity to make the necessary changes to the project, which Crystallex failed to make.

    b.    **The EIS was never approved and the promised Permit, if anything, was limited to preliminary works and exploration**

355. Venezuela contends that, contrary to the Claimant's allegations, Crystallex's EIS was never fully approved, i.e., the Ministry never found that the environmental and socio-

---

[444] Rejoinder, paras 169-172, discussing Answers to the technical observations made by the Ministry of Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)**.

[445] Rejoinder, para. 173, discussing MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**, p. 2.

[446] Rejoinder, para. 174.

[447] Rejoinder, paras 176-183.

[448] Rejoinder, para. 185.

[449] Rejoinder, paras 185-187.

[450] Rejoinder, paras 188-193, discussing Answers to the technical observations made by the Ministry of Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)** and Proposal for the treatment of copper and cyanide, April 2007, **Exh. C-201**.

cultural impacts of the proposed Las Cristinas project, coupled with proposed preventative and mitigating measures, would be tolerable.[451]

356.    For Venezuela, the supposed approval of Crystallex's EIS only related to preliminary works and could only have led to the issuance of an equally limited preliminary Permit. Venezuela explains that when, in April 2004, Crystallex, through the CVG, submitted to the Ministry of Environment its EIS requesting the full Permit for exploitation to be issued, it also requested that a preliminary AARN be issued with urgency for certain preliminary works.[452]

357.    The Respondent highlights that Crystallex's request of 15 April 2004 stressed "the need to start preliminary work on site in accordance with the work schedule established between the CVG and Crystallex" and asked the Ministry of Environment "to process with some urgency the authorization to use natural resources in [seven specified] preliminary work construction activities for the [proposed] project", including extension of access roads, construction of a diversion channel, and others.[453] The letter informed the Ministry that the planned start date for the aforementioned preliminary works was the beginning of May of 2004, i.e. one month later.

358.    For Venezuela, there is no indication that Crystallex or the CVG requested the "urgent" issuance of a Permit with respect to the key facts of its proposed project, such as the construction of the open pits, the processing of extracted materials, and the proposed "tailing dams" (i.e., deposits locations for the waste generated through the processing of extracted materials).[454]

359.    The fact that in their 15 April 2004 letter, Crystallex and the CVG asked to be allowed to begin work at Las Cristinas only one month later, i.e. in May 2004, shows that this request for urgent approval was limited to certain "preliminary works" only, as Crystallex could not have expected the Ministry of Environment to perform the review of the full 900+page EIS, with a view to granting a Permit for exploitation, in one month only.[455]

360.    For the Respondent, throughout 2005 and 2006, Crystallex's focus continued to be on a preliminary Permit, not a Permit for the operation and exploitation of the mine. This is evidenced by the submission of an "Environmental Supervision Plan" in September 2004 which, according to Venezuela, related exclusively to the same preliminary

---

[451] Rejoinder, para. 67.

[452] Counter-Memorial, paras 91-95, discussing Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**, p. 2.

[453] Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**. See Counter-Memorial, para. 92.

[454] Counter-Memorial, para. 95.

[455] Counter-Memorial, para. 98.

construction-type works for which Crystallex was seeking urgent approval.[456] Further, the October 2005 supplement to such Environmental Supervision Plan focused again, in Venezuela's view, exclusively on preliminary works.[457]

361.    Furthermore, according to the Respondent, at the above-mentioned 22 December 2006 meeting, an agreement was reached as to a "phased permitting approach".[458] That is, first, a "priority permitting process" was to be pursued, in which the Ministry would issue a preliminary Permit (if the requirements were satisfied), which the Respondent contends would relate only to preliminary works.[459] The permitting process relating to the proper exploitation phase at Las Cristinas was, to the contrary, meant to be carried out at a later stage.[460] And in a February 2007 communication from Crystallex to the Ministry, so argues the Respondent, Crystallex confirmed that it was presenting information for two separate Permits, one for service works and one for exploitation.[461]

362.    It is against this backdrop, Venezuela contends, that the 16 May 2007 letter should be correctly interpreted. The letter did *not* approve the full EIS, as Crystallex contends. A project accreditation would be much longer and much more detailed than a three-page letter.[462] The 16 May 2007 letter is thus simply a request for a performance bond. In the Respondent's view, the statement whereby the environmental protection and mitigation measures proposed in Crystallex's EIS "have been analyzed and approved by this Office", is necessarily limited by the letter's subject matter. Indeed, the letter related to the request for a limited, preliminary Permit for the constructing of infrastructure and services, as well as exploration, not for a Permit authorizing the entire Las Cristinas project.[463]

363.    In the Respondent's view, there is no mention anywhere in the 16 May 2007 letter of the actual construction or exploitation of the Las Cristinas pits, much less the processing of extracted materials, disposal or water treatment issues, or the closure of the mine once exploitation has finished, all of which are crucial elements of mining projects which must be assessed before a mining project can be fully authorized.[464] Venezuela

---

[456] Counter-Memorial, para. 99, discussing Communication VPCACT/729 from the CVG to the Ministry of Environment and Natural Resources, 15 September 2004, **Exh. C-145**.

[457] Counter-Memorial, para. 100.

[458] See *supra* paras 246-248, 348.

[459] Counter-Memorial, para. 103 discussing MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**.

[460] Counter-Memorial, paras 104-105.

[461] R-PHB, para. 39, discussing Answers to the technical observations made by the Ministry of Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)**, p. 3 of 444.

[462] R-PHB, para. 36.

[463] Counter-Memorial, para. 112.

[464] Counter-Memorial, para. 112.

points to the fact that the letter states its limited focus in two separate places, in which it mentions "exploration" (as opposed to "exploitation").[465]

364.   Thus, Venezuela concludes, Crystallex only ever received, at most, a *partial* approval of its EIS.[466]

365.   As the approval of the EIS was limited in scope (to preliminary works), so was, in Venezuela's view, the corresponding payment of the bond and related taxes requested by the Ministry of Environment in its 16 May 2007 letter.[467]

366.   According to the Respondent, the fact that the bonds requested (and later paid by Crystallex) as well as the environmental taxes related only to preliminary works, is confirmed by the following other documents on the record.

367.   First, on 16 May 2007, the same day the Ministry of Environment requested the Bond, it also wrote to the CVG to request the payment of a tax totaling Bs. 3,940,070 (at the time equal to approximately US$1,835) "for issuance of the [AARN] for implementing activities associated with the project, 'Construction of Infrastructure and Services and Gold Ore Exploration Stage for the Las Cristinas Project'".[468]

368.   Second, on 17 May 2007, the day after it received the two 16 May 2007 letters from the Ministry of Environment, the CVG forwarded those letters to Crystallex.[469] The Spanish original of the CVG's 17 May 2007 letter includes only the general phrase that the bond and taxes were requested to continue the application process for the "*Autorización de Afectación de los Recursos Naturales del Proyecto Minero Las Cristinas*".[470] There is no mention, according to Venezuela, to "exploitation". Rather, the CVG letter of 17 May 2007 made clear that the AARN at issue, and, therefore, the related bond and taxes described in the letters, were limited to the preliminary work of infrastructure and services construction and exploration.[471]

369.   Third, a review of the actual bond purchased by Crystallex states that the environmental measures it guarantees are those "that are contemplated in the environmental impact evaluation of the CONSTRUCTION PROJECT OF INFRASTRUCTURE AND SERVICES AND FOR THE EXPLORATION STAGE OF GOLD, LAS CRISTINAS

---

[465] Counter-Memorial, paras 111-112, discussing Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15**.

[466] Counter-Memorial, para. 113; R-PHB, para. 40.

[467] Counter-Memorial, paras 115-125.

[468] See Oficio from the Vice-Minister of Environmental Administration and Governance to the CVG, 16 May 2007, **Exh. C-205**.

[469] Letter from the CVG to Crystallex, 17 May 2007, **Exh. C-206**.

[470] Letter from the CVG to Crystallex, 17 May 2007, **Exh. C-206**.

[471] Counter-Memorial, para. 119.

PROJECT".[472] Nowhere does the bond say anything about the actual construction of the mine itself, much less its exploitation.[473]

370. Fourth, when Crystallex wrote, on 30 May 2007, to the CVG inquiring about the status of the process before the Ministry for the granting of the AARN it referred to "the Authorization to Affect Natural Resources for the execution of activities associated with the Project for the 'Construction of Infrastructure and Services for the Gold Exploration Stage for the Las Cristinas Project'".[474]

371. In view of all these documents making reference to "exploration", Crystallex's argument that the 16 May 2007 letter simply contained a typographical error is, for the Respondent, untenable.[475]

372. Finally, with regard to the "draft Permit" which Crystallex alleges to have received around the time it received the 16 May 2007 letter, Venezuela points to the fact that this is an undated and unsigned document.[476] For Venezuela, "[w]hatever this document is, and Venezuela does not concede that it is a Ministry document, and however Claimant obtained it, it has no value".[477]

c. **Crystallex did not have a "right" to receive the Permit**

373. Venezuela also argues that, even when a project proponent has received approval of its EIS, produced a bond and paid certain taxes, it is not necessarily guaranteed a permit.[478] For the Respondent, it is disingenuous for Crystallex to suggest that it expected the Ministry of Environment's May 2007 partial approval of the EIS, together with its own posting of a limited bond and payment of equivalently limited taxes, to necessarily result in the issuance of a much broader Permit for exploitation.[479] Venezuela points to the fact that in August 2007, some three months after receiving the Ministry's May 2007 letter, posting the bond, and paying the taxes, Crystallex reported to the SEC that there was "no assurance as to when or if the Permit [would] be granted".[480]

374. Furthermore, even after receiving the full Permit, Crystallex would have been required to secure additional environmental permits in order to lawfully operate the mine (e.g.,

---

[472] Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20** (capital letters in the original).

[473] Counter-Memorial, para. 120.

[474] Letter from L. Cottin (Crystallex) to C. Briceño (CVG), 30 May 2007, **Exh. R-119**.

[475] Rejoinder, paras 146-147.

[476] Rejoinder, para. 151, discussing Draft Environmental Permit, undated, **Exh. C-273**.

[477] Rejoinder, para. 151.

[478] Counter-Memorial, paras 126-138; Rejoinder, paras 163-166.

[479] Counter-Memorial, para. 132.

[480] See Crystallex's Form 6-K for August 2007, 1 August 2007, **Exh. R-62**, p. 8 of 14.

a water concession, and environmental quality permits in relation to the mine's discharges to air, water and land). Thus, according to Venezuela, the Claimant was still very much at the starting line with respect to the environmental permitting.[481]

d.    **The Permit was properly and justifiably denied**

375.    The Respondent submits that the Ministry of Environment's decision not to grant the Permit for exploitation of the Las Cristinas project was reasonable, as it denied the Permit on specific grounds previously identified and never adequately addressed by Crystallex.[482]

376.    The Respondent highlights that Crystallex proposed to construct a massive open pit gold mine that would significantly alter both the landscape and the life of the people that inhabit the project area. Moreover, the adjacency to another massive mining project (Las Brisas/Gold Reserve) involved an even larger cumulative impact on the environment and on the local community.[483]

377.    Furthermore, the Las Cristinas project was to take place in an uniquely sensitive and complex environment, which created complications for the environmentally and socially responsible development of the site. In particular, the Respondent points to the following complications: (i) the significant water issues, deriving from the fact that Las Cristinas is located in an extremely wet area;[484] (ii) the abundant biodiversity, deriving from Las Cristinas' location in the Imataca Forest Reserve;[485] (iii) the presence of indigenous communities;[486] and (iv) the problem of the thousands of small-scale illegal miners.[487] According to Venezuela, Crystallex failed to address these problems to the satisfaction of the Ministry of Environment or pursuant to international standards.

378.    In view of these challenges, the Ministry of Environment was obliged to review the project carefully, only approving it once Crystallex had adequately demonstrated that it would not cause unacceptable environmental or social impacts.[488] Upon review, it concluded that the environmental and socio-cultural impact of the project proposed by Crystallex could not be mitigated and that its authorization would have been a violation

---

[481] Counter-Memorial, para. 136.

[482] Counter-Memorial, paras 171-179; Rejoinder, paras 203-211.

[483] Counter-Memorial, paras 143-145.

[484] Counter-Memorial, paras 147-154.

[485] Counter-Memorial, paras 155-157.

[486] Counter-Memorial, paras 158-159.

[487] Counter-Memorial, paras 160-161.

[488] Counter-Memorial, para. 167.

of the Venezuelan government's obligation to "ensure protection of the environment and the population from situations that constitute imminent damages".[489]

379. For the Respondent, the April 2008 denial expressly mentioned many factors that render the Las Cristinas site an especially sensitive and complicated area to successfully develop a mining project in conformity with the requirements of environment and social protection.[490] For example, the Ministry mentioned specific worries regarding water management and the consideration of biodiversity;[491] social issues concerning the indigenous communities;[492] and the problem of small-scale illegal miners.[493]

380. For the Respondent, the Ministry of Environment did communicate these legitimate concerns during the extended EIS review process that ultimately culminated in the Permit denial, and provided Claimant ample opportunity to respond.[494] Venezuela further highlights that not every inspection or analysis by Ministry technicians resulted in a written report.[495]

381. Finally, the Respondent takes issue with the Claimant's reliance on the conclusions and recommendations of the Permanent Commission of Economic Development of the National Assembly of 4 October 2007.[496] First, Venezuela stresses that this commission does not have any authority in respect of the grant of permits, which lies solely with the Ministry of Environment.[497] Furthermore, any views expressed at that meeting by Ms. Paredes (an official from the Ministry of Mines, and not from the Ministry of Environment) are irrelevant to any determination of whether or not an environmental permit can or should be granted.[498] Finally, the representative of the Ministry of Environment present at that meeting did nothing more than "refer in general to environmental matters", as the minutes record.[499]

---

[489] Counter-Memorial, paras 138, 174, quoting Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**.

[490] Counter-Memorial, para. 179.

[491] Counter-Memorial, para. 176.

[492] Counter-Memorial, para. 177.

[493] Counter-Memorial, para. 178.

[494] The exchanges between the Venezuelan authorities and Crystallex with respect to the alleged deficiencies of the EIS are recounted *supra* in Section V.B.2.a.

[495] Rejoinder, para. 204.

[496] See Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, discussed *supra* at paras 271-274.

[497] Rejoinder, para. 200.

[498] Rejoinder, paras 196-197.

[499] Rejoinder, paras 198-200, discussing Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 4.

e.    **The Ministry of Environment's concerns were legitimate under international standards**

382.    Venezuela recalls that in the MOC, Crystallex agreed to develop Las Cristinas in accordance with international standards.[500] Furthermore, even after signing the MOC, Crystallex continued to assure both Venezuela and the market of its commitment to develop Las Cristinas in compliance with international standards.[501] For Venezuela the relevant standards are the Equator Principles, the World Bank Standards, and the International Finance Corporation (IFC) Performance Standards. Referring to the evaluations by its environmental experts, Venezuela contends that the materials submitted by Crystallex in this case were very far from complying with these standards.[502]

383.    In particular, Venezuela submits, referring to its experts' opinions, that the Claimant did not submit a resettlement plan; its supposed closure plans did not comply with international standards; Crystallex did not identify a post-construction floodplain or address the potential flood risks in and around the proposed mine facilities; its EIS was inconsistent with its other mine plans; and its biodiversity "baseline and impact" studies did not conform to international standards.[503]

384.    It was thus clearly prudent and reasonable to deny the Permit given that the provided documents did not measure up to industry best practices or the applicable international standards.[504]

f.    **After the Permit denial, Crystallex failed to assert its rights**

385.    It is Venezuela's submission that Crystallex's request for reconsideration and hierarchical appeal of the Permit denial were adjudicated in full compliance with Venezuelan law and without any form of discrimination or unfair treatment.[505]

386.    With regard to the request for reconsideration, which was denied by the Director General of the Ministry of Environment's Administrative Office of Permits on 29 May

---

[500] See MOC, **Exh. C-9**, Clause 8.2 ("CRYSTALLEX shall use the most advanced technology with the purpose of reaching international standards and competitive prices. Moreover, it agrees that the extraction of gold mineral will be made according to the best techniques in mining to reach maximum recuperation of the resource, taking care of conserving the deposit and preserving the environment, in the execution of the exploitation works. [...]").

[501] Rejoinder, paras 220-223, discussing Crystallex's annual reports, feasibility and environmental studies.

[502] Rejoinder, paras 224-229; R-PHB, paras 43-47.

[503] R-PHB, para. 46.

[504] R-PHB, para. 47.

[505] Counter-Memorial, para. 239.

2008,[506] Venezuela posits that the issue of whether Crystallex (which did not receive a concession and thus had no mining title) had standing to seek reconsideration on its own was and remains an open legal issue under Venezuelan law, over which jurists and Ministry officials might reasonably disagree.[507]

387.    In any event, to the extent Crystallex believed that the Director General's conclusions were erroneous as a matter of fact or law, it had every opportunity to challenge and appeal those conclusions, which Crystallex did through its hierarchical appeal.[508]

388.    With regard to the Ministry's failure to issue a decision on the hierarchical appeal within 90 days, Venezuela contends that such failure would entitle an appellant to consider the appeal denied and pursue additional relief, including by filing a claim with Venezuelan administrative courts, which the Claimant failed to do.[509] The Respondent and its expert, Prof. Iribarren, explain that Venezuelan administrative procedural law expressly provides that a party has the right to judicial appeals when an administrative process has denied [an application] "or a decision has failed to be arrived at within the appropriate time period".[510]

g.    **Events following the Permit denial**

i.    **The Ministry did not reopen the permitting process**

389.    Venezuela contends that following the Permit denial there is no document evidencing a decision on the part of the Ministry of Environment to reopen the review process for Crystallex's Permit.[511] In particular, in the 20 August 2008 letter, on which the Claimant relies, Vice-Minister Garcia told Crystallex that a report which the company had submitted two weeks before would be useful "in making a decision regarding whether to take on the 'Las Cristinas' Gold Project".[512] However, for the Respondent, Vice-Minister Garcia was referring to the specific decision concerning the pending hierarchical appeal of the denial of the Permit, and not to the broader review of the Permit application.[513]

---

[506] Oficio 2765 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to Crystallex, 29 May 2008, **Exh. C-30**.

[507] Counter-Memorial, para. 244.

[508] Counter-Memorial, para. 245.

[509] Counter-Memorial, paras 245-256.

[510] Rejoinder, paras 232-233, discussing Ley Orgánica de Procedimientos Administrativos, 7 May 1981, published in the *Gaceta Oficial* No. 2818 on 1 July 1981, **Exh. R-2**, Art. 93.

[511] Rejoinder, paras 235-237.

[512] Oficio 1719 from the Vice-Minister of Environmental Administration and Government to Crystallex, 20 August 2008, **Exh. C-36**. This letter is discussed *supra* at para. 300.

[513] Rejoinder, para. 235.

390. In any event, nothing in this communication would suggest that there would be a guarantee that a Permit would be issued. Rather, the communication made very clear that the "decision" to be made by the Ministry remained subject to further review.[514]

### ii. The "VenRus Presentation" is not a Government document

391. Venezuela finally contends that the Claimant mischaracterizes the nature and purpose of the so-called "VenRus Presentation", which for the Respondent should not be attached any value.[515] For the Respondent, the presentation was created not by the Ministry of Mines or any Government agency, but rather by Rusoro, a private Canadian mining company.[516] In Venezuela's view, Rusoro was seeking to market itself and its joint venture subsidiary, VenRus, as an entity that could successfully reboot the development of both the Las Brisas and Las Cristinas together.[517] This document was thus not a strategy document produced by the Ministry of Mines, but rather a sales pitch to the Ministry of Mines.[518] Therefore, the Respondent concludes that the document does not in any way reflect the intentions or strategy of the Ministry of Mines or the CVG.[519]

## C.   THE RESCISSION OF THE MOC

### 1.   The Claimant's Position

#### a.   The rescission was not based on any legitimate contractual ground

392. For the Claimant, the rescission of the MOC was a politically motivated act confirmed by Venezuela's political maneuvering with VenRus and its plan to take Las Cristinas from Crystallex.[520] Furthermore, it was anchored in Venezuela's desire to utilize Crystallex's investments at a time when gold prices had risen from US$317 per ounce when Crystallex signed the MOC to US$1,328 per ounce on 3 February 2011.[521] In the Claimant's view, the decision was arbitrary and in violation of the most basic notions of Venezuelan law and even the terms of the MOC.[522]

---

[514] Rejoinder, para. 237.

[515] Rejoinder, paras 244-250.

[516] Rejoinder, para. 248.

[517] Rejoinder, para. 248.

[518] Rejoinder, para. 249.

[519] Rejoinder, para. 249.

[520] C-PHB, para. 360.

[521] Memorial, para. 230.

[522] Memorial, para. 230.

393.    According to the Claimant, Venezuela cannot rely on Clause 24, for its argument that the MOC could legitimately be rescinded under Clause 24, whether for "paralyzation of activities for over one year without justification", as alleged in the 2 February 2011 CVG Resolution, or for breach of contract, as alleged by Venezuela in this arbitration. Clause 24 reads as follows:

> "This Contract may be unilaterally rescinded by the CORPORATION without compensation to CRYSTALLEX, in the event of delay in the commencement of performance, paralyzation of any activities or contractual breach for a period of one (1) year without justification".[523]

394.    First, Crystallex contends that it did not suspend or paralyze activities under the MOC.[524] It argues that between 2008 and 2011 it never ceased its work to keep the mine site "shovel ready";[525] that it continued to fulfill its social obligations towards the local communities surrounding the campsite;[526] and that it persisted in its efforts to obtain from the Ministry of Environment the environmental Permit.[527] Crystallex points to the monthly reports which it furnished to the CVG, as documenting all these activities.[528]

395.    Second, the lack of gold exploitation activities at Las Cristinas was not a "paralyzation" of activity "without justification".[529] For the Claimant, the only "paralyzation" that Venezuela can point to is the failure to produce gold. However, the Claimant's inability to begin extracting gold was solely due to the Government's unlawful failure to grant the environmental Permit that Crystallex needed by law in order to exploit the mine.[530]

396.    Crystallex contends that, if Venezuela could rely solely on its failure to grant an environmental Permit to claim "paralyzation" of activities under the MOC, the legal protections of Clause 24 of the MOC would be rendered meaningless, since at any time since 2003 (one year after the MOC was concluded) Venezuela could have asserted that there was a "paralyzation" and terminated the MOC. This cannot have been what was intended by Clause 24.[531]

---

[523] MOC, **Exh. C-9**, Clause 24.

[524] C-PHB, paras 363-367.

[525] C-PHB, paras 363-364.

[526] C-PHB, para. 365.

[527] C-PHB, para. 366.

[528] Monthly Community Relations Report, various dates, **Exh. C-436**.

[529] C-PHB, paras 368-373.

[530] C-PHB, para. 371.

[531] C-PHB, para. 372.

397.  Third, pursuant to Clause 9.4 of the MOC the time periods under the MOC would have started to run only after the CVG had obtained all the necessary permits. Thus, the one-year period of Clause 24 of the MOC had not yet started to run.[532]

398.  Furthermore, the Claimant points to communications of the CVG's own legal department and its Industrial Vice-Presidency both before and after the rescission to show the "arbitrary and groundless nature of the rescission":[533]

399.  On 15 August 2010, the CVG's Vice-president stated, in response to a query from Crystallex about the status of the MOC, that the MOC was in "full force and effect".[534] Thus, the Claimant contends, if in fact the CVG believed by August 2010 that activities under the MOC had already been paralyzed for six months (as would have had to be the case for there to be a one-year "paralyzation" six months later in February 2011), this should have been mentioned to Crystallex in response to its query.[535]

400.  In an internal communication dated 28 February 2011, the legal department of the CVG requested from its Vice-President "information […] regarding the reasons why Crystallex International Corporation has paralyzed activities for over one (1) year".[536] The legal department sought this information "in order to support the administrative record in question".[537] The response supplied by the Vice-President of the CVG, Mr. Colmenares, on 17 March 2011 was that Crystallex had executed all of its tasks under the MOC with the exception of gold exploitation, as it did not have a Permit:

> "[A]ccording to the reports from the Liaison Office… Crystallex International Corporation has completed the various tasks set forth in said Operation Contract, with the exception of the tasks corresponding to the construction and development stage of the exploitation phase […] due to the fact that it was not granted the Permit […] ".[538]

401.  For the Claimant, this internal exchange further evinces that a contractual breach did not exist even in the eyes of the CVG officers, and that "the whole basis on which the MOC had been terminated was a sham".[539]

---

[532] Memorial, para. 231.

[533] C-PHB, para. 373.

[534] Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**, p. 2.

[535] C-PHB, para. 373.

[536] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[537] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[538] Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[539] Reply, paras 26, 464-466.

402.    Furthermore, Venezuela's allegations of contractual breach (especially of breaches of Clause 7, concerning the social obligations), made in this arbitration, are, for the Claimant, flatly contradicted by the following documentary evidence on the record and the testimony of Venezuela's own witnesses:[540]

- On 2 July 2004, the CVG's Vice-Presidency took note of Crystallex's compliance with Clause 7 of the MOC.[541]

- In an internal memorandum from Ms. Parades to Minister Khan of 21 November 2006, it was noted that "Crystallex in full co-ordination with the CVG, has already complied with all its preconstruction obligations, including all the works of social interest that were required".[542]

- The report of the National Assembly Economic Development Commission of 16 October 2007 recorded that "the provisions of the contract have been fully complied with the CVG and Crystallex".[543]

- On 10 December 2007, the Ministry of Mines wrote to Crystallex that the MOC "is being correctly performed, according to the most recent records of this Ministry as of this date".[544]

- On 2 March 2009, the CVG wrote to Crystallex that Crystallex had been fulfilling the obligations assumed under the contract, and that the contract was fully valid.[545]

- On 15 August 2010, the CVG wrote to Crystallex, reaffirming that the MOC remained "in full force and effect".[546]

- The already mentioned 17 March 2011 internal communication from the CVG's Vice-President of Industrial Development to the CVG's Legal Department stated that Crystallex had "completed the various tasks set forth in said Operation Contract, with the exception of the tasks corresponding to the

---

[540] C-PHB, para. 374

[541] Letter from the CVG to Crystallex, 2 July 2004, **Exh. C-331**.

[542] Punto de Información from Laura Paredes, Director General of Mining Concessions to José Khan, Minister of Basic Industry and Mines, 21 November 2006, **Exh. C-368**, p. 2.

[543] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 3.

[544] Oficio DGCM-573 from the Director General of Mining Concessions of the Ministry of Mines to Crystallex, 10 December 2007, **Exh. C-22**.

[545] Letter from the CVG to Crystallex, 2 March 2009, **Exh. C-55**.

[546] Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**.

construction and development stage of the exploitation phase […] due to the fact that it was not granted the Permit".[547]

- Even in the handover minutes of 5 April 2011, it was concluded that the Clause 7 obligations "[e]xecuted in full […] provide a foundation for Crystallex International Corporation to affirm that the mining operations contract was developed and complied with in full, except for the contractual obligations for which the environmental authorization acts were required pursuant to Decree 1,257".[548]

### b. The rescission of the MOC is illegitimate as a matter of Venezuelan law

403. For the Claimant, the rescission of the MOC was illegitimate as a matter of Venezuelan law, for the following reasons.

404. First, the rescission was an *ultra vires* act, because the CVG's President, Minister Khan, had no authority to rescind the MOC without the prior approval of the CVG's Board. For the principle of parallelism of forms, in the same way as the MOC was approved by the Board prior to its execution, so too the Board's approval was required for its termination.[549] The fact that Crystallex did not challenge the validity of the rescission before the Venezuelan courts does not mean that the rescission should be presumed valid. The presumption of validity of administrative acts under Venezuelan law does not apply when the act in question is *ultra vires*.[550]

405. Second, the rescission violated Crystallex's due process rights, because no administrative procedure was initiated prior to the rescission, as required under Venezuelan law.[551]

406. Third, the rescission was based on a false supposition of fact (*falso supuesto de hecho*), as there was no factual basis on which Venezuela could allege that Crystallex had paralyzed its activities under the MOC.[552] It was also based on a false supposition of law, in that it ignored that the Permit denial letter had legally prevented Crystallex from exploiting the Las Cristinas mine.[553]

---

[547] Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[548] Minutes of Handover, 5 April 2011, **Exh. C-262**, p. 29.

[549] C-PHB, paras 380-381.

[550] C-PHB, para. 383.

[551] C-PHB, paras 385-387.

[552] C-PHB, para. 388.

[553] C-PHB, para. 389.

407. Finally, the Claimant argues that the rescission frustrated the principle of legitimate expectations (*confianza legitima*);[554] was defectively reasoned;[555] and constituted a deviation of power, because its genuine motive was to allow the Venezuelan Government to take for itself the increased value of the gold at Las Cristinas and to pursue the development of the mine through a partnership with an entity from a "sister nation".[556] It further violated the principles of reasonableness, proportionality, and minimum intervention, because the grounds invoked in the rescission – paralyzation of activities, and reasons of opportunity and convenience – are mutually exclusive and irreconcilable,[557] and because under the MOC, the CVG was required to explore alternative means before terminating the MOC and did not do so.[558]

### 2. The Respondent's Position

#### a. The rescission of the MOC was a contractual exercise consistent with Venezuelan law

408. For Venezuela, the rescission of the MOC was an act of contractual nature performed by the President of the CVG in the exercise of his powers and arising from the prior breach of contract by the Claimant.

409. With regard to the nature of the rescission, the Respondent explains that the MOC contained a contractual clause, Clause 24, allowing for unilateral termination in the event of (i) a delay in the initiation of exploitation; (ii) suspension of any activities for more than one year; and (iii) and uncured breach of contract for more than one year. The CVG proceeded by way of an administrative resolution through which the contract was rescinded alleging breach by the Claimant under such clause. Because Clause 24 is expressly cited in the last recital of the Resolution, Venezuela submits that it is this contractual right which is the basis for the CVG's decision.[559]

410. Similarly as in the *Hipermercado Amigo* case decided by the Venezuelan *Tribunal Supremo*,[560] the rescission is thus an act of contract performance whose legality may only be analyzed with regard to the contract, since the Administration acted as one of the contractual parties, utilizing a mechanism set forth therein to terminate the

---

[554] C-PHB, para. 390.

[555] C-PHB, para. 391.

[556] C-PHB, para. 393.

[557] C-PHB, para. 394.

[558] C-PHB, para. 395, discussing MOC, **Exh. C-9**, Clause 21.1.

[559] Counter-Memorial, para. 274.

[560] *Tribunal Supremo de Justicia* [Supreme Tribunal of Justice], Sala Político-Administrativa [Political-Administrative Chamber], Judgment No. 00633, 30 April 2003, Case: *Hipermercado Amigo* ("Hipermercado Amigo"), **Exh. HIM-25**.

contractual relationship.[561] For Venezuela, the fact that the Administration used a "resolution" does not mean that it was exercising exorbitant powers.[562] Venezuela contends that, when provided for in the contract itself, the right to unilaterally rescind the contract is, unquestionably, a contractual right and may not be considered an "exorbitant power", since this term refers to something that is *not* included in the contract.[563]

411. For the Respondent, the words "opportunity and convenience" were not used as the legal grounds for the decision. The true legal grounds are specifically and expressly described at the end of the same paragraph rescinding the MOC, where it is explained that the decision to rescind the contract was made "due to the cessation of activities for more than one (1) year, in accordance with Clause Twenty-four of the aforementioned contract".[564]

412. According to Venezuela, by February 2011—more than eight years after the MOC was signed—the CVG was faced with a stalled project and a still undeveloped Las Cristinas mine, as well as a deteriorating environmental situation at the mine site.[565] The Respondent posits that this situation directly contravened not only the objectives of the MOC, but also the Administrative Agreement between the CVG and the Ministry of Mines (which required exploitation to begin within 2 years of its signing) and the Mining Law (which provides that exploitation must commence within seven years and that activities may not be suspended for a period greater than one year).[566]

413. For the Respondent, Clause 9.4 of the MOC, which tolls certain time periods until Crystallex has obtained all necessary permits, refers solely to the time limits independently agreed upon by the Parties in the MOC, and not to the timeframe originally established in the Mining Law. Thus, the clause by its own terms is inapplicable to other relevant time limits related to exploitation which are otherwise established by law.[567]

414. Furthermore, any contractual conditions which have the purpose or effect of evading the required time limits under the Mining Law (which concern the public order) are null and void and may not be invoked.[568]

---

[561] Counter-Memorial, para. 277; R-PHB, para. 52.

[562] R-PHB, para. 55.

[563] R-PHB, para. 56.

[564] Counter-Memorial, para. 263; Rejoinder, paras 261-268; R-PHB, para. 61.

[565] Counter-Memorial, para. 262.

[566] Counter-Memorial, paras 265-267, discussing esp. Mining Law 1999, **Exh. C-4**, Art. 61.

[567] Counter-Memorial, para. 269.

[568] Counter-Memorial, paras 270-272.

415.    In addition, Venezuela notes that the rescission was not based on false assumptions, because the activities related to the project were in fact suspended.[569] Furthermore, a unilateral rescission for breach of contract does not require a prior administrative procedure or prior notification.[570] Venezuela explains that Venezuelan jurisprudence has established that, when terminating an authorization for the exploitation of mineral resources due to an operator's failure to meet its obligations, the Administration is not obliged to lodge an administrative procedure.[571] Moreover, there was no "diversion of power" or disproportionate conduct in the exercise by the CVG of its contractual authority to rescind.[572] Finally, the resolution did not violate the Venezuelan law principle of "*confianza legitima*" (legitimate expectation), because any reassurances prior to the rescission that the MOC was in full force could not lead to expectations that the MOC would not be rescinded in the future in accordance with its terms, including as a result of a continued contractual breach or suspension of activities.[573]

### b.    Due process mechanisms were available

416.    Venezuela's position is that, in cases where a rescission is an act of contract performance, it is not necessary to provide a prior administrative procedure, since any party that considers that its right have been violated may, after the alleged violation, bring the case before a court to enforce such rights (as was provided for in the MOC).[574]

417.    Furthermore, in the letter in which CVG President Khan communicated the rescission to Crystallex, he specifically reminded the Claimant of its right to exercise a reconsideration appeal, which the Claimant failed to do.[575]

## D.    THE PARTNERSHIP WITH OTHER PARTIES

### 1.    The Claimant's Position

418.    On 23 August 2011, president Chávez signed Decree 8413 nationalizing all gold mining activities in Venezuela.[576]

---

[569] Counter-Memorial, paras 279-282.

[570] Counter-Memorial, paras 283-284.

[571] Counter-Memorial, para. 285.

[572] Counter-Memorial, para. 288.

[573] Counter-Memorial, paras 289-292.

[574] Rejoinder, paras 269-270; R-PHB, para. 63.

[575] Rejoinder, para. 269, discussing Oficio PRE 004-11 from the President of the CVG to Crystallex, 3 February 2011, **Exh. C-67**.

[576] Decree 8413, 23 August 2011, published in the *Gaceta Oficial* No. 39759 on 16 September 2011, **Exh. C-267**.

419.    At this time, the Claimant contends, China became one of Venezuela's most important partners, and one of its largest creditors.[577]

420.    According to the Claimant, after having considered, but later rejected, a possible collaboration with a Russian partner (Rusoro/VenRus), Venezuela now turned to China. As part of a package of bilateral agreements between Venezuela and China and a number of contracts with Chinese state-owned companies,[578] on 27 February 2012 Venezuela entered into a framework agreement with CITIC, a Chinese construction company, to jointly develop the gold mine at Las Cristinas ("CITIC Framework Agreement").[579]

421.    The Framework Agreement provides that MINERA, the Venezuelan state-company, would provide CITIC all documents relating to the Project that it holds, including all the studies, reserve and resource data and engineering work completed by Crystallex and its consultants.[580] The Claimant takes this reference as a confirmation that its studies were fully sufficient and adequate.[581]

422.    The Claimant further points to Article 6 of the CITIC Framework Agreement, which characterizes the decision which is at issue in this arbitration as "sovereign":

> "The Parties understand that an arbitral proceeding is in existence for a sovereign decision taken by the Venezuelan government in conformity with its laws, in relation to the Las Cristinas mine".

423.    Article 6 goes on to state that this arbitration involves the recovery by the Venezuelan state of *its* rights over Las Cristinas, which the Claimant takes as a further confirmation that this arbitration cannot be considered as a breach of contract dispute between the CVG and Crystallex.[582]

## 2.    The Respondent's Position

424.    According to the Respondent, the Claimant's allegation that Venezuela has partnered with other Parties to develop Las Cristinas following the rescission of the MOC is contradicted by the content of both the CITIC Framework Agreement and the CITIC Studies Agreement. The Respondent submits that neither the CITIC Framework Agreement nor the CITIC Studies Agreement, entered into in 2012, grant any mining

---

[577] Reply, para. 470.

[578] Reply, paras 471-472.

[579] Framework Agreement for the Las Cristinas Project between CITIC and the Venezuelan State, 27 February 2012, **Exh. C-430** ("CITIC Framework Agreement").

[580] Reply, paras 475-477, discussing CITIC Framework Agreement, Article 2.

[581] Reply, paras 475-478.

[582] Reply, paras 483-484, discussing CITIC Framework Agreement, Article 6.

rights.[583] The CITIC Framework Agreement provides the general legal framework under which a contractual relationship for future specific technical services will be conducted.[584] Derived from this legal instrument, the CITIC Studies Agreement provides the specific terms under which these determined and detailed technical services related to Las Cristinas will be rendered and paid.[585] For the Respondent, these activities are all technical in nature and relate to studies of the site, without contemplating any mining rights.[586]

425. Furthermore, the purpose of the two CITIC agreements was to update the studies that had been prepared by Crystallex, which indicates, contrary to the Claimant's assertions, that Crystallex's studies were insufficient and inadequate.[587]

---

[583] Rejoinder, paras 271-278.

[584] Framework Agreement for the Las Cristinas Project between CITIC and the Venezuelan State, 27 February 2012, **Exh. C-430** ("CITIC Framework Agreement").

[585] "Contrato para la Optimización de la Ingeniería, Estudio de Factibilidad y Estudio de Impacto Ambiental y Socio Cultural del Yacimiento Oro-Cobre del Proyecto Las Cristinas entre la empresa CITIC International Contracting Co., LTD y la empresa de Producción Social Minera Nacional, C.A.", 1 September 2012, **Exh. R-149** ("CITIC Studies Agreement").

[586] Rejoinder, paras 274-275.

[587] Rejoinder, paras 277-278.

## VI.    JURISDICTION

### A.    OVERVIEW

426.    It is undisputed between the Parties that the Claimant is an "investor" pursuant to Article I(g)(ii) of the Treaty, which defines "investor" as "any enterprise incorporated or duly constituted in accordance with applicable laws of Canada". Crystallex was incorporated under the laws of the province of British Columbia, Canada,[588] and has its head office in Toronto. Further, Crystallex has asserted that it has made an "investment" under Article I(f) of the Treaty, which provides a broad definition ("every kind of asset"), and includes "rights conferred by law or under contract to undertake any economic and commercial activity including any rights to search for, cultivate, extract or exploit natural resources" (Article I(f)(vi) of the Treaty). In addition, Crystallex's Venezuelan branch constitutes, according to the Claimant, a "form of participation in a company, business enterprise or joint venture" under Article I(f)(ii) of the Treaty. These arguments pertaining to the Tribunal's jurisdiction *ratione personae* and *materiae* have not been disputed by the Respondent.

427.    It is further undisputed that the Tribunal has jurisdiction over the Ministry of Environment's denial of the Permit in April 2008.[589]

428.    The Respondent has, however, put forward two objections to the jurisdiction of the Tribunal in relation to the claims concerning the rescission of the MOC.

   a.    First, the Respondent contends that the Tribunal lacks jurisdiction over the claims regarding the rescission of the MOC because the Claimant has failed to satisfy the notice and amicable settlement requirements set forth in Article XII(2) of the Treaty. Venezuela argues that the rescission of the MOC and any related claims were not subject to the Notice of Dispute sent by Crystallex on 24 November 2008 to the Ministry of Mines, and that, even if they were, a six-month amicable settlement period was not followed subsequent to the rescission of the MOC.

   b.    Second, the Respondent contends that Crystallex's claims related to the rescission of the MOC are contract claims, and in the absence of an umbrella clause in the Treaty, such claims cannot be heard by an international arbitral tribunal. Venezuela further argues that Clause 19 of the MOC provides an exclusive forum selection clause, and that the Claimant's claim relating to the termination of the MOC must thus be heard pursuant to the dispute resolution mechanism set out in that clause,

---

[588] See Certificate of Continuance and By-Law No. 1 of Crystallex International Corporation, undated, **Exh. C-71**.

[589] See Venezuela's Opening Presentation (Goodman), Tr. [Jurisdiction and Merits, Day 1, 264: 10-14: "We don't have a jurisdictional objection to events based on what may or may not happen in April 2008. I hope that's the clearest. Our objection is to February 2011, for the reasons we set forth in our pleadings".

which in the Respondent's view excludes the jurisdiction of an investment treaty tribunal.

429. The Claimant, in turn, contends that:

a. Crystallex has complied with the notice and amicable settlement requirements, because the Notice of Dispute of 24 November 2008 covered not only the denial of the Permit, but also the announcement of the take-over of Las Cristinas, which was ultimately enforced through the rescission of the MOC. Furthermore, the Notice of Dispute was sent in the context of an ongoing and growing dispute, and the rescission of the MOC should be considered as an aggravation of the existing dispute regarding the denial of the Permit, not as a wholly separate and distinct dispute requiring a new notice and amicable settlement period.

b. Crystallex's claims are not contractual in nature, but are all based on the Treaty, and they originate from sovereign acts taken by Venezuela. As a result of the analytical distinction between contract and treaty claims, an exclusive forum selection clause such as Clause 19 of the MOC cannot deprive an investment treaty tribunal of its jurisdiction over treaty claims.

## B. FIRST OBJECTION TO JURISDICTION: NO NOTICE OF DISPUTE AND AMICABLE SETTLEMENT IN RELATION TO THE MOC CLAIMS

### 1. The Respondent's Position

430. The Respondent submits that Crystallex failed to comply with the Treaty's jurisdictional requirements for claims related to the rescission of the MOC, and thus the Tribunal lacks jurisdiction over those claims.[590]

431. The Respondent contends that Article XII of the BIT required Crystallex to (i) provide written notice identifying the measure that it alleges as a breach of the Treaty that caused the investor loss or damage, and (ii) allow six months for good faith negotiations after the notice to settle the dispute amicably.[591] Venezuela submits that the Notice that Crystallex delivered to the Ministry of Mines on 24 November 2008 (the "Notice of Dispute")[592] addressed only the issue of the denial of the Permit and, as it pre-dates the rescission of the MOC by more than two years, it necessarily cannot be considered as covering the claims relating to the latter. Thus, by failing to respect Article XII of the

---

[590] See Counter-Memorial, paras 303-326; Rejoinder, paras 279-317; R-PHB, paras 67-88.

[591] Counter-Memorial, para. 305.

[592] Notice of Dispute, 24 November 2008, **Exh. C-51**.

Treaty with regard to the claims concerning the termination of the MOC, the Claimant did not perfect Venezuela's necessary consent for jurisdiction.[593]

432.   According to Venezuela, Crystallex asserts two separate disputes: the first dispute relates to alleged measures taken by the Ministry of Environment which, according to Crystallex's Notice of Dispute, "culminat[ed]" in the 14 April 2008 denial of Crystallex's application for a Permit to mine Las Cristinas. The language of the Notice of Dispute thus expressly stipulates a temporal limit of the alleged conduct and measures that are in dispute, i.e. the Ministry of Environment's conduct "culminating" in the denial of the Permit in April 2008.[594] The second dispute relates to the rescission of the MOC[595] and Crystallex was accordingly obliged to provide notice of this dispute as well.[596]

433.   According to the Respondent, Crystallex did not provide adequate notice of a dispute over the rescission of the MOC because (i) Crystallex's Notice of Dispute predated the termination of the MOC by more than two years and thus could not have served as a notice of a dispute concerning that measure;[597] and (ii) a general notice that there may be a dispute is insufficient given the text of the BIT which refers to "notice ... that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement", i.e. the state must be notified that a particular measure is an alleged breach that caused the Claimant harm.[598] In that sense, references to hearsay comments reported in the press cannot, in the Respondent's view, constitute notice of a dispute covering measures that have not yet taken place.[599]

434.   Moreover, the rescission of the MOC cannot be seen as a continuation and aggravation of the dispute relating to the denial of the Permit.[600] According to the Respondent, the two disputes are clearly separate, as they "involve different legal questions, different Government actors, and different alleged harm".[601] Even Crystallex treated each measure separately by alleging, after the denial of the Permit, that it was seeking repeated assurances from the CVG that the MOC was still in force and that it continued to perform under the MOC.[602]

---

[593] Counter-Memorial, para. 306; Rejoinder, para. 281.

[594] Rejoinder, paras 285-287.

[595] Rejoinder, para. 285. See also Counter-Memorial, para. 300.

[596] Rejoinder, paras 285-291.

[597] R-PHB, para. 71.

[598] Counter-Memorial, paras 308-309.

[599] Rejoinder, para. 285.

[600] Rejoinder, para. 289.

[601] Counter-Memorial, para. 301; R-PHB, para. 82.

[602] Rejoinder, para. 289.

435.    In addition, the Respondent relies on arbitral decisions that emphasize the importance of precisely articulating the dispute at issue for there to be a finding of state consent to arbitrate.[603] It also argues that compliance with conditions set out in the dispute settlement provisions of a treaty is a jurisdictional requirement, and thus non-compliance with such treaty conditions results in lack of jurisdiction.[604]

436.    Furthermore, even assuming that a dispute was properly filed with respect to the aforementioned contractual claim, the Respondent submits that the Claimant ignored the Article XII(2) six-month cooling-off period to try to reach an amicable settlement before resorting to arbitration. Following the rescission of the MOC, Crystallex did not seek to communicate with the CVG or Venezuela to pursue amicable settlement talks regarding the rescission. Instead, on 16 February 2011 (just 13 days after the rescission) Crystallex filed its Request for Arbitration.[605]

437.    In conclusion, because Crystallex failed to comply with the jurisdictional requirements set out in the Treaty in respect of claims regarding the rescission of the MOC, the Tribunal lacks jurisdiction over those claims.

2.    **The Claimant's Position**

438.    The Claimant contends that the Notice of Dispute it gave to Venezuela fulfilled all the requirements under the Treaty.[606]

439.    The Claimant disputes the Respondent's argument that the Notice of Dispute covered the Permit denial but not the expropriation of the MOC and any related Treaty claims.[607] In this respect, the Claimant argues that the language of the Notice of Dispute explicitly covered the former and the latter as it stated that a "dispute has arisen in connection with conduct and measures culminating in the decision of the Ministry of Environment and Natural Resources not to grant the [Permit] ... and the subsequent announcement by the Ministry of Basic Industries and Mining of its decision to take control of the operation of Las Cristinas [...]".[608] The Claimant points out that the Notice of Dispute

---

[603] Counter-Memorial, para. 310, citing to *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, **Exh. CLA-117** ("*Burlington*"). See also R-PHB, paras 77-81, discussing *Teinver S.A. et. al. v. The Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, **Exh. CLA-178** ("*Teinver*"); *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8; 17 July 2003, **Exh. CLA-99** ("*CMS v. Argentina*").

[604] Rejoinder, paras 283, 303-317; R-PHB, paras 87-88, discussing *Burlington*; *Murphy Exploration and Production Company International v. Republic of Ecuador*, ICSID Case No. ARB/08/4, Award, 15 December 2010, **Exh. RLA-124**; and *Kilic Insaat Ithalat Ihracat Sanayi ve Ticaret Anonim Sirketi v. Turkmenistan*, ICSID Case No. ARB/10/1, Award, 2 July 2013, **Exh. RLA-176**.

[605] Counter-Memorial, paras 314-315; Rejoinder, para. 298.

[606] Reply, paras 487-498, C-PHB, paras 516-524.

[607] Reply, para. 489.

[608] Notice of Dispute, 24 November 2008, **Exh. C-51**, p. 1.

also mentioned, *inter alia*, "the Government's decision to take over the operation of Las Cristinas [...]".[609] Thus, according to the Claimant, the Notice of Dispute covered the Permit denial *as well as* the take-over of Las Cristinas which was ultimately enforced through the rescission of the MOC.[610]

440.    The Claimant additionally alleges that the Notice of Dispute described Crystallex's discriminatory treatment and measures that "ha[d] caused Crystallex to suffer significant economic loss and damage".[611] It went on to provide that the Respondent's actions "constitute a unilateral and fundamental violation of the legal framework applicable to Crystallex's investment in Las Cristinas project as well as a breach of Venezuela's obligations under … international law and the substantive protections of the Treaty".[612] The Notice of Dispute stated that the Claimant would seek arbitration pursuant to the terms of the Treaty if the dispute was not settled.[613] In short, the Claimant claims that the Notice of Dispute fulfilled all of the requirements of the Treaty.

441.    The Claimant further argues that investment treaty tribunals have applied two "rules of reason" when interpreting investment treaties' notice and amicable settlement provisions.[614]

442.    First, when an initial dispute is notified and amicable settlement talks are pursued, an evolution or exacerbation of that same or a related dispute requires no separate notification.[615] Citing to *Teinver v. Argentina*, the Claimant contends that the dispute regarding the rescission of the MOC was "closely related to" and "follow[ed]" the Permit denial and thus no separate notice was required for claims relating to the rescission.[616] Moreover, the rescission of the MOC should be considered as an aggravation of the existing dispute regarding the Permit denial and not as a wholly separate dispute requiring a new notice and amicable settlement period.[617] To hold otherwise would lead to the unreasonable result that Crystallex would be required under

---

[609] Notice of Dispute, 24 November 2008, **Exh. C-51**, p. 2.

[610] Reply, para. 491; C-PHB, para. 517.

[611] Notice of Dispute, 24 November 2008, **Exh. C-51**, p. 3.

[612] Notice of Dispute, 24 November 2008, **Exh. C-51**, p. 3.

[613] Notice of Dispute, 24 November 2008, **Exh. C-51**, p. 3.

[614] C-PHB, para. 519.

[615] Reply, paras 490-494; C-PHB, paras 520-522, discussing *Teinver; Swisslion DOO Skopje v. Former Yugoslav Republic of Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012, **Exh. RLA-134**; and *CMS v. Argentina*.

[616] C-PHB, para. 520.

[617] Reply, para. 494; C-PHB, para. 522.

the BIT to have two separate arbitrations – one for the Permit denial and the other for the rescission of the MOC – when the underlying dispute is one and the same.[618]

443. Further, the two cases on which the Respondent heavily relies (*Burlington Resources v. Ecuador* and *Murphy Exploration v. Ecuador*) are distinguishable and are in the minority view on this legal issue.[619] The notice and amicable settlement provisions of the Treaty are a "best efforts" obligation that Crystallex clearly fulfilled through its notice of dispute and subsequent negotiations.[620]

444. The second "rule of reason" that, in the Claimant's view, investment tribunals have applied to notice and amicable settlement provisions is that there is no requirement for investors to engage in futile settlement discussions with a respondent state.[621] For the Claimant, it would be manifestly unreasonable to interpret the Treaty as requiring Crystallex to renegotiate this issue specifically where Venezuela had already refused, for more than two years, to settle the dispute related to the Permit denial.[622]

---

[618] C-PHB, para. 522.

[619] Reply, paras 495, 497.

[620] Reply, para. 497.

[621] Reply, paras 497-498; C-PHB, para. 523, discussing *Abaclat and Others v. Argentine Republic*, ICSID Case. No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011, **Exh. CLA-119**, para. 564.

[622] Reply, para. 498; C-PHB, para. 523.

3.   **Analysis**

445.   The Tribunal's jurisdiction is governed by Article XII of the BIT, titled "Settlement of Disputes between an Investor and the Host Contracting Party", which reads as follows in relevant parts:

> "1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

> 2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach. […]"[623]

446.   Article XII sets out a multi-layered and sequential dispute resolution system which provides that:

  i.   *First*, an investor must deliver a written notice of dispute to the disputing state Party. The date of the delivery of the written notice determines in turn the date when a "dispute" is considered initiated for the purposes of Article XII(2) of the BIT;

  ii.   *Second*, the Parties must attempt to settle the dispute amicably for a period of six months from the date on which it was initiated; and

  iii.   *Third*, if the dispute has not been settled amicably within such six-month "cooling-off" period, the investor may submit it to arbitration in accordance with Article XII(4).

447.   A "dispute" under Article XII(1)-(2) of the BIT is, according to the oft-quoted definition given by the Permanent Court of International Justice ("PCIJ"), a "disagreement on a point of law or fact, a conflict of legal views or of interests between

---

[623] Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, **Exh. C-3**, Article XII(1)-(2).

two persons".[624] There is no controversy between the Parties that a "dispute", in the sense of the *Mavrommatis* definition, arose after the denial of the Permit in 2008. There is equally no controversy that, in view of the 2008 Notice of Dispute which Crystallex sent to the Ministry of Mines (with a copy to the Minister of the Environment and the Attorney-General of Venezuela),[625] the dispute arising out of the Permit denial was properly notified. It is also beyond disagreement that thereafter the six-month cooling-off period was complied with and that no fruitful amicable settlement was achieved by the Parties during those six months.

448.    The disagreement between the Parties revolves around whether a *new* notice of dispute should have been delivered and a *new* amicable settlement period should have been pursued in relation to the subsequent events concerning the rescission of the MOC, which the Claimant has brought before this Tribunal along with those relating to the Permit denial.

449.    In the Tribunal's view, the question is whether, pursuant to Article XII(1)-(2) of the BIT, the rescission of the MOC relates to the "dispute" over which the Claimant gave its Notice of Dispute in November 2008 and over which the Tribunal has jurisdiction. Put differently, is the Tribunal faced with two different disputes, which would require a new notice of dispute and new amicable settlement, or with the evolution of the same dispute?

450.    The Tribunal considers that the relevant inquiry in these circumstances is whether the disagreements at issue in the two settings relate to the same "subject-matter". The Tribunal finds support for this approach in several decisions of international tribunals. The Tribunal is mindful that some of these decisions were rendered in non-identical legal frameworks and presented non-identical factual constellations. However, despite these differences, the Tribunal finds those decisions instructive for their underlying principles.

451.    In *CMS v. Argentina*, the tribunal rejected an objection from the respondent that the claimant had submitted to the ICSID tribunal two different disputes and that the second dispute "was not registered in accordance with Article 36(3) of the ICSID Convention and the six-month period required by Article VII(3) of the Treaty between the dates a dispute arose and that of its submission for arbitration has not elapsed".[626] The tribunal held that "as long as [multiple different actions] [allegedly] affect the investor in violation of its rights and cover the same subject matter, the fact that they may originate from different sources or emerge at different times does not necessarily mean that the

---

[624] *The Mavrommatis Palestine Concessions* (Greece v. Great Britain), PCIJ, Series A, No. 2, Judgment, 30 August 1924 ("Mavrommatis"), **Exh. RLA-139**, p. 11.

[625] Notice of Dispute, 24 November 2008, **Exh. C-51**.

[626] *CMS v. Argentina*, ICSID Case No. ARB/01/8, Decision on Jurisdiction, 17 July 2003, **Exh. CLA-99**, para. 101.

disputes are separate and distinct".[627] In light of this finding, the tribunal concluded that "such claims do not require either a new request for arbitration or *a new six-month period for consultation or negotiation*, before the submission of the dispute to arbitration under the Treaty".[628]

452.    In *Teinver v. Argentina*, the ICSID tribunal was faced with a similar objection. The issue there was whether the "two disagreements [between the parties were] sufficiently related that negotiations under the first disagreement are enough to satisfy [the 6-month cooling-off requirement]" in the applicable BIT. The tribunal held that "[i]nternational jurisprudence suggests that the *subject matter* of the negotiations should be the same as the dispute that is brought before the court or tribunal".[629] The tribunal's conclusion was that the two "core issues" in the two sets of disagreements were "related to the point that they share[d] the same subject-matter".[630]

453.    The ICSID tribunal in *Swisslion v. Macedonia* similarly concluded that the new facts of which the claimant complained in its Memorial "enter within the subject matter of the original claim and are admissible as such and may be presented *without requiring further consultations between the Parties*".[631]

454.    There can be no doubt, in the Tribunal's eyes, that the two main areas of disagreements at issue in this arbitration (i.e., one relating to the Permit denial and the other relating to the MOC rescission) relate to the same dispute having the same subject-matter. Both disagreements concern the Parties' conflicting legal views and interests in relation to Crystallex's claim to mine Las Cristinas and the underlying facts bear upon the effects of the MOC. Under that framework, the Claimant enjoyed certain rights in relation to Las Cristinas and was pursuing, in cooperation or confrontation with the CVG and Venezuelan authorities (depending on the moments), the objective of commencing the exploitation of the Las Cristinas mine. The fact that different Venezuelan authorities may have played a greater role in one or the other circumstance does not change the Tribunal's conclusion that the two disagreements shared the same subject-matter. In other words, at the time when the MOC was terminated, the dispute which had arisen between the Parties in connection with the Permit denial had simply evolved and the respective positions had not changed but rather become more definite and definitive. Far from giving rise to a new dispute, the MOC rescission only entailed an enlargement of the set of facts rather than new facts giving rise to a new dispute. As a result, the

---

[627] *Ibid.*, para. 109.

[628] *Ibid.*, para. 123 (emphasis added).

[629] *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. The Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, **Exh. CLA-178**, paras 122-123 (emphasis in the original).

[630] *Ibid.*, para. 125.

[631] *Swisslion DOO Skopje v. The Former Yugoslav Republic of Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012, **Exh. RLA-134**, para. 138 (emphasis added, internal footnote omitted).

MOC recission is in reality part and parcel of the same dispute which had arisen with the Permit denial earlier on.

455.    This being so, the Claimant properly delivered its Notice of Dispute in November 2008 and complied with the 6-month cooling-off period, in accordance with Article XII(1)-(2) of the BIT. No fruitful negotiations were achieved at that time. As the more recent MOC rescission related to the dispute which had commenced in April 2008, there was no need for the Claimant to deliver a new notice of dispute in February 2011 and to trigger a new six-month amicable settlement period as there was no (new) dispute to notify.

456.    Furthermore, to adopt the Respondent's position would allow a state to continue to adopt new measures with a view to triggering new notices and amicable settlement requirements. Moreover, to take the Respondent's argument to its logical consequences would mean that the Claimant should have commenced one arbitration for the Permit denial and one for the MOC rescission, which would raise supplemental procedural issues (e.g., consolidation, relationship between the two proceedings if not consolidated, etc.). Such a result cannot be what the notice and amicable settlement requirements in the Treaty reasonably entail.

457.    For the foregoing reasons, the Tribunal concludes that the Claimant complied with the BIT's jurisdictional requirements concerning the notice of dispute and amicable settlement efforts set out in Article XII(1)-(2) of the BIT.

458.    As a result of this conclusion, the Tribunal can dispense with entering into the Claimant's alternative argument that in the circumstances concerning the MOC rescission new amicable settlement attempts would have been futile.

## C.    SECOND OBJECTION TO JURISDICTION: NO JURISDICTION WITH RESPECT TO CONTRACT CLAIMS

### 1.    The Respondent's Position

459.    The Respondent submits that the Claimant's allegations regarding the rescission of the MOC are contractual claims that are not covered by the Treaty[632] and that the Claimant is "trying to elevate an alleged contractual breach by the CVG into a treaty claim".[633] The Respondent underscores that the Treaty does not contain an umbrella clause to bring contract claims within the Tribunal's jurisdiction.[634] In addition, Article XII of

---

[632] Counter-Memorial, para. 5; Rejoinder, para. 7.

[633] Rejoinder, para. 318.

[634] Counter-Memorial, para. 328.

the Treaty provides that only disputes arising from "a breach of *this* Agreement" may be heard by arbitral tribunals established under the Treaty.[635]

460.    According to Venezuela, the Claimant tries to label its claims regarding the rescission of the MOC as treaty claims, but its factual allegations show that the claims "are fundamentally based on the provisions and obligations found in the contract".[636] The Respondent refers in this respect to the Claimant's pleadings that specifically mention alleged breaches by the CVG of obligations under the MOC.[637]

461.    In addition, the Respondent submits that such allegations of non-compliance with the MOC "cannot be transformed into an investment dispute subject to the BIT because the CVG [in rescinding the MOC] was acting as a contracting partner, and not pursuant to its delegated sovereign authority as an instrumentality of Venezuela".[638] In other words, the Claimant has not shown that there has been an act of "*puissance publique*" on the part of the CVG when rescinding the MOC. In this respect, the Respondent disputes the Claimant's reading of Clause 6 of the CITIC Framework Agreement (which refers to Venezuela's "sovereign decision" and the recovery of "its" rights over Las Cristinas). For the Respondent, the purpose of that clause is simply "to exempt CITIC of any potential liability derived from Crystallex's arbitration claims related to Las Cristinas".[639]

462.    Furthermore, according to the Respondent, Clause 19 of the MOC is an exclusive forum selection clause in favor of the Venezuelan courts for all controversies relating to this contract, which deprives the Tribunal of jurisdiction over the Claimant's contract claims.[640]

463.    The Respondent asserts that the clause is a mandatory dispute resolution obligation for disputes of any nature arising from the execution of the contract, and the clause itself even provides that such disputes "may not give rise to claims before foreign tribunals", thereby constituting an effective waiver of the right to arbitrate claims related to the rescission of the MOC before an investment treaty tribunal.[641] For Venezuela, "foreign" in the context of Clause 19 also includes international tribunals set up under international law.[642]

---

[635] Counter-Memorial, para. 329 (emphasis added by the Respondent).

[636] Counter-Memorial, para. 331; Rejoinder, paras 318-322; R-PHB, para. 89.

[637] Counter-Memorial, paras 332-334.

[638] Counter-Memorial, para. 335; Rejoinder, para. 320.

[639] Rejoinder, paras 321-322.

[640] Counter-Memorial, paras 337-338; Rejoinder, paras 323-329; R-PHB, paras 95-99.

[641] Counter-Memorial, paras 340-342.

[642] R-PHB, para. 97.

464.  Relying on the statement by the tribunal in *SGS v. Philippines* to the effect that a contract can waive treaty jurisdiction if 'expressly provided' and that "the Tribunal should not exercise its jurisdiction over a contractual claim when the parties have already agreed on how such a claim is to be resolved, and have done so exclusively", the Respondent submits that this is precisely the case with respect to Clause 19 of the MOC.[643]

## 2.   The Claimant's Position

465.  The Claimant submits that all of its claims are based on the Treaty[644] and that "Venezuela cannot seek to avoid its obligations under the Treaty by labeling this dispute as contractual".[645]

466.  According to the Claimant, Crystallex's contract constitutes an investment under the plain language of Article I(f)(vi) of the Treaty as the term "investment" under this provision covers "rights conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources".[646] Furthermore, under Article II(2) and Article VII of the Treaty, the contract must be provided "fair and equitable treatment and full protection and security" and cannot be nationalized or expropriated unless certain requirements are met.[647]

467.  The Claimant contends that simply because a treaty claim involves a contract (as do the vast majority of treaty claims) does not mean that the analytical distinction between claims based on these separate instruments fails to exist.[648] Crystallex's claim is that Venezuela, through a series of *sovereign* acts, including the Permit denial and the repudiation of the MOC through an administrative resolution, expropriated and mistreated Crystallex's investments in breach of the Treaty.[649]

468.  To this effect, the Claimant refers, *inter alia*, to Clause 6 of the CITIC Framework Agreement which states that there was a "sovereign decision taken by the Venezuelan government in conformity with its laws in relation to the Las Cristinas mine" and that the present arbitration involves the recovery by Venezuela of "its" rights over Las Cristinas and that Venezuela has thus admitted that this arbitration is not a breach of

---

[643] Rejoinder, para. 327, discussing *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004, **Exh. RLA-67**, esp. paras 154-155.

[644] Reply, para. 499; C-PHB, para. 525.

[645] Reply, para. 509.

[646] Reply, para. 500.

[647] Reply, para. 501.

[648] Reply, para. 502; C-PHB, para. 525.

[649] Reply, para. 503.

contract dispute between the CVG and Crystallex.[650] The Claimant also relies on the *MINCA* decision of the Political-Administrative Chamber of the Venezuelan Supreme Court of December 2011 for the conclusion that the rescission is a sovereign act.[651] That case concerned the CVG's termination of the Las Cristinas mine operating contract of Crystallex's predecessor, MINCA. The Supreme Court in that case concluded that the CVG's unilateral termination of that contract on the basis of an express contractual provision recognizing the right of unilateral termination in case of breach constituted an act of *ius imperium* and the exercise of exorbitant powers (i.e., a sovereign act).[652]

469.   The Claimant further contends that investment treaty tribunals have held that an exclusive forum selection clause in a contract cannot deprive a tribunal of its jurisdiction over treaty claims.[653] Thus, relying on the test set out by the Annulment Committee in *Vivendi I*, the Claimant submits that Clause 19 of the MOC cannot divest the Tribunal from jurisdiction in this case.[654]

470.   Finally, the Claimant disputes the Respondent's argument that Crystallex waived arbitral jurisdiction over the rescission of the MOC as a result of Clause 19 of the MOC.[655] According to the Claimant, the plain language of this clause ("uncertainties and controversies of any nature that could arise from the execution of this Contract ... may not give origin to reclamations before foreign tribunals") does not expressly waive claims arising from the Treaty or international law, especially where the claim relates to the destruction of Crystallex's investment and not the "execution" of the MOC.[656] Furthermore, this alleged waiver is not the "unambiguous and knowing waiver that would be required for a claimant to forego its rights under a bilateral investment treaty, if such a waiver could be made at all".[657] Clause 19 does neither refer to the Canada-Venezuela BIT, nor to jurisdiction under the ICSID Additional Facility.[658]

---

[650] Reply, paras 484, 504, discussing CITIC Framework Agreement, 27 February 2012, **Exh. C-277**, Sixth Section.

[651] C-PHB, para. 527.

[652] C-PHB, para. 527, discussing Decision of the Political-Administrative Chamber of the Venezuelan Supreme Court No 1690 (*MINCA* case), 7 December 2011, **Exh. JMB-175**, p. 1.

[653] Reply, paras 502, 506.

[654] Reply, para. 506; C-PHB, para. 529, discussing *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, **Exh. CLA-96**, para. 103.

[655] Reply, para. 510.

[656] Reply, para. 510.

[657] Reply, para. 512. See also C-PHB, para. 531, discussing *Aguas del Tunari, S.A. v. Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on Respondent's Objections to Jurisdiction, 21 October 2005, **Exh. CLA-107**, para. 119.

[658] C-PHB, para. 532.

3.    **Analysis**

471.    At the outset, the Tribunal recalls that its jurisdiction is founded upon Article XII of the BIT. Under this provision, the Tribunal has jurisdiction over "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party, *relating to a claim* by the investor *that a measure* taken or not taken by the former Contracting Party *is in breach of this Agreement*".[659] It is clear from the wording of the dispute settlement clause that the sphere of disputes that can be referred to international arbitration under the BIT is limited to disputes relating to alleged breaches of the BIT. This subject matter limitation of the Tribunal's *ratione materiae* jurisdiction is undisputed between the Parties, and rightly so.[660]

472.    The Parties are, however, in dispute as to whether the Claimant is attempting to bring contract, rather than treaty, claims in relation to the rescission of the MOC.

473.    The Tribunal starts with an observation of a general nature, noting that many investment disputes brought under a bilateral or multilateral investment treaty may involve a set of facts for which there may be a contractual relationship in place between the Parties. As noted by Prof. Zachary Douglas,

> "A great number of important foreign investments are memorialised in agreements with the host state or its emanations and thus it is hardly surprising that a great number of investment disputes are intertwined with a contractual relationship of this nature".[661]

474.    The fact that a contract may exist between the Parties and that issues relating to its performance or termination may play a role in the Parties' pleadings, does not *per se* entail that the Tribunal is faced with contract claims rather than treaty claims. As is well-established in investment treaty jurisprudence, treaty and contract claims are distinct issues. In this respect, the *Vivendi I* annulment committee explained:

> "95. As to the relation between breach of contract and breach of treaty in the present case, it must be stressed that Articles 3 and 5 of the BIT do not relate directly to breach of a municipal contract. Rather they set an independent standard. A state may breach a treaty without breaching a contract, and *vice versa*, and this is certainly true of these provisions of the BIT. The point is

---

[659] Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, **Exh. C-3**, Article XII(1) (emphasis added).

[660] See C-PHB, para. 525; Venezuela's Opening Presentation (Hodgson), Tr. [Jurisdiction and Merits], Day 1, 350: 19-21.

[661] Zachary Douglas, *The International Law of Investment Claims* (CUP, 2009), **Exh. RLA-104, Exh. RLA-158**, para. 447.

made clear in Article 3 of the ILC Articles, which is entitled "Characterization of an act of a State as internationally wrongful":

> The characterization of an act of a State as internationally wrongful is governed by international law. Such characterization is not affected by the characterization of the same act as lawful by internal law.
>
> 96. In accordance with this general principle (which is undoubtedly declaratory of general international law), whether there has been a breach of the BIT and whether there has been a breach of contract are different questions. Each of these claims will be determined by reference to its own proper or applicable law—in the case of the BIT, by international law; in the case of the Concession Contract, by the proper law of the contract [...]".[662]

475. To determine whether, as a matter of jurisdiction, the Claimant is bringing contract or treaty claims, the Tribunal must consider, to use the words of the *Vivendi I* annulment committee, the "fundamental basis of the [Claimant's] claim".[663] The Tribunal's starting point will be the Claimant's prayers for relief and the formulation of its claims, as it is for a claimant to file its claim and thus define the nature of the claim that it submits before a tribunal. However, it would of course not be sufficient for a claimant to simply label contract breaches as treaty breaches to avoid the jurisdictional hurdles present in a BIT. The Tribunal's jurisdictional inquiry is a matter of objective determination, and the Tribunal would in case of pure "labeling" be at liberty and have the duty to re-characterize the alleged breaches.

476. In this case, however, the Tribunal is unable to find any indication in the record which would suggest that the Claimant has disguised contract claims as treaty claims. To the contrary, the Tribunal considers that the Claimant has established that its claims in relation to the MOC are fundamentally based on the Treaty and thus fall within the *ratione materiae* jurisdictional parameters defined by Article XII of the BIT. For example, with respect to expropriation, the Claimant has alleged that the unjustified termination of a contract based on sovereign prerogative is expropriatory and that the alleged "destruction" of the Claimant's contractual rights contained in the MOC amounts to an expropriation.[664] Similarly, the Claimant's fair and equitable treatment claims are predicated upon Venezuela's alleged repudiation of the MOC, which in the Claimant's eyes constitutes unfair and inequitable conduct, a violation of its legitimate expectations, as well as an act which is arbitrary and contrary to transparency and

---

[662] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, **Exh. CLA-96**, paras 95-96.

[663] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, **Exh. CLA-96**, para. 101 (quoted *infra* at para. 479).

[664] See, *e.g.*, Memorial, paras 284-289, 302-315; Reply, para. 521.

consistency.[665] It is clear to the Tribunal that the Claimant does not allege contractual violations on the part of Venezuela and does not—nor could it—request the Tribunal to pass judgment on whether there were any *contractual breaches* in relation to the MOC. The Tribunal considers that the Claimant's complaints that "[w]hen terminating the MOC, the CVG failed to comply with the very terms of the agreement itself" or that the rescission "was plainly illegitimate", which the Respondent takes as indications that the Claimant's pleadings are fundamentally based on the contract,[666] are sentences taken out of their context (which is one relating to *Treaty* claims). They thus do not change in any way the Tribunal's conclusion.

477.    Whether the Claimant's claims are well-founded in law and whether the facts underlying those claims may implicate the Respondent's liability under the BIT's substantive standards are questions which will not be addressed here, but to which the Tribunal will revert when discussing the merits.

478.    Closely related to the issue of the distinction between treaty and contract claims is the question of the effect of Clause 19 of the MOC on the jurisdiction of this Tribunal. Clause 19 of the MOC reads as follows:

> "The uncertainties and controversies of any nature that might arise from the execution of this Contract and that may not be resolved in an amicable manner by the Parties shall be resolved by the competent tribunals of the Bolivarian Republic of Venezuela, in accordance with its laws, and they may not give rise to claims before foreign tribunals."[667]

479.    In this respect, the Tribunal wishes to recall a further and oft-quoted passage from the *Vivendi I* annulment committee decision:

> "98. In a case where the essential basis of a claim brought before an international tribunal is a breach of contract, the tribunal will give effect to any valid choice of forum clause in the contract. [...]
>
> 101. On the other hand, where "the fundamental basis of the claim" is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state or one of its subdivisions cannot operate as a bar to the application of the treaty standard. At most, it

---

[665] See, *e.g.*, Memorial, paras. 363-365, 373, 378, 383.

[666] Counter-Memorial, para. 333, discussing Memorial, paras 305 and 307.

[667] MOC, **Exh. C-9**, Clause 19 (Respondent's translation).

might be relevant—as municipal law will often be relevant—in assessing whether there has been a breach of the treaty […]".[668]

480.    As already clarified, the Claimant is not bringing before this Tribunal any claims relating to the "execution" or performance ("*ejecución*") of the MOC, but claims concerning alleged breaches of the international obligations assumed by the Respondent through an international treaty. As explained in *Vivendi I*, the same set of facts can give rise to different claims grounded on differing legal orders, i.e. the municipal and the international legal orders.[669] However, an exclusive jurisdiction clause in relation to disputes concerning possible *contractual* breaches, such as Clause 19 of the MOC, may not divest an international tribunal of its jurisdiction under an international treaty in relation to possible *treaty* breaches. Differently put, an ICSID (Additional Facility) Tribunal has a duty to carry out its remit under the BIT, namely to decide upon treaty claims under international law, irrespective of a domestic law jurisdictional clause relating to the resolution of different types of disputes.

481.    Finally, the Tribunal addresses the Respondent's argument that the Claimant waived "the right to arbitrate claims related to the termination of the MOC under an international investment treaty" by way of Clause 19 of the MOC.[670] The Tribunal considers that, even if it were minded to find that an investor may waive by contract rights contained in a treaty, any such waiver would have to be formulated in clear and specific terms: a waiver, if and when admissible at all,  is never to be lightly admitted as it requires knowledge and intent of forgoing a right, a conduct rather unusual in economic transactions. As held by the tribunal in *Aguas del Tunari v. Bolivia*:

---

[668] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, **Exh. CLA-96**, paras 98-101 (internal footnotes omitted). The annulment committee went on to say that:

> "102. […] it is not open to an ICSID tribunal having jurisdiction under a BIT in respect of a claim based upon a substantive provision of that BIT, to dismiss the claim on the ground that it could or should have been dealt with by a national court. In such a case, the inquiry which the ICSID tribunal is required to undertake is one governed by the ICSID Convention, by the BIT and by applicable international law. Such an inquiry is neither in principle determined, nor precluded, by any issue of municipal law, including any municipal law agreement of the parties.

> 103. Moreover the Committee does not understand how, if there had been a breach of the BIT in the present case (a question of international law), the existence of Article 16(4) of the Concession Contract could have prevented its characterisation as such. A state cannot rely on an exclusive jurisdiction clause in a contract to avoid the characterisation of its conduct as internationally unlawful under a treaty".

*Ibid.*, paras 102-103.

[669] See also *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003, **Exh. CLA-100**, para. 147.

[670] See Counter-Memorial, para. 342.

"[A]n ICSID tribunal has a duty to exercise its jurisdiction in such instances [where a conflicting forum selection clause exists] absent any indication that the parties *specifically intended* that the conflicting clause act as a waiver or modification of an otherwise existing grant of jurisdiction to ICSID. A separate conflicting document should be held to affect the jurisdiction of an ICSID tribunal only *if it clearly is intended* to modify the jurisdiction otherwise granted to ICSID. As stated above, an explicit waiver by an investor of its rights to invoke the jurisdiction of ICSID pursuant to a BIT could affect the jurisdiction of an ICSID tribunal. However, the Tribunal will not imply a waiver or modification of ICSID jurisdiction *without specific indications of the common intention of the Parties*".[671]

482.    In this case, there is no evidence whatsoever that the Parties specifically intended—through Clause 19 of the MOC—to limit the application of the BIT or the procedural rights granted under such Treaty. As already explained, Clause 19 is an exclusive jurisdiction clause which by its own terms is circumscribed to disputes "arising from the execution ('*ejecución*') of the MOC". That clause makes no mention of the Claimant's rights under the BIT, and no reference to the BIT in general terms or to the Claimant's right to seek recourse in arbitration for the alleged violation of those rights. Furthermore, the Tribunal neither views the reference in Clause 19 to "foreign tribunals" to be capable of depriving an international tribunal constituted under an international treaty of its jurisdiction over alleged treaty breaches nor does it see any indices that the Parties did in fact contemplate such a set of circumstances.

483.    For the foregoing reasons, the Tribunal rejects the Respondent's second jurisdictional objection.

***

484.    In conclusion, the Tribunal has jurisdiction over all of the Treaty claims submitted to it and the MOC rescission is part and parcel of a set of facts validly put into the record.

---

[671] *Aguas del Tunari, S.A. v. Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on Respondent's Objections to Jurisdiction, 21 October 2005, **Exh. CLA-107**, para. 119 (emphasis added). See also *TSA Spectrum de Argentina S.A. v. Argentine Republic*, ICSID Case No. ARB/05/5, Award, 19 December 2008, para. 58 ("if the contract contains a specific clause on dispute settlement, this does not exclude recourse to the settlement procedure in the treaty, unless there is a clear indication in the contract itself or elsewhere that the parties to the contract intended in such manner to limit the application of the treaty [...]"); *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Award, 10 February 2012, **Exh. CLA-120**, para. 178 (investors' rights under a treaty "should not lightly be assumed to have been waived").

## VII.  LIABILITY

### A.  OVERVIEW

485.  As to liability, the Claimant has advanced the following arguments:[672]

   a.  Venezuela has breached Article II(2) of the Treaty by failing to afford Crystallex's investment fair and equitable treatment. Crystallex had legitimate expectations that it would operate Las Cristinas over the life of the MOC. Venezuela eviscerated those legitimate expectations by denying Crystallex the Permit and terminating the MOC without cause, and for purely political reasons. Further, Venezuela's actions were negligent, arbitrary, and lacking due process, transparency and consistency.

   b.  Venezuela has breached Article II(2) of the Treaty by failing to afford Crystallex's investment full protection and security, which for the Claimant includes legal security. Venezuela's actions destroyed the legal security surrounding Crystallex's investment. In particular, Venezuela committed acts of administrative negligence and made a number of statements of "harassment" and discriminatory nature which were, according to the Claimant, not in accord with the full protection and security standard under the Treaty.

   c.  Venezuela has breached Article VII(1) of the Treaty by unlawfully expropriating the Claimant's investment in Venezuela. Because the MOC granted Crystallex the right to develop and exploit the Las Cristinas mine, the MOC (with its ensuing rights) constitutes an investment protected by the Treaty. Crystallex claims that Venezuela indirectly expropriated its investment through a series of cumulative and interconnected measures that began with the denial of the Permit by the Ministry of the Environment, continued with delays in the administrative remedies regarding that denial, repeated assurances by officials that the conditions for the Permit had been fulfilled, as well as nationalization threats by other government officials, and finally ended with the CVG's rescission of the MOC. The Claimant further contends that the rescission of the MOC itself also constituted a direct expropriation because it extinguished Crystallex's rights that allowed it to develop Las Cristinas and ordered the transfer of all assets to the CVG.

486.  The Respondent has advanced the following arguments on liability:

---

[672] The Tribunal notes that the order of the substantive legal claims (i.e., the arguments on the standards of treatment) has somewhat varied throughout the Parties' pleadings. The Tribunal discusses the arguments on the standards of treatment in the order which the Parties have adopted in their post-hearing submissions. See C-PHB, paras 397-513 (discussing *first* fair and equitable treatment, *second* full protection and security, and *third* expropriation) and R-PHB, paras 107-228 (same).

    a. Venezuela has not breached the fair and equitable treatment standard in the Treaty, which is the "minimum standard of treatment" under customary international law. Crystallex could not have any reasonable or legitimate expectations regarding the Las Cristinas project, because Venezuela never made a specific promise or commitment to provide the Permit or, in the case of the CVG, to not exercise its contractual right to rescission. In any event, the Permit was properly denied and the MOC was properly rescinded. Further, Venezuela did not engage in any arbitrary, negligent, non-transparent, inconsistent or abusive conduct.

    b. Venezuela has not breached the full protection and security standard. Full protection and security does not extend to "legal security". In any event, legal protection in Venezuela did exist, but it was Crystallex who chose not to avail itself of it. Furthermore, Venezuelan officials have not engaged in any statements that can be considered acts of harassment.

    c. There was no expropriation (either direct or indirect) of Crystallex's investment, because Venezuela's acts are the legitimate application of reasonable environmental regulations, and a contracting party's legitimate exercise of its right to rescind the MOC under mutually agreed upon terms. According to Venezuela, the Permit was lawfully denied because Crystallex failed to meet the environmental requirements established by law and enforced by the Ministry of Environment, and the CVG's rescission of the MOC was a legitimate response to Crystallex's failure to meet its contractual obligations.

## B.    FAIR AND EQUITABLE TREATMENT

### 1.    The Parties' Positions

#### a.    Overview

487.    The Claimant contends that Venezuela violated its obligation to afford Crystallex's investment fair and equitable treatment. Crystallex had legitimate expectations that it would operate the Las Cristinas project over the life of the MOC. These expectations were backed by contract and a clear Venezuelan legal framework, and were further reinforced by multiple approvals from Government agencies, as well as assurances by Government officials that all the pre-conditions for the Permit had been met and the Permit was to be handed over. Venezuela eviscerated these legitimate expectations by denying Crystallex the Permit, and terminating the MOC without cause and for purely political reasons.

488.    Moreover, the actions of the Venezuelan Government with respect to the Permit were, according to the Claimant, negligent and arbitrary, their decision-making process lacked transparency, and the relevant decisions were taken in the absence of due process of law.

489.    Venezuela contends that the Claimant has failed to establish that Venezuela breached the fair and equitable treatment standard, either under the minimum standard of treatment or under an autonomous treaty standard. The Claimant could not have any legitimate expectations that it would operate the Las Cristinas project, because Venezuela made no specific promises or commitments. In any event, Venezuela did not frustrate any of the Claimant's expectations, because the Permit was properly denied and the MOC was properly rescinded.

490.    Furthermore, according to the Respondent, the Claimant has failed to establish that the measures complained of amount to gross lack of due process, manifest arbitrariness, complete lack of transparency or bad faith (which is the threshold to be met under the minimum standard of treatment), or were otherwise contrary to any of the other autonomous treaty standards identified by the Claimant.

   b.    **The content of the fair and equitable treatment standard**

491.    Article II(2) of the Treaty reads:

> "Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party fair and equitable treatment and full protection and security".

492.    The Claimant submits that "fair and equitable treatment" in Art. II(2) of the Treaty is an autonomous treaty standard, which is intentionally broad, and flexible and meant to protect investors in a variety of situations in which state conduct may be considered as unjust.[673] The standard "requires host States, consistent with the object and purpose of BITs and the good faith principle, to be proactive in the protection of investment and not to act improperly or discreditably".[674] The Claimant further relies on arbitral decisions to argue that bad faith or malicious intent is not required for a finding of breach of the aforementioned standard.[675]

493.    According to the Claimant, international tribunals have developed specific principles inherent in the fair and equitable treatment standard which, in so far as they are relevant to the present dispute, consist of the following state conduct: (a) not to defeat the investor's legitimate expectations; (b) non-arbitrariness; (c) transparency, consistency, procedural propriety, and due process; (d) non-discrimination; (e) non-abusive conduct and good faith.[676] These are the elements of the fair and equitable treatment standard

---

[673] Memorial, paras 327-335.

[674] Memorial, para. 339.

[675] Memorial, paras 336-338.

[676] Memorial, paras 341, 345, C-PHB, para. 419.

that are applicable in this arbitration[677] and "[a] measure that breaches any of these elements is not fair and equitable".[678]

494.    In contradistinction, the Respondent contends that Article II(2)'s requirement to accord "fair and equitable treatment" is the minimum standard under customary international law. According to Venezuela, the language of Article II(2) of the Treaty explicitly qualifies the fair and equitable treatment standard by reference to "principles of international law", which incorporates the minimum standard of treatment of aliens and their property under customary international law.[679] Citing *LFH Neer & Pauline Neer v. Mexico,* the Respondent argues that, in order for the Tribunal to find a breach of the Treaty's fair and equitable treatment obligation, the Claimant must show that the Respondent's conduct amounts "to an outrage, to bad faith, to willful neglect of duty or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".[680]

495.    The Respondent supports its position by noting that the Treaty's Article II(2) is based on NAFTA Article 1105, and NAFTA parties as well as NAFTA tribunals have indicated that this provision incorporates the customary international law minimum standard of treatment. According to the Respondent, Canada's subsequent treaty practice confirms that the Canada-Venezuela BIT applicable in this case incorporates the minimum standard of treatment.[681] The Respondent cites to *Glamis Gold v. United States*, where a NAFTA tribunal stated that "'to violate the customary international law minimum standard of treatment codified in Article 1105 of the NAFTA, an act must be sufficiently egregious and shocking – a gross denial of justice, manifest arbitrariness, blatant unfairness, a complete lack of due process, evident discrimination, or a manifest lack of reasons – so as to fall below international standards and constitute a breach of Article 1105(1)'".[682]

496.    The Respondent contends that NAFTA tribunals are not alone in adopting this view and that "there is consensus among arbitral tribunals that the threshold [for a finding of fair and equitable treatment breach] remains high".[683] The Respondent argues that, under the minimum standard of treatment, merely failing to live up to subjective expectations

---

[677] Reply, para. 563.

[678] Memorial, para. 346.

[679] Counter-Memorial, paras 355-356; R-PHB, paras 107-111.

[680] Rejoinder, paras 412, 414-415; Counter-Memorial, para. 359, discussing *LFH Neer and Pauline Neer v. Mexico,* United States-Mexico General Claims Commission, Decision, 15 October 1926, 4 UNRIAA 60, **Exh. RLA-6**.

[681] Rejoinder, para. 417, discussing the Canada-Latvia BIT (1995); the Canada-Czech Republic BIT (2009); the Canada-Romania BIT (1996); the Canada-Slovak Republic BIT (2010); and the Canada-Peru BIT (2006).

[682] R-PHB, para. 110 (quoting *Glamis Gold v. United States*, Award, 8 June 2009, **Exh. RLA-109**, para. 616).

[683] Rejoinder, para. 424.

cannot be sufficient to establish a breach of the minimum standard of treatment under customary international law.[684]

497.    For the Claimant, in turn, equating the Treaty's language "in accordance with principles of international law" to the customary international law minimum standard of treatment is misplaced. Rather, "a broad and autonomous reading" of the Treaty clause comports with both the ordinary meaning of its terms and the object and purpose of the Treaty.[685] The Claimant notes that each tribunal that has considered the interpretation of the specific phrase "in accordance with principles of international law" has concluded that the term "principles" requires a broader interpretation of the FET clause than that provided by the international minimum standard of treatment.[686]

498.    With regard to a possible parallel with NAFTA, the Claimant argues that Venezuela ignores a number of distinctions between the text of the Treaty and NAFTA, including the fact that the title of Article 1105 NAFTA refers to the "Minimum Standard of Treatment" whereas the title of Article II of the Treaty simply refers to the "Establishment, Acquisition and Protection of Investment".[687] Furthermore, the Claimant casts doubt on the application of the *Neer* standard (which was enunciated in the 1920s) to the present arbitration, and argues that, in any event, customary international law has evolved over the near century since the *Neer* decision.[688]

499.    Finally, the Claimant argues that the Treaty contains a most-favored-nation treatment provision (Article III) pursuant to which it can import the more favorable treatment given in the Belarus-Venezuela Bilateral Investment Treaty, which came into force in August 2008 and which provides that an investor from Belarus shall enjoy fair and equitable treatment without any restriction.[689] Such reliance by the Claimant on the Treaty's MFN clause is disputed by the Respondent, who argues that the Claimant has not proved that it satisfied the three preconditions to the application of the MFN clause in the Treaty, namely, that Venezuela accorded Crystallex's investment (a) "treatment" that (b) "in like circumstances" was (c) "less favourable" than the treatment accorded to investors or investments of Belarus.[690]

---

[684] Counter-Memorial, para. 364.

[685] Reply, para. 562.

[686] Reply, paras 557-558; C-PHB, para. 411.

[687] Reply, paras 556-558.

[688] Reply, paras 556-560.

[689] Reply, para. 563.

[690] Rejoinder, para. 435.

c.    **Legitimate Expectations**

i.    **The Claimant's position**

500.    The Claimant submits that the fair and equitable treatment standard (as established in recent arbitral decisions) requires that investors be provided with a stable and predictable investment environment in accordance with the investor's legitimate and reasonable expectations.[691] According to the Claimant, the concept of legitimate expectations is also recognized in Venezuelan law under the doctrine known as *confianza legitima*.[692]

501.    In its post-hearing submission, the Claimant has summarized its allegations on its legitimate expectations in the following terms.[693]

502.    At the time of *making its initial investment*, the Claimant contends that it had the following legitimate expectations, based on the applicable Venezuelan legal framework and the terms of the MOC:

- Venezuela would act with economic rationality, reasonableness and proportionality toward Crystallex's investment;

- Crystallex would enjoy an exclusive right to exploit the Las Cristinas mine for an initial period of twenty years, which could be extended for two ten-year periods, if Crystallex fulfilled its contractual and regulatory obligations for the issuance of the Permit;

- The process for the issuance of the environmental Permit would be a technical process, i.e. it would be granted the Permit if it fulfilled all of the technical requirements set out in the Venezuelan framework and thus received approval for such technical requirements.[694]

503.    Further, after the 16 May 2007 letter,

- Crystallex had a legitimate expectation that the Permit would be delivered promptly.[695]

504.    Finally, between July 2008 and the rescission of the MOC and the Government take-over of Las Cristinas, Crystallex continued to have legitimate expectations that:

---

[691] Memorial, paras 347-355.

[692] Reply, para. 566.

[693] See also Memorial, paras 356-359.

[694] C-PHB, para. 426. See also Memorial, para. 358; Reply, paras 567-570.

[695] C-PHB, para. 427.

- The Venezuelan Government would act coherently, transparently and in good faith in deciding Crystallex's appeal of the Permit denial;

- The Venezuelan Government would evaluate the adjusted proposal that was submitted to the Ministry of Environment in August 2008;

- Crystallex would be permitted to develop Las Cristinas, based on assurances provided by high-level Venezuelan Government officials; and

- The MOC would not be arbitrarily rescinded without the payment of compensation contrary to the terms of the MOC and Venezuelan law.[696]

505.    In reliance on these expectations, Crystallex made significant investments to ensure that Las Cristinas would be "shovel ready".[697] Further, in reliance upon assurances provided following the issuance of the Permit denial letter that the decision to issue the Permit had been re-opened and that the Government wished to pursue the development of the Las Cristinas project with Crystallex, Crystallex continued to fulfill its obligations and exercise its rights under the MOC.[698]

506.    According to the Claimant, despite the fact that Crystallex obtained all relevant approvals from 2004-2007, and repeatedly obtained assurances and representations that the Permit was forthcoming,[699] Venezuela frustrated each and every one of its expectations, by denying the Permit and terminating the MOC.[700]

ii.    **The Respondent's position**

507.    The Respondent claims that, for there to be legitimate expectations on the part of an investor, tribunals have held that the investor must show that *specific* promises or commitments were made.[701] In this case, the Respondent claims there were "neither specific commitments nor any undertaking to refrain from regulatory action such as the proper evaluation of the environmental impact of Claimant's project".[702] Venezuela never made a specific promise or commitment to provide the Permit or, in the case of the CVG, not to exercise its contractual right to rescission.[703] In addition, no Venezuelan official gave an assurance that Crystallex had applied for and received *all*

---

[696] C-PHB, para. 428.

[697] C-PHB, para. 429.

[698] C-PHB, para. 430.

[699] Memorial, para. 359.

[700] Memorial, paras 360-369; C-PHB, para. 431.

[701] Counter-Memorial, paras 364, 367-371.

[702] Counter-Memorial, para. 369.

[703] Rejoinder, paras 442-446.

the necessary Permits to undertake the project, and Venezuelan authorities timely expressed their concerns about the project's environmental and social impact.[704]

508.    First, according to Venezuela, its regulatory framework could not have given rise to any legitimate expectations, because the Claimant has been unable to show that Venezuelan procedure was not followed by the Ministry of Environment in evaluating its application for the Permit.[705]

509.    Second, no expectations can be derived from the terms of the MOC, which was clear in setting out that the Claimant could not acquire the contractual right to exploit *until* the Permit was obtained.[706]

510.    Third, the alleged administrative approvals on which the Claimant has relied could not have given rise to legitimate expectations. While the Feasibility Study was approved by the CVG and the Ministry of Mines, in the ensuing years, the Claimant kept changing central aspects of its proposed project. For example, the Claimant proposed including drastically different output scenarios that went to the very essence of the project, and did not submit an updated EIS reassessing impacts based on those updates.[707] Therefore, Crystallex could not have had any legitimate expectation of receiving a Permit from the Ministry of Environment based on the approval of an outdated feasibility study. Similarly, no expectations can be derived from the alleged approval of the EIS, because such approval never took place, or if it did (which Venezuela denies), it would have been limited to the EIS's assessment of preliminary infrastructure works.[708] Thus, the 16 May 2007 letter could not have created legitimate expectations that the Ministry would grant the Permit to exploit Las Cristinas.[709] Neither Crystallex's payment of taxes nor the posting of the Bond in June 2007 can sustain any expectation of receiving a Permit for exploitation, because these acts were necessary for the granting of the Permit, but could not automatically cause the Permit to be issued.[710] Crystallex itself acknowledged to its shareholders, in 2007, that there could be no assurance as to when or if the Permit would be granted.[711]

511.    Fourth, the Respondent submits that governmental statements upon which the Claimant relies do not support its position that its legitimate expectations were reassured.[712] For

---

[704] Counter-Memorial, para. 370.

[705] R-PHB, paras 116-117.

[706] R-PHB, paras 114-115.

[707] R-PHB, para. 119.

[708] R-PHB, paras 120-124.

[709] R-PHB, para. 125.

[710] R-PHB, para. 126.

[711] Counter-Memorial, para. 383.

[712] Counter-Memorial, paras 386-391.

instance, the Minister of Mines' statement in June 2005 that the Permit was "well on track" was not tantamount to a reassurance that the Permit would certainly be granted (and in any event the Ministry of Mines had no control over it).[713] Furthermore, any statements by Ms. Laura Paredes, then Director of Mining Concessions, indicating that she did not object to the granting of the Permit, are irrelevant, because it was not within her authority to examine Crystallex's compliance with the environmental requirements.[714] Similarly, it is disingenuous to assert that legitimate expectations could have arisen from statements made at the National Assembly meeting of 4 October 2007 by Sergio Rodriguez, then Director of Planning and Environmental Regulation and later Vice-Minister of Planning and Environmental Regulation, because he only "referred in general to environmental aspects".[715] Finally, the Claimant has not been able to show any documentary support that after the Permit denial there was a decision on the part of the Ministry to reopen the Permit review process. The Respondent's position on the 20 August 2008 letter from Vice-Minister Merly Garcia is that this letter referred to the pending hierarchical appeal of the denial of the Permit, and not to a broader review of the merits of the Permit application. Thus, this letter could not have given rise to legitimate expectations.[716]

512.    To the extent that there were any legitimate expectations, which the Respondent denies, the Respondent claims that it did not frustrate any of them. The Permit was properly denied (because the denial was based on specific grounds previously identified but never adequately addressed by Crystallex) and the MOC was properly rescinded (the (contractual) ground for the rescission being the suspension of the operation by Crystallex for more than one year).[717]

### d.    Arbitrary conduct

513.    The Claimant submits that one of the classic strands of the fair and equitable treatment standard is that a state should not act in an arbitrary manner[718] and that a measure is likely to be found arbitrary if it is motivated by inappropriate considerations.[719]

514.    The Claimant argues that the key measures in this case, namely the failure to issue the Permit and the decision to rescind the MOC and dispossess Crystallex of Las Cristinas,

---

[713] Counter-Memorial, paras 387-390.

[714] R-PHB, para. 131 and note 181.

[715] R-PHB, para. 133.

[716] R-PHB, para. 134.

[717] Rejoinder, paras 458-463; R-PHB, paras 137-150.

[718] Memorial, para. 370; C-PHB, para. 432.

[719] Memorial, para. 372, C-PHB, para. 432.

were taken for purely arbitrary and capricious reasons that had no regulatory or contractual basis, contrary to Venezuelan law.[720]

515. First, the reasons set out in the Permit denial letter have no scientific, technical or rational basis. While the Permit denial letter claims to be based upon unidentified "technical inspection reports" and "research carried out by specialists competent in the matter", it is in fact based only upon a sole Technical Inspection Report from September 2006 which for the Claimant is a fraudulent document.[721] Therefore, there is no supporting data or technical analysis of any kind to support the reasons set out in the Permit denial letter, nor any analysis that would explain the revocation of the decision made less than a year earlier to approve the EIS and issue the Permit.[722]

516. Second, the decision to rescind the MOC was not based upon any legitimate contractual grounds, as clearly shown by a number of CVG letters.[723]

517. Third, the Claimant alleges that Venezuela's threats towards Crystallex and its investment were based on a decision to nationalize the gold sector, something which in the Claimant's view amounts to "administrative caprice".[724] According to the Claimant, the Permit denial was based on a pretext since the true rationale for the denial was the desire to transfer Crystallex's rights to another operator.[725]

518. The Respondent, on the other hand, argues that the customary international minimum standard of treatment requires "manifest arbitrariness, blatant unfairness, a complete lack of due process, evident discrimination, or a manifest lack of reasons".[726] It claims that the Claimant has failed to establish that the measures complained of amount to such manifest arbitrariness. In particular, permits, authorizations and approvals issued by Venezuela to Crystallex (including the EIS) were on their face limited to their terms that did not exceed the scope of the commitments contained therein. The denial of the Permit thus could not have constituted a reversal of the approvals of the EIS. Similarly, there was nothing "manifestly arbitrary and capricious" in Venezuela's decision to deny the Permit since the Government based its decision on a rational analysis of Crystallex's project.[727]

---

[720] C-PHB, para. 433.

[721] See *supra* Section V.B.1.f.i.

[722] C-PHB, para. 435. See also Memorial, para. 373; Reply, para. 577.

[723] C-PHB, para. 436, discussing Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**; Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**. See also Memorial, para. 373.

[724] Memorial, para. 373.

[725] Reply, para. 577.

[726] Counter-Memorial, paras 400-401, citing to *Glamis Gold v. United States*.

[727] Rejoinder, paras 465-467.

e.  **Transparency, consistency, procedural propriety, due process, and non-discrimination**

519.  The Claimant has further discussed transparency, consistency, procedural propriety, due process, and non-discrimination as concrete factors that shape the standard of fair and equitable treatment.[728]

520.  First, the Claimant argues that under the fair and equitable treatment standard of the Treaty, "Crystallex could expect it and its investment to be treated consistently, transparently, and in a manner free from ambiguity".[729] Consistency requires that government decision-making in relation to an investor is orderly, timely and free of serious administrative negligence. Separate government agencies must also act coherently in their positions regarding an investor vis-à-vis one another. Transparency requires that a host state make it possible for an investor to accommodate its behavior to the state's laws, regulations or policies.[730]

521.  In this case, the Claimant contends that there was no consistency or transparency in Venezuela's decision to deny the Permit in April 2008, because, *inter alia*, the denial decision does not explain the *volte-face* in respect of the 16 May 2007 EIS approval; because it is not based on any technical analysis; and because it cannot be reconciled with statements to the contrary from Government officials.[731] Furthermore, the MOC rescission was entirely inconsistent with assurances, provided just months earlier in response to Crystallex's enquiry as to the status of the contract, that the MOC was valid and in full force and effect. It is also inconsistent with statements made by the CVG's Vice-President – two months after the rescission – that Crystallex had thoroughly complied with all of its obligations under the MOC.[732] Finally, according to the Claimant, between April 2008 and February 2011, Crystallex was subjected to a veritable rollercoaster of inconsistent state conduct: one day Crystallex would receive private assurances that it would be permitted to develop Las Cristinas; the next day the President would publicly announce that it was "taking back" Las Cristinas.[733]

522.  Venezuela's conduct, according to the Claimant, also evinces that there was no coherence to the State's actions.[734] Venezuela's own Permanent Committee for

---

[728] Memorial, paras 374-383; Reply, paras 576-578; C-PHB, paras 439-448.

[729] Memorial, para. 379.

[730] C-PHB, para. 439.

[731] C-PHB, para. 441.

[732] C-PHB, para. 442, discussing Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**, and Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[733] C-PHB, para. 443.

[734] Memorial, para. 383.

Economic Development noted that there was a lack of coordination between various Government agencies and departments with regard to the project.[735]

523.    Further, Venezuela failed to respect procedural propriety and due process in its dealings with Crystallex and its investment. In particular, because the Permit denial letter was devoid of any data, figures, supporting evidence and documents, Crystallex could not possibly understand the basis for the decision to deny the Permit, let alone effectively challenge the substance of the Permit denial letter. Additionally, Crystallex was denied due process of law when Venezuela failed to hear Crystallex's administrative appeal following the Permit denial and to offer an administrative proceeding to Crystallex prior to the termination of the MOC.[736]

524.    The Claimant also contends that the Ministry of Environment failed to review Crystallex's proposals diligently and coherently. The Claimant alleges that it lost Crystallex's files on various occasions, and that it did not possess an internal documentary record of how it reviewed and responded to Crystallex's project, and that it admitted that "many of the decisions (if they were made at all) were oral".[737]

525.    Finally, the Claimant submits that Venezuela made clear that from a certain moment on, it did not wish to develop Las Cristinas with a partner from Canada, but rather with a partner from one of its preferred trading partners or "sister nations". Thus, the Claimant suggests that Crystallex's nationality was a decisive factor in Venezuela's decisions to deny the Permit, rescind the MOC and take back physical control over Las Cristinas.[738] The Claimant points to statements and actions by Venezuelan Minister Sanz and President Chávez to show that Crystallex's Canadian nationality made it an unsuitable partner to develop Las Cristinas. It also cites the VenRus presentation, which stated that developing Las Cristinas with a foreign enterprise domiciled in Canada would be against Venezuelan state policy.[739]

526.    The Respondent, in turn, submits that Venezuela never acted negligently nor incoherently. Part of the reason for delay in the analysis by the Ministry was due to Crystallex's own conduct, as it took Crystallex long periods of time to address the

---

[735] Memorial, paras 383, 299(b), discussing Minutes No. 014-2008 of the Ordinary Meeting held on 4 June 2008, 4 June 2008, **Exh. C-32**.

[736] Memorial, para. 378.

[737] Reply, para. 577.

[738] C-PHB, paras 449-457.

[739] C-PHB, paras 452-453, discussing Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**, and "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**.

Ministry's requests. The Government diligently provided ample feedback to Crystallex during the course of the years both orally and in writing.[740]

527.    The Respondent avers that Crystallex's reconsideration and appeal were adjudicated in full compliance with Venezuelan law. The fact that the Ministry of Environment did not render a decision on the hierarchical appeal within 90 days was not arbitrary since the hierarchical appeal was deemed denied under Venezuelan law upon the Minister's failure to respond after 90 days, at which point Crystallex had legal recourse to challenge the denial (which Crystallex chose not to do).[741] Also with regard to the rescission of the MOC, the relevant Resolution advised Crystallex that it could file an administrative appeal of the CVG's decision within 15 days (which Crystallex also did not pursue).[742]

   f.    **Abusive conduct and bad faith**

528.    The Claimant argues that Venezuela's conduct towards Crystallex was abusive in that (i) Venezuela's motivation behind the denial of the Permit and the rescission of the contract "was to transfer Crystallex's investment over to a third party for improper reasons, which Venezuela ultimately effected with its agreement with CITIC"; (ii) "Venezuela used the Permit that it was wrongfully withholding as a *quid pro quo* to effect the seizure of Crystallex's other properties in the country such as the Revemin mill" and (iii) Venezuela was effectively unjustly enriched by using Crystallex's efforts at developing Las Cristinas (including the further exploration of its reserves) to subsequently obtain a new partner.[743] Furthermore, for the reasons discussed earlier, the Claimant submits that both the Permit denial letter and the MOC rescission were measures that lacked good faith.[744]

529.    The Respondent disagrees that its conduct was abusive or in bad faith. It claims that neither the CITIC Framework Agreement nor the CITIC Studies Agreement granted any mining rights. With regard to providing third parties with studies undertaken by Crystallex, Respondent counters that it is the practice of the Ministry of Mines to provide prior studies to new contractors engaged to produce such studies. The Respondent also alleges that the Claimant has failed to demonstrate that CITIC, or any other entity, was a factor at the time the CVG rescinded the MOC.[745] Finally, the

---

[740] Rejoinder, para. 468.

[741] Counter-Memorial, para. 403.

[742] Counter-Memorial, para. 404.

[743] Reply, para. 577.

[744] C-PHB, paras 458-462.

[745] R-PHB, para. 155.

Respondent points out that Venezuela's obligations under the BIT did not impose any restriction on its rights to hire companies to develop its natural resources.[746]

### 2.     Analysis

#### a.     The content of the standard

530.   The Tribunal starts its analysis of FET by elucidating the content of the standard. In this respect, the Tribunal begins with the examination of the formulation "in accordance with the principles of international law", which is found in Article II(2) of the Treaty, quoted above.[747] The Tribunal is of the opinion that the FET standard embodied in the Treaty cannot – by virtue of that formulation or otherwise – be equated to the "international minimum standard of treatment" under customary international law, but rather constitutes an autonomous treaty standard. Unlike treaties such as NAFTA, which expressly incorporate the minimum standard of treatment,[748] the Canada-Venezuela BIT nowhere refers to such minimum standard.

531.   The Tribunal notes that several non-NAFTA tribunals interpreting FET clauses similar to the one at issue in this case have come to the conclusion that the reference to "in accordance with principles of international law" (or analogous formulations) should not be understood as a reference to the minimum standard of treatment.

532.   In *Vivendi v. Argentina*, the tribunal made the following (well-known) comment with respect to the applicable BIT's provision which referred to FET "in conformity with the principles of international law":[749]

> "The Tribunal sees no basis for equating principles of international law with the minimum standard of treatment. First, the reference to principles of international law supports a broader reading that invites consideration of a wider range of international law principles than the minimum standard alone. Second, the wording of Article 3 requires that the fair and equitable treatment conform to the principles of international law, but the requirement for conformity can just as readily set a floor as a ceiling on the Treaty's fair and equitable treatment standard. Third, the language of the provision suggests

---

[746] Rejoinder, para. 469.

[747] See *supra* para. 491.

[748] See NAFTA, Article 1105, entitled "Minimum Standard of Treatment". The NAFTA minimum standard of treatment was the object of a binding interpretation by the Free Trade Commission, which is an authorized treaty body with binding interpretative authority under that treaty.

[749] See *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Resubmitted Case, Award, 20 August 2007, **Exh. CLA-55**, para. 7.4.6 ("Article 3 refers to fair and equitable treatment *in conformity* with the principles of international law, and not to the minimum standard of treatment. The French and Spanish text of the Treaty support this proposition. The French text reads 'un traitement juste et équitable, conformément aux principes du Droit International'. The Spanish text refers to 'un tratamiento justo y equitativo, conforme a los principios de derecho internacional'").

that one should also look to contemporary principles of international law, not only to principles from almost a century ago".[750]

533.    In *Arif v. Moldova* the tribunal aptly noted that:

"The specific language adopted by France and Moldova in Article 3 connects fair and equitable treatment with 'public international law principles', although neither party has raised the question of whether this language limits the fair and equitable treatment standard to the minimum standard of treatment of aliens in customary international law. This question, except in some very specific contexts such as Article 1.105 of NAFTA, is increasingly of historic significance as the rapidly expanding practice on FET clauses in treaties accelerates the development of customary international law. In any event, the Tribunal is satisfied that the fair and equitable treatment standard in Article 3 of the France- Moldova BIT is an autonomous standard given [...]".[751]

534.    As remarked by the tribunal in *SAUR v. Argentina*, the discussion as to whether the BIT's fair and equitable treatment in accordance with the principles of international law should be equated with the customary international law minimum standard of treatment is "rather dogmatic and conceptual" ("*une discussion plutôt dogmatique et conceptualiste*").[752] This Tribunal agrees and is further of the view that the public international law principles concerning the treatment of aliens have undergone considerable developments since the *Neer* case, on which the Respondent relies as the applicable benchmark to define FET. As a result of these developments, what is considered now "fair and equitable" is different and broader than what was considered as such at the beginning of the last century.[753]

535.    This has been noted by a number of tribunals, including in the context of treaties, such as the NAFTA or the DR-CAFTA, which unlike the present Treaty expressly refer to the "minimum standard of treatment". For example, the tribunal in *ADF v. United States*, a case under NAFTA, noted that:

"what customary international law projects is not a static photograph of the minimum standard of treatment of aliens as it stood in 1927 when the Award

---

[750] See *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Resubmitted Case, Award, 20 August 2007, **Exh. CLA-55**, para. 7.4.7. See also *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 30 July 2010, **Exh. CLA-79**, para. 185. See also *Total SA v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, **Exh. CLA-81**, paras 125-127.

[751] *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, **Exh. CLA-179**, para. 529.

[752] *SAUR International S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012, **Exh. CLA-170**, para. 491.

[753] See also *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, **Exh. CLA-185**, para. 567.

in the *Neer* case was rendered. For both customary international law and the minimum standard of treatment of aliens it incorporates, are constantly in a process of development".[754]

536.     The tribunal in *RDC v. Guatemala* in the context of the DR-CAFTA adopted the *ADF* reasoning and shared the conclusion that the minimum standard of treatment is "constantly in a process of development", including since *Neer*'s formulation.[755]

537.     That being said, what, then, is the precise content of "fair and equitable treatment" in this instance? The interpretation of Article II(2) of the Treaty should start from the canons of treaty interpretation as contained in Articles 31 and 32 of the VCLT. Venezuela is not a party to the VCLT, but it is undisputed that the rules on the interpretation of treaties contained in the VCLT reflect customary international law[756] and Venezuela relies on the VCLT to interpret the Treaty.[757]

538.     To establish the content of the standard, the Tribunal must thus first turn to the plain meaning of the terms "fair and equitable". The plain meaning of these terms, however, does not provide much assistance. As noted by the tribunal in *MTD v. Chile*, "[i]n their ordinary meaning, the terms 'fair' and 'equitable' [...] mean 'just', 'even-handed', 'unbiased', 'legitimate'".[758] Similarly, the tribunal in *S.D. Myers v. Canada* stated that unfair and inequitable treatment meant "treatment in such an unjust or arbitrary manner that the treatment rises to the level that is unacceptable from the international perspective".[759] This Tribunal agrees with the *Saluka* tribunal in that "[t]his is probably

---

[754] *ADF Group Inc. v. United States*, ICSID Case No. ARB(AF)/00/1, Award, 9 January 2003, **Exh. RLA-61**, para. 179.

[755] *Railroad Development Corporation v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Award, 29 June 2012, **Exh. CLA-172**, para. 218.

[756] *See, e.g., Case Concerning the Territorial Dispute (Libyan Arab Jamahiriya v Chad),* [1994] ICJ Reports 6, para. 41 ("The Court would recall that, in accordance with customary international law, reflected in Article 31 of the 1969 Vienna Convention on the Law of Treaties, a treaty must be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose. Interpretation must be based above all upon the text of the treaty. As a supplementary measure recourse may be had to means of interpretation such as the preparatory work of the treaty and the circumstances of its conclusion").

[757] *See, e.g.,* Counter-Memorial, para. 355 ("It is well established in treaty-based arbitration of investment disputes that the interpretation of a BIT provision shall be made in accordance with the guidelines provided for in the Vienna Convention on the Law of Treaties. Article 31(1) in particular provides that "[a] treaty shall be interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose", internal footnotes omitted).

[758] *MTD Equity Sdn Bhd and MTD Chile SA v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, **Exh. CLA-41**, para. 113.

[759] *S.D. Myers, Inc. v. Government of Canada*, Partial Award, 13 Nov. 2000, **Exh. RLA-52**, para. 263.

as far as one can get by looking at the 'ordinary meaning' of the terms of Article 3.1 of the Treaty".[760]

539.    Arbitral tribunals have on numerous occasions attempted to capture the somewhat elusive essence of FET and, with a view to ascertaining the ordinary meaning of the phrase "fair and equitable treatment", have extracted a number of elements which they considered inherent components of the standard. The Tribunal considers the findings of these tribunals in this respect to be instructive as they evidence what is nowadays considered to be the core of the "fair and equitable treatment" standard.

540.    For example, the tribunal in *Rumeli v. Kazakhstan* stated that:

> "The parties rightly agree that the fair and equitable treatment standard encompasses *inter alia* the following concrete principles: - the State must act in a transparent manner; - the State is obliged to act in good faith; - the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process; - the State must respect procedural propriety and due process. The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations".[761]

541.    The tribunal in *Lemire v. Ukraine* identified the following factors as part of the FET standard:

> "- whether the State has failed to offer a stable and predictable legal framework; - whether the State made specific representations to the investor; - whether due process has been denied to the investor; - whether there is an absence of transparency in the legal procedure or in the actions of the State; - whether there has been harassment, coercion, abuse of power or other bad faith conduct by the host State; - whether any of the actions of the State can be labeled as arbitrary, discriminatory or inconsistent".[762]

542.    And in *Bayindir v. Pakistan*, the ICSID tribunal derived from decisions of investment tribunals the following principles as components of FET:

> "the obligation to act transparently and grant due process, to refrain from taking arbitrary or discriminatory measures, from exercising coercion or

---

[760] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 297. See also for similar considerations, *Ioan Micula, Viorel Micula & others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, **Exh. RLA-186**, para. 504.

[761] *Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, **Exh. CLA-60**, para. 609.

[762] *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, **Exh. CLA-73**, para. 284 (cited with approval in *Bosh International Inc. and B&P Ltd. Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, **Exh. RLA-135**, para. 212).

from frustrating the investor's reasonable expectations with respect to the legal framework affecting the investment".[763]

543.    Despite the different nuances in the definition of those principles formulated by those and other tribunals, the Tribunal notes that there is a common understanding as to the elements identified above. To the extent that they are relevant to the facts at issue in this case, the Tribunal is of the view that FET comprises, *inter alia*, protection of legitimate expectations, protection against arbitrary and discriminatory treatment, transparency and consistency. The Tribunal believes that the state's conduct need not be outrageous or amount to bad faith to breach the fair and equitable treatment standard. The Tribunal shares the observation made by the tribunal in *Mondev*, whereby "[t]o the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious. In particular, a state may treat foreign investment unfairly and inequitably without necessarily acting in bad faith".[764]

544.    The Tribunal further wishes to point out that the analysis of whether a state's conduct has been fair and equitable requires an assessment of all the facts, context and circumstances of a particular case. As stated in *Mondev*, "[a] judgment of what is fair and equitable cannot be reached in the abstract; it must depend on the facts of the particular case".[765]

545.    With those principles in mind, the Tribunal will first analyze whether the Claimant had any legitimate expectations which the Respondent frustrated, thereby breaching the FET standard (see *infra* Section VII.B.2.b). The Tribunal will then move to the other "strands" invoked by the Claimant which the Tribunal finds relevant for the facts of this case, i.e. non-arbitrariness, transparency and consistency (see *infra* Section VII.B.2.c), before concluding on certain residual allegations on discrimination, due process, and abusive/bad faith conduct (see *infra* Section VII.B.2.d). With regard to the non-arbitrariness, transparency and consistency strands, the Claimant has invoked the same facts as allegedly giving rise to a violation of more than one of these strands at the same time. Indeed, while each of these concepts has an individual and separate meaning, to which the Tribunal will revert when dealing with those specific elements, their reach may in certain circumstances overlap. Thus, for example, a conduct may at the same time be considered arbitrary and lacking transparency. Under the circumstances of this case, it will thus be useful to address those strands in one single section (see *infra* Section VII.B.2.c). In any event, the Tribunal emphasizes that, while

---

[763] *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, **Exh. CLA-68**, para. 178. See also *Biwater Gauff (Tanzania) v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, **Exh. CLA-59**, para. 602.

[764] *Mondev International Ltd. v. United States*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, **Exh. CLA-36**, para. 116.

[765] *Mondev International Ltd. v. United States*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, **Exh. CLA-36**, para. 118.

resort to the elements of which FET is composed may be a useful tool to assess the facts in concrete cases, including this one, it is the overall evaluation of the state's conduct as "fair and equitable" that is the ultimate object of the Tribunal's examination. Rather than to focus on a mass of details and direct the analysis to specific instances of alleged violations of the standard, the Tribunal will endeavor to establish whether an overall pattern of conduct has emerged from these instances and whether that overall pattern of conduct does indeed breach the standard.

### b.    Legitimate expectations

546.    As already stated, the Tribunal agrees with the majority of investment tribunals which have concluded that protection of legitimate expectations is now considered part of the FET standard.[766]   Arbitral tribunals have concluded that the doctrine of legitimate expectations is "firmly rooted in arbitral practice".[767] The concept has its origins in principles of domestic administrative law in various legal systems, and finds increasing recognition both in civil and common law countries.[768] Indeed, Venezuelan law recognizes the concept of protection of legitimate expectations (*confianza legitima*) in the citizen's dealings with the Public Administration.[769]

547.    However, protection of legitimate expectations under the FET standard occurs under well-defined limits. A legitimate expectation may arise in cases where the Administration has made a promise or representation to an investor as to a substantive benefit, on which the investor has relied in making its investment, and which later was frustrated by the conduct of the Administration. To be able to give rise to such legitimate expectations, such promise or representation – addressed to the individual investor – must be sufficiently specific, i.e. it must be precise as to its content and clear as to its form. Furthermore, as recalled by the *Arif v. Moldova* tribunal, "a claim based

---

[766] See, in addition to the awards quoted *supra* at paras 540-542, *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 302 (considering protection of legitimate expectations as the "dominant element" of fair and equitable treatment); *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, **Exh. RLA-115**, para. 216 ("one of the major components"); *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 7.75 ("the most important function").

[767] See, *e.g.*, *Yuri Bogdanov and Yulia Bogdanov v. Republic of Moldova*, SCC Case No. V091/2012, Final Award, 16 April 2013, para. 183, and *Ioan Micula, Viorel Micula & others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, **Exh. RLA-186**, para. 667.

[768] See *Total SA v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, **Exh. CLA-81**, para. 128 (finding that "a comparative analysis of the protection of legitimate expectations in domestic jurisdictions is justified […]. While the scope and legal basis of the principle varies, it has been recognized lately both in civil law and in common law jurisdictions within well defined limits").

[769] ERMuci, para. 121; ERMeier, para. 240, esp. fn. 358 (discussing Constitutional Chamber of the Supreme Court of Justice of 28 April 2003, the case of *Ricardo Javier González Fernández and others*, **Exh. HME-37**) and para. 86, esp. fn. 127 (discussing Decision of the Political-Administrative Chamber of the Supreme Court of Justice No. 514 of 3 April 2001, *The Coca Cola Company* case, **Exh. HME-30**).

on legitimate expectations must proceed from the exact identification of the origin of the expectation alleged, so that its scope can be formulated with precision".[770]

548.    Mindful of these limitations, the Tribunal turns to the examination of the Claimant's alleged legitimate expectations. While the precise articulation of its expectations has somewhat varied throughout its pleadings, in its post-hearing brief the Claimant has summarized its allegations concerning legitimate expectations by distinguishing three moments on which they arose: the time of making its initial investment; upon receipt of the 16 May 2007 letter; and between July 2008 and the rescission of the MOC and the Government take-over of Las Cristinas. For the purposes of a proper understanding and analysis of the Claimant's alleged legitimate expectations, the Tribunal finds it useful to reproduce *verbatim* the Claimant's latest articulation of its expectations.

549.    The Claimant contends that:

A.  At the time of making its investment:

i.    "Crystallex had a legitimate expectation under the FET standard that a host State would act with 'economic rationality', 'reasonableness' and 'proportionality' as a baseline of treatment toward its investment";[771]

ii.   "Crystallex had the legitimate expectation that if it fulfilled its contractual and regulatory obligations, it would enjoy its exclusive right to exploit the Las Cristinas mine for an initial period of 20 years (extendable for two 10-year periods), as set out under the MOC";[772]

iii.  "Crystallex had the legitimate expectation, rooted in the applicable Venezuelan legal framework, that the process for the issuance of the environmental Permit required in order to exploit the mine would be a technical process, as Venezuela's own witnesses have acknowledged it ought to have been. Crystallex had the legitimate expectation that if it fulfilled all of the technical requirements set out in the applicable Venezuelan legal framework, and received approval of those technical requirements, then it would be granted the Permit to exploit Las Cristinas";[773]

B.  "Upon receipt of the Ministry of the Environment's 16 May 2007 letter approving Crystallex's EIS and promising that the Permit would be "handed over" once the requisite bond was posted,"

---

[770] *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, **Exh. CLA-179**, para. 535.

[771] C-PHB, para. 426, sub (i) (internal footnotes omitted).

[772] C-PHB, para. 426, sub (ii) (internal footnotes omitted).

[773] C-PHB, para. 426, sub (iii) (internal footnotes omitted).

iv. "Crystallex had a legitimate expectation that the Permit would be delivered promptly".[774]

C. "Between July 2008 and the rescission of the MOC and Government takeover of the Las Cristinas Project in early 2011, Crystallex continued to have legitimate expectations that":

v. "the Venezuelan Government would act coherently, transparently and in good faith in deciding Crystallex's appeal of the Permit denial";[775]

vi. "the Venezuelan Government would evaluate the adjusted proposal that it submitted to the Ministry of the Environment in August 2008 at the Vice-Minister's request with a view to issuing the Permit, as required under Venezuelan law;"[776]

vii. "it would be permitted to develop the Las Cristinas Project, based on assurances provided by high-level Venezuelan Government officials, none of which have been denied by Venezuela in this Arbitration";[777] and

viii. "its MOC would not be arbitrarily rescinded without the payment of compensation contrary to the terms of the MOC and Venezuelan law".[778]

550. Except for the expectation arising out of the 16 May 2007 letter (*supra sub* iv.), which the Tribunal will deal with below, the Tribunal finds that the expectations as articulated by the Claimant are not "legitimate expectations" protected under the FET standard in the Treaty, for the following reasons.

551. A first set of expectations that the Claimant postulates present, in the Tribunal's view, a circularity of argument that make them incapable of providing a basis for an FET breach. Thus, to take as example the expectations that the Claimant alleges *sub* i. and v. above, the Claimant, to use the words of the tribunal in *Arif v. Moldova*, simply "postulate[s] an expectation to condemn the very conduct that it complains of in the case before it".[779] For example, to state that one has a legitimate expectation under the FET to be treated reasonably or proportionally (as the Claimant does *sub* i.) is tantamount to saying that one has a legitimate expectation to be treated "fairly and

---

[774] C-PHB, para. 427 (internal footnotes omitted).

[775] C-PHB, para. 428, sub (i) (internal footnotes omitted).

[776] C-PHB, para. 428, sub (ii) (internal footnotes omitted).

[777] C-PHB, para. 428, sub (iii) (internal footnotes omitted).

[778] C-PHB, para. 428, sub (iv) (internal footnotes omitted).

[779] *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, **Exh. CLA-179**, para. 533.

equitably". The same circularity of reasoning underlies the alleged expectation that the Respondent "would act coherently, transparently and in good faith in deciding Crystallex's appeal of the Permit denial" (*sub* v.).

552.    In other instances, the Claimant's postulated expectation would amount to an understanding that Venezuela comply with the regulatory framework in place or with the MOC (see expectations *sub* ii., iii., vi., and viii). With regard to the expectations based on the regulatory framework, the Tribunal observes that this is not a case where a claimant alleges that it has relied on an existing framework which the state has later changed allegedly in breach of the investor's legitimate expectations. Rather, the argument is that Crystallex was not granted a Permit under the existing framework. It is rather trite to note that the investor may consider the regulatory framework at the time of the decision to invest and rely on the state's intent to comply with its own laws (*patere legem quam ipse fecisti*). However, a simple general "expectation" of the state's compliance with its laws may not always and as such form the basis of a successful FET claim. It would form such a basis if evidence is given that a specific representation as to a substantive benefit has been frustrated, or there is proof of arbitrary, or non-transparent conduct in the application of the laws in question or some form of abuse of power. Otherwise, it is necessary for the investor to take into consideration that, in the administrative decision-making process, considerations of public interest or going to the specific circumstances of the case may counterbalance what the investor would view as an expectation. Laws are general and impersonal in nature; they will usually leave some degree of discretion to the state agencies for the making of their case-specific decisions and, in fact, are rarely unconditional in their provisions so that the investor would have difficulty founding an actual expectation akin to a vested right. As a matter of fact, in this very case the "expectations" as to the substantive benefit (i.e., the grant of the Permit and the enjoyment of "the exclusive right to exploit the Las Cristinas mine"), which the Claimant grounds on the MOC and the regulatory framework governing the exploitation of mining activities, were conditioned upon the Claimant's fulfillment "of its contractual and regulatory obligations" (see *supra sub* ii.) or "of all the technical requirements" (see *supra sub* iii.), as the Claimant itself recognizes.

553.    The Claimant also alleges that the "assurances provided by high-level Venezuelan Government officials" gave rise to its expectations "that it would be permitted to develop the Las Cristinas Project" (see *supra sub* vii.). The Tribunal finds that, with the already mentioned exception of the 16 May 2007 letter, the "assurances" on which the Claimant relies are too general and indeterminate to found a claim of legitimate expectations under the Treaty. For example, it is clear that no legitimate expectation as to the issuance of the environmental Permit may be said to arise out of the rather generic statement by the Ministry of Mines in June 2005 that the Permit was "well on track".[780]

---

[780] "Venezuela: Crystallex gold mine permit 'on track'," *Reuters*, 3 June 2005, **Exh. C-12**.

The Ministry of Mines had no control over the environmental Permit and at that time (June 2005), it had not yet even approved the Feasibility Study.

554. Similarly, the June 2006 statement by the President of the Commission of Mines of the National Assembly, Deputy Ricardo Gutiérrez, and the Mayor of Sifontes, expressing their joint support for the commencement of the Las Cristinas Project[781] could not create any legitimate expectations as to whether the *Ministry of Environment* would decide to grant the Permit.

555. Furthermore, no legitimate expectations protected under the Treaty could arise from the statements as they are reported in the minutes of the National Assembly meeting held on 4 October 2007. According to these minutes, the only representative from the Ministry of Environment that participated in that meeting, its then Planning Director, Sergio Rodríguez, merely "referred, in general, to environmental aspects. He also agreed with the matters related to the participation of Community Councils in the Projects to be developed".[782] In the Tribunal's view, such vague statements do not meet the level of specificity required to create legitimate expectations which, if later frustrated, are relevant for a finding of an FET breach.

556. The situation, however, is different when it comes to the 16 May 2007 letter from the Office of Permission of the Ministry of Environment to Crystallex, in respect of which closer scrutiny is necessary.

557. As a preliminary matter, that letter dates back to a moment when Crystallex had already made significant investments. A legitimate expectation is normally said to arise "at the time of making the investment".[783] In the Tribunal's eyes, this is logical, as it is the investor's *reliance* on a promise which may prompt, or contribute to, its decision to invest and proceed with that investment, and which makes in turn the expectation worthy of legal protection. In certain cases, however, "investments are made through several steps, spread over a period of time".[784] As the tribunal in *Frontier Petroleum v. Czech Republic* noted, in these instances "legitimate expectations must be examined for each stage at which a decisive step is taken towards the creation, expansion,

---

[781] "AN gestiona permisos mineros", *El Diario de Guayana*, 5 June 2006, **Exh. C-14**.

[782] Report of the Meeting held on 4 October 2007, 16 October 2007, **Exh. C-21**, p. 0005.

[783] See, e.g., *Duke Energy Electroquil Partners and Electroquil SA v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, **Exh. RLA-98**, para. 340 ("expectations must be legitimate and reasonable at the time when the investor makes the investment"); *National Grid plc v. Argentina*, UNCITRAL, Award, 3 November 2008, **Exh. CLA-62**, para. 173 ("[FET] protects the reasonable expectations of the investor at the time it made the investment"); *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, **Exh. CLA-68**, paras 190-191; *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, **Exh. CLA-73**, para. 264.

[784] *Frontier Petroleum v. Czech Republic*, UNCITRAL, Final Award, 12 November 2010, **Exh. RLA-123**, para. 287.

development, or reorganisation of the investment".[785] In this case, Crystallex continued to invest throughout the process, and made investments after the 16 May 2007 letter.[786] Therefore, the 16 May 2007 letter is in principle capable of founding a claim of legitimate expectations, if it fulfills the requisite characteristics of a specific promise, which was later frustrated. It is to this aspect that the Tribunal now turns.

558.    In this context, the Tribunal will address the following questions in turn: (i) what is the scope and import of the 16 May 2007 letter and is it the formal approval of the EIS?; (ii) did the approval relate to the entire project, or only to preliminary works?; (iii) did the Permit that was promised in the letter relate to exploration or exploitation?

i.    **The scope and import of the 16 May 2007 letter**

559.    One first area of disagreement between the Parties concerns whether the 16 May 2007 letter constitutes the formal approval of the EIS, as the Claimant contends. The Respondent denies that this is the case.[787]

560.    The Tribunal sees some force in Venezuela's argument that the 16 May 2007 letter is *not* the official approval of the EIS (the "accreditation" of the project, in Venezuelan law parlance). Indeed, if such letter is compared to the 1996 *Oficio* from the Ministry of Environment to the Vice-President of Minera Las Cristinas,[788] the May 2007 letter appears different and much less detailed. The difference between the two documents has also been conceded at the hearing by the Claimant's Venezuelan law expert, Mr. Meier.[789]

561.    However, it is not necessary to determine whether the 16 May 2007 letter was *the* formal accreditation of the project. As a matter of fact the Tribunal is of the view that, even if the 16 May 2007 letter were not considered as the formal accreditation of the project, but rather as a mere request for a bond (as Venezuela and its experts contend), the explicit statements contained therein cannot be disregarded:

> "[The bond] shall guarantee the implementation of the measures proposed in the document presented for the Environmental Impact Evaluation of the

---

[785] *Frontier Petroleum v. Czech Republic*, UNCITRAL, Final Award, 12 November 2010, **Exh. RLA-123**, para. 287.

[786] See Review of Costs Analysis in Response to Tribunal's Question #4, **Exh. CLEX-125**.

[787] See *supra* paras 252-253, 362-364.

[788] See Oficio No. 0643 from M. Rincones (Ministerio del Ambiente y de los Recursos Naturales Renovables) to M. Thorpe (Minera Las Cristinas), 8 October 1996, **Exh. R-159**.

[789] See Tr. [Jurisdiction and Merits], Day 6, 1599:15-1600:8 (Meier) (Oficio No. 0643 from M. Rincones (Ministerio del Ambiente y de los Recursos Naturales Renovables) to M. Thorpe (Minera Las Cristinas), 8 October 1996, **Exh. R-159**), under Tab 9 of Meier's witness binder).

project, which have been analyzed and approved by this Office, and are presented as follows [list of measures follows]: [...]

Once the Bond has been posted, checked, and found to be compliant by this Office, the Authorization for the Affectation of Natural Resources for the execution of the activities associated with the project, "**Construction of Infrastructure and Services and for the Gold Ore Exploration State of the Las Cristinas Project**" to be carried out within the jurisdiction of the Autonomous Municipality of Sifontes in Bolivar State, will be handed over".[790]

562.   The Tribunal notes that the letter clearly makes reference to an evaluation process carried out by the Ministry, when it specifies that the measures proposed in the EIS have been "analyzed". It also adds that these measures have been "approved" by "this Office", i.e., the Administrative Office of Permissions, which is in charge with processing the requests for the relevant permits. Finally, the letter states in unambiguous terms that "once the Bond has been posted, checked, and found to be compliant by this Office, [...] the [Permit] [...] will be handed over" ("*le será entregado*"). The use of the indicative mode and the future tense – expressing a fact rather than a possibility or a conjecture – and the structure of the sentence make it clear that the Administration has come to the conclusion that the process of analysis and approval has been completed and that the Office of Permissions is ready to "hand over" the Permit, once the Bond formality is cleared. It seems obvious to the Tribunal that at that time, a positive decision by the Administration towards the granting of the Permit had been taken.

563.   The Tribunal thus considers that, whether or not the 16 May 2007 letter was the formal "accreditation" of the project, it is much more than a mere request for a bond, as Venezuela submits. The letter contains a phrase – "the Permit will be handed over" – which would mean much more and appears on its face as a positive representation made by vice-minister Garcia specifically to Crystallex in clear and precise terms, to the effect that the Office of Permissions would continue with the procedures associated with the permitting process. As such, the 16 May 2007 letter was susceptible of creating the type of legitimate expectation that, if later frustrated, is protected under the FET standard.

564.   In the Tribunal's view, Crystallex legitimately relied on the Ministry of Environment's representation. Such expectation was further strengthened by the Ministry's request made on the same day to Crystallex (through the CVG) to pay the environmental taxes.[791] The Stamp Tax Law provides that payment of the environmental taxes

---

[790] Oficio 000328 from the Ministry of Environment to the CVG, 16 May 2007, **Exh. C-15**, p. 2 (bold original, emphasis added).

[791] Oficio from the Vice-Minister of Environmental Administration and Governance to the CVG, 16 May 2007, **Exh. C-205**.

becomes due "simultaneously" with the issuance of the relevant document, in this case the Environmental Permit.[792] In the Tribunal's view, the fact that the Ministry of Environment requested the payment of the bond and the stamp taxes on 16 May 2007 could be construed as meaning that the Ministry had already made a favorable decision with respect to the environmental Permit. Crystallex's expectations that it would be granted the Permit promptly after the posting of the bond and the payment of the taxes was thus reasonable and legitimate. Such expectation was later frustrated by the Respondent through the *manner* in which the Permit was denied and the MOC was rescinded, to which the Tribunal will revert later.

### ii.   Did the approval relate to the entire project or only to preliminary works?

565.    One further area of disagreement between the Parties concerns whether the approval extended to the whole EIS or was only limited to preliminary works.[793]

566.    The Tribunal starts by looking at the EIS submitted by Crystallex to the CVG at the end of 2003, which the CVG then transmitted to the Ministry of Environment on 15 April 2004. This EIS clearly related to the whole project, i.e. it addressed the impact of the entire Las Cristinas project, from construction through operation to mine closure.[794]

567.    It is true that initially Crystallex and the CVG appeared to consider that quicker progress could be made if an early authorization could be obtained for certain preliminary works that would prepare the site for major construction works. This is reflected in the CVG's letter of 15 April 2004 to the Ministry of Environment, transmitting the EIS.[795] Crystallex claims, however, that in late 2004 this request was "abandoned" as the Ministry took the view that the EIS for Las Cristinas had to be approved before it would permit works to be undertaken that would impact the environment.[796]

568.    Upon review of the evidence in the record, the Tribunal is convinced that the initially pursued preliminary works request was abandoned at a later stage, after which the

---

[792] The obligation to pay the stamp taxes related to the Environmental Permit is established in Article 16 of the Stamp Tax Law. The taxable event for such duties is established in Article 27 of that same law:

> "The duties referred to in Articles […], 16 […] of this Law become due simultaneously with the issuance of this document […]".

Stamp Tax Law, 5 October 1999, published in the *Gaceta Oficial* No. 5416 on 22 December 1999, **Exh. C-90**, Articles 16 and 27.

[793] For the Parties' detailed position, see *supra* Sections V.B.1.b and V.B.2.b.

[794] SNC-Lavalin, Environmental Impact Study, April 2004, **C-131(bis)**.

[795] *See* Oficio PRE-219/2004 from the CVG to the Minister of the Environment, 15 April 2004, **Exh. C-11**.

[796] Reply, para. 172.

discussions between the Venezuelan authorities and Crystallex centered on a Permit for the entire project. This emerges in particular from the following documents on the record. First, the 22 December 2006 minutes of the meeting between MINAMB, Gold Reserve and the CVG make clear that on that occasion the Ministry of Environment committed to two things: (1) a short-term track ("three months") for the issuance of permits to the CVG (Crystallex) and Gold Reserve; and (2) a long term track ("approximately 3 years") for two joint CVG (Crystallex)/Gold Reserve projects (the "Community Landing Airstrip" and the "Sanitary Landfill designed for the area (San Isidro Parish)").[797] The Tribunal finds it noteworthy that the list of works for which the CVG (and Crystallex) were to receive a permit on a short-term basis included "construction of the plant", "opening pits", and "aggregates plant".[798] This confirms that the CVG/Crystallex and the Ministry were at that time no longer discussing a Permit for preliminary works, but a Permit for the whole project. The "Answers to technical observations"[799] provided by Crystallex to the Ministry in February 2007 following the 22 December 2006 meeting do not in any way change the Tribunal's conclusions.[800]

569.    As a supplemental reason but also importantly, the Tribunal finds support for its conclusion that the approval related to the entire project in the very Permit denial letter of 14 April 2008, which is unequivocally intended to deny Crystallex's right to exploit

---

[797] MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**, p. 1.

[798] See MINAMB, Gold Reserve and the CVG Meeting Minutes, 22 December 2006, **Exh. R-60**, p. 1: "Short Term (Immediate - Priority for processing of permissions) Commitment from MINAMB: three months with partial deliveries. (MINAMB's requirements shall be taken into account for carrying out this commitment)

CVG

- Access roads to the projects
- Electrical connection
- Deforestation for infrastructure and service works
- Construction of the plant
- Adjustments to current airstrip
- Construction of the channel
- Opening pits
- Aggregates plant"

(emphasis added).

[799] Answers to the technical observations made by the Ministry of the Environment and Natural Resources to the Las Cristinas Project, February 2007, **Exh. C-198(bis)**.

[800] Indeed, despite the possible confusion, the document refers to "[d]ocuments requested in Minutes of 22/12/2006 for initiating proceedings with respect to environmental authorizations for the following service works", and refers to a list of "service works" which includes, *inter alia*, "Construction of processing plant", "Construction of diversion channel", "Opening of quarry (activation)", and "Aggregate plant". See **Exh. C-198(bis)**, p. 5 of 444.

the mine, and not preliminary works.[801] In other words, if the Respondent's position was correct (i.e., that the approval in the 16 May 2007 letter only related to preliminary works and could only have led to the issuance of an equally limited preliminary permit), then presumably the Permit denial would have had the same scope, i.e. it would have been a Permit denial relating to preliminary works if these were the subject-matter of the discussions. This is clearly not the case. Through the Permit denial letter, the Venezuelan authorities considered, "in view of all the legal and technical considerations expressed, not to proceed with [Crystallex's] application to exploit gold in the Imataca Forest Reserve",[802] and decided "not to approve the Affectation of Natural Resources for the exploitation of gold in the Municipality of Sifontes in Bolivar State".[803]

570. The Tribunal thus concludes that the Permit which was to be "handed over" pursuant to the 16 May 2007 letter related to the entire project, and not just to preliminary works.

### iii. Did the Permit promised in the 16 May 2007 letter relate to exploration or to exploitation?

571. It is further disputed between the Parties whether the promised Permit, to which the 16 May 2007 letter refers, concerned the exploration or the exploitation of gold.

572. The Tribunal observes that documents in the record make reference to both "exploration" and "exploitation". The 16 May 2007 letter notably refers twice in the text (and once in the letterhead) to "exploration" (and not to "exploitation"), and so do a few other documents.[804]

573. However, other documents in the record, some contemporaneous to the 16 May 2007 letter, specify that what was being discussed between the Parties was "exploitation". For example, the cover letter by the CVG transmitting the bond to the Ministry refers to the "Exploitation project".[805] A further particularly important document is the letter from the Director of the Ministry's Office of Permissions to the CVG asking for some formal corrections in the Bond, where the Ministry expressly refers to the exploitation

---

[801] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**.

[802] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 3.

[803] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 4 (capital letters omitted, bold omitted).

[804] See the documents mentioned *supra* at paras 367-371.

[805] Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20**, p. 0002.

project.[806] The very Permit denial letter, discussed in the preceding section, is to the same effect.[807]

574.    Despite the possible confusion deriving from the use of "exploration" in certain documents, based on the preponderance of the evidence and having also noted that Crystallex (and before it, Placer Dome) had already completed the exploration phase, the Tribunal concludes that the promised Permit was for "exploitation".

*** 

575.    In conclusion, the Tribunal rejects the claims of legitimate expectations as articulated by the Claimant, with the exception of the one based on the 16 May 2007 letter. In this respect, the Tribunal finds that the specific representation contained in the Ministry of Environment's letter of 16 May 2007 created a legitimate expectation in Crystallex that the procedure of the permitting process would go ahead for the exploitation of gold relating to the entire Las Cristinas project. As the Tribunal will clarify further, the circumstances leading to the denial of the Permit are considered in violation with the obligation to treat the investor fairly and equitably, for the reasons which will be explained below when discussing the other "strands" under the FET. As such, the denial is relevant for the legitimate expectations claim as upheld by the Tribunal, as the Permit denial letter of 14 April 2008 frustrated such legitimate expectations, for the reasons which will be explained below.

c.    **Arbitrariness, lack of transparency and consistency**

576.    The Tribunal now addresses whether Venezuela's conduct was arbitrary, lacking transparency and consistency.

577.    It is beyond peradventure that a conduct that is arbitrary is contrary to FET,[808] whether or not a separate provision on prohibition of "arbitrary treatment" is present in the

---

[806] Letter from the Ministry of the Environment to the CVG, 23 August 2007, **Exh. C-390**.

[807] See Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25** (deciding "not to approve the affectation of natural resources for the exploitation (*explotación*) of gold in the Municipality of Sifontes in Bolivar State"). In addition, see also Oficio 010303-2305, from the Ministry of Environment and Natural Resources to the CVG, 29 December 2004, **Exh. C-159**; Letter from the CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exh. C-20**; Letter from the CVG to the Ministry of Environment, 31 October 2007, **Exh. C-213**; Communication PVE/059-08 from the CVG to Crystallex, 13 May 2008, **Exh. C-227**. See also Oficio 2765 from the Director-General of the Administrative Office of Permissions of the Ministry of the Environment to Crystallex, 29 March 2008, **Exh. C-30**, p. 0010 (correcting in the Permit denial letter of 14 April 2008 the words "exploration of diamonds" with "*exploitation* of gold").

[808] See the awards discussed *supra* at paras 540-542.

treaty.[809] An authoritative definition of arbitrariness was given by a Chamber of the ICJ in the *ELSI* case, where the Court stated that:

> "Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law. [...] It is a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety."[810]

578.    In the Tribunal's eyes, a measure is for instance arbitrary if it is not based on legal standards but on excess of discretion, prejudice or personal preference, and taken for reasons that are different from those put forward by the decision maker.[811]

579.    Furthermore, as noted by a number of arbitral tribunals, FET "requires that any regulation of an investment be done in a transparent manner [...]".[812] The Treaty expressly deals with one aspect of transparency in Article XV.[813] Linked to the notion of transparency is the concept of consistency, which requires that "[o]ne arm of the State cannot [...] affirm what another arm denies to the detriment of a foreign investor".[814]

580.    With those principles in mind, the Tribunal will now review Venezuela's conduct vis-à-vis Crystallex. Before delving into the facts of the case, the Tribunal wishes to make

---

[809] See *CMS Gas Transmission Company v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, **Exh. CLA-45**, para. 290 ("The standard of protection against arbitrariness and discrimination is related to that of fair and equitable treatment. Any measure that might involve arbitrariness or discrimination is in itself contrary to fair and equitable treatment"). See also A. Newcombe & L. Paradell, *Law and Practice of Investment Treaties* (Kluwer, 2009), p. 301 ("Where an IIA accords fair and equitable treatment (expressly or where the treatment guarantee is conferred based on an MFN clause), a separate prohibition on impairment by unreasonable, unjustifiable or arbitrary measures appears to be superfluous. A measure that involves impairment of this kind will breach fair and equitable treatment.").

[810] *Elettronica Sicula SpA (ELSI)* (United States v. Italy) (1989) ICJ Reporter 15, 20 July 1989, Exh. **CLA-85**, para. 128.

[811] See also *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, **Exh. RLA-115**, para. 303.

[812] *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, **Exh. CLA-185**, para. 570. See also *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, **Exh. CLA-51**, para. 128; *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, paras 307-309; *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, **Exh. CLA-73**, para. 284 (listing among the factors to be considered under the FET standard "whether there is an absence of transparency in the legal procedure or in the actions of the State"), cited with approval in *Bosh International Inc. and B&P Ltd. Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, **Exh. RLA-135**, para. 212.

[813] Article XV of the Treaty, entitled "Transparency", reads: "Each Contracting Party shall, to the extent practicable, ensure that its laws, regulations, procedures, and administrative rulings of general application respecting any matter covered by this Agreement are promptly published or otherwise made available in such a manner as to enable interested persons and the other Contracting Party to become acquainted with them".

[814] *EnCana Corporation v. Republic of Ecuador*, Award, 3 November 2006, **Exh. CLA-157**, para. 158.

some preliminary observations, which are relevant especially when it comes to evaluating the Respondent's conduct in relation to the permitting process.

581. First, the Tribunal wishes to highlight that it is a state's sovereign prerogative to grant or deny a permit, particularly one that affects natural resources over which the state has sovereign rights. The Tribunal thus does not share the Claimant's presentation of the issues in terms of it being "entitled" or having a "right" to a Permit. From the point of view of international law, a state could not be said to be under an obligation to grant a permit to affect natural resources, and would always maintain the freedom to deny a permit if it so considers. It would, however, incur liability under the BIT if the treatment of the investor in the process leading to the denial was unfair and inequitable, because it was arbitrary, lacking transparency or consistency. Thus, Venezuela's contention that Crystallex had no "right" to a Permit appears in principle correct to the Tribunal, because of course the "right" was conditioned on the Administration granting the necessary approvals. These approvals, however, needed to be granted or denied *after conducting a procedure which was not arbitrary and in which the applicant was treated fairly*.

582. This point leads the Tribunal to make a further preliminary observation on the applicable standard of review applicable in a case such as here, where an investor alleges that it was wrongfully denied a permit, and the host state contends that it was entitled to deny it based on a number of legitimate concerns. The Parties disagree in particular as to whether Crystallex did or did not meet "adequately" the requests and "adequately" satisfied the concerns raised by the Venezuelan authorities, in particular by the Ministry of Environment, during the permitting process,[815] concerns which were then adduced as reasons for denying the Permit.

583. The Tribunal believes that in matters where a government regulator and/or administration is called to make decisions of a technical nature, those government authorities are the primary decision-makers called to examine the reports presented by the applying investor and the available scientific data. As such, those governmental authorities should enjoy a high level of deference for reasons of their expertise and competence (which is assumed to be present in those institutions called to make the relevant decisions) and proximity with the situation under examination. It is not for an investor-state tribunal to second-guess the substantive correctness of the reasons which an administration were to put forward in its decisions, or to question the importance assigned by the administration to certain policy objectives over others.

584. That being said, it is equally clear that deference to the primary decision-makers cannot be unlimited, as otherwise a host state would be entirely shielded from state

---

[815] Compare, *e.g.*, C-PHB, Section III.D. ("Crystallex provided all the information it was asked to provide") with R-PHB, paras 23-34 (discussing whether Crystallex adequately addressed the Ministry of Environment's concerns).

responsibility and the standards of protection contained in BITs would be rendered nugatory. As the Tribunal in *Unglaube v. Costa Rica* noted,

> "deference, however, is not without limits. Even if such measures are taken for an important public purpose, governments are required to use due diligence in the protection of foreigners and will not be excused from liability if their action has been arbitrary or discriminatory".[816]

585.    Differently put, while the Tribunal will refrain from making findings as to whether or not the concerns expressed by the Ministry were "adequately" addressed by the Claimant, or whether the reasons put forward by the Respondent in denying the Permit were substantively valid, the Tribunal will, in its review of the government conduct, assess whether there have been serious procedural flaws which have resulted in the Permit being arbitrarily denied, or in the investor being treated non-transparently or inconsistently throughout the process and thereafter. It is with this standard of review in mind that the Tribunal examines now the overall process between Crystallex and the Venezuelan authorities.

586.    The review of the record shows that the first years of exchanges between Crystallex and the various actors involved on the Venezuelan side were characterized by a constructive dialogue and reasonably cooperative interactions. It is evident to the Tribunal that those individuals and institutions working with Crystallex "on the ground" supported the project and showed considerable efforts of cooperation towards the company. This is particularly the case of Crystallex's contractual partner, the CVG, as well as the Ministry of Mines, including in the early times key individuals such as Ms. Laura Paredes, then Director-General of Mining Concession at the Ministry of Mines.[817] Individuals holding positions which had no direct incidence on the permitting process, but who nonetheless were involved as part of the state structure and had a broader interest in the process moving forward, such as the President of the National Assembly Committee on Economic Development, Ricardo Gutiérrez, also showed their support on several occasions.

587.    It is also obvious that the permitting process was a very complex procedure involving different government agencies (at both national and local level) and various and sometimes diverging interest groups (indigenous peoples, the local communities, the so-called small miners and their families, etc.). It is thus not surprising that several years passed from the moment when the MOC was signed to the moment where Crystallex probably got the closest to obtaining a Permit (16 May 2007). It is equally not surprising that voluminous exchanges, reports and correspondence were sent and examined by

---

[816] *Marion & Reinhard Unglaube v. The Republic of Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award, 16 May 2012, **Exh. CLA-169**, para. 247 (internal footnote omitted).

[817] See, *e.g.*, Memorandum from Laura Paredes, Director-General of Mining Concession to José Khan, Minister of Basic Industries and Mines, 21 November 2006, **Exh. C-368** (noting that Crystallex had "complied with all its pre-construction obligations" and urging the issuance of the Permit).

both sides, and that the Venezuelan authorities sought on numerous occasions clarifications, integrations and corrections to the plans, projects and reports presented throughout the years.

588.  The Tribunal is of the view that, up to the 16 May 2007 letter, the investor was overall treated in a straightforward manner. As the Tribunal has already explained, that letter created a legitimate expectation in the Claimant that it had fulfilled all the conditions required to obtain the long-sought Permit.

589.  Less than one year later, the Permit denial letter of 14 April 2008 manifested a complete *volte-face* to the previous course, and in particular to the promise contained in the 16 May 2007 letter. As one of the key documents in this arbitration, the Permit denial letter warrants closer scrutiny.

590.  The Permit denial letter, extending to a mere two and a half pages, purports to set out the alleged reasons for denying the Permit. It refers to "serious environmental deterioration in the rivers, soils, flora, fauna and biodiversity in general in the plot, caused by uncontrolled mining activity due to the high presence of miners, generating passive or environmental damage that negatively affect[s] the ecosystems in the area with unpredictable characteristics".[818] It considers, *inter alia*, that "the exploitation of gold and copper in the Imataca Forestry Reserve by the representative company constitutes, according to the environmental studies carried out recently in the area, a considerable [e]ffect on the Forest which would generate irreversible damage to the environment, combined with the effects that on a worldwide level are causing global warming, a phenomenon that our country cannot escape".[819] The Permit denial letter concludes with the decision "not to approve the Affectation of Natural Resources for the exploitation of gold in the Municipality of Sifontes in Bolivar State".[820]

591.  There is no question that Venezuela had the right (and the responsibility) to raise concerns relating to global warming, environmental issues in respect of the Imataca Reserve, biodiversity, and other related issues. The Tribunal, however, believes that the way they were put forward by Venezuela in the Permit denial letter presents significant elements of arbitrariness and evidences a lack of transparency and consistency.

592.  To begin with, the reference to global warming is particularly troublesome. In the concrete circumstances of this case, such concern had not been raised a single time in the innumerable occasions of exchanges occurred between the Claimant and the Venezuelan authorities throughout the 4-year review process. At the hearing, Mr. Pedro

---

[818] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 0002.

[819] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 0002.

[820] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 0004 (capital letters omitted, bold omitted).

Romero, who alleged to have helped prepare the so-called Romero Report (on which see paras. 595 - 597 *infra*), acknowledged that there is nothing in the administrative file relating to any analysis of the issue of global warming or carbon emissions in relation to the Las Cristinas project.[821] To raise this concern for the first time in an attempt to justify the denial of the Permit is a clear example of arbitrary and unfair conduct.

593.    The Permit denial letter also mentions other concerns, such as the effect of illegal mining or alteration of hydrology as apparent justifications for denying the Permit. While these concerns were indeed raised throughout the review process, the letter invokes them in vague terms and without any supporting authority. For the Tribunal, Venezuela had the burden to elucidate the reasons for denying the Permit with some kind of supporting data to explain why it was reaching the conclusion it reached. This is especially important as a general matter because only a precise and reasoned denial could afford Crystallex a true opportunity to challenge that denial (as the denial letter itself states),[822] or to remedy the deficiencies of the project if it was to resubmit a more "adequate" EIS (as at that time the MOC continued to be in force and thus a corrected resubmission could not be ruled out). In this respect, it is particularly surprising that the letter does not refer to a single page, chapter, or even study as a whole of what was submitted by Crystallex throughout the years.

594.    Instead of providing any scientific data to justify its conclusion, the letter refers to "environmental studies carried out recently in the area", to "research carried out by the

---

[821] See Cross-Examination of P. Romero, Tr. [Jurisdiction and Merits], Day 5, 1528:7–11:

> "Q: Mr. Romero, can you tell me anywhere in the Administrative File, anywhere in the record of this arbitration where we will find a reasoned analysis of the question of global warming and carbon emissions in relation to this project? Where can we find it?
>
> […]
>
> Questions from the Tribunal to P. Romero, Tr. [Jurisdiction and Merits] (English), Day 5, 1529:3–10:
>
> PRESIDENT LÉVY: Mr. Romero, another way to put the question, have you seen, yourself, any document, report, memorandum – whatever you want – referring to the effect of the Las Cristinas Project on global warming?
>
> P. Romero: Specifically going to Las Cristinas, no, but global warming is an issue that we're looking at in the Ministry constantly […]".

[822] See Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, p. 0004 ("I decide […] [t]o notify the interested party that it can enter an Appeal for Reconsideration of the content of this Administrative Order within fifteen (15) days following the day of notification, to the official who handed it down, in accordance with the provisions of Article 94 of the Organic Law of Administrative Procedures").

specialists competent in the matter", and to "technical inspection reports".[823] However, no copy of any of those "studies", "research" or "reports" were attached to the Permit denial letter. Nor does the letter identify those reports, their authors or the precise recommendations contained therein. Without more detailed specifications or explanations, these indeterminate references are, by any standards, entirely incapable of providing any possibly sound justification for a decision.

595.    The Tribunal further notes that the only internal report on which the Permit denial letter appears to be based is the so-called Technical Inspection Report of September 2006 (or "Romero Report"), which recommended the denial of the Permit.[824] At the hearing and in its post-hearing submission, the Claimant has insisted on the fraudulent nature of this document.[825] In the Tribunal's view, while the incongruities surrounding the authenticity of the Romero Report raise indeed serious doubts, the Tribunal need not decide whether the document was fraudulently fabricated *ex post facto*, because the Tribunal is in any event convinced that by its own terms the Romero Report is as deficient as the Permit denial letter.

596.    Indeed, the Romero Report, which is a few pages longer than the Permit denial letter and is endowed with three photographs of the Las Cristinas area, admittedly refers to the EIS in a few passages. Upon scrutiny, those references to the EIS, however, amount to no more than paying lip service to such document. Like the Permit denial letter, no scientific data or studies are attached to (or even referred to in) the Romero Report, and the Report displays the same level of generality and vagueness as the Permit denial letter.

597.    The Tribunal is unable to see how thousands and thousands of pages submitted by Crystallex, ensuing from years of work and millions of dollars of costs, could be so blatantly ignored in both the Romero Report and the subsequent Permit denial letter. The huge efforts spent by Crystallex in cooperative coordination, at least up to a certain time, with its main partner, the CVG, entitled Crystallex to have its studies properly assessed and thoroughly evaluated. In order to comply with treatment that can be termed "fair and equitable", such a dramatic halt to the project would have required more than a few pages of nebulous statements—particularly given that the Ministry had promised to "hand over" the Permit less than a year before. In light of the foregoing, the Tribunal cannot but conclude that the Permit denial letter and the Romero Report on which the first appears to be based are so fundamentally deficient that, to the eyes of a reasonable third person, they "surprise a sense of juridical propriety", to use the words of the ICJ in *ELSI*. For the same reasons, the Permit denial letter frustrated

---

[823] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to the CVG, 14 April 2008, **Exh. C-25**, pp. 0002-0003.

[824] Technical Inspection Report noting environmental damage, September 2006, **Exh. R-52**, p. 0032.

[825] CHB, paras 189-201.

Crystallex's legitimate expectation arising out of the specific promise contained in the 16 May 2007 letter.

598.    Furthermore, the Tribunal considers that the process leading to the Romero Report and the Permit denial was also tainted by a serious lack of transparency towards the investor in many respects. If the Ministry of Environment had considered global warming as an issue in 2006 at the time of the Romero Report, it is highly problematic that it never disclosed this to Crystallex until 14 April 2008, let alone invited the company to comment on it. Furthermore and importantly, it constitutes non-transparent and inconsistent conduct on the part of the Ministry of Environment to invite the investor to pay a substantial bond and the environmental taxes through the 16 May 2007 letter, if at the time of the Romero Report—i.e. eight months before—the same Ministry *had already come to the conclusion that the Permit had to be denied*. Similarly noteworthy is the fact that, in spite of the inconsistency between the Permit denial letter of 18 April 2008 and the 16 May 2007 letter (which had concluded that the Permit "will be handed over"), the subsequent denial does not even attempt to explain the departure from the conclusions reached only a few months before by the same Ministry.

599.    The Respondent was unable to provide convincing explanations to these inconsistencies. What appears to the Tribunal from the record is that, not long after the favorable 16 May 2007 letter, changes in policy at the national level started to have repercussions over the permitting process.[826] While the individuals and institutions "on the ground" (i.e., the CVG and certain officials at the Ministry of Mines up to a certain point), who were more closely involved in the project with Crystallex, continued to be in favor of the project, political pressure regarding the project from the highest Venezuelan officers began to pervade the process.

600.    For example, on 15 August 2007, the President of the National Assembly Commission, Mr. Gutiérrez, discussed the status of the project of Las Cristinas in a radio interview and made it clear that the process was not anymore solely a matter of technical assessment at the level of the competent ministerial offices, but involved now the very President of Venezuela.[827]

601.    Following the Permit denial, the general political "climate" became more and more unfavorable to Crystallex.

---

[826] See, *e.g.*, "La Comisión de Desarrollo Económico del Parlamento: Exhortarán al Ejecutivo reactivar proyecto minero Las Cristinas", *El Bolivarense*, 14 August 2007, **Exh. C-18** ("He [Deputy Gutiérrez] said that at the meeting with the Vice-Minister for the Environment, Merli Garcia, the official assured him that all the permits have been processed and that the technical studies have been ready since June of last year. She went on to mention, however, that *due to press reports that questioned the decision, authorization of the environmental permits would be granted directly by the Head of State*", emphasis added).

[827] Transcript of VHeadline Venezuela newshour interview of Ricardo Gutiérrez, 15 August 2007, **Exh. C-19**, page 0004 ("permits have already been made by the Environment Ministry, *and the president [Chávez] can speed this up*", emphasis added).

602.    Thus, around the time the Vice-Minister of Environment referred to Crystallex's latest supplemented submissions informing it "that having fully studied the body of ideas proposed in the aforementioned document, which tend to adhere to Government guidelines in both environmental and social matters, this Office considers the evaluation by our technicians to be useful in making a decision regarding whether to take on the "Las Cristinas" Gold Project",[828] President Chávez announced on 19 September 2008 that it was "taking back big mines" in Guayana, clearly referring to Las Cristinas:

> "In Guayana for example, we are taking back big mines, and one of them is one of the biggest in the world. And do you know what it is? It's gold, it's gold! That has been taken away from our country for a long time, the gold".[829]

603.    Less than two months later, an official press release from the Ministry of Mines announced the plan to seize Las Cristinas to boost Venezuela's international reserves.

> "He [Minister Rodolfo Sanz] added that the Las Cristinas mine, which used to be managed by transnational company Crystallex, is expected to begin being exploited in 2009. He said the mine will be reclaimed and operated by the state.
>
> Las Cristinas is considered one of Latin America's most important gold deposit and one of the largest in the world. With a capacity of approximately 31 million ounces of gold, its estimated value is $35 billion.
>
> [...]
>
> Sanz insisted on the necessity of recovering Venezuela's largest deposits, the objective being to increase the production capacity of strategic minerals, such as gold, diamond, bauxite and uranium.
>
> The government of Venezuela representative admitted that the production capacity of gold had increased during this year, having reached its goal of 1.5 tons of gold.
>
> 'As a result of the financial crisis spreading worldwide, we must try to recover our gold in order to increase our international reserves' [...]".[830]

604.    The Tribunal is struck by the fact that the press release made no mention whatsoever of the environmental concerns referred to in the 14 April 2008 Permit denial letter.

---

[828] Oficio 1719 from the Vice-Minister of Environmental Administration and Government to Crystallex, 20 August 2008, **Exh. C-36**.

[829] See "Chávez asegura que está 'recuperando' las grandes minas de oro", *El Universal*, 19 September 2008, **Exh. C-37**, p. 0002.

[830] Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, p. 0003.

605. A peak of the politically adverse statements against Crystallex was reached on 13 January 2009 when President Chávez in his Annual Address to the Nation announced the takeover of Las Cristinas and development through VenRus:

> "[…] this year the Venezuelan State has taken over the exploitation and control of the gold deposits of Las Cristinas at kilometer 88 in the State of Bolívar; one of the largest gold deposits on the American continent. Cristinas is estimated to have approximately 35.2 million ounces of gold, that is 1,094 metric tons of estimated reserves. Of this reserve, 24.5 million ounces, or 762 tons, are classified as proven.

> In this way, the Venezuelan State controls 30,000 million dollars, which is the current estimated worth of the deposit. Currently, 30 thousand. The Las Cristinas concessions are organized into five parts: Cristina IV, Cristina V, Cristina VI, Cristina VII and Brisas del Cuyuni. They are under the control of socialism, for the development of economic growth for the national development. […]

> In mining we have created this year (2008) the mixed company VenRus, with Russia, a Russian company and a Venezuelan company, a mixed company for the deposits of Las Cristinas".[831]

606. In the two following years (2009-2011), Crystallex was subject to a "roller-coaster" of contradictory and inconsistent statements from the Venezuelan authorities. On the one hand, Crystallex received several confirmations from the CVG that the MOC remained in "full force and effect",[832] and that it had thus to continue bearing the costs associated with the control of the Las Cristinas site. On the other hand, around the same time, President Chávez stated in the weekly TV show "Aló Presidente" on 25 April 2010 that:

> "If we are going to exploit gold, we will have to nationalize all of it, recuperate and put an end to concessions, which led to degeneration […]".[833]

---

[831] Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53**.

[832] See Letter from the CVG to Crystallex, 2 March 2009, **Exh. C-55** ("Taking into account that the normative act that gave origin to the [MOC] has not been revoked or replaced, and that the contract is valid for 20 years and that Crystallex has been fulfilling the obligations assumed under the contract, we hereby inform you that the contract is fully valid and in the process of obtaining the required permits from the competent authorities for the initiation of the development of the Project"); Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64** ("Given that the contract has a duration of twenty (20) years and that the administrative act underlying the contract has not been replaced or repealed, it is clear that the same contract remains in full force and effect").

[833] Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information (extracts), 25 April 2010, **Exh. C-62**.

607.    On 17 October 2010, the Venezuelan state news agency (*Agencia Venezolana de Noticias*) reported the following words pronounced by President Chávez during a state visit to Belarus:

> "Chávez announced the nationalization of the Las Cristinas and Las Brisas mines. 'Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies, I announce to the world that the revolutionary Government recuperated it, together with the Las Brisas mine. These mineral resources are for the Venezuelan people, not for transnationals,' he said."[834]

608.    Minister of Mines Khan followed up on the threat a few months later and. In his function of President of the CVG, Minister Khan rescinded the MOC, for reasons of "opportunity and convenience" and because Crystallex had paralyzed activities for over a year.[835]

609.    Having regard to those political statements, it can be safely inferred that the change of policy with respect to mining at the highest level of the Venezuelan state had a decisive bearing on the permitting process first (with the denial of the Permit in 2008) and the subsequent termination of the MOC in February 2011.

610.    The Tribunal will come back to the reasons mentioned in the MOC rescission when dealing with expropriation.[836] For the purposes of the FET analysis, the Tribunal finds that, within the framework of its assessment of Venezuela's conduct, the MOC rescission was part of a treatment that was unfair and inequitable towards Crystallex. The Tribunal recalls that it is not called upon to pass judgment on whether there were any contract breaches in relation to the MOC.[837] Its role is rather to assess whether the treatment in respect of the MOC rescission (among other events) evinces elements of arbitrariness or lack of transparency or consistency, which have resulted in a breach of the FET standard contained in the Treaty.

611.    The Tribunal believes that the documents in the record clearly show that the MOC rescission was part of the unfair and inequitable treatment suffered by Crystallex on the part of Venezuela. The Tribunal refers here in particular to the internal correspondence between CVG officers following the MOC rescission.[838] In an internal communication dated 28 February 2011, the legal department of the CVG requested from its Vice-

---

[834] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**.

[835] Oficio PRE 004-11 from the President of the CVG to Crystallex, 3 February 2011, **Exh. C-67**; CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**.

[836] See *infra* Section VII.D.3.b.

[837] See *supra* paras 475-480.

[838] Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

President "information […] regarding the reasons why Crystallex International Corporation has paralyzed activities for over one (1) year".[839] The legal department sought this information "in order to support the administrative record in question",[840] making it thus clear that it was lacking such basic information. The response supplied by the Vice-President, Mr. Colmenares, on 17 March 2011 was that Crystallex had executed all of its tasks under the MOC with the exception of gold exploitation, as it did not have a Permit:

> "[A]ccording to reports from the Liaison Office […] Crystallex International Corporation has completed the various tasks set forth in said Operation Contract, with the exception of the tasks corresponding to the construction and development stage of the exploitation phase […] due to the fact that it was not granted the Permit […]".[841]

612.    This internal exchange evinces that the CVG officers, the ones who had been working more closely with Crystallex on the project, were, at a minimum, not aware of any contractual breach on the part of Crystallex and, possibly, were raising doubts about the possibility and lawfulness of the rescission. In the eyes of the Tribunal, the exchange displays, both in itself and in conjunction with further evidence in the record, the serious procedural flaws which Crystallex was subjected to in its dealings with the Venezuelan authorities.

613.    Furthermore, by letter of 15 August 2010 (i.e., 6 months *before* the rescission), the CVG had confirmed to Crystallex that the MOC remained "in full force and effect".[842] The Tribunal considers that it cannot be reconciled with a "consistent" behavior on the part of the CVG to tell Crystallex 6 months before the rescission that the MOC was in full force and effect, *without even hinting at any contractual violations*, and to reproach 6 months thereafter (in February 2011) that Crystallex had paralyzed activities *for one year*.

614.    In the Tribunal's eyes, all of these exchanges show that the rescission of February 2011 was not based on legal standards but based on reasons that are different from those put forward by the decision-maker. This constitutes a clear form of arbitrary conduct and as such is contrary to FET.

---

[839] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[840] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[841] Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[842] Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64**.

### d.    Discrimination, due process, abusive conduct and bad faith

615.    As the Tribunal has already stated, non-discrimination and due process are central components of FET.[843] They require separate consideration from the Tribunal in this section, insofar as the Parties have made specific allegations related to those issues.

616.    To show discrimination the investor must prove that it was subjected to different treatment in similar circumstances without reasonable justification,[844] typically on the basis of its nationality or similar characteristics. The Tribunal believes that, under this standard, the Claimant has not sufficiently established that it was discriminated against by Venezuela. The Tribunal is of the view that no adequate comparator was presented to its attention which would justify a conclusive finding on discrimination. It is true that evidence on the record shows that Venezuela was considering at some point to enter into a joint venture with Rusoro. However, the subsequent events concerning that joint venture in relation to Las Cristinas are not sufficient to found a discrimination claim. Furthermore, it is undisputed that Venezuela subsequently entered into a contractual relationship with the Chinese company CITIC. The Tribunal, however, does not find this to be an appropriate comparator either: the record does not furnish much evidence about the exact circumstances around the CITIC contract and the subsequent conclusion of a differently framed contract cannot easily be compared to the issue of the treatment of Crystallex within the lifespan of the MOC. In other words, the Claimant has not sufficiently established that the fact that Venezuela has entered into a contractual relationship with a Chinese company after the fall-out of its relationship with Crystallex proves discriminatory conduct against Crystallex. The Tribunal has of course not overlooked the repeated and rather derogatory references to "transnationals" and "transnational companies" in the President's and some Ministers' statements.[845] While the Tribunal is not unsympathetic to Crystallex's complains that it was targeted based on its "transnational" nature and cannot exclude that discrimination actually occurred under the circumstances, it is of the view that a showing of discrimination would require more conclusive evidence of facts which are not reflected in the record.

617.    The Claimant has further placed a certain emphasis, for this and other claims, on the so-called VenRus Presentation.[846] The Tribunal has given such document due

---

[843] See *supra* paras. 540-542.

[844] See *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 313.

[845] See Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, page 0003 ("[T]he Las Cristinas mine, which used to be managed by transnational company Crystallex, is expected to begin being exploited in 2009. [...] [T]he mine will be reclaimed and operated by the State"); "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias*, 17 October 2010, **Exh. C-65**, page 0003 ("Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies. I announce to the world that the revolutionary Government recuperated it, together with the Las Brisas mine. These mineral resources are for the Venezuelan people, not for transnationals [...]").

[846] "Proposal for the Project: 'Brisas de Las Cristinas'", undated, **Exh. C-439**.

consideration. It has, however, arrived at the conclusion that the Claimant has not sufficiently established that this document is indeed attributable to Venezuela, rather than to its possible Russian partner.[847] Under these circumstances, there is no sufficient ground for the Tribunal to find a possible supplemental breach of FET based on the VenRus Presentation.

618.    In relation to the subsequent contractual relations which Venezuela entered into with the Chinese state-owned company CITIC, the Tribunal is equally unconvinced that this is evidence of Venezuela's abusive conduct (or even bad faith, as the Claimant contends). Proof of this would entail supplying specific evidence of such conduct, which the Claimant has not been able to sufficiently adduce. The Claimant's specific claims of abusive conduct and bad faith in relation to the CITIC agreements are thus denied.

619.    The Tribunal finally deals with certain due process allegations made by the Claimant in respect of the Permit denial. In this respect, the Claimant complains of both the Director of Permissions' decision on Crystallex's motion for reconsideration and the Ministry's failure to reply to the subsequent hierarchical appeal, and alleges that its due process rights have been violated by those acts and omissions. The Tribunal is not insensitive to the Claimant's dissatisfaction with the ruling on the motion for reconsideration (essentially based on Crystallex's alleged lack of standing) and with the Ministry's failure to render a decision on the hierarchical appeal. However, it notes also the Respondent's position that the Ministry's failure to give a response to the appeal within 90 days entitled Crystallex to consider the appeal denied under Venezuelan law, thus entitling the investor to further recourse before the courts. It is undisputed that Crystallex did not exercise such recourse.

620.    The Tribunal has reviewed the Venezuelan law experts' conclusions on this point. Venezuelan law expert Prof. Iribarren has explained that an appeal is deemed denied or rejected under Venezuelan law where a Minister does not reply to a hierarchical appeal within a specific time-frame.[848] At the hearing, the Claimant's Venezuelan law expert,

---

[847] At the hearing, both Minister Khan and Laura Paredes vigorously denied any involvement on the part of the Ministry of Mines or VenRus in the drafting of the VenRus Presentation. See Tr. [Jurisdiction and Merits], Day 3, 797:16-798:4 and 798:12-799:5 (Khan); Tr. [Jurisdiction and Merits], Day 4, 1267:21-1268:4 (Paredes).

[848] ER Iribarren, para. 54 ("on May 12, 2008, a motion for reconsideration was filed before the Director General of the Permitting Office of the Ministry of Environment, which was ruled inadmissible. Against this decision, the current claimant filed an appeal before the Min[i]ster of the Ministry of Environment, *which was also dismissed as a result of the adverse effect of administrative silence*", emphasis added). See also Tr. [Jurisdiction and Merits], Day 7, 1788:19-1789:13 (Iribarren) ("Crystallex brought a hierarchical remedy before the Ministry of the Environment that was never answered--or that has not been answered to this date, and that's how far Crystallex went. That is to say, Crystallex never brought an action of nullity on the basis of illegality, on the basis of silence so as to then go before the contentious-administrative jurisdiction to challenge the contents of 1427 [the Permit denial]. So, the first thing I must say with respect to the Official Communication, looking at this procedural aspect of what we're talking about, it is an act that is also vested with the principle of legality, and is considered to be self-enforcing and final. And under Venezuelan law, it is considered valid until its nullity is declared by the competent bodies of the administrative jurisdiction […]".).

Prof. Meier, acknowledged the effect of such administrative silence, yet contended that such silence only works as a guarantee in favor of the private person, and not in favor of the administration, so that only the private person can benefit from that guarantee.[849] Whatever the merits of such last argument, it is the Tribunal's view that in these circumstances the Claimant's due process allegations in relation to the motion for reconsideration and the hierarchical appeal have not been sufficiently established. They are thus rejected. In any event, the Tribunal is of the view that this course of events would not add anything to the FET breach itself, which the Tribunal considers established for the reasons explained in detail above.

621. Similarly, the Tribunal considers that the Claimant has not been able to sufficiently establish that due process was violated because no prior administrative procedure was started by the Venezuelan authorities before the termination of the MOC.

622. The Tribunal wishes to point out that its rejection of some *specific* allegations of discrimination, due process and abusive/bad faith conduct in relation to *specific* events as not sufficiently proven in no way affects its conclusion that Venezuela through its overall conduct has treated Crystallex unfairly and inequitably in violation of Article II(2) of the Treaty.

***

623. In conclusion, Venezuela has violated the "fair and equitable treatment" clause contained in Article II(2) of the Treaty. The Respondent frustrated Crystallex's legitimate expectations arising out of the specific promise contained in the 16 May

---

[849] See Tr. [Jurisdiction and Merits], Day 6, 1644:10-1645:14 (Meier):

"Q. [...] The lack of an answer or a response, without prejudice to it being a constitutional violation, does not have under Venezuelan legislation any specific effect provided for when the administration does not rule on a petition or request or in this case an appeal or remedy, does the Venezuelan legislation not consider that the appeal should be considered denied with the effect of administrative silence?

A. Well, that's the concept of administrative silence, but I must clarify this for you because I've studied that quite a bit, and I was a Professor of Administrative Law for 30 years. That is a guarantee in favor of the private person, not in favor of the administration, so only the private person can take cover in that guarantee and consider that the petition has been rejected so as to then be able to immediately file the next appeal or remedy, but they may not do, and the passage of time doesn't affect them because it is a guarantee in favor of the private person, but it is not to facilitate things for the administration.

Q. But this guarantee for the private person existing, the private person could make use of it; and, consequently, file a contentious-administrative action against the Act if they want to?

A. If they want on to, but they have the right to wait for the response however much time may go by."

2007, engaged in arbitrary conduct in denying the Permit and rescinding the MOC, and committed several acts lacking transparency and consistency, as described above. By way of its overall conduct vis-à-vis Crystallex, the Respondent thus violated the FET standard contained in Article II(2) of the Treaty and thereby caused all of the investments made by Crystallex to become worthless, which will be further established below.

## C.   FULL PROTECTION AND SECURITY

### 1.   The Parties' Positions

624.   The Claimant submits that Venezuela has breached Article II(2) of the Treaty by failing to provide Crystallex's investment full protection and security. Article II(2) of the Treaty provides that "[e]ach Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party […] full protection and security".

625.   According to the Claimant, this standard extends beyond the physical security of an investment to an obligation on behalf of a host State to provide "the stability afforded by a secure investment environment".[850] The Claimant has referred to arbitral decisions holding that full protection and security is a standard not limited to physical protection but extending also to legal security.[851] For the Claimant, a concept of full protection and security limited solely to physical protection would not take into account the modern commercial and business context in which investment treaties are framed. The Claimant argues that the full protection and security standard without qualifications contained in the Belarus-Venezuela BIT can be imported through the Canada-Venezuela Treaty's most-favored-nation (MFN) clause.[852]

626.   With regard to the standard's application to the facts, the Claimant submits that there were a number of instances of administrative negligence on the part of Venezuela which have constituted a breach of the full protection and security standard. These included Venezuela's decision to declare Crystallex's motion for reconsideration inadmissible (after the Permit denial) and the failure to render a decision following Crystallex's hierarchical appeal.[853] In this respect, the Claimant submits that either the Ministry of

---

[850] Memorial, para. 386; Reply, paras 580-582.

[851] See Memorial, paras 385-388; Reply, paras 579-581; C-PHB, paras 464-467, discussing *Siemens AG v. Argentina*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 303; *Biwater Gauff (Tanzania) Ltd v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, **Exh. CLA-59**, para. 729; *Total SA v. Argentine Republic*, ICSID Case No ARB/04/1, Decision on Liability, 27 December 2010, **Exh. CLA-81**, para. 343; *Frontier Petroleum v. Czech Republic*, UNCITRAL, Final Award, 12 November 2010, **Exh. RLA-123**, para. 263.

[852] Reply, para. 579.

[853] Memorial, para. 389.

Environment should have allowed Crystallex to file its appeal on its own or the CVG should have joined the appeal, and that the Ministry of Environment should have given "full consideration" to Crystallex's motion for reconsideration and hierarchical appeal.[854]

627. The Claimant further argues that senior Venezuelan officials made a number of discriminatory statements threatening to nationalize Crystallex's investment and/or transfer it to other interested parties, and that such "statements of harassment" were not in accord with the full protection and security standard under the Treaty.[855]

628. The Respondent submits that the obligation to accord full protection and security under Article II(2) of the Treaty is the minimum standard of treatment under customary international law (due to the qualifier "in accordance with the principles of international law"), and it is limited to physical protection and security of an investment.[856] In addition, the Respondent relies on Canada's treaty-making practice which it claims "confirms that the full protection and security standard under the Treaty does not provide economic or legal security or protection".[857] According to the Respondent, Canada has consistently stated that its post-NAFTA BITs (including the Treaty) are based on the NAFTA, are consistent with its provisions, and that Article 1105 of NAFTA prescribes the minimum standard of treatment under customary international law. Therefore, Article II(2) of the Treaty should not be interpreted as going beyond the customary international law minimum standard of treatment of aliens.[858]

629. Whatever the interpretation of the content of the full protection and security standard, the Respondent argues that Crystallex has failed to establish that Venezuela has breached its obligations under Article II(2) of the Treaty.

630. The Respondent argues that the regulatory actions taken with respect to the denial of the Permit, and the re-affirmance of that denial, were consistent with Venezuelan law and international law.[859] The fact that the Claimant chose not to avail itself of the judicial protection offered (i.e., the administrative and judicial appeals procedures against the denial of the Permit and the termination of the MOC) does not mean that legal protection did not exist.[860]

---

[854] Memorial, para. 389.

[855] Memorial, para. 391.

[856] Counter-Memorial, paras 406-417; Rejoinder, paras 10, 471; R-PHB, paras 159-162.

[857] Rejoinder, para. 472.

[858] Rejoinder, paras 472, 475.

[859] Counter-Memorial, para. 419.

[860] Counter-Memorial, para. 420; R-PHB, paras 163-164.

631.    Finally, the Respondent alleges that the Claimant failed to establish that Venezuelan officials made statements that could have "reasonably been expected to prompt types of harassment".[861]

## 2. Analysis

632.    The Parties have proposed two different interpretations of the "full protection and security" provision in Article II(2) of the Treaty. The Claimant submits that "full protection and security" extends to protection of legal security and the stability of the legal environment, whereas the Respondent contends that such standard should be limited to physical protection and security. The Tribunal is of the view that "full protection and security" is a distinct treaty standard whose content is not to be equated to the minimum standard of treatment. However, the Tribunal considers that such treaty standard only extends to the duty of the host state to grant physical protection and security.[862] Such interpretation best accords with the ordinary meaning of the terms "protection" and "security".

633.    Furthermore, this interpretation is supported by a line of cases involving the same or a similar phrase. For example, the tribunal in *Saluka* noted that "[t]he practice of arbitral tribunals seems to indicate [...] that the 'full security and protection' clause is not meant to cover just any kind of impairment of an investor's investment, but to protect more specifically the physical integrity of an investment against interference by use of force".[863] And the tribunal in *Rumeli* held that this standard of treatment "obliges the State to provide a certain level of protection to foreign investment from physical damage".[864] Other arbitral decisions are to the same or similar effect.[865] The Tribunal agrees with this line of cases.

---

[861] Counter-Memorial, para. 421.

[862] To be clear, this is the meaning that the Tribunal attributes to "full protection and security" irrespective of whether the clause is accompanied by the formulation "in accordance with principles of international law" (as in the present case). Thus, there is no need to decide whether the Claimant may import the allegedly more favorable treatment contained in the Belarus-Venezuela BIT through the MFN clause in the basic treaty, as nothing in the record sufficiently shows that an interpretation of the terms "full protection and security" in the Belarus-Venezuela BIT would be different.

[863] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 484.

[864] *Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, **Exh. CLA-60**, para. 668 (discussing *American Manufacturing & Trading, Inc. v. Democratic Republic of the Congo*, ICSID Case No. ARB/93/1, Award, 21 February 1997 and *Wena Hotels LTD. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, **Exh. CLA-27**).

[865] See, *e.g.*, *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Award, 24 December 2007, **CLA-57**, paras 323-328 (supporting a "traditional" interpretation of the standard limited to "situations where the physical security of the investor or its investment is compromised" and finding it "inappropriate to depart from the originally understood standard"); *AWG Group Ltd. v. Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010, **Exh. RLA-120**, paras 174-177 (declining to "depart[] from the historical interpretation traditionally employed by

634.    The Tribunal is mindful that other investment tribunals have interpreted the "full protection and security" standard more extensively so as to cover legal security and the protection of a stable legal framework.[866] As already noted, the Tribunal is of the view that the more "traditional" interpretation better accords with the ordinary meaning of the terms. Furthermore, as rightly observed by a number of previous decisions, a more extensive reading of the "full protection and security" standard would result in an overlap with other treaty standards, notably FET,[867] which in the Tribunal's mind would not comport with the "*effet utile*" principle of interpretation.[868] The Tribunal is thus unconvinced that it should depart from an interpretation of the "full protection and security" standard limited to physical security.[869]

635.    Measured against this standard, the Claimant has not alleged, let alone shown, that it was subjected to a violation of its physical security attributable to Venezuela. The Tribunal thus dismisses the Claimant's claim of breach of the "full protection and security" clause contained in Article II(2).

---

[  ] courts and tribunals and [to] expand[] that concept to cover non-physical actions and injuries"). The tribunal in *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, **Exh. CLA-52**, para. 258, noted that "this particular standard has developed in the context of the physical safety of persons and installations, and *only exceptionally* will it be related to the broader ambit noted in [*CME Czech Republic B.V. v. Czech Republic*]", emphasis added.

[866] See, *e.g.*, *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, **Exh. CLA-49**, para. 408; *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 303. The Tribunal notes that the full protection and security clause in the Argentina-Germany BIT (1991), which was applicable in *Siemens v. Argentina*, expressly provided for "legal security". See *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 301.

[867] See *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, **Exh. CLA-54**, para. 286 ("There is no doubt that historically this particular standard has been developed in the context of physical protection and security of the company's officials, employees or facilities. The Tribunal cannot exclude as a matter of principle that there might be cases where a broader interpretation could be justified, but then it becomes difficult to distinguish such situation from one resulting in the breach of fair and equitable treatment, and even from some form of expropriation"); *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007, **Exh. CLA-56**, para. 323; *AWG Group Ltd. v. Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010, **Exh. RLA-120**, para. 174 ("an overly extensive interpretation of the full protection and security standard may result in an overlap with the other standards of investment protection, which is neither necessary nor desirable").

[868] See also *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 7.83 ("In the Tribunal's view, given that there are two distinct standards under the ECT, they must have, by application of the legal principle of "effet utile", a different scope and role").

[869] See also *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, **Exh. CLA-185**, para. 622.

D.    EXPROPRIATION

1.    **The Claimant's Position**

a.    **The taking of specific contractual rights constitutes expropriation**

636.    The Claimant first submits that it had rights capable of being expropriated under the Treaty. Clause 2 of the MOC granted Crystallex the exclusive right:

> "to undertake all of the investments and works necessary to reactivate and execute in its totality the Mining Project of [Las Cristinas], design, build the plant, operate it, process the gold for its subsequent commercialization and sale, and return the mine and its installations to the [CVG] upon the termination of the Contract […] [and] to exploit and extract gold in the area [of Las Cristinas] […]".[870]

637.    For the Claimant, these rights are investments under the Treaty, defined in Article I(f)(vi) as "right[s], conferred […] under contract, to undertake any economic and commercial activity […]".[871] For the Claimant, these rights existed at the time the MOC was signed and they existed until the MOC was unilaterally rescinded and the Las Cristinas site was physically taken over by the Venezuelan Government in early 2011.[872]

638.    Thus, the Claimant argues, the destruction of contractual rights can amount to an expropriation and relies in this respect on what it considers to be unanimous jurisprudence.[873]

b.    **Venezuela has indirectly expropriated Crystallex's entire investment**

639.    The Claimant first contends that Venezuela indirectly expropriated its investment through a series of cumulative and interconnected measures that began with the denial of the Permit by the Ministry of the Environment, and ended with the destruction of Crystallex's rights through the CVG's rescission of the MOC.

640.    The Claimant submits that it is a well-accepted principle of international law that an expropriation may occur indirectly and refers to a number of legal authorities and decisions to this effect,[874] as well as to Article VII of the Treaty pursuant to which an "investment" may not be expropriated or "subjected to measures having an effect

---

[870] MOC, **Exh. C-9**, Clause 2.1.

[871] C-PHB, para. 472.

[872] C-PHB, para. 472.

[873] Memorial, paras 284, 289; C-PHB, para. 473.

[874] Memorial, paras 268-283.

equivalent to nationalization or expropriation".[875] Furthermore, according to the Claimant, it is commonly accepted that expropriation can be creeping where there is an incremental encroachment on a foreign investor's ownership rights which decreases the value of its investment until that investment no longer has value.[876]

641.   According to the Claimant, the critical factor for a finding of expropriation is the actual *effect* of the measure on the investment. If a measure destroys the investment or substantially deprives an investor in whole or in part of the use or enjoyment of its investment, it amounts to an expropriation.[877] Neither the form, nor the purpose, nor the intent of the measures affects their characterization as expropriatory.[878]

642.   The Claimant finally submits that a host State can expropriate an investment by denying or failing to issue a Permit or license which is critical for an investment project[879], and that the unjustified termination of a contract based on sovereign prerogatives is expropriatory.[880]

643.   According to the Claimant, Venezuela indirectly expropriated Crystallex's investment through the following series of measures:

   •   The Ministry of Environment illegitimately denied the Permit in April 2008. Crystallex claims to have completed all the necessary steps it was required to take according to the applicable legal framework for the Permit to be handed over. In particular, it was granted the Land Occupation Permit, its Feasibility Study was approved, and so was the Environmental Impact Study. Furthermore, it posted the Bond in response to the Ministry of Environment's request dated 16 May 2007, and paid the necessary environmental duties. In addition, throughout the process it received repeated government assurances that it would obtain the Permit. Finally, while the refusal to grant the Permit was officially motivated by alleged concerns over the protection of the environment and indigenous peoples in the Imataca Forest Reserve, no explanation or evidence was provided as to how these concerns related to the Las Cristinas project.[881]

   •   Following the denial of the Permit, Crystallex was denied administrative remedies. The Claimant points to the fact that its motion for reconsideration of the decision to deny the Permit was declared inadmissible on 29 May 2008, and that no decision was

---

[875] Memorial, para. 268.

[876] Memorial, paras 276-279; C-PHB, para. 478.

[877] Memorial, paras 274-283.

[878] Memorial, paras 281-283.

[879] Memorial, paras 309-312; Reply para. 520.

[880] Reply, paras 521-523.

[881] Memorial, paras 290-295.

    ever rendered with regard to the subsequent hierarchical appeal filed before the Minister of the Environment.[882]

- Venezuelan authorities repeatedly assured Crystallex in June and August 2008 that the conditions for the Permit were fulfilled.[883]

- Venezuela threatened to nationalize the project at certain intervals between September 2008 and October 2010. In particular, the Claimant points to statements by President Chávez and Minister Rodolfo Sanz manifesting their intention to "take back" Las Cristinas.[884]

- Venezuela terminated the MOC without justification and based on purely political motives. Such termination took Crystallex's rights, ordered the transfer of all assets to the CVG and made the denial of the Permit irreversible. In this respect, the Claimant points to the CVG Resolution terminating the MOC, which cited the Government's sovereign prerogative to terminate contracts for "reasons of opportunity and convenience", as evidence that Venezuela acted in its sovereign powers and not as a contractual party.[885]

644.    According to the Claimant, the aforementioned measures deprived Crystallex of all of the economic value of its investment, and their cumulative and incremental effect was, to use the language of Article VII of the Treaty, "equivalent to nationalization or expropriation".[886] The actions toward Crystallex's investment were taken outside of the existing regulatory and contractual framework, in the exercise of the state's sovereign powers,[887] and were characterized by lack of reasonableness and proportionality.[888]

    c.    **Venezuela's termination of the MOC further constitutes a direct expropriation of Crystallex's investment**

645.    According to the Claimant, a taking may start off as an indirect expropriation and end as a direct expropriation.[889] Thus, Venezuela directly expropriated Crystallex's investment through its rescission of the MOC and physical takeover of Las Cristinas.[890]

---

[882] Memorial, paras 296-298.

[883] Memorial, paras 299-300.

[884] Memorial, para. 301; Reply, paras 525-527.

[885] Memorial, paras 302-307.

[886] Memorial, para. 308; Reply, para. 515.

[887] Reply, para. 536.

[888] Reply, para. 529.

[889] Reply, paras 542-543.

[890] Counter-Memorial, paras 314-315; C-PHB, paras 485-488.

The Claimant emphasizes that the termination was based, *inter alia*, on "reasons of opportunity and convenience"[891] and that this is "an admitted unilateral taking of contract rights, and thus a direct expropriation".[892]

646. The Claimant further points out that Venezuela failed to comply with the minimum requirements under Venezuelan law to exercise its prerogative to rescind contracts for "reasons of opportunity and convenience" and that the CVG's resolution of 3 February 2011 (by which it terminated the MOC) extinguished Crystallex's rights in developing the project without providing compensation.[893]

### d. The expropriation of Crystallex's investment was unlawful

647. The Claimant contends that under the terms of the Treaty an expropriation can only occur for public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation.[894] It submits that in the present case Venezuela violated the following three requirements (the Claimant contends that violating either renders the expropriation wrongful):

- The expropriation was not accompanied by due process of law. According to the Claimant, Venezuela denied Crystallex an opportunity to be heard when it dismissed its motion for reconsideration of the denial of the Permit and when it failed to provide an answer to Crystallex's subsequent hierarchical appeal. The Respondent further failed to provide advance notice, a prior administrative proceeding or an opportunity to be heard prior to the rescission of the MOC.[895] Furthermore, the rescission was invalidly carried out by Minister Khan as a matter of Venezuelan law, for the reasons recounted *supra*.[896] Thus, an expropriatory act carried out in violation of domestic law, in these circumstances, is, in the Claimant's view, "strongly indicative" that the expropriation was not carried out in accordance with due process of law pursuant to Article VII of the Treaty.[897]

---

[891] Memorial, para. 314.

[892] Memorial, para. 321.

[893] Memorial, paras 314-315.

[894] See Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, **Exh. C-3**, Art. VII.

[895] Memorial, paras 317-319; Reply, paras 545-549.

[896] See *supra* Section V.C.1.b.

[897] C-PHB, paras 497-500.

- The expropriation was not made against prompt, adequate and effective compensation. Venezuela should have made an immediate offer of compensation and it has not made such offer to date, in contravention of the Treaty.[898]

- Finally, the expropriation was discriminatory in light of the 2010 strategy document by the Ministry of Mines for the development of Las Cristinas with VenRus, as well as of the disclosed CITIC documentation.[899] The only justification, in the Claimant's view, for choosing first a Russian and later a Chinese partner over Crystallex is to be found in preferences based on nationality.[900] The Claimant points to the statements by Government officials between 2008 and 2010 that Crystallex's Canadian nationality made it an unsuitable partner to develop Las Cristinas.[901]

### 2. The Respondent's Position

#### a. Crystallex had no rights capable of being expropriated

648. As a preliminary matter, the Respondent contends that the Claimant has failed to meet its burden to demonstrate that it had the rights it alleges were expropriated, namely, a right under the MOC to exploit Las Cristinas, or the right to obtain a Permit. For the Respondent, nowhere in the MOC did the CVG grant Crystallex a direct "right to mine", an absolute "right to exploit", or an unconditional "right to develop" Las Cristinas.[902] Clause 2 of the MOC, on which Crystallex relies to support its claim that it had a right to exploit Las Cristinas, did not provide unfettered rights to exploit or extract the Las Cristinas mineral deposit.[903]

649. According to the Respondent, any rights to exploit that the MOC may have granted Crystallex were conditioned upon the fulfillment of its contractual obligations, its satisfaction of environmental regulations and obtaining the Permit from the Ministry of Environment. With regard to the Permit, the fact that the Claimant had completed certain steps (the Land Occupation Permit, the Feasibility Study, the Environmental Impact Study, which Venezuela denies the Ministry ever approved, the posting of the Bond) in no way guaranteed that it had a right to receive the Permit.[904] Furthermore, even if the Ministry of Environment approved part of Crystallex's EIS, which the

---

[898] Memorial, paras 320-322; Reply, para. 555.

[899] Reply, paras 550-552.

[900] Reply, paras 550-552; C-PHB, paras 504-506.

[901] C-PHB, para. 504, discussing Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**; "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**, p. 3.

[902] R-PHB, para. 170.

[903] R-PHB, para. 170.

[904] Counter-Memorial, paras 452-460; Rejoinder, paras 337-344.

Respondent denies, such approval would have been limited to a Permit for preliminary works, not a full Permit for exploitation. Thus, no right to exploit could have been created, and thus Crystallex could not have lost such right when the Permit was denied.[905]

### b.    There was no expropriation of Crystallex's rights

650.    The Respondent denies that there was any direct or indirect expropriation of Crystallex's investment.[906] More precisely, the Respondent disputes that the acts described by Crystallex - such as the denial of the Permit, the rejection of administrative remedies and the rescission of the MOC - are expropriatory, and submits instead that these acts "involved the legitimate application of reasonable environmental regulations, and a contracting party's legitimate exercise of its right to rescind under mutually agreed upon contractual terms".[907]

651.    According to the Respondent, substantial and consistent decisions conclude that "a government's reasonable and proportionate application of its regulatory power is not an expropriation".[908] Further, for a state action rescinding a contract to be considered an expropriation, the state must have deprived the claimant of its rights by acting outside the legal framework of the contract or concession, on the basis of superior sovereign authority (*puissance publique*).[909] The Claimant has failed to establish that the Ministry of Environment did not act within its legitimate regulatory authority in denying the Permit,[910] or that the contract rescission was anything other than an exercise of commercial contractual rights.

652.    With regard to the specific measures which Claimant argues evince an indirect (or creeping) expropriation, the Respondent makes the following arguments:

- With regard to the denial of the Permit, the Respondent observes that the Ministry of Environment simply applied and enforced Venezuela's environmental regulations in existence at the time of the MOC,[911] and it was in no way pursuing a political agenda when it denied such Permit.[912] Crystallex had been notified repeatedly of (but failed to address) the Ministry of Environment's concerns regarding water issues, vegetation and biodiversity, indigenous peoples, artisanal miners, as well as other matters since

---

[905] C-PHB, paras 186-191.

[906] Rejoinder, para. 336.

[907] Counter-Memorial, paras 423-425.

[908] Rejoinder, para. 346.

[909] Counter-Memorial, paras 433-443.

[910] Rejoinder, para. 349.

[911] Counter-Memorial, paras 463-464.

[912] Rejoinder, para. 360.

at least May 2004.[913] The denial of the Permit was thus a reasoned and proportional exercise of government regulation in light of such repeatedly expressed concerns.[914]

- Crystallex was not denied administrative remedies. In fact, after it failed to obtain a response to its hierarchical appeal with regard to the denial of the Permit (which, under Venezuelan law, means that the appeal has to be considered denied), it had the right to present a case before the Venezuelan administrative courts, which it did not do. Neither did Crystallex pursue domestic court remedies available to it under the dispute resolution provision of the MOC.[915]

- Similarly, the alleged threats of nationalization by Minister Sanz or President Chávez do not support the Claimant's expropriation claims because these are individual statements which, according to arbitral decisions, do not amount to expropriation unless they are made in such a way as to negate the rights concerned without any remedy. Further, "it is an undisputed fact that neither President Chávez nor Minister Sanz proceeded to nationalize Las Cristinas", as it was the CVG that later rescinded the MOC on the basis of the Claimant's breach.[916]

- Finally, the CVG's rescission of the MOC was legitimate in response to Crystallex's failure to meet its contractual obligations, and thus cannot constitute an expropriation. The MOC provided explicit grounds for contract cancellation, termination, and rescission. Because the Claimant had ceased substantial activities at Las Cristinas for over one year and had not begun any exploitation at Las Cristinas, the CVG had ample grounds to rescind the MOC pursuant to Clause Twenty-Four of the MOC.[917] Furthermore, Crystallex's failure to comply with additional undertakings contained in the MOC constituted additional grounds for a legitimate rescission of the MOC.[918] Thus, Venezuela contends, a contractual party's unilateral rescission for cause, even if flawed, is not a treaty-based expropriation where the rescission is pursuant to the contracting party's contractual rights and authority rather than solely its sovereign authority or powers.[919] Finally, according to the Respondent there can be no expropriation based on the rescission of the MOC where Crystallex failed to pursue any of the avenues of local redress explicitly provided for in the MOC. Citing to *Waste Management v. Mexico, Generation Ukraine v. Ukraine*, and *Parkerings v.*

---

[913] Counter-Memorial, paras 463-464.

[914] Rejoinder, para. 331; R-PHB, paras 198-202.

[915] Counter-Memorial, paras 466-467; Rejoinder, paras 377-379; R-PHB, paras 195-197.

[916] Counter-Memorial, para. 469.

[917] Counter-Memorial, paras 470-473.

[918] Counter-Memorial, paras 475-476.

[919] Rejoinder, para. 333, 381, discussing *Malicorp v. Egypt*, Award, 7 February 2011, **Exh. RLA-127**; R-PHB, paras 203-208.

*Lithuania*, Venezuela argues that neglect for local remedies may be a determinative factor on the merits of an expropriation claim.[920]

653. The Respondent also disputes Crystallex's claim that the rescission of the MOC constituted a *direct* expropriation. First, a measure cannot at the same time have contributed to an indirect expropriation and independently qualify as direct expropriation.[921] Also, the rescission by the CVG was a legitimate exercise of commercial contractual rights, not a state-inspired nationalization or outright transfer of title. Because at no point did the CVG relinquish the *title* for Las Cristinas to Crystallex, the Respondent argues that there was no title to "take" back when the CVG rescinded the MOC.[922] In other words, the Claimant did not have any direct rights to the concession or any property rights to the land capable of being expropriated directly when the project was transferred to the CVG pursuant to the rescission of the MOC.[923]

### c. There was no unlawful expropriation

654. Venezuela submits that, in the event that the Tribunal were to find any act of expropriation or any act having an effect equivalent to expropriation, the conditions required for an expropriation to be lawful pursuant to Article VII(1) of the Treaty are met. It argues that the challenged acts were undertaken pursuant to a public purpose, are not discriminatory, and comply with due process. Further, the mere failure to pay compensation does not render an expropriation "unlawful *per se*".

655. First, Venezuela submits that the challenged acts constitute *bona fide* measures adopted in pursuance of a public purpose.[924] It argues that international tribunals afford a large measure of deference to the sovereign determination of a public purpose.[925] In this case, the national interest served by the rational exploitation of a state's natural resources is protected under international law.[926] Venezuela contends that to leave the exploitation of mining resources in the hands of an entity that had proven to be incapable of exploiting them and was in breach of other numerous obligations would be contrary to public interest, because it would deprive the state from enjoying the benefit derived from its natural resources. In denying the Permit, Venezuela was responding to the environmental repercussions posed by the Claimant's ill-planned project. Furthermore,

---

[920] Counter-Memorial, paras 478-484.

[921] Counter-Memorial, para. 486.

[922] Counter-Memorial, para. 488; Rejoinder, paras 405-409.

[923] Rejoinder, para. 343.

[924] Counter-Memorial, paras 509-520.

[925] Counter-Memorial, para. 510, discussing *inter alia Antoine Goetz and Others v. Republic of Burundi*, ICSID Case No. ARB/95/3, Decision on Liability, 2 September 1998, **Exh. RLA-43**, para. 126.

[926] Counter-Memorial, para. 511.

Venezuela's termination of the MOC was motivated by the Claimant's own breaches that prevented the Government from effectively pursuing the public purpose of exploiting the natural resources for the economic and social benefit of Venezuelans.[927] Finally, Venezuela notes that when the Claimant discussed the reasons for which it considers the expropriation unlawful, it has not challenged the fact that the rescission was carried out for a public purpose.[928]

656.    Second, Venezuela denies that the challenged acts are discriminatory. For a state's conduct to be characterized as discriminatory, there must be no reasonable or rational justification for the particular differential treatment of a foreign investor.[929] With reference to the alleged involvement of CITIC in Las Cristinas after Crystallex handed over the area, Venezuela denies such allegations. It argues that the measures were rational in light of the evidence supporting the conclusion that the Claimant could not be trusted to fulfill its obligations under the MOC to bring Las Cristinas into production. Even if it were true that Venezuela had consulted with a third party after it became evident that Crystallex was not taking seriously its obligation to provide what was necessary to obtain the Permit, and even if Venezuela had contracted a third party to assist with the development of Las Cristinas after the rescission of the MOC, neither of these actions would constitute discrimination.[930]

657.    Venezuela further denies that the challenged acts violated due process.[931] In this case, judicial and administrative procedures were available to the Claimant, who had a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard. It was Crystallex's choice to abandon its rights in favor of pursuing this arbitration.[932] Venezuela submits that the CVG provided a legitimate justification for its administrative decisions related to the rescission of the MOC and always informed Crystallex of its right to appeal any decisions taken by Venezuelan authorities. With respect to the Permit, Crystallex filed a *recurso de reconsideración* and a *recurso jerárquico* challenging the Ministry of Environment's decision not to issue the Permit, but chose not to avail itself of its right to take the matter to Venezuelan administrative courts. The Claimant also decided not to file an administrative appeal challenging the CVG's rescission of the MOC. Nor did the Claimant assert its right under the dispute resolution mechanism of the MOC to present its disputes before Venezuelan courts.[933]

---

[927] Counter-Memorial, para. 520.

[928] R-PHB, para. 220.

[929] Counter-Memorial, para. 522.

[930] Rejoinder, para. 531.

[931] Counter-Memorial, paras 528-542.

[932] Counter-Memorial, para. 532.

[933] Counter-Memorial, para. 533.

658.    Finally, Venezuela submits that the lack of compensation alone does not render an expropriation unlawful *per se,* and cites to *Chorzów*, as well as to Iran-US Claims Tribunal and European Court of Human Rights decisions, to support its claim.[934] Because the alleged expropriation was made pursuant to a public purpose, in accordance with due process, and not in a discriminatory manner, the fact that compensation has yet to be paid does not render the entire act unlawful.[935]

---

[934] Counter-Memorial, paras 543-546.

[935] Rejoinder, para. 521.

### 3. Analysis

#### a. Did Crystallex have rights capable of being expropriated?

659. The Tribunal starts its analysis on expropriation with the threshold question as to whether the Claimant had rights capable of being expropriated. Venezuela's argument in this respect is that the "Claimant has failed to demonstrate that it had a right to develop or exploit Las Cristinas capable of being expropriated".[936]

660. Article VII(1) of the Treaty reads as follows:

> "Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as 'expropriation') in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or return expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable."[937]

661. The ordinary meaning of this provision is clear that the Treaty prohibits the expropriation of investors' "investments" (and "returns") unless effected in compliance with certain conditions. Article I(f), in turn, defines "Investments" "for the purpose of this Agreement"[938]—thus including its Article VII(1)—in the following terms:

> "any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third State, in the territory of the other Contracting Party in accordance with the latter's laws, In particular, though not exclusively, 'investment' includes:
>
> (i) movable and immovable property and any related property rights, such as mortgages, liens or pledges;
>
> (ii) shares, stock, bonds and debentures or any other form of participation in a company, business enterprise or joint venture;

---

[936] R-PHB, para. 168. See also Counter-Memorial, para. 452 ("It is undisputed that the MOC did not grant Crystallex property rights to Las Cristinas. Therefore, Crystallex's expropriation argument only begins to make sense if the MOC guaranteed it rights to exploit and operate the mine at Las Cristinas. Yet Crystallex's claim is fundamentally undermined by its inability to prove that it had any contractual entitlement to exploitation, or to the Permit, without meeting its own contractual obligations and adhering to applicable Venezuelan law".).

[937] BIT, Article VII(1).

[938] BIT, Article I, chapeau.

(iii) money, claims to money, and claims to performance under contract having a financial value;

(iv) goodwill;

(v) intellectual property rights;

(vi) rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources,

but does not mean real estate or other property, tangible or intangible, not acquired in the expectation or used for the purpose of economic benefit or other business purposes".[939]

662.    The Tribunal notes that the definition of "investments" provided in the Treaty is a broad one. It further notes that "investments" include "rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources".[940] This clause makes it clear that contractual rights qualify as investments under Article I of the Treaty.

663.    Furthermore, because Article VII of the Treaty makes "investments" (together with "returns") the object of a possible expropriation, it ensures that contractual rights are generally capable of being expropriated. In the Tribunal's eyes, to conclude otherwise would mean to disregard the natural and plain meaning of these terms.[941]

664.    Under Article 2 of the MOC, Crystallex was granted the right to "undertake all of the investments and works necessary to reactivate and execute in its totality the Mining Project of CRISTINA 4, CRISTINA 5, CRISTINA 6 and CRISTINA 7, design, build the plant, operate it, process the gold for its subsequent commercialization and sale, and return the mine and its installations to the [CVG] upon the termination of the Contract,

---

[939] BIT, Article I(f).

[940] BIT, Article I(f)(vi).

[941] There is furthermore clear support in the jurisprudence that contractual rights are capable of being expropriated. For example, in *Phillips Petroleum Company Iran v. Iran*, the Iran-U.S. Claims Tribunal noted that "expropriation by or attributable to a State of the property of an alien gives rise under international law to liability for compensation, and this is so whether the expropriation is formal or de facto and whether the property is tangible, such as real estate or a factory, or intangible, such as the contract rights involved in the present [c]ase" (*Phillips Petroleum Company Iran v. Government of the Islamic Republic of Iran*, Iran-U.S. Claims Tribunal, Award No. 425-39-2, 29 June 1989, **Exh. CLA-16**, para. 75). In *Southern Pacific Properties (SPP) v. Egypt*, the ICSID tribunal observed that "[t]here is considerable authority for the proposition that contract rights are entitled to the protection of international law and the taking of such rights involves an obligation to make compensation therefore [sic]" (*Southern Pacific Properties (Middle East) Ltd. v. Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, **Exh. CLA-19**, para. 164). Several investment treaty tribunals have similarly found that contractual rights may be capable of being expropriated. See, *e.g.*, *Siemens A.G. v. Argentina*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 267; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina*, ICSID Case No. ARB/97/3, resubmitted case, Award, 20 August 2007, **Exh. CLA-55**, para. 7.5.4.

in accordance [with] article 102 of the Law of Mines".[942] Crystallex was further authorized by the CVG to "exploit and extract gold in the area of Cristina 4, 5, 6 and 7".[943] For the Tribunal, these are rights that qualify as investments under Article 1(f)(vi) of the BIT.

665.    The Tribunal further notes that the Treaty places no limitations on the types or on the nature of the contractual rights which are defined as investments. The MOC thus contains investment-related rights to the benefit of Crystallex that were capable of being expropriated.

b.    **Did Venezuela expropriate Crystallex's investment?**

666.    In what is a reflection of the standard for expropriation found in numerous investment treaties, Article VII(1) of the Treaty provides, in broad terms, that "investments…shall not be nationalized, expropriated or *subjected to measures having an effect equivalent to nationalization or expropriation*".[944]

667.    Arbitral case law has identified several types or forms of expropriations.[945] It is generally understood that a "direct" expropriation occurs where the investor's investment is taken through formal transfer of title or outright seizure, whereas an "indirect" expropriation occurs where a state's action or series of actions result in the investor being deprived of the enjoyment or benefit of its investment, although title to the property or the rights remains with the original owner.[946] Furthermore, the expression "creeping expropriation" is used to refer to a specific form of expropriation that results from a series of measures taken over time that cumulatively have an

---

[942] MOC, **Exh. C-9**, Clause 2(1).

[943] MOC, **Exh. C-9**, Clause 2(1).

[944] BIT, Article VII(1) (emphasis added).

[945] As the Tribunal in *Tecmed* noted with particular reference to measures "equivalent or tantamount to expropriation", the distinctions in this respect are not always clearly delimited. See *Técnicas Medioambientales Tecmed S.A. v. Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, **Exh. CLA-39**, para. 114 ("Generally, it is understood that the term "…equivalent to expropriation…" or "tantamount to expropriation" included in the Agreement and in other international treaties related to the protection of foreign investors refers to the so-called "indirect expropriation" or "creeping expropriation", as well as to the above-mentioned de facto expropriation. Although these forms of expropriation do not have a clear or unequivocal definition, it is generally understood that they materialize through actions or conduct, which do not explicitly express the purpose of depriving one of rights or assets, but actually have that effect. This type of expropriation does not necessarily take place gradually or stealthily —the term "creeping" refers only to a type of indirect expropriation—and may be carried out through a single action, through a series of actions in a short period of time or through simultaneous actions. Therefore, a difference should be made between creeping expropriation and de facto expropriation, although they are usually included within the broader concept of "indirect expropriation" and although both expropriation methods may take place by means of a broad number of actions that have to be examined on a case-by-case basis to conclude if one of such expropriation methods has taken place", internal footnotes omitted).

[946] See Andrew Newcombe and Lluís Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), **Exh. RLA-103, RLA-159**, pp. 323-327, with further references.

expropriatory effect, rather than from a single measure or group of measures that occur at one time.

668.   The Tribunal will start by analyzing whether Venezuela's actions constituted an indirect, and in particular a creeping, expropriation.

669.   State responsibility for creeping expropriation is reflected in the concept of a composite act, defined in Article 15(1) of the ILC's Articles on State Responsibility as follows:

> "The breach of an international obligation by a State through a series of actions or omissions defined in aggregate as wrongful occurs when the action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act".[947]

670.   As the tribunal, in *Siemens v. Argentina* noted:

> "By definition, creeping expropriation refers to a process, to steps that eventually have the effect of an expropriation. If the process stops before it reaches that point, then expropriation would not occur. This does not necessarily mean that no adverse effects would have occurred. Obviously, each step must have an adverse effect but by itself may not be significant or considered an illegal act. The last step in a creeping expropriation that tilts the balance is similar to the straw that breaks the camel's back. The preceding straws may not have had a perceptible effect but are part of the process that led to the break".[948]

671.   The Tribunal agrees with the observations made by these ICSID tribunals. With those points in mind, the Tribunal will now consider the facts of the case, although it has already traversed that subject-matter at some length when discussing FET, and will evaluate if Venezuela's actions amount to a creeping expropriation.

672.   For the purposes of its expropriation analysis, the Tribunal is able to discern three broad groups of actions which, taken cumulatively, have made the Tribunal conclude that an expropriation has occurred under the circumstances.

673.   A first series of actions are the actions surrounding the denial of the Permit in April 2008. The Tribunal has already underscored the fundamental unfairness underlying the manner in which the Claimant was treated by the Venezuelan authorities during the process leading to such denial, which has made the Tribunal conclude that the investor

---

[947] International Law Commission, Articles on State Responsibility (International Law Commission, 2001), **Exh. CLA-33**, Article 15.

[948] *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 263. See also *Compañía de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 7.5.31 ("It is well-established under international law that even if a single act or omission by a government may not constitute a violation of an international obligation, several acts taken together can warrant finding that such obligation has been breached").

was unfairly and inequitably treated in violation of Article II(2) of the Treaty.[949] For the purposes of the expropriation analysis, the events surrounding the Permit denial constitute the first step in the expropriatory process—the first tangible occurrence of the investor's rights and the value associated thereto being severely affected as a result of measures attributable to Venezuela.

674.  That being said, the Tribunal wishes to make it clear that it is not ready to consider the Permit denial as *per se* amounting to an act of expropriation. This view is consistent with the Tribunal's earlier finding that Crystallex had no "right" to a Permit under international law, because a state would always maintain its freedom to deny a permit if it so decides, and under Venezuelan law the "right" was conditioned on the Administration granting the necessary approvals.[950] The Tribunal is of course aware that investor-state tribunals have on occasions found that a denial of a permit or of an authorization critical to the investor's investment may constitute a measure tantamount to expropriation, as the cases of *Metalclad v. Mexico*[951] and *Tecmed v. Mexico*[952] show. However, it considers that, under the circumstances of this case, the actions surrounding the permit denial should rather be considered as one series of acts which *in combination* with other actions gave rise to an expropriation.

675.  A second series of actions followed the Permit denial in April 2008 and significantly contributed to the expropriatory process. In the subsequent months, Venezuelan governmental officials of the highest level targeted Crystallex's investment with statements that resulted in a gradual devaluation of the investor's investment, and which paved the way for the final act, the MOC termination. Before turning to this latter act, it is worthwhile recollecting the main events which took place between April 2008 and February 2011.

676.  On 19 September 2008, a few months after the Permit denial and around the time Crystallex was still endeavoring to obtain the sought-after Permit, Venezuela's President Hugo Chávez announced in a public address that the intention of the Government was to take back "big mines" in Guayana, including "one of the biggest in the world". He said:

---

[949] See *supra* Sections VII.B.2.b-VII.B.2.c.

[950] See *supra* para. 581.

[951] See *Metalclad Corporation v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, **Exh. RLA-50**, paras 104-108 (finding the non-issuance of a permit to be a measure tantamount to expropriation in violation of NAFTA Article 1110(1)).

[952] See *Técnicas Medioambientales Tecmed S.A. v. Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, **Exh. CLA-39**, para. 117 (holding the Mexican government's failure to renew the hazardous waste landfill permit held by the investor's subsidiary to be expropriatory).

> "In Guayana for example, we are taking back big mines, and one of them is one of the biggest in the world. And do you know what it is? It's gold, it's gold!"[953]

677. It cannot be doubted, in the Tribunal's view, that Venezuela's President was specifically referring to Las Cristinas (without naming it).

678. Less than two months later, an official press release from the Ministry of Mines announced the plan to seize Las Cristinas. The reason adduced by the Ministry of Mines was "to boost Venezuela's international reserves":

> "He [Minister Rodolfo Sanz] added that the Las Cristinas mine, which used to be managed by transnational company Crystallex, is expected to begin being exploited in 2009. He said the mine will be reclaimed and operated by the state.
>
> Las Cristinas is considered one of Latin America's most important gold deposit and one of the largest in the world. With a capacity of approximately 31 million ounces of gold, its estimated value is $35 billion.
>
> […]
>
> Sanz insisted on the necessity of recovering Venezuela's largest deposits, the objective being to increase the production capacity of strategic minerals, such as gold, diamond, bauxite and uranium.
>
> The government of Venezuela representative admitted that the production capacity of gold had increased during this year, having reached its goal of 1.5 tons of gold.
>
> 'As a result of the financial crisis spreading worldwide, we must try to recover our gold in order to increase our international reserves'. […]"[954]

679. The day after, on 6 November 2008, Minister of Mines Sanz informed a delegation from the Russian Government of Venezuela's plan to develop Las Cristinas with Rusoro, adding that "we have to rescind our relations with [Crystallex] …we have a legal problem there".[955]

680. President Chávez's Annual Address to the Nation on 13 January 2009 could leave little doubts as to Venezuela intentions in respect of Las Cristinas. Venezuela's President announced the takeover of Las Cristinas and its development through VenRus in these terms:

---

[953] "Chávez asegura que está 'recuperando' las grandes minas de oro", *El Universal*, 19 September 2008, **Exh. C-37**.

[954] Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, p. 0003.

[955] "Venezuela offers Russians big gold projects", Reuters, 6 November 2008, **Exh. C-45**.

"[…] this year the Venezuelan State has taken over the exploitation and control of the gold deposits of Las Cristinas at kilometer 88 in the State of Bolivar; one of the largest gold deposits on the American continent. Cristinas is estimated to have approximately 35.2 million ounces of gold, that is 1,094 metric tons of estimated reserves. Of this reserve, 24.5 million ounces, or 762 tons, are classified as proven.

In this way, the Venezuelan State controls 30,000 million dollars, which is the current estimated worth of the deposit. Currently, 30 thousand. The Las Cristinas concessions are organized into five parts: Cristina IV, Cristina V, Cristina VI, Cristina VII and Brisas del Cuyuni. They are under the control of socialism, for the development of economic growth for the national development. […]

In mining we have created this year (2008) the mixed company VenRus, with Russia, a Russian company and a Venezuelan company, a mixed company for the deposits of Las Cristinas".[956]

681.    Subsequently, while Crystallex was being reassured by its contractual partner, the CVG, that the MOC remained in "full force and effect",[957] the adverse statements from the Government continued. Thus, on 25 April 2010, President Chávez stated in the weekly TV show "Aló Presidente" that:

"If we are going to exploit gold, we will have to nationalize all of it, recuperate and put an end to concessions, which led to degeneration […]".[958]

682.    On 17 October 2010, the Venezuelan state news agency (*Agencia Venezolana de Noticias*) reported the following words pronounced by President Chávez in direct reference to Las Cristinas during a state visit to Belarus:

"Chávez announced the nationalization of the Las Cristinas and Las Brisas mines. 'Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies, I announce to the world that the revolutionary Government recuperated it, together with the Las Brisas mine.

---

[956] Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53**.

[957] See Letter from the CVG to Crystallex, 2 March 2009, **Exh. C-55** ("Taking into account that the normative act that gave origin to the [MOC] has not been revoked or replaced, and that the contract is valid for 20 years and that Crystallex has been fulfilling the obligations assumed under the contract, we hereby inform you that the contract is fully valid and in the process of obtaining the required permits from the competent authorities for the initiation of the development of the Project"); Letter from the CVG to Crystallex, 15 August 2010, **Exh. C-64** ("Given that the contract has a duration of twenty (20) years and that the administrative act underlying the contract has not been replaced or repealed, it is clear that the same contract remains in full force and effect").

[958] Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information (extracts), 25 April 2010, **Exh. C-62**.

> These mineral resources are for the Venezuelan people, not for transnationals,' he said."[959]

683.    It is clear to the Tribunal that a decision at the highest level of the Venezuelan state had been taken to oust Crystallex from Las Cristinas, and to take the mine back in governmental hands, with a view to developing it in collaboration with new partners. These statements effected an incremental encroachment of the Claimant's contractual rights and resulted in a gradual yet significant decrease of the value of the Claimant's investment.

684.    On 3 February 2011, Minister Khan, who was also President of the CVG, brought those political announcements to their conclusion and effected, through the termination of the MOC, the "take-over of Las Cristinas" which both Venezuela's President and his predecessor at the Ministry of Mines, Minister Sanz, had clearly announced throughout the years.

685.    The MOC rescission, which in the Tribunal's view constitutes the third and last of the measures or groups of measures, and which taken together constituted the creeping expropriation suffered by Crystallex, is worth considering in some more detail.

686.    In this respect, the Tribunal first recalls the limitation to its jurisdictional mandate, which is to decide Treaty, and not contract, claims.[960] It is thus not for the Tribunal to decide whether the MOC was duly performed, or whether it was rightly or wrongfully terminated, and what would be the consequences of any wrongful termination. These issues are reserved to a different contractually agreed forum.

687.    That said, the Tribunal is not precluded from taking the circumstances concerning the MOC's performance and termination into account to the extent necessary to decide the expropriation claim. As the Tribunal in *Bayindir* noted:

> "While not a contract judge, the Tribunal must review those facts related to contract interpretation and performance and here particularly related to the exercise of certain contractual remedies to the extent necessary to rule on the Treaty claim".[961]

688.    By taking such contractual matters into consideration, based on the extensive evidence submitted by the Parties to this Tribunal, the Tribunal will not determine contractual claims or exercise jurisdiction under the MOC. Any findings that this Tribunal may make in respect of the MOC are relevant only as part of the Tribunal's analysis of the

---

[959] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**.

[960] See *supra* Section VI.C.3.

[961] *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, **Exh. CLA-68**, para. 458. See also *Biwater Gauff (Tanzania) v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, **Exh. CLA-59**, para. 472.

Claimant's expropriation claim, and wouldnot be purported to produce any effects in the contractual context between CVG and Claimant.[962]

689. Quite apart from the jurisdictional issues connected with the distinction between contract and treaty claims, and the presence of an exclusive jurisdictional clause in the MOC, which the Tribunal has already discussed and disposed of above,[963] as a matter of substance, it is clear that a breach of a contract by a State does not normally amount to a violation of international law. The Parties agree on the principal tenet of such latter proposition, though they diverge on its more concrete application and especially on the facts of the case.

690. The Claimant submits that the following test should apply in respect of expropriation under international law:

> "…the analysis is whether the acts may be characterized as merely regulatory or contract-related, or denote instead an unreasonable, unjust, disproportionate or even perverse use of sovereign powers, or *an open resort to the sovereign prerogative to repudiate contracts, which indicate the existence of an expropriation under international law.* This is the international law analysis for a finding of expropriation under the Treaty".[964]

691. The Respondent, on the other hand, considers the applicable test to be the following:

> "For a State action rescinding a contract to be considered an expropriation – a compensable governmental taking of property – the State must have deprived the Claimant of its rights by *acting outside the legal framework of the contract or concession on the basis of superior sovereign authority (puissance publique)*".[965]

692. While the two tests proposed by the Parties are not identical, the Tribunal does not find them irreconcilable, at least in the context of their application in the present dispute. In the Tribunal's view, the pivotal question is whether the Respondent, in terminating the contract, acted in the exercise of its sovereign powers (*puissance publique*) rather than as an ordinary contracting party. The presence of this element allows distinguishing between mere breaches of contracts (which would normally not give rise to international responsibility) and acts which, while expressed as contractual, are in reality sovereign acts which may implicate state responsibility. Differently put, the Tribunal must objectively determine whether the purported exercise of a contractual act

---

[962] See also Counter-Memorial, para. 434 ("although a tribunal's goal is to determine whether a respondent violated its commitment not to expropriate under the relevant investment treaty, it can only do so after it has understood the precise contours of the rights and obligations of both the claimant and the contracting party under the relevant contract").

[963] See *supra* Section VI.C.3.

[964] Reply, para. 519 (emphasis added).

[965] Counter-Memorial, para. 433 (emphasis in the original).

is evidencing the characteristics of the exercise of sovereign power and is thus to be characterized as a sovereign act.

693.    The Tribunal finds support for this approach in an established line of cases.

694.    In *Impregilo v. Pakistan*, the tribunal noted that:

> "a Host State acting as a contracting party does not 'interfere' with a contract; it 'performs' it. If it performs the contract badly, this will not result in a breach of the provisions of the Treaty relating to expropriation or nationalisation, unless it be proved that the State or its emanation has gone beyond its role as a mere party to the contract, and has exercised the specific functions of a sovereign authority. [...]
>
> it is the Tribunal's view that only measures taken by Pakistan in the exercise of its sovereign power (*'puissance publique'*), and not decisions taken in the implementation or performance of the Contracts, may be considered as measures having an effect equivalent to expropriation."[966]

695.    In *Siemens v. Argentina*, the ICSID tribunal similarly remarked that:

> "for the State to incur international responsibility it must act as such, it must use its public authority. The actions of the State have to be based on its 'superior governmental power'. It is not a matter of being disappointed in the performance of the State in the execution of a contract but rather of interference in the contract execution through governmental action."[967]

696.    Other investor-state cases are to a similar effect.[968]

697.    With those standards in mind, the Tribunal now reviews the act through which the CVG terminated the MOC.

---

[966] *Impregilo SpA v. Pakistan*, ICSID Case No. ARB/03/3, Decision on Jurisdiction, 22 April 2005, **Exh. RLA-75**, paras 278, 281.

[967] *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, para. 253.

[968] See *AWG Group Ltd. v. Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010, **Exh. RLA-120**, para. 153 ("In investor-State arbitrations which involve breaches of contracts concluded between a claimant and a host government, tribunals have made a distinction between *acta iure imperii* and *acta iure gestionis*, that is to say, actions by a State in exercise of its sovereign powers and actions of a State as a contracting party. It is the use by a State of its sovereign powers that gives rise to treaty breaches, while actions as a contracting party merely give rise to contract claims not ordinarily covered by an investment treaty"); *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, **Exh. CLA-49**, para. 315 ("contractual breaches by a State party or one of its instrumentalities would not normally constitute expropriation. Whether one or series of such breaches can be considered to be measures tantamount to expropriation will depend on whether the State or its instrumentality has breached the contract in the exercise of its sovereign authority, or as a party to a contract."); *Consortium R.F.C.C. v. Kingdom of Morocco*, ICSID Case No. ARB/00/6, Award, 22 December 2003, **Exh. RLA-65**, para. 65 ("In order for there to be a right to compensation, the expropriated Claimant must prove that it has been the target of measures taken by the State acting not as a co-contracting party, but as a public authority", Tribunal's translation).

698.    The CVG effected the termination of the MOC by way of Resolution No. 003-11 of 3 February 2011, issued by Minister of Mines José Khan in his function of President of the CVG. The Resolution recalls that "[m]ining is of an eminent public policy [...]" and "therefore, the Administration, using its power of self-governance (*potestad de autotutela*) to achieve the general interest, has the power to unilaterally rescind contracts for reasons of opportunity and convenience (*oportunidad y conveniencia*)".[969] The Resolution further recalls Clause 24 of the MOC, which contemplates the CVG's right to unilaterally rescind the contract.[970]

699.    In the operative part of the Resolution, the CVG states its decision to unilaterally rescind the MOC "for reasons of opportunity and convenience [...] due to the cessation of activities for more than one (1) year, in accordance with Clause Twenty-Four of the [MOC]".[971]

700.    In the Tribunal's mind, the fact that the MOC was terminated for an alleged contractual ground, i.e. failure to perform for one year (as well as for reasons of opportunity and convenience) does not in and of itself exclude the possibility of a treaty breach.[972] Having reviewed the circumstances of the case, and in particular all of the acts which throughout the years implicated several governmental organs—the Ministry of Environment, the Ministry of Mines, the Venezuelan Presidency—as well as the CVG, the Tribunal has come to the conclusion that the true nature of the act, howsoever expressed, was one of exercise of sovereign authority.

701.    First, this is evident as a matter of substance. The Tribunal is convinced that the evidence on the record clearly shows that the MOC was terminated to give effect to the superior policy decisions dictated by the higher governmental spheres. The governmental statements and acts recalled above evince that the Respondent had a number of reasons for opposing Crystallex's continued involvement in the project, from the simple desire of regaining the mine into Venezuelan hands,[973] to the plan to develop

---

[969] CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**, fifth whereas.

[970] CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**, sixth whereas.

[971] CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**, Decision no. 1.

[972] See also *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, **Exh. CLA-68**, para. 138 ("the fact that a State exercises a contract right or remedy does not in and of itself exclude the possibility of a treaty breach").

[973] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**; Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information (extracts), 25 April 2010, **Exh. C-62**.

the mine with a new partner perceived to be politically more aligned,[974] to the general aversion to transnationals,[975] to the intention to boost its international reserves.[976]

702.    The Resolution No. 003-11 of 3 February 2011 does not refer to the Respondent's desire to "take back" or "reclaim" Las Cristinas and to "recover [its] gold", and rather purports to terminate the MOC for alleged contractual grounds (Crystallex's cessation of activities for over one year). There can, however, be no doubt in the Tribunal's eyes that this ground was not more than an appearance to use a contractual remedy rather than to resort to a sovereign decision to regain control of the mine. The Tribunal need only look at the CVG's internal correspondence for evidence that such ground was non-existent even or rather precisely in the eyes of the CVG—i.e., Crystallex's contractual partner who had been working with it on the ground for almost a decade.

703.    As already recalled,[977] in an internal communication dated 28 February 2011, a few weeks after the termination, the legal department of the CVG requested from its Vice-President "information [...] regarding the reasons why Crystallex International Corporation has paralyzed activities for over one (1) year [...]".[978] The legal department asserted that it was seeking this information "in order to support the administrative record in question",[979] making it clear that the CVG's legal department was lacking such basic information. The response supplied by the Vice-President, Mr. Colmenares, on 17 March 2011 was that Crystallex had executed all of its tasks under the MOC with the exception of gold exploitation, as it did not have a Permit:

> "[A]ccording to reports from the Liaison Office [...] Crystallex International Corporation has completed the various tasks set forth in said Operation Contract, with the exception of the tasks corresponding to the construction and development stage of the exploitation phase [...] due to the fact that it was not granted the Permit [...]".[980]

---

[974] "Venezuela offers Russians big gold projects", Reuters, 6 November 2008, **Exh. C-45**; Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53**.

[975] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exh. C-65**.

[976] Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, p. 0003.

[977] See *supra* paras. 611-612.

[978] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[979] Cited in Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

[980] Letter from José Luis Colmenares, CVG Vice President of Industrial Development, to Elizabeth Leal, CVG General Legal Counsel, 17 March 2011, **Exh. C-422**.

704.    Thus, not even the CVG officers—the ones monitoring Crystallex's compliance with the contract—could find evidence of the "cessation of activities" (*paralización de actividades*) invoked in the 3 February 2011 Resolution.

705.    In short, the termination was not due to a *bona fide* dispute about the Parties' obligations under the MOC or its performance by Crystallex. It was devised to give effect to the Respondent's unconcealed political agenda in respect of mining generally, and the Las Cristinas mine in particular. The termination, for which the statements of Venezuela's President and Ministers provided the true rationale, was an attempt by Venezuela to "recover the mine", without payment of any compensation. It thus constituted the final sovereign act which completed the expropriatory process.

706.    This would suffice for the Tribunal's conclusion as to expropriation under the Treaty. The Tribunal, however, is further reinforced in its conclusion considering that, also as a matter of Venezuelan law, the termination of the MOC cannot be viewed as anything other than a sovereign act. First, the CVG expressly invoked its power of self-adjudication and self-enforcement (*autotutela*),[981] a power that only entities acting as an authority (and not as a contractual party) may exercise.[982] Secondly, the CVG specifically invoked reasons of "opportunity and convenience" to terminate the MOC, which constitutes an example of an exorbitant public law prerogative deriving from sovereign authority or *ius imperium* under Venezuelan law.[983] Finally, the termination was effected through a "Resolution", a formal administrative act under Venezuelan law.[984]

707.    These additional considerations confirm that the true nature of the rescission was an exercise of sovereign authority, and not an exercise of a contractual right to unilaterally terminate the contract.[985]

708.    In conclusion, the conjunction and progression of acts performed by different governmental organs, starting from the actions surrounding the denial of the Permit, continuing with the announcements that Venezuela would "take back" Las Cristinas, and ending with the repudiation of the MOC, had the effect of substantially depriving Crystallex of the economic use and enjoyment of its investment, and ultimately rendered it entirely useless. The Tribunal thus concludes that the cumulative and

---

[981] CVG Resolution No. 003-11, 3 February 2011, **Exh. C-68**, fifth whereas.

[982] Direct Examination of J. Muci, Tr. [Jurisdiction and Merits], Day 7, at 1700:13-17.

[983] ER Muci, p. 13.

[984] ER Muci, p. 42.

[985] See also Decision of the Political Administrative Chamber of the Supreme Tribunal of Justice No. 1690, 7 December 2011 (*MINCA case*), **Exh. JMB-175** (where the Political-Administrative Chamber of the Supreme Tribunal of Justice concluded that the unilateral decision by the President of the CVG to rescind a (prior) exploration and exploitation contract over Las Cristinas, due to alleged breaches of the contract attributable to the CVG's counterparty, was a typical administrative act, issued by the CVG in exercise of its *ius imperium*).

incremental effect of those measures was "equivalent to [...] expropriation" under Article VII(1) of the Treaty.

709.    In light of this conclusion, the Tribunal may dispense with analyzing whether the MOC termination also constitutes a *direct* expropriation, as any finding in this respect would have no impact on liability or on quantification of damages.

710.    Finally, the Tribunal rejects one last argument put forward by Venezuela, namely that neglect of local remedies should be viewed as a "determinative factor on the merits of an expropriation claim".[986] Article XII(3)(b) of the Treaty requires that an investor terminate any domestic proceedings in order to pursue its international remedies.[987] To read a pursuit of local remedies requirement as part of the substantive cause of action would entail bringing in by the back door a requirement that is excluded at the front door (i.e., an exhaustion requirement as a pre-condition to arbitration). As the Ad Hoc Committee in *Helnan v. Egypt* explained, in annulling the tribunal's finding to the contrary effect:

> "[I]t is an entirely different matter to impose upon an investor, as condition 'to become an international delict for which [the Contracting State] would be held responsible under the Treaty,' a requirement that the decision of a Government Minister, taken at the end of an administrative process, must in turn be challenged in the local court. Such a decision is one for which the State is undoubtedly responsible at international law, in the event that it breaches the international obligations of the State. Moreover, the characterization of such an act as unlawful under international law is not affected by its characterization as lawful under internal law. Thus a decision by a municipal court that the Minister's decision was lawful (a judgment which such a court could only reach applying its own municipal administrative law) could not preclude the international tribunal from coming to another conclusion applying international law".[988]

c.    **Were the conditions for expropriation met?**

711.    Consistent with international standards, Article VII(1) of the Treaty provides that any expropriation must be carried out (i) for a public purpose, (ii) under due process of law, (iii) in a non-discriminatory manner and (iv) against prompt, adequate and effective compensation. The Tribunal now looks at whether Venezuela's conduct met each of these conditions.

---

[986] Counter-Memorial, para. 481.

[987] See BIT, Article XII(3) (providing that "[a]n investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if: [...] (b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting party concerned or in a dispute settlement procedure of any kind").

[988] *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No ARB/05/19, Annulment Proceeding, Decision of the ad hoc Committee, 14 June 2010, **Exh. CLA-165**, para. 51 (internal footnotes omitted).

712.    With regard to public purpose, the Tribunal notes that the Claimant has not challenged Venezuela's compliance with this condition. Venezuela, on its part, contends that taking back Las Cristinas served the public purpose of returning the project to the Venezuelan State so that it might find a means to fulfill Venezuela's public policy goal of bringing the mine into production.[989] States are afforded a wide margin of appreciation in determining whether an expropriation serves a public purpose.[990] Under the circumstances and insofar as necessary given the Parties' position on this question, the Tribunal accepts that Venezuela purported to pursue a public interest goal in expropriating Crystallex's investment.

713.    With regard to due process, the Tribunal accepts the standard set out in this respect by the tribunal in *ADC v. Hungary*, a case cited favorably by both Parties:

> "'due process of law', in the expropriation context, demands an actual and substantive legal procedure for a foreign investor to raise its claims against the depriving actions already taken or about to be taken against it. Some basic legal mechanisms, such as reasonable advance notice, a fair hearing and an unbiased and impartial adjudicator to assess the actions in dispute, are expected to be readily available and accessible to the investor to make such legal procedure meaningful. In general, the legal procedure must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard. If no legal procedure of such nature exists at all, the argument that '*the actions are taken under due process of law*' rings hollow".[991]

714.    Measured against this standard, the Tribunal finds that the Claimant has not sufficiently established that the expropriation was carried out in disrespect of due process standards. As already noted when discussing the due process allegations under FET, to which the Tribunal refers,[992] while the Tribunal is not insensitive to the Claimant's dissatisfaction with the ruling on the motion for reconsideration in respect of the Permit denial and with the Ministry's failure to render a decision on the hierarchical appeal, it is the Tribunal's view, especially in light of the experts' testimonies, that the Claimant did not sufficiently establish a due process violation in relation to the course of events relating to the motion for reconsideration and the failure to render a decision on the hierarchical appeal. Similarly, the Tribunal considers that the Claimant has not been able to sufficiently establish that due process was violated because no prior

---

[989] Rejoinder, para. 507.

[990] See *Amoco International Finance Corp. v. Government of the Islamic Republic of Iran*, Iran-U.S. Claims Tribunal, Partial Award No. 310-56-3, 14 July 1987, **Exh. CLA-13**, para. 145 ("A precise definition of the "public purpose" for which an expropriation may be lawfully decided has neither been agreed upon in international law nor even suggested. It is clear that, as a result of the modern acceptance of the right to nationalize, this term is broadly interpreted, and that States, in practice, are granted extensive discretion").

[991] *ADC Affiliate Ltd. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, **Exh. CLA-50**, para. 435.

[992] See *supra* paras 619-621.

administrative procedure was started by the Venezuelan authorities before the termination of the MOC. Under the circumstances, the Claimant has thus not sufficiently established that this condition under Article VII(1) of the Treaty has been breached.

715.    With regard to discrimination, the Tribunal similarly refers to its earlier findings on discrimination under FET which it considers relevant, *mutatis mutandis*, for its examination of the fulfilment of this particular requirement under expropriation.[993] The Tribunal recalls that to show discrimination the investor must prove that it was subjected to different treatment in similar circumstances without reasonable justification,[994] typically on the basis of its nationality or similar characteristics. When examining discrimination under FET, the Tribunal has already elaborated on the lack of sufficiently appropriate comparators to support a finding of discrimination in this case. While the Tribunal has not overlooked the repeated and rather derogatory references to "transnationals" and "transnational companies" in the President's and the Ministers' statements,[995] it is not satisfied that there are conclusive elements in the record which would support the conclusion that the expropriation was carried out in a discriminatory manner.

716.    Finally, pursuant to Article VII(1) of the Treaty, expropriation must be accompanied by "prompt, adequate and effective compensation". It is undisputed that no such compensation was either paid or offered to Crystallex. When a treaty cumulatively requires several conditions for a lawful expropriation, arbitral tribunals seem uniformly to hold that failure of any one of those conditions entails a breach of the expropriation provision.[996]

---

[993] See *supra* paras 616-617.

[994] See *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 313.

[995] See Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, page 0003 ("[T]he Las Cristinas mine, which used to be managed by transnational company Crystallex, is expected to begin being exploited in 2009. […] [T]he mine will be reclaimed and operated by the State".); "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias*, 17 October 2010, **Exh. C-65**, page 0003 ("Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies. I announce to the world that the revolutionary Government recuperated it, together with the Las Brisas mine. These mineral resources are for the Venezuelan people, not for transnationals […]".).

[996] See, *e.g., Bernardus Henricus Funnekotter et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009, **Exh. RLA-107**, para. 98 ("The Tribunal observes that the conditions enumerated in Article 6 are cumulative. In other terms, if any of those conditions is violated, there is a breach of Article 6."); *Saluka Investments BV v. Czech Republic*, PCA/UNCITRAL, Partial Award, 17 March 2006, **Exh. CLA-48**, para. 266 (non-compliance with one or more of the conditions set out in Article 5 of the treaty would lead to the conclusion that the respondent has breached Article 5 of the Treaty); *Kardassopoulos v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 28 February 2010, **Exh. CLA-74**, para. 390 (noting that absence of due process is sufficient to support a finding that the expropriation was wrongful); *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v. Argentina*, ICSID Case No ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 7.5.21 (lack of compensation makes an expropriation unlawful); *Siag and Vecchi v. Egypt*, ICSID Case No ARB/05/15,

717.    Under the circumstances, the Tribunal cannot but conclude that Venezuela breached Article VII(1) of the Treaty, as no "prompt, adequate and effective compensation" was either offered or provided to Crystallex.

***

718.    For the foregoing reasons, the Tribunal concludes that Venezuela breached Article VII(1) of the Treaty, by expropriating Crystallex's investment without providing prompt, adequate and effective compensation.

---

Award, 11 May 2009, **Exh. CLA-67**, para. 428; *Marion & Reinhard Unglaube v. The Republic of Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award, 16 May 2012, **Exh. CLA-169**, para. 305; *Gemplus, S.A. and Talsud, S.A. v. Mexico*, ICSID Case Nos. ARB(AF)/04/3 and ARB (AF)/04/4, Award, 16 June 2010, **Exh. CLA-78**, para. 8-25 ("The Tribunal concludes that these expropriations were unlawful under the BITs and international law, given the facts found by the Tribunal and the further fact that the Respondent did not meet the condition required by Article 5 of both treaties regarding the payment of adequate compensation").

## VIII.  REPARATION

### A.    OVERVIEW OF THE PARTIES' POSITIONS

719.    According to the Claimant, restitution has become "impossible" after Venezuela granted rights in relation to Las Cristinas to CITIC. Therefore, the Claimant seeks damages as of 3 February 2011 for the Las Cristinas project in the amount of its alleged fair market value of US$3.16 billion based on the average of results from four valuation methodologies. The Claimant further asks the Tribunal to (i) award pre- and post-award interest at the rate of 8% per annum compounded semi-annually, (ii) declare that the award of damages and interest is net of applicable Venezuelan taxes and that Venezuela may not deduct taxes, (iii) order Venezuela to indemnify the Claimant in respect of any double taxation liability in Canada or elsewhere, and (iv)  order Venezuela to pay all the costs and expenses of this arbitration.

720.    The Respondent submits that (i) restitution is not an available remedy in this case; (ii) the BIT's standard of compensation – and not customary international law – is the controlling legal standard; (iii) the Claimant is not entitled to damages other than the fair market value assessed at the time of the alleged taking; (iv) the Claimant is not entitled to damages because (a) the alleged damages are "highly speculative, if not entirely fictional"; (b) the valuation methods put forward by Claimant are inappropriate in the circumstances and contrary to international arbitral practice; and (c) the Claimant has failed to establish any causal link between the alleged wrongful acts and the requested damages. Finally, the Respondent argues that the Claimant is not entitled to compound interest or tax indemnity.

### B.    RESTITUTION

#### 1.    The Claimant's Position

721.    Until the Hearing, the primary remedy sought by the Claimant was restitution of its investment through the re-establishment of the MOC according to its terms and through the grant of the Permit, together with any consequent damages as a consequence of not granting the Permit earlier.[997] The Claimant had invoked Article XII(9) of the BIT, which reads as follows:

> "A Tribunal may award, separately or in combination, only:
>
> (a) monetary damages and any applicable interest;

---

[997] See Memorial, paras 392-397, 495; Reply, paras 585-590, 751.

> (b) restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and applicable interest in lieu of restitution [...]".

722.   For the Claimant, the principle governing recovery from injury for internationally wrongful acts is that of "full reparation".[998] Pursuant to the *Chorzów Factory* ruling by the Permanent Court of International Justice (PCIJ) and the ILC Articles on State Responsibility, a state's first obligation to remedy an international wrongful act is to make restitution.[999] Echoing the ILC Articles and arbitral decisions, the Claimant had submitted that restitution should be ordered, provided it was not materially impossible and did not result in a burden out of proportion as compared to compensation.[1000]

723.   At the hearing, the Claimant stated that:

> "Until recently, restitution seemed like a possibility here. However, it appears that the CITIC transaction has rendered restitution impossible and, therefore, I'm going to focus the remainder of my presentation on the Fair Market Value."[1001]

724.   In reply to a question from the Tribunal as to whether the Claimant had withdrawn its claim for restitution,[1002] the Claimant clarified that it had not withdrawn such claim *per se*, but rather indicated that restitution has become impossible after the Venezuelan Government entered into agreements with a third party, CITIC, granting it rights to Las Cristinas.[1003] As a result, the Claimant contends, "the parties have agreed that the Claimant's restitution claim is now moot".[1004] Accordingly, the Claimant's request for relief as expressed in its post-hearing submission and its supplemental submission on quantum of 12 September 2014 (hereinafter, "C-Supplemental Quantum Submission") no longer includes restitution.[1005]

## 2.   The Respondent's Position

725.   In its Counter-Memorial and Rejoinder, Venezuela argued that restitution is not an appropriate remedy in this case. First, the Respondent noted that restitution is not available for expropriation, because Article VII of the BIT on expropriation clearly

---

[998] Memorial, para. 393.

[999] Memorial, paras 393-394.

[1000] Memorial, paras 394-395, citing to Art. 35 of the ILC Articles on State Responsibility.

[1001] Tr. [Jurisdiction and Merits], Day 1, 205: 14-18 (Claimant's Opening (Yanos)).

[1002] See Tribunal's Questions, 4 March 2014, Question 2.

[1003] C-PHB, Annex, para. 2.1.

[1004] C-PHB, Annex, para. 2.1.

[1005] See C-PHB, para. 749; C-Supplemental Quantum Submission, para. 55, reproduced *supra* at 184.

refers only to monetary compensation (through the use of the terms "payable", "interest", "paid" and "effectively realizable and freely transferable").[1006] Furthermore, even in circumstances where restitution is awarded, Article XII(9) of the BIT allows a Contracting Party to pay monetary damages rather than make restitution of property.[1007]

726.    According to the Respondent, arbitral decisions show that restitution is rarely awarded, especially in cases involving natural resources, concessions and related contracts.[1008] In the context of Las Cristinas, the Respondent submits that such a remedy would imply the re-establishment of a contractual relationship that had been terminated for lack of activity on the part of the Claimant for more than a year and the granting of an environmental Permit for a project "fraught with technical deficiencies and unmitigated social and environmental repercussions".[1009] The Respondent also contends that an award for restitution would constitute a reparation wholly disproportional to its interference with Venezuela's sovereignty when compared to monetary compensation.[1010]

727.    In its post-hearing submission, the Respondent notes that at the hearing the Claimant explicitly withdrew its claim for restitution.[1011]

### 3.    Analysis

728.    There is no need to further discuss the restitution claim, as both Parties, out of different considerations, reject it.

## C.    MONETARY COMPENSATION

729.    With regard to monetary compensation, the Tribunal sets out first the positions of the Parties as to the relevant issues (Section 1), followed by its Analysis (Section 2).

---

[1006] Counter-Memorial, para. 497.

[1007] Counter-Memorial, paras 498-499.

[1008] Counter-Memorial, paras 501-504.

[1009] Rejoinder, para. 484.

[1010] Rejoinder, para. 488.

[1011] R-PHB, para. 234.

1.    **The Positions of the Parties**

a.    **The standard of compensation**

i.    **The Claimant's Position**

(a)    *Fair market value*

730.    The Claimant submits that it is entitled to monetary damages and any applicable interest on the basis of compensation principles established under customary international law.[1012]

731.    For the Claimant, the compensation standard listed under Article VII(1) of the Treaty applies only to lawful expropriations, *i.e.* expropriations that are carried out in accordance with all of the conditions for legality (public purpose, due process, non-discrimination, and the timely payment of appropriate compensation).[1013] With regard to unlawful expropriations and other Treaty breaches (such as violations of the FET and FPS standards), the Claimant contends that "the Treaty provides no compensation formula or a *lex specialis* (or requirement for an expropriation date) […]".[1014] In these circumstances, tribunals must look to customary international law for the applicable standard of reparation and apply the *Chorzów Factory* principle of "full reparation".[1015] This means placing Crystallex in the economic position it would have been had the wrongful acts never occurred.[1016] For the Claimant, the quantum of compensation owed to Crystallex for Venezuela's Treaty breaches other than expropriation is identical to that which would be owed under an unlawful expropriation theory, because the destructive consequence of Venezuela's unlawful acts for Crystallex's investment were the same (regardless of their characterization as one or another form of Treaty breach).[1017]

732.    To achieve full reparation, monetary compensation should, Crystallex claims, be assessed according to the "fair market value" of its investment.[1018] In any event, the Claimant contends that "genuine value" pursuant to Article VII(1), which the Claimant submits applies only to lawful expropriations, is synonymous with fair market value.[1019]

---

[1012] Memorial, paras 398-400.

[1013] Reply, para. 593.

[1014] Memorial, para. 399.

[1015] Reply, para. 595.

[1016] Reply, para. 598.

[1017] C-PHB, para. 556.

[1018] Memorial, para. 402; Reply, para. 601, referring to the ILC Articles on State Responsibility, Commentary *sub* Art. 36, para. 22.

[1019] Reply, para. 602. See also Memorial, para. 402, fn. 818.

733.    The Claimant argues that when an investment is characterized by reasonably contemplating certain prospects of profitability, as was the case with Crystallex's investment in the Las Cristinas gold deposit, international law requires that the fair market value of the investment take into account such future prospects.[1020] At the time of Venezuela's measures, Crystallex was poised to begin construction at Las Cristinas, to be followed by production a short time thereafter.[1021] Furthermore, the Claimant argues that predicting future income from ascertained reserves to be extracted by the use of traditional mining techniques, as is the case of Las Cristinas, can be done with a significant degree of certainty, even without a record of past production.[1022]

(b)    *Valuation date*

734.    With regard to the valuation date, the Claimant submits that 3 February 2011, i.e., the date of the rescission of the MOC, is the appropriate valuation date since it coincides with the final expropriation of its investment and also with the moment when Crystallex was no longer required to fund the asset.[1023]

735.    On the contrary, 13 April 2008, i.e. the date of denial of the Permit, would be an inappropriate valuation date, because at this point in time the act of taking was not irreversible; indeed, Venezuela indicated between April 2008 and February 2011 that the MOC was in full force and that the Permit could still be obtained, whereas the taking became irreversible on 3 February 2011 with the rescission of the MOC.[1024] For the Claimant, an April 2008 valuation date would allow Venezuela to escape its obligation to make "full reparation" for its wrongful conduct and instead to benefit from that conduct.[1025]

736.    For the Claimant, valuing Crystallex's investment as of April 2008 would deprive Crystallex of the fair market value of its expropriated investments on the date of the taking and of the benefit of its economic foresight (i.e., having predicted at the time it began investment that the price of gold would rise), while improperly rewarding Venezuela for its unlawful conduct by permitting it to take advantage of the increase in the value of Crystallex's investment that occurred between April 2008 and the culmination of Venezuela's expropriation in February 2011.[1026]

---

[1020] Reply, para. 604.

[1021] Reply, para. 607.

[1022] Reply, para. 608.

[1023] Reply, para. 609.

[1024] Reply, paras 610-612.

[1025] C-PHB, paras 557-559; C-Supplemental Quantum Submission, para. 8.

[1026] C-Supplemental Quantum Submission, para. 10.

737.    However, even if the Tribunal were to find that Venezuela's expropriation occurred in April 2008, in the Claimant's view, compensation should still be awarded based on a valuation date of February 2011. This is because the expropriation by Venezuela was not conducted lawfully under the parameters established under the Treaty, but constituted an unlawful expropriation in breach of Venezuela's Treaty obligations and customary international law, which requires Crystallex to be compensated as of the valuation date that most closely affords it full reparation.[1027]

738.    Finally, the Claimant notes that, if the Tribunal were to adopt an April 2008 valuation date, it would need to order separate compensation for the significant additional costs incurred by Crystallex after April 2008, in connection with its work on the Las Cristinas Project. These expenses would not have been incurred if Venezuela had actually provided Crystallex with prompt and effective compensation for the expropriation at that time. These "consequential damages" amount to approximately US$ 180 million.[1028]

(c)    *Burden of proof and causation*

739.    As to the burden of proof, the Claimant accepts that it has to prove the damage suffered from Venezuela's wrongful acts, but contends that the standard of proof is one of a balance of probabilities, i.e., it is enough for the tribunal to be able to admit with sufficient probability the existence and extent of the damage.[1029] The Claimant further accepts that it has to prove causation. It submits that there must be a "sufficient causal link" between the cause and effect, such that the breach was "the proximate cause of the harm".[1030] The Claimant argues that it has established that Venezuela's measures not only caused a reduction in the value of its investment, but they destroyed the entirety of that investment.[1031]

740.    The Claimant further notes in respect of causation that (i) Crystallex had obtained financing for the exploration phase; (ii) Las Cristinas had proven and probable gold resources and reserves; and (iii) Crystallex has a proven track record of operating gold mines in Venezuela.[1032] Thus, there is nothing speculative about the damage suffered by Crystallex.[1033] In addition, the Claimant argues that the issuance of the Permit would

---

[1027] C-Supplemental Quantum Submission, para. 11.

[1028] C-Supplemental Quantum Submission, para. 13.

[1029] Reply, para. 614, citing to *Sapphire International Petroleums LTD. v. National Iranian Oil Company*, Award, 15 March 1963, **Exh. CLA-123**, p. 188.

[1030] Reply, para. 615.

[1031] Reply, para. 616.

[1032] Reply, paras 618-619.

[1033] Reply, para. 622.

have facilitated Crystallex's ability to secure further financing,[1034] and that on 11 February 2008, only two months before Crystallex was denied the Permit, Crystallex had been able to raise CDN$69.1 million (approximately US$ 69.0 million) through equity financing, providing sufficient cash to begin construction of the Las Cristinas plant and site and to proceed with the development of the mine.[1035]

741. In any event, even if, *arguendo*, Crystallex could not have financed the development of Las Cristinas (which the Claimant denies),[1036] the company-specific shortcoming of the owner of those rights would be irrelevant to the Fair Market Value of the rights, held by Crystallex in the MOC.[1037]

742. In this respect, Crystallex submits that the quantum issue before the Tribunal is not Crystallex's ability to develop and operate Las Cristinas. Rather, the relevant inquiry is what price Crystallex would have obtained for its right to exploit Las Cristinas in an at arm's length sale.[1038] This is because Fair Market Value is an impersonal detached measure, reflecting the "consensus of the market" as to the value of a particular right or asset, rather than the unique circumstances of a particular holder of a right or asset.[1039]

ii. **The Respondent's position**

(a) *The BIT's standard of compensation*

743. Venezuela contends that, if the Respondent's liability under the BIT is established (which it denies), the standard of compensation provided by Article VII of the BIT controls the computation of monetary damages. For the Respondent, the customary international law principle of "full reparation" has developed in the sphere of inter-state relations and is inapplicable in investor-state arbitration.[1040] The Respondent relies on a passage in *Chorzów* to argue that the scope of the obligation of reparation differs depending on whether an alleged breach concerns the rights of a sovereign state or the rights of a private entity.[1041] Venezuela finds further support in the ILC Articles on State Responsibility, which, it contends, carve out obligations owed to entities other than states.[1042] While Venezuela maintains that the ILC Draft Articles on State

---

[1034] Reply, paras 706-707.

[1035] Reply, para. 709.

[1036] See *supra* Section V.A.1.d.

[1037] C-PHB, para. 567.

[1038] C-PHB, para. 710.

[1039] C-PHB, para. 710.

[1040] Counter-Memorial, paras 551-558.

[1041] Counter-Memorial, paras 552-553.

[1042] Counter-Memorial, paras 554-558, referring to Articles 33, 28 and 55 of the ILC Articles.

Responsibility are not appropriate in the context of this investor-state dispute, it refers to them in its written pleadings "to the extent that they may be used as guidance".[1043]

744.  For the Respondent, Article VII(1) of the BIT makes no distinction between lawful and unlawful expropriations, but only refers to measures depriving investors of their property. Thus, the plain meaning of "compensation" coupled with the absence of a distinction between legal and illegal deprivation measures should be given its natural effect, and, consequently, the treaty-based compensation should be applied to any conduct resulting in a deprivation of rights as long as it is established under the BIT.[1044] The standard of compensation provided by a treaty is *lex specialis* superseding the *lex generalis* of customary international law.[1045]

745.  For the Respondent, the Parties' disagreement over the applicable standard of reparation is ultimately "largely irrelevant", because the Claimant agrees that monetary damages must be assessed by reference to the fair market value of its investment at the time of the alleged deprivation, which is consistent with Article VII(1) of the BIT.[1046] Venezuela suggests that the only implication from the customary international law standard that the Claimant appears to draw is (i) that a date of valuation other than the date of the alleged deprivation be applicable, and (ii) that the award include compound interest and a tax indemnity.[1047]

(b)  *Valuation date*

746.  Venezuela submits that the valuation date should be 13 April 2008 (i.e., the day before the denial of the Permit), and not 3 February 2011.[1048] Only the first date is, in the Respondent's view, consistent with the terms of Article VII of the BIT (setting the date of valuation "immediately before the expropriation or at the time the proposed expropriation became public knowledge") and international arbitral practice.[1049] Because the date on which an investment must be valued is the date when the investor has been deprived of his fundamental rights of ownership, irrespective of whether legal title is affected, 14 April 2008 is the date on which the alleged deprivation occurred.[1050]

---

[1043] Counter-Memorial, p. 291, fn. 1074.

[1044] Counter-Memorial, para. 560-562.

[1045] Counter-Memorial, para. 563.

[1046] Rejoinder, para. 532. See also Counter-Memorial, para. 496.

[1047] Rejoinder, para. 532.

[1048] Counter-Memorial, paras 576-577.

[1049] Counter-Memorial, paras 578-582 (discussing *Santa Elena v. Costa Rica*; *Gemplus v. Mexico*; *Metalclad v. Mexico*); Rejoinder, para. 535.

[1050] Counter-Memorial, para. 579. See also First ER Hart, paras 100-109, esp. 101 (noting that "[o]nce [the] Permit denial was known, the value of the Las Cristinas Project was affected, as potential investors were aware that mining operations could not begin. Even though the MOC was not rescinded until February 2011, it is not reasonable to

By contrast, the Claimant's choice of 3 February 2011 allows it to choose a higher spot price and to increase the amount of economically extractable gold contained in the ore.[1051]

747.    The Respondent further notes that in 2008 the Claimant clearly saw the denial of the Permit as constituting a potential dispute under the Treaty, as shown by its 24 November 2008 Notice of Dispute.[1052] As a consequence, the Claimant cannot seriously claim that its alleged "right to mine" only became affected two years later.[1053] Even assuming *arguendo* that additional discussions may have occurred with Crystallex after that date, the fact remains that its investment in Las Cristinas was negatively impacted with the denial of the Permit and this would have been considered by a hypothetical buyer of Crystallex's alleged rights.[1054]

748.    On the so-called "consequential damages" amounting to US$ 180 million, to which the Claimant argues that it is entitled,[1055] the Respondent submits that this theory is completely new and has never been presented before in this arbitration. Furthermore, this new category of damages has not been independently assessed by the Claimant's damages experts and includes inappropriate and unjustified costs. Moreover, the Claimant has not shown that these costs are attributable to Venezuela's alleged conduct.[1056]

(c)    *Burden of proof and causation*

749.    The Respondent disputes the Claimant's position that the standard of proof for damages is the "balance of probabilities".[1057] For the Respondent, future losses must rather be proven with "sufficient certainty",[1058] as damages claims that resort to mere probabilities, uncertainties, and guess work cannot be recovered.[1059]

750.    Furthermore, the Respondent submits that the Claimant failed to establish the requirement of causation, namely a causal link between Venezuela's conduct and the

---

assume that any outside party would not be negatively influenced by the fact that the Environmental Permit had been denied almost three years earlier").

[1051] Rejoinder, para. 554.

[1052] R-Supplemental Quantum Submission, para. 12.

[1053] R-Supplemental Quantum Submission, para. 12.

[1054] R-Supplemental Quantum Submission, para. 13.

[1055] See *supra* para. 738748.

[1056] R-Supplemental Quantum Submission, para. 15.

[1057] Rejoinder, para. 544.

[1058] Rejoinder, para. 545.

[1059] R-Supplemental Quantum Submission, para. 6.

alleged loss sustained and future profits.[1060] As further detailed below, for the Respondent the claimed damages in this case are too remote and inherently speculative.[1061] In particular, the Claimant's future profits are premised on many unfulfilled and unfounded assumptions and take no account of the host of uncertainties and risks which were prevalent in the Las Cristinas project.[1062] Venezuela posits that the unsubstantiated assumptions destroy the causality between the alleged breaches and the loss of the alleged future profits.[1063]

### b.     Calculation of fair market value

### i.     The Claimant's position

751.    According to the Claimant, the key factors to arrive at an accurate estimate of the value of a gold mine are (i) the size of the deposit and the reserves it holds; (ii) the effect of gold prices on reserves and resources; and (iii) the ease and cost of extraction.[1064]

752.    With regard to the size of the deposit, the Claimant argues that, by hiring Mine Developing Associates (MDA) and investing in a complex process of drilling and testing between 2003 and 2007, Crystallex succeeded in increasing proven and probable reserves at Las Cristinas by 77% relative to the proved and probable reserves known at the time Crystallex assumed control in 2002.[1065] In particular, the Claimant submits that the "MDA 2007 Technical Report" confirmed that Las Cristinas had proven and probable reserves estimated at 16.86 million ounces of gold *in situ*.[1066]

753.    With regard to the effect of gold prices, the Claimant submits that a prospective buyer would have to update the MDA figures for 2007 (an amount of gold based on a gold price of US$ 550 per ounce) by applying the higher price prevailing on 3 February 2011, i.e. US$ 1,328 per ounce.[1067] In this respect, the Claimant argues that its expert, Mr. Ellis, was instructed to prepare such a reserve update and that "[u]sing a cut off grade of 0.31 grams per tonne, Mr. Ellis calculated that the proven and probable reserves at Las Cristinas had increased to 23.6 million ounce of gold *in situ* at the Valuation Date" [i.e., 3 February 2011].[1068]

---

[1060] Counter-Memorial, paras 654-655 and 666.

[1061] Counter-Memorial, para. 658.

[1062] Counter-Memorial, para. 660.

[1063] Counter-Memorial, para. 666.

[1064] Memorial, para. 408.

[1065] Memorial, paras 409-411.

[1066] Memorial, para. 411; Reply, para. 626.

[1067] Memorial, paras 412-413 and 427; Reply, para. 628.

[1068] Memorial, para. 414.

754.    With regard to the ease and cost of extraction, the Claimant submits that Las Cristinas was free from cost-intensive problems insofar as the site was located off a paved highway, that it was close to an electrical substation and that the local population favored the project and included some experienced mine workers.[1069] In addition, Las Cristinas did not present significant geological complexities that would have complicated the process of removing ore from the ground, and the planned mine followed a simple open pit model.[1070] Besides, the Claimant points out that it invested significantly in making the project "shovel ready", namely building access roads, an airstrip, living quarters and other facilities for constructions staff, and clearing the site of illegal miners.[1071]

755.    Thus, the Claimant concludes that "a prospective buyer seeking to assess the fair market value of the right to mine Las Cristinas would have been able to determine with a high degree of certainty the amount of gold ore in the Las Cristinas deposit, the amount of gold that could economically be extracted at current gold prices, the cost of building a processing plant and the cost of operating such a plant. The income stream that would derive from Las Cristinas could confidently be predicted. This would have been the case even before a gold processing plant was built at the site".[1072]

756.    The Claimant also submits that the very large deposit at Las Cristinas has "premium value" because of its potential for further discoveries[1073] and that its reserve for future production would allow Las Cristinas to have "significant strategic value" even if gold prices were to fall.[1074]

757.    The Claimant's experts have been instructed to estimate the investment's value on the valuation date of 3 February 2011,[1075] and based on the following assumptions:

   •    That the Permit would have been granted on 14 April 2008 with immediate start up of the construction phase;[1076]

---

[1069] Memorial, paras 417-418.

[1070] Memorial, para. 419; Reply, paras 630-631.

[1071] Memorial, para. 421.

[1072] Memorial, para. 422.

[1073] Memorial, para. 424.

[1074] Memorial, para. 425.

[1075] Memorial, para. 427.

[1076] Memorial, paras 427-430.

- That construction would have resulted in the operation of the first processing plant and the partial (50%) completion of the second processing plant by February 2011;[1077]

- That a prospective buyer would have operated the mine at the processing rate of 40,000 tpd by the time the second processing plant was complete at the end of 2011;[1078]

- That the duration of the contract was 20 years with two 10-year extensions.[1079]

### ii. The Respondent's position

#### (a) *The Claimant's damages claims are speculative and unsupported*

758. For the Respondent, it is a settled rule of international law that no compensation can be awarded for speculative damages, including lost profits.[1080] It cites to Article 36(2) of the ILC Articles to the effect that "the compensation shall cover any financially assessable damages including loss of profits *insofar as it is established*" (emphasis added). Venezuela contends that international courts and tribunals have approached with great caution the ability of a claimant to establish lost profits with a reasonable degree of certainty in face of no history of operations, earnings or profits.[1081]

759. The Respondent argues that Crystallex never constructed the mine at Las Cristinas or brought it to operation.[1082] Crystallex was still at a pre-feasibility stage for certain costs, financial and engineering and design aspects,[1083] and its EIS had proven to be clearly deficient.[1084] Even if the Claimant had established that it could have begun production

---

[1077] Memorial, para. 429.

[1078] Memorial, paras 431-432. Mr. Ellis was given an alternative assumption that a prospective buyer of Crystallex's rights would not be constrained by Crystallex's financing limitation and could operate the processing plan at an optimum production rate of 140,000 tpd. The Claimant has referred to this as the "Unconstrained Scenario". Memorial, para. 432.

[1079] Memorial, para. 433. See MOC, **Exh. C-9**, Clause 18.1 ("This Contract shall have a duration from its execution date for a period of twenty (20) years, extendable for one (1) or two (2) periods of ten (10) years, previous written agreement of the Parties, said extensions shall be notified prior to the term of the Contract" [sic]). The Claimant's experts also made calculations on the basis of the initial contract period stated in the MOC (20 years) with no extensions (Memorial, para. 433).

[1080] Counter-Memorial, para. 585.

[1081] Counter-Memorial, paras 591-594 (discussing *PSEG v. Turkey*; *Autopista v. Venezuela*; *Metalclad v. Mexico* and the practice of the United Nations Compensation Commission).

[1082] R-PHB, para. 229.

[1083] Counter-Memorial, para. 597.

[1084] Rejoinder, para. 540.

at Las Cristinas, the Respondent submits that the Claimant cannot recover lost profits based on cash flow projections far into the future.[1085]

760. For the Respondent, it is egregious that the Claimant has refused to provide the Tribunal with any alternative damages calculation other than its inflated calculations as of 3 February 2011, or to examine any alternative methodology other than its four proposed valuation approaches.[1086]

761. Venezuela contends that, if the Tribunal were to find Venezuela liable under the Canada-Venezuela BIT, the Tribunal should find that the Claimant has failed to meet its burden of proving and substantiating the quantum of its injuries.[1087]

(b) *The Claimant relies on erroneous assumptions*

762. The Respondent argues that the amount of damages claimed by Crystallex are derived from erroneous assumptions. In particular, Venezuela disputes that the size of the Las Cristinas deposit is known, because Crystallex conducted only limited drilling work and, in addition, MDA's estimates of tonnes and grades at Las Cristinas are unlikely to be accurate.[1088] The Respondent also submits that Crystallex opportunistically selected the spot price for gold as of 3 February 2011 (US$ 1,328) instead of the price at the time of the 2007 Technical Report (US$ 550), with a view to inflating the damages calculations.[1089] Venezuela further disputes that the site was in a "shovel ready" state, and points to a number of unresolved problems and concerns.[1090] The assumption that the project would be attractive to large mining companies and others because, *inter alia*, of its size and potential for future discoveries of resources, is similarly unfounded given the history of the Las Cristinas project (whereby Crystallex was unable to meet its obligations and its previous operator, Placer Dome, abandoned the project) and the inability of Crystallex to attract a partner to develop Las Cristinas.[1091]

763. Venezuela objects to the further assumptions used by the Claimant, and submits the following:

---

[1085] Counter-Memorial, paras 596-599.

[1086] R-PHB, para. 230.

[1087] R-PHB, para. 231.

[1088] Counter-Memorial, paras 618-619.

[1089] Counter-Memorial, para. 620.

[1090] Counter-Memorial, para. 621; Rejoinder, para. 577.

[1091] Counter-Memorial, para. 622.

- As already mentioned, the valuation date should be 13 April 2008 (i.e., the day before the denial of the Permit), and not 3 February 2011.[1092]

- Crystallex was not entitled to the Permit. The Claimant's experts have ignored the environmental risks posed by the Las Cristinas project during its various phases and have accepted the Claimant's instructions without any meaningful verification.[1093]

- The assumption that a larger miner would buy the project is likewise erroneous. For the Respondent the assumptions about the level of return the "willing buyer" would be willing to accept are at odds with both valuation and damages theories.[1094] In addition, these assumptions are contrary to Clause 20 of the MOC, which prohibits the assignment of rights.[1095]

- The spot price of gold on 3 February 2011, as opposed to a historical 3-year average price, is inappropriate. The Respondent contends that regulators, particularly the SEC, recommend using the average price of gold during the trailing three years from the valuation date.[1096] The Respondent favors the use of either a consensus long-term gold price of US$650 (on 13 April 2008) or a three-year historical average price of US$629 (on the same date).

- Unlike what the Claimant contends, Crystallex's technical studies were neither at feasibility level nor bankable. Rather, a reasonable third-party investor would understand that a complete feasibility study would have to be completed, at a cost, before any proper valuation could be conducted.[1097]

- The assumption that Crystallex would be able to obtain financing in mid-2008 to begin the construction of Las Cristinas is erroneous.[1098]

- The assumption that Crystallex would have immediately begun development, construction and production at Las Cristinas once the Permit was granted is also faulty.[1099]

---

[1092] See *supra* paras 746-748.

[1093] Rejoinder, para. 557.

[1094] Rejoinder, paras 558-559.

[1095] Rejoinder, para. 561.

[1096] Rejoinder, para. 566.

[1097] Rejoinder, paras 567-569.

[1098] Rejoinder, paras 570-574.

[1099] Rejoinder, paras 575-579.

- Finally, the Respondent submits that the assumption that the MOC would be extended for an additional 20 years for a total of 40 years is "perhaps the most counterfactual assumption", and cites to communications from the CVG to the effect that the mine life was expected to conform to the shorter 20-year initial term of the MOC.[1100]

### c.   The valuation methodologies

#### i.   Overview

764.   The Claimant's experts have used four different valuation methodologies. In particular, the Compass Lexecon reports prepared by Messrs. Abdala and Spiller have applied three methodologies:

- An income based approach that assesses the Net Asset Value (NAV) for the Las Cristinas project and that is adjusted by reference to the NAV of other gold mining companies, with a figure amounting to US$ 2,813 million;[1101]

- A relative market multiple approach that uses a number of comparable gold mining companies and "market multiples", with a figure amounting to US$ 2,749 million;[1102] and

- A stock market study approach that seeks to assess the damage to the value of the company's stock price by reference to the evolution of stock prices for other gold mining companies, with a figure amounting to US$ 2,833 million.[1103]

765.   The Claimant has also submitted two reports prepared by Mr. Trevor Ellis. These reports have used a "market transaction valuation" method (also known as indirect sales comparison), which is a variation of the market-based comparable approach adopted by Compass Lexecon in its relative market multiple valuation, with figures, *inter alia*, of US$ 4.25 billion under a production rate of 40,000 tpd for 40 years and US$5.9 billion under a production rate of 140,000 tpd.[1104]

766.   According to the Claimant, the use of these four methodologies enables to produce "a consistent assessment of the fair market value of Crystallex's rights in Las

---

[1100] Rejoinder, para. 580. See also First ER Hart, paras 110-111 (arguing that "[g]iven the variety of risks associated with a mining project and the unknown economic terms of any contract extension, the MOC extension is by no means reasonably certain […]").

[1101] Memorial, paras 444-451.

[1102] Memorial, paras 438 and 452-455; Reply, paras 680-685.

[1103] Memorial, paras 438-441 and paras 456-463; Reply, paras 686-696.

[1104] Memorial, paras 442 and 464-471; Reply, paras 697-704.

Cristinas".[1105] On the contrary, the use of a "cost approach methodology" (as propounded by Venezuela) would not produce estimates of fair market value,[1106] and would be inappropriate for the valuation of Las Cristinas, which has proven reserves and resources, as well as cash flows that can be reasonably estimated from those proven reserves and resources.[1107] Thus, under those circumstances, Las Cristinas must be valued according to income-based and market-based approaches.[1108]

767.    In response to the Claimant's expert reports, Venezuela submitted two expert reports by Timothy H. Hart dated 21 November 2012 (the "First Hart Report") and 17 September 2013 (the "Second Hart Report"). The Respondent and its expert contend that, in addition to applying faulty assumptions, the Claimant's damages experts have inappropriately applied each of the methodologies to reach inflated calculations.[1109]

768.    In addition to arguing that each of the four methodologies proposed by the Claimant is in itself faulty, in its Supplemental Quantum Submission the Respondent notes that the "completely discredited" Market Transaction method (proposed by Mr. Ellis) provided the assumptions that continue to form the basis for the P/NAV and Relative Market Multiples methodologies put forth by Abdala and Spiller in response to the Tribunal's 25 July 2014 Questions, thereby undermining their validity.[1110]

769.    The Respondent contends that the only appropriate method to value Crystallex's interest in Las Cristinas is a cost approach, because Las Cristinas was a late exploration / early evaluation and design stage project, with uncertain future cash streams. However, the Respondent contends that the Claimant has failed to put forward a cost claim or any of the necessary supporting details to arrive at a precise figure.

770.    The following paragraphs summarize in greater detail the positions of the Parties on the different valuation methodologies.

ii.    **The Net Asset Value (NAV) approach**

(a)    *The Claimant's position*

771.    The Claimant and its experts contend that the NAV approach is widely used in the mining industry and consists of the calculation of net present value of future cash flows and adjusts those cash flows to account for risk.[1111]

---

[1105] Memorial, para. 443.

[1106] Reply, para. 641.

[1107] Reply, para. 640; Second ER Lexecon, para. 47.

[1108] Reply, para. 640; Second ER Lexecon, para. 47.

[1109] Rejoinder, para. 582.

[1110] R-Supplemental Quantum Submission, para. 9.

[1111] Memorial, para. 444; First ER Lexecon, para. 7; Reply, paras 645-653.

772.   The Claimant distinguishes the NAV approach from a traditional DCF analysis, in which future cash flows are discounted based on the weighted average cost of capital (WACC).[1112] In the Claimant's view, the WACC, which is the critical component used to measure industry risk in a traditional DCF analysis, is not a reliable indicator of the industry risks that affect gold mining companies because, unlike almost every other industry, gold companies are not affected by typical market cycles given the unique economics of their product, which behaves as both a commodity and a safe haven.[1113] Thus, instead of using a WACC, the NAV method incorporates industry-specific risk through the P/NAV (price to Net Asset Value) multiple.[1114]

773.   To arrive at a NAV for the Las Cristinas project, Compass Lexecon first calculated project revenue by calculating projected gold production over 40 years and multiplying this by the spot price of gold on the 3 February 2011 valuation date (i.e., US$1,328 per ounce). From this figure, capital costs, operating costs and income taxes, royalties and other taxes were deducted.[1115] The second step multiplies the NAV of the Las Cristinas site by the Price/NAV Ratio (P/NAV). This ratio compares the market capitalization of publically traded companies engaged in gold mining in developing countries to the net present value of cash flows, discounted at a uniform rate of 5%. The purpose of this step is to account for industry-specific risk.[1116]

774.   The Claimant submits that to calculate a net project revenue for the Las Cristinas mine, a record of production for the Las Cristinas mine is not necessary. Because "gold is a unique commodity",[1117] future cash flows of a gold company – including one at an early stage of development – are significantly more definite than for most companies that are more mature but sell products that are subject to the whims of market demand, innovation and local politics and economies.[1118] Thus, the traditional difficulties of estimating the future cash flows for a company with no historical record do not apply to the gold mining industry.[1119]

775.   With regard to the main variable in future income, gold price fluctuations, an assumption was made that the constant gold price throughout the project would be the spot price on the date of valuation. The use of a spot price is reflected in the practice of the gold industry with respect to capital investment planning and the valuation of mining companies, unlike an use of a backward-looking forecast (such as the

---

[1112] C-PHB, paras 616-620.

[1113] C-PHB, paras 617-618.

[1114] C-PHB, para. 619.

[1115] Memorial, para. 446; First ER Lexecon, paras 90-103.

[1116] C-PHB, paras 619-620.

[1117] Reply, para. 654.

[1118] Reply, para. 655.

[1119] Reply, para. 658.

application of a trailing three-year average price of gold, as propounded by the Respondent).[1120] For the Claimant, there is no evidence on record that the historical prices proposed by Venezuela are ever used by market participants for fair market value transactions (as opposed to regulatory reporting of reserves).[1121]

776.   Further, a yearly discount rate of 5% was applied to the projected annual cash flows.[1122] The use of a 5% *real* discount rate is appropriate, because the country-risk and production-stage adjustments take place through the P/NAV adjustment.[1123]

777.   By this approach, the Claimant's experts have estimated damages as of 3 February 2011 at **US$ 2.81 billion** based on a 40-year operational horizon.[1124]

778.   The Claimant provided further figures in relation to a 2011 valuation date and certain sensitivities requested by the Tribunal in its 4 March 2014 Questions.[1125]

779.   In its 25 July 2015 Questions, the Tribunal asked the following question:

"To supply the necessary data and the calculations in relation to the P/NAV method, assuming:

(i) The date of valuation is 13 April 2008;

(ii) The price of gold is (a) $629, or (b) $650, or (c) $925;

(iii) The duration is (a) 20 years or (b) 40 years;

(iv) The extraction rate is 20,000 tpd moving to 40,000 tpd in year 3; and

(v) The implied nominal discount rate is (a) 10.41%, or (b) 12.71%, or (c) 15%, or (d) 17%, or (e) 22%."[1126]

780.   The Claimant provided calculations in response to the Tribunal's question.[1127] While reiterating that in the P/NAV valuation method nominal discount rates are not used,[1128]

---

[1120] Reply, paras 669-676.

[1121] C-Supplemental Quantum Submission, para. 14.

[1122] Memorial, para. 447; First ER Lexecon, paras 104-106.

[1123] Reply, paras 662-668. By contrast, the Claimant submits that if one were to apply a conventional DCF analysis (by adjusting for cash flows to be in nominal terms, by using forward-looking gold prices, and by not allowing for an additional adjustment via the P/NAV ratio) the nominal discount rate in line with the P/NAV approach taken by Compass Lexecon as of February 2011 using data from emerging (developing) markets would actually be 10.41%. See Reply, para. 663; Second ER Lexecon, para. 7(a).

[1124] First ER Lexecon, para. 8.

[1125] See C-PHB, Annex I, para. 9.3.

[1126] Tribunal's 25 July 2014 Questions, Question 1.

[1127] See C-Supplemental Quantum Submission, para. 28.

[1128] C-Supplemental Quantum Submission, paras 25-26.

in order to employ alternative implied nominal discount rates within the P/NAV method, as requested by the Tribunal, the Claimant's experts generated hypothetical (but, in the Claimant's view, counterfactual) P/NAV multiples consistent with the implied nominal discount rates requested through the same reverse process. In other words, in these alternative valuations, the experts first conducted a DCF-style calculation, which the Claimant contends is inappropriate for a gold project but allows use of the implied nominal discount rates requested by the Tribunal, and then found the P/NAV multiple that yielded the same numerical result as the results produced using the implied nominal discount rates stipulated by the Tribunal.[1129]

781.    The Claimant contends that the P/NAV multiple used in Crystallex's original P/NAV valuation can be compared to a 10.41% discount rate applicable in a traditional DCF analysis.[1130] However, applying higher discount rates to the value of the right to mine Las Cristinas is wholly inconsistent with the real world transactions concerning the right to mine gold in Venezuela.[1131]

782.    The Claimant and its experts have argued that at the implied nominal discount rates and gold prices requested by the Tribunal in its 25 July 2014 Questions, the value assessment under the P/NAV method is the same under the 20-year or 40-year scenario.[1132]

783.    Also in this case, the Claimant contends that the so-called consequential damages in the amount of US$ 180 million should be added.[1133]

(b)    *The Respondent's position*

784.    The Respondent submits that the NAV methodology used by the Claimant and its experts artificially inflates the value of Las Cristinas.[1134] For the Respondent, a valuator can only predict future earnings with reasonable certainty based on past earnings. In this case, Las Cristinas had no past performance and never turned a profit.[1135] The NAV method requires numerous assumptions about a company's projected future revenues, gold prices, and size of reserves, and fails to properly take into account its risks (e.g., technical, environmental and geopolitical). Because of the number and nature of assumptions that must be made when there is no past performance, or when no current

---

[1129] C-Supplemental Quantum Submission, para. 27.

[1130] C-Supplemental Quantum Submission, para. 31.

[1131] C-Supplemental Quantum Submission, para. 31.

[1132] Compass Lexecon Supplemental Report, Section II.

[1133] See *supra* para. 748

[1134] Counter-Memorial, paras 623-639.

[1135] Counter-Memorial, para. 625.

operations exist, or when it is uncertain when or whether operations will start, the NAV approach is inherently unreliable.[1136]

785.    In any event, Mr. Hart does not accept Compass Lexecon's use of (i) a 5% discount rate, recommending instead the use of a 22% discount rate, which would account for the higher level of risk associated with projects in South America;[1137] and (ii) the 3 February 2011 spot price of US$ 1,328 per ounce of gold, recommending instead the use of a 3-year trailing average as per the SEC Guidelines from a valuation date of 13 April 2008.[1138] The Respondent further notes that it is unrealistic to assume that gold prices will remain constant for 40 years.[1139]

786.    In the Respondent's view, the P/NAV method is flawed for a number of additional reasons. First, the (P) multiple is derived from a restricted sample of only 20 companies, and there is significant variance between the lowest and highest multiples of the allegedly comparable companies.[1140] Furthermore, the NAV of Crystallex is based on Mr. Ellis' aggressive extraction and production scenario (80,000 tpd) that never existed in any of the contemporaneous studies prepared by SNC-Lavalin and MDA.[1141]

787.    More generally, the Respondent contends that the P/NAV is not an income approach (as the Claimant's experts have initially characterized it), but rather relies on a comparison of the subject company to comparable companies, thus making it an "inherently market approach".[1142] In the Respondent's view, for a project in which the cash flow can be estimated (which in the Respondent's view is not the case for Las Cristinas) the DCF method would be the appropriate method. Yet, the Claimant has never presented a DCF method.

788.    Finally, according to the Respondent, the NAV approach has received no support in investment treaty jurisprudence.[1143]

789.    In relation to the calculations provided by the Claimant in response to the Tribunal's 25 July 2014 Questions, Venezuela points to the Claimant's own submission that the new calculations "artificially generate" P/NAV ratios through a process of reverse engineering that cannot form the basis of a damages calculation.[1144] The Respondent stresses that the Claimant itself has characterized its experts' new analysis as

---

[1136] Counter-Memorial, para. 628.

[1137] First ER Hart, paras 153-162.

[1138] First ER Hart, paras 163-169.

[1139] Counter-Memorial, para. 626.

[1140] R-Supplemental Quantum Submission, para. 24.

[1141] R-Supplemental Quantum Submission, para. 25.

[1142] Third ER Hart, para. 18.

[1143] Counter-Memorial, paras 628-639, discussing *Wena Hotels v. Egypt* and *Tecmed v. Mexico*.

[1144] R-Supplemental Quantum Submission, para. 21.

"hypothetical (and counterfactual) P/NAV multiples", which leads to "absurd results".[1145] Venezuela submits that such new calculations should thus be ignored.

790.   With regard to the new sensitivities requested by the Tribunal, Venezuela contends that the Claimant's experts admit that they have not selected new "comparable" companies based on analyst reports as of 13 April 2008, but have rather conducted a non-analytical "running of numbers" based on the reverse-engineered P/NAV multiples previously utilized.[1146]

791.   The Respondent also highlights that the Claimant's experts point out that based on Mr. Ellis' scenario a 20-year mine life illogically becomes more valuable than a 40-year mine life.[1147] This, for the Respondent, calls into question the reliability of that plan and the Claimant's experts' judgment in relying on that plan for their valuations.[1148]

792.   Thus, Venezuela concludes, also the new P/NAV valuations supplied by the Claimant's experts are defective and should not be relied on.[1149]

### iii.   The relative market multiple approach

#### (a)   *The Claimant's position*

793.   According to the Claimant, the relative market multiple approach provides a market-based method for assessing the value of Las Cristinas based on the enterprise value (EV) and the size of reserves of publicly-traded gold mining companies. Compass Lexecon analyzed the market prices of 146 publicly traded gold mining companies operating in developing countries characterized by country risk similar to that of Venezuela, as of February 2011. It expressed the market multiples value in US$ of EV per ounce of reserves equivalent of gold, and found that on 3 February 2011, the group of gold mining companies operating in developing countries traded at a median value of approximately US$ 154.04 per ounce.[1150] The EV-to-Reserves Equivalent multiple was adjusted to reflect a 20% control premium, and then applied to the amount of *in situ* gold reserves at Las Cristinas as of 3 February 2011.[1151] This amount was further adjusted for historical cash flows and debt of Las Cristinas to take into account the investment Crystallex would have needed to make in order for Las Cristinas to be

---

[1145] R-Supplemental Quantum Submission, para. 21.

[1146] R-Supplemental Quantum Submission, paras 27-29; Third ER Hart , para. 12.

[1147] R-Supplemental Quantum Submission, paras 31-32, discussing Third ER Lexecon , paras 15-16.

[1148] R-Supplemental Quantum Submission, para. 32.

[1149] R-Supplemental Quantum Submission, para. 35.

[1150] First ER Lexecon, para. 9.

[1151] *In situ* gold is the amount of gold estimated to be contained in the ore, before the recovery rate is applied. See First Compass Lexecon Report, fn. 144.

producing as of 3 February 2011.[1152] Under this approach the Claimant's damages number **US$ 2.75 billion** under the 40-year horizon, and **US$ 1.60 billion** under the 20 years production scenario.[1153]

794. The Claimant submits that the market multiples approach is particularly appropriate to the gold mining industry, where companies, irrespective of their geographic location, exhibit a myriad of similar market characteristics – including risk and growth profiles – and respond to similar economic variables.[1154] This approach has also been vindicated, Crystallex contends, by international tribunals.[1155]

795. The Claimant provided further calculations in response to the Tribunal's 25 July 2015 Questions, wherein the Tribunal had asked the following:

> "To supply the necessary data and the calculations in relation to the market multiples method, assuming:
>
> (i) The date of valuation is (a) 13 April 2008 or (b) 3 February 2011;
>
> (ii) A control premium of 20% or, in the alternative, no control premium;
>
> (iii) The duration is (a) 20 years or (b) 40 years;
>
> (iv) The extraction rate is 20,000 tpd moving to 40,000 tpd in year 3 (assume no "unconstrained" scenario)."[1156]

796. The Claimant explains that to provide the Tribunal with the information it sought in relation to the hypothetical scenarios outlined in its letter of 25 July 2014, the Claimant's experts, following the same criteria as in their prior submissions: (a) compiled a new sample of companies operating in the gold industry in April 2008; (b) narrowed their sample to isolate those companies operating in developing countries; and (c) applied the resulting multiple, in keeping with the methodology they applied in their 2011 Market Multiple valuation.[1157]

797. The results are summarized in the following table:

| Market Multiples Valuation |
|---|
| (All figures in billions of US$) |

---

[1152] *Ibid*, at para. 128.

[1153] First ER Lexecon, para. 9.

[1154] Reply, para. 680; Second ER Lexecon, para. 99.

[1155] Reply, para. 685, citing to *CME v. Czech Republic*, Final Award, 14 March 2003.

[1156] Tribunal's 25 July 2014 Questions, Question 2.

[1157] C-Supplemental Quantum Submission, para. 37.

| Date of valuation | 13 April 2008 | | 3 February 2011 | |
| --- | --- | --- | --- | --- |
| Scenario: | 40 years | 20 years | 40 years | 20 years |
| 20% Control Premium | $2.12 | $1.33 | $3.40 | $2.10 |
| No Control Premium | $1.77 | $1.11 | $2.83 | $1.75 |

798.   To each of those figures, the Claimant contends that the so-called consequential damages in the amount of US$ 180 million should be added.[1158]

799.   The Claimant stresses that the use of the control premium is necessary in order to adjust for the full value of the company given that share prices represent only a company's fractional value as perceived by shareholders.[1159] Furthermore, it is reasonable to assume a 40-year contract length, because a reasonable investor limited by a 20-year contract would proceed to mine all the gold that is economically feasible to extract at the prevailing gold price over the period of time available.[1160] The Claimant submits that contract duration is simply not a factor taken into consideration in a market multiples valuation, because the EV data, upon which the analysis is based, incorporates all known risks, including the risk of non-renewal of the contract.[1161]

(b)   *The Respondent's position*

800.   The Respondent first contends, in general terms, that all three market-based methodologies presented by the Claimant suffer from the same shortcoming, namely that "no two mining properties are the same" and that each mining project has its own unique features such as the size of its reserves, regulatory environment and location, thereby making valuations on the basis of comparables either extremely difficult or impossible.[1162]

---

[1158] See *supra* para. 748.

[1159] C-Supplemental Quantum Submission, para. 39.

[1160] C-Supplemental Quantum Submission, para. 40.

[1161] C-Supplemental Quantum Submission, para. 41.

[1162] Counter-Memorial, para. 650; Rejoinder, paras 590-591.

801.    With specific regard to the "relative market multiple approach", the Respondent submits that the value of Las Cristinas is not equivalent to the value of Crystallex,[1163] and thus such methodology is simply inapplicable.[1164] Furthermore, the approach followed by Compass Lexecon is flawed because, *inter alia*, the Claimant's experts failed to consider a number of factors to determine if the company was comparable or not, such as the geography of the location, the operating history of the company and its ability to raise financing.[1165]

802.    In relation to the calculations provided by the Claimant in response to the Tribunal's 25 July 2014 Questions, the Respondent first notes that, unlike with their P/NAV analysis, the Claimant's experts have undertaken to identify new "comparable" companies as of 13 April 2008 in order to yield a market multiple based upon EV to Gold Reserve Equivalent. However, according to the Respondent, some of Compass Lexecon's 73 comparable companies bear absolutely no resemblance to Crystallex. Venezuela points in particular to Nautilus Minerals, which is involved in underwater exploration of the seafloor in attempts to mine copper, zinc, silver and gold primarily in the waters of Papua New Guinea.[1166]

803.    Furthermore, Venezuela contends that the Claimant's experts rely on Mr. Ellis' erroneous resource and operational calculations (which assume that Crystallex would mine 80,000 tpd, stockpile 40,000 tpd, and select the best 40,000 tonnes of ore to process in the first 20 years).

### iv.  The stock market study valuation approach

#### (a)  *The Claimant's position*

804.    The stock market study approach to valuation is a comparative valuation methodology that seeks to assess the damage to the value of Crystallex's stock price by reference to the evolution of stock prices for other, similarly placed, gold mining companies not affected by Venezuela's expropriatory measures.[1167] The Claimant contends that because Crystallex is a one-asset company and the right to mine Las Cristinas is that single asset, the evolution of the share price of Crystallex gives a good indication of how the market has perceived the effects of the actions of Venezuela with regard to Las

---

[1163] See First ER Hart, para. 139 ("it was not until after 2009 that Las Cristinas became Crystallex's sole project. And even once this occurred, the value of the Las Cristinas Project and the value of Crystallex are not one and the same"), para. 174 ("the value of Las Cristinas is not equal to the value of Crystallex (project vs. company)").

[1164] First ER Hart, para. 174.

[1165] Counter-Memorial, para. 643; Rejoinder, paras 590-591; First ER Hart, paras 174-182.

[1166] R-Supplemental Quantum Submission, para. 39; Third ER Hart , para. 26.

[1167] Memorial, para. 441; Reply, para. 686.

Cristinas and how, as a consequence, the market has radically discounted the value of Crystallex's share price accordingly.[1168]

805.    According to the Claimant and its experts, the stock market approach is based on the proposition that Crystallex's market capitalization prior to the measures represented the company's value (minus the control premium). This value was then adjusted based upon the assumptions that, once the bond has been posted and the taxes paid, the Permit would have been issued, and that Crystallex's stock price would have continued to grow at the same rate as that of other gold companies, represented by the average of four indices of gold mining stocks, but for the impact of Venezuela's unlawful measures.[1169]

806.    For the Claimant, the market capitalization of a company by definition incorporates the market's assessment of all known costs and risks related to that particular asset.[1170] It is an appropriate valuation method in this case because Crystallex was actively and heavily traded on two of the main stock exchanges for mining companies,[1171] and during the relevant period under consideration, Crystallex was effectively a single-asset company, its principal asset being the right to develop Las Cristinas. In fact, in 2007, Crystallex's investment in Las Cristinas formed 99.97% of its total value, and by 2008, the right to mine Las Cristinas formed 100% of Crystallex's value. This means, according to the Claimant, that Crystallex's stock price in 2007 directly reflected the market's assessment of the value of the right to mine Las Cristinas.[1172]

807.    In this case, the stock market study approach involves projecting what Crystallex's stock price would have been *but for* the alleged expropriation (and any threat or action implying a path to expropriation).[1173] The Claimant's experts forecast the but-for evolution of Crystallex's stock price starting on 14 June 2007 (i.e., the date when Crystallex announced and represented that it had completed its filing requirements for the issuance of the Permit needed to commence construction – the "last available clean date") until 3 February 2011.[1174] According to the Claimant, the market, based on its experience with Gold Reserve (which had received its permit one month after the approval of its EIS), expected Crystallex to receive the Permit almost immediately after its 14 June 2007 announcement. Thereafter, as time passed and Crystallex's Permit was

---

[1168] Memorial, para. 456; Reply, para. 690.

[1169] C-PHB, para. 581.

[1170] C-PHB, para. 582.

[1171] C-PHB, para. 584.

[1172] C-PHB, para. 586.

[1173] First ER Lexecon, para. 31.

[1174] First ER Lexecon, para. 33; C-PHB, para. 587.

not issued, Crystallex's share price started to fall significantly and quickly, reflecting investors' concerns that Venezuela had decided to withhold the Permit.[1175]

808.  For the purposes of the stock market study methodology, Compass Lexecon estimated Crystallex's *but-for* stock price through the following process:

(1) It applied a one-time percentage increase to Crystallex's stock price to reflect the removal of the uncertainty related to the Permit. With respect to such permitting bump, Compass Lexecon utilized as comparator the actual increase in the stock price of Gold Reserve on the day the market learned that its investment in Venezuela's Las Brisas deposit had received its Permit.[1176] The Claimant contends that Gold Reserve is a particularly good comparator, because, like Crystallex, it was a single-asset gold mining company seeking to develop a mine in Venezuela, and because Las Brisas is adjacent to Las Cristinas, with similar geology and ore mineralization and is subject to the same regulations.[1177] On the day Gold Reserve obtained its Permit, Gold Reserve's shares increased by 49% and Crystallex's own shares increased by 27% (based on the expectation that Crystallex would also receive its Permit). Thus, Compass Lexecon applied a permitting bump for Las Cristinas of 16.7%. This percentage reflects the fact that the market already took into account that it gave Crystallex a small bump when Gold Reserve received its permit and thus the 16.7% bump represents the likely additional price increase that would have occurred if the Permit had been granted to Crystallex.[1178]

(2) It applied the rate of growth in benchmark industry indices of the stock prices of large, established and widely traded gold mining companies during the same relevant period (i.e. mid-2007 to 3 February 2011, in order to re-express that value as of 3 February 2011).[1179]

(3) Finally, because each share price represents the value of a minority interest, Compass Lexecon applied a 20% control premium. According to the Claimant, the use of a control premium is necessary in order to adjust for the full value of the company.[1180]

809.  By this approach, Compass Lexecon has estimated damages to the Claimant at **US$ 2.83 billion** as of 3 February 2011.

810.  In its post-hearing submission, the Claimant provided further stock market sensitivities in response to Tribunal's Question 10 of the 4 March 2014 Questions.[1181]

---

[1175] C-PHB, para. 590.

[1176] Reply, para. 693; First ER Lexecon, para. 66.

[1177] C-PHB, para. 601.

[1178] C-PHB, para. 603.

[1179] Reply, para. 689; First ER Lexecon, para. 65.

[1180] First ER Lexecon, para. 68; C-PHB, para. 596.

[1181] See C-PHB, Annex I, paras 10.1-10.5.

811.    Furthermore, in its 25 July 2014 Questions, the Tribunal asked the following question in relation to the stock market approach:

> "To supply the necessary data and the calculations in relation to the stock market approach:
>
> (i) Assuming the date of valuation is (a) 13 April 2008 or (b) 3 February 2011;
>
> (ii) Assuming a stock price from 14 June 2007;
>
> (iii) Assuming a control premium of 20% or, in the alternative, no control premium;
>
> (iv) Applying the permitting bump (as set forth by the Claimant) or, in the alternative, excluding a permitting bump;
>
> (v) Using the Market Vectors Junior Gold Mining Index (Exh. CLEX-96) to project the growth of Crystallex's share price to (a) 13 April 2008 or (b) 3 February 2011".[1182]

812.    The following table summarizes the results of the Claimant's answer:

---

[1182] Tribunal's 25 July 2014 Questions, Question 3.

| Stock market valuation (All figures in billions of US$) | | |
| --- | --- | --- |
| Date of valuation | 13 April 2008 | 3 February 2011 |
| **20% Control Premium** | | |
| Permit Bump | $1.80 | $2.65 |
| No Permit Bump | $1.55 | $2.30 |
| **No Control Premium** | | |
| Permit Bump | $1.50 | $2.21 |
| No Permit Bump | $1.30 | $1.91 |

813.    To each of those figures, the Claimant contends that the so-called consequential damages in the amount of US$ 180 million should be added.[1183]

814.    In addition to reiterating the validity of its originally chosen sensitivities, the Claimant notes that the use of the average of four indices (iShare Global Gold, Market Vectors Gold Miner, HSBC Global Mining Index Gold, and the TSXG old Mining Index) as a basis for the evolution of Crystallex's but-for share price is appropriate, as no single index necessarily represents a better proxy than the other and averaging the four main indices ensures more certain coverage of the industry's performance as a whole. The Claimant's experts also note that during the period under examination, Crystallex' stock was indeed part of the iShares Global Gold and TSX Gold Mining indices.[1184] By contrast, a stock market based valuation of Crystallex's investment that relies exclusively on the junior gold index will inevitably be overly conservative.[1185]

---

[1183] See *supra* para. 748.

[1184] Third ER Lexecon, para. 35.

[1185] C-Supplemental Quantum Submission, para. 47.

(b)    *The Respondent's position*

815.    According to the Respondent, the stock market study approach used by Compass Lexecon relies on unfounded assumptions.[1186] Like the market multiples approach, also the stock market approach is not applicable in this situation because the purpose of the valuation should be to provide a value of Crystallex's interest in Las Cristinas, not the value of Crystallex as a company.[1187]

816.    The Respondent has put forward the following arguments as to why the stock market approach is an inappropriate and unreliable methodology:

- According to the Respondent, practitioners and arbitral tribunals are wary of the stock market study as a valuation methodology, because stock prices may depend on many external factors and change quickly, often merely on psychological grounds.[1188] In their Supplemental Reports, the Respondent and its expert, Mr. Hart, have pointed to episodes where the stock price of Crystallex experienced significant one-day increases following a simple recommendation made by a popular U.S. TV stock market commentator.[1189]

- The stock market study falsely assumes an efficient market with full information on Crystallex.[1190] For the Respondent, documents on the record demonstrate that Crystallex provided inconsistent if not misleading information to the market.[1191] Furthermore, according to Venezuela, history of capital markets has proven that information is often not transparently provided to the market, that stock prices can deviate from a company's fair market value and that markets crash when stock prices deviate substantially from the fair market values of listed companies.[1192]

- Crystallex's stock was too volatile to yield a reliable calculation.[1193]

---

[1186] Counter-Memorial, paras 645-647.

[1187] First ER Hart, para. 188.

[1188] Rejoinder, para. 592; Second ER Hart, para. 148; R-PHB, paras 270-273, discussing *Enron v. Argentina*, para. 424 (**Exh. RLA-85**), and *Quasar de Valores v. Russia* (**Exh. RLA-185**).

[1189] Third ER Hart , paras 35-40.

[1190] R-PHB, paras 274-281.

[1191] R-PHB, para. 275; R-Supplemental Quantum Submission, para 57-59 (arguing that there was a significant disconnect between the information being given to the market and what Crystallex was actually doing).

[1192] R-PHB, para. 281.

[1193] R-PHB, paras 282-283; R-Supplemental Quantum Submission, paras 60-63.

- The Claimant's choice of 14 June 2007 is arbitrary, if not opportunistic, and only serves to highlight the stock market study's intrinsic flaws.[1194] For the Respondent, there exist other contemporaneous dates after 14 June 2007 on which the Claimant received positive news with respect to regulatory actions, which should cause one to question why none of these dates has been chosen despite their closer proximity to the Permit denial date. For the Respondent, the answer lies in the fact that the Claimant's stock had lost significant value by then.[1195]

- The 16.7% permitting bump is based on only one other company (Gold Reserve), as opposed to a "peer group" of companies, and moreover is temporary (as stocks tend to decrease again shortly after a bump).[1196]

- The industry indexes used by the Claimant do not accurately represent the Claimant.[1197]

817.   In relation to the Claimant's calculations provided in response to the Tribunal's 25 July 2014 Questions, the Respondent, in addition to reiterating that it considers the stock market approach flawed both conceptually and in its application,[1198] argues that the Market Vectors Junior Gold Mining Index does not accurately represent Crystallex, but rather "transform[s Crystallex] into a company with mines in several global regions with the ability to diversify risks, something it never was and never would be able to do in the real world".[1199]

### v.   The indirect sales comparison method

#### (a)   *The Claimant's position*

818.   The indirect sales comparison method is also referred to as the market transaction method.[1200] It is a variation of the relative market multiple valuation, where, however, actual transactions, rather than equity values, are used for comparison analysis.[1201]

819.   The Ellis Report calculates the relative value of Crystallex's rights in Las Cristinas by reference to 16 transactions involving large gold mining properties, which occurred

---

[1194] R-PHB, paras 284-289; R-Supplemental Quantum Submission, paras 64-66.

[1195] R-PHB, paras 284-286.

[1196] R-PHB, paras 290-293; R-Supplemental Quantum Submission, paras 67-68.

[1197] R-PHB, paras 294-295.

[1198] R-Supplemental Quantum Submission, paras 49-63.

[1199] R-Supplemental Quantum Submission, para. 69.

[1200] Memorial, para. 442.

[1201] Reply, para. 697.

between January 2006 and February 2012. By adjusting a number of variables specific to each of the mining properties that were the subject matter of these transactions, Mr. Ellis arrives at the market-based valuation of the price Las Cristinas would fetch if sold at the date of 3 February 2011.[1202]

820.   Mr. Ellis concedes that no two mineral properties are alike.[1203] However, he argues that by analyzing a number of similar transacted properties and making appropriate adjustments for the inevitable differences in, *inter alia*, geological and geographic characteristics, the market transaction method allows the valuator to make as good as possible a comparison between non-identical mineral properties.[1204]

821.   By this methodology, Mr. Ellis arrives at a value of **US$ 4.14 billion** (based on the scenario that Las Cristinas would be operated at a production rate of 40,000 tpd for 40 years).[1205]

822.   Mr. Ellis has also conducted a similar comparison using a smaller sample of two significant transactions involving one mine in Venezuela, Choco 10, that took place in 2006 and 2007.[1206] In this case, Mr. Ellis has concluded that the value of Las Cristinas based on a market transaction valuation with Choco 10 would have been US$7.4 billion under an unconstrained scenario.[1207] The Claimant has used only the US$4.25 billion figure (and not the US$7.4 billion figure related to the Choco 10 transaction) to arrive at its average of the four valuation methodologies.

### (b)   *The Respondent's position*

823.   The Respondent submits that the market transaction method is also flawed because, *inter alia*, none of the transactions (involving other gold companies) used by the Claimant's expert, Mr. Ellis, are comparable to Crystallex and because the experts' "adjustments are too plentiful to render the method of any practical value".[1208] Mr. Hart also criticizes the time period covered by the chosen transactions (2006-2012) and the size of the adjustments made to the transacted properties in order to compare them to

---

[1202] First ER Ellis , paras 12, 143-144.

[1203] Second ER Ellis, para. 35.

[1204] Second ER Ellis, para. 35.

[1205] C-PHB, para. 644. Ellis also provided an unconstrained scenario, on the basis that, in light of the increase in the price of gold, the parties would want to maximize the production of ore from Las Cristinas. *Ibid.,* para. 642. Here, a buyer would work the mine at 140,000 tpd, and thus the value of the mine would increase to US$ 5.86 billion. *Ibid.,* para. 644.

[1206] Memorial, paras 468-471.

[1207] First ER Ellis , p. 52.

[1208] Counter-Memorial, para. 648; Rejoinder, paras 597-599.

Las Cristinas.[1209] In Mr. Hart's view, only one out of the 16 projects may be considered comparable, i.e. the Tocantinzho Project in Brasil.[1210]

824. Moreover, the Respondent submits that the Claimant does not provide legal authority to quantify damages on this basis and that investment tribunals do not widely accept the comparable sales transaction approach.[1211]

### vi. **The cost approach**

#### (a) *The Claimant's position*

825. For the Claimant, a costs or "book value" approach would not be appropriate in this instance as a matter of international law, and would allow Venezuela to retain a huge windfall between the sunk costs and the Fair Market Value of the right to mine (which it may sell or use as collateral for that full value). Crystallex would thus not receive full reparation in such a case.[1212]

826. The Claimant points to Canadian mining standards CIMVal (prepared by the Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation), according to which a cost approach is not appropriate for "development properties",[1213] such as Crystallex.[1214]

827. The Claimant contends that a cost approach is normally used in those instances where there is no better guide to an investment's value, such as where there is no clear market for the expropriated asset or where the business prospects for the investor are wholly unclear, such as the expropriation of an industrial business selling a product or service for which there is no proven market. The Claimant submits that this situation is different from a gold mine with proven resources in an open, global market where gold is selling for US$1,300/oz and where there is a clear market for even non-producing mines.[1215] The Claimant adds that, if Crystallex had simply invested US$ 650 million in gold at

---

[1209] First ER Hart, paras 203-208.

[1210] First ER Hart, para. 205.

[1211] Counter-Memorial, para. 649.

[1212] C-PHB, paras 684-694.

[1213] The CIMVal guidelines define "development property" as "Mineral Property that is being prepared for mineral production and for which economic viability has been demonstrated by a Feasibility Study or Prefeasibility Study and includes a Mineral Property which has a Current positive Feasibility Study or Prefeasibility Study but which is not yet financed or under construction." See Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation, "Standards and Guidelines for Valuation of Mineral Properties," February 2003, **Exh. CLEX-74**, p. 8.

[1214] See C-PHB, paras 574-579.

[1215] C-PHB, para. 691.

the time of its initial investment in Las Cristinas, it would have been worth more than US$ 2.8 billion in 2011 or US$ 2 billion in 2008.[1216]

828.  For the Claimant, the true value of Crystallex's right to mine Las Cristinas does not appear on Crystallex's historical balance sheets, because it is an intangible asset whose value would be reflected on a balance sheet only after mining began or upon an acquisition at arm's-length.[1217]

829.  Without prejudice to its position that a cost approach would be inappropriate to assess the fair market value of Las Cristinas, the Claimant has provided sunk cost figures in response to one of the Tribunal's questions.[1218] According to the Claimant, Crystallex's historical investment in Las Cristinas from 2002 to 2013 totals more than US$ 644 million.[1219] According to the Claimant, with the exception of the 2013 figures, which have been supplied by Crystallex's management, all of the data provided is drawn directly from Crystallex's audited Financial Statements.[1220] Compass Lexecon have verified the figures and have made minor corrections, as a result of which the total cost figure equals **US$ 644.88 million**.[1221]

### (b)    *The Respondent's position*

830.  Given that Las Cristinas is a late exploration / early evaluation and design stage project, with uncertain future cash streams, for the Respondent and its expert, the only appropriate method to value Crystallex's interest in Las Cristinas is a cost approach, which measures the actual amount spent on the project to date and evaluates the contribution to value made by these funds.[1222] By contrast, forward-looking methodologies that rely on future cash flows would be speculative in the absence of definitive studies or any record of earnings.[1223]

831.  The Respondent argues that the Claimant has not put forward a cost claim or any of the necessary supporting details that would include at least project budgets, invoices, operating contracts, evidence of cash payments and accounting ledger support.[1224] Based on the information available, in his First Report Mr. Hart contends that Crystallex reported that the costs incurred through the first quarter of 2008 were **US$**

---

[1216] C-Supplemental Quantum Submission, para. 53.

[1217] C-Supplemental Quantum Submission, para. 54.

[1218] See Tribunal's Questions, 4 March 2014, Question 11.

[1219] C-PHB, Annex, para. 11.1.

[1220] C-PHB, Annex, para. 11.1, discussing Crystallex Financial Statements, **Exh. CLEX-05**.

[1221] Third ER Lexecon, paras 36-38.

[1222] First ER Hart, paras 95-97; Second ER Hart, paras 200-202.

[1223] First ER Hart, para. 193.

[1224] Second ER Hart, para. 202.

**323.8 million**.[1225] The Respondent points out that the Claimant has not provided supporting documentation for the US$323.8 million figure, and therefore, a thorough analysis of the accuracy and completeness of this figure is impossible.[1226]

832.    For the Respondent, assuming for the sake of argument that the total invested costs were US$ 323.8.8 million, non-prudent or recoverable costs and costs not attributable to the project must be subtracted from this figure to yield a valuation amount under the cost approach.[1227]

833.    First, US$ 37.8 million recovered from the sale of equipment stored outside of Venezuela would have to be subtracted.[1228] Second, a US$ 32 million of tax liability, resulting from Crystallex's weaknesses in its accounting practices, should be considered wasteful.[1229] Finally, management costs spent imprudently cannot be recovered by the Claimant.[1230]

834.    In relation to the Claimant's responses to the Tribunal's 25 July 2014 Questions, the Respondent reiterates that the Claimant has steadfastly refused to present the necessary documents and information concerning its actual costs. Thus a proper cost approach analysis, including a proper assessment of costs and expenses, is impossible.[1231] Venezuela further argues that a number of inappropriate cost components submitted by the Claimant should be excluded, as they are not investment costs spent on Las Cristinas.[1232] Furthermore, Claimant's analysis (as reviewed and adjusted by its experts) provides no assessment of the contributory value of any of the costs claimed.[1233]

835.    In order to comply with the Tribunal's 25 July 2014 Questions (without endorsing any of those figures), Venezuela and its expert arrive at a calculation of the Claimant's spent costs for the Las Cristinas project of between **US$ 240-245 million**.[1234]

---

[1225] First ER Hart, p. 21, Figure 7.

[1226] R-PHB, para. 318.

[1227] R-PHB, para. 318.

[1228] R-PHB, paras 319-321.

[1229] R-PHB, para. 322.

[1230] R-PHB, para. 323.

[1231] R-Supplemental Quantum Submission, para. 83.

[1232] R-Supplemental Quantum Submission, paras 75-82; Third ER Hart, paras 56-73.

[1233] Third ER Hart, para. 49.

[1234] R-Supplemental Quantum Submission, para. 83.

### vii. **Conclusion**

##### (a)   *The Claimant's position*

836.   In conclusion, the Claimant claims the sum of **US$ 3.16 billion** by way of damages, which is the average of all four of the valuations conducted by its experts, which, it contends, most accurately represents the fair market value of its investment in Las Cristinas on 3 February 2011.

837.   The Claimant contends that the valuation which it has put forward in this arbitration is conservative when compared to the value of peer companies as of 3 February 2011, and given the inherent potential of the Las Cristinas site.[1235]

##### (b)   *The Respondent's position*

838.   According to the Respondent, if the Tribunal were to find Venezuela liable under the Treaty, the Claimant would still not be able to recover any damages, because it has failed to meet its burden of proving and substantiating the quantum of any injuries.[1236]

839.   The Claimant has relied on inappropriate methodologies, premised on speculative assumptions, to arrive at incomplete, inaccurate and inflated damages amounts. Venezuela contends that, from the very beginning of this arbitration, it has noted the defects and flaws in the Claimant's approach and has indicated that the more appropriate methodology would be the cost approach. Nevertheless, the Claimant has failed to provide all the necessary information. It has also failed to provide evidence and analyses that would assist the Tribunal in alternative approaches to damages, something the Claimant also bore the burden to do. In light of this, Venezuela submits that the Claimant's request for damages be denied in its entirety.[1237]

### 2.   **Analysis**

840.   The order chosen by the Tribunal to address the issues relating to monetary compensation does not necessarily follow the one(s) advanced by the Parties, but reflects the order which the Tribunal considers appropriate under the circumstances for the purposes of a logical and coherent reasoning. The Tribunal will thus first set out what it considers to be the standard of compensation applicable to this case (a). It will then deal with the question of the valuation date (b) and address issues of burden of proof and causation (c). It will next move to the determination of the "fair market value" of the Claimant's investment and, in that context, deal with the different valuation methodologies presented by the Parties (d-f).

---

[1235] C-PHB, paras 666-671.

[1236] R-PHB, paras 231, 336.

[1237] R-PHB, para. 336.

a.    **The standard of compensation**

841.    The Treaty vests the Tribunal with the power to award "monetary damages and any applicable interest" in case of breach of an obligation contained in the Treaty (Article XII(9) of the BIT). It does not, however, as is generally the case with BITs,[1238] detail any standard of compensation which the Tribunal must apply when awarding such monetary damages. The only reference to a standard of compensation is the one contained in Article VII(1) of the Treaty. Article VII(1) of the BIT provides that:

> "Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable."

842.    It is undisputed that such reference concerns the compensation requirement for an expropriation to be considered compliant with Article VII(1) of the Treaty. The Parties are, however, in dispute as to whether such standard also applies to expropriations not meeting one or more of the Treaty requirements and to violations of other Treaty standards (such as FET or FPS), or whether in such cases the "full reparation" standard set out in *Chorzów* should apply.

843.    While in other cases this question may have important consequences, the Tribunal considers that in this particular case this discussion is rather theoretical and devoid of significant practical effects. In the Tribunal's view, to follow the BIT expropriation standard as opposed to "full reparation" under *Chorzów* may in particular produce different outcomes where the BIT standard would lead to a valuation date as of the date of the expropriation, whereas full reparation may require, under certain circumstances, the valuation date to be fixed at the date of the award.

844.    In this case, however, neither Party has argued in favor of the application of a valuation date as of the date of the award. Rather, as the Tribunal will explain *infra* when dealing with the valuation date, both Parties agree that the valuation date in this case should be

---

[1238] As the tribunal in *CMS* noted:

"[T]he Tribunal is faced with a situation where, absent expropriation under Article IV, the Treaty offers no guidance as to the appropriate measure of damages or compensation relating to fair and equitable treatment and other breaches of the standards laid down in Article II. This is a problem common to most bilateral investment treaties and other agreements such as NAFTA." *CMS v. Argentina*, Final Award, 12 May 2005, **Exh. CLA-45**, para. 409.

the date of expropriation (they disagree on whether such date should be fixed in April 2008 or February 2011, which, however, is a different question).

845.  Furthermore, the Parties agree that monetary damages must be assessed by reference to the fair market value (which is both the standard required under customary international law, and the one applicable under the BIT which speaks of "genuine value" or "valeur réelle" or "valor genuino"). As rightly noted by the Respondent, the Parties' disagreement over the applicable standard of reparation is thus "ultimately largely irrelevant".[1239]

846.  With these considerations in mind, the Tribunal wishes to make the following remarks in relation to the standard of compensation applicable in this case. First, as a general matter, the Tribunal considers that the standard of compensation contained in Article VII(1) of the Treaty is not the appropriate standard of compensation in cases of *breaches* of that provision, i.e., when the requirements set out in Article VII(1) are not met. One particular question is whether the BIT standard is, however, applicable in cases of expropriations merely lacking compensation. This point may be left open here, as in any event the Tribunal is of the view that the Article VII(1) "standard" is only concerned with expropriation, and not breaches of other BIT standards. Because the Tribunal has found breaches of FET (in addition to an expropriation), the Tribunal considers that the "full reparation" principle under customary international law must be applied as a consequence of its decision on liability.[1240] In other words, given the cumulative nature of the breaches that the Tribunal must compensate, and especially in view of its findings on FET that the Respondent's conduct caused all the investments made by Crystallex to become worthless, the Tribunal will apply the full reparation standard according to customary international law.

847.  An authoritative description of the principle of full reparation was provided by the PCIJ in *Chorzów* in the following terms:

> "The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-

---

[1239] Rejoinder, para. 532 ("Claimant agrees that monetary damages pursuant to Article XII(9) must be assessed by reference to the fair market value of its investment at the time of the alleged deprivation, consistent with Article VII(1) of the BIT. The only implication from the customary international law standard that Claimant appears to concretely wish to draw is (i) that a date of valuation other than the date of the alleged deprivation be applicable, and (ii) that the award include of [sic] compound interest and a tax indemnity") (footnotes omitted).

[1240] See *SD Myers v. Canada*, Partial Award, 13 November 2000, **Exh. RLA-52**, paras 310-311; *MTD v. Chile*, 25 May 2004, Award, **Exh. CLA-41**, para. 238; *Feldman v. Mexico*, Award, 16 December 2002, **Exh. RLA-59**, para. 195; *CMS v. Argentina*, Final Award, 12 May 2005, **Exh. CLA-45**, para. 409; *Enron v. Argentina*, Award, 22 May 2007, **Exh. RLA-85**, paras 360-363; *Sempra v. Argentina*, Award, 28 September 2007, **Exh. CLA-56**, para. 403; *National Grid plc v. Argentina*, UNCITRAL, Award, 3 November 2008, **Exh. CLA-62**, para. 269.

establish the situation which would, in all probability, have existed if that act had not been committed."[1241]

848.    The principle of full reparation set forth in *Chorzów* was later codified in the ILC Articles, which, while developed in the inter-state context, have routinely been applied also in the investor-state arbitration context.[1242]

849.    Article 31 of the ILC Articles imposes upon the responsible State "an obligation to make full reparation for the injury caused by the internationally wrongful act." Article 36 specifies that "[t]he State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution" and that "[t]he compensation shall cover any financially assessable damage including loss of profits insofar as it is established."

850.    Furthermore, it is well-accepted that reparation should reflect the "fair market value" of the investment. Appraising the investment in accordance with the fair market value methodology indeed ensures that the consequences of the breach are wiped out and that the situation which would, in all probability, have existed if the wrongful acts had not been committed is reestablished.[1243] As stated in the Commentary of the ILC Articles on State Responsibility,

> "[C]ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the 'fair market value' of the property lost."[1244]

851.    In the words of the Iran-US Claims Tribunal, "fair market value" means

---

[1241] *Case Concerning Certain German Interests in Polish Upper Silesia* (*Chorzów Factory*) (Germany v. Poland), Judgment (Permanent Court of International Justice), 25 May 1926, PCIJ SERIES A, NO. 7 (1927), **Exh. CLA-3**, p. 47.

[1242] The Tribunal is aware that Part Two of the ILC Articles, which sets out the legal consequences of internationally wrongful acts, may not apply, at least directly, to cases involving persons or entities other than States, such as in investment disputes as is the case here. In particular, it is aware that Comment (3) to Article 28 states that "[…] while Part One applies to all the cases in which an internationally wrongful act may be committed by a State, Part Two has a more limited scope. It does not apply to obligations of reparation to the extent that these arise towards or are invoked by a person or entity other than a State. In other words, the provisions of Part Two are without prejudice to any right, arising from the international responsibility of a State, which may accrue directly to any person or entity other than a State, and article 33 makes this clear." That being said, the ILC Articles reflect customary international law in the matter of state responsibility, and to the extent that a matter is not addressed by the Treaty applicable to this case and that there are no circumstances commanding otherwise, the Tribunal will turn to the ILC Articles for guidance. In this case, for instance, they are relied upon to confirm *Chorzów*. The Tribunal further notes that the Claimant has cited to the ILC Articles and, while Venezuela cautions that the ILC Articles are not appropriate in the context of this investor-state dispute, it has referred to them in its written pleadings "to the extent that they may be used as guidance". See Counter-Memorial, p. 291, fn. 1074.

[1243] See *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 8.2.10; *CMS v. Argentina*, Final Award, 12 May 2005, **Exh. CLA-45**, para. 406.

[1244] ILC Articles, Commentary *sub* Art. 36, para. 22.

> "[...] the price that a willing buyer would pay to a willing seller in circumstances in which each had good information, each desired to maximize his financial gain, and neither was under duress or threat. [The expert] appropriately assumed that the willing buyer was a reasonable businessman".[1245]

852.    Or, in the words of the *CMS* tribunal, the "fair market value" of an investment refers to:

> "[T]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms [*sic*] length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[1246]

853.    The Tribunal will thus assess the consequences of the Respondent's breaches using a fair market methodology. The first question, to which the Tribunal now turns, is at what date the Claimant's investment must be valued.

### b.    The valuation date

854.    As has already been mentioned, both Parties agree that in this case the proper date of valuation should be the date of expropriation (which, as noted, is also the date specified in Article VII(1) of the Treaty if one were to apply that provision as the standard of compensation for any Treaty breaches, which is not the case here). The Parties, however, disagree as to when such date of expropriation should be identified. The Claimant has argued for a 3 February 2011 valuation date, while the Respondent favors 13 April 2008.

855.    Upon consideration of the Parties' respective positions, the Tribunal sees merit in the choice of both dates. On balance, however, it considers that 13 April 2008 is the most appropriate valuation date in this particular case, for the following reasons. First, April 2008 is the date that coincides with the culmination of the events surrounding the Permit denial which the Tribunal has found to be both a self-standing breach of FET and the first important act giving rise to the creeping expropriation. It is beyond peradventure that the Claimant's investment in Las Cristinas was negatively impacted with the denial of the Permit, and this fact would no doubt have been considered by a hypothetical buyer of Crystallex's investment.

856.    Second, from April 2008 until 2011, the operation at the mining site was essentially at a standstill and the Claimant spent its time and funds maintaining the site in condition,

---

[1245] *Starrett Housing Co v. Iran*, Iran-U.S. Claims Tribunal, Award No. 314-24-1, 14 August 1987, **Exh. CLA-14**, para. 277.

[1246] *CMS v. Argentina*, Final Award, 12 May 2005, **Exh. CLA-45**, para. 402, quoting the International Glossary of Business Valuation Terms, American Society of Appraisers, http://www.appraisers.org/.

preparing for a possible resumption of operation, but not exploring or exploiting the site. The Claimant was possibly endeavoring to obtain the Permit, but had already notified its Notice of Dispute. While during this period, the CVG reassured Crystallex that the MOC was still binding and enforceable, it was also clear that it could not be *practically* enforced. In other words, while the Claimant may have still harbored hopes that the Permit would be granted, the governmental interference with the permitting process which had occurred at that point in time was such that it made Crystallex's rights practically useless.

857.    It should be added as a third reason that in its Notice of Dispute of 24 November 2008 the Claimant indicated that it considered the denial of the Permit – as well as subsequent statements by the Minister of Mines – to have created an investment dispute under the terms of the Treaty. This provides further confirmation that in the Claimant's own eyes, the dispute had already materialized in 2008, which implies that the Claimant itself considered that a breach had been committed by then.

858.    For the foregoing reasons, the Tribunal decides to assess the Claimant's damages at the valuation date of 13 April 2008.

### c.    General issues: Causation and burden of proof

859.    Before determining the fair market value of Crystallex's investment at the valuation date which the Tribunal has considered appropriate, the Tribunal finds it useful at this stage to address certain preliminary issues of causation and burden/standard of proof.

860.    With regard to causation, under international law, compensation for violation of a treaty will only be due from a respondent state if there is a sufficient causal link between the treaty breach by that state and the loss sustained by the claimant.[1247]

861.    Indeed, Article XII(1) of the Treaty requires that the investor "has incurred loss or damage *by reason of*, or *arising out of*, that breach [of the Treaty]".

862.    However, in this arbitration, the actual issue is less a matter of principle than a matter of proof of the causal link and of the quantum of the damage sustained. Crystallex is asserting that it suffered losses that are the result of the destruction of its investment and these losses would be incurred by reason of and arise out of the Respondent's

---

[1247] See Art. 31, para.1, of the ILC Articles and relating commentary. See also *Gemplus, S.A., et al. v. Mexico*, ICSID Case Nos ARB(AF)/04/3 and ARB(AF)/04/4, Award, 16 June 2010, **Exh. CLA-78**, para. 11.8; *Duke Energy Electroquil Partners and Electroquil SA v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, **Exh. RLA-98**, para. 468 ("compensation will only be awarded if there is a sufficient causal link between the breach of the BIT and the loss sustained by the Claimants"); *Biwater Gauff (Tanzania) v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, **Exh. CLA-59**, para. 779 ("Compensation for any violation of the BIT, whether in the context of unlawful expropriation or the breach of any other treaty standard, will only be due if there is a sufficient causal link between the actual breach of the BIT and the loss sustained by BGT"); *SD Myers v. Canada*, Partial Award, 13 November 2000, **Exh. RLA-52**, para. 316; *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/5, Award, 21 November 2007, **Exh. RLA-91**, para. 282.

wrongful acts during the permitting process and thereafter. In other words, whatever the breach of the Treaty the Tribunal retains, that wrongful act is at the origin of the injury and the actual difficulty is to determine to what extent the Claimant has proven that its damage flows from that internationally wrongful act. The Tribunal considers that the losses sustained by Crystallex did result from the destruction of its investment and were incurred by reason of the Respondent's wrongful acts during the permitting process and thereafter. Thus, they should be remedied to the extent of those wrongful acts, or, to use the Treaty's language, *by reason of such acts*.

863. With regard to issues of proof, the BIT does not set out any specific rules. ICSID AF Rule 41(1), under which the Tribunal operates, provides in turn that "[t]he Tribunal shall be the judge of the admissibility of any evidence adduced *and of its probative value*", which thus grants the Tribunal full discretion in these matters. Such discretion applies also in respect of the weight to be assigned to the evidence proffered in respect of damages calculations.

864. That being said, as a general matter, it is clear that it is the Claimant that bears the *burden* of proof in relation to the fact and the amount of loss.

865. The issue of the *standard* of proof, by contrast, relates to the degree of proof required for the Claimant to discharge its burden of proof. The Parties have debated whether the Tribunal should apply a "balance of probabilities" or a "sufficient degree of certainty" test. In the Tribunal's view, these tests chiefly reflect common law concepts (whereby the balance of probabilities standard, or preponderance of the evidence, is opposed to the "beyond a reasonable doubt" standard, normally used in criminal matters). In continental legal systems, by contrast, the matter of proof is left to the personal appreciation of the judge (inner conviction, *"intime conviction"*). If the judge is persuaded of the truth of a certain matter, then the standard of proof has been met.[1248]

866. Having those different approaches in mind and considering that the Tribunal is operating as an international arbitral body established under the framework of an international treaty, the Tribunal considers that, in the exercise of its discretion granted to it in relation to issues of evidence, it should be guided by the following principles.

867. First, the *fact* (i.e., the existence) of the damage needs to be proven with certainty. In that sense, there is no reason to apply any different standard of proof than that which is applied to any other issue of merits (e.g., liability).

868. Second, once the fact of damage has been established, a claimant should not be required to prove its exact *quantification* with the same degree of certainty. This is because any future damage is inherently difficult to prove. As the tribunal in *Lemire v. Ukraine* observed,

---

[1248] On these issues, see generally S. Ripinsky & K. Williams, *Damages In International Investment Law*, British Institute of International and Comparative Law, 2008, **Exh. CLA-66, Exh. CLA-159, Exh. RLA-93**, pp. 161-167.

"[o]nce causation has been established, and it has been proven that the *in bonis* party has indeed suffered a loss, less certainty is required in proof of the actual amount of damages; for this latter determination Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss."[1249]

869.   The tribunal is of the view that the emphasis should be put on the phrase "with reasonable confidence" which seems to strike a wholesome and pragmatic approach, prone to satisfy common law and civil law minds.

870.   Other tribunals have come to similar conclusions. In *SPP v. Egypt*, for example, the tribunal noted that "it is well-settled that the fact that damages cannot be assessed with certainty is no reason not to award damages when a loss had been incurred".[1250] And in *Tecmed*, the tribunal observed that "any difficulty in determining the compensation does not prevent the assessment of such compensation where the existence of damage is certain".[1251]

871.   Thus, an impossibility or even a considerable difficulty that would make it unconscionable to prove the amount (rather than the existence) of damages with absolute precision does not bar their recovery altogether. Arbitral tribunals have been prepared to award compensation on the basis of a reasonable approximation of the loss, where they felt confident about the fact of the loss itself.[1252] In the Tribunal's view, this

---

[1249] *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, **Exh. CLA-167**, para. 246 (footnote omitted).

[1250] *Southern Pacific Properties (Middle East) Ltd. v. Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, **Exh. CLA-19**, para. 215.

[1251] *Técnicas Medioambientales Tecmed S.A. v. Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, **Exh. CLA-39**, para. 190. See also *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 8.3.16 ("it is well settled that the fact that damages cannot be fixed with certainty is no reason not to award damages when a loss has been incurred").

[1252] The Tribunal finds further confirmation in *Gold Reserve*, where the tribunal noted that:

" […] while a claimant must prove its damages to the required standard, the assessment of damages is often a difficult exercise and it is seldom that damages in an investment situation will be able to be established with scientific certainty. This is because such assessments will usually involve some degree of estimation and the weighing of competing (but equally legitimate) facts, valuation methods and opinions, which does not of itself mean that the burden of proof has not been satisfied. Because of this element of imprecision, it is accepted that tribunals retain a certain amount of discretion or a "margin of appreciation" when assessing damages, which will necessarily involve some approximation. The use of this discretion should not be confused with acting on an *ex aequo et bono* basis, even if equitable considerations are taken into account in the exercise of such discretion. Rather, in such circumstances, the tribunal exercises its judgment in a reasoned manner so as to discern an appropriate damages sum which results in compensation to Claimant in accordance with the principles of international law that have been discussed earlier".

See *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, **Exh. CLA-185**, para. 686.

approach may be particularly warranted if the uncertainty in determining what exactly would have happened is the result of the other party's wrongdoing.

872.  These principles should also be applied with regard to the proof of loss of profits, which is the crucial issue in this case as far as the determination of quantum is concerned.

873.  The ILC Articles recognize that in certain cases compensation for loss of profits may be appropriate. Indeed, Article 36(2) of the ILC Articles provides that "[t]he compensation shall cover any financially assessable damage including loss of profits insofar as it is established". The commentary to the ILC Articles further notes that "[t]ribunals have been reluctant to provide compensation for claims with inherently speculative elements" and "[i]n cases where lost future profits have been awarded, it has been where an anticipated income stream has attained sufficient attributes to be considered a legally protected interest of sufficient certainty to be compensable. This has normally been achieved by virtue of contractual arrangements or, in some cases, a well-established history of dealings".[1253]

874.  Furthermore, according to an oft-cited authority, "in order to be allowable, prospective profits must not be too speculative, contingent, uncertain, and the like. There must be proof that they were reasonably anticipated; and that the profits anticipated were probable and not merely possible".[1254] The same idea was expressed by the tribunal in *ADM v. Mexico* which held that "lost profits are allowable insofar as the Claimants prove that the alleged damage is not speculative or uncertain – i.e., that the profits anticipated were probable or reasonably anticipated and not merely possible".[1255] Furthermore, the *Vivendi v. Argentina* tribunal noted that "compensation for lost profits is generally awarded only where future profitability can be established (the fact of profitability as opposed to the amount) with some level of certainty".[1256]

875.  In the Tribunal's view, all these authorities show that, once the *fact* of future profitability is established and is not essentially of speculative nature, the amount of such profits need not be proven with the same degree of certainty. In other words, the Claimant must prove that it has been deprived of profits that would have actually been earned. This requires proving that there is sufficient certainty that it had engaged or *would have engaged* in a profitmaking activity but for the Respondent's wrongful act, and that such activity would have indeed been profitable.

876.  With those principles in mind, the question thus is whether in this case (i) it is sufficiently certain that the Claimant would have made profits; and (ii) if yes, whether

---

[1253]  ILC Articles, Commentary *sub* Article 36, para. 27 (internal footnotes omitted).

[1254]  Whiteman, *Damages in International Law*, 1943, vol. III, **Exh. RLA-10**, p. 1837.

[1255]  *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/5, Award, 21 November 2007, **Exh. RLA-91**, para. 285.

[1256]  *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 8.3.3.

the Claimant has provided the Tribunal with a reasonable basis to assess such loss of profits. The two questions will be addressed in turn.

### d.    Has the Claimant proven the fact of future profitability?

877.    In relation to the first question, the Tribunal considers that the Claimant has indeed proven the fact of future profitability. It is undisputed that Crystallex did not have a proven track record of profitability, because it never started operating the mine. However, in the Tribunal's view, it has sufficiently established that, if it had been allowed to operate, it would have engaged in a profitmaking activity and that such activity would have been profitable. The Tribunal considers that this is essentially due to the nature of the investment at stake here as well as the development stage of the project.

878.    First, it cannot be cast into doubt that Las Cristinas is one of the most important mines in Latin America, and the Venezuelan authorities also clearly viewed it as such.[1257] During the years in which it was active on the ground, Crystallex had completed the exploration (drilling and testing) activities and the feasibility studies produced by the Claimant (and approved by the Ministry of Mines) show that that the nature of the Las Cristinas deposit was well known. In particular, the MDA 2007 Technical Report confirmed that Las Cristinas had proven and probable reserves estimated at 16.86 million ounces of gold *in situ*, and measured and indicated resources of 20.76 million ounces and inferred resources of 6.28 million ounces.[1258] The Tribunal sees no reason to cast into doubt the accuracy of the studies that those well-known consultants prepared contemporaneously for the Claimant throughout the years.[1259] As noted by the tribunal in *ADC v. Hungary*, a business plan "constitutes the best evidence before the Tribunal of the expectations of the parties at the time of expropriation for the expected stream of cash flows".[1260]

879.    Furthermore, gold, unlike most consumer products or even other commodities, is less subject to ordinary supply-demand dynamics or market fluctuations, and, especially in

---

[1257] See Annual Address to the Nation of the President of the Bolívarian Republic of Venezuela, Hugo Chávez, Federal Legislative Palace, Caracas (extracts), 13 January 2009, **Exh. C-53** ("In this way, the Venezuelan State controls 30,000 million dollars, which is the current estimated worth of the deposit"); Ministry of Mines Press Release, 5 November 2008, **Exh. C-40**, p. 2 ("Las Cristinas is considered one of Latin America's most important gold deposit and one of the largest in the world. With a capacity of approximately 31 million ounces of gold, its estimated value is $35 billion").

[1258] See MDA, 2007 Technical Report, **Exh. C-214**, 7 November 2007, pp. 6, 249.

[1259] The Tribunal further notes that, based on the mine expansion plans developed by Crystallex's consultants, the assumption that Crystallex would have been able to increase extraction from 20,000 tpd to 40,000 tpd in year 3 is reasonable. See in particular SNC-Lavalin, 20,000 to 40,000 t/d Expansion Plan, October 2005, **Exh. C-171**, Section 3.1.

[1260] See *ADC Affiliate Limited, et al. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, **Exh. CLA-50**, para. 507.

the case of open pit gold mining as in Las Cristinas, is an asset whose costs and future profits can be estimated with greater certainty. The Tribunal thus accepts that predicting future income from ascertained reserves to be extracted by the use of traditional mining techniques—as is the case of Las Cristinas—can be done with a significant degree of certainty, even without a record of past production.[1261]

880. In short, the Claimant has established the fact of future profitability, as it had completed the exploration phase, the size of the deposits had been established, the value can be determined based on market prices, and the costs are well known in the industry and can be estimated with a sufficient degree of certainty.

881. This conclusion leads the Tribunal to the second question, i.e., whether the Claimant has provided the Tribunal with a reasonable basis to assess such loss of profits. This issue relates to the choice of the appropriate methodology or methodologies to determine the fair market value of Crystallex's investment. In this respect, a first choice to be made is whether it is more appropriate to adopt one or more of the Claimant's methodologies (which are all forward-looking, as they aim at calculating lost profits) or the methodology propounded by the Respondent, namely the cost approach, which is backward-looking and thus aimed at considering what the investor expended in the project.

882. The Tribunal considers that in this case only forward-looking methodologies aimed at calculating lost profits are appropriate in order to determine the fair market value of Crystallex's investment. By contrast, a backward-looking methodology such as the cost approach, while susceptible of being utilized in certain instances where there is no record of profitability and other methodologies would lead to excessively speculative and uncertain results, cannot be resorted to in this case. The cost approach method would not reflect the fair market value of the investment, as by definition it only assesses what has been expended into the project rather than what the market value of the investment is at the relevant time.

---

[1261] See also *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, **Exh. CLA-185**, para. 830, noting that:

> "Claimant's experts have modelled an alternative value based on a weighted average of a DCF valuation, comparable publically traded company and comparables transactions. *Although the Brisas Project was never a functioning mine and therefore did not have a history of cashflow which would lend itself to the DCF model*, the Tribunal accepts the explanation of both Dr Burrows (CRA) and Mr Kaczmarek (Navigant) that *a DCF method can be reliably used in the instant case because of the commodity nature of the product and detailed mining cashflow analysis previously performed*. The Tribunal also notes that the experts agreed on the DCF model used, and it is only the inputs that are contested. Many of these have already been discussed above, with the remaining variables discussed below." (emphasis added, internal footnote omitted)

883.    The appropriateness of choosing, at least for a case like this one, a method which aims at determining lost profits and, by contrast, of discarding methods that are purely based on the computation of sunk costs, is confirmed by the "Standards and Guidelines for Valuation of Mineral Properties" by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIMVal Guidelines"), which are considered as important standards in the industry.

884.    The CIMVal Guidelines define "development property" as "a Mineral Property that is being prepared for mineral production and for which economic viability has been demonstrated by a Feasibility Study or Prefeasibility Study and includes a Mineral Property which has a Current positive Feasibility Study or Prefeasibility Study but which is not yet financed or under construction". It is undisputed that the Ministry of Mines had approved Crystallex's Feasibility Study on 6 March 2006. Las Cristinas should thus be considered a "development property" within the meaning of the Guidelines (as opposed to a less advanced "exploration property").[1262] In relation to "development properties", the CIMVal Guidelines advise in favor of the application of income- and market-based methodologies, and against the use of cost-based methodologies.[1263]

885.    For the foregoing reasons, the Tribunal will consider the Claimant's four methodologies to assess the fair market value of Crystallex's investment and will assess whether the Claimant has provided the Tribunal with a reasonable basis to assess lost profits.

e.    **The valuation methods**

886.    Valuation is not an exact science. There often is no single value of a business. Rather, there are typically a range of values. Similarly, there is no one methodology best suited for determining the fair market value of the investment lost in every situation. Tribunals may consider any techniques or methods of valuation that are generally acceptable in the financial community, and whether a particular method is appropriate to utilize is based on the circumstances of each individual case. A tribunal will thus select the appropriate method basing its decision on the circumstances of each individual case, mainly because a value is less an actual fact than the expression of an opinion based on the set of facts before the expert, the appraiser or the tribunal.

887.    In this case, the Claimant has presented four valuation methodologies:

    i. The stock market approach

---

[1262] See Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation. "Standards and Guidelines for Valuation of Mineral Properties", February 2003, **Exh. CLEX-74**, p. 10 (defining "exploration property" as "a Mineral Property that has been acquired, or is being explored, for mineral deposits but for which economic viability has not been demonstrated".)

[1263] See Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation. "Standards and Guidelines for Valuation of Mineral Properties", February 2003, **Exh. CLEX-74**, p. 24.

    ii. The P/NAV method

    iii. The market multiples method

    iv. The indirect sales comparison method

888.    The Tribunal will deal with them in turn. Thereafter, it will also come back to the cost approach (v.), which is not considered for the purposes of the Tribunal's assessment of damages, but is presented for "informative" purposes only, in order to show the breadth of the investments made by the Claimant.

### i.   **The stock market approach**

889.    The Tribunal considers that in this particular case the stock market approach is a particularly appropriate and reliable valuation method, due to the following reasons.

890.    First, as a general matter, the stock market methodology reflects the market's assessment of the present value of future profits, discounted for all publicly known or knowable risks (including gold prices, contract extensions, management, country risk, etc.) without the need to make additional assumptions. In other words, the use of the stock market approach eliminates the need to resort to such assumptions, as the market factors in all risks and costs associated to the asset. The second reason why in this particular case the stock market may be relied upon is that Crystallex was a one-asset company and the rights which Crystallex enjoyed under the MOC in relation to Las Cristinas were that single asset.[1264] Thus, any buyer acquiring the totality of Crystallex's shares would have acquired the entire value of Crystallex's rights under the MOC and would in principle have been interested foremost and possibly exclusively in and valued the company on the basis of that single asset. Third, Crystallex's stock was actively and heavily traded on two main stock exchanges for mining companies[1265] so that transactions were occurring with sufficient frequency and sufficient volume to provide pricing information on an ongoing basis that reflects the expectations of a multitude of arm's length buyers and sellers on the underlying value of the company. Reciprocally, as the buyers do first think of the Claimant as a one-asset company, it is obvious that the stock value will reflect that asset valuation. The Tribunal considers that the stock market approach is thus a reliable method in this case.[1266]

---

[1264] See Crystallex Financial Statements, **Exh. CLEX-05**, p. 0657 (showing that, in 2007, Crystallex's investments in Las Cristinas formed 99.97% of its total value in "Property, Plant and Equipment".).

[1265] See Crystallex AMEX Trading Volume 2003–2010 (Source: Bloomberg), **Exh. C-533**; Crystallex Trading Volume Data, **Exh. CLEX-73**.

[1266] See generally I. Marboe, Calculation of Compensation and Damages in International Investment Law, Oxford University Press (2009), **Exh. CLA-71**, para. 5.15 ("The price of the stock seems to be the most reliable and objective indicator of value because '[t]he public capital markets in the United States (as well as in other countries) reprice thousands of stocks every day mostly through transactions among financial buyers and sellers who are well-informed (because of stringent disclosure laws, at least in the United States) and have no special motivation or compulsion to buy or sell. This constant repricing gives up-to-the-minute evidence of prices that buyers and sellers

891.  To determine the value of Crystallex on 13 April 2008, the Tribunal must start with the last price before the wrongful acts which negatively affected the company's share price and then calculate what would have been the value as of the valuation date if Crystallex had been unimpeded by Respondent's conduct. With regard to the "last clean date", the Tribunal also accepts the choice of 14 June 2007 as appropriate. This is the date when Crystallex announced to the market that it had fulfilled the requirements for the issuance of the Permit and that it had paid the necessary taxes and posted the requisite bond. The Tribunal accepts that after 14 June 2007 the actual stock price of Crystallex became affected by the absence of positive news on permitting, while the industry indexes continued to grow until the onset of the 2008 financial crisis. The Tribunal further notes that, beyond criticizing the use of the June 2007 date, the Respondent and its expert have not suggested an alternative satisfactory date for these purposes.[1267] Furthermore, the Tribunal accepts the "build-up" to 2008 performed by the Claimant's experts which tracks Crystallex's actual share price movement up to the last trading date that was free of any threat of unlawful act and then makes it evolve according to a relevant industry index. For the Tribunal, such build-up is indeed appropriate to reflect a but-for scenario.[1268]

892.  With regard to the index to be chosen for the build-up, the Tribunal considers the junior mining index as the most appropriate in this case, as Crystallex could be considered a "junior" mining company because at that stage it had only one major development stage project in its portfolio, i.e. Las Cristinas. In this respect, the Tribunal does not agree with the Claimant that reliance on the junior gold index would lead to an overly conservative valuation.

893.  Finally, the Tribunal considers that neither the "permitting bump" nor the "control premium" should be considered in this case. With regard to the "permitting bump", the Tribunal considers its application unwarranted under the circumstances. The Claimant's reliance on Gold Reserve's bump (as opposed to bumps possibly

---

agree on for securities in all kinds of industries relative to the fundamental variables perceived to drive their values, such as dividends, cash flows and earnings'" (quoting S. Pratt et al., Valuing a Business: The Analysis and Apprasial [sic] of Closely Held Companies (New York: McGraw-Hill, 2000) 224-5)."); **CLA-66** 2008 S. Ripinsky & K. Williams, Damages In International Investment Law, British Institute of International and Comparative Law (2008), **Exh. CLA-66, Exh. CLA-159, Exh. RLA-93**, p. 189, fn. 25 ("Arbitral tribunals have acknowledged that where the assets, and shares in particular, are publicly traded, stock market quote of the shares on the relevant date would be an appropriate indicator of the fair market value."). See also *Quasar de Valores, SICAV, S.A., et al. v. Russian Federation,* SCC No. 24/2007, Award, 20 July 2012, **Exh. RLA-185**, paras 216-217; *Enron v. Argentina,* Award, 22 May 2007, **Exh. RLA-85**, para. 383 (where the tribunal used the stock market value as a means to verify the result derived from the primary valuation method used, a DCF method).

[1267] See *Quasar de Valores, SICAV, S.A., et al. v. Russian Federation,* SCC No. 24/2007, Award, 20 July 2012, **Exh. RLA-185**, para. 212 ("The required certitude is not as to a precise number, but as to the reality of a substantial deprivation for which the wrongdoer cannot escape liability by insisting on its lack of detailed exactitude - and *a fortiori* when it presents no better alternative analysis").

[1268] See *Quasar de Valores SICA V SA et al v. The Russian Federation,* SCC No. 24/2007, Award, 20 July 2012, **Exh. RLA-185**, paras 214-16.

experienced also by other mining companies) is insufficient to warrant the permitting bump sought and its size, especially since the Claimant had already received a 27% increase in share price when Gold Reserve received its permit because the market expected Crystallex would also be receiving its permit shortly thereafter. With regard to the control premium, the Tribunal considers that the Claimant and its experts have not sufficiently proven that its application is appropriate in this case. As the Claimant's authorities point out, one of the main reasons for a control premium is that new management will change the business strategy and thereby create value. In the Tribunal's view, the Claimant has not shown this to be the case and in fact it seems to be inapplicable here. Moreover, the Respondent has argued that the MOC expressly prohibited Crystallex from assigning directly or indirectly its rights and obligations thereunder.[1269] Whether this prohibition equally applies to Crystallex's shares (as opposed to the investment itself) may be left open here. What appears likely is that Venezuela might have raised objections (whether well-founded or not) to that transfer and that might have made the sale of control more difficult and possibly reduced the price. The Claimant also has not shown that it is appropriate to add a control premium to compensate for an implied minority discount.

894.    Finally, the Tribunal decides to reject the Claimant's claim for US$ 180 million as "consequential post-2008 damages". The Tribunal considers that the Claimant has not sufficiently established why those damages beyond the date of valuation chosen by the Tribunal should be added, and in any event considers that they have not been sufficiently detailed to be taken into account for these purposes.

895.    In conclusion, the Tribunal considers that the Claimant's stock market method, with the adjustments made above, provides a reasonable and reliable basis to quantify the Claimant's damages as of April 2008. The application of the variables discussed above leads to a figure of **US$ 1,295.16 million**.[1270] The Tribunal, having reviewed the figures which result from the application of these variables, concludes that it sees no reason why it should not accept the accuracy of the Claimant's experts' calculations in this respect. Moreover, the Respondent's expert, while challenging the inputs, did not challenge the accuracy of the calculations made based on those inputs.

ii.    **The P/NAV method**

896.    A further method presented by the Claimant is the so-called P/NAV method. While the Tribunal considers that conceptually it would have no difficulties in accepting it as a method *per se*, it has come to the conclusion that, with respect to an April 2008 valuation date, the "valuation" presented by the Claimant and its experts cannot be relied upon.

---

[1269] See MOC, **Exh. C-9**, Clause 20.

[1270] See Third ER Lexecon, para. 34.

897.    It should be recalled that the Tribunal asked the Claimant to perform a new P/NAV valuation with regard to an April 2008 valuation date and the use of a number of variables.[1271] Having reviewed the new calculations provided by the Claimant's experts especially in view of their original February 2011 P/NAV valuation, the Tribunal considers that such April 2008 calculations do not provide reliable data as the process performed by the experts does not follow the methodology applied for their original valuation, at least not identically. In particular, the Claimant's experts have not selected new comparable companies based on analyst reports as of 13 April 2008 from which they would have obtained a new price multiple derived from the median of such companies.

898.    In the words of the Claimant:

> "In order to employ alternative implied nominal discount rates within the P/NAV method, as requested by the Tribunal, Prof. Spiller and Dr. Abdala generated hypothetical (and counterfactual) P/NAV multiples consistent with the implied nominal discount rates requested through the same reverse process. In other words, in these alternative valuations, the experts first conducted a DCF-style calculation, which is inappropriate for a gold project but allows use of the implied nominal discount rates requested by the Tribunal, and then, by the same process of trial and error, found the P/NAV multiple that yielded the same numerical result as the results produced using the implied nominal discount rates stipulated by the Tribunal".[1272]

899.    The inadequacies of such "reverse engineering" process in relation to an April 2008 valuation have been particularly shown upon Venezuela's cross-examination of the Claimant's experts at the Quantum Hearing.[1273] While the Tribunal does not cast into doubt that the process followed by the Claimant's experts in response to the Tribunal's questions may have been due to a good faith misunderstanding of the Tribunal's questions on the P/NAV valuation, the fact remains that, by the Claimant's own admission, the "running of the numbers" with regard to the 2008 valuation date generates somewhat "artificial" and incomplete results,[1274] which the Tribunal is thus unable to consider for the purpose of its damage quantification. In view of this conclusion, it is thus unnecessary to examine whether the Claimant could legitimately substitute the P/NAV method to the more customary DCF approach and why the Claimant did not supply a DCF calculation at all.

---

[1271] See Tribunal's 4 March 2014 Questions, Question 9; Tribunal's 25 July 2014 Questions, Question 1.

[1272] C-Supplemental Quantum Submission, para. 27.

[1273] *Compare* Tr. [Supplemental *Quantum*] (Figueroa), 109:5 et seq. (reviewing how the original P/NAV valuation was correctly performed in relation to the February 2011 valuation date), *with* 111:19 et seq. and 118 et seq. (showing the different process followed in respect of the 2008 valuation date).

[1274] See C-Supplemental Quantum Submission, paras 26-29.

900. For the foregoing reasons, the Tribunal thus disregards the P/NAV method supplied by the Claimant in respect of the April 2008 valuation date.

### iii. The market multiples method

901. The third methodology proposed by the Claimant is the market multiples approach. This is a valuation method that estimates the value of an asset or company by examining the market valuation of companies holding properties of similar characteristics. It derives a measure of value for the asset subject to valuation by inference from the value of peer companies. The Tribunal considers that such method is widely used as a valuation method of businesses, and can thus be safely resorted to, provided it is correctly applied and, especially, if appropriate comparables are used. Also the CIMVAL Guidelines confirm that market-based methodologies, such as this one, are appropriate for the valuation of a development stage mineral property such as Las Cristinas.[1275]

902. With regard to the application of this methodology to the specificities of this case, the Tribunal is of the view that the valuation provided by the Claimant's experts in relation to the 13 April 2008 valuation date yields reliable results. In respect of this method, in response to the Tribunal's request the Claimant's experts have undertaken to identify new comparable companies as of 13 April 2008 in order to yield a market multiple based upon Enterprise Value to Gold Reserves Equivalent ("EV/Resource"). In this regard, the Tribunal is of the view that the Claimant and its experts have identified sufficiently comparable companies to find their EV/Resource multiple. While the Tribunal has noted the Respondent's criticism that some of the 73 companies used as comparables seem to bear little resemblance to Crystallex, no two companies will ever be exactly alike. This is a given that must be accepted when using this kind of methodology. After all, "to compare" is a process made with objects similar to the subject rather than with identical objects—if those even exist.

903. With regard to the sensitivities discussed by the Parties, the Tribunal decides the following. First, no control premium should be added, as the Claimant and its experts have not sufficiently proven that its application is appropriate in this case. Second, the Tribunal considers it appropriate to refer to a 20-year duration of the exploitation, which is the base duration of the MOC, without renewals. The Tribunal has not been convinced by the Claimant's argument that a reasonable investor limited by a 20-year contract would proceed to mine all the gold that is economically feasible to extract at the prevailing gold price over the period of time available. The Tribunal first notes that the MOC provides a duration of 20 years "extendable for one (1) or two (2) periods of ten (10) years" "subject to the previous written agreement of the Parties" (*previo*

---

[1275] See Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation, "Standards and Guidelines for Valuation of Mineral Properties", February 2003, **Exh. CLEX-74**, pp. 22-24.

*acuerdo escrito entre las partes*).[1276] Thus, there is no automatic right to further renewals, and it cannot be simply assumed that either Party would have simply agreed to renew the MOC, much less on identical or similar terms in the wake of changed circumstances (for example in case of significant increase or decrease of gold prices). The Tribunal thus considers that taking into account a 20-year duration, in line with the MOC's base duration, more accurately reflects the determination of the fair market value of Crystallex's investment.[1277]

904. As to the consequential post-2008 damages, the Tribunal refers to its earlier finding at para. 894 which is also applicable in this instance.

905. The application of the market multiples method with the sensitivities discussed above yields damages in the amount of **US$ 1,109 million**.[1278] The Tribunal, having reviewed the figures that result from the application of these variables, concludes that it sees no reason why it should not accept the accuracy of the Claimant's experts' calculations in this respect. Moreover, the Respondent's expert, while challenging the inputs, did not challenge the accuracy of the calculations made based on those inputs.

#### iv. The indirect sales comparison method

906. The fourth and last valuation method presented by the Claimant is the market transaction method (or indirect sales comparison approach) performed by Mr. Trevor Ellis. This approach takes prior mine transactions which the Claimant and its expert argue are indirectly comparable to a potential Las Cristinas transaction and then develops a value for Las Cristinas based on a series of adjustments made to the prior mine transactions.

907. The Tribunal has no difficulty in accepting that in theory such method could yield reasonable results and would thus be an appropriate valuation method to value an investment in an international arbitration. However, its particular application by the Claimant's expert presents uncertainties and speculative elements so that the Tribunal cannot consider it in this particular case.

908. First, the Tribunal considers that Mr. Ellis' valuations performed under the "unconstrained scenarios" (i.e., processing 140,000 tpd for a majority of the project) are based on too "aggressive" and unrealistic assumptions which find little, if any, reflection in the Claimant's own contemporaneous mining studies. The Tribunal notes

---

[1276] MOC, **Exh. C-9**, Clause 18.1.

[1277] See also I. Marboe, Calculation of Compensation and Damages in International Investment Law, Oxford University Press (2009), **Exh. CLA-71**, para. 5.166 ("If the contract provided for an extension only in the case of an agreement between the parties, the arbitral tribunal usually did not include it in the valuation", with further references to cases).

[1278] Third ER Lexecon, para. 27.

that the Claimant itself did not include the valuations under these scenarios when calculating its damages request.

909. With regard to the 40,000 tpd scenario (which is included in the Claimant's damages request), the Tribunal is of the view that the expert has not proven that the transactions presented are sufficiently comparable to a potential Las Cristinas transaction. The Tribunal notes that Mr. Ellis applies several adjustments to the allegedly comparable transactions to make them more comparable to Las Cristinas. The Tribunal considers that such adjustments are too plentiful to render this method of reliable value and that the assessment of damages reached through such calculations is too speculative to be taken into account.

910. For the foregoing reasons, the Tribunal will disregard the indirect sales comparison method presented by Mr. Ellis.

### v. Cost approach

911. Before concluding on the valuation methods, the Tribunal wishes to briefly discuss the figures which would result from the cost approach. The Tribunal has already explained that in this case it does not consider it appropriate to resort to such method, as the fair market value of an object is not related to its historical cost but to its future performance.[1279] However, it presents the following comments for "informative" purposes only, in order to show the breadth of the investments made by the Claimant in relation to the Las Cristinas project.

912. In response to the Tribunal's questions, the Claimant has provided the following summary of the costs it has incurred. The final column ("Corrected") incorporates certain corrections made by the Claimant's experts who have reviewed the Claimant's cost information.[1280]

| Item | Original Submission | Corrected |
|---|---|---|
| 1. **Property Plant & Equipment** | 374,184,145 | 374,321,327 |
| 2. **Administration Expense** | 188,583,382 | 192,044,025 |
| 3. **Reorganization Expense** | 22,336,000 | 18,437,981 |
| 4. **Stock Based Compensation** | 11,426,562 | 11,426,562 |
| 5. **Bond Interest** | 94,895,177 | 94,895,177 |

---

[1279] See *supra*, paras 881-8855.

[1280] See also C-PHB, Annex 1, pp. 40 *et seq.* for a more detailed breakdown of the costs.

| | | |
|---|---|---|
| 6.  **Other Interest** | 6,894,357 | 5,713,000 |
| 7.  **Proceeds from Sale of Equipment** | -41,209,474 | -41,958,000 |
| 8.  **Reduction for Arbitration Expense** | -4,125,000 | -1,526,000 |
| **Total Cost** | **644,757,643** | **644,876,800** |

913.    While the Tribunal has noted Venezuela's and its expert's contention that some of the costs should be excluded as they did not contribute to the project's value,[1281] it cannot be disputed that the Claimant expended hundreds of millions in the project.[1282]

914.    The Tribunal wishes in particular to note the large-scale investments made by Crystallex in social projects in Venezuela, pursuant to its obligations under Clauses 7 and 12 of the MOC for the implementation of social programs for the benefit of the communities surrounding Las Cristinas. Among other things, Crystallex provided technical support for small-scale mining associations;[1283] it maintained and upgraded the Las Claritas Medical Center;[1284] it built houses in the local communities;[1285] and improved the potable water and sewage system.[1286] Indeed, on several occasions, the CVG acknowledged that Crystallex had complied with its social projects obligations under the MOC.[1287]

915.    Thus, even if certain costs were to be disregarded according to the Respondent's observations, such as the proceeds from the sales of equipment or a portion of such

---

[1281] See R-Supplemental Quantum Submission, paras 70-89; Third ER Hart, paras 48-90.

[1282] The Tribunal notes that even Venezuela's "high-level calculation" of the costs Crystallex prudently incurred towards Las Cristinas reaches a figure of US$ 240-245 million. See R-Supplemental Quantum Submission, paras 83-87.

[1283] See Small-Scale Mining Management, Report of the 1st quarter 2007: Program for gold exploration in the areas assigned to small-scale mining – Las Cristinas Project, **Exh. C-197**; Small Mining Management: Monthly Report of January 2008, 30 January 2008, **Exh. C-222**; Certification of Completion of Work, 15 April 2008, **Exh. C-225**.

[1284] See, *e.g.*, Crystallex *Reporte de Aspectos Relevantes*, 2007, **Exh. C-195**, pp. 21 and 26.

[1285] See, *e.g.*, Crystallex *Reporte de Aspectos Relevantes*, 2007, **Exh. C-195**, p. 17; Housing Transfer, 13 January 2004, **Exh. C-118**.

[1286] Crystallex *Reporte de Aspectos Relevantes*, 2007, **Exh. C-195**, p. 18.

[1287] See, *e.g.*, CVG Press Release, 5 November 2003, **Exh. C-112** (acknowledging Crystallex's compliance with its obligations to create jobs above the contractually required level, the improvements of the medical center and the building of the houses). See also Minutes of Meeting, 13 February 2004, **Exh. C-127**; Completion and Final Acceptance Minutes. Construction of the Water Purification Project in the areas of Las Claritas, San Marcos and Araymatepuy, 29 March 2006, **Exh. C-187**; Minutes of Transfer of the Purification Plant of Las Claritas, 18 January 2008, **Exh. C-221**.

proceeds[1288], it is clear that the cost summaries provided by the Claimant show the breadth of activities conducted by the Claimant not only to bring the mine to a "shovel-ready" state, but also towards the social and environmental measures envisaged under the MOC.[1289]

### f.    Conclusion on the valuation methods

916.    In conclusion, the Tribunal has found that the application of forward-looking methodologies is appropriate to assess the fair market value of Crystallex's investment, for the reasons explained above. It has further reviewed the four methodologies propounded by the Claimant, and has come to the conclusion that, for the valuation date that it considers appropriate in this case (i.e., 13 April 2008), the stock market and the market multiples approaches provide reliable bases upon which to value the Claimant's loss. By contrast, the P/NAV method does not appear to provide reliable figures in relation to the April 2008 valuation date, and the indirect sales comparison method is disregarded as its results here are excessively speculative.

917.    The Tribunal further notes that the damages assessed through the stock market and the market multiples approaches amount to **US$ 1,295.16** million and **US$ 1,109 million** respectively. The two approaches thus lead to results which are largely consistent with each other.[1290] Rather than opting for one methodology to the exclusion of the other,

---

[1288] The Tribunal notes that the Respondent has insisted in its post-hearing submissions that certain costs, and in particular the proceeds deriving from the sale of certain equipment, be subtracted from the figures which would result from a cost approach valuation.

See R-PHB, paras 319-321 (where Venezuela, in the section devoted to the cost approach, argues that "[i]n any event, under the Cost Approach, the use of proceeds for recovered costs is irrelevant—they are still subtracted from the amount spent on 'plant and equipment' (which is part of the overall total) to accurately represent those costs", emphasis added); R-PHB, Annex, paras 108-109 and 116-119; R-Supplemental Quantum Submission, para. 85 (where Venezuela, in Section V devoted to the cost approach, submits that "[s]ince an accurate cost approach analysis needs to account for the net costs, Mr. Hart deducts all identifiable non-prudent costs and costs that have been or reasonably could be recovered by Claimant. These deductions include: (1) the amount Claimant recovered by selling the mining equipment [...]"). See also Third ER Hart, Section V.B.iii.a.

The Tribunal has decided to discard the cost approach so that it is unnecessary to further consider this issue.

[1289] Taking as an example the Claimant's corrected figure of US$ 645 million, the cost approach would produce a result that would not be entirely dissimilar to the valuations according to the forward-looking methods, particularly if one were to add an appropriate rate of interest the Claimant would have paid on its disbursements from their effective date. It is of course not possible to reintroduce through the backdoor a method that is found not to be fit in the circumstances of the case. However, to ascertain that its results, albeit not as high as the figures resulting from the forward-looking valuations, are not totally different either, is reassuring as a sort of indication of reasonableness of the use of the latter methodologies. This observation would still hold true even if the Tribunal were to disregard or deny certain cost items, as argued by the Respondent.

[1290] See M. Kantor, *Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert Evidence* (2008), **Exh. CLA-65**, p. 27 ("Valuation methods are often complementary. If the valuations reached by two methodologies are widely inconsistent with each other, that can be a strong signal something is awry. If several valuation methods produce consistent results, arbitrators may take greater comfort from the valuations"). See also T.W. Wälde & B. Sabahi, *Compensation, Damages and Valuation in International Investment Law*, TDM, Vol. 4, No. 6 (Nov. 2007), **Exh. RLA-90**, p. 14 "[...] there is not one full-proof method. There are a variety of valuation

the Tribunal decides to average the two figures out and assess the Claimant's damages in the amount of **US$ 1,202 million**.

918.    The Tribunal is convinced that this figure represents a correct and reasonable assessment of the fair market value of the Claimant's investment. The result reached is, in the Tribunal's view, not speculative, but, if anything, may err on the conservative side, especially given that the Tribunal has decided to discard the Claimant's alleged consequential damages as well as certain variables proposed by the Claimant (such as the control premium, the permitting bump, or the further contract renewals beyond the 20 years) which would have increased the Claimant's damages.

## D.    INTEREST

### 1.    The Claimant's Position

919.    The Claimant submits that an award of interest is an integral component of the full reparation principle under customary international law[1291], and that in any event Venezuela agreed under Article VII(1) of the Treaty that compensation for expropriations shall accrue interest from the date of expropriation at a "normal commercial rate".[1292] Furthermore, the Claimant argues that the award of interest is clearly warranted under the circumstances of this case.[1293]

920.    For the Claimant, a suitable commercial rate of interest should be a rate that reflects commercial interest rates for U.S. dollar borrowing in Venezuela.[1294] According to the Claimant, the nearest proxy is the rate at which Petróleos de Venezuela S.A. (PDVSA) pays interest on short term, Venezuelan U.S.-dollar bonds. Based on its valuation date of 3 February 2011, the Claimant selects two short term bonds from 15 October 2010 and 28 June 2011 with a coupon rate of 8% per annum and maturity dates of 17 November 2013.[1295] By contrast, the application of a risk-free rate would be inappropriate, because it would ignore the commercial reality that companies do not raise capital through risk-free investments, and would thus result in serious under-compensation to the Claimant.[1296]

---

methods, each one with its draw-backs. It is best – and that also seems to be the main current arbitral practice – to apply a combination of the various methods and then try to narrow down the differences between the results of application of each by understanding, assessing and judging the reasons for such differences").

[1291] Memorial, para. 475, citing to Art. 38 of the ILC Articles on State Responsibility.

[1292] Memorial, paras 475-476; Reply, paras 714-715.

[1293] Reply, paras 717-718.

[1294] Memorial, para. 478.

[1295] Memorial, para. 478; Reply, para. 721.

[1296] Reply, paras 724-728.

921.    Furthermore, the Claimant contends that the only way to fully repair Crystallex for the time value of its money and to avoid that Venezuela has a windfall for its wrongful act is by the compounding of pre-award interest.[1297] It submits that nearly every recent damages investment treaty award has granted compound pre-award interest.[1298] With regard to the periodicity of the compounding, the Claimant submits that interest should be compounded semi-annually.

922.    Finally, the Claimant seeks post-award interest.[1299] Crystallex asserts that it is entitled to compound interest accruing on the Tribunal's award from the date of the award until payment is made in full, and that post-award interest removes any incentive by the Respondent to delay compensation.[1300] It thus claims post-award interest at a rate of 8% per annum from the date of the Tribunal's award, compounded semi-annually.[1301]

### 2.    The Respondent's Position

923.    First, the Respondent submits that there is no automatic entitlement to interest,[1302] and cites in this respect to Article 38 of the ILC Articles on State Responsibility.[1303] It is for the Tribunal to assess whether the circumstances warrant the award of interest, which is not the case here.[1304]

924.    Second, Venezuela contends that the Claimant's proposed interest is out of line with commercial reality and legal authority.[1305] The suggested 8% rate is also disproportionate if compared to the proposed discount rate of 5%.[1306] Further, there is no evidence that – either pre- or post-award – Crystallex would have used any awarded amounts to purchase or invest in PDVSA bonds.[1307] By contrast, an interest rate based on the U.S. risk-free rate, such as rates used in U.S. Treasury bills, would be appropriate in this case.[1308] A conservative approach to interest is appropriate, because, Venezuela

---

[1297] Memorial, paras 479, 487.

[1298] Memorial, paras 479-485. See also Reply, paras 731-736.

[1299] Memorial, para. 495.

[1300] Memorial, para. 488.

[1301] Reply, para. 751.

[1302] Counter-Memorial, paras 667-670; Rejoinder, para. 601.

[1303] Counter-Memorial, para. 669, citing to the Commentary to Art. 38 of the ILC Articles ("Interest [...] shall be payable *when necessary* to ensure full reparation. [...] The awarding of interest depends on the circumstances of each case." Emphasis added).

[1304] Counter-Memorial, paras 669-670; Rejoinder, para. 601.

[1305] Counter-Memorial, paras 671-676.

[1306] Counter-Memorial, para. 672; First ER Hart, para. 221.

[1307] Rejoinder, para. 603.

[1308] Counter-Memorial, para. 676; First ER Hart, para. 219; Rejoinder, para. 609.

contends, applying interest at anything other than the risk-free rate necessarily adopts speculative assumptions about the nature and success of the investments that the Claimant would have made, and would award the Claimant an unjustified risk premium.[1309]

925. Furthermore, the Respondent submits that the Claimant is not owed compound interest. It contends that international courts and tribunals have consistently declined to award compound interest, unless there are special reasons justifying such interest.[1310] Venezuela does not dispute that there are instances where compound interest has been awarded in investment treaty arbitrations, yet it submits that this practice is by no means uniform.[1311] The relevant inquiry is whether there are any special circumstances justifying the award of compound interest. The Claimant has failed to demonstrate that the circumstances in this case warrant the award of compound interest.[1312]

926. Finally, according to the Respondent, post-award interest is also not justified, because the Claimant has not established a risk that Venezuela will not pay an award.[1313] According to the Respondent, Venezuela has never defaulted on an arbitral award and – should Venezuela not willingly pay the award – the Claimant would be in a position to pursue its claim through any of the signatories of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards.[1314]

### 3. Analysis

927. As recalled above, the Treaty vests the Tribunal with the power to award "monetary damages and *any applicable interest*" in case of breach of an obligation contained in the Treaty (Article XII(9) of the BIT).

928. The Tribunal finds that both pre-award and post-award interests are due.

929. With regard to pre-award interest, its function is to compensate the injured party for the loss of its ability to benefit from the use of the principal compensation sum from the date it fell due.

930. The substantive international legal obligation to pay interest on monies due is well established. An authoritative statement of the position is to be found in Article 38(1) of the ILC Articles:

---

[1309] Rejoinder, para. 607.

[1310] Counter-Memorial, paras 678-681; Rejoinder, para. 610.

[1311] Counter-Memorial, paras 682-683.

[1312] Counter-Memorial, para. 684; Rejoinder, paras 610-617.

[1313] Counter-Memorial, paras 686-687; Rejoinder, para. 618.

[1314] Counter-Memorial, para. 687.

> "Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result".

931.    As noted in the commentary to Article 38, "[s]upport for a general rule favouring the award of interest as an aspect of full reparation is found in international jurisprudence".[1315]

932.    Indeed, an award of interest is an integral component of the full reparation principle under international law, because, in addition to losing its property and other rights, an investor loses the opportunity to invest funds or to pay debts using the money to which that investor was rightfully entitled.[1316] In this case, due to Venezuela's unlawful conduct, Crystallex lost the opportunity to use the amount corresponding to the fair market value of its expropriated investment to productive ends. The reparation should address this loss of opportunity by virtue of awarding interest.

933.    With regard to the interest rate, the Tribunal is unable to accept the Claimant's proposed rate, i.e. 8% per annum based on the coupon rate of bonds used by PDVSA. In the Tribunal's view, the Claimant has not proven that either pre- or post-award Crystallex would have used any awarded amounts to purchase or invest in PDVSA bonds or, for that matter, any instrument or investment producing a similar return.

934.    In the Tribunal's view, taking into account the circumstances of the case, the most appropriate interest rate which will adequately compensate Crystallex is the 6-month average U.S. dollar LIBOR plus 1 per cent per year at the valuation date.[1317] In the Tribunal's view, this approach approximates a commercially reasonable rate and provides adequate compensation for the financial loss caused to a company engaged in international business. At the hearing, experts of both sides confirmed that LIBOR plus a certain percentage constituted a normal commercial rate in the circumstances.[1318]

---

[1315] ILC Articles, Commentary *sub* Art. 38, para. 2, with further references.

[1316] See *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para 8.3.20 (to give effect to "the Chorzów principle […] it is necessary for any award of damages in this case to bear interest"), para. 9.2.1 ("the liability to pay interest is now an accepted legal principle"); *Asian Agricultural Products Ltd. v. The Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, **Exh. CLA-18**, para. 114 ("[T]he case-law elaborated by international arbitral tribunals strongly suggests that in assessing the liability due for losses incurred the interest becomes an integral part of the compensation itself"); *Siemens A.G. v The Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, **Exh. CLA-53**, paras 396-401.

[1317] The Tribunal notes that, in addition to its preferred interest rate, i.e., the U.S. Treasure bills risk-free rate, the Respondent has cited to the LIBOR plus 2% by reference to *PSEG v. Turkey*. See Counter-Memorial, para. 674 (referencing *PSEG Global Inc., et al. v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, **Exh. CLA-52**, para. 348).

[1318] See Tr. [Jurisdiction and Merits], Day 10, (Spiller) 2840:15-22 (stating that "the normal commercial rate at the time could, you know, be somewhere in 2007, 2008, could be anywhere from LIBOR plus 2 and a half to 4, to 5") and 3006:12-17 (Hart) (stating that a commercial rate would be "a LIBOR based or a U.S. Treasury as your base plus a spread"). See also *ibid.*, 3006:18-22 and 3007:1-15.

Such interest shall start running from the date of valuation, i.e. 13 April 2008, until the date of the Award.

935.   With regard to the issue of whether such interest should be simple or compound, the Tribunal decides that such interest should be compound. The Tribunal acknowledges that traditionally there was an inclination on the part of international tribunals to award only simple interest.[1319] However, more recently, it has become increasingly recognized that simple interest may not adequately ensure full reparation for the loss suffered and the award of interest on a compound basis is therefore not excluded. This is because modern financial activity normally involves compound interest. Thus, a judgment creditor promptly placed in the possession of the funds due would be able to lend them out or invest them at compound interest rates or, if forced to borrow as a result of the respondent's wrongful act, will do so at compound rates.[1320] Indeed, while arbitral case law on this issue is not unanimous, the Tribunal is able to discern a clear trend in recent decisions in favor of the award of compound interest.[1321]

---

[1319] See Whiteman, *Damages in International Law*, 1943, vol. III, p. 1997, cited in *R.J. Reynolds Tobacco Company v. The Government of the Islamic Republic of Iran and Iranian Tobacco Company*, Iran-US Claims Tribunal, Partial Award, Award No. 145-35-3, 6 August 1984, **Exh. RLA-20**. See also ILC Articles, Commentary *sub* Art. 38, para. 8 (noting that "[t]he general view of courts and tribunals has been against the award of compound interest, and this is true even of those tribunals which hold claimants to be normally entitled to compensatory interest", but also adding that "[n]onetheless, several authors have argued for a reconsideration of this principle, on the ground that 'compound interest reasonably incurred by the injured party should be recoverable as an item of damage'. This view has also been supported by arbitral tribunals in some cases." Internal footnotes omitted).

[1320] As explained by the tribunal in *Wena v. Egypt*, "[a]n award of compound (as opposed to simple) interest is generally appropriate in most modern commercial arbitrations […] 'If the claimant could have received compound interest merely by placing its money in a readily available and commonly used investment vehicle, it is neither logical nor equitable to award the claimant only simple interest". *Wena Hotels Ltd. v. Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, **Exh. CLA-27**, para. 129. See also *ADC Affiliate Limited, et al. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, **Exh. CLA-50**, para. 522 ("[T]ribunals in investor-State arbitrations in recent times have recognized economic reality by awarding compound interest."); *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, **Exh. CLA-61**, para. 309 ("[C]ompound interest reflects economic reality in modern times […] The time value of money in free market economies is measured in compound interest; simple interest cannot be relied upon to produce full reparation for a claimant's loss occasioned by delay in payment").

[1321] See, *e.g.*, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011, **Exh. CLA-83**, para. 382; *Gemplus, S.A., et al. v. Mexico*, ICSID Case Nos. ARB(AF)/04/3 and ARB (AF)/04/4, Award, 16 June 2010, **Exh. CLA-78**, para. 16-26; *Alpha Projekthogding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, **Exh. CLA-80**, para. 514; *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador*, UNCITRAL, Partial Award on the Merits, 30 March 2010, **Exh. CLA-75**, para. 555; *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Award, 3 March 2010, **Exh. CLA-74**, para. 664; *National Grid plc v. Argentina*, Award, 3 November 2008, **Exh. CLA-62**, para. 294; *Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, **Exh. CLA-60**, para. 818-4; *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, **Exh. CLA-55**, para. 9.2.8; *Sempra Energy International v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, **Exh. CLA-56**, para. 486; *PSEG Global Inc. v. Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, **Exh. CLA-52**, para. 348; *ADC Affiliate Limited, et al. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, **Exh. CLA-50**, para. 522; *MTD Equity v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, **Exh. CLA-41**, para. 251; *Técnicas Medioambientales Tecmed*

936. In conclusion, in the Tribunal's view, awarding compound interest comes closer to achieving the purpose of full reparation than simple interest.

937. As to the periodicity, the Tribunal opts for compounding on a yearly basis.

938. Thus, for the reasons stated above, the Tribunal awards interest on the principal sum awarded, compounded annually, at the rate of the 6-month average U.S. Dollar LIBOR plus one percent, which shall accrue from 13 April 2008 until the date of the Award.

939. With regard to post-award interest, the Tribunal also considers that awarding such interest is appropriate under the circumstances. It agrees with the observation made by the tribunal in *Aucoven v. Venezuela*, whereby "post-award interest is intended to compensate the additional loss incurred from the date of the award to the date of final payment".[1322]

940. The Respondent shall thus pay post-award interest on the total amount of damages, compounded annually, at the rate of the 6-month average U.S. Dollar LIBOR plus one percent, from the date of the Award until full payment.

## E. TAX

### 1. The Claimant's Position

941. The Claimant contends that the valuations set out in the Compass Lexecon and Ellis Reports have been prepared net of Venezuelan tax. Consequently, any taxation by Venezuela of the eventual award in this arbitration would, Crystallex submits, result in the Claimant being effectively taxed twice for the same income.[1323]

942. The Claimant therefore requests that the Tribunal declare that (i) any award be made net of all applicable Venezuelan taxes and (ii) Venezuela may not tax or attempt to tax the award.[1324]

943. The Claimant also seeks a tax indemnity for taxes imposed by Canada. It justifies its request by describing possible taxes in Canada as a "consequential damage" that may have to be paid by Crystallex but for Venezuela's alleged treaty breaches.[1325]

---

*S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, **Exh. CLA-39**, para. 197; *Pope & Talbot v. Government of Canada*, Award in Respect of Damages, 31 May 2002, **Exh. CLA-30**, para. 89; *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, **Exh. CLA-34**, para. 175; *Compañía del Desarrollo de Santa Elena, SA v. The Republic of Costa Rica*, ICSID Case No. ARB/96/1, Final Award, 17 February 2000, **Exh. CLA-24**, paras 96–106.

[1322] *Autopista Concesionada de Venezuela, C.A. (Aucoven) v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/00/5, Award, 23 September 2003, **Exh. CLA-40**, para. 380.

[1323] Memorial, para. 491; Reply, para. 741.

[1324] Memorial, para. 493; Reply, para. 743.

[1325] Reply, paras 746-748.

### 2. The Respondent's Position

944. The Respondent objects to the Claimant's tax indemnity requests. According to the Respondent, the Claimant provides "no legal support for its unusual request" and fails to explain what taxes would be applicable. Such claim should thus be rejected as premature and speculative.[1326]

945. The Respondent further submits that the Claimant has not provided any evidence that the award would be subject to double tax liability and argues that "Venezuela cannot provide an indemnity against Canadian taxes because it cannot control or influence the taxation decisions of another sovereign State".[1327]

### 3. Analysis

946. With regard to the Claimant's request that the Tribunal declare that any award be made net of all applicable Venezuelan taxes and Venezuela may not tax or attempt to tax the award, the Tribunal takes note that the Claimant's experts have indicated that their quantum calculations have been prepared net of Venezuelan tax. Faced with a similar request, the tribunal in *Occidental v. Ecuador* deemed such request "speculative and premature".[1328] This Tribunal likewise considers such request to be premature and thus denies the Claimant's request.

947. With respect to the Claimant's request for tax indemnity for taxes imposed by Canada, the Claimant has not established that the award would be subject to such tax liability. Nor has the Claimant sufficiently proved that it would have suffered a distinct and foreseeable loss from any tax imposed by Canada for which Venezuela rather than the Claimant itself should be held liable. Without any need to examine Venezuela's other arguments, which may not be without justification, the request is accordingly denied.

---

[1326] Counter-Memorial, para. 689.

[1327] Counter-Memorial, para. 690; Rejoinder, para. 620.

[1328] See *Occidental Petroleum Corporation et. al. v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, **Exh. CLA-175**, para. 853.

## IX.    COSTS

948.    Both Parties request an award of costs in respect of the legal fees and expenses and the costs of arbitration incurred in connection with this proceeding and have filed submissions quantifying their fees and costs.[1329]

949.    The Claimant's legal fees and expenses amount to US$ 30,493,635.[1330] The Claimant has advanced US$ 1,000,000 on account of the fees and expenses of the Members of the Tribunal and the ICSID administrative fees and expenses. The Claimant seeks an award of the entirety of these costs and interest at a reasonable commercial rate from the date at which such costs were incurred until the date of payment by the Respondent.[1331]

950.    The Respondent's legal fees and expenses amount to US$ 14,322,826.[1332] It has advanced US$ 974,750 on account of the fees and expenses of the Members of the Tribunal and the ICSID administrative fees and expenses. The Respondent seeks an award of the entirety of these costs (or a least of the costs incurred for the supplemental quantum procedure) and interest from the date at which such costs were incurred until the date of payment by the Claimant.[1333]

951.    Both sides argue that a costs award is warranted because a prevailing party is entitled to such an award under the principle of costs follow the event, and because the other party has conducted the arbitration in a manner which has led to delay and increased costs.

952.    In particular, the Claimant contends that the Tribunal should take into account the following factors in allocating costs in favor of the Claimant: (i) Venezuela's proposal for the disqualification of its originally appointed arbitrator;[1334] (ii) Venezuela's

---

[1329] See Claimant's Cost Submission, 23 January 2015 ("Claimant's Cost Submission"); Cost Submission of the Bolivarian Republic of Venezuela, 23 January 2015 ("Respondent's Cost Submission").

[1330] See Claimant's Cost Submission, paras 19-32. This amount includes the following items: the travel and other expenses incurred by the Claimant's witnesses and representatives; the fees and disbursements of the Claimant's international counsel, Freshfields Bruckhaus Deringer US LLP; the fees and disbursements of the Claimant's Venezuelan counsel Wallis & Guerrero and Travieso Evans Arria Rengel & Paz; and the fees and expenses of all of the Claimant's experts and consultants.

[1331] See Claimant's Cost Submission, paras 1, 32.

[1332] Respondent's Cost Submission, paras 29-30. This amount includes legal fees of Foley Hoag LLP; fees incurred for work conducted by the Respondent's experts, and "administrative costs" (which include costs relating to document production, legal research, Foley Hoag LLP travel, translations and miscellaneous). The Respondent has also provided a separate chart, isolating the costs associated with the supplemental quantum procedure. See Respondent's Cost Submission, para. 30.

[1333] See Respondent's Cost Submission, paras 2, 32.

[1334] Claimant's Cost Submission, paras 16-18.

"fabrication" of the Technical Inspection Report (or "Romero Report");[1335] and (iii) Venezuela's failure to produce timely the CITIC Studies Agreement.[1336]

953.    For its part, the Respondent argues that the Tribunal should take into account the following factors in allocating costs in favor of the Respondent: (i) the Claimant's refusal to provide certain information on a plausible damages theory or information to support an April 2008 valuation date, which triggered the supplemental procedure on quantum that the Tribunal ordered after post-hearing briefs were exchanged;[1337] (ii) the Claimant's insistence on raising various irrelevant issues and arguments (such as the Rusoro PowerPoint, the CITIC document request and arguments, the "Empresa Nacional Aurífera" transaction, and the introduction of the *Gold Reserve* award);[1338] (iii) the Claimant's untimely introduction of evidence.[1339]

954.    The Tribunal has the power to determine and allocate the costs of the arbitration pursuant to Article XII(9) of the Treaty, which provides that the Tribunal "may also award costs in accordance with the applicable arbitration rules".[1340] Article 52(1)(j) of the ICSID Additional Facility Rules provides that the award shall contain "any decision of the Tribunal regarding the cost of the proceeding". Article 58 further provides that:

> "(1) Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne. The Tribunal may, to that end, call on the Secretariat and the parties to provide it with the information it needs in order to formulate the division of the cost of the proceeding between the parties.
>
> (2) The decision of the Tribunal pursuant to paragraph (1) of this Article shall form part of the award."

955.    As the Parties have not agreed otherwise, the Tribunal is vested with the authority to decide the allocation of costs in this arbitration. The applicable rules just mentioned grant it considerable discretion in this respect.

956.    Two main approaches may be distinguished in awarding costs in investment treaty arbitrations. Some tribunals apportion ICSID costs where they were incurred and rule that each party should bear its own costs. Others apply the principle "costs follow the

---

[1335] Claimant's Cost Submission, para. 18(a).

[1336] Claimant's Cost Submission, para. 18(b).

[1337] Respondent's Cost Submission, paras 7, 22-28.

[1338] Respondent's Cost Submission, paras 9-19.

[1339] Respondent's Cost Submission, paras 20-21.

[1340] See Treaty, 1 July 1996, **Exh. C-3**, Art. XII(9).

event", making the losing party bear all or part of the costs of the proceedings, including those of the prevailing party.

957. As evidenced by the foregoing sections of this Award, there were numerous procedural issues and difficult substantive legal questions involved at the various phases of the arbitration. Many of these issues were far from clear-cut and involved meritorious arguments by both Parties.

958. While the Claimant has ultimately prevailed on jurisdiction and, in part, the merits, the Respondent's defenses were not frivolous, but quite to the contrary serious, and a number of its positions were accepted by the Tribunal.

959. Furthermore, none of the facts that would clearly justify cost allocation (such as bad faith, abusive or unreasonable argument, or obstructions tactics) was present in this arbitration. To the contrary, each side presented valid arguments in support of its respective case and acted fairly and professionally. In particular, the extensive pleadings of both Parties greatly assisted the Tribunal in its task.

960. Having considered all these circumstances, the Tribunal considers that each Party should bear its own costs and the Parties should equally share the ICSID costs.[1341] In this latter respect, it is noted that the ICSID Secretariat will provide the Parties with a statement of the case account in due course.

---

[1341] This result is also in accordance with the well-settled public international law practice in this respect.

## X.    DECISION

961.    For the reasons stated in this Award, the Tribunal makes the following decision:

   a.   The Tribunal has jurisdiction over the entire dispute involving the Claimant and the Respondent;

   b.   Venezuela has breached Article II(2) of the Treaty by failing to accord the Claimant's investments in Venezuela fair and equitable treatment;

   c.   Venezuela has breached Article VII(1) of the Treaty by expropriating the Claimant's investments in Venezuela;

   d.   As a result of the Respondent's breaches of the BIT, the Respondent shall pay to the Claimant damages amounting to US$ 1,202 million (one thousand two hundred and two million United States Dollars);

   e.   The Respondent is ordered to pay pre-award interest on the amount specified in subparagraph (d) above at the rate of the 6-month average U.S. Dollar LIBOR + 1%, compounded annually, calculated from 13 April 2008 until the date of the Award;

   f.   The Respondent is ordered to pay post-award interest on the amounts specified in subparagraph (d) and (e) above at the rate of the 6-month average U.S. Dollar LIBOR + 1%, compounded annually, calculated from the date of the Award until full payment;

   g.   Each Party shall finally  bear the costs of the arbitration that it has advanced and no payments between the Parties are thus necessary in this regard;

   h.   Each Party shall bear the fees and expenses it incurred for the preparation and presentation of its case;

   i.   All other claims or prayers for relief are dismissed.

Made at Washington, D.C.

Prof. Laurence Boisson de Chazournes
Arbitrator
Date: March 30, 2016

Prof. John Y. Gotanda
Arbitrator
Date: March 14, 2016

Dr. Laurent Lévy
President
Date: March 10. 2016

Place of arbitration: Washington, D.C.

264