# Exhibit 2

**AGREEMENT
BETWEEN
THE GOVERNMENT OF CANADA
AND
THE GOVERNMENT OF THE REPUBLIC OF VENEZUELA
FOR THE PROMOTION AND PROTECTION OF INVESTMENTS**

**THE GOVERNMENT OF CANADA AND THE GOVERNMENT OF THE REPUBLIC OF VENEZUELA**, hereinafter referred to as the "Contracting Parties",

**Recalling** the Cooperation Agreement signed in Ottawa on June 25, 1982, which entered into force on December 20, 1982, establishing the framework for cooperation in the cultural, economic and technological fields between them,

**Recognizing** that the promotion and the protection of investments of investors of one Contracting Party in the territory of the other Contracting Party will be conducive to the stimulation of business initiative and to the development of economic cooperation between them,

**Have agreed as follows:**

## ARTICLE I

### Definitions

For the purpose of this Agreement:

(a) "enterprise" means

(i) any entity constituted or organized under applicable law, whether or not for profit, whether privately-owned or governmentally-owned, including any corporation, trust, partnership, sole proprietorship, joint venture or other association; and

(ii) a branch of any such entity;

(b) "existing measure" means a measure existing at the time this Agreement enters into force;

(c) "financial service" means a service of a financial nature, including insurance, and a service incidental or auxiliary to a service of a financial nature;

(d) "financial institution" means any financial intermediary or other enterprise that is authorized to do business and regulated or supervised as a financial institution under the law of the Contracting Party in whose territory it is located;

(e) "intellectual property rights" includes copyright and related rights, trademark rights, patent rights, rights in layout designs of semiconductor integrated circuits, trade secret rights, plant breeders' rights, rights in geographical indications and industrial design rights;

(f) "investment" means any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third State, in the territory of the other Contracting Party in accordance with the latter's laws. In particular, though not exclusively, "investment" includes:

(i) movable and immovable property and any related property rights, such as mortgages, liens or pledges;

(ii) shares, stock, bonds and debentures or any other form of participation in a company, business enterprise or joint venture;

(iii) money, claims to money, and claims to performance under contract having a financial value;

(iv) goodwill;

(v) intellectual property rights;

(vi) rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources.

but does not mean real estate or other property, tangible or intangible, not acquired in the expectation or used for the purpose of economic benefit or other business purposes.

Any change in the form of an investment does not affect its character as an investment.

(g) "investor" means

in the case of Canada:

(i) any natural person possessing the citizenship of Canada in accordance with its laws; or

(ii) any enterprise incorporated or duly constituted in accordance with applicable laws of Canada,

who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela; and

in the case of Venezuela:

(i) any natural person possessing the citizenship of Venezuela in accordance with its laws; or

(ii) any enterprise incorporated or duly constituted in accordance with applicable laws of Venezuela,

who makes the investment in the territory of Canada and who does not possess the citizenship of Canada;

(h) "measure" includes any law, regulation, procedure, requirement, or practice;

(i) "returns" means all amounts yielded by an investment and in particular, though not exclusively, includes profits, interest, dividends, royalties, fees, other current income or capital gains;

(j) "state enterprise" means an enterprise that is governmentally-owned or controlled through ownership interests by a government;

(k) "territory" means with respect to each Contracting Party:

the territory of the Contracting Party, as well as those maritime areas, including the seabed and subsoil adjacent to the outer limit of the territorial sea, over which that Contracting Party exercises, in accordance with international law, sovereign rights for the purpose of exploration and exploitation of the natural resources of such areas.

## ARTICLE II

### Establishment, Acquisition and Protection of Investment

1. Each Contracting Party shall encourage the creation of favourable conditions for investors of the other Contracting Party to make investments in its territory.

2. Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party fair and equitable treatment and full protection and security.

