# Exhibit 5

**ARBITRATION UNDER THE RULES OF THE ADDITIONAL FACILITY OF THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**CRYSTALLEX INTERNATIONAL CORPORATION**

Claimant

**-v-**

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**

Respondent

# REQUEST FOR ARBITRATION
**16 FEBRUARY 2011**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................................ 3

II.   THE FACTS RELEVANT TO THE DISPUTE ...................................................... 5

    A.   Crystallex's investments in Venezuela ............................................................. 5
    B.   Venezuela's Measures ...................................................................................... 15
    C.   The impact of Venezuela's Measures on Crystallex's investments ................... 28

III.   VENEZUELA'S BREACHES OF THE TREATY ............................................... 29

    A.   Venezuela has expropriated Crystallex's investment ....................................... 29
    B.   Venezuela has failed to accord Crystallex's investment fair and equitable treatment and full protection and security ...................................................... 30
    C.   Venezuela has impaired Crystallex's investments through discriminatory Measures ............ 33

IV.   THE CLAIMANT'S INVESTMENTS ARE PROTECTED UNDER THE TREATY ..................... 34

V.   THE PARTIES' CONSENT TO ARBITRATION UNDER THE TREATY AND ADDITIONAL FACILITY RULES ................................................................................................... 35

    A.   The requirements for access to the Additional Facility have been fulfilled ............. 35
    B.   The access requirements under the Treaty have been fulfilled ......................... 38
    C.   Approval of the Secretary-General ................................................................. 40

VI.   CONSTITUTION OF THE ARBITRAL TRIBUNAL, APPLICABLE LAW, PLACE AND LANGUAGE OF THE ARBITRATION ................................................................. 41

VII.   THE PARTIES ....................................................................................................... 42

VIII.   THE CLAIMANT'S REQUEST FOR RELIEF .................................................. 44

## I.    INTRODUCTION

1.    Crystallex International Corporation (***Crystallex*** or the ***Claimant***) hereby submits this Request for Arbitration (the ***Request***) in respect of its dispute with the Bolivarian Republic of Venezuela (***Venezuela*** or the ***Respondent***) pursuant to:

(a)    Articles 2 and 3 of the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes (the ***Arbitration Rules***); and

(b)    the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and which entered into force on 28 January 1998 (the ***Treaty***).[1]

2.    Crystallex is a publicly traded company existing under the laws of Canada with its head office in Toronto, Ontario.[2] Crystallex has a successful track record of exploring, developing and operating mining properties and mines in Venezuela and elsewhere in Latin America.

3.    As described in more detail in Section IV below, this dispute concerns measures and omissions of Venezuela (the ***Measures***) affecting Crystallex's investments in the areas named Cristina 4, Cristina 5, Cristina 6 and Cristina 7 (collectively referred to as ***Las Cristinas***) and, in particular the failure to grant the necessary permit to Crystallex to develop the Las Cristinas Project, despite Crystallex's fulfillment of all the pre-conditions established by Venezuela (as acknowledged by Venezuela) and the unilateral termination of the Mine Operation Contract (the ***MOC***) that Crystallex had entered into with the Government agency Corporación Venezolana de Guayana (***CVG***)[3] to develop and exploit the gold deposits at Las Cristinas.

---

[1]    Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998 (the *Treaty*), together with a letter from the Deputy Director of the Treaty Law Division at the Canadian Department of Foreign Affairs and International Trade, 7 May 2009, **Exhibit C-3**.

[2]    Certificate of Continuance and By-Law No. 1 of Crystallex International Corporation, **Exhibit C-71**.

[3]    The CVG is a Government agency created to oversee the economic development of the Guayana Region in Bolivar State effectively controlled by the Ministry of Mines (the Minister of Mines is also the President of CVG as was his predecessor). It falls under the auspices of the Ministry of the Secretary to the Presidency. *See* Preamble of Administrative Agreement, *infra* note 6. The current

4.    In reliance upon the terms of that MOC, the legal framework governing the Las Cristinas Project and the representations of the Venezuelan Government, Crystallex spent in excess of US$500 million to make Las Cristinas "shovel ready" and to comply with obligations to fund several social programs and construction projects in the local community surrounding the site.

5.    Crystallex has complied with all conditions that would allow it to begin mining development at Las Cristinas, as confirmed by Venezuela. However, notwithstanding such confirmation, Venezuela refused to grant the Authorization for the Exploitation of Natural Resources (*Autorización de Afectación de Recursos Naturales*, the ***Permit***) in April 2008. Venezuela subsequently announced a series of mutually inconsistent decisions with respect to Las Cristinas (none of which were formally communicated to Crystallex) including: (a) an outright ban on open-pit mining in the region due to alleged environmental concerns; (b) the nationalization of Las Cristinas and its development by the Venezuelan Government; and (c) the granting of the mining rights to Las Cristinas to a Russian-owned mining company. Finally, in February 2011, Venezuela unilaterally terminated Crystallex's MOC in open breach of its own terms and governing Venezuelan law, without providing compensation.

6.    The Government's declarations show that Venezuela's denial of the Permit, its subsequent announcements regarding the future of the Las Cristinas mining project and the unilateral termination of the MOC are based on a decision to nationalize the mining sector or political considerations such as the desire to favor the interests of country partners such as Russia.

7.    By denying Crystallex's request for the Permit for political reasons, notwithstanding its agreed fulfillment of all the criteria set out in the applicable legal framework, and by unilaterally and unlawfully terminating Crystallex's MOC, the Government has illegally expropriated Crystallex's investment and has violated Crystallex's legitimate expectations of developing and operating a mine at Las Cristinas in breach of the protections provided to Crystallex by the Treaty.

---

President of the CVG, Jose Khan, is also the Minister of Mines. The previous CVG President, Rodolfo Sanz was also the Minister of Mines.

8.    In this Request, Crystallex will show the jurisdictional and substantive bases upon which it is entitled to bring these proceedings. Specifically, Crystallex notes that:

(a)    Venezuela has taken certain Measures in connection with Crystallex's investments which have given rise to a dispute between Crystallex and Venezuela under the Treaty (Section II below);

(b)    Venezuela's Measures have violated the protections afforded to Crystallex under the Treaty (Section III below);

(c)    Crystallex is a protected investor with qualifying investments in Venezuela which are protected by the Treaty (Section IV below); and

(d)    Crystallex is entitled to initiate arbitration proceedings by accepting Venezuela's offer to arbitrate pursuant to the Treaty (Section V below).

9.    Crystallex reserves its right to supplement or amend the factual or legal claims and arguments contained herein including in the light of any Measures that Venezuela has taken or may take in breach of its internal and international obligations.

## II.    THE FACTS RELEVANT TO THE DISPUTE

### A.    Crystallex's investments in Venezuela

10.    Las Cristinas is one of the world's largest undeveloped gold deposits, with estimated measured and indicated resources in 2007 of 21 million ounces of gold (with an additional six million ounces of inferred resources) containing proven and probable gold reserves of 17 million ounces.[4] It is situated in an area known as "Km 88" in the Imataca region in south-eastern Venezuela, in the municipality of Sifontes in Bolivar State.

---

[4]    Crystallex's 2007 Annual Report (excerpts), 31 December 2007, **Exhibit C-23**, page 7. These reserves figures were based on a gold price of US$550/ounce. Reserve calculations today are based on a gold price between US$950 and US$1000/ounce which would lead to materially greater reserves. Crystallex will present evidence of these revised calculations at the appropriate procedural juncture in the arbitration.

### 1.    Origins of the investment

11.    In the autumn of 1999, following the suspension of activity by the former developer of Las Cristinas, the Government sought to attract foreign investors to reactivate the mining project. Several investors expressed an interest in investing in Las Cristinas.

12.    Decree 1757 of April 2002 granted jurisdiction over the exercise of mining rights in Las Cristinas to the Ministry of Energy and Mines (now known as the Ministry of Basic Industry and Mines, the **Ministry of Mines**).[5] Subsequently, through an administrative agreement executed on 16 May 2002 (the **Administrative Agreement**), the Ministry of Mines delegated the award of the mining rights over Las Cristinas to the CVG. As would be expected between different government agencies, the mining rights to Las Cristinas were transferred to CVG free of charge. The Administrative Agreement expressly authorized CVG to enter into operating contracts with third parties, subject to prior notification to the Ministry of Mines.[6]

13.    Following a series of interviews with international mining companies, Crystallex was selected by CVG to develop and exploit the gold deposits at Las Cristinas. On 6 September 2002, CVG notified the Ministry of Mines that its Board of Directors had resolved to enter into the MOC with Crystallex, pursuant to Clause 2 of the Administrative Agreement.[7]

14.    CVG selected Crystallex to activate, develop and operate the Las Cristinas gold mining project in recognition of the "need to select the investor that best guarantees to the Republic that it can transform the dramatic precarious living conditions and

---

[5]    Decree 1757, 29 April 2002, published in the *Gaceta Oficial* No. 37437 on 7 May 2002, **Exhibit C-6**.

[6]    Administrative Agreement between the Ministry of Mines and CVG, 16 May 2002, **Exhibit C-7**. Clause 1 provides: "The [Ministry of Mines] authorizes [CVG] to explore, exploit and sell the gold mineral located in [Las Cristinas] […]." English translation. The original Spanish reads: "El [Ministerio de Minas] autoriza a [CVG], para la ejecución de los trabajos de exploración, explotación y venta del mineral de oro, que se encuentra en los yacimientos comprendidos en las áreas de las concesiones denominadas [Las Cristinas] […]."

Clause 2 provides: "In order to properly comply with this Contract, [CVG] may enter into operating contracts with third parties, subject to a ten (10) working day prior written notification to the [Ministry of Mines]." English translation. The original Spanish reads: "A los efectos del adecuado cumplimiento de este Contrato, [CVG] podrá celebrar contratos de operación con terceros, previa información escrita al [Ministerio de Minas], con un plazo no menor de diez (10) días hábiles."

[7]    Notification from CVG to the Ministry of Mines, 6 September 2002, containing CVG Resolution No. 8700 of 2 September 2002, **Exhibit C-8**.

unemployment in the Sifontes municipality".[8] The Energy and Mines Commission of the Venezuelan National Assembly openly supported Crystallex's investment, noting that its proposed investment in the project would "give great impulse to the regional and national economy as it will create some 6,000 direct and indirect jobs."[9]

15. Crystallex's technical skills and experience in the mining sector were well-known by CVG at the time it was selected for the Las Cristinas Project. Crystallex had by that time been exploring, developing and operating mining ventures in southern Bolivar State, an area known for hosting major mineral deposits, for several years. These included the operation from 1994 to 1998 of the Albino gold mine adjacent to Las Cristinas and the acquisition and operation since 2000 of the Tomi and Lo Increíble gold mines together with the Revemin mill.

