**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | ) ) ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:16-cv-00661-RC |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) | |
| Respondent. | ) ) | |

**BOLIVARIAN REPUBLIC OF VENEZUELA'S MOTION TO VACATE ARBITRAL
AWARD (ORAL ARGUMENT REQUESTED)**

Respondent the Bolivarian Republic of Venezuela ("Venezuela"), by and through

undersigned counsel, hereby moves this Court for an order vacating the arbitral award issued on

April 4, 2016 in the arbitration *Crystallex International Corporation v. Bolivarian Republic of

Venezuela*, ICSID Case No. ARB(AF)/11/2, conducted under the auspices of the Additional

Facility of the International Centre for Settlement of Investment Disputes, the same award that

Petitioner is seeking to have confirmed in this action ("Award").  For the reasons set out in detail

in the attached Memorandum of Points and Authorities in Support of this Motion, the Court

should vacate the Award on the grounds that:

*1.*  The arbitration tribunal that issued the Award ("the Tribunal") exceeded its powers by:

(a) basing part of the Award on contract claims that are outside the scope of Venezuela's

consent to arbitration; and (b) calculating damages by reference to a date other than the

date required by the governing treaty and by incorporating into its valuation assumptions

that it had already rejected as unrealistic and speculative.  9 U.S.C. § 10(a)(4).

*2.* For the same reasons, the Tribunal manifestly disregarded the law.  *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

Respectfully submitted,

BOLIVARIAN REPUBLIC OF
VENEZUELA

By its attorneys,

/s/ *Lawrence H. Martin*
Lawrence H. Martin (D.C. Bar # 476639)
lmartin@foleyhoag.com
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 232-1200
Facsimile:  (202) 785-6687

Dated: July 5, 2016

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>Petitioner,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:16-cv-00661-RC |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENT
BOLIVARIAN REPUBLIC OF VENEZUELA'S MOTION TO VACATE ARBITRAL
AWARD (ORAL ARGUMENT REQUESTED)**

## I. INTRODUCTION

Pursuant to section 10 of the Federal Arbitration Act, the Bolivarian Republic of Venezuela ("Venezuela") hereby respectfully requests that this Court enter an order vacating an arbitral award (the "Award") that was rendered in favor of Crystallex International Corporation ("Crystallex") on April 4, 2016 by an arbitral tribunal (the "Tribunal") constituted under the bilateral investment treaty between Venezuela and Canada (the "BIT" or the "Treaty").

As set out in detail below, the Award should be vacated for the following reasons.

*First*, Article XII of the BIT sharply confines the jurisdiction of tribunals constituted thereunder to the arbitration of claims for breach of the Treaty. All other disputes—including contractual disputes between the States Parties to the Treaty and foreign investors—fall outside the consent to arbitration and thus outside the jurisdiction of a tribunal. Nonetheless, the Tribunal proceeded to arbitrate claims against Venezuela even though they are quintessential

contract claims falling under the mining contract that a Venezuelan state entity had entered into with Crystallex. The Tribunal's exercise of jurisdiction was particularly egregious because the relevant contract had an exclusive forum selection clause that required all disputes to be submitted to Venezuela's domestic courts.

*Second*, after erroneously determining that Venezuela was liable, the Tribunal proceeded to determine the amount of damages in a way that contravenes the express requirements of the Treaty.  In that regard, Article VII of the BIT mandates that valuation be determined as of the date immediately prior to the allegedly expropriatory action.  The Tribunal agreed with Venezuela that the relevant date is April 13, 2008.  However, when it came to actually applying the methodology for calculating damages, the Tribunal used a date nine months earlier: June 14, 2007.  Because that earlier date coincided with a temporary spike in Crystallex's market capitalization, attributable to a misleading public announcement by Crystallex, using it for calculating damages artificially inflated the amount that Venezuela owed by hundreds of millions of dollars.

*Third*, the Tribunal compounded its error in determining damages by incorporating into the methodology it employed assumptions regarding the potential productivity of Crystallex's contemplated mining activities even though it had elsewhere expressly rejected those very assumptions as unrealistic and speculative.

Each of these errors warrant vacating the Award because, in making them, the Tribunal "exceeded [its] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," 9 U.S.C. § 10(a)(4), and because the Tribunal manifestly disregarded the law.  *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

## II. BACKGROUND

**1.      The international investor-State arbitration regime**

Investor-State dispute settlement, or "ISDS," is a public international law adjudication regime that grants a foreign investor investing in a foreign host State the right to bring claims against the State in a private, neutral dispute settlement proceeding. Conceived as a method to de-politicize the type of investment disputes—usually involving expropriation of property—that had once been the purview of diplomatic channels, ISDS involves the extraordinary waiver of a State's sovereign immunity before a foreign arbitral tribunal. States therefore carefully express and limit the scope of their consent for what types of disputes they permit to be arbitrated. In investor-State arbitration, the parties' consent to international arbitration often stems from bilateral investment treaties concluded between two sovereign States, such as the Venezuela-Canada Treaty at issue in this case.

State Parties to bilateral investment treaties negotiate these treaties carefully and include specific definitions and conditions pertaining to the nature of the investors and the investments that will be protected under the treaty and—critically—the scope of the dispute settlement clause contained in the treaty. In order for a tribunal to have jurisdiction over a dispute between a host State and a foreign investor under the international investment treaty, the dispute in question must comply with all the conditions expressly set forth in the treaty, and it must fall within the coverage of the dispute settlement clause.  Otherwise, the sovereign State Party to such treaty cannot be deemed to have consented to arbitration of the dispute.

One such condition on consent to arbitration is typically that arbitration is confined solely to claims arising from alleged breaches of the investment protections set out in the treaty itself. In other words, not all disputes between an investor and a host State are subject to arbitration, even where an investment treaty is present.  For example, claims arising out of the alleged breach

of an investment contract between the investor and the host State are not arbitrable under many investment treaties. This gives rise to a distinction in investor-State arbitral jurisprudence between treaty claims and contract claims. Contract claims are excluded from arbitration under many investment treaties.[1]

## 2.      Facts

In September 2002, Crystallex entered into a Mine Operating Contract ("MOC") with the Corporación Venezolana de Guayana ("CVG"), a Venezuelan state-owned company charged with the economic development of the Guayana region of Venezuela. The MOC permitted Crystallex to explore certain mining concessions, known collectively as "Las Cristinas," (which were owned by the Republic of Venezuela through its Ministry of Mines), and to develop and operate a gold mine on those concession for an original term of twenty years. Exhibit A, Affidavit of Kenneth Juan Figueroa ("Figueroa Aff.") ¶ 8.

In exchange for these limited rights to develop the Las Cristinas gold deposit, Crystallex agreed to, *inter alia*:

- Abide by Venezuela's mining laws and environmental standards;

- Prepare, submit, and obtain approval of required studies (including a Feasibility Study and an Environmental Impact Study), responding to the objectives of the MOC;

- Fulfill all environmental regulation "[b]efore beginning any project activities;"

- Obtain and supply to the CVG "the technical information […] for the processing of the environmental permits necessary for the operation of the mine"; and

- Provide technical assistance, including to local artisanal mining groups and students/trainees in the area. Figueroa Aff. ¶ 9.

---

[1] The implications of this are discussed in greater detail in *infra* section III(1)(a)(ii).

4

Crystallex's ability to develop the mine at Las Cristinas was conditioned upon its obtaining an Environmental Permit from the Ministry of the Environment and the MOC included an explicit acknowledgment of the parties' responsibility to "comply[ ] with certain regulations on environmental protection and improvements especially those involving the control of environmental impact of mining activities and the rectification, recovery and improvement of the areas where it is undertaking its activities." Figueroa Aff. ¶ 10.

The MOC provided the CVG with the right to unilaterally rescind the contract without compensation "in the event of delay in commencement, halting of activity or contractual breach for a period of one (1) year without due justification." Furthermore, the MOC expressly provided in Clause 19 that any disputes were to be resolved by the competent tribunals of the Bolivarian Republic of Venezuela, in accordance with its laws, and that parties expressly renounced claims before any foreign tribunals. Figueroa Aff. ¶ 11.

Between entering the MOC in September 2002 and April 2008, Crystallex failed to develop an operating mine at Las Cristinas. Crystallex had over the course of that period submitted to the Ministry of Mines and/or made public to its shareholder a number of different feasibility studies with different conceptions and operational features for the mine, including varying operational time-frames and varying production capacities. While the Ministry of Mines ultimately approved a feasibility study, Crystallex continued to make significant changes to the feasibility studies which it subsequently presented to the market. Figueroa Aff. ¶ 12.

Crystallex was also unable to secure an Environmental Permit from Venezuela's Ministry of the Environment. The Ministry of the Environment on repeated occasions stated its concerns regarding the environmental impact of Crystallex's operational plans, including its impact on the protected fauna and flora in the region, the local population, and its cumulative impact, taking

into account the operations of another mine in a neighboring concession. The Ministry of Environment on repeated occasions requested information responsive to those concerns, including a Joint Environmental and Social Impact Study with the company operating the neighboring concession. In response to those requests, Crystallex provided only partial, incomplete and inconsistent information, and it never provided the requested joint study. Figueroa Aff. ¶ 13.

Ultimately, in April 2008, the Ministry of the Environment denied Crystallex's application for an Environmental Permit. Three years later, in February 2011, in light of Crystallex's failure to obtain an Environmental Permit, and its failure to develop or commence operations of the mine, the CVG rescinded the MOC pursuant to its contractual rights. Figueroa Aff. ¶ 14.

