**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CRYSTALLEX INTERNATIONAL   :
CORPORATION,        :
              :
   Petitioner,      :   Civil Action No.:  16-0661 (RC)
              :
   v.         :   Re Document Nos.:  1, 11, 14
              :
BOLIVARIAN REPUBLIC OF VENEZUELA :
              :
   Respondent.     :

## MEMORANDUM OPINION

**GRANTING PETITIONER'S PETITION TO CONFIRM ARBITRAL AWARD;
DENYING RESPONDENT'S MOTION TO VACATE ARBITRAL AWARD;
DENYING PETITIONER'S MOTION FOR A PRE-JUDGMENT BOND AS MOOT**

## I. INTRODUCTION

Petitioner Crystallex International Corporation (Crystallex)—a Canadian company—invested in gold deposits in Venezuela in 2002. Over a period of several years, a series of actions by the Venezuelan government deprived Crystallex of the benefit of its investment. In accordance with a bilateral investment treaty (BIT) between Canada and Venezuela, Crystallex pursued its grievances against Venezuela before an international arbitration tribunal (the Tribunal). The Tribunal awarded Crystallex just over $1.2 billion. Crystallex now requests that this Court confirm the award in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), which has been incorporated into United States law through the Federal Arbitration Act (FAA). Although the FAA does not allow Venezuela to re-litigate each point of the Tribunal's decision, Venezuela raises various challenges and argues that the award should be vacated. Because none of Venezuela's arguments suffice to vacate or modify the award under the New York Convention, the Court grants

Crystallex's petition to confirm the award and denies Venezuela's motion to vacate.

Additionally, Crystallex has moved for a pre-judgment bond, but because it confirms the award, the Court denies that motion as moot.

## II.  BACKGROUND

### A.  The Bilateral Investment Treaty

In 1996, Canada and Venezuela entered into a bilateral investment treaty (BIT) to promote economic cooperation and investment opportunities between the two nations. *See generally* Agreement Between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments (BIT), ECF 2-2, Ex. 2. The BIT required both nations to, *inter alia*, give investments by investors of the other nation[1] "fair and equitable treatment," BIT, art. II(2), and refrain from unlawfully expropriating such investments, BIT, art. VII(1).

As part of the BIT, Canada and Venezuela gave their "unconditional consent to the submission of a dispute to international arbitration" in accordance with various provisions. BIT, Art. XII(5). Arbitration was provided for disputes "between one [nation] and an investor of the other [nation], relating to a claim by the investor that a measure taken or not taken by the [nation] is in breach of [the BIT], and that the investor . . . has incurred a loss or damage by reason of . . . that breach." BIT, Art. XII(1). Tribunals hearing claims under the BIT were

---

[1] The BIT defined an investor from Canada as "any enterprise incorporated or duly constituted in accordance with applicable laws of Canada, who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela," BIT, art. I(g) and an investment as "any kind of asset owned or controlled by an investor of one [nation] . . . . In particular, though not exclusively . . . rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources," BIT, art. I(f). Crystallex's status as a Canadian investor covered by the BIT is not under dispute.

instructed to apply the BIT itself and "applicable rules of international law." BIT, Art. VII(7).

The BIT specified that arbitrations would proceed under either the International Centre for the

Settlement of Investment Disputes (ICSID) rules, the ICSID Additional Facility Rules, or the

United Nations Commission on International Trade Law (UNCITRAL) rules. BIT, Art. XII(4).

## B.  Factual Background

Crystallex, a Canadian corporation, entered into the Mine Operating Contract (MOC) in

2002 with the Corporación Venezolana de Guayana (CVG).[2] Arbitral Tribunal's Award (Award)

¶¶ 3, 18, ECF No. 2-1, Ex. 1. Under the MOC, Crystallex acquired the rights to develop the gold

deposits at Las Cristinas in Venezuela. Award ¶ 18. The MOC had an initial duration of twenty

years and the possibility of an extension to forty years. Award ¶ 20. The MOC placed obligations

on both parties, including requiring Crystallex to "bear all responsibility for the development of

the Las Cristinas project and all of its associated costs." Award ¶ 18. Over the following years,

Venezuelan officials repeatedly noted Crystallex's compliance with the terms of the MOC.

Award ¶ 402.

Before it could begin operations at Las Cristinas, Crystallex needed various permits,

including an Authorization to Affect National Resources from the Venezuela Ministry of

Environment (the permit). Award ¶ 21. Obtaining the permit was a lengthy process that required

Crystallex to obtain a land occupation permit, submit a feasibility study, and submit an

environmental impact study. Award ¶ 21. Between 2003 and 2007, Crystallex completed many

---

[2] Venezuela asserts that the CVG "is an autonomous institution, legally separate from and with a budget independent of the Venezuelan State." Opp'n Confirm at 27, ECF No. 15. In support, Venezuela cites to a Venezuelan statute. *See generally* 1985 CVG Bylaws, ECF No. 15-2, Ex. 1. The Tribunal characterized the CVG as a "governmental organ," Award ¶ 700, and noted that "the right to explore and exploit [various mineral deposits] ultimately remained with the State, acting through the Ministry of Mines, which, in turn, assigned operations to the CVG," Award ¶ 205.

of these prerequisites. Award ¶¶ 22–41. On May 16, 2007, the Ministry of Environment informed Crystallex that it was prepared to "hand over" the permit once Crystallex paid a bond and fees. Award ¶ 43; *see also* Award ¶ 561 ("Once the Bond has been posted, checked, and found to be compliant by this Office, [the permit] . . . will be handed over."). Crystallex posted such a bond and paid the required fees. Award ¶ 41. On June 14, 2007, Crystallex announced to the market that it had fulfilled the requirements to receive the permit. Award ¶ 42.

However, despite the Ministry of Environment's earlier statements, the permit did not issue. After a delay of almost a year, the Ministry of Environment officially denied Crystallex the permit on April 14, 2008. Award ¶¶ 44, 589–90. Later in 2008, a press release from the Venezuelan government indicated that Las Cristinas would be operated and exploited by the Venezuelan government. Award ¶ 678. Crystallex responded by submitting its Notice of Dispute under the BIT on November 24, 2008. Award ¶ 53. In early 2009, then-Venezuelan-President Hugo Chávez announced "this year the Venezuelan State has taken over the exploitation and control of the gold deposits of Las Cristinas," Award ¶ 605. After two more years, during which Crystallex continued to bear the costs associated with control of the Las Cristinas site, the CVG officially rescinded the MOC (1) "for reasons of opportunity and convenience" and (2) due to "the cessation of activities for more than one (1) year." Award ¶¶ 59, 606.

## C.  The Arbitration

Crystallex initiated arbitration proceedings against Venezuela in 2011 under the BIT. Award ¶ 64. Crystallex claimed that Venezuela had breached the BIT by (1) denying Crystallex's investments "fair and equitable treatment" and (2) expropriating Crystallex's

investments. ¶ 184. The arbitration proceeded under the ICSID's "Additional Facility" rules.[3] Award ¶ 1. The parties selected three arbitrators and engaged in two years of briefing and discovery. Award ¶¶ 66–68, 70–110. Hearings began in Washington, D.C. in 2013 and concluded in 2015. Award ¶¶ 110, 157. In April of 2016, the three arbitrators unanimously issued a decision, Award at 1, affirming their jurisdiction over the claims at issue, finding that Venezuela had breached the BIT, and awarding Crystallex $1.202 billion, with interest, Award ¶ 961.