3. Each Contracting Party shall permit establishment of a new business enterprise or acquisition of an existing business enterprise or a share of such enterprise by investors or prospective investors of the other Contracting Party, in accordance with its laws and regulations, but in all cases on a basis no less favourable than that which, in like circumstances, it permits such acquisition or establishment by investors or prospective investors of any third state.

## ARTICLE III

### Most-Favoured-Nation (MFN) Treatment after Establishment and Exceptions to MFN

1. Each Contracting Party shall grant to investments, or returns of investors of the other Contracting Party, treatment no less favourable than that which, in like circumstances, it grants to investments or returns of investors of any third State.

2. Each Contracting Party shall grant investors of the other Contracting Party, as regards their expansion, management, conduct, operation, use, enjoyment, sale, or disposal of their investments or returns, treatment no less favourable than that which, in like circumstances, it grants to investors of any third State.

3. Paragraph (3) of Article II and paragraphs (1) and (2) of this Article do not apply to treatment by a Contracting Party pursuant to any existing or future bilateral or multilateral agreement establishing, strengthening or expanding a free trade area or customs union.

## ARTICLE IV

### National Treatment after Establishment

1. Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns of its own investors.

2. Each Contracting Party shall grant to investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants its own investors with respect to the expansion, management, conduct, operation, use, enjoyment, sale or disposal of the investment or returns.

## ARTICLE V

### Other Measures

1. (a) A Contracting Party may not require that an enterprise of that Contracting Party, that is an investment under this Agreement, appoint to senior management positions individuals of any particular nationality.

   (b) A Contracting Party may require that a majority of the board of directors, or any committee thereof, of an enterprise that is an investment under this Agreement be of a particular nationality, or resident in the territory of the Contracting Party, provided that the requirement does not materially impair the ability of the investor to exercise control over its investment.

2. Subject always to its laws, regulations and policies relating to the entry of aliens, each Contracting Party shall grant temporary entry to citizens of the other Contracting Party employed by an enterprise who seeks to render services to that enterprise or a subsidiary or affiliate thereof, in a capacity that is managerial, executive or involves specialized knowledge.

## ARTICLE VI

### Compensation for Losses

Investors of one Contracting Party who suffer losses because their investments or returns on the territory of the other Contracting Party are affected by an armed conflict, a national emergency or a natural disaster on that territory, shall be accorded by such latter Contracting Party, in respect of restitution, indemnification, compensation or other settlement, treatment no less favourable than that which it accords to its own investors or to investors of any third State.

## ARTICLE VII

### Expropriation

1. Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable.

2. The investor affected shall have a right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial or other independent authority of that Party, of its case and of the valuation of its investment or returns in accordance with the principles set out in this Article.

## ARTICLE VIII

### Transfer of Funds

1. Each Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns. Without limiting the generality of the foregoing, each Contracting Party shall also guarantee to the investor the unrestricted transfer of:

   (a) funds in repayment of loans related to an investment;

   (b) the proceeds of the total or partial liquidation of any investment;

   (c) wages and other remuneration accruing to a citizen of the other Contracting Party who was permitted to work in a capacity that is managerial, executive or involves specialized knowledge in connection with an investment in the territory of the other Contracting Party;

   (d) any compensation owed to an investor by virtue of Articles VI or VII of the Agreement.

2. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer.

3. Neither Contracting Party may require its investors to transfer, or penalize its investors that fail to transfer, the returns attributable to investments in the territory of the other Contracting Party.

4. Notwithstanding paragraphs 1, 2 and 3, a Contracting Party may prevent a transfer through the equitable, non-discriminatory and good faith application of its laws relating to:

   (a) bankruptcy, insolvency or the protection of the rights of creditors;

   (b) issuing, trading or dealing in securities;

(c) criminal or penal offenses;

(d) reports of transfers of currency or other monetary instruments; or

(e) ensuring the satisfaction of judgments in adjudicatory proceedings.