16. With the approval of the Ministry of Mines on 17 September 2002, CVG entered into the MOC with Crystallex, granting Crystallex the right to develop and exploit the gold deposits at Las Cristinas – including the exploration, design and construction of facilities, and operation of the facilities for the processing of gold for its subsequent commercialization and sale.[10] Pursuant to the MOC, Crystallex had rights to the proceeds of the sale of the gold produced at Las Cristinas, subject to the payment of royalties and taxes.[11] The MOC had a term of twenty years which could be extended for a further twenty years upon agreement of the parties.[12]

17. Within five days of the signature of the MOC, Crystallex timely made an initial payment of US$15 million, as it was required to do pursuant to Clause 6 of the MOC.

---

[8]     *Ibid*, page 2. English translation. The original Spanish reads: "la necesidad de seleccionar al inversor que mejor garantía ofrezca a la República para transformar el dramático cuadro de desempleo y condiciones precarias de vida del Municipio Sifontes".

[9]     "Crystallex obtiene apoyo del Congreso por Las Cristinas – Venezuela", *BN Americas*, 3 November 2000, **Exhibit C-5**. English translation. The original Spanish reads: "va a generar un gran impulso tanto para la economía nacional como la regional, ya que creará unos 6.000 puestos de trabajo, directos e indirectos."

[10]    Mine Operation Contract (MOC) between CVG and Crystallex, 17 September 2002, **Exhibit C-9**, Clause 2.

[11]    *Ibid*, Clause 6.

[12]    *Ibid*, Clause 18.

18.   Crystallex took possession of Las Cristinas on 30 September 2002. In accordance with the terms of the MOC, Crystallex intended to commence production at Las Cristinas within 20 months, subject to receipt of the necessary permits.[13]

### 2.   Crystallex's investments in the Las Cristinas Project

19.   Pursuant to the terms of the MOC, Crystallex is under the obligation "to undertake all of the investments and works necessary to reactivate and execute in its totality the [Las Cristinas] Mining Project, design, build the plant, operate it, process the gold for its subsequent commercialisation and sale, and return the mine and its installations to the [CVG] at the end of the Contract".[14]

20.   Crystallex was therefore under an obligation to conduct geological, feasibility and environmental studies, undertake engineering design work, purchase all necessary equipment and materials required for the project, maintain existing installations and employ and manage a work force necessary for the development of the project.[15]

21.   Crystallex was also under the obligation to build infrastructure and develop several social programs and projects in the local community, including the following:

   (a)   maintenance of sufficient ongoing works to generate employment in the surrounding areas;

   (b)   provision of training programs and technical assistance to local residents;

   (c)   assumption of the costs of community health care facilities;

   (d)   construction of a minimum of 30 homes in the village of Santo Domingo;

   (e)   completion of various infrastructure improvements to water and sewage systems as well as to the access road to the Project site;

---

[13]   *Ibid*, Clauses 5 and 9. Administrative Agreement, **Exhibit C-7**, Clause 9.

[14]   MOC, **Exhibit C-9**, Clause 2.1. English translation. The original Spanish reads:

   "efectuar todas las inversiones y trabajos necesarios para reactivar y ejecutar en su totalidad el proyecto minero de [Las Cristinas], diseñar, construir la planta, operarla y procesar el material de oro para su posterior comercialización y venta, y transferir la mina y sus instalaciones a la [CVG] al término del Contrato".

[15]   *Ibid*, Clause 2.1 *in fine*.

    (f)     engagement of professional security firms to provide security for the facilities and the personnel;

    (g)     upgrading of a 19 kilometre access road to the mine site so heavy equipment would bypass the local communities; and

    (h)     refurbishment of the camp at Las Cristinas.[16]

22.    Crystallex has fully complied with its obligations under the MOC. In reliance upon the terms of the MOC, the legal framework governing the Las Cristinas Project and the representations of the Venezuelan Government, Crystallex made significant investments in Venezuela in order to reactivate and begin operations at Las Cristinas. In particular, Crystallex has:

    (a)     completed a number of geological studies and drilling programs that discovered significantly larger reserves and resources at Las Cristinas than previously known;

    (b)     engaged independent engineering firms to:

         (i)     complete a Technical, Economic and Financial Feasibility study (the *Feasibility Study*);

         (ii)    complete an Environmental Impact Study (the ***Environmental Impact Study***); and

         (iii)   substantially complete all engineering services to design and construct a mine and mill at Las Cristinas;

    (c)     purchased specialized, long lead-time mining and milling equipment;

    (d)     awarded all material construction contracts to build the mine;

    (e)     hired employees and contractors to develop and maintain Las Cristinas, including senior project development staff; and

    (f)     maintained the security of the site against invasion from illegal miners.

---

[16]   *Ibid*, Clauses 7 and 8.

23.    In fulfillment of its social obligations under the MOC, Crystallex, amongst other projects:

    (a)    installed one new water treatment plant and upgraded two existing plants to provide drinking water for eight communities;

    (b)    upgraded two roadways, one connecting the mine to Santo Domingo and the other one connecting the mine to the nearest highway, bypassing several local communities;

    (c)    constructed a sewer network to serve three communities;

    (d)    constructed a sewage treatment plant;

    (e)    upgraded an existing medical clinic, provided the clinic with a radiologist and radiology equipment, and provided two ambulances that are available to the local communities;

    (f)    provided dental facilities and a dentist for the local communities;

    (g)    continuously funded the maintenance of the existing medical clinic and provided doctors and medical supplies to the clinic;

    (h)    constructed a new 10,000 square foot, 20-person hospital with housing for medical staff;

    (i)    built 30 homes in the village of Santo Domingo; and

    (j)    established a malaria clinic at the Las Cristinas site.

24.    Crystallex also funded a local educational scholarship program, and provided sponsorship of local sports teams and free lunches at local schools.

### 3.    Crystallex's fulfillment of the conditions for the grant of the Permit

25.    Under the MOC, CVG was responsible for obtaining the environmental and mining permits required for the operation of the Las Cristinas mine in accordance with Venezuelan law, based on technical documents and reports to be supplied by

Crystallex to support the applications for the permits.[17] Principal among these permits was the Permit to be obtained from the Ministry of the Environment (the *Ministerio del Poder Popular para el Ambiente*, formerly known as the *Ministerio del Ambiente y de los Recursos Naturales*). Without this Permit, Crystallex could not commence construction or operations at the Las Cristinas mine.

26.    Crystallex knew at the time of its investment that the legal framework consisting of Decree 295 (the ***Mining Law***)[18] and Decree 1257[19] required the following conditions and steps to be fulfilled in order to be granted the Permit:

(a)    a Feasibility Study had to be prepared and submitted for approval to CVG and the Ministry of Mines;[20]

(b)    an Environmental Impact Study had to be prepared and submitted for approval to the Ministry of the Environment.[21]

27.    Upon the approval of these studies, certain duties would need to be paid (as established by the Ministry of the Environment) and the Permit would then be issued.[22]

28.    Crystallex completed all of the steps outlined above.

*(a)    Completion and approval of the Feasibility Study*

29.    Crystallex completed the Feasibility Study of the Las Cristinas Project and submitted it to CVG for its analysis and approval in September 2003.[23] In April 2004, CVG

---

[17]    *Ibid,* Clauses 9.4 and 8.3.4. Prior to issuing all relevant permits, no time limit under the MOC would begin to run.

[18]    Decree 295, 5 September 1999, published in the *Gaceta Oficial* No. 5382 on 28 September 1999, **Exhibit C-4**.

[19]    Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35946 on 25 April 1996, **Exhibit C-2**.

[20]    MOC, **Exhibit C-9**, Clause 2.2 and Mining Law, **Exhibit C-4**, Article 52.

[21]    Decree 1257, 13 March 1996, published in the *Gaceta Oficial* No. 35946 on 25 April 1996, **Exhibit C-2**, Articles 6 and 7.

[22]    *Ibid*, Article 13.

[23]    Feasibility Study (Executive Summary), September 2003, **Exhibit C-10**.

approved the Feasibility Study and submitted it to the Ministry of Mines which granted its approval in March 2006.[24]

### (b)    Completion and approval of the Environmental Impact Study

30.    Crystallex prepared the Environmental Impact Study detailing environmental mitigation and recovery strategies, and setting out its socio-economic development plans. It was submitted to the Ministry of the Environment for approval in April 2004[25] and was formally approved in May 2007.[26]

### (c)    Satisfaction of final requirements

31.    Upon its approval of the Environmental Impact Study on 16 May 2007, the Ministry of the Environment set out the two remaining requirements which Crystallex had to fulfil in order for the Permit to be issued: the posting of a Construction Compliance Guarantee Bond (the ***Bond***) and the payment of certain environmental duties.[27]

32.    The posting of the Bond was the final step required in the procedure for the issuance of the Permit, as acknowledged in the Ministry of the Environment's letter of 16 May 2007 which stated:

> "Once the Bond has been posted, checked and found to be compliant by this Office, the [Permit] for the execution of the activities associated with the [Las Cristinas Project] will be issued."[28]

33.    On 18 May 2007, Crystallex, through CVG, posted the Bond which was discussed with the Ministry of the Environment and modified in accordance with its request, and paid the requisite environmental duties.[29]

---

[24]    Oficio 1193-2006 from the Vice-Minister of Mines to CVG, 6 March 2006, **Exhibit C-13**.

[25]    Oficio PRE-219/2004 from CVG to the Minister of the Environment, 15 April 2004, **Exhibit C-11**.

[26]    Oficio 328 from the Vice-Minister of Environmental Administration and Governance to CVG, 16 May 2007, **Exhibit C-15**.

[27]    *Ibid.*

[28]    *Ibid.* English translation. The original Spanish reads: "Una vez consignada la Fianza, revisada y encontrada conforme por este Despacho, les será entregado el Oficio correspondiente a la Autorización de Afectación de Recursos Naturales para la ejecución de actividades asociadas al proyecto […] Las Cristinas".

[29]    Letter from Crystallex to CVG, 18 May 2007, **Exhibit C-16** and Letter from CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 May 2007, **Exhibit C-17**. Upon request, modifications to the Bond were made on 18 September 2007. *See* Letter

### (d)    Crystallex relied on the assurances of various Government departments throughout the permitting process

34.    As explained above, Crystallex relied upon and fulfilled the conditions for the grant of the Permit set out in the legal framework applicable to the Las Cristinas Project and fully complied with its obligations under the MOC, as acknowledged on various occasions by the CVG and the Ministry of Mines.[30]

35.    In reliance on the applicable legal framework and assurances from all levels of the Venezuelan Government, Crystallex incurred out of pocket costs in excess of US$500 million.