Crystallex, relying upon a pro forma request made in May 2007 by the Ministry of the Environment to pay a bond and certain environmental taxes prior to a final decision on the issuance of the Permit, claimed that it understood the Ministry to have approved its Permit request. Crystallex claimed that it legitimately expected to receive the Permit within a few days (notwithstanding the lack of any factual or legal basis for this expectation). Furthermore, Crystallex claimed that the denial of the Environmental Permit and subsequent rescission of the MOC was part of a broader political conspiracy to remove it from Las Cristina without cause. Figueroa Aff. ¶ 15.

Crystallex claimed damages of US$3.16 billion, based on an average of four different damages methodologies. These methodologies were: (1) the P/NAV Approach which purported to assess the net asset value of Crystallex and adjust it by a multiple derived from allegedly "comparable" gold companies, which resulted in a figure of US$2.813 billion; (2) the Market

Multiples Approach, which purported to estimate Crystallex's value by reference to a "multiple" derived from the enterprise value-to reserve equivalents of "comparable" mining companies, which resulted in a figure of US$ 2.749 billion; (3) the Stock Market Approach, which purported to derive Crystallex's value by reference to Crystallex's stock market price as of June 14, 2007, building up a counter-factual stock price as of that date through the valuation date, and which resulted in a figure of US$2.833 billion; and (4) the Market Transaction Valuation or "Indirect Sales Comparison," which purported to estimate the value of Crystallex based on "comparable" transactions involving mine acquisitions under certain "built up" assumptions and "adjustments." Three of the four methodologies, the P/NAV approach, the Indirect Sales Comparison, and the Stock Market Approach, have never been adopted by an arbitral tribunal in an investment dispute under modern bilateral investment treaties. Figueroa Aff. ¶ 16.

Venezuela objected to the jurisdiction of the arbitral tribunal, arguing, *inter alia*, that Crystallex's allegations were based on a contractual dispute under the MOC, and thus were not cognizable as violation of the Treaty (which did not have a so-called umbrella clause permitting resolution of contractual disputes with the State or its entities). Figueroa Aff. ¶ 17.

With regard to the merits of the dispute, Venezuela presented evidence of the legitimate concerns expressed by its Environment Ministry and Crystallex's failures in responding to those concerns in a full and adequate manner. It further presented evidence that the rescission of the MOC was effected by CVG pursuant to its contractual rights and not, as Crystallex alleged, by the State in its sovereign capacity. Finally, with respect to damages, Venezuela demonstrated the weaknesses in each of the methodologies presented by Crystallex and objected to certain aspects of these methodologies which contravened the express requirements of the Treaty. For example, Crystallex advocated for the use of the so-called Stock Market Approach, whereby the value of

Crystallex's interest in the MOC would be determined by reference to Crystallex's stock market price. However, in addition to the inherent defects of such a methodology, Venezuela observed that this methodology failed to use the valuation date specifically prescribed by the Treaty. In addition, Venezuela observed that all of the methodologies—and in particular the Indirect Sales Comparison and the Market Multiples Approach—relied on speculative assumptions which did not meet international legal standards, pursuant to which Crystallex had the burden of proving its damages to reasonable certainty. Figueroa Aff. ¶ 18.

On 25 July 2014, subsequent to the hearing on the merits and jurisdiction, and the filing of post-hearing briefs by the Parties, the Tribunal invited the Parties to file one further round of submissions, with related evidence and expert reports, in connection with certain questions raised by the Tribunal concerning quantum. Venezuela strenuously objected that this request was in violation of its due process, since Venezuela had repeatedly raised the very same issues addressed by the Tribunal's questions and Crystallex repeatedly refused to respond to them. Venezuela objected that Crystallex had thus failed to meet its burden of proof and should not be given an unlimited opportunity to plead its case. Further to its objection, and without prejudice to it, Venezuela requested that to the extent the Tribunal accepted the new quantum material, that an additional hearing be held on these new quantum submissions. Following the parties joint supplemental submission on quantum, the additional hearing was held in Paris, France, on November 22, 2014. Figueroa Aff. ¶ 23.

On April 4, 2016, the Arbitral Tribunal issued its award. The Tribunal rejected Crystallex's claim of a violation of Full Protection and Security, although it determined that Venezuela had not complied with the Treaty's requirement of Fair and Equitable Treatment and further determined that the denial of the Environmental Permit and subsequent rescission of the

MOC constituted a creeping expropriation of Crystallex's contractual rights without compensation. With respect to damages, the Tribunal rejected two of the four methodologies presented by Crystallex. However, it adopted the Stock Market Approach (utilizing a reference date other than the valuation date) and the Market Multiples Approach (which relied on speculative assumptions rejected by the Tribunal in other parts of the Award). Notably, the calculations adopted by the Tribunal were those submitted by Crystallex in the supplement submissions on quantum, over Venezuela's objections. The Tribunal calculated valuations under each of the two referenced approaches and determined the award damages by simply averaging those amounts determined by each approach, resulting in an award of US$1.2 billion. Figueroa Aff. ¶ 27.

**3.      The Tribunal's Flawed Award**

The Award issued by the Tribunal is fatally flawed in two respects.  First, it is based on claims that are fundamentally contractual in nature, and thus outside of the scope of consent to arbitration.  Second, it awarded damages using a methodology that ignores the express requirement of the Treaty.

a.      <u>The Tribunal incorrectly assumed jurisdiction over quintessentially contractual claims.</u>

In its Award, the Arbitral Tribunal wrongly determined it had jurisdiction over the claims related to the rescission of the Mining Operation Contract ("MOC"). D.E. 2-1, Award, ¶¶ 482-3. Crystallex had claimed that Venezuela, through the MOC's rescission via an administrative resolution, expropriated and mistreated Crystallex's investments in breach of the BIT. *Id.* ¶ 467. However, the MOC was rightfully rescinded according to its own terms by Crystallex's contractual partner, the CVG.  Moreover, the MOC contained an exclusive forum selection

clause. In particular, Clause 19 of the MOC excluded the Arbitral Tribunal's jurisdiction over the

MOC claims as it provided:

> The uncertainties and controversies of any nature that might arise from the <u>execution of this Contract</u> and that may not be resolved in an amicable manner by the Parties shall be resolved by the competent tribunals of the Bolivarian Republic of Venezuela, in accordance with its laws, <u>and they may not give rise to claims before foreign tribunals</u>.

*Id.* ¶ 478, emphasis added.

During the arbitration, Venezuela objected to the Tribunal's jurisdiction arguing, *inter alia*, that Crystallex's claims with regard to the rescission of the MOC were contractual in nature and were thus not covered by the Treaty. *Id.* ¶ 459. Venezuela also argued that Crystallex sought to elevate an alleged contractual violation by the CVG into a treaty claim despite the clear absence of an umbrella clause in the Treaty. *Id.* However, the Treaty's Article XII provides that solely disputes arising from "a breach of *this* Agreement" [i.e. this *Treaty*] may be submitted to arbitral tribunals constituted under the Treaty. D.E. 2-2, Treaty, Art. XII (emphasis added). International tribunals have recognized that they lack jurisdiction to hear claims where "the essential basis of a claim brought before an international tribunal is a breach of contract," and there is a "valid choice of forum clause in the contract. *Compañia de Aguas del Aconquija S.A. and Vivendi Universal v. The Argentine Republic* (Vivendi I), ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 98; *Woodruff Case,* American-Venezuelan Mixed Commission, 1903, Reports of International Arbitral Awards, vol. IX, p. 213

Further, Venezuela argued that Crystallex labelled its claims related to rescission of the MOC as treaty claims but in reality, its factual allegations demonstrated that the claims were essentially "based on the provisions and obligations found in the contract." D.E. 2-1, Award, ¶ 460. For example, in its Memorial, Crystallex complained that "[w]hen terminating the MOC,

the CVG failed to comply with the very terms of the agreement itself" and that the rescission of the MOC was contrary to Venezuelan law. Crystallex essentially complained that the rescission of the MOC by the CVG "was plainly illegitimate." Figueroa Aff. Exh. 3, Rejoinder, ¶ 318. As Venezuela observed during the arbitration, the dispute as raised by Crystallex ultimately rested on an interpretation of the MOC and each party's rights and obligations thereunder.  In other words, the dispute rested on purely contractual issues.

In any case, Venezuela submitted that Crystallex's allegations of non-compliance with the contract could not be converted into an investment BIT dispute because the CVG, when it decided to rescind the MOC, acted as a "contracting partner, and not pursuant to its delegated sovereign authority as an instrumentality of Venezuela", and Crystallex failed to prove that the rescission had been an act of "*puissance publique*."  D.E. 2-1, Award, ¶ 461. Instead, Crystallex attempted to rely on an agreement between other parties signed years after its dispute arose to show that the CVG's rescission was a "sovereign" act.  Figueroa Aff. Exh. 3, Rejoinder, ¶¶ 321-322; D.E. 2-1, Award, ¶ 461.