A brief summary of the Tribunal's findings follows. As a threshold matter, Venezuela argued to the Tribunal that the Tribunal lacked jurisdiction over Crystallex's claims because they were contract—not treaty—claims. Award ¶¶ 459–64. The Tribunal rejected this argument and concluded that the claims at issue were treaty claims. Award ¶¶ 471–83.

The Tribunal identified two separate violations of the BIT. First, the Tribunal found that Venezuela had violated the guarantee of "fair and equitable treatment" found in Article II(2) of the BIT[4] by: reneging on its commitment to issue Crystallex the permit, "engag[ing] in arbitrary conduct in denying the Permit and rescinding the MOC, and committ[ing] several acts lacking transparency and consistency." Award ¶ 623; *see also generally* Award ¶¶ 487–623. Second, the Tribunal concluded that Venezuela had breached Article VII(1) of the BIT's prohibition on

---

[3] The BIT provided three possible frameworks for arbitration. If both nations were parties to the ICSID convention, then the arbitration would occur at ICSID pursuant to the Convention. BIT, Art. XII(4)(a). If one nation, but not the other, was a party to the ICSID Convention—as was the case here—then the arbitration would occur under ICSID's Additional Facility Rules. BIT, Art. XII(4)(b). Finally, if neither procedure was available, then the arbitration would occur under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). BIT, Art. XII(4).

[4] The Tribunal rejected Crystallex's claim that Venezuela had failed to provide "full protection and security" as required by Article II(2) of the BIT. Award ¶ 635.

expropriation by seizing the resources at Las Cristinas to develop itself, including by rescinding the MOC.[5] *See generally* Award ¶¶ 636–718.

The Tribunal then addressed the appropriate measure of compensation. *See generally* Award ¶¶ 719–960. The Tribunal determined that it would apply the "full reparation" principal to calculating compensation, as described in the *Chorzów* case before the Permanent Court of International Justice. Award ¶¶ 846–47. The Tribunal averaged together the results of two different calculations to award Crystallex $1.202 billion. Award ¶ 917.

The first method of calculating damages that the Tribunal considered was the stock market method, "a comparative valuation methodology that seeks to assess the damage to Crystallex's stock price by reference to the evolution of stock prices for other, similarly placed, gold mining companies not affected by Venezuela's expropriatory measures." Award ¶ 804; *see generally* Award ¶¶ 804–817. By setting the "last clean date" as June 14, 2007, Award ¶ 891, and the "valuation date" as April 13, 2008, the method yielded a damages amount of $1.295 billion.[6]

The second method the Tribunal considered for calculating damages was the market multiples method, which "estimates the value of an asset or company by examining the market valuation of companies holding properties of similar characteristics." Award ¶ 901; *see also* Award ¶ 793–803. By comparing Crystallex's market valuation to that of seventy-three comparator companies, Award ¶ 902, and adjusting that valuation based on the expected size of

---

[5] The Tribunal noted that, because its jurisdiction was "to decide Treaty, and not contract, claims" "[i]t is thus not for the Tribunal to decide whether the MOC was duly performed, or whether it was rightly or wrongly terminated, and what would be the consequences of any wrongful termination. . . . That said, the Tribunal is not precluded from taking the circumstances concerning the MOC's performance into account to the extent necessary to decide the expropriation claim." Award ¶¶ 686–87.

[6] The Tribunal rejected Crystallex's request for a "permit bump" or "control premium." Award ¶¶ 893, 895.

the gold reserves at Las Cristinas, Award ¶ 793, the method yielded a damages amount of $1.109 billion.[7] Award ¶ 905.

The Tribunal concluded that the damages amounts suggested by each method[8] were "largely consistent with each other" and averaged their results, to arrive at its damages award of $1.202 billion. Award ¶ 917. The Tribunal rejected Crystallex's request for $180 million in consequential damages to compensate it for its losses after the valuation date of April 13, 2008. Award ¶ 894. Because the Tribunal denied Crystallex these consequential damages rejected various assumptions favorable to Crystallex that Crystallex requested the Tribunal consider in assessing damages, the Tribunal felt that the damages amount it awarded "may err on the conservative side."[9] Award ¶ 918.

### D.  Procedural History

In April of 2016, Crystallex petitioned this Court[10] to confirm the arbitral award. Petition Confirm Arbitral Award (Petition), ECF No. 1. The New York Convention, as incorporated into the FAA, permits parties to arbitrations governed by the New York Convention to seek confirmation of the award in a United States district court. 9 U.S.C. § 207. Venezuela moved instead to vacate the award. *See generally* Bolivarian Republic of Venezuela's Motion Vacate

---

[7] The Tribunal assumed a twenty-year duration for the MOC, and rejected a "control premium" sought by Crystallex. Award ¶ 903.

[8] Crystallex had also proposed two additional methods by which to calculate damages, the P/NAV method and the indirect sales comparison method, which the Tribunal decided not to rely on in its analysis. *See, e.g.*, Award ¶ 916.

[9] The Tribunal also awarded pre- and post-award interest, Award ¶ 934, and ordered each party to bear its own costs and split the arbitration costs, Award ¶ 960.

[10] Crystallex previously sought and received recognition of the award in Canadian courts through a default judgment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2016 ONSC 4693 ¶¶ 1, 11, 43 (Can. Ont. Sup. Ct. J.), ECF No. 17-2, Ex. 1.

Arbitral Award (Mot. Vacate), ECF No. 11. The motion to vacate and the petition to affirm now

being fully briefed, the matter is ripe for resolution by this Court.[11]

## III.  LEGAL STANDARD

First, this Court addresses its jurisdiction. Jurisdiction is proper under the Foreign

Sovereign Immunities Act (FSIA). Under 28 U.S.C. § 1330, "[t]he district courts shall have

original jurisdiction . . . of any nonjury civil action against a foreign state . . . with respect to

which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or

under any applicable international agreement." Jurisdiction over actions against foreign states is

thus limited to the enumerated exceptions to immunity in the FSIA. *See Saudi Arabia v. Nelson*,

507 U.S. 349, 355 (1993). Because of this limitation, a court must "satisfy itself that one of the

exceptions applies" at "the threshold of every action in a District Court against a foreign state."

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493–94 (1983).

Here, the exception in § 1605(a)(6) applies. Section 1605(a)(6) grants jurisdiction over

actions "to confirm an award made pursuant to an arbitration agreement governed by an

international treaty." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015). In this

action, Crystallex seeks to confirm an award made pursuant to the BIT and governed by the New

York Convention, 9 U.S.C. §§ 201 *et seq.* The D.C. Circuit has held that actions to confirm

---

[11] Crystallex also moved for imposition of a pre-judgment bond. *See generally* Pet'r Crystallex Int'l Corp's Mot. Pre-Judgment Bond (Mot. Bond), ECF No. 14. In light of the Court's denial here of Venezuela's motion to vacate the bond and the entry of judgment in Crystallex's favor, this request is denied as moot. *See Republic of Argentina v. AWG Grp. Ltd.*, No. 15-1057, 2016 WL 5928464, at *2 n.4 (D.D.C. Sept. 30, 2016) ("AWG has requested the posting of a pre-judgment bond . . . but this request is denied as moot since the pending motions are resolved and judgment is entered in AWG's favor with this Memorandum Opinion." (citing *Republic of Argentina v. BG Grp. PLC*, 715 F. Supp. 2d 108, 115 n.6 (D.D.C. 2010), *rev'd*, 665 F.3d 1363 (D.C. Cir. 2012), *rev'd*, 134 S. Ct. 1198 (2014))), *appeal docketed*, No. 16-7134 (D.C. Cir. Oct. 31, 2016).