5. Paragraph 3 shall not be construed to prevent a Contracting Party from imposing any measure through the equitable, non-discriminatory and good faith application of its laws relating to the matters set out in subparagraphs (a) through (e) of paragraph 4.

6. Notwithstanding paragraphs 1, 2 and 3 and without limiting the applicability of paragraph 4, a Contracting Party may prevent or limit transfers by a financial institution to, or for the benefit of, an affiliate of or person related to such institution, through the equitable, non-discriminatory and good faith application of measures relating to maintenance of the safety, soundness, integrity or financial responsibility of financial institutions.

## ARTICLE IX

### Subrogation

1. If a Contracting Party or any agency thereof makes a payment to any of its investors under a guarantee or a contract of insurance against non-commercial risk it has entered into in respect of an investment, the other Contracting Party shall recognize the validity of the subrogation in favour of such Contracting Party or agency thereof to any right or title held by the investor.

2. A Contracting Party or any agency thereof which is subrogated to the rights of an investor in accordance with paragraph (1) of this Article, shall be entitled to the same rights as those of the investor in respect of the investment concerned and its related returns. Such rights may be exercised by the Contracting Party, by any agency thereof or by an authorized agent or assignee of the Contracting Party or any agency thereof.

## ARTICLE X

### Investment in Financial Services

Nothing in this Agreement shall be construed to prevent a Contracting Party from adopting or maintaining reasonable measures for prudential reasons, such as:

(a) the protection of investors, depositors, financial market participants, policy-holders, policy-claimants, or persons to whom a fiduciary duty is owed by a financial institution;

(b) the maintenance of the safety, soundness, integrity or financial responsibility of financial institutions; and

(c) ensuring the integrity and stability of a Contracting Party's financial system.

## ARTICLE XI

### Taxation Measures

1. This Agreement shall apply to taxation measures only to the extent set out in this Article and in paragraph (14) of Article XII.

2. Nothing in this Agreement shall affect the rights and obligations of the Contracting Parties under any tax convention. In the event of any inconsistency between the provisions of this Agreement and any such convention, the provisions of that convention apply to the extent of the inconsistency.

## ARTICLE XII

### Settlement of Disputes between an Investor and the Host Contracting Party

1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph; a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.

3. An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:

   (a) the investor has consented in writing thereto;

   (b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;

   (c) if the matter involves taxation, the conditions specified in paragraph 14 of this Article have been fulfilled; and

   (d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.

4. The dispute may, by the investor concerned, be submitted to arbitration under:

(a) The International Centre for the Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington 18 March, 1965 (ICSID Convention), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or

(b) the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or

In case neither of the procedures mentioned above is available, the investor may submit the dispute to an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).

5. Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.

6. (a) The consent given under paragraph (5), together with either the consent given under paragraph (3), or the consents given under paragraph (12), shall satisfy the requirements for:

(i) written consent of the parties to a dispute for purposes of Chapter II (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules; and

(ii) an "agreement in writing" for purposes of Article II of the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention").

(b) The venue for any arbitration under this Article shall be such so as to ensure enforceability under the New York Convention, and claims submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of Article 1 of that Convention.

7. A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. **An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal.**

8. A tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. A tribunal may not order attachment or enjoin the application of the measure alleged to constitute a breach of this Agreement. For purposes of this paragraph, an order includes a recommendation.

9. A tribunal may award, separately or in combination, only:

(a) monetary damages and any applicable interest;

(b) restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.

A tribunal may also award costs in accordance with the applicable arbitration rules.

Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls any award shall be made to the affected enterprise.

10. An award of arbitration shall be final and binding. Each Contracting Party shall provide for the enforcement of an award in its territory.

11. Nothing in this Article shall deprive a Contracting Party of its right to seek compliance by the other Contracting Party with its obligations under this Agreement, including through use of the procedures set forth in Articles XIII and XIV.