36.    In early June 2005, the Minister of Mines commented that the status of the Permit was "well on track" and that the issuance of the Permit was "following its normal, routine course. It's a bureaucratic formality".[31]

37.    In early June 2006, the President of the Commission of Mines of the National Assembly, Deputy Ricardo Gutiérrez, and the Mayor of Sifontes expressed their joint support for the rapid commencement of the Las Cristinas Project by Crystallex.[32] Deputy Gutiérrez also stated that he had arranged to meet with the Minister of the Environment to express his commission's support for the rapid development of the Las Cristinas Project by Crystallex.[33]

38.    Following the posting of the Bond, the Government twice acknowledged that Crystallex had satisfied all of the conditions in order to be granted the Permit and to begin operations at Las Cristinas.

---

from CVG to the Director General of the Administrative Office of Permissions of the Ministry of the Environment, 18 September 2007, **Exhibit C-20**.

[30]    Oficio DGCM-573 from the Director General of Mining Concessions of the Ministry of Mines to Crystallex, 10 December 2007, **Exhibit C-22**; Letter from CVG to Crystallex, 2 March 2009, **Exhibit C-55**; and Letter from CVG to Crystallex, 15 August 2010, **Exhibit C-64**.

[31]    "Venezuela: Crystallex gold mine permit 'on track'", *Reuters*, 3 June 2005, **Exhibit C-12**.

[32]    "AN gestiona permisos mineros", *El Diario de Guayana*, 5 June 2006, **Exhibit C-14**.

[33]    *Ibid*.

39.   In August 2007, the Vice-Minister of the Environment gave assurances that all of the permits for the Las Cristinas Project had been processed, and all of the technical studies had been ready since June 2007.[34]

40.   Later that year, in October 2007, Ministry of the Environment officials testified before the National Assembly that all the requirements for the commencement of mining operations at Las Cristinas had been fulfilled and that the Permit would be issued.[35] The report issued by the National Assembly after the hearing took place provided that:

> "The concessionaire [CVG], and the operator, Crystallex International, have complied with both the feasibility study and the other legal and technical requirements established for the corresponding permits to be granted to them by the Ministry of the Environment for the commencement of the construction and development of the Las Cristinas Project."[36]

41.   In August 2007, the President of the Commission of Economic Development of the Venezuelan National Assembly, Ricardo Gutiérrez, expressed his support for the Las Cristinas Project and indicated that his committee was taking steps to hasten the issuance of the Permit. He said:

> "The Commission I lead, the Permanent Commission for Economic Development at the National Assembly, has started a series of actions before the Ministry and the President of the Republic to finalize the issuance of the environmental permits. […] The President [Hugo Chavez] is aware, and so are we, that the beginning of exploitation at the Las Cristinas gold mines has a special importance, it has an economic importance [...] a social importance, as thousands and thousands of families, dedicated to illegal mining, and who use mercury and work in deplorable conditions, can participate through formal jobs in this activity developed by Crystallex in the exploitation of gold in Las Cristinas. […] The permits have already been prepared by the Environment Ministry, and the President can speed this up. […] The Las Cristinas Project will begin soon, and will pass from project to full exploitation with the

---

[34]   "La Comisión de Desarrollo Económico del Parlamento: Exhortarán al Ejecutivo reactivar proyecto minero Las Cristinas", *El Bolivarense*, 14 August 2007, **Exhibit C-18**.

[35]   Report of the Meeting held on 4 October 2007, 16 October 2007, **Exhibit C-21**, page 4.

[36]   *Ibid.* English translation. The original Spanish reads:

> "La concesionaria, Corporación Venezolana de Guyana (C.V.G.), y la empresa operadora, Crystallex Internacional, han satisfecho tanto el estudio de factibilidad como los demás requerimientos jurídicos y técnicos exigidos para que les sea otorgada la permisología correspondiente, por parte del Ministerio del Ambiente, para el inicio de la construcción y desarrollo del Proyecto Las Cristinas."

modern technology of one of the most important gold mines of the planet."[37]

42. Since the signing of the MOC, all relevant branches of the Venezuelan Government were aware that Crystallex was investing hundreds of millions of dollars in accordance with its provisions. On 10 December 2007, the Ministry of Mines confirmed that the MOC was in full force and effect and in good standing.[38] Similarly, the CVG has confirmed, most recently in August 2010, the continued validity of the MOC.[39]

## B.    Venezuela's Measures

43. In direct contradiction to the applicable legal framework as well as the Government approvals and assurances described above, in April 2008, the Government denied Crystallex the Permit it required to develop Las Cristinas, bringing the mining project to a halt, although Crystallex continued to incur the requisite expenditures to remain in compliance with the terms of the MOC. Since April 2008, various Government actors have issued contradictory decisions and statements regarding the Las Cristinas Project and Crystallex's rights. These have included an announcement that open-pit mining activities would be banned for environmental reasons, and declarations that Las Cristinas would be nationalized and developed by the State or that it would be

---

[37]    Statement by the President of the Commission of Economic Development of the Venezuelan National Assembly, Ricardo Gutiérrez, during a radio interview in August 2007 . *See* Transcript of VHeadline Venezuela Newshour interview of Ricardo Gutiérrez, 15 August 2007, **Exhibit C-19**. English translation. The original Spanish reads:

"[L]a Comisión que yo presido, Comisión Permanente de Desarrollo Económico de la Asamblea Nacional, ha iniciado acciones ante el Ministerio como ante el Señor Presidente de la República, a los fines de lograr que culminemos la tramitación de los permisos ambientales. [...] El presidente está consciente como lo estamos nosotros, de que el inicio de la explotación de las minas auríferas de Las Cristinas tiene una especial importancia, tiene una importancia económica [...] una importancia social, porque permitiría dar miles y miles de familias, dedicadas a la minería ilegal, que utilizan mercurio y que trabajan en deplorables condiciones, puedan participar mediante empleos formales en esta actividad que desarrollaría la empresa Crystallex en la explotación del oro de Las Cristinas. [...] Ya los permisos fueron elaborados por el Ministerio del Ambiente y el presidente puede agilizar eso [...] el Proyecto de Las Cristinas va a iniciarse pronto, va a pasar de proyecto a la plena explotación con esta moderna tecnología de uno de los yacimientos auríferos más importantes del planeta".

*See also*, "La Comisión de Desarrollo Económico del Parlamento: Exhortarán al Ejecutivo reactivar proyecto minero Las Cristinas", *El Bolivarense*, 14 August 2007, **Exhibit C-18**.

[38]    Oficio DGCM-573 from the Director General of Mining Concessions of the Ministry of Mines to Crystallex, 10 December 2007, **Exhibit C-22**.

[39]    Letter from CVG to Crystallex, 2 March 2009, **Exhibit C-55**, and Letter from CVG to Crystallex, 15 August 2010, **Exhibit C-64**.

exploited by Russian interests. Ultimately, and notwithstanding prior assurances as to the validity of and compliance with the MOC, Venezuela unilaterally and unlawfully rescinded Crystallex's MOC. These events are described more fully in the sub-sections below.

### 1. The Ministry of the Environment denied the request for the Permit

44. Notwithstanding Crystallex's fulfillment of the requisite conditions, Venezuela's approval of the acknowledged Environmental Impact Study and assurances that the Permit would be issued, on 14 April 2008 the Ministry of the Environment denied the request for the Permit.[40]

45. Although the Environmental Impact Study for the project had already been approved by the Ministry of the Environment, the Director General of the Office of Permits of the Ministry of the Environment, in clear violation of the applicable legal procedures, claimed that the refusal to grant the Permit was based on alleged concerns over the protection of the environment and indigenous peoples in the Imataca forest reserve.[41] No explanation or evidence was provided as to how these concerns were linked to the Las Cristinas mining project, nor was any attempt made to justify the complete reversal of the Ministry of the Environment's earlier approval of the Environmental Impact Study (rendered less than one year earlier), nor to explain the changes in the Government's statements to the CVG and before the National Assembly that all the requisite conditions for the grant of the Permit had been fulfilled. Nor was Crystallex afforded an opportunity to be heard or provide its views.

46. The Government's professed concerns over the environment and indigenous peoples were unfounded. In fact, it was precisely these concerns over the environment and welfare of the impoverished indigenous population in the region that had motivated the Government and CVG to enter into the MOC with Crystallex in the first place. On several occasions, Government officials and CVG openly recognized that reactivating the Las Cristinas projects would have "a social importance, as thousands and thousands of families, dedicated to illegal mining, and who use mercury and work in deplorable conditions, can participate through formal jobs in this activity developed

---

[40] Oficio 1427 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to CVG, 14 April 2008, **Exhibit C-25**.

[41] *Ibid.*

by Crystallex in the exploitation of gold in Las Cristinas",[42] and would "transform the dramatic precarious living conditions and unemployment in the Sifontes municipality".[43]

47.    It was therefore not surprising that the communities surrounding the Las Cristinas Project supported the granting of the Permit. Representatives of the indigenous communities of the nearby village of San Isidro in Sifontes wrote to the then Minister of Basic Industries and Mines, Rodolfo Sanz, on 28 April 2008 asking him to facilitate the start-up of the gold production projects in the area, including Las Cristinas, in order to generate jobs.[44]

48.    Crystallex requested the reconsideration of the Director General's decision to deny the Permit. Crystallex's motion for reconsideration *(Recurso de Reconsideración)* before the Director General, filed on 12 May 2008,[45] was declared inadmissible on 29 May 2008 due to CVG's failure to join the request. The Director General also ratified his initial denial of the Permit.[46]

49.    Crystallex appealed this decision on 17 June 2008 by submitting a hierarchical appeal *(Recurso Jerárquico)* before the Ministry of the Environment.[47] In accordance with Article 91 of the Organic Law on Administrative Procedures, a decision should have

---

[42]    Statement by the President of the Commission of Economic Development of the Venezuelan National Assembly, Ricardo Gutiérrez, during a radio interview in August 2007. *See* footnote 37 above. English translation. The original Spanish reads:

"[…] una importancia social, porque permitiría que miles y miles de familias, dedicadas a la minería ilegal, que utilizan mercurio y que trabajan en deplorables condiciones, puedan participar mediante empleos formales en esta actividad que desarrollaría la empresa Crystallex en la explotación del oro de Las Cristinas".

[43]    Notification from CVG to the Ministry of Mines, 6 September 2002, containing CVG Resolution No. 8700 of 2 September 2002, **Exhibit C-8**. English translation. The original Spanish reads: "la necesidad de seleccionar al inversor que mejor garantía ofrezca a la República para transformar el dramático cuadro de desempleo y condiciones precarias de vida del Municipio Sifontes".

[44]    "Mineros solicitan arranque de empresas del oro", *El Diario de Guayana*, 22 April 2008, **Exhibit C-26** and "Solicitan a Mibam el comienzo del plan Las Cristinas y Brisas", *El Diario de Guayana*, **Exhibit C-27**.

[45]    Crystallex's Recurso de Reconsideración, 12 May 2008, **Exhibit C-28**.