Venezuela observed that Clause 19 of the MOC cited *supra* is a mandatory exclusive forum selection clause in favor of the Venezuelan courts for all disputes relating to the MOC. Venezuela noted the international jurisprudence that disallows claims where "by the very agreement that is the fundamental basis of the claim, it was withdrawn from the jurisdiction of" the tribunal. Figueroa Aff. Exh. 2, Counter-Memorial, ¶ 343 (citing *Compañia de Aguas del Aconquija S.A. and Vivendi Universal v. The Argentine Republic (Vivendi I)*, ICSID Case No. ARB/97/3 Decision on Annulment, ¶ 100, 3 July 2002 (quoting the *Woodruff Case*, American-Venezuelan Mixed Commission, 1903, Reports of International Arbitral Awards, vol. IX, p. 213)). The inclusion of an exclusive jurisdiction clause in the MOC effectively constituted a

waiver depriving the Arbitral Tribunal of jurisdiction over Crystallex's claims related to the contract. According to the express terms of Clause 19, claims "of any nature" relating to the MOC could not be arbitrated before a "foreign" tribunal, which would include all tribunals outside of Venezuela. *Id.* ¶¶ 462-3. Venezuela cited to the holding in *SGS v. Philippines* (ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004, ¶¶ 154-5) that, if "expressly provided," a contract can waive a tribunal's treaty jurisdiction and that a tribunal should not accept jurisdiction over a contractual claim "when the parties have already agreed on how such a claim is to be resolved, and have done so exclusively." Venezuela argued that Clause 19 of the MOC evidenced the parties' agreement to resolve disputes regarding the MOC exclusively before the courts of Venezuela. D.E. 2-1, Award, ¶ 464.

The Tribunal wrongfully rejected Venezuela's jurisdiction objection. *Id.* ¶ 483. Ignoring the CVG's role as a contractual party separate from the State of Venezuela, and the lack of an umbrella clause in the Treaty, the Tribunal concluded that the MOC claims were treaty-based and met the requirements set forth in Article XII of the BIT. *Id.* ¶ 476.

The Tribunal's erroneous decision to exercise jurisdiction stands in stark contrast to other tribunals faced with similar issues. Another international tribunal recently refused to hear a claim for sunk costs based on a contractual provision because it was a "mere contractual right" and the claimant "was largely aware of the existing challenges and made strategic choices for which it has to bear responsibility" when negotiating the agreements. *Oxus Gold plc v. Republic of Uzbekistan*, UNCITRAL, Final Award, 17 December 2015, ¶ 398.  As in *Oxus Gold*, Crystallex was fully aware of the terms of the MOC it entered into with the CVG to gain valuable rights in Venezuela. Crystallex knew if it did not fulfill its commitments, its contractual partner could rescind the MOC. Further, disputes "of any nature" regarding the performance of the MOC

would have to be submitted to Venezuelan courts. The Tribunal thus wrongly concluded that Clause 19 of the MOC did not exclude its jurisdiction over the claims presented, allowing Crystallex to bypass the agreed-to forum for resolving its contractual dispute with the CVG. D.E. 2-1, Award, ¶¶ 480–82.

       b.    <u>The Tribunal adopted a valuation date that is contrary to the requirement of the Treaty.</u>

The Tribunal compounded its error in exercising jurisdiction by, after finding that Venezuela was liable, calculating damages in a manner in contravention of an express provision of the Treaty.   In that regard, over Venezuela's objection, the Tribunal adopted two of Crystallex's proposed methodologies for calculating compensation[2] and determined the final damages award of approximately US$ 1.2 billion by calculating the average of the amounts determined by each approach.   In so doing, the Tribunal adopted a methodology that applied a reference date that was different than the valuation date expressly required by the Treaty. Further, the Tribunal employed a second methodology that had imbedded in it assumptions that were already rejected as speculative by the Tribunal.

       (i)    The Tribunal Did Not Use the Valuation Date Mandated by the Treaty and International Law.

Article VII of the BIT provides that any compensation awarded "shall be based on the genuine value of the investment or returns expropriated *immediately before* the expropriation or

---

[2] Crystallex presented four valuation methodologies and based its damages claim of US$ 3.16 billion on the average of the amounts derived from each of those methodologies: (1) the P/NAV Approach, never before adopted by an arbitral tribunal, which purported to assess the net asset value of Crystallex and adjust it by a multiple derived from "comparable" gold companies, which resulted in a figure of  US$2.813 billion; (2) the Market Multiples Approach, which estimates Crystallex's value by reference to "multiple" derived from the enterprise value-to reserve equivalents of "comparable" mining companies, which resulted in a figure of US$ 2.749 billion; (3) the Stock Market Approach, discussed in further detail below, which resulted in a figure of US$2.833 billion; and (4) the Market Transaction Valuation or "Indirect Sales Comparison", also never before adopted by an arbitral tribunal, which purports to estimate the value of Crystallex based on "comparable" transactions involving mine acquisitions under certain "built up" assumptions.  D.E. 2-1, Award, ¶¶ 764-766; 771-783, 793-799, 804-814, 818-829.

at the time the proposed expropriation became public knowledge, whichever is earlier."  This provision mirrors similar clauses in nearly all other investment treaties.[3]  NAFTA's Investment Chapter, for example, provides:  "Compensation shall be equivalent to the fair market value of the expropriated investment *immediately before* the expropriation took place ("date of expropriation"), and shall not reflect any change in value occurring because the intended expropriation had become known earlier."[4]  Similarly, bilateral investment treaties to which the United States is a party also provide that the value of compensation should be determine with reference to the date immediately prior to the expropriation or other alleged wrongful measure.[5]

---

[3] *See* Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, Article 5 ("Such compensation shall amount to the genuine value of the investment expropriated immediately before the expropriation […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/2375; Agreement between the Czech Republic and the Republic of Venezuela for the Promotion and Reciprocal Protection of Investments, Article 5 ("Such compensation prompt, adequate and effective compensation shall amount to the market value of the investment expropriated immediately before the expropriation […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/998; Agreement between the Government of the Republic of Lithuania and the Government of the Republic of Venezuela on the Promotion and Protection of Investments, Article 4 ("The compensation […] shall be equivalent to the market value of the expropriated investments immediately before the expropriation occurred […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/1930; Agreement between the Government of the Republic of Estonia and the Government of the Kingdom of Denmark Concerning the Promotion and Reciprocal Protection of Investments, Article 5 ("Such compensation shall amount to the market value of the investment expropriated immediately before the expropriation […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/1004; Treaty Concerning the Reciprocal Encouragement and Protection of Investments between the Federal Republic of Germany and Bulgaria, Article 4 ("Such compensation shall be equivalent to the value of the investment expropriated immediately before the date the expropriation […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/529; Agreement between the Republic of Croatia and the Kingdom of Spain on the Promotion and Reciprocal Protection of Investments, Article V ("Such compensation shall amount to the market value of the expropriated investment immediately before the expropriation […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/889.

[4] NAFTA, art. 1110(2)

[5] *See* Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment, Article III ("Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/1065; Treaty between the United States of America and the Oriental Republic of Uruguay Concerning the Encouragement and Reciprocal Protection of Investment, Article 6 ("The compensation […] shall: (a) be paid without delay; (b) be equivalent to the fair market value of the expropriated investment immediately before the expropriation took place […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/2380; Treaty between the United States of America and

This treaty language is consistent with the customary international law principle of full reparation, pursuant to which a State that has breached its international obligations to another State must "wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed." *Factory at Chorzów*, Merits, Judgment No. 13, 1928, P.C.I.J., Series A, No. 17, p. 47.   For example, in *Kuwait v. Aminoil*, an *ad hoc* arbitration involving a dispute arising from the nationalization of an oil and gas concession, the tribunal, applying customary international law[6], adopted the date of the nationalization decree as the proper valuation date.   *The Government of the State of Kuwait v. The American Independent Oil Company*, Award  (March 24, 1982),  21 International Legal Materials 976.   Accordingly, even in investor-State cases involving non-expropriatory breaches, the rule is that the valuation date is the date of, or immediately before, the wrongful State conduct, or the date in which such State conduct has "ripened" to an irreversible deprivation of the investment. *See Asian Agricultural Products Ltd. v. Republic of Sri Lanka,* ICSID Case No. ARB/87/3,, Award, June 27 1990, ¶¶ 96-97, 106-07; *Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12,, Award, July 14, 2006; ¶ 417; *CMS Gas Transmission Company v. The Republic of Argentina,* ICSID Case No. ARB/01/8,, Award, May 12, 2006, ¶ 441.

---

the Government of the Hashemite Kingdom of Jordan Concerning the Encouragement and Reciprocal Protection of Investment, Article III ("Compensation shall be paid without delay; be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/1776; Treaty between the United States of America and the Government of the Republic of Croatia Concerning the Encouragement and Reciprocal Protection of Investment, Article III ("Compensation shall be paid without delay; be equivalent to the fair market value of the expropriated covered investment immediately before the expropriatory action was taken […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/897; Treaty between the United States of America and the Argentine Republic Concerning the Reciprocal Encouragement and Protection of Investment, Article IV ("Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken […]"), available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/127.

[6] The arbitration was commenced in accordance with an arbitration agreement between the parties and was not based on a treaty.  *The Government of the State of Kuwait v. The American Independent Oil Company*, Award  (March 24, 1982),  21 International Legal Materials 976.

This valuation date mirrors U.S. law on damages, which has as its purpose to place the injured party in the same position he would have been prior to the wrongful act. The requirement of a valuation date for damages that falls immediately prior to the alleged treaty breach is also consistent with international accounting practices, pursuant to which a valuation date is selected based on the occurrence of an "economic event" (e.g. an expropriation or other State action). Figueroa Aff. Exh. 4, Supplemental Report of Timothy H. Hart, CPA, CFE (Sept. 17, 2013), ¶ 15. In the assessment of damages, accounting experts thus calculate impairment or loss as of the day prior to the "first bad act." *Id.*

In the investor-state context, the rationale for a valuation date "immediately prior" to the alleged offensive measure is two-fold. First, absent special circumstances, it prevents a tribunal from taking into account as part of its damages assessment information concerning the value of the investment *after* the valuation date. As a general rule, such *ex post* value would have been negatively affected by the State action which is the subject of dispute and its incorporation in a damages assessment would violate the customary international law norm that "the value of property or contract rights must not be affected by the unlawful act that removed those rights." *Amco c. Indonesia II*, Award on the Merits, ¶ 187 (May 31, 1990); *see also* Figueroa Aff. Exh. 8, Sergey Ripinsky & Kevin Williams, *Damages in International Investment Law*, British Institute of International and Comparative Law (2008), § 6.3.4(c), pp. 253-259.