arbitration awards under the New York Convention fall into exception § 1605(a)(6) "by its

terms." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999). Here, Crystallex

has met the requirements of § 1605(a)(6), which requires the petitioner to show that "(1) a

foreign state has agreed to arbitrate; (2) there is an award based on that agreement; and (3) the

award is governed by a treaty signed by the United States calling for the recognition and enforcement

of arbitral awards." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) (internal

quotation marks and citations omitted). Crystallex has produced the BIT, the arbitral award

against Venezuela under the BIT, and refers to the New York Convention. *Cf. Chevron*, 795 F.3d

at 205. This Court thus has jurisdiction because the BIT demonstrates Venezuela's agreement to

arbitrate, and the award is based on the BIT and governed by the New York Convention.[12]

Second, the Court addresses the appropriate standard of review. In general, courts apply a

deferential standard when reviewing arbitral awards. "Consistent with the 'emphatic federal

policy in favor of arbitral dispute resolution' . . . the FAA affords the district court little

discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Social*

---

[12] Venezuela does not object to this Court's jurisdiction. To the extent that Venezuela's claims that the Tribunal exceeded its powers would implicate these jurisdictional questions, the Court notes that the standard for jurisdiction under the FSIA places only the burden of production on the plaintiff, and requires the party claiming foreign sovereign immunity to bear the burden of persuading the Court of the absence of a factual basis for jurisdiction by a preponderance of the evidence. *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 204–05 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2410 (2016); *see also Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) ("For purely factual matters [of jurisdiction] under the FSIA, however, this is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence.").

Moreover, the Court concludes in its analysis of the merits here, *infra*, that Venezuela did agree to arbitrate the claims at issue here in the BIT and that the Tribunal reached its award based on the BIT.

*Development Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

This deferential standard is akin to the deferential standard used when reviewing domestic arbitral awards. *See Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) ("Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.' . . . If parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" (first quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995), then quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008))); *see also BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1208 (2014) ("[T]he fact that the document" containing the arbitration agreement "is a treaty" does not affect the level of deference because "[a]s a general matter, a treaty is a contract, though between nations"). The Supreme Court has described the deferential standard as allowing vacatur of an award not if "the panel committed an error—or even a serious error" but "only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010) (internal quotation marks and citations omitted); *see also id.* at 696 ("Courts . . . do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. . . . This Court, therefore, may not disturb the arbitrators' judgment, even if convinced that serious error infected the panel's award." (internal quotation marks and citations omitted)). Similarly, the D.C. Circuit has held that "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of [her] authority, that a court is convinced [she] committed serious error does not suffice to overturn [her] decision." *Kanuth v. Prescott,*

*Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (D.C. Cir. 1991) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

In addition to the deference due the arbitral decision, a district court "may refuse to enforce the award [under the New York Convention] only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (citation omitted); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("Confirmation proceedings are generally summary in nature" because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award." (citing *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)). "The party resisting confirmation . . . bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V applies." *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 120 (D.D.C. 2015) (citations omitted), *appeal docketed*, No. 15-7158 (D.C. Cir. Dec. 30, 2015).

Here, Venezuela alleges that Article V(1)(c) and V(2)(b) of the New York Convention warrant vacatur, as does the Tribunal's manifest disregard of the law. Mindful of the narrow scope of its review, the Court addresses each in turn.

## IV.  ANALYSIS

### A.  Article V(1)(c)—Excess of Powers

Venezuela argues that the Tribunal exceeded the scope of Venezuela's consent to arbitrate by addressing matters the BIT did not consign to arbitration. Article V(1)(c) of the New York Convention provides that a court may refuse to confirm an award if the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." Venezuela

argues that the Tribunal stepped beyond the bounds of the BIT in two ways—first, by considering claims that were actually contract violations rather than treaty violations; and second, by using valuation methods that departed from the BIT's instructions.

Before considering each of these challenges, this Court must determine the amount of deference to grant the Tribunal's determination of its scope. Although, as discussed previously, district courts generally defer to the conclusions of arbitral tribunals, Venezuela argues that questions of "arbitrability"—or the scope of the parties' consent to arbitrate—are an exception to the standard rule and should receive *de novo* review. *See, e.g.*, Mot. Vacate at 27–29, ECF No. 11; Venezuela's Resp. Crystallex's Pet. Confirm Arbitral Award (Opp'n Confirm) at 19–22, ECF No. 15; Venezuela's Reply Mem. P. & A. Supp. Mot. Vacate Arbitral Award (Reply Vacate) at 5–10, ECF No. 25. In support, Venezuela cites a line of Supreme Court precedent that identifies a distinction in the presumptive standard of review for questions of "arbitrability" and more procedural questions. *See generally BG Group PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014) (holding that issues of arbitrability presumptively *receive de novo* review, while procedural jurisdiction questions presumptively receive deferential review). That line of cases however, including *BG Group*, dealt only with the *presumptive* standard when the treaty itself was silent as to whether the tribunal or the court should decide the tribunal's jurisdiction. *Id.* at 1206. *BG Group* left intact the principle that "it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide." *Id.* at 1206. In other words, when the parties explicitly agree that the tribunal should decide the scope of its own inquiry, then courts should review that determination deferentially. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("[A] court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration.").

Determining that the parties submitted questions of arbitrability to the tribunal requires clear and unmistakable evidence. *Id.* at 944. In this case, such unmistakable evidence exists in the form of Venezuela's explicit consent in the BIT to the ICSID Additional Facility Rules.[13] BIT, art. XII(4). The ICSID Additional Facility rules provide that "[t]he Tribunal shall have the power to rule on its competence." ICSID Arbitration (Additional Facility) Rules, art. 45 (2006), http://icsidfiles.worldbank.org/icsid/icsid/staticfiles/facility/partd-chap08.htm. Thus, by consenting in the BIT to proceed under the ICSID Additional Facility rules, Venezuela clearly and unmistakably assigned the question of arbitrability to the Tribunal, and this Court will

---

[13] Attentive readers may recall that the BIT established three possible frameworks for arbitration—including the ICSID Additional Facility rules applied in this matter—and specified which framework should apply based on various factors. BIT, art. XII(4). In this case, however, this does not affect this Court's conclusion that it should defer to the Tribunal's determination of its scope because all three frameworks delegate issues of arbitrability to the Tribunal. *See* ICSID Convention art. 41, http://icsidfiles.worldbank.org/icsid/icsid/staticfiles/basicdoc/parta-chap04.htm ("The Tribunal shall be the judge of its own competence."); UNCITRAL Arbitration Rules art. 23 (2013), http://www.uncitral.org/pdf/english/texts/arbitration/arb-rules-2013/UNCITRAL-Arbitration-Rules-2013-e.pdf ("The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement.").