12. (a) Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls, the following provisions shall apply:

(i) both the investor and the enterprise shall be required to give the consent referred to in subparagraph (3)(a);

(ii) both the investor and the enterprise must give the waiver referred to in subparagraph (3)(b); and

(iii) the investor may not make a claim if more than three years have elapsed from the date on which the enterprise first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that it has incurred loss or damage.

(b) Notwithstanding subparagraph 12(a), where a disputing Contracting Party has deprived a disputing investor of control of an enterprise, the following shall not be required of the enterprise:

(i) the consent referred to in subparagraph (3)(a); and

(ii) the waiver referred to in subparagraph (3)(b).

13. Where an investor submits a claim to arbitration and the disputing Contracting Party alleges as a defense that the measure in question is

(a) a reasonable measure for prudential reasons of the kind referred to in Article X, or

(b) a measure to limit or prevent transfers by a financial institution under paragraph 6 of Article VIII,

the tribunal, at the request of such Contracting Party, shall request both Contracting Parties to submit a joint report in writing as to whether the defence is a valid one in that particular case. The Contracting Parties shall consult through their financial services authorities on the matter.

The tribunal may proceed to decide the matter if it does not receive, within 70 days of its referral, either

(a) the joint report requested, or

(b) written notification that the matter has been submitted to arbitration between the Contracting Parties under Article XIV.

If the joint report or, as the case may be, the decision of the arbitral tribunal under Article XIV finds that the defence is valid, the tribunal shall be bound by this finding.

Tribunals for disputes on prudential issues and other financial matters shall have the necessary expertise relevant to the specific financial service in dispute.

14. Subject to Article XI, a claim by an investor that:

(a) a taxation measure of a Contracting Party is in breach of an investment agreement between the central government authorities of that Contracting Party and the investor, or

(b) a taxation measure of a Contracting Party constitutes an expropriation under of Article VII,

may be subjected to arbitration under this Article unless the Contracting Parties, through the competent taxation authorities designated by each, determine jointly, within six months of being notified of the claim by the investor, that the measure in question, as the case may be, is not in breach of the investment agreement or does not constitute an expropriation.

## ARTICLE XIII

### Consultations and Exchange of Information

The Contracting Parties may agree, at any time at the request of either Contracting Party, to consultations regarding the interpretation or application of this agreement. Upon request by either Contracting Party, information shall be exchanged on the measures of the other Contracting Party that may have an impact on new investments, investments or returns covered by this Agreement.

## ARTICLE XIV

### Disputes between the Contracting Parties

1. Any dispute between the Contracting Parties concerning the interpretation or application of this Agreement shall, whenever possible, be settled amicably through consultations.

2. If a dispute cannot be settled through consultations, it shall, at the request of either Contracting Party, be submitted to an arbitral tribunal for decision.

3. An arbitral tribunal shall be constituted for each dispute. Within two months after receipt through diplomatic channels of the request for arbitration, each Contracting Party shall appoint one member to the arbitral tribunal. The two members shall then select a national of a third State who, upon approval by the two Contracting Parties, shall be appointed Chairman of the arbitral tribunal. The Chairman shall be appointed within two months from the date of appointment of the other two members of the arbitral tribunal.

4. If within the periods specified in paragraph (3) of this Article the necessary appointments have not been made, either Contracting Party may, in the absence of any other agreement, invite the President of the International Court of Justice to make the necessary appointments. If the President is a national of either Contracting Party or is otherwise prevented from discharging the said function, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is a national of either Contracting Party or is prevented from discharging the said function, the Member of the International Court of Justice next in seniority, who is not a national of either Contracting Party, shall be invited to make the necessary appointments.

5. The arbitral tribunal shall determine its own procedure. The arbitral tribunal shall reach its decision by a majority of votes. Such decision shall be binding on both Contracting Parties. Unless otherwise agreed, the decision of the arbitral tribunal shall be rendered within six months of the appointment of the Chairman in accordance with paragraphs (3) or (4) of this Article.