[46]    Oficio 2765 from the Director General of the Administrative Office of Permissions of the Ministry of the Environment to Crystallex, 29 May 2008, **Exhibit C-30**.

[47]    Crystallex's Recurso Jerárquico, 17 June 2008, **Exhibit C-33**.

been rendered within 90 business days, i.e. by 31 October 2008.[48] No decision was ever rendered.[49]

50.     Venezuela's change of political strategy is further evidenced by CVG's failure to join in Crystallex's request for reconsideration and to appeal the denial of the Permit as it is required to do under the MOC.[50] The actions of CVG, together with the position taken by the Ministry of the Environment that Crystallex lacked standing and the refusal to decide the appeal, deprived Crystallex of its ability to obtain any redress through the administrative process.

### 2.     Venezuela continues to confirm that the conditions for the Permit were fulfilled

51.     Despite the Ministry of the Environment's denial of the request for the Permit, Crystallex was invited to appear at a public hearing of the National Assembly's Permanent Committee for Economic Development (the **Committee**) on 4 June 2008.[51] At the hearing, Crystallex gave a presentation addressing a wide range of matters, including plans for mining at Las Cristinas, the current state of the environment in the area of the project, the proposed plan for reclamation at the completion of mining, the social projects in the local communities and its employment and training plans for the local communities.[52] Senior representatives of the Ministry of Mines who appeared at this hearing confirmed Crystallex's compliance with all of the procedural and administrative steps required for the issuance of the Permit.[53] The summary issued by the Committee notes that Crystallex had been given the support of several branches of the Venezuelan Government over the significant period of time in which the Las

---

[48]     Ley Orgánica de Procedimientos Administrativos, 7 May 1981, published in the *Gaceta Oficial* No. 2818 on 1 July 1981, **Exhibit C-1**, Article 91 and Article 94 providing that under Venezuelan law, the lack of a decision within this time-frame may be interpreted by Crystallex as a denial of its appeal.

[49]     This administrative proceeding was withdrawn in February 2011 in accordance with Article XII(3)(b) of the Treaty. *See* paragraph 127 below.

[50]     MOC, **Exhibit C-9**, Clauses 8 and 9.

[51]     Oficio CPDE/2008/05/0238 from the Secretary of the National Assembly's Permanent Committee for Economic Development to Crystallex, 29 May 2008, **Exhibit C-31**.

[52]     Minutes No.014-2008 of the Ordinary Meeting held on 4 June 2008, **Exhibit C-32**, pages 5-8.

[53]     *Ibid.*

Cristinas Project had been in development.[54] The summary further noted a lack of coordination between the various Government agencies and departments.

52.    Following the filing of Crystallex's hierarchical appeal of the denial of the Permit in June 2008, Crystallex was invited to a meeting with representatives of the Ministry of the Environment including its Vice-Minister. At the meeting, Crystallex was informed that the Ministry of the Environment had been instructed by the Government to reconsider the issuance of the Permit. To that end, Ministry of the Environment representatives suggested that Crystallex consider potential modifications to the project which could enable the Permit to be issued, including modifications that would: (a) increase the social projects in the area; (b) mitigate the impact of open vein deposit mining in the affected areas of the Imataca; and (c) improve the recovery plans at the end of the mine's life as well as plans to remedy the existing environmental damage caused by the illegal miners who have worked in the area.

53.    Following further instructions from the Ministry of the Environment, Crystallex prepared and submitted a report on 4 August 2008 incorporating the suggested modifications to its development plan.[55] On 7 and 8 August 2008, a team from the Ministry of the Environment led by the Vice-Minister completed a site visit of the Las Cristinas Project.

54.    On 20 August 2008, the Vice-Minister of the Environment wrote to Crystallex confirming that its proposed modifications to its development plan were consistent with the Government's guidelines on social and environmental matters. The Vice-Minister further stated that this conclusion would be considered in making any decision relating to the Permit.[56]

55.    On 24 October 2008, Crystallex filed a motion with the Ministry of the Environment supplementing its prior appeal and requesting that the Minister of the Environment

---

[54]    *Ibid.*

[55]    Letter from Crystallex to the Vice-Minister of Environmental Administration and Governance, 4 August 2008, **Exhibit C-35**.

[56]    Oficio 1719 from the Vice-Minister of Environmental Administration and Government to Crystallex, 20 August 2008, **Exhibit C-36**.

take Oficio 1719 into consideration in rendering her decision on the appeal.[57] In spite of this, the deadline for deciding Crystallex's administrative appeal lapsed on 31 October 2008 without any decision from the Ministry of the Environment.

### 3.    Venezuela threatens to nationalize the Las Cristinas Project

56.    On 15 May 2008, again citing concerns for the protection of the environment and indigenous people, the Minister of Environment Yuvirí Ortega stated that the Ministry of the Environment had decided to ban open-pit mining altogether, and that all concessions were under review.[58] This decision was never officially notified to Crystallex. Shortly after the Minister's statement, Crystallex entered into discussions with the Ministry of the Environment regarding potential changes to its development plan that would allow the Permit to be issued.[59]

57.    In contradiction with the statements of the Minister of Environment, in the autumn of 2008 the Government publicly announced its intention to nationalize the mining sector and develop it under State control. On 19 September 2008, referring to Las Cristinas, President Chavez declared:

> "In Guayana for example, we are taking back big mines, and one of them is one of the biggest in the world. And do you know what it is? It's gold, it's gold!"[60]

58.    In November 2008, the threat of nationalization was expressly directed to Las Cristinas. In a public address, the Minister of Basic Industries and Mining, Rodolfo Sanz, stated that:

> "The exploitation of the Las Cristinas mine, which was owned by the transnational company Crystallex, is estimated to begin by 2009 […] this mine will be recovered and will be operated under State control."[61]

---

[57]    Crystallex's submission to the Minister of the Environment: "Escrito mediante el cual se consigna Oficio No. 1719 de fecha 20 de agosto de 2008, emanado de ese Ministerio", 24 October 2008, **Exhibit C-39**.

[58]    "Venezuela negará permisos para explotación de oro", *Cadena Global*, 15 May 2008, **Exhibit C-29**.

[59]    For which *see* paras. 52-54, above.

[60]    "Chávez asegura que está 'recuperando' las grandes minas de oro", *El Universal*, 19 September 2008, **Exhibit C-37**. English translation. The original Spanish reads: "Allá en Guayana por ejemplo, estamos recuperando unas grandes minas, y una que es de las más grandes del mundo, ¿saben de qué? de oro, ¡oro!"

59. In his address, the Minister of Mines explained that, as a result of the financial crisis and the attendant fall in oil prices, it needed the production from the Las Cristinas mine in order to boost its reserves: "[a]s a result of the financial crisis that has spread to a global scale, it is necessary to try to reclaim our gold to increase our international reserves."[62]

### 4. Venezuela threatens to rescind Crystallex's MOC and grant the rights to develop Las Cristinas to a Russian company

60. In early November 2008, as part of President Chavez's efforts to strengthen Venezuela's relationship with Russia, a Russian delegation visited Caracas seeking to forge closer diplomatic and economic ties. The Venezuelan Vice-President Ramon Carrizales announced on State television that Venezuela and Russia were "moving forward with energy, education, mining, cultural, industrial and sports agreements, agreements in all areas [...]. This is an integrated relationship, which has already become strategic."[63]

61. In the course of the delegation's visit, the Minister of Mines (and President of the CVG), Rodolfo Sanz, gave a presentation in which he announced that Venezuela would be signing an agreement with Russian-owned mining company, Rusoro Mining Ltd (**Rusoro**), to operate Las Cristinas and the neighbouring Brisas projects with Venezuela.[64] He then noted, in an apparent reference to Crystallex, that: "We have to

---

[61] Ministry of Mines Press Release, 5 November 2008, **Exhibit C-40**. English translation. The original Spanish reads: "Para el 2009 se estima la explotación de la mina Las Cristinas, la cual estaba en manos de la empresa transnacional Cristalex [...] esta mina será recuperada y será operada bajo la administración estatal".

The Minister added that the Las Cristinas mine contains "approximately 31 million ounces of gold, valued at about 35 billion dollars". English translation. The original Spanish reads: "Cuenta con una capacidad aproximada de 31 millones de onzas de oro, valoradas cerca de 35 mil millones de dólares".

*See also* "Sanz asegura que el Estado operará mina Las Cristinas", *El Universal*, 6 November 2008, **Exhibit C-42**. English translation. The original Spanish reads: "esa mina será recuperada y será operada bajo la administración estatal".

[62] "Ahora Chávez va por mina de oro Las Cristinas", *ADNMundo*, 6 November 2008, **Exhibit C-43**. English translation. The original Spanish reads: "A raíz de la crisis financiera, que se ha extendido a escala mundial, es necesario tratar de recuperar nuestro oro para aumentar nuestras reservas internacionales".

*See also* "Venezuela's bid to boost gold reserves bad news for Crystallex", *Globe and Mail*, 6 November 2008, **Exhibit C-44**.

[63] "Venezuela courts Russian investment as oil tumbles", *Bloomberg*, 6 November 2008, **Exhibit C-47**.

[64] "Venezuela offers Russians big gold projects", *Reuters*, 6 November 2008, **Exhibit C-45**.

rescind our relationship with a company that has been working in the zone […]. We have a legal problem there."[65]

62.  Increasingly concerned by reports of the Government's intention to nationalize Las Cristinas, and having received no notification or indication from the Government, in November 2008, Crystallex formally requested (on no less than three occasions) clarification from the Ministry of Mines as to the status of the MOC and the Las Cristinas Project.[66] The Government failed to respond to any of the three letters.

63.  Consequently, on 24 November 2008, Crystallex wrote to the Minister of Mines to notify a dispute under the Treaty (the ***Notice of Dispute***) and its willingness to hold discussions with a view to achieving an amicable settlement.[67]

64.  The Government's intent to form an alliance with Rusoro to exploit Las Cristinas was reiterated on 13 January 2009 when President Chavez announced in a speech to the Venezuelan National Assembly that VenRus – a joint venture company formed by the Venezuelan Government and Rusoro – would be granted five mining concessions, including Las Cristinas.[68] President Chavez stated:

> "In 2008 we created the 'mixed enterprise' VenRus with Russia, a Russian and Venezuelan enterprise. A mixed Enterprise for the reserves at Las Cristinas."[69]

65.  President Chavez further added:

> "In this way, the Venezuelan State gains control of 30,000 million dollars, which is the current estimated [value] of the Las Cristinas

---

[65]  *Ibid.*

[66]  Letters from Crystallex to the Minister of Mines, dated 6 November, 10 November and 13 November 2008, **Exhibits C-46**, **C-48 and C-49**.

[67]  Notice of Dispute, 24 November 2008, **Exhibit C-51**.