Second, the value of the subject investment may fluctuate over time due to a number of causes wholly independent of any State action. This may include, for example, general political conditions, poor management, market upheaval, labor disputes, or operational problems. As the Iran-U.S. Claims Tribunal observed:

> Prior changes in the general political, social and economic conditions which might have affected the enterprise's business prospects as of the date the enterprise was taken should be considered [in determining damages].

*American International Group, Inc. and American Life Insurance Company, v. Islamic Republic of Iran and Central Insurance of Iran (Bimeh Markazi Iran)*, Iran-United States Claims Tribunal, Award, 19 December 1983, 4 Iran-US Claims Tribunal Reports 96, 107-08.

The requirement of a valuation date "immediately prior" to any alleged wrongful State action thus seeks to ensure that any compensation awarded for damages is based on the loss that can reasonably be said to have been caused by the State measure.  To value an investment at any other date not only disregards the specific terms expressly negotiated by the State Parties to an investment treaty, but also risks providing an investor with an unjustified windfall.  Accordingly, tribunals will generally only look at dates other than the date immediately prior to the relevant State action where there is little or no evidence of the investment on the proper valuation date (which was not the case with respect to Crystallex).  *See* Figueroa Aff. Exh. 8, Ripinsky & Williams, § 6.3.4(b), pp. 252-253.   Even in those circumstances, tribunals have normally discounted or rejected damages based on *ex ante* information far removed from the State conduct at issue and the proper valuation date.  See *Faith Lita Khosrowshahi v. Iran*, Award (June 30, 1994), 30 Iran-U.S. CTR, ¶¶ 47-52, 78; *James M. Saghi v. Iran*, Award (January 22, 1993) 29 Iran-U.S. CTR 20, ¶¶ 91-105; *Sola Tiles v. Iran*, Award (April 22, 1987, 14 Iran-U.S. CTR 223; *see also* Figueroa Aff. Exh. 8, Ripinsky & Williams, § 6.3.4(b), pp. 252-253.

In the underlying arbitration the parties agreed on the general principle that the valuation date should be the date immediately before the alleged expropriation, but disagreed on what date that should be.  Crystallex argued that the valuation date should be February 3, 2011, the date immediately prior to the MOC Rescission, based on the thesis that this is the date immediately prior to the date on which Crystallex allegedly lost the totality of its investment. D.E. 2-1,

Award, ¶ 734.  Venezuela, however, argued that, assuming *arguendo* and for the sole purposes of damages, that Crystallex allegations of liability were correct, then the appropriate valuation date was April 13, 2008, the date immediately prior to the date on which the Ministry of the Environment issued its decision denying Crystallex its Environmental Permit.  *Id.* ¶ 746.[7]  The denial of the Environmental Permit was the first alleged wrongful measure that would have deprived Crystallex's of its investment.  *Id.*   In its Award, the Tribunal agreed with Venezuela and adopted April 13, 2008 as the appropriate valuation date. *Id.* ¶ 855.

One of the two valuation approaches adopted by the Tribunal was the Stock Market Approach.[8]  Under this approach, Crystallex's value was determined by reference to the value of its stock on a given date. Assuming the stock market approach was a viable damages approach (which it is not), that reference date, as was argued by Venezuela during the hearing, should have been the April 13, 2008 valuation date.  Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela, October 31, 2014, ¶ 66.

Crystallex, however, proposed an approach whereby the reference date for Crystallex stock market prices was not the valuation date (as required by the Treaty), but rather an arbitrary date chosen by Crystallex as the so-called "last clean date."   D.E. 2-1, Award, ¶¶ 807. Specifically, Crystallex argued that by February 3, 2011, the date of MOC Rescission, the alleged delay in issuance of the Environmental Permit and its subsequent denial would have already been considered by the market and negatively affected Crystallex's stock market price. *Id.*  The same principle would apply to an April 2008 valuation date because, according to

---

[7] Crystallex proposed valuation date was strategic in nature as it artificially inflated damages by incorporating the elevated price of gold in 2011, which was significantly higher than the price of gold in 2008.  Figueroa Aff. Exh. 4, Supplemental Report of Timothy H. Hart, CPA, CFE (Sept. 17, 2013), ¶ 16.

[8] D.E. 2-1, Award, ¶ 889-895.

Crystallex, its stock market price would have been negatively affected by market concerns that the Ministry of Environment was taking longer than expected to issue an Environmental Permit. *Id.*

Crystallex thus proposed using as a reference date June 14, 2007 (i.e., *9 months prior* to any of the measures at issue in the arbitration).   *Id.*   On that date, Crystallex announced and represented to the market that it had completed its filing requirements for the issuance of the Environmental Permit.  *Id.* ¶¶ 227, 807.[9]  Notably, the date of that announcement coincided with a temporary spike in Crystallex's stock price before declining in value.  *Id.* ¶ 816; Figueroa Aff. Exh. 4, Supplemental Report of Timothy H. Hart, CPA, CFE (Sept. 17, 2013), ¶ 16.  Crystallex justified this date as being the "last clean date" at which its stock price would not be affected by market concerns regarding the Environmental Permit.  D.E. 2-1, Award, ¶ 807.  According to Crystallex's proposed methodology -- which was ultimately adopted by the Tribunal -- once the stock market price on the alleged "last clean date" was determined, a counterfactual stock price between the "last clean date" and the Treaty-mandated valuation date would then be *estimated* or "built up," using third-party market indices. *Id.* ¶¶ 807-808.

Venezuela objected to the use of the Stock Market Approach on various grounds, including that it is not an appropriate method to calculate the fair market value of Crystallex, a penny stock in the Canadian stock exchange susceptible to potential manipulation and distortions due to misleading press releases and the activities of speculators.  D.E. 2-1, Award, ¶ 816.  Indeed, Venezuela observed that no arbitral tribunal constituted under a modern investment treaty had adopted the Stock Market Approach as a reliable valuation methodology, and that

---

[9] The truth was that Crystallex had no legal or factual basis to make such an assertion and its representation was misleading.  *See id.* ¶¶ 355-374 (setting out Venezuela's position).

Crystallex and its damages expert had failed to demonstrate otherwise (a point ignored by the Tribunal in its Award). Figueroa Aff. Exh. 5, Post-Hearing Brief of the Bolivarian Republic of Venezuela (May 12, 2014), ¶¶ 270-73; Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela (October 31, 2014), ¶ 52. Crystallex itself had recognized in its pleadings that tribunals in investment arbitrations have been wary about using the stock market approach as the sole methodology for valuation. Figueroa Aff. Exh. 5, Post-Hearing Brief of the Bolivarian Republic of Venezuela (May 12, 2014), ¶ 270; Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela (October 31, 2014), ¶ 52. Crystallex cited only one case in its pleadings in which the stock market approach was considered by tribunals, *Enron v. Argentina, ICSID* Case no. ARB/01/3, Award (May 22, 2007). However, in that case, the tribunal expressly rejected the approach as a valuation tool. *Id.* ¶ 424.[10]

Venezuela objected to the inappropriate use of a date reference other than the valuation date established by the Treaty. D.E. 2-1, Award, 816; Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela (October 31, 2014), ¶ 66. It observed that the alleged "last clean date" was arbitrary and chosen to take advantage of a short spike in Crystallex's stock price following its misleading press release. D.E. 2-1, Award, ¶ 816;

---

[10] At the hearing on the merits and jurisdiction, Crystallex's damages expert cited a second case, *Renta 4 SVSA, et al v. Russian Federation*. However, as Venezuela pointed out, that case was inapposite because the matter in dispute in that arbitration was the value of the claimant's minority stake in Yukos, a recently nationalized Russian oil company. The stock price was not being used as a proxy for the fair market value of the company as a whole. *Renta 4 SVSA, et al. v. Russian Federation*, SCC No. 24/2007 (Award on Preliminary Objections, 20 Mar. 2009), ¶ 131. Also at the hearing, Crystallex's party-appointed arbitrator, without citing an case in particular, observed that the Iran-U.S. Claims Tribunal may have adopted the stock market approach in certain cases (over twenty years ago). Post -Hearing Brief of the Bolivarian Republic of Venezuela (May 12, 2014) n. 454. To the extent the Iran Claims Tribunal relied on a company's stock price to determine damages, it should be noted that it never used the "last clean date" and related counterfactual build up as advocated by Crystallex and ultimately adopted by the Tribunal. To the contrary, where the referenced stock price was prior to the valuation date, the Iran-U.S. Claims Tribunal *discounted* the available stock price to reflect that other circumstances beyond State action would have affected that price. *See, e.g., Faith Lita Khosrowshahi v. Iran*, Award (June 30, 1994), 30 Iran-U.S. CTR, ¶¶ 47-52, 78.

Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela (October 31, 2014), ¶ 57-63. Venezuela also observed that according to Crystallex's logic, *any date* between June 14, 2007 and April 13, 2008 could be used, since there were no state measures taken in the interim, no negative public information concerning the Environmental Permit and, in fact, there had been some positive press reports about Crystallex. D.E. 2-1, Award, ¶ 816.