In fact, Venezuela's consent to use any of three arbitration methods, each of which explicitly assigns questions of scope to the arbitrator, strengthens the case for deference here. *See Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 67 (D.D.C. 2013) ("In this Circuit, clear and binding precedent dictates that in the context of a bilateral investment treaty, 'incorporation of the UNCITRAL Rules provides clear[] and unmistakabl[e] evidence[] that the parties intended for the arbitrator to decide questions of arbitrability.' (quoting *Republic of Argentina v. BG Group PLC*, 665 F.3d 1363, 1371 (D.C. Cir. 2012)), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015); *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir. 2011) ("By signing the BIT, Ecuador agreed to resolve investment disputes through arbitration under the UNCITRAL rules. . . . Therefore, Ecuador consented to sending challenges to the 'validity' of the arbitration agreement to the arbitral panel."); *Wal-Mart Stores, Inc. v. PT Multipolar Corp.*, 202 F.3d 280 (9th Cir. 1999) (holding that incorporation of the UNCITRAL rules demonstrated that "the parties agreed to abide by a system in which the tribunal rules on objections to its jurisdiction and the arbitrator, rather than the district court, should decide whether the parties' disputes are arbitrable").

deferentially review the Tribunal's determination as to its own jurisdiction.[14] This conclusion is

in harmony with prior interpretations of this precise Canada–Venezuela BIT. *See Gold Reserve*

*Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 121 (D.D.C. 2015) (deferring to

---

[14] Objecting to this interpretation, Venezuela cites a variety of cases from federal and state jurisdictions. Reply Vacate at 6, ECF No. 25. However, upon close inspection a common theme arises. None of the cases Venezuela identifies deals with either set of ICSID rules or the UNCITRAL rules—most deal with the American Arbitration Association (AAA) rules. Furthermore, most actually support the general rule that reference to rules which assign arbitrability to the tribunal—such as the AAA rules—clearly and unmistakably demonstrates the parties' agreement. However, the cases Venezuela identifies each stand for a much more limited proposition about various special circumstances in which the general rule would not apply. No such circumstances are present here.

For example, in *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC* the Third Circuit held that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" but applied an exception for issues of class arbitration. 809 F.3d 746, 763 (3d Cir.), *cert. denied*, 137 S. Ct. 40 (2016). The remainder of Venezuela's examples are no more helpful.

In *Katz v. Feinberg*, the Second Circuit avoided the default rule because the agreement at issue contained a specific provision which assigned the relevant questions to a separate authority. 290 F. 3d 95 (2d Cir. 2002). In *Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, the court concluded that "[i]f parties to an arbitration agreement have explicitly incorporated a rule that empowers the arbiter to determine arbitrability, numerous courts agree . . . that such incorporation constitutes clear and unmistakable evidence of the parties' intent to delegate that issue to the arbiter" but did not apply that general rule in the instant case because the parties had signed their agreement prior to the year when the AAA incorporated such a default rule. 251 P.3d 1091 (Colo. App. 2010). *James & Jackson, LLC v. Willie Gary, LLC* also concluded that "reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator," but decided the issue on an explicit carve-out found in the particular agreement at issue. 906 A.2d 76, 80 (Del. 2006). Finally, the court in *Allstate Ins. Co. v. Toll Bros., Inc.* found that "[v]irtually every circuit to have considered the issue has determined that incorporation of the AAA rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" but found an exception to that default rule because the specific agreement incorporated two different sets of rules (and the other did not assign questions of arbitrability to the tribunal) and, additionally, one of the parties was unsophisticated. 171 F. Supp. 3d 417, 427 (E.D. Pa. 2016) (quoting *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016)).

Venezuela also cites a comment to a tentative draft of the Restatement (Third) of the U.S. Law of International Commercial Arbitration. Reply Vacate at 6–7 & n.3. This comment, of course, is not binding authority on this Court, and, as discussed above, does not accurately reflect the practice of the majority of jurisdictions to consider this issue.

the tribunal's determination of its jurisdiction because the BIT incorporated the ICSID Additional Facility Rules), *appeal docketed*, No. 15-7158 (D.C. Cir. Dec. 30, 2015).

To dispute this conclusion, Venezuela argues that Canada's intervention in a different case (*United Mexican States v. Cargill, Inc.*), before a different court (a Canadian tribunal), based on a different bilateral investment treaty (NAFTA), demonstrates the "shared expectation[] of the contracting parties" that the tribunal's determination of arbitrability be reviewed *de novo*. Reply Vacate at 7–10, ECF No. 25. In *Cargill*, the attorney general of Canada intervened to argue that the tribunal's determination that it had jurisdiction over "up-stream" damages[15] should be reviewed under a "correctness" standard, which Venezuela argues is akin to *de novo* review. Reply Vacate at 8 (citing *United Mexican States v. Cargill, Inc.*, 2011 ONCA 622 (Can. Ont. C.A. 2011), http://www.ontariocourts.ca/decisions/2011/2011ONCA0622.htm). However, the description of Canada's position in the opinion is very sparse, stating only: "[t]he appellant submits . . . that the appropriate standard of review is the correctness standard. Canada, an intervener on the appeal, supported this position." *Cargill*, 2011 ONCA 622 ¶ 27. Missing from the opinion—or Venezuela's briefing—is any explanation of Canada's reasons for supporting the correctness standard. Were they based in Canadian law? The text of NAFTA, which was the treaty at issue in *Cargill*? Nor does Venezuela offer any explanation as to how this Court should balance the contemporaneous evidence of Canada's intentions, as demonstrated by the text of the BIT, against its litigation position years later. Without more, Venezuela has not adequately established the intent of Canada as a party to the BIT with Venezuela.

---

[15] In *Cargill*, both parties apparently agreed that the tribunal had jurisdiction over "down-stream" losses, or direct losses suffered by the investor due to the breaching-nation's actions. The investor in *Cargill* was a wholly owned subsidiary of another company, and the dispute was over whether the tribunal also had jurisdiction over the so-called "up-stream" damages that the parent company incurred in lost sales to its subsidiary. *See generally Cargill*, 2011 ONCA 622.

Because the question of the jurisdiction of the Tribunal was assigned to the Tribunal to decide, this Court will deferentially review the Tribunal's conclusions. In such a deferential review, a court "should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *cf. Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir. 2012) (holding that when the parties "clearly and unmistakably agreed to arbitrate issues of arbitrability" the objecting party "is not entitled to an independent judicial redetermination of that same question"). With this deferential lens in place, the Court turns to each of Venezuela's alleged examples of the Tribunal exceeding its scope.

### 1.   The Tribunal's Identification of Treaty Claims

Venezuela argues that the Tribunal exceeded its jurisdiction by considering claims based on the rescission of the Mining Operation Contract (MOC) that were contractual in nature. Mot. Vacate at 9–13, ECF No. 11. Both Crystallex and Venezuela agreed throughout the arbitration process—and here—that the Tribunal had jurisdiction over "alleged breaches of the BIT."[16] Award ¶ 471. They disagree, however, over whether Crystallex's claims fit into that category.

According to Venezuela, Crystallex's discussion of the MOC in its briefing before the Tribunal and (unsuccessful) request that the MOC be reinstated demonstrated that Crystallex was actually bringing contract claims. Mot. Vacate at 10–11; Reply Vacate at 17. The Tribunal rejected this position.[17] The Tribunal noted that "many investment disputes brought under a[n] . . .

---

[16] In contrast, Venezuela argues, and Crystallex does not dispute, that pure breach of contract claims are not arbitrable. *See, e.g.*, Mot. Vacate at 29–30; *see also* Award ¶ 471.