6. Each Contracting Party shall bear the costs of its own member of the tribunal and of its representation in the arbitral proceedings; the costs related to the Chairman and any remaining costs shall be borne equally by the Contracting Parties. The arbitral tribunal may, however, in its decision direct that a higher proportion of costs shall be borne by one of the two Contracting Parties, and this award shall be binding on both Contracting Parties.

7. The Contracting Parties shall endeavour to reach agreement, within 60 days of the decision of a tribunal, on the manner in which to resolve their dispute in conformity with such decision.

## ARTICLE XV

### Transparency

Each Contracting Party shall, to the extent practicable, ensure that its laws, regulations, procedures, and administrative rulings of general application respecting any matter covered by this Agreement are promptly published or otherwise made available in such a manner as to enable interested persons and the other Contracting Party to become acquainted with them.

## ARTICLE XVI

### Application and Annex

1. This Agreement shall apply to any investment made by an investor of one Contracting Party in the territory of the other Contracting Party before or after the entry into force of this Agreement. This Agreement shall, however, not create a right to dispute settlement under Articles XII and XIV regarding actions taken and completed prior to the entry into force of this Agreement.

2. The Annex hereto shall for all purposes constitute an integral part of this Agreement.

## ARTICLE XVII

### Entry into force

1. Each Contracting Party shall notify the other in writing of the completion of the procedures required in its territory for the entry into force of this Agreement. This Agreement shall enter into force on the date of the latter of the two notifications.

2. This Agreement shall remain in force unless either Contracting Party notifies the other Contracting Party in writing of its intention to terminate it. The termination of this Agreement shall become effective one year after notice of termination has been received by the other Contracting Party. In respect of investments or commitments to invest made prior to the date when the termination of this Agreement becomes effective, the provisions of Articles I to XVI inclusive of, and the Annex to, this Agreement shall remain in force for a period of fifteen years.

# ANNEX

The Contracting Parties have agreed to the following:

## I. Interpretation

1. With respect to Article I(f), an investment shall be considered to be controlled by an investor if the investor demonstrably controls, directly or indirectly, the enterprise which owns the asset.

2. With respect to Article I(g): For the purposes of this Agreement, the term "natural person possessing the citizenship of Canada" shall include a natural person permanently residing in Canada in accordance with the laws of Canada, including the provisions of the Immigration Act of Canada or any statute replacing it in whole or in part (the "Act"), and without limiting the generality of the foregoing shall include a natural person who:

   (a) has been granted landing within the meaning of the Act;

   (b) has not become a Canadian citizen; and

   (c) has not ceased to be a permanent resident of Canada pursuant to the provisions of the Act.

## II. A, Group of Three Treaty and Exceptions

1. Nothing in this Agreement shall be interpreted to require a Contracting Party to extend to the other Contracting Party, any investor of the other Contracting Party, or to any investment, any right, privilege, preference or treatment more favourable than required to be extended by that Contracting Party

   in the case of Canada, under the North American Free Trade Agreement (the "NAFTA") to any state, investor or investment to which the NAFTA applies;

   in the case of Venezuela, under the Free Trade Treaty of the Group of Three (the "G-3 Agreement") to any state, investor or investment to which the G-3 Agreement applies.

2. Paragraph 1 alone shall not be interpreted to require a Contracting Party to extend to the other Contracting Party, or to any investor of the other Contracting Party, or to any investment, any right, privilege, preference or treatment which it extends

   in the case of Canada, under the NAFTA to any state, investor or investment to which the NAFTA applies;

   in the case of Venezuela, under G-3 Agreement to any state, investor or investment to which the G-3 Agreement applies.

3. (a) Decisions by either Contracting Party, pursuant to measures not inconsistent with this Agreement, as to whether or not to permit an acquisition shall not be subject to the provisions of Articles XII or XIV of this Agreement.