[68]  Minera Venrus, C.A. was incorporated in Venezuela on 29 September 2008 and is a joint venture between Rusoro Mining de Venezuela C.A. and Empresa de Producción Social Minera Nacional, C.A., a Venezuelan state-owned company under the control of the Ministry of Mines. *See* the Act and Articles of Incorporation of Corporación Minera Venrus, 29 September 2008, **Exhibit C-38**.

[69]  "Venezuela y Rusia explotarán mina oro Las Cristinas: Chávez", *Reuters*, 13 January 2009, **Exhibit C-52**. English translation. The original Spanish reads: "En el 2008 creamos la empresa mixta VenRus con Rusia, empresa rusa y empresa venezolana. Una empresa mixta para los yacimientos de Las Cristinas".

reserves […] [u]nder the control of socialism, for the development of economic growth, for national development."[70]

66.     Echoing President Chavez's sentiment, Rusoro's CEO has publicly declared that the company "stands to benefit from strong ties between Chavez and the Russian government" and that it was the Venezuelan Government's "preferred partner" to develop Las Cristinas.[71]

### 5.    The Government confirms that Crystallex's MOC remains in force

67.     Days after President Chavez's address to the National Assembly, Minister Sanz declared – in direct contradiction to his earlier statements – that the Government had taken no decision with regard to Crystallex's MOC.[72]

68.     Mr Cruz Briceño, CVG's Mining Manager, later confirmed in a letter to Crystallex dated 2 March 2009 that the MOC was in full effect, that Crystallex was in full compliance with it and that the permitting process remained pending:

---

[70]     Annual address to the Nation of the President of the Bolivarian Republic of Venezuela, Hugo Chavez, Federal Legislative Palace, Caracas, 13 January 2009, **Exhibit C-53**, page 79. English translation. The original Spanish reads: "Entonces el Estado venezolano, con esto, pasa a controlar 30 mil millones de dólares, que es el estimado actual [del valor] del yacimiento […] [b]ajo control del socialismo, para el desarrollo del crecimiento económico, para el desarrollo nacional."

One year after President Chavez's speech, however, the Minister of Mines, Rodolfo Sanz, denied that a partner had been selected to exploit the Las Cristinas Project, indicating that the Government continued to search for a suitable partner. *See* "Venezuela podría emitir este año bonos respaldados con oro", *El Universal*, 31 March 2010, **Exhibit C-61**.

[71]     "Rusoro says it is 'preferred partner' for gold mine", *Bloomberg*, 14 November 2008, **Exhibit C-50**.

[72]     "Venezuela, sin decisión sobre explotación mina oro Las Cristinas", *Reuters*, 22 January 2009, **Exhibit C-54**. *Reuters* quoted Minister Sanz as follows:

"'The Venezuelan State has the power to exercise sovereign control over its strategic mineral deposits […] that does not exclude any form of relation, of association in each case we will study which will be the relation', said the Minister [of Mines], Rodolfo Sanz, on Thursday.

When asked whether Crystallex would be out of the project, after waiting for years for the environmental permits for the development [of the project], the Minister answered, 'I have not said that.' 'When we have a decision we will inform those who need to know,' he added […]"

English translation. The original Spanish reads:

"'El Estado venezolano tiene la disposición de ejercer control soberano sobre sus yacimientos de minerales estratégicos […] eso no excluye cualquier forma de relación, de asociación en cada caso estudiaremos cuál será la relación', dijo el jueves el ministro de Industrias Básicas y Mineria, Rodolfo Sanz.

Interrogado sobre si Crystallex saldría del proyecto, tras haber esperado durante años los permisos ambientales para desarrollarlo, afirmó 'yo no he dicho eso'. 'Cuando tengamos una decisión se la comunicaremos a quien haya que comunicársela', agregó […]".

> "Taking into account that the normative act that gave origin to the operations contract has not been revoked or replaced, and that the contract is valid for 20 years, and that Crystallex has been fulfilling the obligations assumed with the contract, we hereby inform you that the contract is fully in force and in the process of obtaining the required permits from the competent authorities for the development of the Project."[73]

69.     This confirmation of the validity of the MOC was reiterated by the CVG in August 2010, as discussed below.

### 6.     Venezuela's renewed expropriation threats

70.     In April 2010, in reaction to environmental damage caused by illegal artisanal miners, President Chavez – on his Sunday television address, "Alo, Presidente" – threatened to nationalize the gold mines in the State of Bolivar:

> "If we are going to exploit gold we will have to nationalize all of it, recuperate and put an end to concessions, which led to degeneration […]".[74]

71.     Again, no such decision was notified to Crystallex. Concerned, Crystallex again wrote to CVG to enquire as to the status of its MOC. On 15 August 2010, the CVG responded indicating that:

> "Given that the contract has a duration of 20 years and that the administrative act underlying the contract has not been replaced or repealed, it is clear that the same [the MOC] remains in full force and effect". [75]

---

[73]    Letter from CVG to Crystallex, 2 March 2009, **Exhibit C-55**. English translation. The original Spanish reads:

> "Como quiera que el acto normativo que dió origen al contrato de operación, no ha sido derogado ni remplazado por otro, y toda vez que, el contrato tiene una vigencia de 20 anos y se han venido cumpliendo las obligaciones asumidas por Crystallex, hacemos de su conocimiento que el mencionado contrato se encuentra en plena vigencia y en tramites ante los organismos competentes para la obtención de las autorizaciones requeridas para el inicio del desarrollo del Proyecto".

[74]    Transcript of "Aló Presidente" television program No. 356 prepared by the Ministry of Communication and Information, 25 April 2010, **Exhibit C-62**, page 22. English translation. The original Spanish reads: "Si nosotros vamos a explotar el oro habrá que nacionalizar todo eso, recuperar y acabar con las concesiones, que fue una degeneración aquí". *See also* "Chávez ordena nacionalizar la explotación del oro en Bolívar", *El Universal*, 28 April 2010, **Exhibit C-63**.

[75]    Letter from CVG to Crystallex, 15 August 2010, **Exhibit C-64**. English translation. The original Spanish reads: "Toda vez que el contrato tiene una vigencia de veinte (20) años, y que el acto administrativo que dio origen al referido no ha sido reemplazado ni derogado, queda claramente expresado que el mismo se encuentra en plena vigencia".

72. In an effort to mitigate its loss and seek to create some value from its otherwise worthless investment, in May 2010, Crystallex proposed to the Government the possibility of entering into a strategic association with a Chinese State-owned company. The aim of this proposal was to seek to unblock the stalled permitting process through an association with China, one of the States with which President Chavez had sought closer economic cooperation. The proposal was not acted upon and no transaction was consummated.

73. On 17 October 2010, the Venezuela State news agency[76] reported an announcement of President Chavez in relation to Las Cristinas whilst on a State visit to Belarus. Chavez stated:

> "Las Cristinas, this mine belongs to Venezuela and it has been handed over to transnational companies. I announce to the world that the revolutionary Government has recuperated it, together with the Las Brisas mine. These mineral resources are for the Venezuelan people, not for transnationals".[77]

74. Several days later, it was reported that President Chavez had announced that Russia would help Venezuela "start to exploit one of the biggest gold mines in the world", in reference to Las Cristinas.[78]

### 7.    Venezuela's termination of the MOC

75. Notwithstanding the Government's assurances as to the MOC's validity provided most recently in August 2010,[79] on 3 February 2011, the CVG unilaterally terminated the MOC.[80] The CVG letter notifying Crystallex of the unilateral termination enclosed

---

[76] The *Agencia Venezolana de Noticias*, or *AVN*, is a part of the Ministry of Communication and Information.

[77] "Visita de Chávez a Belarús fortalece el desarrollo socioeconómico en Venezuela", *Agencia Venezolana de Noticias* (State news agency), 17 October 2010, **Exhibit C-65**. English translation. The original Spanish reads: "Las Cristinas, esa mina es venezolana y la habían entregado a unas transnacionales, anuncio al mundo que la recuperó el gobierno revolucionario, así como la mina Las Brisas, esos recursos minerales son para los venezolanos, no para las transnacionales".

[78] "Chávez anuncia fondo de US$ 1.000 millones entre Venezuela y Libia", *Noticias24*, **Exhibit C-66**.

[79] Oficio DGCM-573 from the Director General of Mining Concessions of the Ministry of Mines to Crystallex, 10 December 2007, **Exhibit C-22**; Letter from CVG to Crystallex, 2 March 2009, **Exhibit C-55**; and Letter from CVG to Crystallex, 15 August 2010, **Exhibit C-64**.

[80] Oficio PRE No. 004-11 from the President of CVG to Crystallex, 3 February 2011, **Exhibit C-67**.

a copy of a CVG Resolution of the same date.[81] Both were signed by Jose Khan in his dual role as CVG President and Minister of Mines.

76.    The CVG Resolution ordered the rescission of the MOC citing the Government's prerogative to terminate contracts for "reasons of opportunity and convenience".[82] It also cited the lack of activity at the Las Cristinas mine for over one year as a basis for termination under Clause 24 of the MOC.[83]

77.    The Resolution provided that "[a]s a consequence of the unilateral termination of the [MOC], Crystallex International Corporation is ordered to […] transfer to the [CVG] the installations, including permanent works and improvements, accessories and equipment which form an integral part of these, as well as moveable and immoveable, tangible and intangible assets affected to the mineral deposits denominated [Las Cristinas]" within a 90-day period.[84]

78.    Crystallex was not afforded an opportunity to be heard or provide its views prior to the rescission of the MOC, nor has Crystallex been compensated for the effects of the rescission.

79.    The MOC was rescinded for purely political reasons. By rescinding the MOC, Venezuela acted on its earlier threats to eliminate its ties with Crystallex so that it could pursue the production of gold at Las Cristinas in accordance with its political agenda.

80.    The arbitrary nature of this rescission is illustrated by CVG's failure to comply with the most basic notions of Venezuelan law and the very terms of the MOC. First, Clause 24 of the MOC which is cited by the CVG as a basis for the contract's termination, only provides for the rescission of the MOC after lack of activity at Las

---

[81]    *Ibid*. *Also see* CVG Resolution No. 003-11, 3 February 2011, **Exhibit C-68**.

[82]    *Ibid*, page 3.

[83]    *Ibid.*

[84]    *Ibid*, pages 3-4. English translation. The original Spanish reads:

"Como consecuencia de la rescisión unilateral del Contrato de Operación, se ordena a la empresa CRYSTALLEX INTERNATIONAL CORPORATION, previo inventario de bienes, transfiera a favor de [CVG], las instalaciones, incluyendo las obras permanentes y sus mejoras, accesorios y equipos que formen parte integral de ellas, así como los bienes muebles e inmuebles, tangibles e intangibles, afectos a los yacimientos denominados Cristina 4, Cristina 5, Cristina 6 y Cristina 7".