In essence, by using the concept of a "last clean date" of June 14, 2007, Crystallex was effectively (and inappropriately) attributing the cause of its subsequent decline in stock prices prior to April 2008 to Venezuela, notwithstanding that prior to April 2008, Venezuela could not be said to have taken any measure whatsoever with respect to Crystallex, and that evidence existed that the decline in stock prices was due to other factors. *See* Figueroa Aff. Exh. 5, Post-Hearing Brief of the Bolivarian Republic of Venezuela (May 12, 2014), ¶¶ 287-288; Figueroa Aff. Exh. 6, Supplemental Submission on Quantum of the Bolivarian Republic of Venezuela (October 31, 2014), ¶ 65. Venezuela insisted that, given the flawed logic of Crystallex's position and the arbitrary nature of a "last clean date," the Stock Market Approach should be rejected. D.E. 2-1, Award, ¶¶ 816-17.

In short, the Tribunal adopted the Stock Market Approach together with the use of the alleged "last clean date," in contravention of the express terms of the Treaty. *Id.* ¶ 891 By adopting this methodology, the Tribunal arrived at a damages calculation that is U$ 713.25 million greater than what would have resulted had the proper valuation date been used.[11] The

---

[11] This figure is derived as follows: The Tribunal's application of the Stock Market Approach with the "last clean date" as a reference point led to a calculated market capitalization of Crystallex of US$1.29516 billion. D.E. 2-1, Award, ¶ 895. The actual market capitalization of Crystallex on April 11, 2008 (the closest trading day to the April 13, 2008 valuation date) was US$0.58191 billion. *See* Figueroa Aff. Exh. 9, Crystallex stock price data submitted by Crystallex's damages expert as Exhibit CLEX-073. Use of the "last clean date" and subsequent counterfactual build-up thus resulted in an artificial increase in value US$713.25 million.

Tribunal thus grossly exceeded its mandate and its determination of value based on the Stock Market Approach should be vacated.

        (ii)    The Tribunal imperfectly exercised its authority by adopting a methodology that included assumptions that had already been rejected by the Tribunal.

The second approach adopted by the Tribunal is the "Market Multiples Approach," which estimated a value of US$1.109 billion for Crystallex based on the financial information of "comparable" mining companies on the valuation date of April 13, 2008.  *Id.* ¶¶ 793-799.[12]  The Tribunal's calculation of damages under the Market Multiples Approach is subject to vacatur because the Tribunal imperfectly exercised its authority by incorporating incorrect and speculative data from another valuation method by another Crystallex expert that the Tribunal had already expressly rejected.  In short, the Market Multiples Approach is based on faulty and highly speculative assumptions that the Tribunal disregarded when analyzing another methodology.  The Tribunal's inconsistency cannot be allowed to stand.

The Market Multiples Approach assessed the value of Crystallex based on a ratio of enterprise value (EV) to the size of gold reserves of publically traded companies on a given valuation date.  D.E. 2-1, Award, ¶ 793.  This ratio is the median of a list of ratios of allegedly "comparable" mining companies operating in developing countries, which was US$154.04 per ounce of gold.  *Id.*  It was applied to Crystallex based on certain assumption concerning the

---

[12] Although Venezuela disagrees with the Tribunal's decision to adopt the Market Multiples Approach because, *inter alia*, none of the other mining companies used in the calculation were appropriately comparable to Crystallex, the Tribunal at least calculated a value using the proper valuation date as required by the Treaty.  D.E. 2-1, Award, ¶¶ 858, 901-905.  Notably, Crystallex's case in chief had calculated a value under the Market Multiples Approach only for its proposed February 3, 2011 valuation date.  *Id.* ¶ 793.  Notwithstanding Venezuela's objection that Crystallex had failed to meet its burden of proving damages, the Tribunal permitted Crystallex to submit alternative calculations as of the April 13, 2008 valuation date subsequent to the arbitration hearings, which ultimately led to a second hearing exclusively on the new alternative damages calculations.  *Id.* ¶¶ 795-799.

amount of gold in the Las Cristinas deposit that Crystallex could have extracted during its 20-year concession period.  *Id.* ¶¶ 793, 902.

With respect this second part of the equation, Crystallex's damages experts, Compass Lexecon, did not use any of the actual plans developed by Crystallex in its feasibility studies during the relevant period to calculate the amount of gold Crystallex could mine.[13]   Instead, Compass Lexecon presented calculations that relied on the resource and operational assumptions of Crystallex's other damages expert, Trevor Ellis, who submitted a separate valuation based on the "Indirect Sales Comparison" method.   As noted above, the Indirect Sales Comparison method purported to derive a value for Crystallex based on "comparable" sales transactions under various "scenarios" pursuant to which Crystallex could extract different amounts of gold over different periods at different rates.  *Id.* ¶¶ 818-822.  Notably, none of these scenarios were based on factual data or contemporaneous documents but relied on Mr. Ellis' assumptions and "adjustments."  *Id.* ¶¶823.

The Tribunal was highly critical of Mr. Ellis' valuations and expressly "disregard[ed]" all of them.   It rejected even his most conservative "scenario" in which Crystallex mined 40,000 tonnes of ore per day ("tpd") for 40 years because his "adjustments are too plentiful to render his method of reliable value and the assessment of damages reached through such calculations is too speculative to be taken into account."  *Id.*  ¶¶ 909-910.  Indeed, the Tribunal did not invite Mr. Ellis to submit further calculations nor did he participate in the second hearing regarding Crystallex's alternative damages calculations.  *See id.* ¶ 768.

---

[13] Although Venezuela disagrees with the Tribunal's refusal to fault Crystallex's contemporaneous plans, the Tribunal's failure to incorporate the assumptions therein when determining damages constitutes an error in calculation.  *See Id.* ¶ 878.

The Tribunal, however, glossed over the fact that certain of the same assumptions used by Mr. Ellis in the rejected Indirect Sales Comparison method were also used as a basis for the Market Multiples Approach.  In particular, as Venezuela indicated in the arbitration (and the Tribunal recognized in the Award), Compass Lexecon's Market Multiples calculations were premised on Mr. Ellis' "scenario" in which Crystallex would mine 80,000 tpd, stockpile 40,000 tpd, and select the highest-grade 40,000 tpd to process during the 20-year period.  *Id.* ¶ 803.  The Tribunal made no adjustments to these assumptions, but rather simply adopted Compass Lexecon's US\$ 1.109 billion Market Multiples calculation (one of several alternatives submitted by Crystallex's damages experts).  *Id.* ¶ 905. In so doing, the Tribunal embraced assumptions and calculations by Mr. Ellis that it had explicitly discredited.

It is a well-settled rule of international law that no compensation can be awarded based on a speculative request for damages.[14]  Claimant bears the burden of establishing any claimed damages "with a sufficient degree of certainty," as damages claims that resort to mere probabilities, uncertainties, and guess work "cannot be recovered."[15]  Given that the Tribunal

---

[14] *See Amoco Int'l Fin. Corp. v. Islamic Republic of Iran* (Partial Award No. 310-56-3, 24 July 1987) (Virally, Brower, Ansari Moin), *reprinted in* 15 Iran-US Claims Tribunal Case No. 189, ¶ 238  ("One of the best settled rules of the law of international responsibility of States is that no reparation for speculative or uncertain damage can be awarded"); *Percy Shufeldt (US) v. Guatemala*, 2 U.N.R.I.A.A. 1081 (1930) (Sisnett), p. 0021  ("*[L]ucrum cessans* must be the direct fruit of the contract and not too remote or speculative. […]  The contract at the date of its cancellation or abrogation had been in existence for six years, and the extraction and exportation of chicle was carried on as a going business which was producing substantial profits, and there is nothing to show that these profits would not have been continued to the expiration of the contract."); *Amco Asia Corp. et al. v. Republic of Indonesia,* ICSID Case No. ARB/81/1 (Award, 20 Nov. 1984) (Goldman, Foighel, Rubin), ¶ 268  ("Before proceeding to this calculation, the Tribunal has to state that here again, according to principles and rules common to the main national legal systems and to international law, the damages to be awarded must cover only the direct and foreseeable prejudice.  The requirement of directness is but a consequence of the requirement of a causal link between the failure and the prejudice; and the requirement of foreseeability is met practically everywhere."); *see also* M. M. WHITEMAN, DAMAGES IN INTERNATIONAL LAW (1943), p. 5.

[15] Figueroa Aff. Exh. 4, Rejoinder, ¶ 545 (citing *Kardassoppolis v. Georgia*); *Saphire Int'l Petroleum Ltd. v. National Iranian Oil Co.* (Ad hoc, Award, 15 Mar. 1963) (Cavin), 35 ILR 136 (1967), p. 0054; *Rudloff Case* (Merits), US-Venezuela Mixed Claims Commission, 9 U.N.R.I.A.A 255 (1903-05), p. 0006; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. 064/2008, ¶¶ 95-96 (Final Award, 8 June 2010) (Hertzfeld, Happ, Zykin) ("*Al-Bahloul v. Tajikistan*").

rejected as unreliable Mr. Ellis' calculations in a "scenario" in which Crystallex extracted 40,000 tonnes of ore per day for 40 years, there is no rational or logical explanation for how the Tribunal could accept the more aggressive "scenario" used in the Market Multiples Approach in which Crystallex would mine 80,000 tpd, stockpile 40,000 tpd, and select the highest-grade 40,000 tpd to process during the 20-year period. *Id.* ¶ 803.[16]   The Tribunal made no effort anywhere in the Award to explain how Mr. Ellis made correct calculations with respect to the scenario underlying the Market Multiples Approach or to reconcile its conflicting views of Mr. Ellis' assumptions. *See id.* ¶ 803.  Nor does the Tribunal discuss how Mr. Ellis' mining assumptions that underlie the Market Multiple calculation are factually based on, or conceptually consistent with, the actual plans developed by Crystallex.