[17] Venezuela argues that the Tribunal could not rely on Crystallex's representations as to the nature of its claim, but should instead have performed an objective analysis. *See, e.g.*, Reply Vacate at 11–12. The Court notes, however, that the Award demonstrates that the Tribunal did

. investment treaty may involve a set of facts for which there may be a contractual relationship in place between the Parties" but "[a] state may breach a treaty without breaching a contract, and *vice versa*." Award ¶¶ 473–74 (citing a prior arbitration award). In this case, while the facts may *also* have constituted contract violations (i.e., breaches of the MOC), the Tribunal concluded that Venezuela's actions constituted violations of the BIT and addressed only the treaty violations.[18] The Tribunal found that Crystallex referred to the MOC only to show how Venezuela had violated the BIT by depriving Crystallex of fair and equitable treatment and expropriating Crystallex's investment, and not as a separate contract claims. *See* Award ¶ 476. The Tribunal was "unable to find any indication in the record which would suggest that [Crystallex] has

_____

not merely accept Crystallex's representations but instead inquired objectively into the facts and circumstances in the record. *See* Award ¶¶ 471–83.

[18] Venezuela never directly addresses the Tribunal's conclusion that some claims may represent both treaty violations and contract violations, and that the Tribunal retains jurisdiction over such mixed claims to the extent that they represent violations of the BIT. Although Venezuela appears to hint that the contractual nature of such a mixed claim could remove it from the Tribunal's jurisdiction, the Court considers this argument to be untenable.

Venezuela presents no authority for the proposition that the simultaneous existence of contract claims serves to remove arbitral jurisdiction from related treaty violations, nor is such a limitation found in the BIT. The lone arbitration Venezuela cites in support of its assertion that contract claims fall outside of the arbitrator's jurisdiction, *see* Mot. Vacate at 12–13, actually holds to the contrary. *See Oxus Gold v. Republic of Uzbekistan*, Final Award ¶ 398 (UNCITRAL Dec. 17, 2015), http://www.italaw.com/sites/default/files/case-documents/italaw7238_2.pdf ("Mere contractual breaches in principle fall outside the jurisdiction of the Arbitral Tribunal, *unless they constitute at the same time a breach of Respondent's obligations under the BIT . . .*" (emphasis added)).

Venezuela does argue that behavior violating a treaty must go "beyond that which an ordinary contracting party could adopt" to be an exercise of sovereign power. *See, e.g.*, Opp'n Confirm at 26 (internal citation omitted). The Tribunal considered this standard and found that the rescission of the MOC did involve sovereign authority because the decision was made at high policy levels, not based on Crystallex's compliance with the terms of the MOC, and justified with the principal of "autotutela," an exercise of sovereign authority. Award ¶¶ 692–706. Moreover, the actions concerning denial of the permit—including a series of governmental announcements from several agencies and then-President Chávez that Venezuela would take back Las Cristinas, Award ¶¶ 675–82, 708—intertwined to constitute additional sovereign acts distinct from any breach of the MOC.

disguised contract claims as treaty claims. To the contrary, . . . [Crystallex] has established that its claims in relation to the MOC are fundamentally based on the Treaty."[19] Award ¶ 476. Buttressing this conclusion, the Tribunal nowhere found that the MOC was breached, analyzed the terms of the MOC, or referred to the terms of the MOC to determine the appropriate remedy.[20] Furthermore, the Tribunal identified acts completely separate from the MOC that breached the BIT, such as Venezuela's refusal to grant the permit. Mot. Vacate at 32 n.21; *see also* Award ¶ 708.

Venezuela next argues that the MOC was terminated by the CVG, an "autonomous institution which is legally separate from the Venezuelan State," rather than by the state exercising its sovereign authority.[21] Reply Vacate at 16. The Tribunal, however, disagreed and

---

[19] The Tribunal also rejected Venezuela's argument, hinted at here, that a forum selection clause in the MOC for disputes "aris[ing] from the execution of" the MOC deprived the Tribunal of jurisdiction because "an exclusive jurisdiction clause in relation to disputes concerning possible contractual breaches, such as Clause 19 of the MOC, may not divest an international tribunal of its jurisdiction under an international treaty in relation to possible treaty breaches." Award ¶¶ 478–80.

Similarly, because no contract claims were involved, it is immaterial whether the BIT included an umbrella clause which would grant the Tribunal jurisdiction over contract claims, or what forum or choice-of-law the MOC dictated for contract violations. *Cf.* Opp'n Confirm at 23–24; Mot. Vacate at 10.

[20] Venezuela argues that Crystallex characterized the dispute as one concerning contract claims when it initially requested that the Tribunal reinstate the MOC, a remedy which Venezuela argues is exclusively contractual. *See, e.g.*, Reply Vacate at 17–18. However, given that no such remedy was ever awarded, this Court does not find that even a mistaken request by Crystallex for a contract remedy would conclusively demonstrate that Crystallex was not also asserting treaty claims, especially when Venezuela elsewhere argues that only an objective determination about the nature of the claims will suffice because Crystallex's characterizations of the dispute are not binding. *See supra* note 17.

[21] The Court notes that, because Venezuela—not the CVG—was a party to the arbitration and was bound by the award, this argument by Venezuela appears closer to a challenge to the substance of the Tribunal's conclusion (in essence, arguing that the Tribunal held Venezuela responsible for conduct it did not commit) rather than a challenge to the Tribunal's jurisdiction. To the extent, however, that Venezuela asserts that the Tribunal exceeded its powers, the Court considers the argument.

concluded that CVG was a branch of the Venezuelan state and that Venezuela was accountable for CVG's rescission:

> Having reviewed the circumstances of the case, and in particular all of the acts which throughout the years implicated several governmental organs—the Ministry of Environment, the Ministry of Mines, the Venezuelan Presidency—as well as the CVG, the Tribunal has come to the conclusion that the true nature of [the rescission], however expressed, was one of exercise of sovereign authority.

Award ¶ 700. The Tribunal reached this decision because the rescission was intended "to give effect to the superior policy decisions dictated by the higher governmental spheres." Award ¶ 701. Furthermore, the CVG justified the rescission through its "power of self-adjudication and self-enforcement (*autotutela*), a power that only entities acting as an authority (and not a contractual party) may exercise" and "specifically invoked reasons of 'opportunity and convenience' to terminate the MOC, which constitutes an example of an exorbitant public law prerogative deriving from sovereign authority or *ius imperium* under Venezuelan law." Award ¶ 706 (footnotes omitted).

This Court declines to disturb any of the Tribunal's conclusions in light of the deferential standard of review.[22] Clearly, the Tribunal at least purported to interpret the BIT, and the Court does not identify error, much less a more than serious error, in the Tribunal's conclusion that Venezuela's arbitrary and expropriatory rescission of the MOC could constitute a violation of the BIT. Venezuela has not met its "heavy burden of establishing that one of the grounds for denying confirmation in Article V applies." *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146

---

[22] Even if the Court reviewed the Tribunal's determination of its jurisdiction *de novo*, it would conclude that the Tribunal acted within the scope of its authority under the BIT. It is clear that the facts alleged by Crystallex make out a case for a violation of the BIT, regardless of whether they also suggest a contractual violation of the MOC. The BIT prohibited Venezuela from denying Crystallex fair and equitable treatment, and from expropriating its investments. By delaying the issuance of a needed permit on unclear grounds and eventually rescinding the contract which allowed Crystallex to operate, Venezuela did both.

F. Supp. 3d 112, 120 (D.D.C. 2015) (citations omitted), *appeal docketed*, No. 15-7158 (D.C. Cir.

Dec. 30, 2015).