(b) Decisions by either Contracting Party not to permit establishment of a new business enterprise or acquisition of an existing business enterprise or a share of such enterprise by investors or prospective investors shall not be subject to the provisions of Article XII of this Agreement.

4. Paragraph (3) of Article II and paragraphs (1) and (2) of Article III do not apply to treatment by a Contracting Party pursuant to any existing or future bilateral or multilateral agreement:

(a) negotiated within the framework of the GATT or its successor organization and liberalizing trade in services, or

(b) relating to aviation; telecommunications transport networks and telecommunications transport services; fisheries; maritime matters, including salvage; or financial services.

5. Paragraph 3 of Article II does not apply in respect of financial services.

6. Neither Contracting Party may impose any of the following requirements in connection with permitting the establishment or acquisition of an investment or enforce any of the following requirements in connection with the subsequent regulation of that investment:

(a) the purchase or use by an enterprise of products of domestic origin or from any domestic source, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production;

(b) that an enterprise's purchase or use of imported products be limited to an amount related to the volume or value of local products that it exports;

(c) restrictions on the importation by an enterprise of products used in or related to its local production by restricting its access to foreign exchange to an amount related to the foreign exchange inflows attributable to the enterprise;

(d) restrictions on exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume of its local production; and

(e) requirements that an investor of the other Contracting Party transfer technology, a production process or other proprietary knowledge to a person in its territory unaffiliated with the transferor, except when the requirement is imposed or the commitment or undertaking is enforced by a court, administrative tribunal or competition authority, either to remedy an alleged violation of competition laws or acting in a manner not inconsistent with other provisions of this Agreement.

7. (a) In respect of intellectual property rights, a Contracting Party may derogate from Articles III and IV in a manner that is consistent with the Agreement Establishing the World Trade Organization done at Marrakesh, April 1994.

(b) The provisions of Article VII do not apply to the issuance of compulsory licenses granted in relation to intellectual property rights, or to the revocation, limitation or creation of intellectual property rights, to the extent that such issuance, revocation, limitation or creation is consistent with the Agreement Establishing the World Trade Organization done at Marrakesh, April 1994.

8. Articles II, III, IV and V of this Agreement and the related provisions of this Annex do not apply to:

   (a) procurement by a government or state enterprise;

   (b) subsidies or grants provided by a government or a state enterprise, including government-supported loans, guarantees and insurance;

   (c) any measure denying investors of the other Contracting Party and their investments any rights or preferences provided to the aboriginal peoples of either country; or

   (d) any current or future foreign aid program to promote economic development, whether under a bilateral agreement, or pursuant to a multilateral arrangement or agreement, such as the OECD Agreement on Export Credits.

9. Investments in cultural industries are exempt from the provisions of this Agreement. "Cultural industries" means natural persons or enterprises engaged in any of the following activities:

   (a) the publication, distribution, or sale of books, magazines, periodicals or newspapers in print or machine readable form but not including the sole activity of printing or typesetting any of the foregoing;

   (b) the production, distribution, sale or exhibition of film or video recordings;

   (c) the production, distribution, sale or exhibition of audio or video music recordings;

   (d) the publication, distribution, sale or exhibition of music in print or machine readable form; or

   (e) radiocommunications in which the transmissions are intended for direct reception by the general public, and all radio, television or cable broadcasting undertakings and all satellite programming and broadcast network services.

10. (a) Nothing in this Agreement shall be construed to prevent a Contracting Party from adopting, maintaining or enforcing any measure otherwise consistent with this Agreement that it considers appropriate to ensure that investment activity in its territory is undertaken in a manner sensitive to environmental concerns.

   (b) Provided that such measures are not applied in an arbitrary or unjustifiable manner, or do not constitute a disguised restriction on international trade or investment, nothing in this Agreement shall be construed to prevent a Contracting Party from adopting or maintaining measures, including environmental measures:

      (i) necessary to ensure compliance with laws and regulations that are not inconsistent with the provisions of this Agreement;

      (ii) necessary to protect human, animal or plant life or health; or

      (iii) relating to the conservation of living or non-living exhaustible natural resources.