Cristinas for over one year "without justification".[85] The failure to obtain the Permit – an obligation of the CVG under the MOC[86] – clearly constitutes such a justification. Moreover, although there were no direct mine development activities due to a lack of the Permit, Crystallex continued with a number of activities during the past year, including completing the construction of a new medical clinic, employing people at site, providing security and medical services and complying with all the terms of the MOC. Furthermore, Clause 9.4 of the MOC provides that none of the time periods set out in the MOC begin to run until the CVG has procured the necessary environmental and mining permits,[87] such that the one year period set out in Clause 24 is not applicable in these circumstances. Moreover, as a matter of Venezuelan law, the Government cannot proceed to unilaterally rescind an administrative contract such as the MOC without providing the other party with an opportunity to be heard and present its views at a hearing.[88]

### 8.    Venezuela's failure to treat Crystallex's investments in a consistent, transparent, stable and predictable manner

81.    As illustrated above, Crystallex's efforts to obtain the Permit and begin operations at Las Cristinas have been pursued in an atmosphere of total confusion created by the conflicting signals, outright contradictions, arbitrary behaviour and lack of coordination between the various Government departments.

---

[85]    MOC, **Exhibit C-9**. Clause 24 provides that: "This contract can be unilaterally rescinded by the [CVG] without any compensation for Crystallex in the event of a delay in the initiation, paralysis of any of the activities or breach of contract for a period of one (01) year without justification." English translation. The original in Spanish reads:

> "Este contrato podrá ser rescindido unilateralmente por la [CVG] sin indemnización alguna para CRYSTALLEX, en caso de darse un retardo en el inicio, paralización de cualquiera de las actividades o incumplimiento contractual por un periodo de un (01) año sin motivo debidamente justificado."

[86]    *Ibid,* Clause 9.4.

[87]    MOC, **Exhibit C-9**. Clause 9.4 provides that: "The [CVG] will deal with matters relating to the securing of environmental and mining permits required for the execution of this Project. In all cases, time periods set out in this contract will not begin to run until the these authorizations or permits are obtained." English translation. The original in Spanish reads:

> "La [CVG] tramitará lo concerniente a la obtención de los permisos ambientales y mineros requeridos para la ejecución de este Proyecto. En todo caso los lapsos que se establecen en el presente contrato no comenzaran a computarse sino a partir de la obtención de estas autorizaciones o permisos".

[88]    These due process rights are set out in Article 49 of the Constitution of the Bolivarian Republic of Venezuela.

82.     Whilst Crystallex relied on the legal framework for its investment as well as on the assurances of support from various branches of Government throughout the permitting process and had received all the necessary approvals for the grant of the Permit, the Ministry of the Environment suddenly reversed its position and denied the Permit for no valid reason. Subsequently, at the same time that the Ministry of the Environment signalled that the denial of the Permit might be reversed, the Ministry of Mines announced that Las Cristinas would be nationalized and operated by the State. The Minister of Mines later changed his position stating that Las Cristinas would not be nationalized but rather taken from Crystallex and operated by Russian interests, despite the fact that CVG had provided Crystallex with written confirmation that the MOC remained in full force and effect. Ultimately, the President of Venezuela announced that Las Cristinas would be nationalized and developed by Venezuelan nationals. The latest position appears to be once more that the mine is to be operated as part of a joint venture with Russian interests. Finally, in February 2011, Venezuela acted on its prior threats and terminated Crystallex's MOC without prior notice or compensation.

## C.    The impact of Venezuela's Measures on Crystallex's investments

83.     Venezuela's Measures have destroyed Crystallex's investments. By ultimately denying Crystallex's request for the Permit notwithstanding its compliance with all pre-conditions established by the regulatory framework, and by unilaterally and arbitrarily terminating Crystallex's MOC, the Government has deprived Crystallex of all of the economic value of its investments.

84.     As explained below, Venezuela's Measures depriving Crystallex of its investments were taken in breach of the terms of the Treaty and Venezuelan law.[89] Crystallex accordingly respectfully requests as its primary claim the restitution of its investment, the reinstatement of the MOC and the issuance of the Permit pursuant to Article XII(9) of the Treaty (as a consequence of which Crystallex continues to retain beneficial interest in the ownership of the Las Cristinas Project) and compensation for all losses resulting from the date of the Measures to the date of full restitution.

---

[89]     *See* section III.

85.    Secondarily, in the event that Venezuela elects not to return to Crystallex its rightful investments, it must compensate Crystallex for all losses suffered as a result of the expropriation, being the value of its interest in the Las Cristinas Project. Crystallex will submit detailed evidence at the appropriate stage of the proceedings to prove the losses suffered, which it currently estimates to be in excess of US$3.8 billion. In this regard, Crystallex notes the declarations of Venezuela's President and Minister of Mines that:

> "In this way, the Venezuelan State gains control of US$30 billion, which is the current estimated [value] of the [Las Cristinas] mining reserve."[90]

> "Las Cristinas is considered one of Latin America's most important gold deposits and one of the largest in the world. With a capacity of 31 million ounces of gold, its estimated value is US$35 billion."[91]

## III.    VENEZUELA'S BREACHES OF THE TREATY

86.    Venezuela's Measures are in breach of the Treaty and international law and trigger Venezuela's State responsibility.

### A.    Venezuela has expropriated Crystallex's investment

87.    The Treaty provides that protected investments shall not be subject to expropriation or to measures having an effect equivalent to expropriation except: (a) for a public purpose; (b) under due process of law; (c) in a non-discriminatory manner; and (d) upon payment of prompt, adequate and effective compensation.

88.    Article VII(1) of the Treaty provides the following protection to Crystallex's investment:

> "Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as 'expropriation') in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory

---

[90]    Annual address to the Nation of the President of the Bolivarian Republic of Venezuela, Hugo Chavez, Federal Legislative Palace, Caracas, 13 January 2009, **Exhibit C-53**, page 79. *See* footnote 70 above. English translation. The original Spanish reads as follows: "Entonces el Estado venezolano con esto pasa a controlar 30.000 millones de dólares, que es el estimado actual del yacimiento [Las Cristinas]".

[91]    Ministry of Mines Press Release, 5 November 2008 **Exhibit C-40**, page 2. English translation. The original Spanish reads: "Las Cristinas, se constituye como uno de los yacimientos de oro más importante de América Latina y uno de los más grandes del mundo. Cuenta con una capacidad aproximada de 31 millones de onzas de oro, valoradas cerca de 35 mil millones de dólares".

manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable."[92]

89.    This obligation has been breached by Venezuela. By denying the request for the Permit after Crystallex's agreed fulfillment of all the regulatory criteria and rescinding the MOC in an arbitrary and discriminatory manner, the Government has rendered valueless Crystallex's investments in the Las Cristinas Project.

90.    The Government's Measures have deprived Crystallex of all use and economic benefits of its investments, without the payment of fair compensation, and amount to an illegal expropriation of Crystallex's investments under the terms of the Treaty and international law. Accordingly, Crystallex respectfully requests the restitution of its investment through the reinstatement of the MOC and the issuance of the Permit pursuant to Article XII(9) of the Treaty and full compensation for related losses or, in the event that Venezuela refuses to grant such restitution, full compensation for the loss of its investment.

**B.    Venezuela has failed to accord Crystallex's investment fair and equitable treatment and full protection and security**

91.    The Treaty provides that qualifying investments shall be accorded "fair and equitable treatment" and "full protection and security" in accordance with the principles of international law. Article II(2) of the Treaty provides:

"Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investments of the other Contracting Party, fair and equitable treatment and full protection and security."[93]

92.    Venezuela has breached this provision by frustrating Crystallex's legitimate expectations at the time that it made its investment by arbitrarily denying the Permit for political reasons and without due process, and by failing to provide a stable and predictable framework for Crystallex's investments.

---

[92]    Treaty, **Exhibit C-3**, Article VII(1).

[93]    Treaty, **Exhibit C-3**, Article II(2).

93.   The Ministry of the Environment's decision to deny the Permit was contrary to Crystallex's legitimate reliance on the legal framework governing its investments, including the objective conditions set out by the Government for the granting of the Permit, as well as the Government's expressed intention to exploit Las Cristinas as an open-pit mine. This decision was also contrary to Venezuelan law, as it violated Crystallex's right to due process as well as its rights to obtain the Permit in light of its fulfillment of all of the necessary criteria, including Venezuela's approval of its Environmental Impact Study, its request for and receipt of the taxes relating to the issuance of the Permit (which were never reimbursed to Crystallex) and the posting of the Bond.

94.   The Ministry of the Environment's decision was also arbitrary and without basis. Although the Director General of the Ministry of the Environment claimed that his decision was based on concerns over the protection of the environment and indigenous peoples, no explanation was provided as to how these concerns were linked to the Las Cristinas Project. Having approved Crystallex's Environmental Impact Study less than a year earlier, the Ministry of the Environment made no attempt to explain its sudden reversal of position. The Government's decision to deny the request for the Permit – after it had repeatedly acknowledged that all conditions had been met – without explanation or due process was arbitrary and contrary to the transparent and predictable framework that Crystallex legitimately expected for its investments.

95.   The CVG's decision to rescind unilaterally Crystallex's MOC was similarly arbitrary and contrary to Venezuelan law, as explained above.[94]

96.   Venezuela's Measures against Crystallex were politically motivated. With declining oil production and the rise in the price of gold, the Venezuelan Government has candidly admitted its desire to increase its stake in the country's mining sector.[95] Shortly after it denied Crystallex's Permit, the Government revoked the permit of

---

[94]   For which, *see* paragraph 80 above.

[95]   "Venezuela se apresta a revocar concesión a mina de oro", *El Universo*, 5 November 2008, **Exhibit C-41**.

another Canadian company operating a neighbouring property. This property was to be given to VenRus together with Las Cristinas.[96]

97.    The Government has cloaked these Measures under the guise of the "socialist revolution" with mining officials quoted in the press as stating that "Venezuela is taking control of the mines in order to save and take back what is ours."[97] Moreover, the Government's expressed intention to deprive Crystallex of its rights to Las Cristinas so as to grant them to Russian interests appears to be motivated by President Chavez's ambitions to strengthen Venezuela's political ties with Russia.

98.    The Government's treatment of Crystallex's investment has been inconsistent and arbitrary. Whilst the Government acknowledged repeatedly that all conditions for the grant of the Permit had been fulfilled, a few months later, it reversed its position and inexplicably denied the request for the Permit. The Government then continued to represent that the Permit may yet be issued whilst, on the other hand, threatening to nationalize Las Cristinas or take Crystallex's rights so as to grant them to Russian interests. All the while it continued to receive Crystallex's investments under the MOC without complaint, confirming that the MOC was valid and remained in force. Ultimately, it unilaterally terminated the MOC arbitrarily and in violation of Venezuelan law. This failure of the Government to provide a stable and transparent framework for Crystallex's investment constitutes a violation of the obligation to accord fair and equitable treatment under the Treaty and international law.