The Tribunal cannot have it both ways when it comes to Mr. Ellis' mining assumptions and calculations; it cannot disregard them in one methodology and follow similar ones without any explanation in another.

## III. ARGUMENT

Awards issued by investor-State tribunals can be enforced in U.S. courts pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 330 U.N.T.S. 38, 21 U.S.T. 2517 (1958) ("New York Convention"), which is integrated into the Federal Arbitration Act ("FAA") at 9 U.S.C. §201 *et seq.*   But the awards are not meant to be beyond

---

[16] Mr. Ellis' erroneous calculations are subtle yet significant.  Most notably, he doubles the gold grade from 0.71 to 1.42 grams of gold per tonne, which would have made Crystallex's mining operations considerably more lucrative. *See* Figueroa Aff. Exh. 4, Supplemental Report of Timothy H. Hart, CPA, CFE (Sept. 17, 2013), ¶¶ 220-222. Venezuela estimates that using the actual gold grade would cut the "Market Multiples" calculation in half (from US$ 1.109 billion to US$ 554.5 million), which would, in turn, lower the final damages amount under the Tribunal's simple average method by several hundred million dollars (approximately US$ 924.8 million), without considering the Tribunal's errors in connection with the Stock Market Approach.  Moreover, a lower "Market Multiples" figure undermines the Tribunal's finding that it is "consistent" with the "Stock Market Approach."  *See* D.E. 2-1, Award, ¶ 917.

scrutiny.  Both the New York Convention and the FAA recognize that U.S. courts have authority to review awards in order to protect the rights of the parties.

Accordingly, a court can decline to recognize and enforce an award when it finds one of the grounds stated in Article V of the New York Convention to be present.[17]  Additionally, the FAA authorizes "the United States court in and for the district wherein the award was made" to vacate the award upon multiple grounds.  9 U.S.C. §10.  Domestic courts are thus plainly intended to play an active role in the international arbitration regime.  Indeed, while a U.S. court's standard of review of an arbitral award is deferential with respect to some issues, there are other issues over which the court has primary responsibility and reviews *de novo*.  *See BG Group PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1206 (2014).  Even when a court reviews an award with deference, that deference may be overcome and the award vacated.  *See Stolt-Nielsen v. AnimalFeeds*, 559 U.S. 662, 673–77 (2010).

**1.      The Award should be vacated because the Tribunal exceeded its powers.**

The Federal Arbitration Act gives courts authority to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.  9 U.S.C. § 10(a)(4).  In issuing the flawed Award, the Tribunal exceeded its powers by (1) ruling on claims that were contractual in nature and thus outside of Venezuela's consent to arbitration, and (2) awarding damages based on a valuation date not permitted by the Investment Treaty the parties tasked it with interpreting.

---

[17] Venezuela addressed why the Court should deny Crystallex's Petition on the basis of Article V grounds in its Motion for Extension of Time to Respond to Petition to Confirm Arbitral Award, or, in the Alternative, Opposition to Petition to Confirm Arbitral Award filed on July 1, 2016 (D.E. 9).  Venezuela incorporates those arguments by reference as additional reasons why the Court should vacate the Award.

a.      The Tribunal had no authority to issue an award or award damages with respect to contract claims; it nonetheless did so and thereby exceeded its power.

The Tribunal incorrectly exercised jurisdiction over claims that were contractual in nature.  Because this presents an issue of whether certain claims fall within the consent to arbitration embodied in the Treaty, the Court must review this issue *de novo* and must vacate the Award should it find that the claims were indeed contract claims, rather than treaty claims.  *See BG Group PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1206 (2014).

(i)      This Court must determine *de novo* whether Crystallex's claims regarding recission of the MOC were covered by the agreement to arbitrate contained in the Treaty.

The "first principle" of the Supreme Court's arbitration jurisprudence, as the Court itself has explained, is that "[a]rbitration is strictly a matter of consent" and is therefore "a way to resolve those disputes -- *but only those disputes* -- that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotations omitted) (emphasis in original).  This principle applies with full force to the threshold issue of whether a particular claim is covered by an agreement to arbitrate, regarding which courts do not simply rubber stamp the determination reached by the arbitrator, but instead play their own active role.

"[W]hether an arbitration clause in a concededly binding contract applies to a particular type of controversy" is a "dispute[] about 'arbitrability.'"  *BG Group PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1206 (2014) (internal quotations omitted); *see also National R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761–2 (D.C. Cir. 1988) ("breadth of an arbitration clause" is an arbitrability issue).  How a court should review an arbitral tribunal's decision regarding an issue of arbitrability turns on who the parties to the arbitration agreement intended to "bear[] primary responsibility" for determining arbitrability.  *See BG Group*, 134 S. Ct. at

1206.  A court must presume that the parties intended the court to bear primary responsibility.  *BG Group*, 134 S. Ct. at 1206 ("[C]ourts presume that the parties intend courts, not arbitrators, to decide.")  In other words, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability,*' is 'an issue for judicial determination [u]nless the parties clearly and unmistakeably provide otherwise."  *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002) (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)) (second alteration and emphasis in original).

When a court bears primary responsibility for an issue of arbitrability, its review of the issue is *de novo*.  *See BG Group*, 134 S. Ct. at 1206.  Even if an arbitrator has already issued an award finding that a particular claim is arbitrable, the court may "not afford any deference at all to the arbitrator's view on that issue."  *KenAmerican Resources v. International Union, UMW*, 99 F.3d 1161, 1163 (D.C. Cir. 1996); *see also Oxford Health Plans LLC v. Sutter*, 133 S Ct. 2064, 2068 n. 2 (2013) (questions of arbitrability not subject to deference generally shown to arbitral awards); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("If . . . the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.").

During the arbitration, Venezuela maintained that Crystallex's claims related to recission of the MOC were contractual in nature, and therefore not covered by the Treaty, including the agreement to arbitrate contained therein.  D.E. 2-1, Award, ¶ 459.  Crystallex argued otherwise, and the Tribunal ultimately ruled against Venezuela and entertained the claims.  *Id.* ¶ 483.  In short, there was a dispute regarding whether the agreement to arbitrate contained in the Treaty "applie[d] to a particular type of controversy."  *BG Group PLC*, 134 S. Ct. at 1206; *see also* D.E.

2-1, Award, ¶ 472 ("The Parties are, however, in dispute as to whether the Claimant is attempting to bring contract, rather than treaty, claims in relation to the rescission of the MOC.") This was an issue of arbitrability. *BG Group PLC*, 134 S. Ct. at 1206. It is thus "an issue for judicial determination [u]nless the parties clearly and unmistakeably provide otherwise." *Howsam*, 537 U.S. at 83.

There is no "clear[] and unmistakeabl[e]" evidence that Venezuela or Canada, the two parties to the BIT, ever intended to give arbitral tribunals primary responsibility for determining threshold issues of arbitrability. In fact, the Parties' practice confirms the presumption that they intended for this responsibility to lie with national courts. For example, when the Ontario Court of Appeals reviewed an award issued under the investor-State dispute resolution provision of NAFTA Chapter 11 (which is similar to the dispute resolution provisions of bilateral investment treaties such as the Venezuela-Canada Treaty), it held that the correct standard of review was one of "correctness, " *i.e.*, a lack of deference akin to *de novo* review. *United Mexican States v. Cargill, Inc.*, 2011 ONCA 622, ¶ 42 (Ontario Ct. App. 2011). The Government of Canada intervened in the case and supported the argument that "correctness" was the proper standard. *Id.* at ¶ 27. Therefore, it falls to this Court to make a *de novo* determination of whether Crystallex's claims regarding recission of the MOC were arbitrable.

> (ii)    The Award must be vacated because Crystallex's claims regarding recission of the MOC are not covered by the agreement to arbitrate contained in the Treaty.

The Award before the Court arises from the Investor-State dispute settlement regime. As explained above, the ISDS regime is the result of a constellation of treaties concluded between sovereign States. By way of these treaties, States grant investors from one or more other signatory States the right to bring certain claims against them before a neutral international arbitral tribunal. Given that States are thereby making a limited waiver of their sovereign

immunity and consenting to arbitration, it is unsurprising that the conditions of that consent are strictly limited.  By entering these treaties, States do not consent to arbitration of any and all disputes between them a foreign investor.  Only alleged breaches of the investment protections set out in the relevant treaty (*i.e.*, breaches of international law) may be submitted to arbitration. Other breaches, such as alleged breaches of a contract between the State and an investor (*i.e.*, a breach of domestic contract law) may *not* be arbitrated under the dispute resolution provision of the treaty absent the inclusion in the treaty of an "umbrella clause,"  a provision that imposes a requirement on each Contracting State to observe <u>all</u> investment obligations entered into with investors of the other State.  Where such an umbrella clause is present, an investor may raise the alleged breach of contractual obligations before an arbitral tribunal constituted in accordance with the Treaty.  Without such a clause, contractual breaches cannot be arbitrated under the Treaty's dispute resolution procedures.[18]

That is the case here.  Indeed, Article XII of the Venezuela-Canada Treaty sets out the very specific limitations on the States Parties' consent to international investor-State arbitration. The first is that a claim must arise out of an alleged breach of the *Treaty*.[19]  Accordingly, only

---

[18] Arbitral panels have recognized the fundamentally distinct nature between contract and treaty claims. *See, e.g.,* Compania de Aguas Del Aconquija S.A. & Vivendi Universal v. Argentine Republic, ICSID Case No. ARB/97/3, Decision on Annulment, ¶¶ 95-96 (2002) ("A state may breach a treaty without breaching a contract, and vice versa […] whether there has been a breach of the BIT and whether there had been a breach of a contract are different questions. Each of these claims will be determined by reference to its own proper or applicable law—in the case of the BIT, by international law; in the case of the Concession Contract, by the proper law of the contract."); *BIVAC B.V. v. Republic of Paraguay*, ICSID Case No. ARB/07/9, Decision on Jurisdiction, ¶ 127 (29 May 2009) (finding that it is "well established that there is a significant distinction to be drawn between a treaty claim and a contract claim, even if there may be a significant interplay between the underlying factual issues.").