### 2.   The Tribunal's Methodology for Calculating the Award

Venezuela also argues that the Tribunal exceeded its scope by using improper methods to

calculate the amount of the award. For the same reasons previously discussed, the Court

concludes that deferential review of the amount of the Tribunal's award is appropriate.[23] Indeed,

other courts in this jurisdiction have applied a particularly high amount of deference in reviewing

arbitral awards. *See, e.g.*, *Contech Const. Prods., Inc. v. Heierli*, 764 F. Supp. 2d 96, 110 (D.D.C.

2011) (holding that when examining an arbitration award "it is particularly necessary to accord

the 'narrowest of readings' to the excess-of-authority provision"); *Kanuth v. Prescott, Ball &*

*Turben, Inc.*, 949 F.2d 1175, 1182 (D.C. Cir. 1991) (upholding the amount of an arbitral award

because "there is nothing on the face of the panel's lump-sum award which suggests that the

panel failed to construe the contract. To hold otherwise would require us to inquire into precisely

how and why the panel derived the lump-sum award, an inquiry clearly outside of our limited

scope of review").

Venezuela claims to identify two flaws in the Tribunal's methodology for calculating

damages. First, Venezuela argues that the Tribunal incorrectly considered dates prior to the date

of the expropriation in applying the stock market method. Mot. Vacate at 18–22. Second,

---

[23] Venezuela does not explicitly address the appropriate standard of review for evaluating whether the Tribunal's award exceeded the scope of the BIT. Crystallex argues, and this Court agrees, that a deferential standard is appropriate. *See* Opp'n Vacate at 34.

To the extent that it thus denies Venezuela a more searching review, the Court notes that the authorities Venezuela itself identifies as examples of overturned awards used a deferential standard. *See, e.g.*, *Alken-Zeigler, Inc. v. UAW, Local Union 985*, 134 F. App'x 866, 867 (6th Cir. 2005) (holding that "our review is extremely deferential" (cited by Venezuela at Mot. Vacate at 35; Reply Vacate at 22)). This standard, of course, is "not toothless," *id.* at 868, and will on occasion warrant vacating an award.

Venezuela argues that the Tribunal used unreliable assumptions in applying the market multiples method. Mot. Vacate at 22–25. For the reasons set forth below, applying the deferential standard of review, the Court rejects both arguments.

*a. Stock Market Method*

Venezuela argues that the Tribunal erred in its application of the stock market method. Mot. Vacate at 18–22, ECF No. 11. The Tribunal selected a valuation date, and then used the stock market method to adjust the value of Crystallex's investments on that date to compensate for wrongful, value-decreasing acts by Venezuela prior to the valuation date. Venezuela objected to this approach for two reasons—first, on the grounds that there were no wrongful acts prior to the valuation date, Reply Vacate at 19, ECF No. 25; and second, on the grounds that the BIT limited the Tribunal to considering the value of Crystallex's investment immediately prior to the expropriation. Mot. Vacate at 13–14 (citing BIT, art. VII(1)). Both arguments fail.

Both parties agreed that the valuation date to determine the amount of the award should be set on the date of expropriation, Award ¶ 844, which the Tribunal identified as April 13, 2008,[24] Award ¶ 855. However, the Tribunal determined that Venezuela had committed wrongful acts that depressed the value of Crystallex's investment *prior* to the valuation date, and

---

[24] Crystallex argued that the expropriation occurred when the MOC was terminated on February 3, 2011, while Venezuela maintained that the expropriation had occurred when the permit was denied on April 13, 2008. Award ¶ 854. The Tribunal adopted Venezuela's proposed date of April 13, 2008 because "the Tribunal has found [that denial] to be both a self-standing breach of [fair and equitable treatment] and the first important act giving rise to the creeping expropriation." Award ¶ 855.

Crystallex likely preferred a later valuation date because the price of gold continued to rise through February of 2011. Award ¶ 753. The Tribunal rejected Crystallex's suggestion for various reasons, including that Crystallex indicated on November 24, 2008 that it believed the BIT had been breached by submitting its Notice of Dispute. Award ¶ 857. Neither party here argues for using a date after the date of the expropriation—such as the date of the award—as the valuation date. Award ¶ 844.

therefore used the stock market method to calculate the hypothetical value of Crystallex's investment on the valuation date, "but for" Venezuela's wrongful conduct.[25] Award ¶ 807.

The stock market method looks at two different dates: first, a date before any wrongful acts—the last clean date—and second, the desired valuation date. The method compares the change in Crystallex's stock price during that interval to the change in the stock prices of comparator companies that were not affected by Venezuela's actions. *See* Award ¶ 804. The method can thus estimate what effect Venezuela's conduct had on Crystallex's stock price. The overall purpose of the method is still to calculate a value for Crystallex's investment on the valuation date, but the hypothetical value that the investment would have had *but for* Venezuela's inequitable actions. *See* Award ¶ 891. The Tribunal found that the stock market method was appropriate because "Crystallex was a one-asset company and the rights which Crystallex enjoyed under the MOC in relation to Las Cristinas were that single asset." Award ¶ 890. The Tribunal applied the method by comparing Crystallex's share price to other junior mining companies. Award ¶ 892.

The Tribunal selected June 14, 2007—the day Crystallex announced to the market that it had fulfilled the requirements for the permit and paid the required taxes and bond—as the "last

---

[25] Moving the valuation date earlier to precede the first wrongful act by Venezuela would have the undesirable effect of altering Crystallex's compensation in ways unrelated to Venezuela's actions. For example, if the global economy faltered between Venezuela's first wrongful act and the date of the expropriation—thereby reducing Crystallex's valuation—Crystallex should only be compensated based on the (newly lower) value of its investment on the valuation date, plus the portion of the decrease in value attributable to Venezuela's wrongdoing. Similarly, if the global economy flourished and Crystallex's valuation increased until the valuation date, then Crystallex should be compensated at the value of its investment on the valuation date, as well as any additional increase in value it would have seen *but for* Venezuela's inequitable conduct. Moving the valuation date would sweep in more than just Venezuela's prior conduct. The Tribunal therefore turned to the stock market approach to determine the effect of Venezuela's wrongful conduct on Crystallex's stock price prior to the valuation date.

clean date." Award ¶ 891. The Tribunal found that this was the last date prior to Venezuela's wrongful acts affecting the stock price because "after 14 June 2007 the actual stock price of Crystallex became [negatively] affected by the absence of positive news on permitting." Award ¶ 891. Venezuela did not propose an alternative last clean date. Award ¶ 891.

Venezuela advances two objections to the Tribunal's application of the stock market method. First, Venezuela argues that the Tribunal did not need to consider any dates prior to the date of expropriation because Venezuela did not commit any wrongful acts before the date of expropriation. Second, Venezuela argues that the text of the BIT prohibits the Tribunal from considering any dates prior to the date of expropriation.