11. Paragraphs (1) and (2) of Article IV, paragraph (1) of Article V, and paragraph 6 of Part II of this Annex do not apply to:

(a) (i) any existing non-conforming measures maintained within the territory of a Contracting Party; and

(ii) any measure maintained or adopted after the date of entry into force of this Agreement that, at the time of sale or other disposition of a government's equity interests in, or the assets of, an existing state enterprise or an existing governmental entity, prohibits or imposes limitations on the ownership of equity interests or assets or imposes nationality requirements relating to senior management or members of the board of directors;

(b) the continuation or prompt renewal of any non-conforming measure referred to in subparagraph (a);

(c) an amendment to any non-conforming measure referred to in subparagraph (a), to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with those obligations;

(d) the right of each Contracting Party to make or maintain exceptions within the sectors or matters listed below:

(i) Canada reserves the right to make and maintain exceptions in the sectors or matters listed below:

- social services (i.e. public law enforcement; correctional services; income security or insurance; social security or insurance; social welfare; public education; public training; health and child care);

- services in any other sector;

- government securities - as described in SIC 8152;

- residency requirements for ownership of oceanfront land;

- measures implementing the Northwest Territories and the Yukon Oil and Gas Accords.

For the purpose of this Annex, "SIC" means, with respect to Canada, Standard Industrial Classification numbers as set out in Statistics Canada, *Standard Industrial Classification*, fourth edition, 1980.]

(ii) Venezuela reserves the right to make and maintain exceptions in the sectors or matters listed below:

- Social services (i.e., public law enforcement; correctional services; income security or insurance; social security or insurance; social welfare; public education; public training; health and child care.)

- Services in any other sector.

- Ownership of vessels or airplanes registered in Venezuela; transportation by water or air within its territory; fishing in waters under its jurisdiction.

- Ownership of land in areas that has been declared by Venezuela security areas; ownership of land by foreign states.

- Debt-equity swaps.

- Private enterprises for protection and security that are authorized to bear arms.

- Venezuela may require that up to 90 percent of manual labourers and 90 percent of non-manual labourers employed by an enterprise in its territory be nationals of Venezuela provided that the requirement does not materially impair the ability of the investor to exercise control over its investment.

12. The Contracting Parties shall, within a two year period after the entry into force of this Agreement, exchange letters listing, to the extent possible, any existing measures that do not conform to the obligations in Article IV, paragraph (1) of Article V, or paragraph 6 of Section II of this Annex.

**IN WITNESS WHEREOF,** the undersigned, being duly authorized thereto by their respective Governments, have signed this Agreement.

**EN FOI DE QUOI,** les soussignés, dûment autorisés à cet effet par leurs Gouvernements respectifs, ont signé le présent Accord.

**EN FE DE LO CUAL,** los abajo firmantes, debidamente autorizados para ello por sus respectivos Gobiernos, firman el presente Convento.

Done in two copies at Caracas, this 1st day of July 1996, in the English, French and Spanish languages, each text being equally authentic.

Fait en double exemplaire à Caracas, ce 1ere jour de Juillet 1996, en langues française, anglaise et espagnole, les trois textes faisant également foi.

Hecho en doble ejemplar en Caracas, el dia 1º de Julio 1996, en español, inglés y francés, dando fé por igual cada uno de los textos.

**FOR THE GOVERNMENT OF CANADA**
**POUR LE GOUVERNEMENT DU CANADA**
**POR EL GOBIERNO DE CANADA**

**FOR THE GOVERNMENT OF THE REPUBLIC OF VENEZUELA**
**POUR LE GOUVERNEMENT DE LA RÉPUBLIQUE DU VENEZUELA**
**POR EL GOBIERNO DE LA REPÚBLICA DE VENEZUELA**