99.    Moreover, the conduct described above amounts to a failure to accord full legal protection and security to Crystallex's investment.

---

[96]    In May 2007 the Ministry of the Environment revoked the March 2007 Authorization for the Exploitation of Natural Resources for the Construction of Infrastructure and Services phase of the Las Brisas Project. The Las Brisas property is located nearby Las Cristinas and occupies an area of approximately 1,235 acres. The Canadian mining company Gold Reserve Inc. acquired the alluvial gold concession for Las Brisas in 1992. Gold Reserve commenced arbitration proceedings pursuant to the Treaty on 21 October 2009 under the ICSID Additional Facility Rules, claiming US$1.928 billion in damages. Within a week of filing its Request for Arbitration, on 26 October 2009 the Government seized control over Gold Reserve's Brisas concession. *See* "Gold Reserve Files International Arbitration against the Venezuelan Government", Gold Reserve Press Release, 21 October 2009, **Exhibit C-57** and "Gold Reserve Reports on Status of Brisas Property", Gold Reserve Press Release, 27 October 2009, **Exhibit C-58**. *See also* "Gold Reserve Notifies Venezuelan Government of Investment Dispute", Gold Reserve Press Release, 21 April 2009, **Exhibit C-56**, and "Inicia transición de concesión en Las Cristinas", *Correo del Caroní*, 28 October 2009, **Exhibit C-59**.

[97]    "Gobierno impedirá explotación de Imataca", *El Universal*, 23 June 2008, **Exhibit C-34**. English translation. The original Spanish reads: "Venezuela está tomando control de las minas para salvar y apropiarnos de lo que es nuestro".

**C.    Venezuela has impaired Crystallex's investments through discriminatory Measures**

100.    The Treaty provides that protected investors and investments shall not be subjected to treatment which is no less favorable than that which the State accords to its own investors or investments (***national treatment***) or to investors or investments of any third State (***most favored nation***, or ***MFN*** standard).

101.    Article III(1) and (2) of the Treaty sets out the MFN standard applicable to established investments:

> "1. Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party, treatment no less favourable than that which, in like circumstances, it grants to investments or returns of investors of any third State.
>
> 2. Each Contracting Party shall grant investors of the other Contracting Party, as regards their expansion, management, conduct, operation, use, enjoyment, sale, or disposal of their investments or returns, treatment no less favourable than that which, in like circumstances, it grants to investors of any third State […]".[98]

102.    Article IV of the Treaty sets out national treatment standard applicable to investments and investors:

> "1. Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns of its own investors.
>
> 2. Each Contracting Party shall grant to investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to its own investors with respect to the expansion, management, conduct, operation, use, enjoyment, sale or disposal of the investment or returns."[99]

103.    Venezuela has breached this provision by denying the request for the Permit and unilaterally terminating the MOC based on political considerations relating to Venezuela's assertion of sovereignty over its resources, its 'socialist revolution' in the mining sector and its desire to strengthen ties with Russia.

---

[98]    *Ibid*, Articles III(1) and III(2).

[99]    *Ibid*, Articles IV(1) and IV(2).

## IV.   THE CLAIMANT'S INVESTMENTS ARE PROTECTED UNDER THE TREATY

104.   Crystallex is a protected investor with qualifying investments under the Treaty.

105.   According to Article I(g) of the Treaty, an "investor" is:

> "(ii) any enterprise incorporated or duly constituted in accordance with applicable laws of Canada."[100]

106.   Article I(f) of the Treaty defines investments protected by the Treaty as follows:

> "[…] every kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third State, in the territory of the other Contracting Party in accordance with the latter's laws. In particular, though not exclusively, 'investment' includes:
>
> (i) movable and immoveable property and any related property rights, such as mortgages, liens or pledges;
>
> (ii) shares, stock, bonds and debentures or any other form of participation in a company, business enterprise or joint venture;
>
> (iii) money, claims to money and claims to performance under contract having a financial value;
>
> (iv) goodwill;
>
> (v) intellectual property rights; and
>
> (vi) rights, conferred by law or under contract, to undertake any economic or commercial activity, including any rights to search for, cultivate, extract or exploit natural resources.
>
> […]".[101]

107.   As a company incorporated in accordance with the laws of Canada,[102] Crystallex qualifies as a protected investor under the Treaty.

108.   Crystallex holds significant investments in Venezuela which are protected under the Treaty. By delegation of the Government, State entity CVG granted Crystallex the

---

[100]   Treaty, **Exhibit C-3**, Article I(g)(ii).

[101]   *Ibid*, Article I(f).

[102]   Certificate of Continuance and By-Law No. 1 of Crystallex International Corporation, **Exhibit C-71**. Crystallex was incorporated under the laws of the province of British Columbia and continued its existence under the federal laws of Canada on 23 January 1998.

rights to develop and exploit the gold deposits at Las Cristinas. These rights constitute a moveable asset owned in accordance with Venezuelan law, and thus fall within the general definition of a protected investment in Article I(f) (which reads "every kind of asset owned or controlled by an investor") and the specific definition of Article I(f)(i). Crystallex's rights pursuant to the MOC also fall within the meaning of Article I(f)(vi) as a "right, conferred under contract, to search for, cultivate, extract or exploit natural resources".

109.    Crystallex's registered branch in Venezuela has hired employees, contractors and suppliers to develop the Las Cristinas Project.[103] This branch is a protected investment under the general definition in Article I(f) and constitutes a "form of participation in a company, business enterprise or joint venture" under Article I(f)(ii).

## V.    THE PARTIES' CONSENT TO ARBITRATION UNDER THE TREATY AND ADDITIONAL FACILITY RULES

### A.    The requirements for access to the Additional Facility have been fulfilled

110.    Article 2 of the Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes (the *Additional Facility Rules*) and Article 1 of the Arbitration Rules set out the requirements to access arbitration proceedings under the Additional Facility. Article 2 of the Additional Facility Rules provides, in the relevant part, as follows:

> "The Secretariat of the Centre is hereby authorized to administer, subject to and in accordance with [the Additional Facility Rules], proceedings between a State (or a constituent subdivision or agency of a State) and a national of another State, falling within the following categories:
>
> (a) conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State;
>
> (b) conciliation and arbitration proceedings for the settlement of legal disputes which are not within the jurisdiction of the Centre because they do not arise directly out of an investment, provided that either the State

---

[103]    Certificate of Registration of Crystallex International Corporation C.A., 28 November 2002, supplemented by a further Certificate of Registration, 4 April 2008, **Exhibit C-24**.

party to the dispute or the State whose national is a party to the dispute is a Contracting State; [...]."[104]

111.    The relevant definitions are set out at Article 1 of the Additional Facility Rules:

"(1) 'Convention' means the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, submitted to Governments by the Executive Directors of the International Bank for Reconstruction and Development on March 18, 1965, which entered into force on October 14, 1966. [...] [(the **ICSID Convention**)]

(4) 'Contracting State' means a State for which the Convention has entered into force. [...]

(6) 'National of another State' means a person who is not, or whom the parties to the proceeding in question have agreed not to treat as, a national of the State party to that proceeding."[105]

112.    Article 1 of the Arbitration Rules provides:

"Where the parties to a dispute have agreed that it shall be referred to arbitration under the Arbitration (Additional Facility) Rules, the dispute shall be settled in accordance with these Rules, save that if any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail."[106]

113.    Thus the Secretariat is empowered to administer, in accordance with the Additional Facility Rules and the Arbitration Rules, arbitration proceedings: (1) for the settlement of legal disputes; (2) which are not within the jurisdiction of the Centre because either the State party or the State whose national is a party is not a Contracting State; (3) where there is an agreement of the parties that the dispute shall be referred to arbitration pursuant to the Additional Facility Rules; and (4) there is no applicable provision from which the parties cannot derogate which negates the jurisdiction of the ICSID Secretariat pursuant to the Arbitration Rules.

114.    All of these requirements are satisfied in this case.

---

[104]    Additional Facility Rules, Articles 2(a) and 2(b).

[105]    *Ibid*, Articles 1(1), 1(4) and 1(6).

[106]    *Ibid*, Article 1.

### 1.    There is a legal dispute

115.   There is a legal dispute arising from Venezuela's violation of Crystallex's rights under the Treaty, as set out in section III above.

### 2.    The dispute is between an ICSID Contracting State and the national of a State which is not a Contracting State

116.   The dispute is between:

> (a) Venezuela, which became an ICSID Contracting State on 1 June 1995,[107] and

> (b) Crystallex, a qualifying Canadian investor. As of the date of institution of these proceedings, Canada is not an ICSID Contracting State.[108]

### 3.    The parties agree that the dispute is to be submitted to arbitration pursuant to the Additional Facility Rules

117.   Pursuant to Articles XII(4) and (5) of the Treaty,[109] Venezuela has unconditionally consented to submit the dispute to arbitration pursuant to the Additional Facility Rules.

118.   In its Notice of Dispute delivered to Venezuela on 24 November 2008, Crystallex expressed its unconditional consent pursuant to Article XII(3) of the Treaty to submit the dispute to arbitration under the Additional Facility Rules and the Arbitration Rules in accordance with the Treaty.[110]

119.   According to Article XII(6) of the Treaty, Venezuela's consent pursuant to Article XII(5) of the Treaty, together with Crystallex's consent under Article XII(3) of the Treaty, "satisf[ies] the requirements for written consent of the parties to a dispute for the purposes […] of the Additional Facility Rules."[111]

---

[107]   Venezuela signed the ICSID Convention on 18 August 1993 and ratified the Convention on 2 May 1995. The ICSID Convention entered into force in Venezuela on 1 June 1995.

[108]   Canada signed the ICSID Convention on 15 December 2006. However, Canada has not yet deposited its instruments of ratification in accordance with Article 69(2) of the ICSID Convention. Consequently, Canada is currently not a party to the ICSID Convention.

[109]   The full text of Article XII of the Treaty is reproduced at paragraph 122, below.

[110]   Notice of Dispute, 24 November 2008, **Exhibit C-51**.

[111]   Treaty, **Exhibit C-3**, Article XII(6)(a)(i).

**4.    There are no applicable provisions from which the parties cannot derogate which negate access to the Additional Facility**

120.    In accordance with Article XII(7) of the Treaty, the law applicable to the dispute consists of the provisions of the Treaty and applicable rules of international law.

121.    At the time of submission of the Request, there are no applicable provisions which negate access to the Additional Facility. Furthermore, as explained in the section below, all of the relevant jurisdictional requirements set out under the Treaty have been met.