[19] Article XII of the Treaty provides in part that:

(1) Any dispute between one Contracting Party and an investor of the other Contracting Party relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of <u>this Agreement</u>, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

claims that relate to the State's alleged violation of the protections set forth in the Treaty may be submitted to arbitration by an investor.  These protections are laid out in Articles II, II, IV, VII and VIII of the Treaty.  Unlike many other bilateral investment treaties,  the Venezuela-Canada Treaty does not contain an "umbrella clause."  As one investment tribunal accurately put it, it is a "widely accepted principle … that under general international law, a violation of a contract entered into by a State with an investor of another State, is not, by itself, a violation of international law."  *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision on Objections to Jurisdiction, 6 Aug. 2003, ¶ 167.[20] Thus, pursuant to the Venezuela-Canada Treaty, an arbitral tribunal lacks jurisdiction to hear a dispute stemming from an alleged breach of an obligation arising under a contract between the investor and Venezuela.  In short, a tribunal is only empowered to determine disputes that are legitimately based on Treaty claims.

The contractual nature of Crystallex's claims has been evident since the outset of the arbitration.  It commenced when Crystallex filed its Request for Arbitration ("RFA"), the arbitral analog to a complaint.   Section 3 of the RFA characterizes the "dispute" as concerning "measures and omissions of Venezuela (the Measures) affecting Crystallex's investments." Figueroa Aff. Exh. 1, Request for Arbitration, ¶ 3].  Only two such "Measures" are specified;

---

(2)  If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.

D.E. 2-2, Treaty, Art. XII (emphasis added).

[20] Even in cases where umbrella clauses were at play, tribunals have held that "clear and convincing evidence" that elevating contract claims to the level of treaty claims through an umbrella clause was indeed the intent of the Contracting Parties to the relevant treaty. *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Award on Jurisdiction, 6 August 2003, ¶ 167.

one of which is "the unilateral termination of the Mine Operation Contract (the MOC) that Crystallex had entered into with the Government agency Corporación Venezolana de Guayana (CVG) to develop and exploit the gold deposits at Las Cristinas." *Id.* ¶ 3.[21]

The Request for Arbitration then sets out in detail Crystallex's view of the dispute, including its claims based on what it called "Venezuela's termination of the MOC." *Id.* § 7, p. 25. Crystallex's discussion of those claims leaves no doubt that they are nothing more than run-of-the-mill contact claims. Crystallex alleged: "Notwithstanding the Government's assurances as to the MOC's validity provided most recently in August 2010, on 3 February 2011, the CVG unilaterally terminated the MOC." *Id.* ¶ 75. It acknowledged that the CVG "cited the lack of activity at the Las Cristinas mine for over one year as a basis for termination under Clause 24 of the MOC," *id.* ¶ 76. However, Crystallex disputed the legal basis under Venezuelan contract law for the termination, including CVG's interpretation of Clause 24. According to the RFA:

> The arbitrary nature of this rescission is illustrated by CVG's <u>failure to comply with the most basic notions of Venezuelan law and the very terms of the MOC</u>. First, <u>Clause 24 of the MOC</u> which is cited by the CVG as a basis for the contract's termination, only provides for the rescission of the MOC after lack of activity at Las Cristinas for over one year 'without justification'. The failure to obtain the Permit - an obligation of the CVG under the MOC -- clearly constitutes such a justification. Moreover, although there were no direct mine development activities due to a lack of the Permit, Crystallex continued with a number of activities during the past year, including completing the construction of a new medical clinic, employing people at site, providing security and medical services and complying with all the terms of the MOC. Furthermore, <u>Clause 9.4 of the MOC</u> provides that none of the time periods set out in the MOC begin to run until the CVG has procured the necessary environmental and mining permits, such that the one year period set out in Clause 24 is not applicable in these circumstances. Moreover, as a matter of Venezuelan law, the Government cannot proceed to unilaterally rescind an administrative contract such as the MOC without providing the other party with an opportunity to be heard and present its views at hearing.

---

[21] The other claim was: "failure to grant the necessary permit to Crystallex to develop the Las Cristinas Project, despite Crystallex's fulfillment of all the preconditions established by Venezuela (as acknowledged by Venezuela)." Figueroa Aff. Exh. 1, Request for Arbitration, ¶ 3.

*Id.* ¶ 80 (emphasis added).

The fact that the claims Crystallex sought to have arbitrated are contract claims is made clear elsewhere in its Request for Arbitration as well.  For instance, it claimed that Venezuela had "destroyed Crystallex's investment" by, among other things, "unilaterally and arbitrarily terminating Crystallex's MOC."  *Id.* ¶ 83.  And, underscoring that the claim was based in contract, Crystallex requested as a remedy the "reinstatement of the MOC." *Id.* ¶ 140(b).

Put simply, Crystallex's own Request for Arbitration makes abundantly clear that the essence of its claim was that the CVG, one of the parties to the MOC, did not comply with the "terms of the MOC" and the domestic law governing it, and that the prerequisites for termination in the MOC had not been met.  In other words, Crystallex was asserting a claim for breach of contract.

If the court, through its *de novo* review, determines that the claims in question were not arbitrable, the award should be vacated.  This is precisely the step taken by the Court of Appeals in *Republic of Arg. v. BG Group PLC*, 665 F.3d 1363 (D.C. Cir. 2012) (*rev'd on other grounds sub nom. BG Group PLC v. Republic of Arg.*, 134 S. Ct. 1198 (2014)).  There, the court engaged in a *de novo* review of what it (incorrectly) deemed to be a question of arbitrability.  Upon concluding that an investor-State arbitral tribunal had exercised jurisdiction over a non-arbitrable issue, it vacated the award.  *Id.* at 1373.  In reversing the Court of Appeals' determination that the issue in that case was one of arbitrability, the Supreme Court did not disturb the principle that vacatur would be proper if the issue were one of arbitrability, and in fact confirmed that the issue in *this* case is one of arbitrability.  *BG Group PLC*, 134 S. Ct. at 1206 (listing "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" as an example of an arbitrability issue).

Here, the Tribunal issued an award regarding claims that were not subject to the parties' agreement to arbitrate.  The Award is thus invalid and must be vacated.[22]

      b.     <u>The Tribunal only had authority to interpret the BIT, not to dispense its own brand of justice; it exceeded its power by crafting its own valuation date instead of applying the valuation date mandated by the BIT.</u>

In addition to exceeding its power by adjudicating contract claims, the Tribunal exceeded its power by adopting a valuation date for damages that contradicted the express terms of the Treaty and the submissions of both parties.  Because the Tribunal merely "dispense[d] [its] own brand of . . . justice," rather than applying the Treaty, the Award should be vacated.  *See Stolt-Nielsen v. AnimalFeeds*, 559 U.S. 662, 669 (2010) (internal quotation omitted); 9 U.S.C. §10(a)(4).

An arbitral tribunal has no power over the parties beyond what the parties have contractually granted it.  *See Granite Rock*, 561 U.S. at 299.  Accordingly, a tribunal exceeds its power when it "acts outside the scope of [its] contractually delegated authority -- issuing an award that simply reflects [its] own notions of economic justice rather than drawing its essence from the contract."  *Oxford Health Plans LLC v. Sutter*, 133 S Ct. 2064, 2068 (2013) (quotations omitted).

A tribunal acts outside the scope of its contractually delegated authority when it ignores the clear requirements of the agreement it is tasked with interpreting and arrives at a result not derived from, or compatible with, that agreement.  Thus, the Supreme Court has held that vacatur is proper when the court finds that the arbitrators, instead of simply misinterpreting the contract,

---

[22] Even assuming, *arguendo*, that the Court's review was not *de novo* but rather the deferential review accorded to arbitral awards in other situations, the Tribunal's exercise of jurisdiction over the contractual MOC recission claims would be an excess of power within the meaning of 9 U.S.C. §10(a)(4) and thus grounds for vacating the Award. *See Mala Geoscience AB v. Witten Techs., Inc.*, No. 06-cv-1343, 2007 U.S. Dist. LEXIS 38767, at *21 (D.D.C. May 30, 2007) (vacating award in part under 9 U.S.C. §10(a)(4) where arbitrator exceeded scope of his jurisdiction).

"abandoned their interpretive role." *Id.* at 2070. Such a result cannot stand because it is not "based on a determination regarding the parties' intent." *Id.* at 2069.