Venezuela appears to seek substantive review of the Tribunal's conclusion that Venezuela committed wrongful acts prior to refusing the permit, asserting that "[t]here was no basis to find any other value-depressing conduct prior to [the valuation date] under the terms of the Treaty." Reply Vacate at 19, ECF No. 25. The existence and timing of Venezuela's violations of the BIT is a question already decided by the Tribunal, which this Court reviews deferentially. The Tribunal identified a series of violations of the requirement of fair and equitable treatment, *see generally* Award ¶¶ 546–614, among them that Venezuela violated Crystallex's reasonable expectations based on Venezuela's letter that it was prepared to "hand over" the permit, Award ¶ 564. The Tribunal found that the refusal to hand over the permit negatively affected Crystallex's stock price through the "absence of positive news on permitting" after Crystallex had announced that the permit would imminently be granted. Award ¶ 891. In challenging the Tribunal's factual finding, Venezuela seeks essentially a "full-bore legal and evidentiary appeal[]," which the Supreme Court has held inappropriate in reviewing arbitral

awards. *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (quoting *Hall St.*

*Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008)).

In addition to its objections to the Tribunal's factual findings, Venezuela argues that the

text of the BIT barred consideration of dates prior to the date of expropriation. Venezuela's

interpretation is incorrect and relies upon removing a short phrase in the BIT from its context.

Read in its entirety, it is clear that the language of the BIT upon which Venezuela's argument

relies discusses only the amount of compensation which must be provided in the context of

expropriation:

> Investments or returns of investors of either [nation] shall not be
> nationalized, expropriated or subjected to measures having an effect equivalent to
> nationalization or expropriation (hereinafter referred to as "expropriation") in the
> territory of the other [nation], except for a public purpose, under due process of
> law, in a non-discriminatory manner and *against prompt, adequate and effective*
> *compensation. Such compensation* shall be based on the genuine value of the
> investment or returns expropriated immediately before the expropriation or at the
> time the proposed expropriation became public knowledge, whichever is the
> earlier, shall be payable from the date of expropriation with interest at a normal
> commercial rate, shall be paid without delay and shall be effectively realizable
> and freely transferable.

BIT, art. VII(1) (emphasis added). Even if Venezuela's restrictive interpretation of the phrase is

correct, that restriction applies only to compensation offered in exchange for an expropriation, to

prevent the expropriation from violating the BIT. Indeed, the rest of the BIT is silent as to the

method to be used to calculate an appropriate award, stating simply that the Tribunal should

"decide the issues in dispute in accordance with this Agreement and the applicable rules of

international law." BIT, art. XII(7).

The Tribunal considered these same arguments advanced by Venezuela and determined

that it was not restricted by this text of the BIT to only consider the value of Crystallex on the

valuation date. The Tribunal appropriately concluded that the "standard" described by Venezuela

"is only concerned with expropriation, and not breaches of other BIT standards." Award ¶ 846.

Instead, the Tribunal turned to international law and determined that because it "found breaches of [fair and equitable treatment] (in addition to an expropriation), . . . the 'full reparation' principle under customary international law" must be applied.[26] Award ¶ 846. The Tribunal summarized the full reparation principle as a reparation that "wipe[s] out all the consequences of the illegal act and re-establish[es] the situation which would, in all probability, have existed if that act had not been committed." Award ¶ 847 (quoting *Case Concerning Certain German Interests in Polish Upper Silesia (Chorzów Factory)* (Germany v. Poland), Judgment (Permanent Court of International Justice), 25 May 1926, PCIJ SERIES A, NO. 7 (1927)).

In conducting its deferential review, this Court will not disturb the Tribunal's selection of the "full reparation" standard[27] —which was clearly based on both the text of the BIT and international law—or its choice to apply that standard through the stock market method and its selection of the appropriate date range. Any error which the Tribunal may have committed—and the Court identifies none—does not rise past the level of a "serious error" to justify vacating the award. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010). Here, the Tribunal was certainly "arguably construing or applying the [treaty] and acting within the scope of [its] authority" and thus even if a court were "convinced [that the Tribunal] committed serious

---

[26] Because, as the Tribunal notes, the treaty violations here were not limited to expropriation, the Court need not determine if the allegedly restrictive standard of the BIT in Article VII(1) is also the only appropriate measure of compensation for previously-uncompensated expropriations.

[27] Venezuela appear to agree that full reparation is the applicable standard from customary international law, *see* Opp'n Confirm at 29 n.12 (citing the *Chorzów* standard); Mot. Vacate at 14–16, and thus that the award should seek to return Crystallex to the position it would have occupied absent any wrongful acts. This position is consistent with Venezuela's argument that it committed no wrongful acts prior to the expropriation date, but in tension with Venezuela's position that the text of the BIT absolutely bars consideration of acts prior to the expropriation date.

error," that "does not suffice to overturn [its] decision."[28] *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (internal citation omitted).

### b. Market Multiples Method

Venezuela further argues that the Tribunal used improper assumptions to implement the market multiples method of calculating damages. Mot. Vacate at 22–25, ECF No. 11. According to Venezuela, the Tribunal rejected certain assumptions developed by Crystallex's experts when it rejected the "indirect sales comparison" method, but then relied on the same assumptions in executing the market multiples method, thus breaching the "well-settled rule of international law" that "no compensation can be awarded based on a speculative request for damages." Mot. Vacate at 22–24. Under the highly deferential review proper here, the Court does not disturb the Tribunal's use of the market multiples method.

The market multiples method "estimates the value of an asset or company by examining the market valuation of companies holding similar properties of similar characteristics." Award ¶ 901. The Tribunal relied upon calculations by experts that compared the valuation of Crystallex to that of similar mining companies. *See* Award ¶ 902. To increase the accuracy of these comparisons, experts considered the relationship between the gold reserves of the comparator companies and Crystallex's projected gold reserves. Award ¶ 902. Because Crystallex never operated a mine at Las Cristinas, the experts used projections—possibly the same projections

---

[28] Having disagreed with Venezuela's argument that the text of the BIT bound the Tribunal to determine compensation based only on the date of the expropriation, the past cases Venezuela cites in favor of vacating the award are inapposite. *See, e.g.*, Mot. Vacate at 37. In these cases, the tribunals violated the instructions in the applicable treaties about damage awards. Here, in contrast, both sides apparently agree that full reparation is the appropriate standard under the text of the treaty and disagree about only whether the Tribunal correctly identified events for which Crystallex deserved reparation. This question is one within the Court's deference to the Tribunal's determination.

rejected in the indirect sales comparison method. Crystallex and Venezuela disagree over which precise projections were rejected by the Tribunal, but neither provides a clear citation to the record to resolve the dispute. *See* Mot. Vacate at 23–24; Pet.'s Mem. P. & A. Opp'n Mot. Vacate Arbitral Award (Opp'n Vacate) at 38, ECF No. 17; Reply Vacate at 20–21. The Court need not resolve this issue because, either way, the Tribunal committed no more than a "serious error," and even a serious error is insufficient to permit this Court to disturb the Tribunal's conclusion.[29] *See Stolt-Nielsen*, 559 U.S. at 671–72. Furthermore, to do so would require the Court to delve into "precisely how and why the panel derived the [] award," *Kanuth*, 949 F.2d at 1181–82, which would defeat the purpose of arbitration in the first place. Accordingly, the Tribunal's use of the market multiples method does not warrant vacating the award.

## B.  Article V(2)(b)—Public Policy

Article V(2)(b) of the New York Convention permits a court to deny confirmation of an award if the award "would be contrary to the public policy" of the country in which confirmation is sought. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638 (1985). Relying upon this provision, Venezuela argues that confirming the award would harm the "public policy of the United States that States have the sovereign right to regulate the environmental impact of industrial activities" because Venezuela's conduct toward Crystallex was intended to protect Venezuela's environment. Opp'n Confirm at 3. This argument also fails.