**B.    The access requirements under the Treaty have been fulfilled**

122.    Article XII of the Treaty contains Venezuela's offer to submit investment disputes with qualifying investors to arbitration pursuant to the Additional Facility Rules. This provision reads in its material part as follows:

> "(1) Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.
>
> (2) If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph; a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that the measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or enterprise owned or controlled directly or indirectly by the investor has incurred loss of damage by reason of, or arising out of, that breach.
>
> (3) An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:
>
> (a) the investor has consented in writing thereto;
>
> (b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind; […]

(d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.

(4) The dispute may, by the investor concerned, be submitted to arbitration under:

(a) The International Centre for Settlement of Investment Disputes (ICSID), […] provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or

(b) the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; [...]

(5) Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.

(6) (a) The consent given under paragraph (5) together with either the consent given under paragraph (3), or the consents given under paragraph (12), shall satisfy the requirements for:

(i) written consent of the parties to a dispute for purposes of Chapter II (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules; […]"[112]

123.   The requirements set out in the Treaty have been met in the present case. A dispute has arisen between Venezuela and a qualifying Canadian investor (as demonstrated in section IV above) relating to Measures taken in breach of the Treaty that have resulted in loss or damage to Crystallex (as demonstrated in sections II and III above). This dispute has not been amicably settled within a period of six months from the date on which it was initiated, pursuant to Articles XII(1) and (2) of the Treaty. Crystallex initiated this dispute by delivering its Notice of Dispute to Venezuela on 24 November 2008, more than six months ago.[113] Despite Crystallex's attempts to engage the Venezuelan Government in a constructive dialogue, Crystallex and Venezuela have been unable to resolve the dispute amicably. In these circumstances, by this Request, Crystallex is initiating arbitral proceedings.

---

[112]    *Ibid*, Article XII.

[113]    Notice of Dispute, 24 November 2008, **Exhibit C-51**.

124. In its Notice of Dispute, Crystallex expressed its unconditional consent pursuant to Article XII(3) of the Treaty to submit the dispute to arbitration under the Additional Facility Rules. Consequently, both Venezuela and Crystallex have satisfied the requirements for consent to arbitration provided at Article XII(6) of the Treaty.

125. In accordance with Article XII(4)(b) of the Treaty, arbitration pursuant to the Additional Facility Rules is available since one party (Venezuela) is a party to the ICSID Convention, as explained above.

126. In accordance with Article XII(3)(d) of the Treaty, these arbitration proceedings have been brought within three years from the date on which Crystallex first acquired knowledge of Venezuela's breach of the Treaty, and the ensuing loss or damage to its investment, which did not occur before April 2008.

127. In accordance with Article XII(3) of the Treaty, Crystallex confirms that there are no pending proceedings in relation to Venezuela's Measures before the courts or tribunals of Venezuela or in a dispute settlement procedure of any kind and unconditionally waives any right to initiate such proceedings before the courts or tribunals of Venezuela.[114]

## C. Approval of the Secretary-General

128. As set out in Article 4(1) of the Additional Facility Rules, access to arbitration is dependent on the Secretary-General's approval of the agreement providing for arbitration prior to, or at the time of, the institution of proceedings. Crystallex accordingly respectfully requests the Secretary-General's approval of the arbitration agreement established by Crystallex's acceptance (in its Notice of Dispute and this Request) of Venezuela's unconditional offer to arbitrate any dispute in relation to this investment under the Treaty pursuant to the Additional Facility Rules.[115] As required by this provision, a copy of the Treaty is attached to this Request.[116]

---

[114] Letter from Robert Crombie, President of Crystallex International to the ICSID Secretary-General, 15 February 2011, **Exhibit C-70**.

[115] The Claimant notes that this discretion was exercised in *Gold Reserve Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/09/1) and in *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/04/6), both claims under the Treaty. The exercise of this discretion would also be consistent with the 22 April 2010 decision in *Nova Scotia Power Incorporated v Bolivarian Republic of Venezuela* (UNCITRAL) in which the tribunal accepted Venezuela's argument

129.   Article 4(2) of the Additional Facility Rules sets out two conditions to be satisfied prior to the grant of approval by the Secretary-General:

> "In the case of an application based on Article 2(a), the Secretary-General shall give his approval only if (a) he is satisfied that the requirements of that provision are fulfilled at the time, and (b) both parties give their consent to the jurisdiction of the Centre under Article 25 of the Convention (in lieu of the Additional Facility) in the event that the jurisdictional requirements 'ratione personae' of that Article shall have been met at the time when proceedings are instituted."[117]

130.   Both of these conditions have been satisfied. In its Notice of Dispute, Crystallex expressly consented to the jurisdiction of the Centre under Article 25 of the ICSID Convention in the event that the jurisdictional requirements *ratione personae* of that Article had been met at the time of the institution of proceedings.

131.   Pursuant to Article XII(4) of the Treaty, Venezuela has also given its unconditional consent to arbitration pursuant to the ICSID Convention. Venezuela has, therefore, also given the consent required by Article 4(2)(b) of the Additional Facility Rules.

## VI.   CONSTITUTION OF THE ARBITRAL TRIBUNAL, APPLICABLE LAW, PLACE AND LANGUAGE OF THE ARBITRATION

132.   In accordance with Article 6(1) of the Arbitration Rules, and in light of the substantial amounts that will be involved in these proceedings, the Claimant proposes that the Tribunal be composed of three arbitrators, one arbitrator to be nominated by each party within 20 days of registration and the President to be appointed by agreement of the parties within a further period of 20 days. In the absence of agreement, the President shall be appointed in accordance with Article 6(4) of the Arbitration Rules.

133.   Pursuant to Article XII(7) of the Treaty, the Tribunal shall resolve the dispute in accordance with the Treaty and applicable rules of international law.[118]

---

that the appropriate forum for the dispute under the Treaty was the ICSID Additional Facility, and not the UNCITRAL Rules. The decision is available at http://ita.law.uvic.ca/.

[116]   The Treaty is attached at **Exhibit C-3**.

[117]   Additional Facility Rules, Article 4(2).

[118]   Treaty, **Exhibit C-3**. Article XII(7) provides:

> "A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. An

134.    Crystallex proposes New York City as the seat of the arbitration as a neutral seat, with hearings to be held for the sake of convenience at the facilities available to ICSID in Washington D.C. This is in compliance with Article XII(6) of the Treaty and Article 19 of the Arbitration Rules which provide that the arbitration shall be held in a State which is a party to the 1958 UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the *New York Convention*).[119]

135.    The Treaty is silent on the question of the language of the arbitration and the parties have not reached an agreement on this issue. The Claimant proposes English as the language of the arbitration, an official language of the Centre. The Claimant further proposes that documents, exhibits and authorities in Spanish may be submitted by the parties in the course of the proceedings without translation into English and has adopted this practice in the present Request.

## VII.    THE PARTIES

136.    Crystallex is a company constituted in Canada with its head office at:

> 8 King Street East
> Suite 1201
> Toronto
> Ontario M5C 1B5
> Canada

137.    The Claimant has duly authorized the listed signatories of this Request to institute and pursue arbitration proceedings on its behalf against Venezuela under the Arbitration Rules and the Treaty.[120]

138.    All correspondence and notices relating to this case should be addressed to:

> Nigel Blackaby
> Lluís Paradell
> Caroline Richard
> Freshfields Bruckhaus Deringer US LLP
> 701 Pennsylvania Avenue, NW
> Suite 600

---

interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal."

[119]    The United States has been a party to the New York Convention since 29 December 1970.

[120]    Power of Attorney granted by Crystallex International Corporation to the signatories of this Request, 14 February 2011, **Exhibit C-69**.

Washington, DC 20004-2692
United States of America
Tel.:   +1 202 777 4500
Fax:   +1 202 777 4555
Email: nigel.blackaby@freshfields.com
lluis.paradell@freshfields.com
caroline.richard@freshfields.com

Luis Guerrero
Wallis & Guerrero
Avenida Venezuela, Edificio El Samán, Piso 6,
El Rosal, Chacao
Caracas, Venezuela.
Tel: + 58 212-953 4554, +58 212-952 2844.
Fax: +58 212-953 2498
Email: luguero2002@yahoo.com

Eduardo Travieso Uribe
Travieso Evans Arria Rengel & Paz
Edificio Atlantic, Piso 6
Avenida Andrés Bello
Los Palos Grandes
Caracas 1060 – Venezuela
Tel: +58 212 918 33 33
Fax : +58 212 918 33 34
Email: etu@traviesoevans.com

139.    ICSID is respectfully requested to serve copies of this Request for Arbitration on the
Respondent at each of the following addresses:

His Excellency Mr Hugo Chávez Frías
President of the Bolivarian Republic of Venezuela
Palacio de Miraflores
Despacho del Presidente de la República
Avenida Urdaneta
Caracas – 1010
Venezuela

Ms Gladys María Gutiérrez Alvarado
Attorney General for the Bolivarian Republic of Venezuela
Paseo los Ilustres c/c Av Lazo Marti
Edificio Sede Procuraduría General de la República
Santa Mónica
Caracas – 1040
Venezuela

Minister José Khan
Minister of Basic Industry and Mining
Ministerio del Poder Popular para las Industrias Básicas y Minería
Av. La Estancia
Torre las Mercedes, piso 9
Urb. Chuao, Caracas – 1060
Venezuela

## VIII.   THE CLAIMANT'S REQUEST FOR RELIEF

140.   On the basis of the foregoing, without limitation and reserving the Claimant's right to supplement these prayers for relief in accordance with Article 47 of the Arbitration Rules, the Claimant respectfully requests that the Tribunal:

   (a)   DECLARE that:

     (i)   Venezuela has breached Article VII(1) of the Treaty by expropriating the Claimant's investments in Venezuela;

     (ii)   Venezuela has breached Article II(2) of the Treaty by failing to accord the Claimant's investments in Venezuela fair and equitable treatment, and full protection and security;

     (iii)   Venezuela has breached Articles III(1), III(2) and IV of the Treaty by impairing the Claimant's investments in Venezuela through discriminatory measures;

   (b)   ORDER the restitution by Venezuela of Crystallex's investments, including the reinstatement of the MOC and the issuance of the Permit together with compensation to Crystallex for interim losses suffered since April 2008 or, alternatively;

   (c)   ORDER Venezuela to compensate the Claimant for its breaches of the Treaty in an amount to be determined at a later stage in these proceedings, plus interest until the date on which full payment of the award is made;

   (d)   AWARD such other relief as the Tribunal considers appropriate; and

   (e)   ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimant's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's Additional Facility costs.

Respectfully submitted on the 16 day of _february_ 2011 by

Nigel Blackaby
Lluís Paradell
Caroline Richard
FRESHFIELDS BRUCKHAUS DERINGER US LLP

Luis Guerrero
Wallis & Guerrero

Eduardo Travieso Uribe
Travieso Evans Arria Rengel & Paz

for the Claimant