Accordingly, in *Stolt-Nielsen v. AnimalFeeds*, 559 U.S. 662, 673–77 (2010), the Supreme Court held that an arbitral panel exceeded its powers when, rather than applying (or even seeking to ascertain) the controlling rule of law, the panel instead fashioned its own rule. Ignoring a critical date laid out in the parties' agreement is likewise an instance of an arbitrator exceeding his authority. In the arbitration underlying *Alken-Ziegler, Inc. v. UAW, Local Union 985*, 134 Fed. App'x 866, 867 (6th Cir. 2005), the arbitrator considered a labor agreement that explicitly provided that only employees "actually working on January 1st of any year" were eligible for vacation pay for the previous year. *Id.* The arbitrator nonetheless awarded vacation pay to employees who were laid off from the company several months prior to January 1, opining that it would be "unreasonable" to do otherwise. *Id.* The court vacated the award, holding:

> The arbitrator's responsibility was to enforce the labor contract as written. He did not. The result was the imposition of his own brand of industrial justice. As such, the arbitration award cannot stand.

*Id.* at 868 (internal citation and quotations omitted).

Here, the method the Tribunal used to calculate the over $1.2 billion Award was outside the scope of its authority under the Treaty. Article VII of the Treaty contains a clear directive that compensation "shall be based on the genuine value of the investment or returns expropriated *immediately before* the expropriation or at the time the proposed expropriation became public knowledge, whichever is earlier. D.E. 2-2, Treaty, Art. VII (emphasis added). As explained above, this provision reflects a fundamental and widespread principle of international law. Its applicability is further evidenced by the fact that, during the arbitration, both parties proposed valuation dates immediately prior to material events. Venezuela proposed April 13, 2008 as the

valuation date, while Crystallex proposed February 3, 2011. D.E. 2-1 Award, ¶¶ 734, 746.   The Tribunal agreed with Venezuela, and determined that April 13, 2008 was the appropriate valuation date.  *Id.* ¶ 855.

Notwithstanding its recognition of April 13, 2008 as the valuation date, the Tribunal proceeded to calculate damages using a methodology that relied in part on a date well prior to April 13, 2008.   To arrive at its damages award, the Tribunal averaged the results of two valuation methodologies: the Market Multiples Approach and the Stock Market Approach.  The Stock Market Approach the tribunal adopted, however, ignored the April 13, 2008 valuation date.   Instead, it valued Crystallex's purported investment according to a "last clean date" of June 14, 2007.  *Id.* ¶¶ 807, 891

June 14, 2007 is *9 months prior* to any of the measures that were at issue in the arbitration.   The Tribunal's adoption of a valuation based on that date is plainly inconsistent with the Treaty's requirement that compensation be based on the value of the purported investment *immediately before* the wrongful measure.   Rather than interpreting and applying this clear language within the Treaty, the Tribunal "abandoned [its] interpretive role" and fashioned its own remedy, in excess of its power.  *Oxford Health Plans LLC v. Sutter*, 133 S Ct. 2064, 2070 (2013).  This is sufficient reason for the Court to vacate the Award.  *Stolt-Nielsen*, 559 U.S. at 673–77; *Alken-Ziegler, Inc.*, 134 Fed. App'x at 868.

The Tribunal also exceed its power through its application of the Market Multiples Approach.  As explained in *supra* section II(3)(b)(ii), that approach incorporated assumptions from a third approach (the Indirect Sales Comparison method) about the amount of gold Crystallex could mine that were developed as part of a third methodology even though the Tribunal had already rejected them as unreliable and speculative.

Under well-established rules of international law, no compensation can be awarded based on a speculative request for damages. *See supra* footnote 14. By considering the assumptions underlying the Indirect Sales Comparison method, finding them speculative and unreliable, yet proceeding to apply them via the Market Multiples Approach -- which formed half the basis of the over $1.2 billion Award -- the Tribunal awarded damages not permitted by law. In so doing it exceeded its power.

Courts have not hesitated to vacate awards in similar circumstances, given that tribunals are "not free to disregard unambiguous language and craft [their] own remedy." *Mo River Servs. v. Omaha Tribe*, 267 F.3d 848, 855 (8th Cir. 2001) (vacating award where arbitrator ignored language in the parties' agreement that prescribed the nature of damages that could be awarded); *see also 187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005) (per curiam) ("The arbitrator had no authority . . . to fashion an alternative remedy."). Arbitrators have been found to have exceeded their authority by awarding damages not requested by either party, *see Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651–52 (5th Cir 1979) or not authorized by the governing law, *see Stratton Oakmont, Inc. v. Nicholson*, 868 F. Supp. 486, 488 (E.D.N.Y. 1994) (vacating award under 9 U.S.C. §10(a)(4) where arbitrators exceeded their power by awarding punitive damages in contradiction of governing New York law). Finally, an award based on events outside the period in dispute between the parties may also be vacated. In *Melun Indus. v. Strange*, 898 F. Supp. 990, 993 (S.D.N.Y. 1990), the court found that the dispute submitted to the arbitrator allowed him only to consider events occurring within a specific period of time when calculating damages. The arbitrator nonetheless issued an award in which damages were based in part on events preceding the relevant time period. *Id*. at 993–94. The court

vacated the award, holding that the award was "outside the arbitrator's powers and represented a fundamental alteration of the Agreement between the parties." *Id*. at 994.

The flawed Award that Crystallex seeks to enforce should be vacated for substantially the same reasons. The Tribunal disregarded the express language of the Treaty and crafted its own remedy. *See Mo River Servs.*, 267 F.3d at 855. The remedy it crafted was both contrary to the governing law, *see Stratton Oakmont, Inc.*, 868 F. Supp. at 488, and based on events outside of the period of dispute between the parties, *see Melun Indus.*, 898 F. Supp. at 993. In short, it was made in excess of the Tribunal's power, and should be vacated. 9 U.S.C. §10(a)(4).

2.      **The Award should be vacated because the Tribunal manifestly disregarded the law.**

A court may also vacate an award if the arbitral tribunal "acted in manifest disregard of the law." *Int'l Thunderbird Gaming Corp. v. United Mexican States*, 473 F. Supp. 2d 80, 83 (D.D.C. 2007), *aff'd* 255 Fed. App'x 531 (D.C. Cir. Nov. 15, 2007).[23] "[T]o modify or vacate an award on [the ground that the award was in manifest disregard of law], a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001) (quotations omitted).

The Tribunal manifestly disregarded the law in two respects. First, it disregarded the Treaty's limitation of arbitrable claims to treaty-based claims. The principle that only treaty-based claims may be arbitrated under the dispute resolution provision of an investment treaty is a widespread feature of ISDS. Enshrined in Article XII of the Treaty, it was "well defined,

---

[23] Although some have questioned whether the doctrine of manifest disregard of law survives the Supreme Court's decision in *Hall Street Assocs. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008), this District has found it "prudent to assume that the 'manifest disregard' standard remains good law," and has proceeded to consider it. *Affinity Fin. Corp. v. AARP Fin., Inc.*, 794 F. Supp. 2d 117, 120 n.1 (D.D.C. 2011).

explicit, and clearly applicable" in the arbitration.  *See LaPrade*, 246 F.3d at 706.  The Tribunal recognized this, stating: "It is clear from the wording of the dispute settlement clause that the sphere of disputes that can be referred to international arbitration under the BIT is limited to disputes relating to alleged breaches of the BIT."  D.E. 2-1, Award, ¶ 471.   Nevertheless, the Tribunal refused to apply this principle -- or opted to ignore it -- when it exercised jurisdiction over claims that are contractual in nature.  *See Dewan v. Walia*, 544 Fed. App'x 240, 245 (4th Cir. 2013) (award vacated where an arbitrator found a release of claims to be valid, yet still awarded damages).

Second, the Tribunal manifestly disregarded the law requiring it to value Crystallex's purported investment immediately before the wrongful act giving rise to liability.  This rule was "well defined, explicit, and clearly applicable to the case," *LaPrade*, 246 F.3d at 706, given that it is spelled out in the Treaty.  D.E. 2-2, Treaty, Art. VII.  It is moreover present in the vast majority of investment treaties, and reflects the customary international law rule of full reparation.  The Tribunal was well aware of this rule, and after consideration, adopted April 13, 2008 as the proper valuation date.  D.E. 2-1, Award, ¶ 855.  Despite this, it based its calculation of damages in part on a reference date of June 14, 2007.  In other words, the Tribunal "acknowledged and then summarily disregarded [the] applicable rule." *ARMA, S.R.O. v. BAE Sys. Overseas*, 961 F. Supp. 2d 245, 268 (D.D.C. 2013).  The Tribunal also awarded damages based on a methodology that incorporated assumptions the Tribunal itself had already found unreliable and speculative.  Both of these actions constitute a manifest disregard of law, on the basis of which the award should be vacated.  *LaPrade*, 246 F.3d at 706 (D.C. Cir. 2001).

## IV. CONCLUSION

WHEREFORE, Venezuela respectfully requests that the Court grant its motion to vacate the Award, on the grounds that the Tribunal exceeded its powers, 9 U.S.C. §10(a)(4), and manifestly disregarded the law, *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

Respectfully submitted,

BOLIVARIAN REPUBLIC OF
VENEZUELA

By its attorneys,

/s/ *Lawrence H. Martin*
Lawrence H. Martin (D.C. Bar # 476639)
lmartin@foleyhoag.com
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 232-1200
Facsimile: (202) 785-6687

Dated: July 5, 2016

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as unregistered participants on July 5, 2016.

/s/ *Lawrence H. Martin*
Lawrence H. Martin