---

[29] Given that the parties agree that full reparation is the correct standard, their disagreement here is essentially only over the method that the Tribunal used to calculate the compensation. This is quite different than the cases Venezuela cites in which awards were vacated because tribunals awarded damages that contradicted the explicit text of the applicable treaties. *See, e.g.*, Mot. Vacate at 37.

While Venezuela at times alludes to an argument that the Tribunal awarded damages for events prior to the period of dispute between the parties, *see, e.g.*, Mot. Vacate at 37–38, these arguments are not fleshed out and Crystallex's Notice of Dispute is phrased broadly to include all treaty violations, *see generally* Request for Arbitration, ECF No. 2-5.

The "public policy" escape-hatch of Article V(2)(b) is "construed narrowly" and "merits vacating an award only when the award 'would violate the forum state's most basic notions of morality and justice.'" *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 132 (D.D.C. 2015) (citing *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096 (9th Cir. 2011) and quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007)), *appeal docketed*, No. 15-7158 (D.C. Cir. Dec. 30, 2015). Venezuela's arguments fall short of the demanding threshold necessary to show a violation of public policy.

First, in determining that Venezuela's conduct regarding Crystallex violated the BIT's guarantee of fair and equitable treatment, the Tribunal cast serious doubt on whether Venezuela's assertions of environmental concerns motivated its actions. The Tribunal found that Venezuela's denial of the permit was "not based on legal standards" and constituted "arbitrary conduct" based on documents "so fundamentally deficient that, to the eyes of a reasonable third person, they surprise a sense of juridical propriety."[30] Award ¶¶ 597, 614 (internal quotation marks omitted).

Second, enforcing this award does not risk violating public policy. The award does not interfere with Venezuela's environmental rules or regulations, but only requires Venezuela to compensate Crystallex for the results of its inequitable actions and expropriation. Venezuela fails to meet the demanding threshold by demonstrating that holding it to the terms of its own treaty would violate our basic notions of morality or justice. The Court thus concludes that public policy does not bar confirmation of the award.

---

[30] Venezuela devotes significant space in its briefing to describing what it views as the flaws in Crystallex's compliance with environmental regulations. *See, e.g.*, Opp'n Confirm at 9–16, ECF No. 15. The Tribunal considered Crystallex's quest for a permit at length and concluded that Venezuela had violated the guarantee of fair and equitable treatment in denying the permit. Award ¶¶ 580–614, 623.

### C.  Manifest Disregard of the Law

Independent of its challenges under the New York Convention, Venezuela argues that the award should be vacated because the Tribunal manifestly disregarded the law. In this context, manifest disregard of the law occurs when "(1) the arbitrators knew of a legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001). Assuming, *arguendo*, that the doctrine is still good law,[31] it does not apply here.

Manifest disregard for the law typically occurs when the Tribunal "acknowledged and then summarily disregarded an applicable rule." *ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961

---

[31] In the domestic arbitration context, the Supreme Court has held that the FAA's enumerated reasons are the exclusive grounds for a court to decline to enforce an arbitral award. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) ("We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."). That decision left open the possibility that manifest disregard of the law survived as a gloss on the enumerated reasons for vacatur or modification. *See id.* at 585 ("Maybe the term 'manifest disregard' was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them."); *see also Regnery Pub., Inc. v. Miniter*, 368 F. App'x 148, 149 (D.C. Cir. 2010) ("Assuming without deciding that the 'manifest disregard of the law' standard survives *Hall Street* . . .").

Because the arbitral decision at issue in *Hall Street* was governed by the domestic arbitration provisions of the FAA rather than the New York Convention, additional uncertainty surrounds the application of manifest disregard to the enforcement of foreign arbitral awards. *See, e.g.*, *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 26–27 (D.D.C. 2011) (noting that the "'manifest disregard of the law' standard . . . is one that historically has been applied to actions to vacate an arbitral award under Section 10(a) of the FAA, and not proceedings to confirm arbitral awards under the New York Convention").

However, "because the petitioners in this case have not established the arbitrators' 'manifest disregard' of the law, the court need not decide once and for all the viability of the 'manifest disregard' standard in order to resolve this case." *Affinity Fin. Corp. v. AARP Fin., Inc.*, 794 F. Supp. 2d 117, 120 n.1 (D.D.C. 2011), *aff'd*, 468 F. App'x 4 (D.C. Cir. 2012). The Court therefore does not take a position on the current validity of manifest disregard of the law as justification to vacate or modify an award under the New York Convention.

F. Supp. 2d 245, 268 (D.D.C. 2013). This is a high standard that requires "more than error or misunderstanding with respect to the law." *Kanuth*, 949 F.2d at 1178.

In an attempt to demonstrate the Tribunal's manifest disregard, Venezuela repurposes its previous arguments, claiming that the Tribunal (1) exceeded its scope by improperly addressing contract claims and (2) exceeded its scope by using defective valuation methods to set the award. Mot. Vacate at 28, ECF No. 11. Neither claim can succeed.

First, this Court's rejection, *supra*, of Venezuela's position on both fronts illustrates that the principles of law cited by Venezuela are not "well defined, explicit, and clearly applicable to this case." Although the Court did not apply a searching review to the Tribunal's conclusions, the standard for manifest disregard of the law—like the standard for vacating an arbitral award—requires egregious conduct and cannot be satisfied by a merely shaky conclusion of the Tribunal.

Second, the Tribunal clearly engaged with and considered the law cited by Venezuela in reaching its conclusions. As to the dispute over permissible claims, the Tribunal repeatedly emphasized that its role was cabined to reviewing treaty claims. Award ¶ 471 ("It is clear . . . that the sphere of disputes that can be referred to international arbitration under the BIT is limited to disputes relating to alleged breaches of the BIT."); Award ¶ 475 ("To determine whether, as a matter of jurisdiction, the Claimant is bringing contract or treaty claims, the Tribunal must consider . . .the fundamental basis of the [Claimant's] claim." (internal quotation marks and citations omitted)); Award ¶ 610 ("The Tribunal recalls that it is not called upon to pass judgment on whether there were any contract breaches in relation to the MOC."). Nor did the Tribunal simply state this standard and then ignore it. The Tribunal carefully avoided actually adjudicating the parties' rights under the MOC. Similarly, as to the dispute over the amount of the award, the Tribunal carefully considered the appropriate valuation date, *see* Award ¶ 890–91,

and whether the estimates of Crystallex's losses were speculative, *see* Award ¶ 918 ("The result reached is, in the Tribunal's view, not speculative . . ."). In neither case did the Tribunal merely pay "lip service" to the applicable law. The Court is therefore confident that the Tribunal did not manifestly disregard the law.

### D.  Confirming the Award

Crystallex asserts, and Venezuela does not dispute, that the Court must confirm the award if it does not vacate, modify, or correct it. *See* 9 U.S.C. § 9 ("[T]he court must grant [an order affirming the award] unless the award is vacated, modified, or corrected . . ."); 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."). Thus, having rejected Venezuela's arguments for vacating the award, the Court will confirm the award.

## V.  CONCLUSION

For the foregoing reasons, Petitioner's petition to confirm the award (ECF No. 1) is **GRANTED**, Respondent's motion to vacate the arbitral award (ECF No. 11) is **DENIED**, and Petitioner's motion for pre-judgment bond (ECF No. 14) is **DENIED AS MOOT.** An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 25, 2017                                  RUDOLPH CONTRERAS
                                                       United States District Judge